# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re:<br>CFRA HOLDINGS, LLC | Case No. 8:20-bk-03608-CPM<br>Chapter 11 |
| | *Jointly Administered with:* |
| CFRA, LLC<br>CFRA TRI-CITIES, LLC | Case No. 8:20-bk-03609-CPM<br>Case No. 8:20-bk-03610-CPM |
| Debtors.<br>_____ / | |

## EMERGENCY MOTION FOR ENTRY OF INTERIM ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND (B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL

## [Expedited Consideration Requested]

The above-captioned debtors and debtors-in-possession (the "**Debtors**") file this motion (this "**Motion**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), for entry of interim orders, substantially in the forms attached hereto as Exhibit A (the "**Interim DIP Order**") and Exhibit B (the "**Interim Cash Collateral Order**" and, collectively, the "**Interim Orders**"), pursuant to sections 105, 361, 363, 364, and 507(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2081-1(g)(1) and (2) of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "**Local Rules**"), (A) authorizing the Debtors to obtain post-petition financing (the "**DIP Financing**") from Raymond James Bank, N.A. ("**RJB**") and Valley National Bank ("**VNB**" and, collectively, with RJB, the "**Lenders**") and (B) authorizing the continued use of the Lenders' "cash

collateral" (as defined in section 363(a) of the Bankruptcy Code, and hereinafter referred to as "**Cash Collateral**"). In support of the Motion, the Debtors state as follows:

## JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. The statutory predicates for the relief requested herein are sections 361, 362, 363, 364(d) and 507(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c) and 9014, and Local Rule 2081-1(g)(1) and (2).

## BACKGROUND

4. On May 6, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned jointly administered chapter 11 cases (the "**Chapter 11 Cases**").

5. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their financial affairs as Debtors-in-possession. No trustee, examiner or committee has been appointed in the Chapter 11 Cases.

6. The Debtors are franchisees of IHOP restaurants, operating forty nine (49) IHOP restaurants in South Carolina, North Carolina, Tennessee and Virginia. All of the Debtors' restaurants have been shuttered as a result of the various "safer at home" restrictions in connection with the ongoing Covid-19 pandemic. These closures resulted in an immediate liquidity crisis, leaving the Debtors unable to fund operations and debt service in the ordinary course of business.

7. On April 22, 2020, each of the Debtors executed an *Assignment for the Benefit of Creditors* pursuant to Chapter 727, Florida Statutes, designated J. Tim Pruban ("**Mr. Pruban**") of Focus Management Group USA Inc. ("**Focus**") as assignee of the Debtors' assets and empowering him to liquidate such assets and take such other actions as may be warranted to maximize value for the Debtors' creditors and stakeholders.

8. Subsequently, Mr. Pruban and the Debtors determined that it was in the best interest of the Debtors and their estates to seek relief under chapter 11 of the Bankruptcy Code, in order to gain the "breathing spell" afforded by the automatic stay of section 362 of the Bankruptcy Code and to pursue a sale of the Debtors' assets free and clear of liens, claims, encumbrances and other interests pursuant to section 363(b) of the Bankruptcy Code. In order to effectively and efficiently transition into chapter 11, the Debtors and Mr. Pruban, in his capacity as Assignee of the Debtors, appointed Mr. Pruban as Chief Restructuring Officer of each of the Debtors, subject to the approval of the Bankruptcy Court.

## PRE-PETITION SECURED DEBT

9. Prior to the Petition Date, Lenders, as lenders, extended certain loans to CFRA, LLC and CFRA Tri-Cities, LLC (the "**Operating Company Debtors**"), as borrowers, which loans are guaranteed by CFRA Holdings, LLC ("**CFRA Holdings**") and are secured by property of Operating Company Debtors as set forth below. These loans are evidenced by various agreements and documents that are collectively referred to as the "**Bank Credit Agreements**."

10. Pursuant to the terms of the Bank Credit Agreements, the Lenders made available to the Operating Company Debtors a revolving line of credit in the principal amount of up to Twenty-Six Million ($26,000,000) (the **"Prior Loan"**).

11. The Prior Loan is comprised of (i) a Revolving Line of Credit Promissory Note dated September 8, 2016 (the "**VNB Note**") made by the Operating Company Debtors and held by VNB in the principal amount of $11,000,000; and (ii) a Revolving Line of Credit Promissory Note dated September 8, 2016 (the "**RJB Note**," and collectively with the VNB Note, the "**Prepetition Notes**") made by the Operating Company Debtors and held by RJB in the principal amount of $15,000,000. CFRA Holdings guaranteed payment and performance of Operating Company Debtors under the Bank Credit Agreements, including the Prepetition Notes, pursuant to a Guaranty of Payment and Performance dated September 8, 2016 (the "**Guaranty**").

12. As of the Petition Date, the Debtors were jointly and severally indebted (i) to VNB in the amount of at least $8,269,315.85, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (ii) to RJB in the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (together, the "**Prepetition Indebtedness**").

13. The Operating Company Debtors' payment of the Prepetition Indebtedness and performance under the Bank Credit Agreements, including the Prepetition Notes, are secured by the property identified in that certain Security Agreement dated September 9, 2016 (the "**Prepetition Security Agreement**"), wherein Operating Company Debtors granted Lenders valid, binding, perfected security interests and liens (the "**Prepetition Liens**") in certain of their property (the "**Prepetition Collateral**").

14. The Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtors, enforceable against them in accordance with the terms of the Bank Credit

Agreements and/or the Guaranty (other than in respect of the stay of enforcement pursuant to 11 U.S.C. § 362), and no portion of the Prepetition Indebtedness is subject to avoidance, re-characterization, reduction, setoff, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination or any challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.  The Debtors are jointly and severally liable to the Lenders in the amount of the Prepetition Indebtedness.

15. The Prepetition Liens constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement pursuant to 11 U.S.C. § 362) and perfected security interests and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Lenders, as applicable, for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, re-characterization, subordination or avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

**DIP FINANCING AND USE OF CASH COLLATERAL IS NECESSARY**

16. The Debtors' need to obtain credit is critical in order to fund the administration of the Chapter 11 Cases.  While the Debtors' restaurants are shuttered and the Debtors currently have no employees, the Debtors nonetheless must continue to fund certain operating expenses to preserve the value of their assets, including, without limitation, the costs of insurance, certain utility costs and costs attendant to operating in chapter 11, including professional fees and quarterly fees to the United States Trustee.

17. The Debtors do not have sufficient sources of working capital and financing without the DIP Financing and authorized use of Cash Collateral.  The Lenders are willing to provide necessary and adequate liquidity on the terms provided in the DIP Loan Documents and the Interim Orders.

18. The Debtors reasonably believe that the DIP Financing and authority to use Cash Collateral will be adequate to pay all administrative expenses due or accruing through the period covered by the Budget. The Debtors' use of Cash Collateral alone is insufficient to meet the Debtors' postpetition liquidity needs, especially considering the added costs necessarily resulting from operating while in chapter 11. Without access to the DIP Financing and use of Cash Collateral, the Debtors would suffer immediate and irreparable harm and the Debtors' restructuring objectives would be jeopardized to the significant detriment of the Debtors' estates, creditors and other parties-in-interest.

19. The Debtors, in their reasonable business judgment, respectfully suggest that there is no possible credit available on more favorable terms than that provided by the DIP Financing. The Lenders, who hold first-priority secured liens on substantially all of the Debtors' assets, would not consent to being primed by a third-party loan, and will only agree to fund the DIP Financing so that the Debtors can achieve their restructuring objectives which will benefit the Lenders, among others.

20. Under the Debtors' current operating status and in consideration of the Covid-19 pandemic, the Debtors are unable to obtain unsecured financing allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors would also be unsuccessful obtaining credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to the liens securing the Lenders' Prepetition Indebtedness.

## RELIEF REQUESTED

21. By this Motion, the Debtors seek the entry of the Interim DIP Order, authorizing the Debtors to obtain post-petition secured financing from the Lenders in accordance with the budget attached as Exhibit B to the Interim DIP Order (the "**Budget**") and pursuant to the terms of the Interim DIP Order.

22. The Debtors further seek the entry of the Interim Cash Collateral Order, authorizing the Debtors to use the Lenders' Cash Collateral under the terms described in the Interim Cash Collateral Order and in accordance with the Budget.

23. The Debtors further request that the Court schedule a final hearing with respect to the relief sought herein.

## Compliance with Local Rule 2081-1(g)(1) and (2)

24. Local Rule 2081-1(g)(1) provides that a motion seeking to use cash collateral provide certain enumerated information.

25. Local Rule 2081-1(g)(1)(A) provides a list of Required Terms that must be included in all cash collateral motions. In compliance therewith, the Debtors provide the following disclosures:

| Local Rule | Disclosure Requirement | Terms of Interim Cash Collateral Order |
|---|---|---|
| 2081-1(g)(1)(A)(i) | Budget | A copy of the budget is attached as Exhibit A to the Interim Cash Collateral Order. |
| 2081-1(g)(1)(A)(ii) | Amounts and types of cash collateral on the petition date | Known cash collateral as of the Petition Date is limited to the Debtors' cash-on-hand (*de minimis*) and potential accounts receivable. |
| 2081-1(g)(1)(A)(iii) | Name of each secured creditor having an interest in cash collateral, basis for security interest, amount owed | Raymond James Bank, N.A. is owed $11,276,339.75 and Valley National Bank is owed $8,269,315.85. Liens arising from prepetition security agreements and UCC financing statements. |

| | | |
|---|---|---|
| 2081-1(g)(1)(A)(iv) | Proposed adequate protection | Replacement liens and superpriority administrative expense claims to the extent of diminution of value. Interim Cash Collateral Order, ¶¶19-20. |
| 2081-1(g)(1)(A)(v) | Reasonable reporting requirements | On the Tuesday of each week, the Operating Company Debtors shall provide Lenders with an accounting of all income received or collected and/or paid during the preceding week by the Operating Company Debtors. Together with such accounting, the Operating Company Debtors shall provide written notice to Lenders of all Approved Budgeted Expenses (and any other expenditures) of the Operating Company Debtors during the preceding week. Interim Cash Collateral Order, ¶7. |
| 2081-1(g)(1)(A)(vi) | Proposed consequences of default | Lenders may terminate their consent for the use of cash collateral for "cause," defined by a finding of the Court, after five (5) business days' written notice to the Operating Company Debtors, that at any time the Operating Company Debtors have violated the material duties imposed under the Interim Cash Collateral Order. Inter Cash Collateral Order, ¶17. In addition, the Interim DIP Order provides that the Lenders may terminate the Debtors' ability to draw upon the DIP Loan upon an Event of Default or otherwise at any time in the Lenders' sole and absolute discretion for any reason, or no reason. Interim DIP Order, ¶15. |

26. Further, Local Rule 2081-1(g)(1)(B) provides a list of Extraordinary Terms that will not typically be approved absent compelling circumstances. In accordance therewith, the Debtors provide the following disclosures:

| Local Rule | Disclosure Requirement | Terms of Interim Cash Collateral Order |
|---|---|---|
| 2081-1(g)(1)(B)(i) | Cross-Collateralization provisions | n/a |
| 2081-1(g)(1)(B)(ii) | Waiver of avoidance actions against | n/a |

| | | |
|---|---|---|
| | secured creditor | |
| 2081-1(g)(1)(B)(iii) | Section 506(c) waiver | Both the Interim Cash Collateral Order and the Interim DIP Order include a waiver of potential claims and charges under section 506(c) of the Bankruptcy Code. Inter Cash Collateral Order, ¶21; Inter DIP Order, ¶22. |
| 2081-1(g)(1)(B)(iv) | Factual stipulations or findings that bind the estate or parties-in-interest | Any official committee of unsecured creditors shall have until thirty (30) days from the date of its formation/appointment to contest any provision of the Interim Cash Collateral Order, including with respect to the Debtors' stipulation in paragraph 11 of the Interim Cash Collateral Order as to the Lenders' pre-petition claims. Any other creditor must file and serve an objection no later than seven (7) days prior to the Final Cash Collateral Hearing date. Interim Cash Collateral Order, ¶14. |
| 2081-1(g)(1)(B)(v) | Relief from stay provisions | The Interim DIP Order provides that the automatic stay is modified to the extent necessary to authorize the Debtors to pay, and Lenders to retain and apply, payments made in accordance with the terms of this Interim Order and consistent with the DIP Financing Agreements including, without limitation, payments of accrued interest and payments of principal amounts outstanding under the DIP Loan. The Interim DIP Order also modifies the automatic stay to permit the Lenders to exercise their rights as to the DIP Collateral upon a Termination Event. Interim DIP Order, ¶21. |
| 2081-1(g)(1)(B)(vi) | Liens on avoidance action recoveries | n/a |
| 2081-1(g)(1)(B)(vii) | Validation of security interest within a limited period of time after appointment of a committee | The provisions of the Order become binding upon any appointed committee thirty (30) days after such appointment. Interim Cash Collateral Order, ¶14. |
| 2081-1(g)(1)(B)(viii) | Subordination of administrative priority claims | The Interim Cash Collateral Order and Interim DIP Order provide superpriority administrative expense claims as is customary for postpetition DIP financing and cash collateral usage. Interim Cash Collateral Order, ¶19; Interim DIP Order, ¶8. |

27. Local Rule 2081-1(g)(2) also provides a list of provisions that must be included in any motion seeking approval of postpetition financing. To the extent not already described above, the Debtors provide the following disclosures pursuant to Local Rule 2081-1(g)(2):

| Local Rule | Disclosure Requirement | Terms of Interim DIP Order |
|---|---|---|
| 2081-1(g)(2)(A) | Identity of lender and relationship | Raymond James Bank, N.A. and Valley National Bank are the Debtors' prepetition secured lenders and proposed DIP lenders. |
| 2081-1(g)(2)(B) | Copy of DIP loan agreement | The DIP loan agreement is attached as <u>Exhibit A</u> to the Interim DIP Order. |
| 2081-1(g)(2)(B)(i) | Collateral for postpetition financing and whether lender seeks to prime existing liens | Substantially all assets of the Debtors. Lenders seek to prime all existing liens, other than purchase money security interests. |
| 2081-1(g)(2)(B)(ii) | Amount of proposed loan | $1,000,000 |
| 2081-1(g)(2)(B)(iii) | Applicable interest rate and other charges | LIBOR plus 8.0% |
| 2081-1(g)(2)(B)(iv) | Payment terms and duration | Repay in full upon maturity, defined as the earlier of (i) final payment in full of all obligations hereunder and the corresponding termination of the Revolving Line of Credit established hereunder pursuant to a closing of a sale of all or substantially all of Debtors' asset pursuant to Court Order under 11 U.S.C. § 363; (ii) a Termination Event as defined in the DIP Loan Agreement, at which time all outstanding sums due hereunder shall be immediately due and payable in full; or (iii) August 31, 2020. |
| 2081-1(g)(2)(C) | Amount of credit sought on interim basis | $88,000.00 |
| 2081-1(g)(2)(D) | Efforts made to obtain alternative financing | Due to the Debtors' shuttered status in connection with Covid-19 and the prepetition lenders unwillingness to permit a third-party priming lien, the Debtors concluded there was no possibility for postpetition financing other than from the Lenders. |
| 2081-1(g)(2)(E) | Ability to repay the DIP loan | The Debtors reasonably believe they will be able to repay the DIP loan from a sale of substantially all of their assets. |
| 2081-1(g)(2)(F) | Inclusion of any terms listed in Local Rule 2081-1(g)(1)(B) | All such terms are described above, to the extent applicable. |

## Basis for Relief

28.     An emergency need exists for the Debtors use of cash collateral and to obtain post-petition financing in order to maintain their business operations. As set forth in the Budget and described in the Interim Orders, the Debtors lack sufficient cash collateral to cover the Debtors' expenses in the interim period and, therefore, the Debtors request authority to obtain post-petition financing from the Lenders to fund their operations while in Chapter 11.

29.     Given the emergency need more fully described herein, the Debtors request an emergency hearing on the requested relief. If this Motion is not considered on an expedited basis, there will be a direct and immediate material and adverse impact on the continuing operation of the Debtors' business and on the value of their assets. In order to achieve their restructuring objectives, the Debtors must use the Cash Collateral and DIP Financing pursuant to the terms of the Budget and the Interim Orders. The Debtors' inability to pay their budgeted expenses will result in irreparable injury to the Debtors and their property.  Further, without post-petition financing, the Debtors will be unable to pay utilities and insurance premiums, and would likely require an immediate conversion of these cases to cases under chapter 7 of the Bankruptcy Code.

30.     If allowed to use Cash Collateral and obtain the DIP Financing, the Debtors believe that they can preserve their assets during these Chapter 11 Cases as they seek market and sell their assets for the benefit of their creditors and other parties in interest.

31.     The terms for the post-petition financing and the use of the cash collateral, as set forth fully in the Interim Orders, are fair and reasonable, and will preserve the value of the Lenders' collateral and provide the Lenders with adequate protection for the post-petition advances and ensure the Debtors' a reasonable opportunity to reorganize.

A. **Post-Petition Financing**

32. The post-petition financing will be governed by a new post-petition loan agreement and related loan documents and the Interim DIP Order (collectively the "**DIP Loan Documents**"). As set forth in the Interim DIP Order, the post-petition financing shall be secured by a first and paramount security interest and lien in all property of the Debtors and a super-priority administrative claim. The Debtors' use of the proceeds of DIP Financing is limited by the terms of the Interim DIP Order. The granting of such priority and liens is appropriate pursuant to Sections 364(c), 364(d), and 507(b) of the Bankruptcy Code.

33. Pursuant to 11 U.S.C. § 364(c), if a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt: (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). *In re Levitt & Sons, LLC,* 384 B.R. 630, 640 (Bankr. S.D.Fla. 2008).

34. In the event the debtor is unable to obtain credit under the provisions of § 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien." *Id.* at 640-41, 11 U.S.C. § 364(d), *In re Devlin*, 185 B.R. 376, 377 (Bankr. M.D.Fla. 1995). Therefore, under 11 U.S.C. § 364(d)(1), the debtor in possession may "prime" an existing lien, notwithstanding covenants in the existing loan agreement or nonbankruptcy law that would protect the position of the existing lender. *See In re Mosello*, 195 B.R. 277 (Bankr. S.D.N.Y. 1996).

35. Section 364(d)(2) of the Bankruptcy Code provides that the debtor in possession "has the burden of proof on the issue of adequate protection." 11 U.S.C. § 364(d)(2). The "important question" in determining the adequacy of protection required under section 364(d)(1)(B) of the Bankruptcy Code is "whether the interest of the secured creditor whose lien is being primed 'is being unjustifiably jeopardized.'" *Mosello*, 195 B.R. at 289 (quoting *In re Plabell Rubber Products, Inc.*, 137 B.R. 897, 899 (Bankr. N.D. Ohio 1992).

36. In these cases, the Debtors are not able to obtain credit that is not secured by liens equal or senior to the Lenders' lien position. As noted above, the Debtors' obligations to the Lenders under the DIP Loan Documents are secured by all of the Debtors' assets, the granting of a superpriority administrative expense claim and replacement liens to the extent of diminution of value of the Lenders' prepetition secured position. Under these circumstances and given the Debtors' current financial status, the Debtors believe that the Lenders (or any other lender) will not provide post-petition financing to the Debtors other than on a senior secured basis pursuant to Section 364(d) of the Bankruptcy Code.

37. Accordingly, the terms of the DIP Financing are fair and reasonable and the product of an arm's length negotiation between the Debtors and the Lenders. The Debtors respectfully suggest that the Court should defer to the Debtors' business judgment that the terms of the post-petition financing are reasonable under the circumstances. *See Group of Institutional Investors v. Chicago Milwaukee St. Paul & Pacific Railroad*, 318 U.S. 523, 550 (1943); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, and interfere with the Bankruptcy Code's provision for private control of administration of the estate …"); *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

### B.    Use of Cash Collateral

38.    Section 363 of the Bankruptcy Code governs a debtor's ability to use, sell, or lease property of the estate. Section 363(c)(2) of the Bankruptcy Code restricts a debtor's ability to use the cash collateral. Section 363(a) of the Bankruptcy Code defines cash collateral as, *inter alia*, "the proceeds, products, profits, offspring, rents or profits of property." 11 U.S.C. § 363(a). In these cases, the Lenders' cash collateral consists of monies collected by the Debtors on account of collections from the Debtor's pre-petition receivables.

39.    The Debtors seek authorization to use Cash Collateral in the amounts set forth on the Budget and pursuant to the Interim Cash Collateral Order. As set forth more fully in the Interim Cash Collateral Order, the Debtors may only use cash collateral and the proceeds of the post-petition advances to fund payment of expenses as and when budgeted (subject to timing variances and amount variances as set forth in the Interim Cash Collateral Order).

### C.    Adequate Protection

40.    Adequate protection can be provided through a number of different methods. Section 361 of the Bankruptcy Code provides that adequate protection may be provided by (1) "providing to [an] entity an additional or replacement lien to the extent that such ... use . . . results in a decrease in the value of [the] entity's interest in such property" or (2) "granting such other relief . . . as will result in the realization by [an] entity of the indubitable equivalent of [the] entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3).

41.    The Debtors maintain, and the Lenders agree, that the Lenders' interests both on a pre- and post-petition basis are adequately protected under the terms of the Interim Orders.

42. It is in the Lenders' interests that the Debtors be allowed to use the cash collateral and obtain DIP Financing. The Lender's collateral will be substantially impaired if the Debtors halt operations and cannot fund payments to preserve their assets.

43. Section 361(2) of the Bankruptcy Code expressly provides that the granting of a replacement lien constitutes a means of providing adequate protection. 11 U.S.C. § 361(2). Here, the Debtors request that in addition to the senior liens for the post-petition financing, that the Lender be granted replacement liens in the post-petition Collateral to the extent of diminution in value of the Lenders' prepetition liens, including in all cash received post-petition, inventory and accounts receivable, to the same extent and priority as the Lender's respective pre-petition liens and security interests. These liens shall not extend to avoidance actions.

## Notice of Interim and Final Hearing

44. The Debtors shall serve this Motion and any Interim Orders granted with respect thereto upon: (a) the Office of the United States Trustee; (b) Lenders; (c) the Internal Revenue Service; (d) the twenty (20) largest unsecured creditors of each Debtor (e) any other creditor asserting a lien in the assets of the Debtors; (f) any other party who has requested notice in the Bankruptcy Case (the "**Service List**"). In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

45. The Debtors request that they be authorized to serve a copy of the signed Interim Orders authorizing the DIP Financing and the use of the Cash Collateral which order shall set the time and date for filing objections, by first class mail upon the Service List and all other parties that have filed appearances in this case or as otherwise directed by this Court, and shall set a final hearing at least 14 days from the date of the filing of this Motion. The Debtors request that

the Court consider such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Interim Orders granting the Motion as follows: (a) granting the relief requested on an interim, emergency basis, including: (i) authorizing the Debtors use of Cash Collateral, (ii) authorizing the Debtors' to obtain DIP Financing from the Lenders; (iii) granting the Lenders senior and replacement liens as adequate protection, (b) scheduling a final hearing on this Motion, and (c) granting such other relief deemed just, equitable and proper.

Dated: May 18, 2020

**SAUL EWING ARNSTEIN & LEHR LLP**
*Proposed Counsel for Debtors and Debtors-in-Possession*
701 Brickell Avenue, 17th Floor
Miami, FL 33131
Telephone: (305) 428-4500
Facsimile: (305) 374-4744

*By:*   */s/ Aaron S. Applebaum*
Carmen Contreras-Martinez
Florida Bar No. 093475
Carmen.Contreras-Martinez@saul.com

-and-

Stephen B. Ravin (*pro hac vice*)
Florida Bar No. 293768 (*inactive status*)
Aaron S. Applebaum (*pro hac vice*)
1037 Raymond Boulevard
Suite 1520
Newark, NJ 07102
Telephone: (973) 286-6700
Facsimile: (973) 286-6800
Stephen.Ravin@saul.com
Aaron.Applebaum@saul.com