**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| In re:<br>CFRA HOLDINGS, LLC | Case No. 8:20-bk-03608-CPM<br>Chapter 11 |
| | *Jointly Administered with:* |
| CFRA, LLC<br>CFRA TRI-CITIES, LLC | Case No. 8:20-bk-03609-CPM<br>Case No. 8:20-bk-03610-CPM |
| Debtors.<br>_____/ | |

**DECLARATION OF J. TIM PRUBAN IN SUPPORT OF
DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM
ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION
FINANCING AND (B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL**

1.      J. Tim Pruban submits this declaration (the "**Declaration**") pursuant to 28 U.S.C. § 1746 in support of the *Emergency Motion for Entry of Interim Orders (A) Authorizing Debtors to Obtain Post-Petition Financing and (B) Authorizing Debtors to use Cash Collateral* (the "**Motion**")[1] [Docket No. 47], filed by the above-captioned debtors and debtors-in-possession (the "**Debtors**").

**BACKGROUND**

2.      I am the Chief Restructuring Officer ("**CRO**") of the Debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

3.      The Debtors are franchisees of IHOP restaurants, operating forty nine (49) IHOP restaurants in South Carolina, North Carolina, Tennessee and Virginia. All of the Debtors'

---

[1] Capitalized terms used but not otherwise defined herein shall have the same meaning as that ascribed to them in the Motion.

restaurants have been shuttered as a result of the various "safer at home" restrictions in connection with the ongoing Covid-19 pandemic. These closures resulted in an immediate liquidity crisis, leaving the Debtors unable to fund operations and debt service in the ordinary course of business.

4. On April 22, 2020, each of the Debtors executed an *Assignment for the Benefit of Creditors* pursuant to Chapter 727, Florida Statutes, designating me as assignee of the Debtors' assets and empowering me to liquidate such assets and take such other actions as may be warranted to maximize value for the Debtors' creditors and stakeholders.

5. Subsequently, the Debtors and I determined that it was in the best interest of the Debtors and their estates to seek relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**"), in order to gain the "breathing spell" afforded by the automatic stay of section 362 of the Bankruptcy Code and to pursue a sale of the Debtors' assets free and clear of liens, claims, encumbrances and other interests pursuant to section 363(b) of the Bankruptcy Code. In order to effectively and efficiently transition into chapter 11, the Debtors and I, in my capacity as Assignee of the Debtors, appointed me as Chief Restructuring Officer of each of the Debtors, subject to the approval of the Bankruptcy Court.

6. In my capacities as CRO and Assignee of the Debtors, I am generally familiar with the Debtors' operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

7. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' former management team and the Debtors' advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and

restructuring initiatives. If called upon to testify, I could and would testify competently to the facts set forth herein.

## PRE-PETITION SECURED DEBT

8. Prior to the Petition Date, Raymond James Bank, N.A. ("**RJB**") and Valley National Bank ("**VNB**" and, collectively with RJB, the "**Lenders**"), as lenders, extended certain loans to CFRA, LLC and CFRA Tri-Cities, LLC (the "**Operating Company Debtors**"), as borrowers, which loans are guaranteed by CFRA Holdings, LLC ("**CFRA Holdings**") and are secured by property of Operating Company Debtors as set forth below. These loans are evidenced by various agreements and documents that are collectively referred to as the "**Bank Credit Agreements**."

9. Pursuant to the terms of the Bank Credit Agreements, the Lenders made available to the Operating Company Debtors a revolving line of credit in the principal amount of up to Twenty-Six Million ($26,000,000) (the **"Prior Loan"**).

10. The Prior Loan is comprised of (i) a Revolving Line of Credit Promissory Note dated September 8, 2016 (the "**VNB Note**") made by the Operating Company Debtors and held by VNB in the principal amount of $11,000,000; and (ii) a Revolving Line of Credit Promissory Note dated September 8, 2016 (the "**RJB Note**," and collectively with the VNB Note, the "**Prepetition Notes**") made by the Operating Company Debtors and held by RJB in the principal amount of $15,000,000. CFRA Holdings guaranteed payment and performance of Operating Company Debtors under the Bank Credit Agreements, including the Prepetition Notes, pursuant to a Guaranty of Payment and Performance dated September 8, 2016 (the "**Guaranty**").

11. As of the Petition Date, the Debtors were jointly and severally indebted (i) to VNB in the amount of at least $8,269,315.85, exclusive of legal fees and costs due under the

Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (ii) to RJB in the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (together, the "**Prepetition Indebtedness**").

12. The Operating Company Debtors' payment of the Prepetition Indebtedness and performance under the Bank Credit Agreements, including the Prepetition Notes, are secured by the property identified in that certain Security Agreement dated September 9, 2016 (the "**Prepetition Security Agreement**"), wherein Operating Company Debtors granted Lenders valid, binding, perfected security interests and liens (the "**Prepetition Liens**") in certain of their property (the "**Prepetition Collateral**").

13. The Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtors, enforceable against them in accordance with the terms of the Bank Credit Agreements and/or the Guaranty (other than in respect of the stay of enforcement pursuant to 11 U.S.C. § 362), and no portion of the Prepetition Indebtedness is subject to avoidance, re-characterization, reduction, setoff, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination or any challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity. The Debtors are jointly and severally liable to the Lenders in the amount of the Prepetition Indebtedness.

14. The Prepetition Liens constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement pursuant to 11 U.S.C. § 362) and perfected security interests and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Lenders, as applicable, for fair consideration and reasonably equivalent value, and are not subject to defense,

counterclaim, re-characterization, subordination or avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

## THE DEBTORS' NEED FOR DIP FINANCING AND USE OF CASH COLLATERAL

**A.     Immediate Need for Postpetition Financing and Use of Cash Collateral**

15.     The Debtors' need to obtain credit is critical in order to fund the administration of the Chapter 11 Cases. While the Debtors' restaurants are shuttered and the Debtors currently have no employees, the Debtors nonetheless must continue to fund certain operating expenses to preserve the value of their assets, including, without limitation, the costs of insurance, certain utility costs and costs attendant to operating in chapter 11, including professional fees and quarterly fees to the United States Trustee.

16.     The Debtors do not have sufficient sources of working capital and financing without the DIP Financing and authorized use of Cash Collateral. The Lenders are willing to provide necessary and adequate liquidity on the terms provided in the DIP Loan Documents and the Interim Orders.

17.     The Debtors reasonably believe that the DIP Financing and authority to use Cash Collateral will be adequate to pay all administrative expenses due or accruing through the period covered by the Budget. The Debtors' use of Cash Collateral alone is insufficient to meet the Debtors' postpetition liquidity needs, especially considering the added costs necessarily resulting from operating while in chapter 11. Without access to the DIP Financing and use of Cash Collateral, the Debtors would suffer immediate and irreparable harm and the Debtors' restructuring objectives would be jeopardized to the significant detriment of the Debtors' estates, creditors and other parties-in-interest.

**B.       No Credit Available on More Available Terms**

18.   Given the current economic situation, the Debtors, in their reasonable business judgment, believe they are unlikely to obtain credit on such an emergency basis on more favorable terms than that provided by the DIP Financing.  The Lenders, who hold first-priority secured liens on substantially all of the Debtors' assets, would not consent to being primed by a third-party loan, and will only agree to fund the DIP Financing so that the Debtors can achieve their restructuring objectives which will benefit the Lenders, among others.

19.   Under the Debtors' current operating status and in consideration of the Covid-19 pandemic, the Debtors are unable to obtain unsecured financing allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors would also be unsuccessful obtaining credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to the liens securing the Lenders' Prepetition Indebtedness.

**C.       Need for Interim Relief to Avoid Immediate and Irreparable Harm**

20.   An emergency need exists for the Debtors use of cash collateral and to obtain post-petition financing in order to maintain their business operations. As set forth in the Budget and described in the Interim Orders, the Debtors lack sufficient cash collateral to cover the Debtors' expenses in the interim period and, therefore, the Debtors request authority to obtain post-petition financing from the Lenders to fund their operations while in Chapter 11.

21.   If this Motion is not considered on an expedited basis, there will be a direct and immediate material and adverse impact on the continuing operation of the Debtors' business and

on the value of their assets. In order to achieve their restructuring objectives, the Debtors must use the Cash Collateral and DIP Financing pursuant to the terms of the Budget and the Interim Orders. The Debtors' inability to pay their budgeted expenses will result in irreparable injury to the Debtors and their property. Further, without post-petition financing, the Debtors will be unable to pay utilities and insurance premiums, and would likely require an immediate conversion of these cases to cases under chapter 7 of the Bankruptcy Code.

22. If allowed to use Cash Collateral and obtain the DIP Financing, the Debtors believe that they can preserve their assets during these Chapter 11 Cases as they seek market and sell their assets for the benefit of their creditors and other parties in interest.

**D.    Proposed Terms are Fair and Reasonable**

23. The terms for the post-petition financing and the use of the cash collateral, as set forth fully in the Interim Orders, are fair and reasonable, and will preserve the value of the Lenders' collateral and provide the Lenders with adequate protection for the post-petition advances and ensure the Debtors' a reasonable opportunity to reorganize.

24. In these cases, the Debtors are not able to obtain credit that is not secured by liens equal or senior to the Lenders' lien position. As noted above, the Debtors' obligations to the Lenders under the DIP Loan Documents are secured by all of the Debtors' assets, the granting of a superpriority administrative expense claim and replacement liens to the extent of diminution of value of the Lenders' prepetition secured position. Under these circumstances and given the Debtors' current financial status, the Debtors believe that the Lenders (or any other lender) will not provide post-petition financing to the Debtors other than on a senior secured basis pursuant to Section 364(d) of the Bankruptcy Code.

25. Accordingly, the terms of the DIP Financing are fair and reasonable and the product of an arm's length negotiation between the Debtors and the Lenders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 20th day of May, 2020       */s/ J. Tim Pruban*
                                          J. Tim Pruban
                                          Chief Restructuring Officer