**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CFRA HOLDINGS, LLC | ) | Case No. 8:20-bk-03608-CPM |
| | ) | |
| | ) | *Jointly Administered with* |
| | ) | |
| CFRA LLC | ) | Case No. 8:20-bk-03609-CPM |
| CFRA TRI-CITIES, LLC | ) | Case No. 8:20-bk-03610-CPM |
| | ) | |
| Debtors. | ) | |

**IHOP RESTAURANTS LLC, IHOP FRANCHISOR LLC, AND IHOP LEASING LLC'S**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

IHOP Restaurants LLC,  IHOP Franchisor LLC, and IHOP Leasing LLC (collectively,

"IHOP"), bring this motion (the "Motion") seeking relief from the automatic stay pursuant to

Section 362 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  In

support of the Motion, IHOP submits the *Declaration of Nicole Durham-Mallory in Support of*

*IHOP Restaurants LLC, IHOP Franchisor LLC, and IHOP Leasing LLC's  Motion for Relief from*

*the Automatic Stay*, attached hereto as Exhibit A (the "Durham-Mallory Declaration"), and further

state as follows:

**Preliminary Statement**

Prior to the Petition Date, the above-captioned entities (the "Debtors" or, prior to the

Petition Date as described below, "CFRA") operated 49 IHOP restaurants pursuant to individual

franchise agreements (the "Franchise Agreements") with IHOP.  Notwithstanding the terms of the

Franchise Agreements, at various times in March and April 2020, CFRA permanently closed all 49

of the restaurants without IHOP's consent, rejecting IHOP's offer to allow for temporary closure

during the COVID-19 pandemic.  On April 16 & 17, 2020, following the discovery that CFRA

had shuttered its doors permanently, had notified guests by a sign on the door of the permanent

closure, and had laid off all restaurant employees, IHOP  responded by terminating each of the 49

Franchise Agreements, triggering, among other things, IHOP's rights under the Franchise

Agreements and related subleases to access the properties.  Since that time the restaurants have

remained closed, and CFRA has continued to deny IHOP access to the restaurants refused to turn

over the keys to the restaurants where CFRA is a sub-lessee, to among other things, allow IHOP

to protect its brand, ensure that the restaurants are properly secured, that utilities have been safely

turned off, that food is not rotting, that the properties are properly secured from any trespassers,

and that rodent or insect infestations have not begun in the absence of attendance.  Neither has

CFRA turned over the equipment that it leases from IHOP.  Subsequent to closure of the

restaurants, CFRA commenced assignments for the benefit of creditors, resulting in further

defaults under the terms of the Franchise Agreements as well as the ancillary lease agreements.

The current situation is intolerable to IHOP as a franchisor and, notwithstanding the

nationwide effects of the Covid-19 pandemic, *has not been repeated* in connection with any other

IHOP franchisee.  Insofar as the Franchise Agreements and related leases were terminated prior to

the Petition Date, as described more fully below, the Debtors have no legal or equitable interest in

the Franchise Agreements or the sub-leased properties or leased equipment.  Further delay in

permitting IHOP access to these locations continues to waste the value of IHOP's assets.  In

addition, IHOP continues to incur hundreds of thousands of dollars in lease, tax, and other

obligations—including but not limited to $14,179.00 a week under the Leases with respect to the

leased equipment and $112,539.38 a week under the Leases with respect to the leased real

property—as the days pass without it being permitted to recover its property and premises.  The requested relief is urgent.  Durham-Mallory Declaration ¶ 5.

More specifically, the restaurants are variously located in North Carolina, South Carolina, Tennessee, and Virginia    In addition, 29 of the Franchise Agreements implicate auxiliary agreements whereby CFRA is the lessee of certain equipment from IHOP or its affiliates and is the sublessee of its stores from IHOP or its affiliates (collectively, the "Leases").  Commencing in March 2020, CFRA notified IHOP of its intent to close its IHOP restaurants permanently in violation of the Franchise Agreements.  As described more fully below, while there are force majeure provisions in the Franchise Agreements that may excuse the failure to perform certain obligations, those provisions do not allow for permanent closure of the restaurants.  Here, the state executive orders for the four states where the Debtors operated their restaurants did not *require* total and permanent closure but only  restricted on-premises dining while permitting restaurants to serve guests through  delivery, take-away, and curbside pick-up.  Moreover,  IHOP offered deferral of  payment  obligations,  which  CFRA  chose  to  reject  along  with  IHOP's  authorization  for temporary closure during the COVID-19 pandemic.  No other IHOP franchisee permanently closed all of its restaurants in connection with the Covid-19 pandemic as CFRA did here.  This is not the situation of a franchisee relying upon the force majeure clause to excuse inability to offer certain menu items or failing to comply with other obligations required of franchisees flying the IHOP banner.  The force majeure provision cannot allow a franchisee to walk away from all of its restaurants, placing a sign on the doors announcing to the world of "permanent closure," and then deny IHOP's right to terminate that agreement. The force majeure clause simply does not work this way.  Durham-Mallory Declaration ¶ 4.

DOCS_DE:228658.7 18037/004
DM_US 168796125-1.089762.0025

On April 16, 2020, IHOP provided written notice to CFRA, in accordance with the terms of the Franchise Agreements, that CFRA was in default with respect to 28 of the restaurants that had permanently closed on or about March 24, 2020, which permanent closure constituted an incurable material breach of the Franchise Agreements.  The April 16, 2020, notice further terminated all 28 of the affected Franchise Agreements as a result of these closures.  On April 17, 2020, IHOP learned that all of the remaining 21 restaurants had closed and provided notice to CFRA, in accordance with the terms of the Franchise Agreements, that CFRA was in default with respect to the remaining 21 restaurants insofar as such permanent closure constituted an incurable material breach of the Franchise Agreements.  The April 17, 2020, notice also terminated all 21 of the remaining Franchise Agreements as a result of these closures.  All 49 of the Franchise Agreements were terminated not later than April 17, 2020.[1]  In addition, on April 25, 2020, IHOP provided CFRA written notice of the termination of the Leases as a consequence of the termination of the Franchise Agreements and their assignment to the assignee, which notice, notwithstanding the sufficiency and effectiveness of the earlier termination notices, also included a further statement of termination of the Franchise Agreements based on an incurable, material default arising from CFRA's assignment of the Franchise Agreements to the assignee in the context of an assignment for the benefit of creditors.  Consequently, because the Franchise Agreements and the Leases terminated prior to the Debtors' instant bankruptcy cases, the Franchise Agreements and Leases (including both real property and equipment) are not property of the Debtors' bankruptcy estates and are not protected by the automatic stay.

---

[1] As detailed more fully in the Background section below, various other notices were also provided CFRA, which independently occasioned defaults and terminations on various later dates, to the extent that these notices were to be found ineffective for any reason.

In an abundance of caution, IHOP files this Motion to confirm that the automatic stay does not apply to the terminated Franchise Agreements or to the equipment and real property affected by the Leases.  Furthermore, even if this Court were to determine that the Franchise Agreements and Leases were not terminated and/or that the automatic stay somehow applied to the Franchise Agreements or the Leases, the automatic stay should be modified to permit IHOP to terminate the Franchise Agreements and the Leases.  IHOP also requests that this Court modify the stay, to the extent that the Court finds it to apply, to permit IHOP  to enforce (through, if necessary, litigation in any appropriate forum) its post-termination rights under the Franchise Agreements, including, without limitation, enjoining the Debtors from using or infringing IHOP's trademarks, de-affiliating closed restaurants, and compelling surrender of the subleased premises and leased equipment to IHOP.

The requested relief is particularly urgent because, although the 49 restaurants are ostensibly closed, the Debtors have continued to deny IHOP access to the properties where IHOP is the master tenant so that IHOP may mitigate expenses that continue to accrue and address any health and safety issues that may arise in connection with the abandonment and improper shutdown of the restaurants.  This includes, without limitation the incomplete shutdown of utilities that may continue to accrue expenses or may be improperly disconnected, abandoned and unrefrigerated food, trespassers, and/or rodent or insect infestation that may arise in an abandoned property.  In addition, IHOP continues to incur lease, tax, and other expenses in connection with the abandoned properties, IHOP has already paid certain amounts in delinquent taxes in connection with the Leases and expects to make a further real estate tax payment on or about June 5, 2020, in connection with the Leases, which will bring the total expended on taxes alone to $159,961.17. While certain amounts owed to IHOP have been satisfied by an April 28, 2020, draw upon a letter

of credit pledged by CFRA, IHOP estimates that the total amount owed to it as of May 6, 2020, is approximately $226,045.86, which does not include termination damages, lost royalties, or other amounts incurred in connection with CFRA's improper shutdown of the restaurants associated with the Franchise Agreements. The continued closure of the restaurants constitutes an ongoing harm to IHOP's brand and its trademarks. In addition, obligations under the Leases continue to accrue at a rate of $14,179.00 a week with respect to equipment and $112,539.38 a week with respect to real property. No provision for any of these amounts, or amounts necessary to remediate the health and safety issues described above, appears to have been made in connection with the Debtors' debtor-in-possession financing budget. Durham-Mallory Declaration ¶ 6.

## Jurisdiction

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (G), and (O). Venue of these proceedings and the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 362 of the Bankruptcy Code.

## General Background with Respect to Franchise Agreements

3.      IHOP is a franchisor of a nationally recognized chain of restaurants. IHOP's brand and image are key to the overall value and success of the IHOP franchise system. IHOP's brand and image are based principally on the use of certain trademarks (the "Marks") that IHOP owns and licenses to authorized franchisees. IHOP spends substantial sums for advertising and promotion of the Marks. The Marks are distinctive, widely recognized, and engender a substantial amount of goodwill and consumer association.

6

4.      Commencing in May 2005 with respect to certain restaurant locations, and continuing from time to time as new Franchise Agreements were added with respect to additional locations, IHOP began entering into franchise agreements with CFRA to provide for the operation of IHOP restaurants and licensing its Marks to CFRA.  As of March 2020, CFRA operated 49 IHOP restaurants pursuant to 49 separate—but largely similar—Franchise Agreements.  A list of the 49 restaurants is attached to the Durham-Mallory Declaration as Exhibit 1.  All of the pre-September 2014 Franchise Agreements are held by IHOP Restaurants LLC, and all of the post-September 2014 Franchise Agreements are held by IHOP Franchisor LLC.  Twenty-nine of the Franchise Agreements also included Leases.  All of the pre-September 2014 equipment leases are held by IHOP Restaurants LLC, and all of the post-September 2014 equipment leases are held by IHOP Franchisor LLC.  All of the real property subleases are held by IHOP Leasing LLC.  A list of the locations implicating all of the Leases is attached as Exhibit 2 to the Durham-Mallory Declaration.  An example of a typical Franchise Agreement is attached to the Durham-Mallory Declaration as Exhibit 3.[2]  An example of typical Leases, one with respect to real property and one with respect to personal property are attached to the Durham-Mallory Declaration as Exhibit 4 and Exhibit 5, respectively.

5.      The duration of the various Franchise Agreements is variable.  Some are set to expire in 2020.  They were not timely renewed by CFRA prior to the commencement of the instant bankruptcy cases.

6.      The Franchise Agreements require CFRA to, among other things, pay certain continuing royalties and advertising fees to IHOP, maintain insurance, and pay applicable federal,

---

[2] While each of the Franchise Agreements vary in certain respects, IHOP does not believe any of the variations are material with respect to the effectuation of terminations described in this Motion, except as otherwise noted herein.

7

state, and local taxes.  *See* Franchise Agreement ¶¶ 6.01, 7.01, 10.04, & 10.06.  In addition, with respect to properties where the Leases are implicated, the Leases require CFRA to pay certain amounts with respect to the lease of real and personal property on a weekly basis and to maintain insurance thereon.

7.      In addition, because of IHOP's interest in protecting its brand and Marks and the personal relationship between IHOP and its franchisees, the Franchise Agreements provide numerous restrictions upon and conditions to any attempt by the franchisee to assign the agreement. Among other restrictions, a franchisee may not assign a franchise agreement without the consent of IHOP, it is required to provide prior written notice of the proposed assignment, and may not assign an agreement where it is not otherwise in compliance with all of its obligations under the agreement (or related agreement) owed to IHOP.  *See* Franchise Agreement ¶ 11.03(a)(i), (ii), & (iv).  It is common in the franchise industry that any unauthorized transfer of a franchisee agreement is the basis for termination.  That is because the franchising relationship requires a franchisee, as an independent third party, to represent the IHOP brand before the public through its operation and management.  Because the public often does not distinguish one franchisee from another within the IHOP system, the act of one franchisee can tarnish and negatively impact the entire system of independent business owners.  A great deal of trust therefore is entrusted by IHOP as franchisor upon its franchisees, particularly when a franchise transfer is under consideration. Durham-Mallory Declaration  ¶ 7.

8.      Broadly speaking, the Franchise Agreements describe two categories of defaults that may give rise to the right of IHOP to terminate the Franchise Agreements: termination with notice and termination without notice.  *See* Franchise Agreement ¶¶ 12.01 & 1202.  Terminations with notice primarily arise from monetary defaults or failures to comply with other material

8

obligations.   The franchisee has either five or seven days (depending upon the terms of the particular agreement) after written notice to cure such default.  *See Franchise Agreement* ¶ 12.01. Terminations without notice permit IHOP to terminate the agreement for certain material, incurable defaults without an opportunity for the franchisee to cure the default.  These defaults include, *inter alia*:

    a.   "If Franchisee shall attempt or purport to assign this Agreement, without the prior written consent of Franchisor, or if an Assignment of this Agreement by Franchisee shall occur by operation of law, or by reason of judicial process;" or

    b.   "If Franchisee shall 'abandon' the Franchised Restaurant without Franchisor's prior written consent. For purposes of this Agreement, 'abandon' means Franchisee's failure, at any time during the term of this Agreement: (i) to keep the Franchised Restaurant open and operating for business during ordinary business hours for a period of 3 consecutive days, except as provided in the Franchisor's Operations Bulletins, (ii) to keep the Franchised Restaurant open and operating for any period after which it is not unreasonable under the facts and circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the Franchised Restaurant, unless such failure to operate is due to Force Majeure (subject to the requirements of Section 12.04) or such closure is caused by action by any Governmental Authority;" or

    c.   Franchisee's insolvency (as revealed by its records or otherwise); or, if Franchisee files a voluntary petition and is adjudicated a bankrupt; or if an involuntary petition is filed against it and such petition is not dismissed within 30 days; or if it shall make an assignment for the benefit of creditors; or if a receiver or trustee in

> bankruptcy or similar officer, temporary or permanent, be appointed to take charge
> of Franchisee's affairs or any of its property; or if dissolution be commenced by or
> against Franchisee or if any judgment against Franchisee remains unsatisfied or
> unbonded of record for 15 days."

*See* Franchise Agreement ¶ 12.02(c), (k), & (l).  Certain of the older Franchise Agreements provide that the defaults arising from closing of the stores or insolvency or related issues are curable after notice, but amendments to those agreements modify that provision to exclude defaults arising from closings:

> Notwithstanding the provisions of Paragraph 12.01, if a Material Breach occurs that does not relate to the payment of money, Franchisee shall have ten (10) business days to cure such breach, *unless* (i) the Material Breach endangers the health or safety of patrons of the Restaurant, jeopardizes any license the Restaurant may have to continue operating, *involves the closing of the Restaurant, or could reasonably be expected to result in the closing* of the Restaurant.

 *See, e.g., Addendum to Franchise Agreement* ¶ 7.  An example of a Franchise Agreement with modified termination provisions and the addendum are attached to the Durham-Mallory Declaration as Exhibit 6 and 7, respectively.

9.    The Franchise Agreements also outline in detail what CFRA was required to do upon termination and the post-termination rights of IHOP.  Specifically, the Franchise Agreements provide, *inter alia*, that the franchisee shall deliver up materials involving the Marks and related operational document to IHOP, discontinue the use of Marks and trade secrets, provide for assignment to IHOP of websites and domain names that contain the Marks, and permit IHOP to succeed to CFRA's rights under any leases.  *See* Franchise Agreement ¶¶ 4.04, 8.09, &16.02.

10.    The Franchise Agreements also include a provision for a prevailing party to recover "all costs and expenses . . . including reasonable attorneys' fees."  *See* Franchise Agreement ¶ 16.11.

DOCS_DE:228658.7 18037/004
DM_US 168796125-1.089762.0025

11.     Finally, the Franchise Agreements are governed by California law.  *See* Franchise Agreement ¶ 16.09.

### **Background Regarding the Debtors' Breach of the Franchise Agreements**

12.     In March 2020, CFRA became delinquent in connection with is obligations under the Franchise Agreements.  During this time, various states were issuing executive orders requiring the cessation of restaurant dine-in service in connection with the Covid-19 outbreak. The orders implemented in each of the jurisdictions where the restaurants related to the Franchise Agreements were located did not mandate total closure, but permitted continued operation for the purposes of delivery, take-away, and curbside pick-up.  *See* State of North Carolina Executive Order 118, Section 1, March 17, 2020; State of South Carolina Executive Order 2020-10, Section 4, March 17, 2020; State of Tennessee Executive Order 17, Section 1.c., March 22, 2020; State of Virginia Executive Order EO-53 (2020), Section 3, March 23, 2020.

13.     On March 24, 2020, IHOP learned, based upon signs posted on the front doors of several restaurants that those restaurants had been "permanently" closed.  Also, on March 24, 2020, CFRA wrote to IHOP to identify 28 restaurants that had been permanently closed and 21 others that continued to operate with "limited hours."  With respect to the 28 closed restaurants, CFRA stated that it had "no current intention to re-open" those restaurants.  A copy of the March 24, 2020, letter is attached to the Durham-Mallory Declaration as Exhibit 8.

14.     On March 25, 2020, IHOP wrote to CFRA stating that it was not authorizing any permanent closures, but it would authorize temporary closures of the 28 identified restaurants for a period of up to 30 days beginning March 24, 2020.  A copy of the March 25, 2020, letter is attached to the Durham-Mallory Declaration as Exhibit 9.

15.     While there were further communications between IHOP and CFRA, CFRA continued to indicate its intent to close the 28 restaurants on a permanent basis.  The next relevant written communication occurred on April 10, 2020, when counsel to the Debtors' lenders (the "Lenders") wrote to IHOP to advise IHOP of the Debtors' default under their loans with the Lenders and noted, among other things, that: (a) by letter dated March 24, 2020, CFRA reported to their Lenders the closure of 28 IHOP restaurants and that CFRA had "no intention of re-opening these restaurants;" (b) CFRA had originally intended to operate 21 IHOP restaurants on a "reduced" schedule; but (c) CFRA "now intended to cease operations" at those locations.  A copy of the Lenders' letter is attached to the Durham-Mallory Declaration as Exhibit 10.  IHOP's further communications with CFRA, including offers to defer certain payments, were unsuccessful.  CFRA never executed a proposed deferral agreement forwarded by IHOP.  IHOP never authorized permanent closure of any of the locations implicated by the Franchise Agreements.

16.     On April 16, 2020, IHOP sent a letter advising CFRA of its default under the Franchise Agreements with respect to the 28 closed restaurants, noting CFRA's "multiple" statements of its intent to close those restaurants permanently and that such closure and abandonment constituted an "incurable material breach."  Accordingly, those "Agreements are terminated effective as of the date of this notice."  The letter also identified $534,287.00 in past due expenses, detailed on an attachment. A copy of the April 16, 2020, letter is attached to the Durham-Mallory Declaration as Exhibit 11.

17.     Also on April 16, 2020, IHOP sent a letter advising CFRA of its default under the Franchise Agreements with respect to the 21 restaurants operating on a limited schedule based on $370,410.00 in past-due obligations related to those locations, as detailed on an attachment.  IHOP

12

advised CFRA that those 21 Franchise Agreements would terminate without further notice absent a cure by April 24, 2020.  A copy of the second April 16, 2020, letter is attached to the Durham-Mallory Declaration as Exhibit 12.

18.     Between its sending of the second April 16, 2020, pertaining to the 21 open restaurants and the following day, IHOP learned that those restaurants had been closed on a permanent basis as well.  Consequently, on April 17, 2020, IHOP sent CFRA a further default letter with respect to those 21 locations, noting "various communications from CFRA threatening to close the Restaurants and making clear that such closure would be on a permanent basis." IHOP stated that such closure and abandonment constituted an "incurable material breach." Accordingly, those "Agreements are terminated effective as of the date of this notice."   A copy of the April 17, 2020, letter is attached to the Durham-Mallory Declaration as Exhibit 13.

19.     Thereafter, on April 22, 2020, CFRA Holdings, LLC, and CFRA, LLC, both executed an Assignment for the Benefit of Creditors under Fla. Stat. §§ 727, *et seq.* before the state circuit court for Pinellas County, Florida.  On April 24, 2020, CFRA Tri-Cities, LLC, similarly filed an assignment for the benefit of creditors before the same court (collectively, the "Florida ABC").  The commencement of the Florida ABC proceedings was consistent with the Debtors' representations to IHOP that they intended to permanently cease operating all 49 IHOP franchises. All three sets of the Florida ABC petitions and the assignment agreements themselves clearly state they are irrevocable.

20.     Notably, while commencement of the Florida ABC does limit certain actions by unsecured creditors to levy, attach, or execute upon assigned assets, it does not (unlike commencement of a Chapter 11 bankruptcy proceeding) give rise to anything similar to the Bankruptcy Code's automatic stay.  While some commentators refer to this language as an

"injunction," it does not stop secured creditors from foreclosing, and it does not have language like 11 U.S.C. § 365 invalidating *ipso facto* clauses. Consequently, insofar as such assignment was in further breach of the Franchise Agreements, IHOP properly supplied CFRA a further notice of default on April 25, 2020, advising CFRA that its assignment of the Franchise Agreements, and its insolvency in the form of assignment for the benefit of creditors, constituted further material and incurable defaults giving rise to immediate termination of the Franchise Agreements. The April 25, 2020, letter also expressly states that the Leases (both real property and equipment) were terminated. A copy of the April 25, 2020, letter is attached to the Durham-Mallory Declaration as Exhibit 14.

21.    On May 6, 2020 (the "Petition Date"), each of the Debtors filed a petition under Chapter 11 of the Bankruptcy Code in this Court.

22.    As of the current date, all of the restaurants associated with the Franchise Agreements remain closed, no cure payments with respect to monetary defaults have been made by CFRA to IHOP or appear to have been budgeted for in the Debtors' debtor-in-possession financing. Similarly, no funds for maintenance or security of the restaurants has been budgeted. CFRA has failed to provide IHOP with access to the closed restaurants or to turn over the keys with respect to the 29 restaurants as to which CFRA is a sub-lessor and equipment lessor. CFRA has also failed to turn over the equipment it leased from IHOP. In fact, CFRA has not complied with any of its post-termination obligations. In the interim, IHOP is prejudiced as it continues to accrue expenses with respect to the Leases, taxes, and other obligations of the Debtors under the Franchise Agreements. Without limitation, $14,179.00 a week under the Leases with respect to the leased equipment and $112,539.38 a week under the Leases with respect to the leased real property continues to accrue.

14

## **Relief Requested**

23.     The record is clear that each of the Franchise Agreements terminated without a cure period prior to the Petition Date, on April 16, 2020, based upon the closing of 28 restaurants and the associated notice and on April 17, 2020, based upon the closing of the remaining 21 restaurants and the associated notice.[3]  The Leases were effectively terminated no later than April 25, 2020.   Accordingly, neither the Franchise Agreements nor the property (real and personal) associated with the Leases are property of the Debtors' estate.  Consequently, IHOP requests a determination that the automatic stay under section 362 of the Bankruptcy Code does not apply to the terminated Franchise Agreements or to the equipment or property affected by the Leases.

24.     Furthermore, even if this Court were to determine that the Franchise Agreements and Leases were not terminated prior to the Petition Date, the automatic stay should be modified to permit IHOP to terminate the Franchise Agreements and the Leases given that the Debtors functionally have no interest in even non-terminated Franchise Agreements because: (a) the Debtors have no reasonable prospect of being able to satisfy the monetary and non-monetary obligations under the Franchise Agreements to effectuate assumption and assignment, even if IHOP were to consent to such assignments, or to satisfy associated cure amounts; (b) the Debtors have failed to pay post-petition rent pursuant to 11 U.S.C. § 365(d)(3) as it comes due on a weekly basis in an amount of $112,539.38; and (c) in some instances, the remaining terms under the

---

[3] In addition, the April 25, 2020, termination notice based on commencing  the assignment for the benefit of creditors and assigning the Franchise Agreements provides a separate and independent termination as of that date, in the event that either or both of the April 16, 2020, and April 17, 2020, terminations are found deficient for any reason by the Court.

DOCS_DE:228658.7 18037/004
DM_US 168796125-1.089762.0025

Franchise Agreements is de minimis and has not been timely extended, rendering them essentially valueless.[4]

26.	IHOP also requests that this Court modify the stay, to the extent that the Court finds it to apply, to permit IHOP to enforce (through, if necessary, litigation in any appropriate forum) its post-termination rights under the Franchise Agreements, including, without limitation, enjoining the Debtors from using or infringing IHOP's Marks, de-affiliating closed restaurants, and compelling surrender of the subleased premises and leased equipment to IHOP.

**Applicable Law and Argument**

I.	The Automatic Stay Does Not Apply Insofar as the Franchise Agreements and Leases Are Not Property of the Debtors' Estate

26.	Section 362 effectuates a stay of actions by certain parties against "property of the estate." *See, e.g.,* 11 U.S.C. § 362(a)(3) (staying "any act to obtain possession of *property of the estate* or of property from the estate or to exercise control over property of the estate") (emphasis added). By definition, the automatic stay only protects property of the estate. An agreement properly terminated prior to the bankruptcy filing never becomes property of the estate. For example, in *In re Levine*, 22 B.R. 16, 18 (Bankr. S.D. Fla. 1982), the court concluded that "[b]ased on the express language of the Franchise and Sublease Agreements, the uncontested evidence of default, and proper notice to the franchisees of such default, the Court finds that the Franchise and Sublease Agreements were terminated prior to the filing of the bankruptcy petition that precipitated this action. These agreements never became property of the estate and are therefore not subject to the automatic stay provisions of 11 U.S.C. § 362." *See also, e.g., In re Gainesville P-H Properties*, 77 B.R. 285, 295 (Bankr. M.D. Fla. 1987) (concluding that "[w]hen the

---

[4] IHOP expressly reserves the right to argue that the Debtors have no legitimate interest in the Franchise Agreements because the Franchise Agreements cannot be assigned absent the consent of IHOP, but do not make that position a basis for the requested relief.

termination process has been completed and has been effective prior to the date of the filing of the bankruptcy petition . . . there is nothing left to become part of the estate under 11 U.S.C. §§ 365 and 541").

27.    Other jurisdictions have come to the same conclusion. *See In re Triangle Lab.*, 663 F.2d 463, 467-68 (3d Cir. 1981) (finding that a contract validly terminated pre-petition is "not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's assets."); *Moody v. Amoco Oil Co.*, 734 F.2d, 1200, 1212-13 (7th Cir. 1984) (franchise agreement not property of the estate where right to cure franchise agreement terminated pre-petition and termination was automatically effective pre-petition; notice of termination sent post-petition did not extend debtor's time to cure default); *In re Iriss*, 630 F.2d 1370 (10th Cir. 1980) (contract terminated before filing cannot be assumed or rejected); *In re Moeini Corp.*, Case No. 17-4073, Order on IHOP's Motion for Relief From Stay [Dkt. No. 61] (Bankr. S.D. Ala. Dec. 6, 2017) (attached hereto as Exhibit B) (granting stay relief and finding if franchise agreements were properly terminated pre-petition, the agreements would not be property of the estate, but invoking permissive abstention and abstaining from deciding whether the pre-petition termination was proper in favor of a state court venue); *In re Tornado Pizza, LLC*, 431 B.R. 503, 510-11 (Bankr. D. Kan. 2010) ("when a franchise agreement has been terminated for cause prepetition and the termination process is complete with no right to cure when the petition is filed, the debtor does not have a property interest in the franchise on the date of filing and there is no executory contract to assume, even if on the date of filing the debtor remains in possession of the franchised business and continues to use the franchisor's trademark property. The bankruptcy filing does not resuscitate the terminated rights."); *In re Thompson*, 186 B.R. 301, 307 (Bankr. N.D. Ga. 1995) (contract terminated pre-petition "cannot be revived solely by virtue of a bankruptcy petition.

17

Filing for bankruptcy relief does not confer new rights on a debtor in regard to . . . terminated agreements and a debtor is not permitted to cure his defaults and/or assume such agreements."); *In re B-K of Kansas, Inc*., 69 B.R. 812, 816 (Bankr. D. Kan. 1987) (holding that franchise agreements that terminated pre-petition are not property of the bankruptcy estate).

28.    Therefore, in the first instance, the Court can determine that the automatic stay does not apply here because the Franchise Agreements were terminated pre-petition on April 16, 2020 (with respect to 28 locations), and on April 17, 2020 (with respect to 21 locations), and because the Leases were terminated not later than April 25, 2020, all well before the Debtors filed their chapter 11 petitions.[5]  Neither the Franchise Agreements nor the Leases nor the equipment and real property implicated in the Leases are property of the Debtors' estate.[6]

29.    The Franchise Agreements supply no flexibility in connection with core principles, among which are the requirement of continued operations.  It is a bedrock of franchise law and the restaurant industry that abandoning a restaurant, and announcing to the public that the restaurant is "permanently closed," warrants immediate termination of the franchise.  Durham-Mallory Declaration ¶ 8.  In addition to the total loss of revenue and damage to goodwill, closure creates negative connotations that affect the franchisor's brand.  For this reason, the courts have consistently recognized that a franchisee's abandonment of its franchise constitutes good cause for termination.  *See*, *e.g.*, *Zeidler v. A&W Restaurants, Inc*., 301 F.3d 572, 574 (7th Cir. 2002) ("[T]he Zeidlers must prove that A & W wrongfully terminated their franchise in order to show that A & W breached the license agreement and violated the [Illinois Franchise Disclosure

_____

[5] In addition, the April 25, 2020, termination notice based on commencing  the assignment for the benefit of creditors and assigning the Franchise Agreements provides a separate and independent termination as of that date, in the event that either or both of the April 16, 2020, and  April 17, 2020, terminations are found deficient for any reason by the Court.

[6] In addition, insofar as the Debtors effectuated irrevocable assignments for the benefit of creditors prior to the Petition Date, the Court may find that the Franchise Agreements and Leases remain with the assignee and are not property of the estate created by the Chapter 11 filing.

Act]. In attempting to do so, they point to A&W's March 25 termination letter. But by March 25 the Zeidlers had already abandoned their restaurant and their relationship with A & W; that abandonment justifies A&W's subsequent termination and therefore prevents the Zeidlers from establishing their breach of contract claim. The abandonment also dooms their IFDA claim because the statute recognizes voluntary abandonment of a franchise as "good cause" for a franchisor to terminate a license agreement."). In addition, virtually every state that has enacted a franchise statute has specifically recognized that a franchisee's abandonment of its franchise constitutes grounds for the immediate termination of a franchise agreement without affording the franchisee any notice or any opportunity to cure. *See, e.g.*, Cal. Bus. & Prof. Code § 20021(b).

30.     IHOP respectfully submits that the force majeure exception to performance of the Franchise Agreements, quoted above, does not render invalid IHOP's termination of the Franchise Agreements. Where the term is defined in the Franchise Agreements (not every Franchise Agreement supplies a definition), it is defined as follows:

> 'Force Majeure' means acts of God (such as tornadoes, earthquakes, hurricanes, floods, fire or other natural catastrophe); strikes, lockouts or other industrial disturbances; war, terrorist acts, riot, or other civil disturbance; epidemics; or other similar forces which Franchisee could not by the exercise of reasonable diligence have avoided; provided however, that neither an act or failure to act by a Governmental Authority, nor the performance, non-performance or exercise of rights under any agreement with Franchisee by any lender, landlord, contractor, or other person shall be an event of Force Majeure hereunder, except to the extent that such act, failure to act, performance, non-performance or exercise of rights results from an act which is otherwise an event of Force Majeure. For the avoidance of doubt, Franchisee's financial inability to perform or Franchisee's insolvency shall not be an event of Force Majeure hereunder.

*See* Franchise Agreement ¶ 1.02.

31.     While this defined term includes "epidemics," the overall definition is further explained by the phase "other similar forces which Franchisee could not by the exercise of reasonable diligence have avoided." Indeed, California law, applicable pursuant to the terms of

DOCS_DE:228658.7 18037/004
DM_US 168796125-1.089762.0025

the Franchise Agreements, "requires a promisor invoking a force majeure clause to show 'that, in spite of skill, diligence and good faith on his part, performance became impossible or unreasonably expensive.'" *Jin Rui Group, Inc. v. Societe Kamel Bekdache & Fils S.A.L.*, 621 Fed. Appx. 511, 511 (9th Cir. 2015). Reasonable diligence could have avoided the instant result. Here, CFRA *permanently* closed each of the restaurants that was the subject of its Franchise Agreements with IHOP. Such closing was neither necessitated by the epidemic nor required by the various state orders requiring the cessation of on-premises dining. CFRA was not *forced* to close the restaurants on a permanent basis; it elected to do so rather than continuing to operate delivery, curbside, or takeaway services. It elected to close the restaurants on a permanent basis notwithstanding IHOP's offer of opportunities to defer payments or to close on a temporary basis. This position is further supported by the fact that of IHOP's 330 other franchisees, none of them have unilaterally closed all their locations on a permanent basis. Furthermore, and apart from the fact that the closings were not the result of a force majeure event, nothing in connection with the epidemic or state orders compelled CFRA to effectuate the Florida ABC, which was an unauthorized attempt to transfer the franchise agreements that caused yet another material, incurable breach. Consequently, the Franchise Agreements were effectively terminated.

II.    <u>In the Alternative, the Automatic Stay Should Be Lifted</u>

32.    To the extent the Court determines the Debtors have any remaining rights in the Franchise Agreements or the Leases that have not been terminated, IHOP seeks to modify the stay and permit IHOP to terminate the Franchise Agreements. IHOP further requests that the Court modify the stay to permit IHOP to enforce its post-termination rights under the Franchise Agreements, including, without limitation: enjoining the Debtors from using or infringing IHOP Marks; supplying IHOP access to the premises and the equipment leased by the Debtors' pursuant

20

to the Leases; de-affiliating any closed restaurants; and compelling assignment of any real-estate leases for the restaurants that IHOP requests assignment of and surrender of the restaurants' premises to IHOP so that IHOP can take control of those restaurants and protect its brand.

      i.      *The Debtors Lack Equity in the Property and Do Not Have a Chance of Effective Reorganization*

33.      Section 362(d)(2) of the Bankruptcy Code provides that the automatic stay should be lifted if (a) "the debtor does not have an equity in such property" and (2) "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2).

34.      The Debtors have no equity in the franchise rights—including the Franchise Agreements, the Leases, and the property implicated by the Leases—because the Franchise Agreements and the Leases terminated pre-petition. "The existence of 'equity,' as used by § 362(d)(2), is dependent upon a finding that the market value of the property exceeds the debt secured by liens which attach to the property." *In re Mimi's of Atlanta, Inc.*, 5 B.R. 623, 630 (Bankr. N.D. Ga. 1980). While IHOP disputes that there are any valid liens encumbering its property—the Franchise Agreements, the Leases, or the property implicated thereby because, among other reasons, the Franchise Agreements specifically prohibit such encumbrance (*see* Franchise Agreement ¶ 11.02(a))—the "market value" of such property is relevant for determining whether there is any equity. Because the Franchise Agreements and the Leases terminated prior to the Petition Date, there is literally *nothing* for the Debtors to sell, no value, and thus no equity.

35.      Similarly, the property in question *cannot* be necessary to an effective reorganization. Regardless of the Debtors' prospects for reorganization, such reorganization cannot be contingent upon property that is not property of the Debtors' estates. Thus, because the Franchise Agreements were terminated prior to the Petition, the Debtors have neither the right

21

nor the capacity to continue to use IHOPs Marks, to continue to operate the IHOP restaurants, or to assign the Franchise Agreements.

36.     Consequently, in the event the Court determines that the automatic stay is applicable, relief from the automatic stay is warranted pursuant to 11 U.S.C. § 362(d)(2).

*ii.     The Debtors Have Failed to Provide Adequate Protection*

37.     There is also sufficient "cause" to modify the stay in this case pursuant to 11 U.S.C. § 362(d)(1).  Section 362(d)(1) of the Bankruptcy Code allows the Court to grant relief from the automatic stay "for cause, including the lack of adequate protection."  11 U.S.C. § 362(d)(1). Insofar as "Cause' is not defined in the bankruptcy code, . . . courts consider a variety of case-specific factors under the totality of the circumstances. . . .  These factors may include the following: (1) 'whether the debtor acted in bad faith'; (2) 'the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code'; and (3) 'pending state court proceedings'"  *In re Siewe*, 730 Fed. Appx. 871, 877 (11th Cir. 2018).

38.     The Court need not consider whether "cause" appears in the abstract because the cause here expressly arises from the complete lack of adequate protection.  *See, e.g., In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989) (observing that "[t]he statute specifically provides that 'the lack of adequate protection of an interest in property' is cause to lift a stay"). The Debtors' recently filed their debtor-in-possession financing motion.  The associated budget [Docket No. 47-1] provides no line items for continued payments to IHOP under the Leases or the Franchise Agreements.  In the absence of any adequate protection whatsoever, cause exists to provide IHOP with the requested relief from the stay.

III.   <u>Rule 4001(a)(3)</u>

39.    IHOP further requests any order entered in connection with the Motion be made immediately effective notwithstanding Rule 4001(a)(3), as a 14-day stay is unwarranted when the risk to IHOP's brand and the extended delays associated with the Debtors denial of access to the restaurants has persisted for over one month.

## **<u>Prayer for Relief</u>**

WHEREFORE, IHOP respectfully requests that the Court find that the automatic stay is not applicable with respect to the Franchise Agreements and Leases, all of which were terminated pre-petition or, in the alternative, IHOP requests that the Court lift, modify, or terminate the automatic stay for cause to allow IHOP to terminate the Franchise Agreements and allow IHOP to enforce (through, if necessary, litigation in any appropriate forum) its post-termination rights under the Franchise Agreements and the Leases, including, without limitation, enjoining the Debtors from using or infringing the Marks, de-affiliating any closed restaurants, compelling surrender of the subleased premises and leased equipment to IHOP, compelling assignment of any real-estate leases for the restaurants to IHOP which IHOP seeks assignment of and surrender of the restaurants' premises to IHOP; award prevailing party fees and expenses, including reasonable attorney's fees,

[*remainder of page intentionally left blank*]

in an amount to be determined; and waive the effect of Fed. R. Bankr. P. 4001(a)(3); or for such

other or further relief as the Court deems appropriate.

Dated: May 25, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       dbertenthal@pszjlaw.com

-and-

MCDERMOTT WILL & EMERY LLP

*/s/ Craig V. Rasile*
Craig V. Rasile (FBN 613691)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-4336
Telephone: (305) 358-3500
Facsimile: (305) 347-6500
Email: crasile@mwe.com

*Counsel to IHOP*

24

## <u>CERTIFICATE OF MAILING</u>

THE UNDERSIGNED HEREBY CERTIFIES that a true and correct copy of the foregoing *IHOP Restaurants LLC, IHOP Franchisor LLC, and IHOP Leasing LLC's Motion for Relief from the Automatic Stay* was served on all counsel of record and all interested parties identified on the attached Service List on May 25, 2020 via transmission of Notices of Electronic Filing generated by CM/ECF and via email; and on May 26, 2020 via First Class U.S. Mail, postage prepaid, as indicated thereon.

Dated: May 25, 2020                    **MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**

*/s/ Craig V. Rasile*
Craig V. Rasile (FBN 613691)
333 SE 2nd Avenue
Suite 4500
Miami, FL 33131-4336
Telephone:  (305) 358-3500
Facsimile:  (305) 347-6500
Email:  crasile@mwe.com

*Attorneys for Dine Brands Global, Inc., IHOP Restaurants, LLC, IHOP Franchisor, LLC, and IHOP Leasing, LLC*

**<u>Electronic Service List</u>**

Aaron S. Applebaum on behalf of Debtors CFRA Holdings, LLC, et al.
aaron.applebaum@saul.com

Carmen D. Contreras-Martinez on behalf of Debtors CFRA Holdings, LLC, et al.
carmen.contreras-martinez@saul.com; aida.mclaughlin@saul.com; mia-ctdocs@saul.com;
aaron.applebaum@saul.com

David S Catuogno on behalf of Creditor Raymond James Bank, N.A.
david.catuogno@klgates.com

David S Catuogno on behalf of Creditor Valley National Bank
david.catuogno@klgates.com

Herbert R Donica on behalf of Interested Party CFRA Holdings, LLC
ecf-hrd@donicalaw.com, ecf-cd@donicalaw.com; hrdecf@gmail.com;
r63937@notify.bestcase.com

Daniel Eliades on behalf of Creditor Raymond James Bank, N.A. and Valley National Bank
daniel.eliades@klgates.com

Alberto F Gomez, Jr. on behalf of Creditor Elliston Place Limited Partnership
al@jpfirm.com, al@jpfirm.com; andrenaw@jpfirm.com;  katherineb@jpfirm.com

Camille J Iurillo on behalf of Creditor SmartVision Construction, LLC
ciurillo@iurillolaw.com, nhawk@iurillolaw.com; khing@iurillolaw.com

Jeffrey T Kucera on behalf of Creditor Raymond James Bank, N.A. and Valley National Bank
jeffrey.kucera@klgates.com, etna.medina@klgates.com; docketing.east@klgates.com

David S Kupetz on behalf of Interested Party 6851 Lennox, LLC
dkupetz@sulmeyerlaw.com

Robert L. LeHane on behalf of Creditor SITE Centers Corp.
KDWBankruptcyDepartment@kelleyDrye.com; MVicinanza@ecf.inforuptcy.com

Dana L Robbins on behalf of Creditor Ballantyne Property Group, LLC
drobbins@burr.com, jmorgan@burr.com

J Ellsworth Summers, Jr. on behalf of Creditor Ballantyne Property Group, LLC
esummers@burr.com, sguest@burr.com

United States Trustee – TPA
USTPRegion21.TP.ECF@USDOJ.GOV

Nathan A Wheatley on behalf of U.S. Trustee United States Trustee – TPA
nathan.a.wheatley@usdoj.gov

1

**<u>Via U.S. Mail</u>**

6851 Lennox, LLC/Moss Group
6345 Balboa Blvd., Suite 310
Encino, CA 91316
Attn: Richard Moss

Beltram Edge Tool Supply Inc.
6800 North Florida Avenue
Tampa, FL 33604

BrightRidge
2600 Boones Creek Road
Johnson City, TN 37615

Bristol Virginia Utilities
15022 Lee Hwy
Bristol, VA 24202

Broadway Lights LLC
1085 Thousand Oaks Blvd.
Greenville, SC 29607

CaptiveAire Systems
4641 Paragon Park Road
Raleigh, NC 27616

Casual Dining Smyrna, LLC
c/o Richard Nasano
26 Knights Court
Saddle River, NJ 07458

Cigar City Marketing, LLC
1228 E. 7th Avenue, Suite 200
Tampa, FL 33605

City of Kingsport
225 West Center Street
Kingsport, TN 37660

Commercial Kitchen Specialist
1850 Indian Ridge Drive
Kingsport, TN 37660

Dan's Professional Plumbing
1558 Fuller Street
Kingsport, TN 37664

2

David Nakahara
415 Oneida Ct.
Danville, CA 94526

DDR Cotwold LP
Dept 328818 21089
41909
PO Box 83400
Chicago, IL 60691

Etheridge Roofing, Inc.
1211 Tarboro Street, SW
Wilson, NC 27893

Ford & Harrison LLP
Attn: P. Maxwell Smith
271 17th Street NW, Suite 1900
Atlanta, GA 30363

HPI Direct, Inc.
785 Goodard Court
Alpharetta, GA 30005

Interface Security Sys. LLC
8339 Solutions Center
Chicago, IL 60677

Johnson City Utility System
601 E. Main Street
Johnson City, TN 37601

MS Park
Dallas Lockbox
P.O. Box 848499
Dallas, TX 75284

National Tax Credit Holdings
10499 W. Bradford Rd., #102
Littleton, CO 80127

Performance Food Group
7420 Ranco Rd.
Henrico, VA 23228

Performance Foodservice
12500 West Creek Parkway
Henrico, VA 23238

3

Premier Fire Protection Inc.
1338 TN-126
Bristol, TN 37620

Putnam Mechanical
131 Crosslake Park Dr., #202
Mooresville, NC 28117

Raymond James Bank, N.A.
710 Carillon Parkway
St. Petersburg, FL 33716

Rosnet Technology
8500 NW River Park Dr.
Kansas City, MO 64152

Rustic Ridge Landscaping
205 Pickens Bridge Rd.
Johnson City, TN 37615

S&D Coffee
300 Concord Parkway South
Concord, NC 28027

Smartvision Construction, LLC
1155 East Isle of Palms Ave.
Myrtle Beach, SC 29579

The Wasserstrom Company
4500 E. Broad Street
Columbus, OH 43213

Trane Technologies
800-E Beaty Street
Davidson, NC 28036

Trilogy, Inc.
1220 Richmond Road
Williamsburg, VA 23185

Valassis Direct Mail, Inc.
90469 Collection Center Drive
Chicago, IL 60693

Valley National Bank
4790 140th Avenue North
Clearwater, FL 33762

4

Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC 20224

Internal Revenue Service
Centralized Insolvency Operation
Post Office Box 7346
Philadelphia, PA 19101-7346

Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Maria Chapa Lopez
United States Attorney for
the Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, FL 33602

Office of Attorney General
State of North Carolina
114 W. Edenton Street
Raleigh, NC 27603

Office of Attorney General
State of South Carolina
1000 Assembly St., #501
Columbia, SC 29201

Office of Attorney General
State of Virginia
202 North 9th Street
Richmond, VA 23219

Office of Attorney General
State of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207