<u>Exhibit 3—Typical Franchise Agreement</u>

IH #419

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement") is made and entered into as of this 31 day of August, 2013, (the "Effective Date") by and between IHOP Restaurants LLC, a Delaware limited liability company  (hereinafter referred to as "Franchisor") and CFRA, LLC, a Delaware limited liability company (hereinafter referred to as "Franchisee") with reference to the following facts:

A.    Franchisor or its predecessors have developed and Franchisor and its Affiliates are continuing to develop certain Systems for operating IHOP Restaurants under the names "IHOP," "The International House of Pancakes" and "International House of Pancakes Restaurant" which feature the sale of pancakes and various other food products, and which, conducted in accordance with the provisions of this Agreement and Franchisor's Operations Bulletins, are designed to enable such businesses to compete more effectively in their respective marketplaces;

B.    Franchisor now owns or licenses and hereafter will develop, license or purchase valuable Trademarks used in connection with the operation of IHOP Restaurants; and

C.    Franchisee desires to obtain a franchise to use the Systems and the Trademarks associated therewith in connection with the operation of one Franchised Restaurant at a specific Franchised Location, and Franchisor is willing to grant said franchise upon the terms and subject to the conditions set forth below.  Franchisee has executed this Agreement pursuant to the following (check one):

        [ ]    Area Development Agreement, dated _____
        [ ]    Multi-Store Development Agreement, dated _____
        [ ]    Novation Program
        [ ]    Single Store Development Program
        [ ]    Purchase Program
        [ ]    Renewal or extension of an existing franchise
        [ ]    Assignment of an existing franchise
        [X]    Other

WHEREFORE, IT IS AGREED:

I
## GRANT OF FRANCHISE

1.01  Use of Systems.

Franchisor hereby grants to Franchisee and Franchisee hereby accepts a franchise to operate one Franchised Restaurant at the Franchised Location during the Term hereof in accordance with the provisions of this Agreement and any ancillary documents pertaining hereto.

1.02  Certain Definitions

"Affiliate" when used herein in connection with Franchisor or Franchisee, includes each Business Entity which directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Franchisor or Franchisee, as applicable.  Without limiting the foregoing, the term "Franchisee-Affiliate" includes any Business Entity more than 49% of whose stock, membership interests, Partnership Rights, or other equity ownership interests (collectively "Equity") or voting control, is held by person(s) or Business Entities who, jointly or severally, hold more than 49% of the Equity or voting control of Franchisee.

"Alternative Distribution Channels" means and includes any site, venue or location, including grocery stores, supermarkets and convenience stores (including those which may be located within the Franchised Area) whether wholesale or retail, and including, without limitation, mail order catalogs, direct mail advertising, Internet marketing or other distribution methods.

"Applicable Law" means and includes all applicable common law and all applicable statutes, laws, rules, regulations, ordinances, policies and procedures established by any Governmental Authority, which governs the construction or operation of the Franchised Restaurant, including all building codes and local zoning provisions, and all labor, disability, food and drug laws and regulations, as in effect on the Effective Date, and as may be amended from time to time.

"Business Entity" means any limited liability company or partnership, general partnership or limited partnership, and any trust, association, corporation or other entity which is not an individual.

"Continuing Royalty" shall have the meaning given that term in Section 6.01 below.

"CSCS" shall mean Centralized Supply Chain Services, a co-operative formed in 2009 for the purpose of negotiating contracts of supply and distribution on behalf of IHOP and Applebees' franchisees who are members.

"Force Majeure" means acts of God (such as tornadoes, earthquakes, hurricanes, floods, fire or other natural catastrophe); strikes, lockouts or other industrial disturbances; war, terrorist acts, riot, or other civil disturbance; epidemics; or  other similar forces which Franchisee could not by the exercise of reasonable diligence have avoided; provided however, that neither an act or failure to act by a Governmental Authority, nor the performance, non-performance or exercise of rights under any agreement with Franchisee by any lender, landlord, contractor, or other person shall be an event of Force Majeure hereunder, except to the extent that such act, failure to act, performance, non-performance or exercise of rights results from an act which is otherwise an event of Force Majeure.  For the avoidance of doubt, Franchisee's financial inability to perform or Franchisee's insolvency shall not be an event of Force Majeure hereunder.

"Franchised Area" shall mean that geographic area which is either described in, or outlined on a map attached hereto as, Exhibit "A".

"Franchised Location" shall have the meaning given that term in Section 2.01.

"Franchised Restaurant" means the IHOP Restaurant franchised pursuant to this Agreement.

"Governmental Authority" means and includes all Federal, state, county, municipal or local governmental or quasi-governmental agencies, commissions and authorities.

"Gross Sales", as used in this Agreement, shall mean the total revenues derived by Franchisee in and from the Franchised Restaurant, whether for cash sales of food and other merchandise or otherwise, or charge sales thereof, or revenues from any source arising out of the operation of the Franchised Restaurant, deducting therefrom: (a) all refunds and allowances, if any; (b) any sales or excise taxes which are separately stated and which Franchisee collects from customers and pays to any federal, state or local taxing authority; and (c) any amounts deposited in any vending machines or pay telephones which are located in or about the Franchised Restaurant, if said vending machines and/or pay telephones are leased and not owned by Franchisee, in which case Gross Sales shall include only the commissions Franchisee receives therefrom.

"IHOP Restaurant" means a restaurant operated under Franchisor's Trademarks and in accordance with the Franchisor's Systems and specializing in the sale of pancakes and other authorized menu items.

"Initial Term" shall have the meaning given that term in Section 3.01.

"Leasing Affiliate" means the Affiliate of Franchisor which is the Franchisee's sublessor for the Franchised Location, if applicable.

"Local Advertising Fee" shall have the meaning given that term in Section 7.02.

"Majority Owner" means any owner which, directly or indirectly, owns 51% or more of the Stock of Franchisee.

"Master Lease", if applicable, means the lease for the Franchised Location under which Franchisor or its Leasing Affiliate is the lessee, and pursuant to which Franchisor or its Leasing Affiliate has subleased the Franchised Location to Franchisee.

"National Advertising Fee" shall have the meaning given that term in Section 7.01.

"New Master Lease" shall have the meaning given such term in Section 3.07(a).

"Non-Traditional Venue" means any site, venue or location within another primary business or in conjunction with other businesses or at institutional settings such as schools, colleges and universities, military and other governmental facilities, hospitals, airports, highway rest stops, toll roads, hotels, motels, arenas, travel plazas, office or in-plant food facilities, supermarkets, grocery stores or convenience stores, casinos, stadiums, shopping malls and any other site, venue or location operated by a master concessionaire or contract food service provider.

"Novation Program" means the Franchisor's program pursuant to which Franchisee has substituted this Agreement for a preexisting franchise agreement.

"Operations Bulletins" shall mean the Franchisor's Operations Manual, and all bulletins, notices, and supplements thereto, and all ancillary manuals, specifications and materials, as the same may be amended and revised from time to time.

"Other IHOP Concepts" means restaurants which (a) feature self-serve or counter service and not full table service, (b) have a different or more limited menu than that offered at an IHOP Restaurant, even though that menu may include pancakes and certain other authorized menu items authorized at Restaurants, and (c) operate under a principal name and mark different from "IHOP" or "International House of Pancakes" but which may include "IHOP" or "International House of Pancakes" together with an additional prefix or suffix, such as and including "IHOP Express", "IHOP U", and "IHOP N' GO".

"Owner" shall mean a shareholder, general partner, limited partner, member, or other owner of the Business Entity.

"Partnership" shall mean and include any general partnership and limited partnership.

"Partnership Right" shall mean the voting power, property, profits or losses, or partnership interests of a Partnership, or any of them.

"Purchase Program" means Franchisor's program pursuant to which the Franchisee assumes the ownership, operation and management of an IHOP Restaurant which was developed and/or operated by Franchisor or its Affiliate prior to the execution hereof.

"Renewal Term" shall have the meaning given that term in Section 3.02 or 3.03 as the context requires.

"Single Store Development Program" means Franchisor's program pursuant to which Franchisee leases or purchases the Franchised Location and either converts an existing restaurant into an IHOP restaurant or develops, constructs and equips an IHOP Restaurant thereat in accordance with Franchisor's current standards and specifications.

"Stock" shall mean all corporate shares (whether common, preferred or otherwise) in the case of a corporation, all membership interests in the case of a limited liability company, a partner's Partnership Rights in a Partnership, and in all cases all voting rights in the Business Entity.

"Systems" means the systems, products, methods, techniques and other Trade Secrets designated by Franchisor for Franchisee's use in connection with the Franchised Restaurant.

"Table Allowances" shall mean all rebates, allowances, discounts and other monetary compensation received by Franchisor or its Affiliate on account of the purchase of food items, supplies or services

by all franchisees in consideration for the open display by all franchisees of a supplier's product, trademark or logo. "Table Allowances" shall not include any allowances granted on account of purchases by less than all Franchisees.

"Term" means and includes the Initial Term of this Agreement, and any and all extensions and renewals thereof.

"then current" when used in connection with a franchise disclosure document, franchise agreement, sublease, equipment lease or other agreement means the form then currently being provided to prospective franchisees of Franchisor in the state in which the Franchise Location is situated, or if not then being so provided, then such form selected by Franchisor in its sole discretion which previously has been delivered to and, in the case of a franchise agreement, executed by a franchisee of Franchisor.

"Trademarks" means those trademarks, service marks, trade names, logotypes, insignia, labels, designs and other commercial symbols, which Franchisor may from time to time authorize or direct Franchisee to use in connection with the operation of the Franchised Restaurant, and which may include the names "IHOP," "The International House of Pancakes" and "International House of Pancakes Restaurant," and the goodwill annexed thereto.

"Trade Secrets" means the Franchisor's Systems and secret formulae, processes, ingredients, and methods of operation, including any information concerning the business, assets, liabilities, operations, affairs, customers, products, plans or prospects of Franchisor or its Affiliate(s) which has not been made available to the public, and all studies, reports, records or other documents or materials which contain, or are prepared on the basis of, any such non-public information.

"Venue" means any site, venue or location other than a Non-Traditional Venue.

"Weekly Reporting Period" shall mean Monday through Sunday, or such other 7 consecutive day period designated by Franchisor from time to time.

II
FRANCHISED LOCATION AND FRANCHISED AREA

2.01   Franchised Location.

(a)   Franchisor hereby grants and Franchisee hereby accepts a franchise to operate one Franchised Restaurant at the following location (hereinafter the "Franchised Location"):

**1031 Assembly Street**
**Columbia, SC 29201-3145**

(b)    Franchisee acknowledges and agrees that selection of the Franchised Location is Franchisee's sole responsibility, and that if Franchisor shall have, in its sole and absolute discretion, provided any assistance to Franchisee in evaluating or selecting the Franchised Location, such assistance shall not be construed as a warranty, guaranty or other assurance of any kind that such Franchise Location will necessarily be a successful or profitable site.

2.02   Franchised Area.

So long as Franchisee faithfully performs and observes each and all of the obligations and conditions to be performed and observed by Franchisee under or in connection with this Agreement, Franchisor, during the Term, shall not own, operate, franchise or license any IHOP Restaurant which is located within the Franchised Area. Notwithstanding any voluntary policy which Franchisor may from time to time establish regarding the spacing of IHOP Restaurants pursuant to which it may announce its intention to forebear from locating IHOP Restaurants within certain areas surrounding the Franchised Area, Franchisee acknowledges and agrees that Franchisor, or its Affiliates, expressly reserves the exclusive and unrestricted right, in its sole and absolute discretion, now and in the future, directly and indirectly, (a) to own, operate, franchise and license both within and outside of the Franchised Area restaurants and other business concepts operating under names other than "International House of Pancakes," or "IHOP," including Other IHOP Concepts, regardless of their proximity to the Franchised Restaurant, and whether or not such other restaurants or other business concepts offer products which are the same or similar to those which are or may be offered by the Franchised Restaurant; (b) to own, operate, franchise and license both within and outside of the Franchised Area IHOP Restaurants at Non-Traditional Venues; and (c) to produce, franchise, license, distribute and market products (whether or not under the Trademarks), including pre-packaged food, snacks and beverage products; books; clothing, souvenirs and novelty items, at or through any and all Alternative Distribution Channels (regardless of its proximity to the Franchised Restaurant), whether or not under the "International House of Pancakes" or "IHOP" names or the Trademarks.  Nothing herein grants any exclusive rights as to the customers who may be served by Franchisee, Franchisor or its Affiliates, or by any other franchisee.

### III
### TERM AND RENEWAL

3.01   Initial Term.

(a)  Subject to earlier termination pursuant to the provisions of this Agreement and the conditions set forth in paragraph 3.05, the "Initial Term" of this Agreement shall commence upon the Effective Date and shall expire (check applicable provision):

[  ]  ____ years after the date the Franchised Restaurant opens for business, or

[X] on August 30, 2033.

(b) Notwithstanding anything herein to the contrary, the Term of this Agreement (and the Term of any Renewal Agreement executed pursuant to Section 3.02 and/or 3.03) shall automatically terminate (i) upon the earlier expiration or termination of, as applicable, Franchisor's or the Leasing Affiliate's Master Lease, if any, or any lease or sublease, as applicable, for the Franchised Location, or (ii) upon the occurrence of any event which prevents or prohibits Franchisee from occupying the Franchised Location or Franchised Restaurant; provided, however, that Franchisee shall not do anything which will cause such Master Lease, lease or sublease to be terminated or otherwise amended or modified without the prior written consent of Franchisor or the Leasing Affiliate, as applicable, which consent may be granted or withheld for any reason in its sole and absolute discretion.

3.02   Special Renewal Term.

(a)   If (i) the Initial Term set forth in Section 3.01 is less than 10 years; (ii) Franchisor, the Leasing Affiliate, or Franchisee, as applicable, shall have accepted any renewal, extension or New Master Lease for the Franchised Location, thereby extending the Master Lease beyond the Initial Term; (iii) Franchisee shall have agreed to pay a Deferred Initial Fee as set forth in Section 5.01(b); and (iv) Franchisee shall have satisfied in all respects the requirements and conditions set forth in Sections 3.04 through 3.06, Franchisor shall provide Franchisee with the right, but not the obligation ("Renewal Right"), to execute a new franchise agreement (the "Renewal Agreement") for a period (the "Special Renewal Term") which shall commence at the end of the Initial Term and shall terminate (subject to earlier termination as provided in Section 3.01(b)) one day prior to the expiration of the New Master Lease (but in no event for a period which when combined with the Initial Term is more than 25 years).

(b)   This Section 3.02 shall not apply (i) if this Agreement has been executed as a renewal or extension of a preexisting franchise agreement; (ii) if Franchisee has executed this Agreement in connection with its purchase of an existing franchisee's business and the existing franchisee's franchise agreement does not expressly grant a Special Renewal Term; or (iii) if "other" is checked in Recital C to this Agreement.

3.03   General Renewal Term.

(a)   If (i) Franchisee shall have satisfied in all respects the requirements and conditions set forth in Sections 3.04 through 3.06, and (ii) Franchisee shall pay a Renewal Fee of $10,000, Franchisee shall be granted a Renewal Right upon the expiration of the Initial Term (or the Special Renewal Term, if applicable), to enter into a new franchise agreement in the then current form of Franchise Agreement (the "Renewal Agreement") the term of which shall commence upon the expiration of the Initial Term (or the Special Renewal Term, if applicable) and shall continue for a period of 10 years (subject to earlier termination as provided in Section 3.01(b)).

(b)   This Section 3.03 shall apply if this Agreement has been executed for a "Special Renewal Term" pursuant to Section 3.02 of Franchisee's preexisting franchise agreement, but shall not apply (i) if this Agreement has otherwise been executed as a renewal or extension of a

preexisting franchise agreement (e.g., for an "Option Term" pursuant to paragraph 3.03 of Franchisee's preexisting franchise agreement, or if such preexisting franchise agreement did not otherwise expressly grant Franchisee any further right to renew); (ii) if Franchisee has executed this Agreement in connection with its purchase of an existing franchisee's business and the existing franchisee's franchise agreement does not expressly grant a right to renew or to enter a Renewal Agreement; or (iii) if "other" is checked in Recital C to this Agreement.

3.04  Form and Manner of Renewal.

Franchisee shall exercise its Renewal Right, if at all, strictly in the following manner:

(a) at least 12 months but not more than 18 months before the expiration of the Initial Term of this Agreement, Franchisee shall notify Franchisor in writing ("Renewal Notice") that it intends to exercise its Renewal Right and shall request a copy of Franchisor's then-current Franchise Disclosure Document, immediately upon receipt of which Franchisee shall sign and return to Franchisor the acknowledgment of receipt attached to the Franchise Disclosure Document, and no sooner than 14 days nor more than 21 days after Franchisee receives said Franchise Disclosure Document, if applicable, and execution copies of the Renewal Agreement, Franchisee shall execute the copies of said Renewal Agreement and return them to Franchisor.

(b) If Franchisee subleases the Franchised Location from Franchisor or its Leasing Affiliate, Franchisee shall execute and return to Franchisor or its Leasing Affiliate, as applicable, the then-current form of sublease or amendment to sublease which Franchisor or the Leasing Affiliate, as applicable, shall prepare and deliver to Franchisee in accordance with Section 3.07(b), within 21 days after delivery of the same to Franchisee by Franchisor or the Leasing Affiliate.

(c) If Franchisee shall have exercised its Renewal Right in accordance with Section 3.04(a) and (b) and satisfied all of the conditions contained in Section 3.06, Franchisor shall execute the Renewal Agreement executed by Franchisee and at the expiration of the Initial Term deliver one fully executed copy thereof to Franchisee.

(d) If Franchisee fails to perform any of the acts, or deliver any of the documents required pursuant to the provisions of Sections 3.04 in a timely fashion, such failure shall be deemed an election by Franchisee not to exercise its Renewal Right and shall automatically cause Franchisee's said Renewal Right to lapse and expire, and this Agreement shall terminate at the end of the Initial Term.

3.05  Modification of Renewal Franchise Agreement

Notwithstanding anything herein contained to the contrary, the Renewal Agreement, if executed by parties hereto, shall differ, and be modified, from Franchisor's then-current form of franchise agreement in the following respects:

IHOPFDD 3/13
IH #419
CFRA, LLC

(a)  Franchisee shall be required to pay a Renewal Fee, as set forth in Section 3.03(a) for the General Renewal Term; provided, however, that if Franchisor has deferred Franchisee's Initial Franchise Fee, in whole or in part, pursuant to Section 5.01(d), Franchisee, with respect to the Special Renewal Term, prior to execution of the Renewal Agreement, shall have paid the Deferred Franchise Fee and/or executed and delivered to Franchisor the promissory note, in accordance with Section 5.01(b);

(b)  Franchisee's Continuing Royalty will not exceed the rate set forth in Section 6.01.

(c)  The Term shall be deemed modified consistent with Section 3.03 (and Section 3.02, if applicable) above and either: (i) all reference to a renewal term contained in the Renewal Agreement shall be deleted and Franchisee shall have no further right or option to renew or to execute any further Renewal Agreement, or (ii) if this Agreement has been executed for a Special Renewal Term, Franchisee shall be provided with one additional Renewal Right after the Special Renewal Term, as described in Sections 3.02 and 3.03.

(d)  Franchisee acknowledges and agrees that Franchisor's then current form of franchise agreement may contain terms substantially different than those contained in this Agreement, which may include, without limitation, a different Franchised Area, and a National Advertising Fee and Local Advertising Fee exceeding the rates set forth in Section 7.01, depending on the rates set forth in the then current franchise agreement.

3.06  General Conditions Precedent to Renewal

Franchisee's right to enter into a Renewal Agreement, in accordance with the provisions of Section 3.03 (or Section 3.02, if applicable) is conditioned upon Franchisee's fulfillment of each and all of the following conditions precedent:

(a)  At the time Franchisee delivers its Renewal Notice to Franchisor and at all times from such notification to the time of the commencement of the term of the Renewal Agreement, Franchisee shall have fully performed all of its obligations under this Agreement and under all other agreements which may then be in effect between Franchisee and Franchisor or its Affiliate, including any sublease, equipment lease, and promissory note, and each Franchisee-Affiliate shall have fully performed all of its obligations under each and every agreement between such Franchisee-Affiliate and Franchisor or its Affiliate.

(b)  At the time Franchisee notifies Franchisor of its election to renew, and at the commencement of the Renewal Agreement, Franchisee shall have not received 4 or more notices of default during any 24 month period during the Initial Term of this Agreement, whether or not such defaults were cured.

(c)  If Franchisor has deferred the Initial Franchise Fee, in whole or in part, pursuant to Section 5.01(d), with respect to the Special Renewal Term, if applicable, Franchisee shall have paid the Deferred Initial Fee and/or executed and delivered to Franchisor a promissory note providing for

the payment of the Deferred Initial Fee, in accordance with Section 5.01(d), or Franchisee shall pay the Renewal Fee pursuant to Section 3.03(a) with respect to the General Renewal Term.

(d)  Concurrently with Franchisee's delivery of it Renewal Notice, Franchisee shall have provided written evidence and assurance satisfactory to Franchisor of Franchisee's financial ability to refurbish and remodel the Franchised Restaurant pursuant to Section 4.03(b), and prior to the expiration of the Initial Term, Franchisee, at its sole expense, shall have completed refurbishing and remodeling the Franchised Restaurant, pursuant to Section 4.03(b), shall have repaired the Franchised Restaurant so that it is in first class condition and repair pursuant to Section 4.03(a), and shall have otherwise brought it into conformity with Franchisor's specifications and standards, as respects building design, furniture, fixtures, signs, equipment and color schemes, as are then applicable for new franchises being granted by Franchisor for the operation of IHOP Restaurants. If Franchisee fails to fully remodel the Franchised Restaurant prior to the commencement of the Renewal Term, the Renewal Right shall lapse and this agreement shall automatically terminate without notice to Franchisee unless the time for completion of the remodel has been extended by Franchisor in writing.

(e) Franchisee shall have secured the right to continue to occupy the Franchised Location after the expiration of the Initial Term and throughout the Renewal Term by having renewed or extended its lease or sublease, or executed a new or amended lease or sublease (at Franchisor's election, on the then-current form of agreement, if the Franchised Location is leased or subleased from Franchisor or its Affiliate).

(f) At the time Franchisee delivers its Renewal Notice to Franchisor and at all times from and after such notification to the time of the commencement of the term of the Renewal Agreement, Franchisee shall meet the then-current standards set by Franchisor for issuing new franchises to existing franchisees.

3.07  No Duty by Franchisor to Renew Master Lease

(a)  Franchisee acknowledges that its right to enter into a Renewal Agreement, and the continuation of the Term of the Franchise Agreement, shall be subject to the continuation of Franchisee's right to occupy the Franchised Location.  If Franchisee's Location is leased or subleased by Franchisee from a third party, it shall be Franchisee's sole responsibility to maintain its lease or sublease for the Franchised Location in full force and effect.  If Franchisee subleases the Location from the Franchisor or its Leasing Affiliate, neither Franchisor nor its Leasing Affiliate shall be obligated to exercise any renewal right or option available to it under the Master Lease, or otherwise, and any decision to exercise any option to renew or extend the Master Lease may be exercised in its sole and absolute discretion.  If Franchisor or such Leasing Affiliate shall decide not to renew or exercise any said option to renew, it may in its sole discretion (if and to the extent permitted to do so under its Master Lease) assign any such renewal right or option to Franchisee who may exercise it in its own name and behalf; provided, however, that Franchisor shall not be required to continue, assume, or undertake, any continuing liability with respect to the lease for the Franchised Location, whether as assignor, signatory or guarantor, and it shall be Franchisee's exclusive responsibility to

provide such guarantees, security or other financial assurances as may be acceptable to the lessor. Any such option (if exercised) or renewal, extension or new Master Lease (if accepted by Franchisor or the Leasing Affiliate, as applicable) shall be referred to herein as the "New Master Lease."

(b)  Should Franchisor or the Leasing Affiliate, as applicable, as a condition to or in consideration for the New Master Lease, be required to or otherwise agree to increases in base rental, percentage rental, taxes and/or "other expenses" in excess of those previously required of Franchisee as lessee, under the Master Lease, Franchisor or the Leasing Affiliate, as applicable, shall have the right to increase in a like dollar amount, any, all, or any combination of the base rental, percentage rental, taxes and/or "other expenses", respectively, to be paid by Franchisee to Franchisor or the Leasing Affiliate pursuant to the sublease or amendment to sublease to be executed by Franchisee under Sections 3.04(b) and 3.06(e), respectively.  Any such increase(s) in Franchisee's base rental, percentage rental, taxes and/or "other expenses" shall be equal in dollar amount to the increase(s) therein required of Franchisor or the Leasing Affiliate, as applicable, as lessee in connection with the New Master Lease.  By way of illustration, if the original Master Lease called for a minimum monthly rental of $1,000.00, and the New Master Lease called for a minimum monthly rental of $2,000.00, with no change in the amount of percentage rental, the Franchisee's sublease minimum rental would increase by $1,000.00 per month payable on a weekly basis.  "Other expenses" may include a onetime payment to Franchisor's or the Leasing Affiliate's Master Landlord in consideration for the New Master Lease, new or increased administrative fees or common area maintenance charges, and/or capital expenditures or expenses for remodelling, refurbishment, expansion, renovation, repair or decoration of the interior, exterior or surrounding areas of the Franchised Location.  Any such obligations shall be in addition to those required under Section 3.06(d) above; in the event of any conflict between work to be performed under Section 3.06(d) on the one hand, and this Section 3.07(b), on the other hand, the resolution thereof shall be determined by Franchisor or the Leasing Affiliate, as applicable, in its sole and absolute discretion.

3.08  Notice of Expiration Required by Law.

If Applicable Law requires that Franchisor give notice to Franchisee prior to the expiration of the Term, this Agreement shall remain in effect on a week-to-week basis until Franchisor has given the requisite notice required by such Applicable Law.  Notwithstanding anything herein to the contrary, if Franchisor is not offering new franchises or is otherwise not lawfully able to offer Franchisee its then-current form of Franchise Agreement at the time Franchisee elects to renew, Franchisor may, at its option, agree to renew this Agreement on its current terms, or extend the term hereof until it is lawfully able to offer its then-current form of franchise agreement.

IV
RESTAURANT CONSTRUCTION AND REFURBISHING

4.01  Standard Plans and Specifications.

(a)  If the Franchised Restaurant has not been constructed as of the Effective Date, Franchisor or its Affiliate shall furnish to Franchisee, at no additional charge to Franchisee,

Franchisor's standard plans and specifications for the erection of an IHOP Restaurant and for equipment and signs, but excluding site plans. Franchisee shall, at its sole cost and expense, prepare site plans, and make such modifications to Franchisor's standard plans and specifications, as may be required to construct the Franchised Restaurant and the entire Franchised Location in conformity with Applicable Law. Franchisee shall not make or allow any change or addition to be made in or to the plans or specifications furnished by Franchisor or its Affiliate without Franchisor's or its Affiliate's, as applicable, prior written consent and approval, which consent and approval shall not be unreasonably withheld. If requested by Franchisor, upon completion of the construction, and prior to opening, Franchisee shall cause its architect to provide to Franchisor a certification that the building was built in accordance with plans previously submitted and approved by Franchisor and that the plans as submitted to IHOP comply with all applicable laws and codes. It is Franchisee's responsibility to ensure that the building complies with all applicable laws and codes.

(b) If the Franchised Restaurant is to be converted to an IHOP Restaurant by Franchisee, Franchisor or its Affiliate will furnish to Franchisee, at no cost to Franchisee, Franchisor's standard plans and specifications for the construction of an IHOP Restaurant and for equipment and signs, and/or remodel specifications for the conversion of a restaurant. Franchisee shall, at its sole cost and expense, adapt the standard plans to the particular site in conformity with Franchisor's standard plans, prepare site plans and submit the same to Franchisor or its Affiliate for its written approval. Any further modifications to the plans or deviations from the provided plans and specifications are subject to the prior written approval of Franchisor or its Affiliate, as applicable. If requested by Franchisor, upon completion of the construction, and prior to opening, Franchisee shall cause its architect to provide to Franchisor a certification that the building was converted in accordance with plans previously submitted and approved by Franchisor and that the plans as submitted to IHOP comply with all applicable laws and codes. It is Franchisee's responsibility to ensure that the building complies with all applicable laws and codes.

4.02  Construction.

(a) If this Agreement has been signed under the Multi-Store Development Program or Single Store Development Program, Franchisee shall, at its sole cost and expense, acquire the Franchised Location through purchase or lease, and promptly either erect, or cause to be erected, or convert the building, as applicable, to an IHOP Restaurant on the Franchised Location which conforms to the plans and specifications furnished to Franchisee, pursuant to Section 4.01(a) or (b) as applicable. Franchisee shall use its best efforts promptly to complete construction or conversion, as applicable, and have all fixtures, furnishings, machinery and equipment installed, parking areas completed, inventory delivered, business and other permits obtained, personnel employed and all other necessary things attended to so that the Franchised Restaurant shall be open for business to the public as expeditiously as possible, but by no later than _____.

(b) If this Agreement has been signed under the Single Store Development Program or Multi-Store Development Program, Franchisee shall provide Franchisor with comprehensive information regarding all phases of the development process of the Franchised Location as Franchisor may require, and weekly progress reports during construction, in a format designated by

Franchisor. Such information shall include, without limitation, the name, telephone number, and address of the architect, civil engineer, surveyor, general contractor, and environmental consultant, and the primary contact for each, copies of all permits, and digital photographs, and shall be submitted to Franchisor via hard copy, electronically including subscribing to a web based construction tracking service, or by such other means as Franchisor may designate.

(c) If this Agreement has been signed under the Single Store Development Program, notwithstanding anything to the contrary contained in Section 4.02 (a), Franchisee may, at its option, forestall the termination of this Agreement by Franchisor caused by Franchisee's failure to open the Franchised Restaurant by the date set forth in Section 4.02 (a), provided Franchisee has broken ground and commenced construction by the date set forth in Section 4.02(a), by providing Franchisor with written notice of Franchisee's request for additional time, specifying the amount of additional time requested, which in no event shall exceed 60 days, and by paying to Franchisor the sum of $350.00 per day ("Delayed Development Fee") in advance with said written notice, for each day (in whole or in part) for which the extension of time is requested, provided, however, if Franchisee shall have failed to open the Restaurant within 60 days after the date set forth in Section 4.02(a), or to pay the Delayed Development Fee for the extended period, then such failure shall constitute a material breach of this Agreement pursuant to Section 12.02.

(d) If this Agreement has been signed under the Multi-Store Development Program, notwithstanding anything to the contrary contained in Section 4.02 (a), Franchisee may, at its option, forestall the termination of this Agreement by Franchisor caused by Franchisee's failure to open the Franchised Restaurant by the date set forth in Section 4.02 (a), provided Franchisee has broken ground and commenced construction by the date set forth in Section 4.02(a), by providing Franchisor with written notice of Franchisee's request for additional time, specifying the amount of additional time requested, which in no event shall exceed 60 days, and by paying to Franchisor the sum of $350.00 per day ("Delayed Development Fee") in advance with said written notice, for each day (in whole or in part) for which the extension of time is requested, provided, however, if Franchisee shall have failed to open the Restaurant within 60 days after the date set forth in Section 4.02(a), or to pay the Delayed Development Fee for the extended period, then such failure shall constitute a material breach of this Agreement pursuant to Section 12.01. Payment of the Delayed Development Fee hereunder shall constitute payment of the Delayed Development Fee as set forth in Section 2.1.2 of the Multi-Store Development Agreement between the parties hereto or their Affiliate(s), as applicable.

4.03 <u>Maintaining and Refurbishing of Franchised Restaurant</u>.

(a) Franchisee shall at all times during the Term hereof maintain at its sole expense the interior and exterior of the Franchised Restaurant and the entire Franchised Location, including the parking lot and the point of sale system, in first class condition and repair, and in compliance with all Applicable Laws and Operations Bulletins, except to the extent Franchisor may otherwise expressly agree in writing.

(b) Except as otherwise provided herein, every 5 years during the entire Term hereof, at Franchisee's sole cost and expense, Franchisee shall refurbish, remodel and improve the Franchised Restaurant in accordance with Franchisor's then current standards as set forth in the Operations Bulletins or as otherwise promulgated by Franchisor and provided to Franchisee. Franchisee shall commence the first such refurbishing, remodeling and improving [check one] [ ] on _____, or [X] on the anniversary date occurring 5 years from the Effective Date.  Each subsequent refurbishing, remodeling and improving shall commence 5 years from the date on which the last such refurbishing, remodeling and improving was commenced. Franchisee shall complete any such refurbishing, remodeling and improving as expeditiously as possible, but in any event within 30 days after commencing same.  This refurbishment and remodel requirement is in addition to and does not include the maintenance obligations set forth in Section 4.03(a) above.



(c) Franchisor or its Affiliate may, on one or more occasions, by written notice to Franchisee, waive or defer for such period of time as Franchisor may deem appropriate, Franchisee's obligation to refurbish, remodel and improve an IHOP Restaurant.

4.04  Lease Requirements and Franchisor's Succession Rights.

(a) If Franchisee leases the Franchised Location or the Franchised Restaurant from a third party, the lease shall expressly provide, by lease addendum in a form prescribed by IHOP, unless Franchisor modifies or waives these requirements in writing, that (i) in the event of any breach or claim by the Landlord thereunder of any breach by Franchisee, said Landlord shall be obligated to notify Franchisor in writing at least 30 days prior to the termination of said lease, where-upon Franchisor or an Affiliate shall have the right, but not the obligation, to cure such breach and succeed to Franchisee's rights thereunder, and (ii) in the event of the termination of this Agreement as a result of Franchisee's breach hereof, and upon Franchisor's or such Affiliate's written election to Franchisee to be made within 10 days after the date of said termination, Franchisor or its Affiliate shall have the right to succeed to Franchisee's rights under the lease, and (iii) if Franchisor does not elect the foregoing right to succeed to Franchisee's rights under the lease, Landlord shall permit Franchisor to have reasonable access to the leased premises for the purpose of de-identifying the Franchised Restaurant such that it will no longer be recognized as an IHOP Restaurant.  If Franchisor or such Affiliate elects to succeed to Franchisee's rights under the lease, as aforesaid, Franchisee shall assign to Franchisor or such Affiliate all of its right, title and interest in and to said lease, whereupon the Landlord thereunder shall attorn to Franchisor or such Affiliate as the tenant thereunder.  Franchisee shall execute and deliver to Franchisor or such Affiliate such assignment and take such further action as Franchisor or such Affiliate, as applicable, in its sole and absolute discretion, may deem necessary or advisable to effect such assignment, within 10 days after written demand by Franchisor or such Affiliate to do so, and upon Franchisee's failure to do so, Franchisor or such Affiliate shall be, and hereby is, appointed Franchisee's attorney in fact to do so.  This power of attorney granted by Franchisee to Franchisor or such Affiliate is a special power of attorney coupled with an interest and is irrevocable and shall survive the death or disability of Franchisee.  Any sum expended by Franchisor or such Affiliate to cure Franchisee's breach of the lease shall be deemed additional sums due Franchisor or its Affiliate hereunder and Franchisee shall pay such amount to

Franchisor or its Affiliate upon demand.  The covenants of Franchisee contained in this Section 4.04(a) shall survive the termination of this Agreement.

(b) Franchisee shall deliver to Franchisor a complete copy of such lease promptly after execution thereof by Franchisee and the Landlord in the form previously approved by Franchisor.  Franchisee shall duly and timely perform all of the terms, conditions, covenants and obligations imposed upon him or her under the lease for the Franchised Location.

4.05 Damage and Destruction; Condemnation

(a)    In the event of damage or destruction to the Franchised Restaurant, or any portion thereof, at any time during the Term, this Agreement shall continue in full force and effect. Franchisee shall proceed as soon as possible but no later than thirty (30) days after the date of the occurrence of any damage or destruction, to repair, replace and restore the Franchised Restaurant to its condition prior to such damage or destruction.  If Franchisee is proceeding diligently and through no fault of Franchisee, Franchisee is unable to commence the repair, replacement and/or restoration within the 30 day period, Franchisor shall allow Franchisee such additional reasonable period of time as Franchisor deems reasonably necessary to commence same. Such construction shall be completed and the Franchised Restaurant shall reopen for business not later than twelve (12) months following the date of such damage or destruction. If Franchisee is proceeding diligently and through no fault of Franchisee, Franchisee is unable to complete the construction and reopen for business within twelve (12) months following the date of damage or destruction, Franchisor shall allow Franchisee such additional reasonable period of time as Franchisor deems reasonably necessary to complete same and reopen for business.  Franchisee shall have available to it the proceeds, if any, from the policy or policies of insurance maintained by Franchisee pursuant to Section 10.4 below and the Operations Bulletins to pay for such repair, replacement and restoration of the Franchised Restaurant, subject to the provisions of the Master Lease, if applicable.  In the event the proceeds from such insurance are insufficient or not available to pay for any repair, replacement or restoration of the Franchised Restaurant, Franchisee shall, at its sole cost and expense, complete the repair, replacement and restoration of the Franchised Restaurant, and provide to Franchisor, within fifteen (15) days of a request by Franchisor, such written assurances as Franchisor may require, in its sole and absolute discretion, that Franchisee will pay for the cost of such repair, replacement and restoration.  In the event Franchisee shall fail to provide Franchisor with satisfactory assurances that Franchisee shall pay for the total cost of any repair, replacement or restoration of the Franchised Restaurant, Franchisor may, in its sole and absolute discretion, in writing delivered to Franchisee within ninety (90) days after such damage or destruction, terminate this Agreement as of the date of such damage or destruction.

(b)    In the event that any portion of the Franchised Location or interest therein is taken by any governmental authority under power of eminent domain or a sale by Landlord or Franchisor or its Affiliate, if Franchisor or its Affiliate is the Landlord of the Franchised Location, to or as directed by any authority having the power of eminent domain either under the threat of condemnation or while condemnation proceedings are pending, then subject to the provisions of the Master Lease and Sublease with Franchisor or its Affiliate, if applicable, and unless the purpose of this Agreement is

frustrated by said taking or sale of a portion of the Franchised Location, Franchisee shall repair and restore the Franchised Location at Franchisee's cost and expense.

(c)    If Franchisee is required to repair or restore the Franchised Restaurant pursuant to Section 4.05 (a) or (b) above, Franchisee shall make every effort to have the repaired or reconstructed Franchised Restaurant reflect the then-current image, design and specifications of new IHOP Restaurants.

V

INITIAL FRANCHISE FEE

5.01  <u>Initial Franchise Fee (check as applicable)</u>:

[ ]    (a) If this Agreement has been signed under the Purchase Program, Franchisee shall pay to Franchisor the sum of $_____, as an Initial Franchise Fee; payable $_____ upon the execution of this Agreement, and the balance, if any, in _____ equal weekly installments with interest on the unpaid balance at the rate of ____% per annum (or the maximum rate allowed by law, whichever is lower), evidenced by a promissory note on the form prescribed by Franchisor. The first payment on the balance shall be due on the second Wednesday following the date the Franchised Restaurant opens for business with subsequent payments due on each succeeding Wednesday until paid in full.

[ ]    (b) If the Initial Term under the Purchase Program set forth in Section 3.01(a) is less than 10 years, and Franchisee is entitled to a Special Renewal Term pursuant to Section 3.02, Franchisee shall also pay, as a condition precedent to Franchisee's right to enter into a Renewal Agreement pursuant to Section 3.02, and in addition to the Initial Franchise Fee payable pursuant to Section 5.01(a), a "Deferred Initial Fee" equal to $_____ for each year of the First Renewal Term (not to exceed a total of $_____); which Deferred Initial Fee shall be payable $_____ at the time Franchisee executes its Renewal Agreement pursuant to Sections 3.02 and 3.04, and the balance, if any, in _____ equal consecutive weekly installments with interest on the unpaid balance at the rate of ____% per annum (or the maximum rate allowed by law, whichever is lower), evidenced by a promissory note on the form prescribed by Franchisor.

[ ]    (c) If Franchisee is executing this Agreement pursuant to the Single Store Development Program under which you paid a location fee ("Location Fee"), Franchisee shall pay to Franchisor the sum of $50,000.00 as an Initial Franchise Fee, less the Location Fee of $15,000.00 paid for the Franchised Location, payable upon execution of this Agreement.

[ ]    (d) If Franchisee is executing this Agreement pursuant to the terms of an executory IHOP Multi-Store Development Agreement pursuant to which you paid a development fee ("Development Fee"), Franchisee shall pay to Franchisor the sum of $40,000.00, less the Development Fee of $20,000.00 paid for this Franchised Location, payable upon execution of this Agreement.

[ ]      (e)  If this Agreement has been signed under the Novation Program, or in connection with the renewal or assignment of a preexisting franchise agreement for the Franchised Location, there shall be no Initial Franchise Fee payable pursuant to the execution of this Agreement, but any balance which remains unpaid in respect of the franchise fee previously incurred by Franchisee (or its assignor, if applicable) shall remain payable on the terms previously agreed, as shall the general account balance and other obligations then owed to Franchisor by Franchisee (or its assignor, if applicable).

[ ]      (f) If Franchisee is executing this Agreement pursuant to the terms of an executory IHOP Area Development Agreement for a Franchised Location within the Exclusive Territory defined therein, there shall be no additional Initial Franchise Fee payable pursuant to the execution of this Agreement, but any balance which remains unpaid in respect of the franchise fee previously incurred by Franchisee pursuant to the Area Development Agreement shall remain payable on the terms previously agreed, as shall Franchisee's other obligations to Franchisor.

[X]      (g) If "other" is checked in Recital C to this Agreement, Franchisee shall pay to Franchisor the sum of $50,000 as an Initial Franchise Fee.

[ ]      (h) If Franchisee is executing this Agreement as a renewal or extension of an existing franchise for a General Renewal Term, Franchisee shall pay to Franchisor the sum of $10,000 as a "Renewal Fee" payable upon execution of the Renewal Agreement.

## VI
## CONTINUING ROYALTY, DEFINITION OF
## GROSS SALES AND RECORD KEEPING

6.01 Continuing Royalty.

Each week during the Term, Franchisee shall pay to Franchisor a Continuing Royalty in an amount equal to:

[X]      (a) 4.5% of Franchisee's Gross Sales during the preceding Weekly Reporting Period, or

[ ]      (b) The percentage of Franchisee's Gross Sales set forth in the schedule attached hereto, for the first _____ Weekly Reporting Periods following the Effective Date, and thereafter 4.5% of Franchisee's Gross Sales for the balance of the Term.

6.02 Payments and Reporting.

(a) The Continuing Royalty payment for each Weekly Reporting Period shall be due on the Wednesday following the Weekly Reporting Period in which such Gross Sales were earned, and shall be accompanied, where applicable, by any installment payments due pursuant to Section 5.01.

(b) Franchisee's weekly Continuing Royalty payments shall be accompanied by a statement in such form and detail as Franchisor shall from time prescribe, showing how such Continuing Royalty was computed for such Weekly Reporting Period, and accompanied by all electronic point-of-sale system tapes of the Franchised Restaurant for the same period.

(c) On a monthly basis, Franchisee shall submit to Franchisor a copy of Franchisee's monthly sales tax reports.

(d) Within 30 days after the expiration of each calendar quarter (or other 3 month period designated by Franchisor), Franchisee shall furnish Franchisor with a profit and loss statement of the Franchised Restaurant for such previous quarter and within 90 days after the end of each calendar year, Franchisee shall furnish Franchisor with a profit and loss statement and balance sheet of the Franchised Restaurant for the previous calendar year. All such financial statements shall be prepared in accordance with Generally Accepted Accounting Principles ("GAAP") consistently applied from applicable period to period and shall be certified by Franchisee, or by Franchisee's Chief Executive Officer or Chief Financial Officer, if Franchisee is a Business Entity, as being true and correct, and as being prepared in accordance with GAAP consistently applied from applicable period to period. All such financial statements shall also comply with any specific requirements as Franchisor may from time to time designate. Franchisee hereby irrevocably consents to the inspection of said financial statements by Franchisor or its Affiliate and to Franchisor's use of said financial statements, at Franchisor's election, in Franchisor's franchise disclosure document for the offer and sale of franchises. Franchisee shall submit all such financial statements to Franchisor by such means, including electronically, as Franchisor may designate from time to time.

(e) If Franchisee should at any time cause an audit of Franchisee's business to be made by a public accountant, Franchisee shall furnish Franchisor with a copy of said audit, without any cost or expense to Franchisor.

(f) Franchisee shall allow Franchisor and its Affiliate access to, and upon request shall provide copies of, the Franchisee's state, federal and local income tax returns and Franchisee hereby waives any privilege pertaining thereto.

(g) Upon request of Franchisor, Franchisee must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to receive payments from Franchisee by pre-authorized bank draft, wire transfer, automated clearinghouse (ACH) transfer, or otherwise, as Franchisor specifies from time-to-time in Franchisor's sole and absolute discretion, in accordance with procedures that may be set forth in the Operations Bulletins.

6.03 Records.

(a) Franchisee shall record all sales in such form and manner, and using such equipment, as prescribed in the Operations Bulletins. Franchisee shall cause all such sales to be registered upon an electronic point-of-sale system, of such type and having such features as specified

by Franchisor, and which may require a lock-in running total. At any time upon Franchisor's request, Franchisee shall provide to Franchisor or its authorized representatives access, and if applicable a key to permit reading of, the running total of the point-of-sale system. Any electronic point-of-sale system must at all times meet each and all of Franchisor's standard specifications and requirements then in effect for same.

(b) Franchisee shall keep and preserve for a period of not less than 36 months after the end of each calendar year or any longer period as may be required by Applicable Law, such business records as may be prescribed by Franchisor, including point-of-sale system reports, standardized numbered guest checks, sales tax or other tax returns, bank books, duplicate deposit slips, and other evidence of Gross Sales and business transactions in accordance with Franchisor's requirements promulgated from time to time. In addition to the rights granted Franchisor under Section 10.07, Franchisor and its Affiliate shall have the right, at any time and from time to time, to enter Franchisee's Franchised Restaurant and other business offices to inspect (including the right to inspect point-of-sale systems, and other equipment, as applicable, and to take readings of all documenters, pre-checkers and point of sale systems), audit, verify sales and make or request copies of books of account, bank statements, documents, records, tax returns, papers and files of Franchisee relating to Gross Sales and business transacted and, upon request by Franchisor, Franchisee shall make any such materials available for inspection by Franchisor and its Affiliate at the Franchised Restaurant or at Franchisee's other business offices as specified by Franchisor. Such audit and/or sales verification may include the on-site presence of one or more personnel of Franchisor or its Affiliate for 7 full consecutive days. If Franchisor should cause an audit to be made and the Gross Sales business transacted and payments due to Franchisee as shown by Franchisee's statements should be found to be understated or unpaid by any amount, Franchisee shall immediately pay to Franchisor or its Affiliate, if applicable, the additional amount payable as shown by such audit, plus interest thereon at the highest rate of interest allowed by law, and if they are found to be understated by 2% or more, or if records are not produced as requested by Franchisor, Franchisee shall also immediately pay to Franchisor the cost of such audit and any subsequent audit and/or sales verification that may be performed due to Franchisee's prior failure to produce records; otherwise, the cost of the audit shall be paid by Franchisor.

(c) Upon request by Franchisor, Franchisee shall electronically link its Franchised Restaurant to Franchisor or its Affiliate, and allow Franchisor and/or its Affiliate, to poll the Franchised Restaurant on a daily or other basis at such times and in such manner as established by the Franchisor or its Affiliate, with or without notice, through the computerized POS system and to retrieve such transaction information including sales, sales mix, usage, and other operations data as Franchisor and/or its Affiliate deems appropriate. Franchisee shall, at its sole cost and expense, obtain and maintain such means of making such information available electronically, such as the internet via a broadband connection, or if not available, a separate dedicated telephone line and modem or such other alternative electronic means of gathering this information, at Franchisee=s cost and expense, as Franchisor or its Affiliate may specify from time to time.

VII

ADVERTISING

IHOPFDD 3/13
IH #419
CFRA, LLC

7.01   Advertising Expenditures.

(a) In addition to all other payments provided for herein, each week during the Term, Franchisee shall pay to Franchisor an Advertising Expenditure Fee in an amount which will not exceed 3% of the Gross Sales of the Franchised Restaurant, payable on the Wednesday following the Weekly Reporting Period in which such Gross Sales were earned (simultaneously with Franchisee's Continuing Royalty payment for the same period). This amount represents the total maximum amount will be due and payable for the National Advertising Fee and the Local Advertising Fee, and shall be allocated between the National Advertising Fee and the Local Advertising Fee as determined on an annual basis by Franchisor in its sole discretion.

(b) As of the date of this Agreement, the Advertising Expenditures Fee shall be allocated as follows:

(i) 2.25% of the Gross Sales of the Franchised Restaurant shall be allocated to the National Advertising Fee.

(ii) .75% of the Gross Sales of the Franchised Restaurant shall be allocated to the Local Advertising Fee.

(c) Franchisor reserves the right, from time to time, on an annual basis, to change the allocation of the Advertising Expenditure Fee between the National Advertising Fee and the Local Advertising Fee; provided however, Franchisor shall not allocate less than .75% to the Local Advertising Fee.

7.02   National Advertising Fee.

(a) National Advertising Fees paid by Franchisee shall be administratively segregated on Franchisor's or its Affiliate's books and records (the "National Advertising Fund"), together with the aggregate of:

(i) National Advertising Fee payments made by all franchisees of IHOP Restaurants;

(ii) Payments equal to the National Advertising Fee (in the amount paid by franchisees pursuant to IHOP's allocation pursuant to Section 7.01(c) above) for IHOP Restaurants operated by Franchisor and its Affiliates; and

(iii) All Table Allowances received by Franchisor or its Affiliates.

(b) From sums available in the National Advertising Fund, Franchisor shall develop advertising, public relations, and promotional campaigns and materials designed to promote and enhance the image, identity or patronage of all IHOP Restaurants. In addition, should sufficient sums be available in the National Advertising Fund, Franchisor may, but is not obligated to, make

expenditures from the National Advertising Fund for the purpose of paying for advertising, public relations and promotional campaigns designed to promote and enhance the image, identity or patronage of all IHOP Restaurants. Permissible expenditures and activities may include, but not be limited to, conducting marketing studies, purchasing computer software and hardware to facilitate customer and marketing analysis or advertising generally, conducting focus groups or other consumer insight activities, employment of advertising agencies and the production and purchase of advertising art, commercials, musical jingles, print advertisements, point of sale materials, media advertising, outdoor advertising art, and direct mail pamphlets and literature. It is expressly agreed that in all phases and aspects of such activities, including cost, development, type, format and style, quantity, timing, placement, choice of media or agency, and all other matters relating to such advertising, public relations and promotional activities, the decision of Franchisor shall be final. Nothing herein shall be construed to require Franchisor to allocate or expend National Advertising Fund contributions so as to benefit any particular franchisee or group of franchisees on a pro rata or proportional basis or otherwise. The National Advertising Fund shall not be a trust fund and shall be commingled with Franchisor's other funds. Franchisee shall not engage in any such activities, nor shall it erect or display any sign or notice of any kind without the prior written consent of Franchisor, whose decisions shall be final.

(c) Such advertising, public relations, and promotional services shall be provided and administered as follows:

(i) Franchisor shall consult with franchisees at regularly scheduled meetings concerning the type, content, frequency, development and nature of proposed National Advertising Programs, and shall give due consideration to the views of franchisees. The proposed advertising programs and allocation of advertising expenditures from the National Advertising Fund shall be finally determined by Franchisor, in its sole discretion.

(ii) Franchisor shall disburse funds from the National Advertising Fund for the purpose of paying for its actual administrative expenses with respect to said Fund, its reimbursement of direct costs incurred by its Affiliate in providing administrative services respecting the National Advertising Fund, including, without limitation, the actual, general and administrative expenses of Franchisor's internal Marketing Department, consultants and third party agencies, but excluding any costs relating to Franchisor's Franchise Sales Program. To the extent the Franchisor's Affiliate provides administrative services for the direct benefit of the National Advertising Fund and incurs expenses as a result thereof, such expenses will be reimbursed from the National Advertising Fund. Additionally, Franchisor shall disburse funds from the National Advertising Fund for the purpose of paying for the other expenses hereinabove set forth in paragraph 7.01(c).

(iii) Within a reasonable time after the expiration of each of Franchisor's fiscal years, Franchisor shall furnish franchisees summary information with respect to the receipts and expenditures of monies by and from the National Advertising Fund, which shall contain the following information:

(1) The opening balance in such Fund at the beginning of such fiscal year;

(2) The total amount of fees paid into the National Advertising Fund by all franchisees during such fiscal year;

(3) The total amount of Table Allowances received by Franchisor and its Affiliates during such fiscal year;

(4) A reasonably itemized summary breakdown and description of all disbursements from the National Advertising Fund during such preceding fiscal year, sufficient to indicate separately each of the various classes of expenditures made from such Fund and the amount of the expenditures made for each class thereof; and

(5) The net balance, if any, remaining in the National Advertising Fund at the close of such fiscal year.

If Franchisor's National Advertising Fund expenditures in any one fiscal year shall exceed the total amount contributed to said Fund during said fiscal year, Franchisor shall have the right to be reimbursed to the extent of the excess of those amounts subsequently contributed to said Fund. If the contributions to said Fund exceed the expenditures from such Fund in any fiscal year, such excess will be retained in said Fund for future advertising.

7.03    Local Advertising Fee.

(a) Franchisor shall, from time to time, develop Regional Advertising cooperatives designed to promote and enhance the value of all IHOP Restaurants in each region. Franchisor may establish and modify from time to time guidelines and procedures which shall govern the conduct and operation of the Regional Advertising Cooperatives. The geographical description of each region (hereinafter "Advertising Region") shall be designated by Franchisor in its sole subjective judgment, exercised in good faith. Franchisee's Franchised Restaurant and all IHOP Restaurants operated by Franchisor and its Affiliates located in the Advertising Region shall participate in the Regional Advertising Cooperative and contribute thereto on an equal basis with all other franchisees who are obligated to, or if applicable, voluntarily elect to, participate in such Regional Advertising Cooperative.

(b) From Franchisee's Local Advertising Fee, but only to the extent that such fee actually has been paid by Franchisee to Franchisor during Franchisor's fiscal year then in progress, or Franchisor shall reimburse Franchisee or credit Franchisee's account with Franchisor, for: (i) Franchisee's Franchisor-approved local advertising expenses incurred during said fiscal year (after deducting any expenses that Franchisor has previously paid or is or may be required to pay on account of advertising run by, for, or on behalf of Franchisee), and, (ii) contributions made by Franchisee during said fiscal year (whether through payment to Franchisor or directly to a third party) to the Regional Advertising Cooperative, if any, of which Franchisee is a member, for advertising of

the Franchised Restaurant; provided, however, that the combined amount of Franchisor's said reimbursements for any of its fiscal years pursuant to (i) and (ii) shall in no event exceed the Local Advertising Fee actually paid by Franchisee during said fiscal year, and such right of reimbursement shall be subject to the condition that Franchisee furnish Franchisor with appropriate verification, satisfactory to Franchisor, of such advertising expenditures and that the advertising resulting therefrom has been placed and paid for either by Franchisee or the Regional Advertising Cooperative of which Franchisee is a member and that no liability to any party exists or may exist with respect to such advertising. Local Advertising Fees which are contributed in a particular fiscal year of Franchisor, but which Franchisor is not required to reimburse or credit on account of advertising expenditures incurred by Franchisee during said fiscal year, shall become part of Franchisor's general operating funds.

      7.04   <u>General Advertising Requirements</u>.

      (a) Franchisee shall conduct all local advertising and promotion in accordance with such policies and provisions with respect to format, content, media, geographic coverage and other criteria as are from time to time contained in the Operations Bulletins, or as otherwise directed by Franchisor, and shall not use or publish any advertising material which does not conform to said policies and provisions or as to which Franchisee shall not have received Franchisor's prior written approval; provided, however, that if Franchisor shall not object to any proposed advertisement submitted by Franchisee for approval within 20 days after Franchisor's receipt thereof, such advertisement shall be deemed approved subject to Franchisor's right to subsequently withdraw its approval.

      (b) Franchisee may not develop, create, generate, own, license, lease or use in any manner any computer medium or electronic medium (including any internet home page, website, social media site, including those utilizing mobile technology, bulletin board, newsgroup or other internet-related medium) which in any way uses or displays the Trademarks, in whole or part, and Franchisee shall not cause or allow the Trademarks, or any of them, to be used or displayed in whole or part, as an internet domain name, or on or in connection with any internet home page, website, social media site, including those utilizing mobile technology bulletin board, newsgroup or other internet-related activity without Franchisor's express prior written consent, and then only in such manner and in accordance with such procedures, policies, standards and specifications as Franchisor may establish.

      (c) Franchisor may (but is not required to) develop an Intranet network through which Franchisor and its franchisees (including Franchisee) may communicate by e-mail or similar electronic means and through which Franchisor may disseminate updates to the System and other confidential information. If Franchisor develops such an Intranet network, Franchisee agrees to use the facilities of the Intranet in strict compliance with the System, and with such procedures, policies, standards and specifications as Franchisor may establish from time to time (including, without limitation, standards, protocols and restrictions relating to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements). If

Franchisor shall develop said Intranet, Franchisor shall have no obligation to maintain the Intranet, and may discontinue its use at any time without liability to Franchisee.

VIII

TRADEMARKS AND TRADE SECRETS

8.01  <u>License to Use Trademarks</u>.

(a) Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, the right, during the Term hereof, upon the terms and conditions contained herein, to use and display the Trademarks, but only in connection with the retail sale at the Franchised Restaurant of those items contained on the standard menu of IHOP Restaurants as prescribed by the Operations Bulletins.

(b) Nothing herein shall give Franchisee any right, title or interest in or to the Trademarks, except a mere privilege and license, during the Term hereof, to display and use the same according to the foregoing limitations and upon the terms, covenants and conditions contained herein.

8.02  <u>Acts in Derogation of Franchisor's Trademarks</u>.

(a) Franchisee agrees that, as between Franchisor and Franchisee, the Trademarks of Franchisor are the sole and exclusive property of Franchisor and Franchisee now asserts no claim and will hereafter assert no claim to any goodwill, reputation or ownership thereof by virtue of Franchisee's licensed use thereof.  Franchisee agrees that it will not do or permit any act or thing to be done in derogation of any of Franchisor's rights in connection with the same, either during the Term or thereafter, and that it will use same only for the uses and in the manner licensed hereunder and as herein provided.

(b) Except to the limited extent expressly licensed hereunder, Franchisee shall not use, or permit the use, as part of its name, the phrases "IHOP", "International House of Pancakes", "House of Pancakes", or any phrase or combination of words confusingly similar thereto.

8.03  <u>Prohibition Against Disputing Franchisor's Rights</u>.

Franchisee agrees that it will not, during or after the Term, in any way, dispute or impugn the validity of the Trademarks licensed hereunder, or the rights of Franchisor thereto, or the right of Franchisor, its Affiliates, or other franchisees of Franchisor to use the same both during the Term and thereafter.

8.04  <u>Use of Franchisor's Name</u>.

Franchisee agrees that the Franchised Restaurant shall be named "IHOP",  "International House of Pancakes" or "International House of Pancakes Restaurant," or such other similar name, as specified by Franchisor or any combination thereof as may be approved by Franchisor in its sole