discretion, without any suffix or prefix attached thereto and all signs, advertising and slogans will only bear the name "IHOP", "International House of Pancakes", or "International House of Pancakes Restaurant," or such other Trademarks as Franchisor may hereafter specify in its Operations Bulletins. Franchisee shall maintain a plaque of reasonable and suitable size and design, as approved by Franchisor, behind the host station on the interior of the premises, identifying the restaurant as owned and operated by an independent IHOP franchisee or such other language as Franchisor shall designate from time to time, and shall use Franchisee's correct name on all invoices, orders, vouchers, checks, letterheads, and other similar materials, identifying the Franchised Restaurant as being a franchise of Franchisor which is independently owned and operated by Franchisee.

### 8.05  Trademark Protection.

In the event that any third party makes any claim, by suit or otherwise, against Franchisee because of Franchisee's use in accordance with this Agreement of the Trademarks, Franchisee shall immediately notify Franchisor in writing. After receipt of said notice, Franchisor shall promptly take such action as may be necessary to protect and defend Franchisee against any such claim, suit or demand, and Franchisor shall protect, indemnify and save Franchisee harmless from any loss, costs or expenses arising out of or relating to any such claim, demand or suit. Franchisee shall have no right to settle, compromise, or litigate any such claim except in strict compliance with any specific directives provided by Franchisor relating to such specific claim. Franchisor shall have the right to defend, compromise or settle any such claim at Franchisor's sole cost and expense, using attorneys, advisors, experts and consultants of its own choosing, and Franchisee shall cooperate fully with Franchisor in connection with the defense of any such claim.

### 8.06   Prosecution of Infringers

If Franchisee shall receive notice or is informed or learns that any third party, which it believes to be unauthorized to use the Trademarks, is using the Trademarks or any variant thereof, Franchisee shall promptly notify Franchisor of the facts relating to such alleged infringing use. Thereupon, Franchisor shall determine whether or not it wishes to take any action against such third person on account of such alleged infringement of Franchisor's Trademarks. Franchisee shall have no right to make any demand against any such alleged infringer of Franchisor's Trademarks or to prosecute or require Franchisor to prosecute any claim of any kind or nature whatsoever against such alleged infringer of Franchisor's Trademark for or on account of such infringement.

### 8.07   Modification of Trademarks

From time to time, in the Operations Bulletins, Franchisor may add to, delete or modify any or all of the Trademarks. Franchisee shall accept, use, or cease using, as may be applicable, the Trademarks, including any such modified or additional trade names, trademarks, service marks, logotypes and commercial symbols, in accordance with the procedures, policies, rules and regulations contained in the Operations Bulletins, as though they were specifically set forth in this Agreement.

8.08    License to Use Trade Secrets.

(a) Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, the right, during the Term hereof, upon the terms and conditions contained herein, to use Franchisor's Trade Secrets, but only in connection with the retail sale at the Franchised Restaurant of those items contained on the standard menu of IHOP Restaurants as prescribed by the Operations Bulletins.

(b) Franchisor will disclose certain of its Trade Secrets to Franchisee in the Operating Bulletins, confidential correspondence, or other confidential communications, and through the Franchisor's training program and other guidance and management assistance, and in performing Franchisor's other obligations and exercising Franchisor's rights under this Agreement. Franchisee acknowledges that the Trade Secrets now and hereafter provided or revealed pursuant to this Agreement are revealed in confidence and Franchisee expressly agrees to keep and respect the confidence so reposed.

(c) Franchisee shall acquire no interest in the Trade Secrets other than the right to use them in developing and operating the Franchised Restaurant during the Term. Franchisee's duplication or use of the Trade Secrets in any other endeavor or business shall constitute an unfair method of competition. Franchisee shall: (i) not use the Trade Secrets in any business or other endeavor other than in connection with the Franchised Restaurant; (ii) maintain absolute confidentiality of the Trade Secrets during and after the Term; (iii) make no unauthorized copy of any portion of the Trade Secrets, including the Operating Bulletins, confidential correspondence, or other confidential communications, whether written or oral; and (iv) operate and implement all reasonable procedures prescribed from time to time by Franchisor to prevent unauthorized use and disclosure of the Trade Secrets, including restrictions on disclosure to Owners and others who may have access to the Operations Bulletins, or any of the Trade Secrets, and, at Franchisor's request, Franchisee shall cause such persons to execute confidentiality agreements on a form prescribed by Franchisor. Promptly upon Franchisor's request, Franchisee shall deliver executed copies of such agreements to Franchisor.

(d) Nothing herein contained shall be construed so as to require Franchisor to divulge any Trade Secret or other of its secret processes, formulae or ingredients. Franchisor expressly reserves all rights with respect to IHOP's goods, products, Trademarks, Trade Secrets, except for the limited license expressly granted to Franchisee herein.

8.09    Obligations Upon Termination or Expiration.

Upon the expiration or termination of this Agreement for any reason, Franchisee shall deliver and surrender up to Franchisor or its Affiliate any and all manuals, Bulletins, instruction sheets, forms, marks, devices, training materials, confidential communications, Trademarks, and the possession of any physical objects bearing or containing any of said Trademarks, and shall not thereafter use any of the same or any such Trademarks or Trade Secrets; provided Franchisor or its Affiliate may, at its option purchase from Franchisee at a price equal to Franchisee's book value, consisting of Franchisee's cost therefor less depreciation computed in accordance with GAAP, all

signs, paper goods, dishes, and other items of personal property purchased by Franchisee in the ordinary course of its business which are, in Franchisor's or its Affiliate's reasonable judgment, in good, usable condition and which bear any Trademarks of Franchisor.

IX
FURTHER OBLIGATIONS OF FRANCHISOR

9.01  Initial Training.

If Franchisee, or in the case of a Franchisee which is a Business Entity, an Owner or other designated representative selected by Franchisee and approved by Franchisor ("Designated Representative"), has not previously undergone training conducted by Franchisor for the operation of an IHOP Restaurant, Franchisor, itself or through its Affiliate, shall:

(a)  Furnish 5 weeks of training in the operation of an IHOP Restaurant to Franchisee (or its Designated Representative if Franchisee is a Business Entity), and, upon Franchisee's request, to the manager of the Franchised Restaurant (the "Initial Training"). Said training shall be given at an IHOP Restaurant or a training center designated from time to time by Franchisor. Franchisee (or its Designated Representative if Franchisee is a Business Entity) shall pursue and complete such training to Franchisor's sole subjective satisfaction unless waived by Franchisor in its sole subjective judgment, exercised in good faith, by reason of such person's prior training and experience, in which case the proposed manager of the Franchised Restaurant shall be required to pursue and complete such training (unless waived by Franchisor). If the manager of the Franchised Restaurant is replaced by a new manager, such new manager must attend such Initial Training and complete same to Franchisor's sole subjective satisfaction (unless waived by Franchisor). Franchisor will provide such Initial Training to up to 2 persons during the first year following the Effective Date at no additional cost. If Franchisor provides training to more than 2 persons, or if Franchisee requests training for its manager more than one year following the Effective Date, Franchisee must pay Franchisor's then current training fee for such training.

(b)  If Franchisee has executed this Agreement in connection with a sale or transfer of the Franchised Restaurant to Franchisee from a preexisting franchisee, and Franchisee or its assignor has paid the then-current training fee as contemplated by Section 11.03(a)(iii) below, which is $5,000 as of the date of this Agreement, Franchisor shall, in addition to the Initial Training, and at no additional charge to Franchisee, permit up to 2 of Franchisee's employees or Owners to attend one of Franchisor's regularly scheduled training classes conducted during the one year period following the Effective Date, subject to space availability and Franchisor's reasonable scheduling requirements (including that Franchisor's new franchisees shall have scheduling priority over additional training to Franchisee pursuant to this Section 9.01(b)).

(c)  At Franchisor's election, furnish management seminars from time to time for the benefit of its franchisees, on an optional or mandatory basis. Franchisor shall have the right to require Franchisee, its Designated Representative (if applicable), or the manager employed by Franchisee for the Franchised Restaurant, to attend at least one management seminar per year if

Franchisor deems attendance to be essential. Said management seminars shall be given at an IHOP Restaurant, a training center, or such other place designated from time to time by Franchisor. Franchisor shall not impose any attendance fee or tuition for mandatory seminars, but may charge a reasonable fee or tuition for optional seminars.

(d) Notwithstanding the fact that Franchisor shall provide the Initial Training and certain other management seminars at no additional charge, Franchisee shall bear all costs and expenses incurred by Franchisee, its Designated Representative, and its managers and other attendees in connection with attendance at all training programs and seminars, including transportation costs, meals, lodging and other living expenses. Neither Franchisor nor any of its Affiliates will pay any compensation for any services performed by any trainee during any training.

9.02  Other Services.

Franchisor or its Affiliates shall furnish Franchisee with:

(a) If this Agreement has been executed pursuant to the Franchisor's Single Store Development Program, Multi-Store Development Program or Purchase Program, on-location assistance for such period of time as Franchisor shall deem necessary, but not exceeding 30 days allocated at Franchisor's sole and absolute discretion between the time immediately prior to and after the opening of the Franchised Restaurant by Franchisee.

(b) If this Agreement has been executed pursuant to the Franchisor's Single Store Development Program, Multi-Store Development Program or Purchase Program, promotional assistance at the time of the opening of the Franchised Restaurant by Franchisee.

(c) Periodic supervision and assistance from field representatives who shall visit the Franchised Restaurant from time to time.

(d) Ongoing availability at its home office for consultation and guidance with respect to the operation and management of the Franchised Restaurant.

(e) In addition to the foregoing, additional assistance from the staff of Franchisor or its Affiliate (i) upon Franchisee's request and subject to staff availability, (ii) or if Franchisee does not have an approved manager, IHOP shall have the right to provide same at a cost to be paid by Franchisee at the then prevailing price per person per day, as shall be specified from time to time in the Operations Bulletins, plus reasonable transportation and living expenses.

(f) If this Agreement has been executed pursuant to the Franchisor's Single Store Development Program or Multi-Store Development Program, and if Franchisor determines, in its sole discretion, that Franchisee will need training support and/or operational assistance to open the Franchised Restaurant, a training team to provide training support and/or operations assistance for a period of up to 3 weeks, allocated at Franchisor's sole and absolute discretion generally between 1 week prior to opening and up to 2 weeks after opening. Franchisee agrees to pay to Franchisor a

Training Support Fee of up to $16,500.00. The amount of the fee will be based upon the number of trainers deemed necessary by Franchisor, in its sole discretion. The opening training support team is typically made up of 7 trainers, of which 4 are provided by Franchisor at no additional cost to Franchisee. A fifth trainer will be provided by Franchisor, at a cost to Franchisee of $5,500, unless waived by Franchisor. The additional 2 trainers may be supplied by Franchisee, with the understanding that these trainers must be committed to work on the opening training for the entire duration of the opening training, and provided they meet Franchisor's requirements, as they may be specified from time to time. These requirements include being a certified trainer in their current IHOP Restaurant, and successfully passing an SOP test administered by Franchisor prior to and/or at the opening, if required by Franchisee. There will be no additional charge for these 2 trainers supplied by Franchisee unless Franchisee's trainers fail to meet the above commitments and qualifications, in which case Franchisee will be required to pay $5,500 per additional trainer supplied by Franchisor. If Franchisee does not have any qualified opening trainers, Franchisee will be required to pay to Franchisor the sum of $16,500 upon execution of this franchise agreement. The scheduling of the training team will generally be done 30 days prior to the anticipated opening date of the Franchised Restaurant, based on the schedule provided by Franchisee. If training must be rescheduled for any reason other than an act of God, Franchisee shall pay to Franchisor any increase in costs that are incurred by Franchisor due to the scheduling changes, which costs may include but are not limited to increases in airfare, car rental, and training material shipping and storage. Franchisor estimates this cost to be between $500 and $6,000. Franchisee shall pay these charges to Franchisor within 30 days after billing therefor.

## X
## OTHER OBLIGATIONS OF FRANCHISEE

10.01  Sales and Service of Food Products.

Franchisee shall sell, serve and dispense only those items and products as shall be designated by Franchisor in the Operations Bulletins. In connection therewith, the parties agree that Franchisor or its Affiliate may, from time to time, recommend or suggest those prices to be charged by Franchisee for each menu item sold or offered at IHOP Restaurants; and, for purposes of economy and cost-saving to those Franchisees who elect to follow such recommendations, may cause the production of pre-priced menus which Franchisor or its Affiliate shall offer for sale to Franchisee. Such recommended or suggested prices are not binding in any respect upon Franchisee, and Franchisee is and shall be at all times, free to charge prices entirely of its own choosing, regardless of whether the same do or do not conform to the recommended or suggested prices. Franchisee shall not be required to use or to purchase any pre-priced menus, and shall be entirely free to procure menus with prices of its own choosing; provided however that such menus shall, in all respects except as to prices, strictly comply with the specifications therefor contained in the Operations Bulletins.

10.02  Required Purchases of Proprietary Products.

(a) Franchisee shall purchase only from Franchisor or its Affiliate (if offered directly to Franchisees by Franchisor) or from Franchisor approved distributors who have purchased such products from Franchisor or its Affiliate, all of its requirements for buttermilk pancake mix, egg batter, Harvest Grain 'N Nut7 pancake mix, Corn Cake pancake mix, Belgium waffle mix and such other future products as may then be required by Franchisor, all of which may embody secret formulas owned by Franchisor (collectively referred to as "Required Products").

(b) For purposes of insuring consistency and uniformity of product, Franchisee shall purchase only from Franchisor or its Affiliate (if offered directly to Franchisees by Franchisor or its Affiliate) or from Franchisor-designated suppliers, all of its requirements for coffee. Further, Franchisee shall purchase only such blends of coffee as Franchisor shall from time to time designate.

(c) Except as provided in Sections 10.02 (a) and (b), Franchisee shall purchase for use in the operation of the Franchised Restaurant certain products which bear IHOP Trademarks that may include, as provided in the Operations Bulletins, dishware, silverware, napkins, placemats, coasters and other items (herein referred to as "Trademarked Products"). All such required Trademarked Products shall comply with the specifications set forth in the Operations Bulletins. Franchisee may purchase Trademarked Products from Franchisor or its Affiliate, if made available by Franchisor or its Affiliate, suppliers designated by Franchisor or its Affiliate, or suppliers chosen by Franchisee as provided in paragraph 10.03 below, provided such suppliers execute a royalty-free trademark license in a form reasonably satisfactory to Franchisor.

(d) Without Franchisor's prior written consent, Franchisee may not use, offer, sell, or give away, except at the Franchised Location, any Required Products, Trademarked Products, or other goods or services which utilize Franchisor's Trade Secrets in whole or in part, including its recipes, or any goods, services, materials, equipment, supplies, or inventory (including food, beverages, condiments, and smallwares) purchased by Franchisee or any Affiliate of Franchisee (or any Owner, officer, director, manager of either) from or through any supplier pursuant to any pricing or purchasing terms negotiated or arranged by IHOP or its Affiliates or by any approved purchasing co-operative such as CSCS, for or on behalf of itself or its franchisees. In addition, Franchisee shall not at any time purchase greater quantities of such products than necessary to meet its reasonably anticipated requirements to operate its IHOP Restaurant.

10.03  Compliance with Franchisor's Specifications.

(a) All food products, services, supplies, equipment, materials, and menus, permitted or required to be used in the operation of the Franchised Restaurant shall be in full compliance with the specifications set forth in the Operations Bulletins and, except only those items referred to in Sections 10.02(a) and (b), shall be purchased and procured by Franchisee from Franchisor or its Affiliate (if offered by Franchisor or its Affiliate), from approved suppliers or distributors designated by Franchisor or its Affiliate, or from suppliers or distributors selected by Franchisee and not disapproved in writing by Franchisor or its Affiliate.

IH #419

(b) In the event that Franchisee should desire to procure any food product other than those described in paragraphs 10.02(a) and (b), service, supplies, equipment, or material from any supplier or distributor other than Franchisor, its Affiliate, or a supplier or distributor designated by Franchisor or its Affiliate, Franchisor or its Affiliate shall, upon request of Franchisee, furnish to Franchisee specifications, by established brand name wherever possible, for all such items. Franchisee shall deliver written notice to Franchisor or its Affiliate of its desire to do so, which notice shall identify the name and address of such supplier or distributor and the items desired to be purchased from such supplier or distributor. Franchisor shall have the right to inspect the supplier's or distributor's facilities, conduct tests on products, require full production runs, and to require that samples from the supplier or distributor be delivered, at Franchisor's option, either to Franchisor or to an independent, certified laboratory designed by Franchisor for testing. Franchisee, or the supplier or distributor, shall pay the costs of any such test. Franchisor may withhold approval of any supplier or distributor proposed by Franchisee if, among other grounds, such suppliers or distributors shall fail to demonstrate, to the reasonable satisfaction of Franchisor or its Affiliate, (i) the ability to supply a product meeting the Franchisor's specifications, (ii) reliability with respect to the quality of product or service, or (iii) willingness and agreement to permit Franchisor or its Affiliate to make periodic inspections, reasonable in respect of frequency, time and manner of inspection, to assure continued conformity to specifications. Franchisee may not purchase any products from a proposed supplier or distributor until and unless Franchisor has provided written approval thereof to Franchisee. Franchisor or its Affiliate shall be entitled to disapprove or to subsequently withdraw its approval of any food product, supplier or distributor selected by Franchisee only upon the ground that such food product, supplier or distributor has failed to meet one or more of the requirements hereinabove set forth. Once Franchisee has delivered a notice of its desire to purchase the specified items from any such supplier or distributor, and Franchisor has given Franchisee its approval thereof, it shall be entitled to purchase same from such supplier or distributor until it shall have received a timely statement of disapproval or withdrawal of approval from Franchisor or its Affiliate.

(c) In some instances, Franchisor's specifications may be such that only a single supplier or a limited number of suppliers can meet such specifications. With respect to such products, Franchisee shall purchase such products only from the source or sources designated by Franchisor or its Affiliate.

10.04  Insurance.

(a) Subject to any other additional requirements set forth in the Master Lease, sublease or equipment lease, Franchisee shall procure and maintain at Franchisee's expense during the Term hereof policies of insurance meeting minimum standards, coverages, and limits and insuring Franchisee against the insurable risks prescribed in Franchisor's Operations Bulletins. All such policies of insurance shall name Franchisor, its Affiliates, if applicable, and such other parties as it may designate as additional insureds, as their interests may appear, and shall provide that Franchisor, its Affiliates, if applicable, and other parties shall receive at least 10 days prior written notification of any cancellation, termination, amendment or modification thereof.

(b) Franchisee shall provide Franchisor, its Affiliates, if applicable, and any other parties designated by Franchisor with Certificates of Insurance evidencing the required coverage at least 10 days prior to the date on which the Franchised Restaurant opens for business to the public, 10 days prior to the date on which any insurance policy is scheduled to expire, and at such other times as Franchisor may reasonably require.

(c) If Franchisee fails or refuses to procure and maintain insurance conforming to the requirements prescribed by the Operations Bulletins, or fails or refuses to provide Franchisor or any other party designated by Franchisor with a certificate of such insurance, Franchisor may but shall not be obligated to procure, through agents and insurance companies of its own choosing, such insurance as is necessary to meet such requirements, provided, however, such insurance need not name Franchisee as an insured or additional insured thereunder. Payments for such insurance shall be borne by Franchisee. Nothing herein shall be construed or deemed to impose any duty or obligation on Franchisor to procure such insurance or as an undertaking or representation by Franchisor that such insurance as may be procured by Franchisee or by Franchisor for Franchisee will insure Franchisee against any or all insurable risks of loss which may or can arise out of, or in connection with the Franchised Restaurant. Franchisee may obtain such other or additional insurance as Franchisee deems proper in connection with the operation of its business.

10.05  Compliance with Applicable Laws and Operations Bulletins.

Franchisee shall operate the Franchised Restaurant in strict compliance with all Applicable Laws and with the standard procedures, policies, rules and regulations established by Franchisor and incorporated herein, or in Franchisor's Operations Bulletins. Such standard procedures, policies, rules and regulations established by Franchisor may be revised from time to time as circumstances warrant, and Franchisee shall strictly comply with all such procedures as they may exist from time to time as though they were specifically set forth in this Agreement and when incorporated in Franchisor's Operations Bulletins the same shall be deemed incorporated herein by reference. By way of illustration and without limitation, such standard procedures, policies, rules and regulations may or will specify accounting records and information, payment procedures, specifications for required supplies and purchases, including Trademarked Products, hours of operation, advertising and promotion, cooperative programs, specifications regarding required insurance, minimum standards and qualifications for employees, design and color of uniforms, menu items, methods of production and food presentation, including the size and serving thereof, standards of sanitation, maintenance and repair requirements, specifications of furniture, fixtures and equipment, flue cleaning, and fire prevention service, appearance and cleanliness of the premises, accounting and inventory methods and controls, forms and reports, and in general will govern all matters that, in Franchisor's judgment, require standardization and uniformity in all IHOP Restaurants. Franchisor or its Affiliate will furnish Franchisee with Franchisor's current Operations Bulletins upon the execution of this Agreement. Said Operations Bulletins and all notices, amendments and supplements relating thereto shall at all times remain the property of Franchisor or its Affiliate. Franchisee shall not reproduce any portion of such Operations Bulletins by any means, shall at all times maintain same in a secure place at the Franchised Location and, upon termination or expiration of this Agreement shall deliver said Operations Bulletins to Franchisor or its Affiliate. Without

limiting the generality of the foregoing, Franchisor may establish emergency procedures pursuant to which it may require Franchisee to temporarily close the Franchised Restaurant to the public, in which event Franchisor shall not be liable to Franchisee for any losses or costs, including consequential damages or lost profits occasioned thereby.

10.06  Taxes.

Franchisee shall pay in full any and all city, county, state and federal taxes arising in connection with or levied or assessed by any Governmental Authority in connection with all or any part of this Agreement, or the operation of the Franchised Business, or all or any of the merchandise and assets being sold hereunder, promptly when due, and prior to any delinquency.

10.07  Inspection by Franchisor.

Franchisee expressly authorizes Franchisor, or its representatives, or those of its Affiliate, to enter the Franchised Restaurant at any time it is open for business, without notice, to inspect the premises, fixtures, furnishings and equipment therein, and to examine and inspect the operations in all respects to determine compliance with this Agreement and with Franchisor's standard operating procedures, policies, rules and regulations.

10.08  Participation in Operation of Franchised Business.

Franchisee shall actively participate in the day-to-day operation of the Franchised Restaurant and devote such of its time as is reasonably necessary for the efficient operation of the Franchised Restaurant and the performance of its obligations under this Agreement, all ancillary documents relating hereto and all other agreements which may then be in effect between Franchisor and/or its Affiliate and Franchisee, or Franchisee may employ a manager to operate the Franchised Restaurant, who has previously satisfactorily completed training conducted by Franchisor for the operation of an IHOP Restaurant, subject to the prior approval of Franchisor, unless waived by Franchisor in its sole subjective judgment, exercised in good faith, by reason of such person's prior training and experience. Franchisee shall not divorce himself or herself from the active conduct of the operation of the Franchised Restaurant. Franchisee shall be entitled to engage in other, noncompetitive business activities (as defined in Section 14.01 below) so long as same do not unreasonably interfere with the conduct of the operation of the Franchised Restaurant.

The Majority Owner of any Business Entity shall be, as applicable, the president of Franchisee if it is a corporation, the manager if it is a limited liability company, the general partner if it is a Partnership, and the comparable position if it is any other form of Business Entity, unless otherwise consented to by Franchisor in its sole, subjective judgment. Franchisor will review any proposed deviations from these approved structures provided Franchisee agrees to reimburse Franchisor for all legal fees and costs it may incur in this review process.

Franchisee is entering into this Agreement for its own account, and not with the intent to transfer the same (except as permitted pursuant to Section 11.03(b) below), or to offer, sell, or

negotiate the sale of franchises or licenses to any third party, or otherwise subfranchise, sublicense, subcontract (including execution of any management agreement), share, divide or partition this Agreement and nothing in this Agreement will be construed as granting Franchisee the right to do so. Without limiting the generality of the foregoing, Franchisee shall not: (1) delegate, contract for or otherwise permit a third party to perform or assume responsibility for any part of the operation of the Franchised Restaurant, including in connection with a management contract, purchase or other similar agreement; or (2) require or accept any payment or other consideration from any person for the right to manage or work in the Franchised Restaurant. Further, except with the prior written consent of Franchisor and otherwise in compliance with the provisions of Section 11, no employee or independent contractor may be an Owner of Franchisee if Franchisee is a Business Entity or otherwise have an interest in this Agreement or the Franchised Business.

10.09   Personal Computer.  Upon request by Franchisor or its Affiliate, Franchisee shall, at its own cost and expense, obtain and maintain a personal computer as Franchisor or its Affiliate may specify from time to time.

10.10   Business and Ethical Practices.

As of the date of this Agreement, Franchisee and each of its Owners shall be and, during the Term shall remain, in full compliance with all Applicable Laws in each jurisdiction in which Franchisee or such Owners, as applicable, conducts business that prohibits unfair, fraudulent or corrupt business practices in the performance of its obligations under this Agreement and related activities, including but not limited to the following prohibitions:

Neither Franchisee nor any of the Owners shall make any expenditure other than for lawful purposes or directly or indirectly offering, giving, promising to give or authorizing the payment or the gift of any money, or anything of value, to any person or Business Entity, while knowing or having reason to know that all or a portion of such money or thing of value will be given or promised, directly or indirectly, to any government official, official of an international organization, officer or employee of a foreign government or anyone acting in an official capacity for a foreign government, for the purpose of (a) influencing any action, inaction or decision of such official in a manner contrary to his or her position or creating an improper advantage; or (b) inducing such official to influence any government or instrumentality thereof to effect or influence any act or decision of such government or instrumentality.

No government official, official of an international organization, political party or official thereof, or candidate is an Owner or has any investment interest in the revenues or profit of Franchisee.

Neither Franchisee nor any of its Owners conducts any activity, or has failed to conduct any activity, if such action or inaction constitutes a money laundering crime, including any money laundering crime prohibited under the International Money Laundering Abatement and Anti-Terrorist Financing Act ("Patriot Act") and any amendments or successors thereto.

IHOPFDD 3/13
IH #419
CFRA, LLC

34

Neither Franchisee nor any of its Owners nor any employee of any of them is named as a "Specially Designated Nationals" or "Blocked Persons" as designated by the U.S. Department of the Treasury's Office of Foreign Assets Control.  Currently, this list is published under the internet website address "www.ustreas.gov/terrorism.html".  Franchisee is neither directly nor indirectly owned or controlled by the government of any country that is subject to a United States embargo. Nor does Franchisee or any of its Owners act directly or indirectly on behalf of the government of any country that is subject to a United States embargo.  Franchisee agrees that it will notify Franchisor in writing immediately of the occurrence of any event, which renders the foregoing representations and warranties of this paragraph incorrect.

Franchisee and its Owners represent that they understand and have been advised by legal counsel on the requirements of the applicable laws referred to above, including the United States Foreign Corrupt Practices Act (currently located at www.usdoj.gov/criminal/fraud/fcpa.html), any local foreign corrupt practices laws and the Patriot Act (currently located at www.epic.org/privacy/terrorism/hr3162.html), and hereby acknowledge the importance to Franchisor, the System and the parties' relationship of their respective compliance with the requirements of this Section 10.09, including any applicable auditing requirements and any requirement to report or provide access to information to Franchisor or any government, that is made part of any applicable law.  Franchisee shall take all reasonable steps to require its consultants, agents and employees to comply with such laws prior to engaging or employing any such persons.

INITIALS:    (CFRA, LLC) _____

By: Nicholas Peters, President

Franchisee represents to Franchisor that it has taken all necessary and proper action required by the laws of the Franchised Area and has the right to execute this Agreement and perform under all of its terms.

XI

ASSIGNMENT

11.01  <u>Assignment by Franchisor</u>.

Franchisor shall have the right to assign this Agreement and all of its rights and privileges hereunder to any other person or Business Entity; provided that, in respect to any assignment resulting in the subsequent performance by the assignee of the functions of Franchisor, the assignee shall expressly assume and agree to perform such obligations.  Without limiting the foregoing, Franchisor may (i) assign any and all of its rights and obligations under this Agreement to an Affiliate; (ii) sell its assets, its Marks, or its system outright to a third party; (iii) engage in a public offering of its securities; (iv) engage in a private placement of some or all of its securities; (v) undertake a refinancing, recapitalization, leveraged buy-out or other economic or financial restructuring; or (vi) merge, acquire other business entities or be acquired by another business entity. Franchisor shall be permitted to perform such actions without liability or obligation to Franchisee who expressly and specifically waives any claims, demands, or damages arising from or related to any or all of the above actions (or variations thereof).

11.02  <u>Assignment by Franchisee</u>.

(a)  During the Term, Franchisee shall have the right to assign, transfer or sell its interest in this Agreement, upon the terms and conditions provided herein, and subject to the provisions contained in Sections 11.03, and 11.04.  The terms "Assign" and "Assignment" shall include, if Franchisee is a Business Entity, each of the following: (i) the sale, assignment, transfer, conveyance, gift, pledge, mortgage, or other encumbrance of more than 49% in the aggregate, whether in one or more transactions, of the Stock of Franchisee, by operation of law or otherwise or any other event(s) or transaction(s) which, directly or indirectly, effectively changes management control of Franchisee; (ii) the issuance of any securities by Franchisee which itself or in combination with any other transaction(s) results in the Owners existing as of the Effective Date owning less than 51% of the outstanding shares, membership interests or voting power of Franchisee as constituted as of the Effective Date; (iii) if Franchisee is a Partnership, the withdrawal, death or legal incapacity of a general partner or limited partner owning 51% or more of the Partnership Rights of the Partnership, or the admission of any additional general partner or the transfer or assignment by any general partner of any of its Partnership Rights in the Partnership; (iv) the death or legal incapacity of any direct or indirect Majority Owner; (v) the sale, assignment, transfer, conveyance, gift, issuance of securities or any other event or transaction, whether in one or more transactions, by any direct or indirect Majority Owner as of the Effective Date which results in such Majority Owner owning, directly or indirectly, less than 51% of the Stock in Franchisee; and (vi) any merger, stock redemption, consolidation, reorganization, recapitalization or other transfer of control of the Franchisee, however effected.  Notwithstanding the foregoing, Franchisee shall not have the right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Franchise Agreement or any of the rights of Franchisee hereunder, or in the operation of the Franchised Restaurant by any other person, in any manner whatsoever, without the express written permission of Franchisor, which permission may be withheld for any reason whatsoever in Franchisor's sole subjective judgment.  In all events, Franchisor shall have the right, but not the obligation, to furnish any prospective assignee with copies of all financial statements which have been furnished by Franchisee to Franchisor in accordance with this Agreement during the 3 year period prior to the date for which approval of the proposed Assignment is sought.  Franchisor's approval of such proposed transaction shall not, however, be deemed a representation or guarantee by Franchisor that the terms and conditions of the proposed transaction are economically sound or that, if the transaction is consummated, the proposed assignee will be capable of successfully conducting the Franchised Business and no inference to such effect shall be made from such approval.  Notwithstanding anything to the contrary herein, in the event of the death or legal incapacity of Franchisee or, if Franchisee is a Business Entity, the Owner holding 50% or more of the Stock or voting power of Franchisee, the transfer of Franchisee's or such Owner's interest in this agreement to its heirs, personal representatives or conservators, as applicable, shall not give rise to Franchisor's right of first refusal hereunder, although such right shall apply as to any proposed Assignment by such heirs, personal representatives or conservators.

(b)     In the event Franchisee has executed this Franchise Agreement pursuant to a Multi-Store Development Agreement, then notwithstanding anything to the contrary herein, during the term

of the Multi-Store Development Agreement, this Franchise Agreement may not be transferred or assigned without a simultaneous assignment to the same assignee of all then existing Franchise Agreements executed pursuant to the Multi-Store Development Agreement (and all of the assets of the Restaurants developed and under development pursuant thereto) and of the Multi-Store Development Agreement (or any successor area development agreement(s) executed for the Development Area, in whole or in part).

11.03  <u>Conditions to Assignment by Franchisee</u>.

(a) Any Assignment by Franchisee shall be subject to the following conditions:

(i)  Except in the case of Franchisee's death or legal incapacity, Franchisee shall serve upon Franchisor written notice of the proposed Assignment, setting forth all of its terms and conditions and all available information concerning the proposed assignee (the "Notice of Intent to Assign").

(ii)  Franchisee shall obtain Franchisor's written consent, not to be unreasonably withheld, of the proposed Assignment.  The withholding of such consent by Franchisor shall be reasonable if, by way of illustration and not by limitation, the proposed assignee (1) is not financially responsible and economically or otherwise capable of performing the obligations of Franchisee hereunder; (2) does not meet the then-current standards set by Franchisor with respect to its new franchisees and/or its existing franchisees who desire to acquire additional franchises, as applicable; (3) fails to complete Franchisor's Initial Training program in accordance with Franchisor's then current standards, (4) fails to designate a single individual acceptable to Franchisor, with whom Franchisor may primarily communicate, (5) fails, upon Franchisor's request, to sign Franchisor's form of franchise agreement then being offered to prospective franchisees (except that: (x) the assignee shall not be obligated to pay any Initial Franchise Fee other than its assumption of any existing promissory note executed by its assignor which shall not have been paid in full; (y) the Term and any remaining Renewal Rights thereunder shall be the same as set forth in this Agreement; and (z) the assignee's National Advertising Fee and Local Advertising Fee may exceed the rates set forth in Section 7.01 hereof, but assignee's Continuing Royalty shall not exceed the rate set forth in Section 6.01); or (6) if any of the assignee's Owners and/or spouses, as applicable,  fail or refuse to execute a guaranty in a form satisfactory to Franchisor.

(iii) Franchisee, or Franchisee's heirs, personal representatives or conservators in the case of Franchisee's death or incapacity, shall pay Franchisor the transfer fee specified from time to time in the Operations Bulletins (the "Transfer Fee").  As of the date of this agreement, the transfer fee consists of a $7,500 transfer fee and a $5,000 training fee.  Fifty percent (50%) of the non-refundable transfer fee shall be paid at the time Franchisee serves written notice upon Franchisor of the proposed assignment, and the balance shall be paid by no later than the date of the assignment.  Franchisor may waive all or part of the training fee to the extent that Franchisor determines in its sole subjective judgment that the assignee does not require training.

(iv) As of the date of any such Assignment, Franchisee shall be in compliance with all of its obligations owing to Franchisor or any of its Affiliates whether pursuant to this Agreement, or any other agreements with Franchisor or its Affiliate, and shall pay in full all outstanding amounts owed to Franchisor and its Affiliates, and the remaining balance, if any, of the Initial Franchise Fee, unless waived by Franchisor.

(v) As a condition precedent to Franchisor's written consent, Franchisor itself, or through its Affiliate, shall have the right, at its sole discretion, to conduct an audit and/or sales verification prior to the proposed Assignment.

(vi) Unless Franchisor otherwise consents, if the proposed assignee is a Business Entity, one person approved by Franchisor shall at all times own directly or indirectly, 51% or more of the Stock of the proposed assignee.

(vii) Franchisee shall execute and deliver to Franchisor a general release, on a form prescribed by Franchisor of any and all known and unknown claims against Franchisor and its Affiliates and their officers, directors, agents, shareholders and employees, with respect to this Franchised Restaurant.

(b) If Franchisee is an individual and not a Business Entity, he or she shall have the right, without paying a Transfer Fee and without complying with the provisions of Section 11.04, to Assign this Agreement to a Business Entity formed by Franchisee for the purpose of owning and operating the Franchised Restaurant, after first complying with the following conditions:

(i) Franchisee shall, together with said Business Entity, be jointly and severally liable for all existing or subsequent breaches of this Agreement and any other agreement between Franchisee and Franchisor or its Affiliate, and for all obligations accrued or accruing thereunder. Franchisee, his/her spouse, as applicable, and all other Owners and their spouses, as applicable, shall sign a guaranty in the form prescribed by Franchisor. Franchisee shall waive notice or demand in the event of default, and will be bound by any modifications or supplemental agreements entered into between the assignee Business Entity and Franchisor and/or its Affiliate, as hereinafter set forth;

(ii) The assignee Business Entity shall provide Franchisor with all charter or other documents, and execute an acceptance of such assignment, in the form prescribed by Franchisor which shall contain covenants agreeing to be bound by all of the terms and conditions herein contained;

(iii) Franchisee shall be possessed of and retain at all times, legal and beneficial ownership of not less than 51% of all the outstanding Stock of the assignee (including the voting power of such Stock), unless otherwise agreed to in writing by Franchisor in its sole discretion;

(iv) All of the Stock certificates or other evidence of Ownership issued by assignee Business Entity shall have endorsed upon them the following legend: "The transfer of this [Stock] is subject to the terms and conditions of a Franchise Agreement, relating to an IHOP Restaurant, dated _____, 20_____ ", and the date of this Agreement shall be inserted into such statement; and

(v) When incorporation or organization of the Business Entity shall have been completed, Franchisee shall advise Franchisor and thereafter keep Franchisor advised of the names, addresses and titles of the officers, directors, and resident agent of the assignee corporation, the names and addresses of the shareholders and the number of shares issued to each, and the address of the principal office of said corporation.

(vi) No Assignment pursuant to this paragraph 11.03(b) shall be deemed to be effective unless and until Franchisee shall have complied with all of the provisions hereunder.

11.04   Franchisor's Right of First Refusal.

(a) Except with respect to an Assignment to a Business Entity as provided for in paragraph 11.03(b), or an Assignment to Franchisee's heirs, personal representatives or conservators in the case of Franchisee's death or legal incapacity, within 30 days after Franchisor's receipt of Franchisee's Notice of Intent to Assign its interest in this Agreement as set forth in Paragraph 11.03(a)(i), (or if Franchisor shall request additional information, within 30 days after receipt of such additional information), Franchisor may, at its option, accept the proposed Assignment to itself or its nominee, upon the terms and conditions specified in the notice.

(b) Should Franchisor not exercise its option and Franchisee fails to consummate the proposed Assignment within 90 days upon the same terms and with the same assignee as disclosed in the Notice of Intent to Assign to Franchisor, Franchisor's right of first refusal shall revive.

11.05   Offers of Securities.

Securities, partnership or other ownership interests in Franchisee may not be offered to the public under the Securities Act of 1933, as amended, nor may they be registered under the Securities Exchange Act of 1934, as amended, or any comparable federal, state or foreign law, rule or regulation. Such interest may be offered by private offering or otherwise only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld. All materials required for any such private offering by federal or state law shall be submitted to Franchisor for a limited review as discussed below prior to being filed with any governmental agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use. No such offering by Franchisee shall imply that Franchisor is participating in an underwriting, issuance or offering of securities of Franchisee or Franchisor, and Franchisor=s review of any offering materials shall be limited solely to the subject of the relationship between Franchisee and Franchisor and its Affiliates. Franchisor may, at its option, require Franchisee=s offering materials to contain a written statement prescribed by Franchisor concerning the limitations

described in the preceding sentence. Franchisee, its Owners and the other participants in the offering must fully defend and indemnify Franchisor, and its Affiliates, their respective officers, directors, manager(s) (if a limited liability company), shareholders, members, partners, agents, representatives, independent contractors, servants and employees of each of them, from and against any and all losses, costs and liability in connection with the offering and shall execute any additional documentation required by Franchisor to further evidence this indemnity. For each proposed offering, Franchisee shall pay, in addition to any transfer fee required under Section 11.05 of this Agreement, to Franchisor such amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering including without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least 30 days prior to the date of commencement of any offering or other transaction covered by this Section.

11.06  Delegation by Franchisor.

Franchisor shall have the right to delegate to one or more of its Affiliates some or all of Franchisor's duties to Franchisee under this Agreement; provided, however, Franchisor shall remain fully responsible to Franchisee for the full and faithful performance of all its obligations to Franchisee hereunder.

XII
DEFAULT BY FRANCHISEE

12.01  Right of Termination After Notice of Default.

Except as otherwise expressly provided for in this Agreement, including under Section 12.02 of this Agreement, Franchisee shall have 10 days (or 5 days in the case of non-payment of money) after Franchisor's written notice of a Material Breach within which to remedy such breach, and to provide evidence of such remedy to Franchisor. If any such material breach is not cured within that time period, or such longer time period as Applicable Law may require or as Franchisor may specify in the notice of default, this Agreement and all rights granted by it shall thereupon automatically terminate at Franchisor's election without further notice or opportunity to cure. If any such Material Breach, except those relating to the nonpayment of money, by its nature cannot be cured within such 10 day period, and Franchisee shall immediately commence and diligently continue to cure such default, Franchisor shall upon Franchisee's written request given prior to the expiration of said 10 day cure period, allow Franchisee such additional reasonable period of time as Franchisor deems reasonably necessary to cure such Material Breach. As used herein, the phrase "Material Breach" shall include:

(a)  Failure of Franchisee (or its Affiliate) to pay in full promptly when due any or all payment obligations arising under this Agreement or any of the agreements listed in paragraph 16.03 hereinbelow, including, without limitation, payments due under any development agreement, including payments under the Development Impact Assistance Program, if applicable, (together with this Agreement, "the agreements"); and

(b) Failure of Franchisee to comply with any other material obligation of Franchisee under the agreements, including a failure to comply with Franchisor's Operations Bulletins as described in paragraph 10.05.

12.02    <u>Termination Without Notice</u>.

Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately, without prior notice to Franchisee, upon the occurrence of any or all of the following events, each of which shall be deemed an incurable breach of this Agreement:

(a) If an audit or investigation conducted by Franchisor discloses that Franchisee has knowingly maintained false books or records, or submitted false reports to Franchisor, or knowingly understated its Gross Sales or withheld the reporting of any of Franchisee's Gross Sales.

(b) Franchisee's material misrepresentation to Franchisor with respect to any information provided in connection with its application to become an IHOP Franchisee, including any relevant credit information.

(c) If Franchisee shall attempt or purport to assign this Agreement, without the prior written consent of Franchisor, or if an Assignment of this Agreement by Franchisee shall occur by operation of law, or by reason of judicial process.

(d) If Franchisee shall attempt to Assign Franchisor's Trademarks, or the goodwill connected thereto, or if Franchisee shall use, or permit the use of said Trademarks, or the goodwill connected thereto in derogation of Franchisor's rights pursuant to this Agreement, or if Franchisee shall use or permit the use of said Trademarks, or the goodwill annexed thereto in a manner, or at locations not authorized by Franchisor pursuant to the terms of this Agreement, or takes any action which reflects materially and unfavorably upon the operation and reputation of the Franchised Restaurant, or the "IHOP" chain generally and/or if Franchisee engages in the unauthorized use, disclosure, or duplication of the Trade Secrets, excluding independent acts of employees or others if Franchisee shall have exercised its best efforts to prevent such disclosures or use.

(e) If Franchisee, or any of its principal Owners, is convicted of or pleads guilty or nolo contendere to a felony or any other criminal misconduct which is relevant to the operation of the franchise, or that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the Franchisor's reputation, system, Trademarks or the goodwill associated therewith, or Franchisor's interest therein;

(f) If in Franchisor's reasonable judgment, Franchisee's continued operation of the franchise will result in an imminent danger to public health or safety.

(g) If Franchisee fails, for a period of 20 days after notification of noncompliance, to comply with any Applicable Law governing the operation of the Franchised Restaurant.

(h) If Franchisee is a party to a sublease with Franchisor or its Leasing Affiliate, the attachment of any involuntary lien in the sum of $10,000 or more upon any of the business assets or property of Franchisee which lien is not removed, or for which Franchisee does not post bond sufficient to satisfy such lien within 30 days after notification of such lien.

(i) If this Agreement has been signed under the Single Store Development Program, and Franchisee fails to open the Restaurant by the date specified in Section 4.02 (a) (unless Franchisee has complied with Section 4.02 (c)).

(j) Any default by Franchisee under any mortgage, deed of trust, lease or sublease, including any sublease with Franchisor or its Leasing Affiliate, covering the premises in which the Franchised Restaurant is located, which results in Franchisee being unable to continue operations at the Franchised Restaurant.

(k) If Franchisee shall "abandon" the Franchised Restaurant without Franchisor's prior written consent. For purposes of this Agreement, "abandon" means Franchisee's failure, at any time during the term of this Agreement: (i) to keep the Franchised Restaurant open and operating for business during ordinary business hours for a period of 3 consecutive days, except as provided in the Franchisor's Operations Bulletins, (ii) to keep the Franchised Restaurant open and operating for any period after which it is not unreasonable under the facts and circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the Franchised Restaurant, unless such failure to operate is due to Force Majeure (subject to the requirements of Section 12.04) or such closure is caused by action by any Governmental Authority.

(l) Franchisee's insolvency (as revealed by its records or otherwise); or, if Franchisee files a voluntary petition and is adjudicated a bankrupt; or if an involuntary petition is filed against it and such petition is not dismissed within 30 days; or if it shall make an assignment for the benefit of creditors; or if a receiver or trustee in bankruptcy or similar officer, temporary or permanent, be appointed to take charge of Franchisee's affairs or any of its property; or if dissolution be commenced by or against Franchisee or if any judgment against Franchisee remains unsatisfied or unbonded of record for 15 days.

(m) Upon the death or permanent disability of Franchisee, if Franchisee is an individual, or, if Franchisee is an Entity, any Majority Owner, unless the executor, administrator, conservator, or other personal representative of such person ("Representative") or Franchisee shall, promptly following such death or disability, (i) notify Franchisor of any death or disability; (ii) if Franchisee is an individual, notify Franchisor of its desire to continue as Franchisee hereunder, and (iii) if Franchisee is an individual, or if such deceased or permanently disabled Owner is the Chief Executive Officer or Director of Operations, within sixty (60) days from the date of death or disability, appoint a designated successor reasonably acceptable to Franchisor to continue to oversee the proper ongoing development and operation of the Franchisee and the Franchised Restaurant, (iv)

otherwise reasonably satisfy Franchisor that Franchisee's (if an individual) or such Majority Owner's (if Franchisee is an Entity) heir(s) meet all of the standards and qualifications for a transferee Franchisee, or Majority Owner, as the case may be, or agrees to transfer promptly (and in any event within 12 months) following such death or disability, his or her Equity in Franchisee to a third party who satisfies such standards and qualifications, and subject to Franchisor's right to approval of such transfer and the Right of First Refusal.

(n) Franchisee receives 3 or more written notices of default (whether concerning the same of different obligations) in any 12 month period during the Term, whether or not corrected after notice, which repeated course of conduct shall itself be grounds for termination of this Agreement without further notice or opportunity to cure.

12.03   Cross Default.

Except for a default or termination of any Area Development Agreement, Single Store Development Agreement, Multi-Store Development Agreement or other development agreement offered by Franchisor, consisting solely of Franchisee's failure to meet the development schedule thereunder, any Material Default by Franchisee under the terms and conditions of any lease, or any other agreement between Franchisor (or its Affiliate), on the one hand, and Franchisee (or its Affiliate), on the other, or any default by Franchisee of its obligations to any Advertising Cooperative of which it is a member, shall be deemed to be a Material Default of this Agreement. Notwithstanding the foregoing, Franchisor shall not declare a default under this Section 12.03 as to any agreement, which, if standing alone, would not be subject to default absent this cross-default provision, until an additional sixty (60) days past the date of cure date specified in the noticed default and then, only if, such default remains uncured. The foregoing is not intended to amend, modify or limit the cross-default provisions in any such other agreement, if any.

12.04   Special Requirements for Asserted Force Majeure.

If Franchisee claims an event of Force Majeure, Franchisee shall provide written notice to Company as soon as practicable, but in no event more than thirty (30) days from the occurrence of the event. The notice must (i) state that Franchisee believes that an event of Force Majeure has occurred and expressly include the words "Force Majeure," (ii) describe the circumstances of the event with particularity, and (iii) describe how the Force Majeure has impacted Franchisee's performance under this Agreement. Franchisee must also provide all other information as may be requested by Company, in its reasonable discretion, and periodic updates on Franchisee's progress and diligence in responding to and overcoming the Force Majeure. Thereafter, Franchisee must notify Company immediately upon cessation of Force Majeure. If Franchisee fails to notify Company of any alleged Force Majeure within 7 days, or fails to provide updates at reasonable intervals during the continuance of the alleged Force Majeure, Franchisee shall be deemed to have waived the right to claim Force Majeure.

12.05   Conformity With Laws.

IH #419

If any valid law or regulation by a Governmental Authority with jurisdiction over this Agreement shall limit Franchisor's rights of termination or require a longer or different notice than that specified in this Article XII, this Agreement shall be deemed amended to confirm with the minimum notice periods or restrictions upon termination required by such law or regulation. Franchisor shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination thereof.

## XIII
## ARBITRATION AND REMEDIES

13.01  <u>Arbitration</u>.

(a) Subject to Section 13.01(b), any controversy or claim, except those described in paragraph 13.03, arising out of or relating to this Agreement, or any agreement relating thereto, or any breach of this Agreement including any claim that this Agreement or any portion thereof is invalid, illegal or otherwise voidable, shall be submitted to arbitration before and in accordance with the commercial rules of the American Arbitration Association and judgment upon the award may be entered in any court having jurisdiction thereof; provided, however, that this clause shall not limit either party's (or its Affiliate's) right to obtain any provisional remedy, including injunctive relief, or to obtain writs of recovery of possession, or similar relief, from any court of competent jurisdiction, as necessary or appropriate to require the other party to comply, or to prohibit the other party's non compliance, with its obligations hereunder or under the sublease, if applicable, or in Franchisor's case to obtain possession of the Franchised Location or protect the Trademarks or other property rights of Franchisor (or its Affiliate), or, as part of such action or proceeding, to seek damages, costs and expenses caused to or incurred by it by reason of the act or action or non action which caused such party (or its Affiliate) to institute such action or proceeding. The institution of any such action or proceeding for provisional remedy or similar relief shall not be deemed a waiver on its part to institution of an arbitration proceeding pursuant to the provisions of this Article. If Franchisee subleases the Franchised Restaurant or Franchised Location by or through Franchisor or its Affiliate, in the event of an arbitration award which includes a determination that this Agreement is or has expired or has been terminated by reason of Franchisee's default thereof, Franchisee consents to the entry of a judgment by a court of competent jurisdiction containing an appropriate writ for the recovery of possession of the premises. The situs of arbitration proceedings shall be in Los Angeles, California.

(b) All arbitration proceedings and claims shall be filed and prosecuted separately and individually in the name of Franchisee and Franchisor (and/or its Affiliate), and not in any class action or representative capacity, and shall not be consolidated with claims asserted by or against any other franchisee. The following shall not be subject to arbitration: any claim or dispute involving or contesting the validity of any of the Trademarks, any dispute alleging a violation of federal or state securities law, and class action claims. The decision of whether any issue, claim, controversy or dispute is arbitrable shall be made by the arbitrator, who shall have jurisdiction to make such determination. Unless prohibited by law, both Franchisor and Franchisee hereby waive the right, if

any, to obtain any award for exemplary or punitive damages from the other in any arbitration, or judicial proceeding, or other adjudication, arising out of or with respect to this Agreement, or any breach thereof, including any claim that said Agreement, or any part thereof, is invalid, illegal or otherwise voidable or void. The arbitration and the parties' agreement therefor shall be deemed to be self executing, and if either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party despite said failure to appear.

13.02   Remedies of Franchisor.

In the event of a Material Breach of this Agreement, Franchisor may, at its election pursue the following remedies in addition to such other remedies as may be available to it hereunder and at law or equity: (i) terminate this Agreement, and thereafter bring such action as it may deem proper to protect its rights hereunder, in accordance with the provisions of this Article XIII, and (ii) seek to recover such damages, including all sums due and owing pursuant to this Agreement and any other agreement relating thereto, and the benefit of its bargain hereunder, as Franchisor may, in its discretion, deem appropriate. In computing such damages, it is agreed that the benefit of Franchisor's bargain shall include Franchisor's average Continuing Royalty fee of 4.5% of Franchisee's Gross Sales, computed on the basis of the last 26 weeks that Franchisee conducted business at its Franchised Restaurant (or if any such Franchised Restaurant is open for less than 26 weeks, the entire period that any such Franchised Restaurant is open for business) multiplied by the number of weeks remaining under this Franchise Agreement, computed from the effective date of the termination of this Agreement. Said sum shall thereupon be "present valued" by discounting the same, on an annual basis, predicated upon the prime rate charged by the Chase Manhattan Bank of New York City, on the effective date of such termination.

13.03   Summary Possessory Actions.

If Franchisee subleases the Franchised Restaurant or Franchised Location from Franchisor or its Affiliate, Franchisor or such Affiliate shall be entitled to maintain actions in unlawful or forcible detainer or other appropriate summary possessory action for recovery of the premises of said Franchised Restaurant or Location, in any court of competent jurisdiction without being required to resort to arbitration, in respect of any uncured default by Franchisee in payment of premises rental under the sublease or by reason of any of the causes specified in Sections 12.01, 12.02 and 12.03, for a judgment which shall, if Franchisor or such Affiliate shall prevail therein, include both an order for restitution of the premises and any monetary relief incident thereto which may by law be awarded in any such possessory action. In any such possessory action by Franchisor or such Affiliate, Franchisee shall be entitled to assert defenses, set offs and counterclaims, if any, which are permitted by applicable law in such a possessory action, but no others; and, if Franchisee shall prevail thereon, it may obtain any relief thereon which may by law be awarded in such possessory action.

13.04   Interest on Late Payments.

In addition to the other remedies available to Franchisor, in the event that Franchisee

shall fail or refuse to make any of the payments due under this Agreement, any sublease, any equipment lease, or any purchase contracts for equipment or supplies which were entered into prior to, contemporaneously with or subsequent to this Agreement, when due, Franchisee shall pay interest at the highest rate permitted by law, or 1.5% per month, whichever is less, of such late obligations to defray the cost of maintaining Franchisee's account in arrears, it being expressly understood that payment of this charge shall not forgive or excuse any arrearage.

13.05   In proceeding with arbitration and in making determinations through arbitration, the arbitrators shall not have the power or authority to waive, extend, amend, modify or suspend any terms of this Agreement or the reasonable standards of business performance and operation established by Franchisor in good faith. The filing of a demand for arbitration or any notice or request to arbitrate, shall not stay, postpone or rescind the effectiveness of any termination of this Agreement; provided however, that the foregoing is not intended to preclude either party from seeking any provisional remedy from the arbitrator, including bringing a motion requesting a restraining order or injunction with regard to such termination, if such party believes any termination of this Agreement was improper.

13.06   With respect to all claims which, as a matter of law or public policy, cannot be submitted to arbitration, then Franchisee hereby irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Central District of California, Los Angeles, and if as a matter of law or public policy such matter cannot be heard in Federal Court, to the exclusive jurisdiction of the State Courts of Los Angeles County, California.  Franchisee and its principals, directors, Owners, if any, hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision, and that personal service may be made on them in any legal proceeding arising out of this Agreement by any means allowed by California or federal law.  Franchisee and its principals, directors, and Owners, if any, further agree that venue for any legal proceeding relating to or arising out of this Agreement shall be Los Angeles County, California; provided that for any action (i) for monies owed; (ii) for injunctive or other extraordinary relief; or (iii) involving possession or disposition of, or other relief relating to, real property, Franchisor's Leasing Affiliate may bring an action in any state or Federal District Court which has jurisdiction.

XIV
NON-COMPETITION

14.01      <u>General</u>.

Without Franchisor's prior written consent which may be withheld for any reason in Franchisor's sole subjective discretion, Franchisee shall not, during the Term, including any extension or renewal thereof, directly or indirectly, own, operate, control or have any financial interest in any family style restaurant, pancake house, coffee shop, buffet serving breakfast, or diner, including but not limited to the Village Inn, Bob's Big Boy, Shoney's, Denny's, Perkins', Waffle House, Baker's Square, Coco's, JB's, Allie's, Cracker Barrel, Marie Callendar's, Friendly's, Bob Evans' Farms, Mimi's, Carrows, Denny's Diner, Golden Corral, Original Pancake House, Country Kitchen, Hometown Buffet, or any other food service operation that sells pancakes or derives more than 25%

of its total sales from sit down breakfast items. The foregoing prohibitions shall not apply to ownership by Franchisee of less than 3% of the issued and outstanding stock of any company whose shares are listed for trading over any public exchange or over-the-counter market and whose business includes the owning, operating, or franchising of family style restaurants, pancake houses, or coffee shops, provided Franchisee does not control any such company. Franchisee also agrees that it will not at any time communicate, divulge, or use for the benefit of himself or herself or any other person or entity, other than in the course of conduct of the Franchised Restaurant, any information or knowledge which it may have acquired in connection with the operation of the Franchised Restaurant, and that it will not do any act prejudicial or injurious to the business or goodwill of Franchisor, any of its Affiliates, or any other IHOP franchisee. As used in this paragraph AFranchisee@ shall include Franchisee and each of its Owners and affiliates, the respective officers, directors, managers and affiliates of each of them, and the spouse and family members who live in the same household of each of the foregoing who are individuals.

## XV
## INDEMNITY BY FRANCHISEE

15.01      <u>Indemnity by Franchisee</u>.

Franchisee shall defend, indemnify and hold Franchisor and each Affiliate harmless from and against any and all claims, demands, losses, damages, costs, liabilities and expenses (including attorneys' fees and costs of suit) of whatever kind or character, on account of any actual or alleged loss, injury or damage to any person, firm or corporation or to any property arising out of or in connection with the operation of the Franchised Restaurant.

## XVI
## MISCELLANEOUS

16.01   <u>Right To Cure Defaults</u>

In addition to all other remedies herein granted, if Franchisee shall default in the performance of any of its obligations or breach any term or condition of this Agreement or any related agreement, Franchisor or its Affiliate may, at its election, immediately or at any time thereafter, without waiving any claim for breach hereunder and without notice to Franchisee cure such default for the account and on behalf of Franchisee, and the cost to Franchisor or its Affiliate thereof shall be due and payable on demand and shall be deemed to be additional compensation due to Franchisor or its Affiliate hereunder and shall be added to the amount of compensation next accruing hereunder, at the election of Franchisor or its Affiliate.

16.02     <u>Obligations Upon Termination</u>

(a)   In the event of the termination or expiration of this Agreement for whatever reason, Franchisee shall forthwith discontinue the use of Franchisor's Trademarks and shall not thereafter operate or do business under any name or in any manner that might tend to give the general

public the impression that it is either directly or indirectly associated, affiliated, franchised or licensed by or related to, the IHOP Restaurant system, and shall not, either directly or indirectly, use any name, logotype, symbol or format confusingly similar to the IHOP Trademarks or formats, at either the Franchised Location, the Franchised Restaurant or any other location not then franchised to Franchisee by Franchisor. Since Franchisor's IHOP Restaurants have a distinctive color scheme, unless Franchisor exercises its right to cause an assignment of the lease for the Franchised Location or Franchised Restaurant pursuant to paragraph 4.04(a), Franchisee shall promptly upon demand by Franchisor or its Affiliate repaint the Franchised Restaurant in a different color scheme. In addition, upon such expiration or termination, Franchisee shall not, either directly or indirectly, for any purpose whatsoever, use any of Franchisor's Trade Secrets, procedures, techniques or materials acquired by Franchisee by virtue of the relationship created by this Franchise Agreement, including, (i) recipes, formulae and descriptions of food products; (ii) the Operations Bulletins and all manuals, Bulletins, instruction sheets, and supplements thereto and shall return same to Franchisor; (iii) all forms, advertising matter, marks, devices, insignias, slogans and designs used from time to time in connection with IHOP Restaurants; and (iv) all copyrights, Trademarks and patents now or hereafter applied for or granted in connection with the operation of IHOP Restaurants.

(b) Further, Franchisee shall, at Franchisor's option, cancel or assign to Franchisor or its designate all of Franchisee's right, title and interest in any internet and website home pages, domain name listings and registrations which contain the Trademarks, or any of them, in whole or part, and Franchisee shall notify Network Solutions, InterNIC or other applicable domain name registrar and all listing agencies, upon the termination or expiration hereof, of the termination of Franchisee's right to use any domain name, web page and other internet devise associated with Franchisor or any "IHOP" Restaurant, and authorize and instruct their cancellation or transfer to Franchisor, as directed by Franchisor. Franchisee is not entitled to any compensation from Franchisor if Franchisor exercises its said rights or options.

(c) Franchisor shall have the option, exercisable by written notice within 30 days after the termination of this Agreement, to take an assignment of all telephone numbers (and associated listings) for the Franchised Restaurant, and Franchisee shall notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use any telephone number and any classified or other telephone directory listings associated with the Restaurant, and authorize and instruct their transfer to Franchisor. Franchisee hereby irrevocably appoints Franchisor as Franchisee's attorney-in-fact to execute in the name of and on behalf of Franchisee any and all instruments necessary or appropriate to transfer any or all such telephone numbers and listings to Franchisor, if Franchisee fails to do so for any reason.

(d) The covenants of Franchisee contained in this paragraph 16.02 shall survive the termination of this Agreement.

16.03  Entire Agreement.

This Agreement and the Operations Bulletins contain all of the terms and conditions agreed upon by the parties hereto with reference to the specific subject matter hereof, and no other

agreements oral or otherwise shall be deemed to exist or to bind any of the parties hereto and all prior and contemporaneous agreements, understandings and representations are merged herein and superseded hereby.  Except as set forth in the Franchise Disclosure Document, Franchisor represents that there are no contemporaneous agreements or understandings relating to the subject matter hereof between the parties that are not contained herein. No officer or employee or agent of Franchisor has any authority to make any representation or promise not contained in this Agreement or in any Franchise Disclosure Document for prospective franchisees required by Applicable Law, and Franchisee agrees that it has executed this Agreement without reliance upon any such representation or promise. Notwithstanding the foregoing, for purposes of default, with respect to any other agreements relating hereto, including, but not limited to,  any purchase agreement, single store or multi-store development agreement or other development agreement as may be offered by Franchisor from time to time,  lease or sublease for the Franchised Location or Franchised Restaurant, any equipment purchase agreement, equipment lease or sublease, any sign lease, or any purchase contracts for equipment or supplies which were entered into prior to, contemporaneously with, or subsequent to the Effective Date between Franchisee and Franchisor or its Affiliate, or between Franchisee and third parties, or any franchise fee promissory note, any material default thereof shall also be a material breach of this Agreement.  This Agreement cannot be modified or changed except by written instrument expressly referring to this Agreement, signed by all of the parties hereto.

16.04   Severability.

Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law.  Whenever there is any conflict between any provisions of this Agreement or the Operations Bulletins and any present or future statute, law, ordinance, regulation, or judicial decision, contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the provision of this Agreement or the Operations Bulletins thus affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.  In the event that any part, Article, paragraph, sentence or clause of this Agreement or the Operations Bulletins shall be held to be indefinite, invalid or otherwise unenforceable, the indefinite, invalid or unenforceable provision shall be deemed deleted, and the remaining part of the Agreement shall continue in full force and effect, unless said provision pertains to the payment of fees, pursuant to Articles V, VI and VII hereof, in which case this Agreement shall, at Franchisor's option, terminate.

16.05   Waiver And Delay.

No waiver by Franchisor of any breach or series of breaches or defaults in performance by Franchisee and no failure, refusal or neglect of Franchisor either to exercise any right, power or option given to it hereunder or to insist upon strict compliance with or performance of Franchisee's obligations under this Agreement or the Operations Bulletins, shall constitute a waiver of the provisions of this Agreement or the Operations Bulletins with respect to any prior, concurrent or subsequent breach  thereof or a waiver by Franchisor of its rights at any time thereafter to require exact and strict compliance with the provisions thereof.

16.06   Survival Of Covenants.

IHOPFDD 3/13
IH #419
CFRA, LLC

The covenants contained in this Agreement which by their terms require performance by the parties after the expiration or termination of this Agreement shall be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

16.07 Successors And Assigns.

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Franchisor and shall be binding upon and inure to the benefit of Franchisee and its or their respective heirs, executors, administrators, successors and assigns, subject to the restrictions on Assignment contained herein.

16.08 Joint And Several Liability.

If Franchisee consists of more than one person or entity, or a combination thereof, the obligations and liabilities of each such person or entity to Franchisor are joint and several.

16.09 Governing Law.

All matters relating to arbitration and within the scope of the federal arbitration act (9 U.S.C. ' 1 et seq.) will be governed by such act. Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. ' 1051 et seq.) or other Federal law, this agreement and the relationship between Franchisee and Franchisor will be governed by and construed in accordance the laws of the state of California, without giving effect to principles of conflicts of law, except that (a) the provisions of Section 14.01 of this Agreement respecting non-competition covenants shall be governed in accordance with the laws of the State where the Franchised Restaurant is located, and (b) the California Franchise Investment Law, and any other state law relating to (1) the offer and sale of franchises (2) franchise relationships, or (3) business opportunities, will not apply unless the applicable jurisdictional requirements are met independently without reference to this paragraph.

16.10 Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

16.11 Fees And Expenses.

Should any party hereto commence any action or proceeding for the purpose of enforcing, or preventing the breach of, any provision hereof, whether by arbitration, judicial or quasi-judicial action or otherwise, or for damages for any alleged breach of any provision hereof, or for a declaration of such party's rights or obligations hereunder, or commence any appeal therefrom, then the prevailing party shall be reimbursed by the losing party for all costs and expenses incurred in

connection herewith, including reasonable attorneys' fees for the services rendered to such prevailing party. Notwithstanding the foregoing, if Franchisor incurs expenses in connection with Franchisee=s failure to pay when due amounts owing to Franchisor or otherwise to comply with this Franchise Agreement, including, but not limited to legal and accounting fees, Franchisee will reimburse Franchisor for any such costs and expenses which Franchisor incurs.

16.12  Notices.

Except as otherwise expressly provided herein, all notices, reports and documents permitted or required to be delivered by the provisions of the Agreement shall be delivered by hand, by telegraph or telecopier, by FedEx, DHL Worldwide Express, or other reputable overnight courier service ("Courier"), or by deposit with United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid, and shall be deemed so delivered at the earlier of, as applicable: the time delivered by hand, one business day after transmission by facsimile (with confirming copy sent by mail), 1 business day after deposit with a Courier for delivery, or 3 business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid, and addressed as follows:

> General Counsel
> International House of Pancakes, LLC
> 450 N.  Brand Boulevard, 7th Floor
> Glendale, California 91203-2306

The addresses herein given for notice may be changed at any time by either party by written notice given to the other party as herein provided.

In addition to the foregoing, Franchisee shall provide to Franchisor an e-mail address and the telephone number and address of its residence and principal place of business, if different from the Franchised Location, and any changes thereto; provided that delivery by e-mail or telephone shall not constitute notice hereunder.

16.13  Relationship Of Franchisee To Franchisor.

It is expressly agreed that the parties intend by this Agreement to establish between Franchisor and Franchisee the relationship of franchisor and franchisee, and that it is not the intention of either party to undertake a joint venture or to make Franchisee in any sense an agent, partner, employee or affiliate of Franchisor or any Franchisor Affiliate.  It is further agreed that Franchisee has no authority to create or assume in the name of, or on behalf of, Franchisor or any Franchisor Affiliate any obligation, express or implied, or to act or purport to act as the agent or representative of Franchisor or any Franchisor Affiliate for any purpose whatsoever.

16.14  Gender And Construction.

All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context, or sense of this Agreement or any Article or Section hereof may require. As used in this Agreement, the words "include," "includes" or "including" are used in a non-exclusive sense. Unless otherwise expressly provided herein to the contrary, any consent, approval or authorization of Franchisor which Franchisee may be required to obtain hereunder may be given or withheld by Franchisor in its sole and absolute discretion, and on any occasion where Franchisor is required or permitted hereunder to make any judgment or determination, including any decision as to whether any condition or circumstance meets Franchisor's standards or satisfaction, Franchisor may do so in its sole subjective judgment. Section and paragraph titles used in this Agreement are for convenience only and shall not be deemed to affect the meaning of any of the terms, provisions, covenants or conditions of this Agreement.

16.15   <u>Payments</u>.

All payments required hereunder, shall be paid in United States Dollars.

16.16 <u>Non-Solicitation</u>.

During the Term of this Agreement and for 1 year following the expiration or termination and each Assignment, Franchisee shall not, without the prior written consent of Franchisor, directly or indirectly: (a) employ or attempt to employ any person who at that time is employed by Franchisor, an Affiliate of Franchisor, or any other Franchisee or area developer of Franchisor, including, without limitation, any manager or assistant manager; (b) employ or attempt to employ any person who within six (6) months prior thereto had been employed by Franchisor, an Affiliate of Franchisor, or any other Franchisee or area developer of Franchisor; or (c) induce or attempt to induce any person to leave his or her employment with Franchisor, an Affiliate of Franchisor, or any franchisee or area developer of Franchisor.

XVII
SUBMISSION OF AGREEMENT

17.01   <u>General</u>.

The submission of this Agreement does not constitute an offer, and this Agreement shall become effective only upon the execution thereof by Franchisor and Franchisee.   THIS AGREEMENT SHALL NOT BE BINDING ON FRANCHISOR UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY AN AUTHORIZED OFFICER OF FRANCHISOR. THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL AND UNLESS FRANCHISEE SHALL HAVE RECEIVED A FRANCHISE DISCLOSURE DOCUMENT IN SUCH FORM AND MANNER AS MAY BE REQUIRED UNDER OR PURSUANT TO APPLICABLE LAW.

Franchisee jointly and severally acknowledges that it has carefully read this Agreement and all other related documents to be executed concurrently or in conjunction with the execution hereof, that it has had the opportunity to obtain the advice of counsel in connection with entering into this Agreement, that it understands the nature of this Agreement, and that it intends to comply herewith and be bound hereby. Except as set forth in the Franchise Disclosure Document, if any such representation was made, Franchisor expressly disclaims making, and Franchisee acknowledges that it has not received or relied on any warranty or guarantee, express or implied, as to the potential volume, profits, expenses, or success of the business venture contemplated by this Agreement.

IN WITNESS WHEREOF, Franchisor and Franchisee have caused this Agreement to be executed as of the day and year first above written.

**FRANCHISOR:**
IHOP RESTAURANTS LLC
a Delaware limited liability company
*Acknowledged and Affirmed as of september 21 , 2016*

By: _____
James F. Anhut, *Senior Vice President*

I HEREBY ACKNOWLEDGE THAT AT LEAST 14 CALENDAR DAYS PRIOR TO THE DATE THAT I HAVE EXECUTED THIS AGREEMENT, OR HAVE PAID ANY CONSIDER-ATION THEREFOR, I RECEIVED, AND HAVE SINCE READ, FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT; I HEREBY ALSO ACKNOWLEDGE THAT I RECEIVED A COMPLETELY PREPARED COPY OF THIS AGREEMENT MORE THAN 7 CALENDAR DAYS PRIOR TO THE DATE I HAVE EXECUTED SAME.

**FRANCHISEE:**
CFRA, LLC
a Delaware limited liability company

By: _____
Nicholas Peters, *President*

IHOPFDD 3/13
IH #419
CFRA, LLC

# Exhibit A



IHOP #419
1031 Assembly St.
Columbia, SC

Franchised Area

The Franchised Area depicted on this map should not be construed as a representation by International House of Pancakes, LLC ("IHOP") or any of its agents, that you will or can expect to attain any specific amount or range of income, sales profits or earnings from the operation of a franchised business within this Franchised Area. Actual results vary from operation to operation and we cannot estimate the results that any franchisee may achieve. You are expected to evaluate your own income, sales, profits and earnings potential. You should always seek independent financial, business and legal advice in assessing the suitability of this business opportunity for you.

Created On:
06.03.13

Created By:

NORTH

No Window

## Exhibit A
## Franchised Area (Census Block Groups)



IHOP #419
1031 Assembly Street  COLUMBIA, SC 29201-3145

3 June 2013

Coordinates Longitude:    -81.034322
Latitude:    33.998338

| Census Block Group | Longitude | Latitude |
|---|---|---|
| 450630202011 | -81.051025 | 33.981350 |
| 450630202012 | -81.061562 | 33.979698 |
| 450630202013 | -81.059349 | 33.972519 |
| 450630203001 | -81.054291 | 33.990345 |
| 450630203002 | -81.065781 | 33.984917 |
| 450630203003 | -81.066193 | 33.993851 |
| 450630205052 | -81.077942 | 33.992603 |
| 450630205092 | -81.071106 | 34.004181 |
| 450630205093 | -81.070290 | 33.999901 |
| 450630205094 | -81.068398 | 34.001244 |
| 450790002001 | -81.038399 | 34.037727 |
| 450790004001 | -81.045769 | 34.035297 |
| 450790004002 | -81.054115 | 34.034550 |
| 450790005001 | -81.025894 | 34.036060 |
| 450790005002 | -81.033051 | 34.032017 |
| 450790006001 | -81.049232 | 34.025425 |
| 450790006002 | -81.058510 | 34.021488 |
| 450790007001 | -81.029968 | 34.019356 |
| 450790007002 | -81.036636 | 34.020351 |
| 450790007003 | -81.043022 | 34.019810 |
| 450790007004 | -81.050095 | 34.013996 |
| 450790009001 | -81.013237 | 34.025810 |
| 450790009002 | -81.012573 | 34.029659 |
| 450790009003 | -81.022476 | 34.028484 |
| 450790010001 | -81.025055 | 34.021900 |
| 450790010002 | -81.021461 | 34.019146 |
| 450790010003 | -81.017921 | 34.020657 |
| 450790010004 | -81.017738 | 34.016693 |
| 450790010005 | -81.017082 | 34.013947 |
| 450790011002 | -81.004379 | 34.024330 |
| 450790011004 | -81.001427 | 34.019203 |
| 450790011005 | -81.010605 | 34.019413 |
| 450790012001 | -80.989143 | 34.013504 |
| 450790012002 | -81.003410 | 34.012257 |
| 450790013001 | -81.013268 | 34.012161 |

# Exhibit A
# Franchised Area (Census Block Groups)

IHOP #419
1031 Assembly Street  COLUMBIA, SC 29201-3145

3 June 2013

Coordinates Longitude:   -81.034322
Latitude:   33.998338

| Census Block Group | Longitude | Latitude |
|---|---|---|
| 450790013002 | -81.011063 | 34.009102 |
| 450790013003 | -81.012001 | 34.004314 |
| 450790013004 | -81.017487 | 34.009350 |
| 450790014001 | -81.026321 | 34.010349 |
| 450790014002 | -81.029831 | 34.008614 |
| 450790015001 | -81.037285 | 34.009338 |
| 450790015002 | -81.033882 | 34.001850 |
| 450790016001 | -81.045036 | 34.009052 |
| 450790016002 | -81.043129 | 34.005131 |
| 450790016003 | -81.048744 | 34.002457 |
| 450790016004 | -81.052650 | 34.005493 |
| 450790018001 | -81.036697 | 33.996536 |
| 450790018002 | -81.035110 | 33.992695 |
| 450790018003 | -81.045944 | 33.993217 |
| 450790019001 | -81.027748 | 33.997040 |
| 450790020011 | -81.024460 | 34.002407 |
| 450790020012 | -81.022270 | 33.998745 |
| 450790020021 | -81.016441 | 34.001907 |
| 450790021001 | -81.009117 | 34.002041 |
| 450790021002 | -81.008644 | 33.998405 |
| 450790021003 | -81.011337 | 33.996536 |
| 450790021004 | -81.011002 | 33.992828 |
| 450790021005 | -81.007103 | 33.991840 |
| 450790022001 | -80.998634 | 34.005116 |
| 450790022002 | -81.003731 | 34.006924 |
| 450790023001 | -80.987106 | 34.005138 |
| 450790023002 | -80.983604 | 33.997700 |
| 450790023003 | -80.993195 | 34.002460 |
| 450790025001 | -81.001465 | 33.995403 |
| 450790025002 | -80.996300 | 33.994896 |
| 450790025003 | -80.990906 | 33.992661 |
| 450790026021 | -80.996506 | 33.984554 |
| 450790026022 | -81.006493 | 33.977074 |
| 450790026023 | -81.005630 | 33.982761 |
| 450790027001 | -81.019272 | 33.996033 |

Data Source: Pitney Bowes Business Insight
© 2011 Pitney Bowes Software Inc. All Rights Reserved.

## Exhibit A
## Franchised Area (Census Block Groups)



IHOP #419
1031 Assembly Street  COLUMBIA, SC 29201-3145

3 June 2013

Coordinates Longitude:   -81.034322
Latitude:   33.998338

| Census Block Group | Longitude | Latitude |
|---|---|---|
| 450790027002 | -81.017471 | 33.992264 |
| 450790027003 | -81.013870 | 33.987480 |
| 450790027004 | -81.020844 | 33.986076 |
| 450790028001 | -81.026390 | 33.989983 |
| 450790028002 | -81.037521 | 33.983887 |
| 450790104033 | -81.069077 | 34.017662 |
| 450790105021 | -81.061928 | 34.030228 |
| 450790117011 | -81.004326 | 33.967918 |
| 450790117012 | -81.011421 | 33.946720 |