ORDERED.

**Dated:  May 27, 2020**

Catherine M. Ewen

Catherine Peek McEwen
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
www.flmb.uscourts.gov

In re:

CFRA HOLDINGS, LLC

Case No. 8:20-bk-03608-CPM
Chapter 11

*Jointly Administered with:*

CFRA, LLC

Case No. 8:20-bk-03609-CPM

CFRA TRI-CITIES, LLC

Case No. 8:20-bk-03610-CPM

Debtors.

_____/

**INTERIM ORDER
(I) AUTHORIZING THE DEBTORS TO
OBTAIN POST-PETITION FINANCING
FROM PREPETITION LENDERS PURSUANT
TO 11 U.S.C. § 364; (II) GRANTING LIENS AND
SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C.
§ 364; (III) GRANTING ADEQUATE PROTECTION PURSUANT
TO 11 U.S.C. §§ 361, 362, AND 363; AND (IV) GRANTING SUCH
OTHER AND FURTHER RELIEF THAT THIS COURT FINDS EQUITABLE**

**THIS MATTER** came on for hearing on May 21, 2020, on the Motion (the "DIP

Financing Motion")[1] [Docket No. 47] of CFRA Holdings, LLC ("CFRA Holdings"), CFRA, LLC

---

[1]    The Debtors filed a combined Motion for (i) Authority to Obtain Post-petition Financing; and (ii) Authority
to use Lenders' Cash Collateral.  This Interim Order addresses the request for Authority to incur Post-
petition Financing.  The request for Authority to use Lender's Cash Collateral is addressed in a separate
Interim Order.  For purposes of this Interim Order the motion is defined as the DIP Financing Motion.



36955628.9 [SUBSTANTIVE CHANGES TO PROPOSED ORDER ARE INITIALED; GRAMMAR AND MINOR, NON-SUBSTANTIVE
CHANGES ARE NOT FLAGGED]

("CFRA"), and CFRA Tri-Cities, LLC ("CFRA Tri-Cities")[2] in the above-captioned chapter 11 cases (the "Cases") pursuant to Sections 105, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2018-1(g)(2) of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules"), for entry of this interim consent order (the "Interim Order") seeking, among other things:

(i)     authorization for the Debtors to obtain a secured post-petition loan (the "DIP Loan") in the aggregate principal amount of up to One Million Dollars ($1,000,000), together with interest, costs, fees and other expenses and amounts pursuant to the terms and conditions set forth in that certain Debtor-in-Possession Loan Agreement (the "DIP Loan Agreement"), attached as **Exhibit A** hereto[3], and  the notes, agreements and loan documents identified and referenced therein (collectively, the "DIP Loan Documents") by and between the Debtors, as borrowers, and Valley National Bank ("VNB") and Raymond James Bank, N.A. ("RJB," and collectively with VNB, the "Lenders") as lenders;

(ii)    authorization for the Debtors to execute and deliver the DIP Loan Documents to the Lenders and to perform such other and further acts as may be required in furtherance of the DIP Loan and the DIP Loan Documents;

(iii)   authorization for the Debtors to draw on the DIP Loan, subject to the terms and conditions precedent as set forth in the DIP Loan Documents, and to use proceeds of the DIP Loan only in accordance with (a) this Interim Order and/or a Final DIP Order (defined below) authorizing entry of the DIP Loan Documents; (b) the then-applicable Approved DIP Budget (as

---

[2]     CFRA Tri-Cities and CFRA are referred to collectively as the "Operating Company Debtors".

[3]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Loan Agreement.

defined in the DIP Loan Documents), the Interim Approved DIP Budget is attached hereto as **Exhibit B**; and (c) any interim and/or final order authorizing Debtors' use of Lenders' cash collateral (the "Cash Collateral Order(s)");

(iv)    subject to the Carve-Out (defined below), the granting of allowed superpriority administrative expense claim status to Lenders in each of the Debtors' jointly administered cases herein for all amounts which become due and outstanding to Lenders under the DIP Loan and DIP Loan Documents (collectively, the "DIP Obligations");

(v)    subject to the Carve-out (as defined below) and exclusive of Avoidance Actions (as defined below), the granting to Lenders automatically perfected first-priority security interests in and liens on all of the property, assets or interests in property of each Debtor and each Debtor's "estate" (as defined in the Bankruptcy Code), in each case of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, real property leases, personal property leases, intellectual property, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, all proceeds of leases of real property, all of the issued and outstanding capital stock of each subsidiary of such Debtor, money, investment property, deposit accounts, all commercial tort claims and other causes of action, all cash and cash equivalents of the Debtors and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of the collateral described above (collectively, with respect to all such entities, the "DIP Loan Collateral") to secure all DIP Obligations;

(vi)     subject to and  effective upon the entry of this Interim Order, the waiver by the Debtors of any right to surcharge against the Collateral pursuant to 11 U.S.C. § 506(c) or otherwise;

(vii)    modification of the automatic stay imposed by 11 U.S.C. § 362 to the extent necessary to provide Lenders with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents;

(viii)   scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of a final order (the "<u>Final DIP Order</u>") authorizing the balance of the credit available under the DIP Loan Documents and/or consideration of a modified and extended Approved DIP Budget and any requested relief not granted under the Interim Order on a final basis, all as set forth in the DIP Financing Motion and in the DIP Loan Documents.

**NOW THEREFORE**, the Court having considered the DIP Financing Motion, the DIP Loan Documents, and the evidence proffered at the Interim Hearing held on May 21, 2020; and due and appropriate notice of the DIP Financing Motion, the relief requested therein, and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001 and 9014; and the Interim Hearing to consider the relief requested in the DIP Financing Motion having been held and concluded; and all objections to the relief requested in the DIP Financing Motion having been resolved, addressed or overruled by the Court; and it appearing to the Court that granting the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors and equity holders; and it further appearing, that the Debtors' estates are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**THE COURT FINDS AS FOLLOWS:**

A.       *Petition Date*.   On May 6, 2020, (the "<u>Petition Date</u>") each of the Debtors filed a separate voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida (the "<u>Court</u>").

B.       *Debtors-in-Possession*.   The Debtors continue to maintain dominion and control over their assets and business operations as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

C.       *Jurisdiction and Venue*.   This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over the Debtors' chapter 11 cases, and over the persons and property affected hereby.   Consideration of the DIP Financing Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).   Venue for these Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.       *Official Committees*.   As of the date of the filing of the DIP Financing Motion, the Office of the United States Trustee for Region 21 has not formed an Official Committee of Unsecured Creditors in any of the Cases.

E.       *Notice.* The notice given by the Debtors of the DIP Financing Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice thereof and complies with the Bankruptcy Rules and Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

F.       *Debtors' Stipulations*.   The Debtors admit, stipulate, and agree that:

a.       *The Prepetition Loan*.

i.       Prior to the Petition Date, Lenders, as lenders, extended certain loans to the Operating Company Debtors, as borrowers, which loans are guaranteed by CFRA Holdings and are secured by property of the Operating Company Debtors as set forth below.

These loans are evidenced by various agreements and documents that are collectively referred to as the "Bank Credit Agreements."

ii.        Pursuant to the terms of the Bank Credit Agreements, the Lenders made available to the Operating Company Debtors a revolving line of credit in the principal amount of up to Twenty-Six Million ($26,000,000) (the "Prior Loan").

iii.        The Prior Loan comprises (i) a Revolving Line of Credit Promissory Note dated September 8, 2016 (the "VNB Note") made by the Operating Company Debtors and held by VNB in the principal amount of $11,000,000; and (ii) a Revolving Line of Credit Promissory Note dated September 8, 2016 (the "RJB Note," and collectively with the VNB Note, the "Prepetition Notes") made by the Operating Company Debtors and held by RJB in the principal amount of $15,000,000. CFRA Holdings guaranteed payment and performance of the Operating Company Debtors under the Bank Credit Agreements, including the Prepetition Notes, pursuant to a Guaranty of Payment and Performance dated September 8, 2016 (the "Guaranty").

iv.        As of the Petition Date, the Debtors were jointly and severally indebted (i) to VNB in the amount of at least $8,269,315.85, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (ii) to RJB in the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (together, the "Prepetition Indebtedness").

b.        *The Prepetition Collateral*.

i.        The Operating Company Debtors' payment of the Prepetition Indebtedness and performance under the Bank Credit Agreements, including the Prepetition Notes, are secured by the property identified in that certain Security Agreement dated September

9, 2016 (the "<u>Prepetition Security Agreement</u>"), wherein the Operating Company Debtors granted Lenders valid, binding, perfected security interests and liens (the "<u>Prepetition Liens</u>") in certain of their property (the "<u>Prepetition Collateral</u>").

ii.      The Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtors, enforceable against them in accordance with the terms of the Bank Credit Agreements and/or the Guaranty (other than in respect of the stay of enforcement pursuant to 11 U.S.C. § 362), and no portion of the Prepetition Indebtedness is subject to avoidance, re-characterization, reduction, setoff, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination or any challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.  The Debtors are jointly and severally liable to the respective Lenders in the amount of the Prepetition Indebtedness as identified herein.

iii.      The Prepetition Liens constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement pursuant to 11 U.S.C. § 362) and perfected security interests and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Lenders, as applicable, for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, re-characterization, subordination or avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

G.      <u>*Findings Regarding the Post-Petition Financing and Use of Cash Collateral*</u>.

a.      <u>*Cause*</u>.  Good cause has been shown for entry of this Interim Order.

b.      <u>*Need for Post-Petition Financing and Use of Cash Collateral*</u>.  The Debtors have an immediate and critical need to obtain the DIP Loan to preserve property of the estates and maximize the distribution to creditors of the estates. The Debtors contend that they require immediate authority to use cash collateral of Lenders and obtain the DIP Loan from Lenders in

order to pursue a sale of all or substantially all of the property of the estates and the Debtors do not have sufficient unencumbered cash or other assets to fund the necessary activities to be performed during the marketing period.   As noted, *supra,* the DIP Financing Motion also incorporates the Debtors' request for authority to use cash collateral of Lenders in these Cases (the "Cash Collateral Motion") and the Debtors have also filed a separate motion to approve bidding procedures and the sale of property of the estates (the "Sale Motion"), including property and property interests utilized in connection with operation of the Debtors' forty-nine (49) restaurants (the "Restaurants") as specifically identified in the Sale Motion.   The Debtors contend that the Sale Motion, DIP Financing Motion and Cash Collateral Motion are inextricably intertwined. Lenders' agreement to provide the DIP Loan as set forth herein is contingent upon the Debtors' prosecution and the Court's approval of the Cash Collateral Motion and the Sale Motion.

        c.     *No Credit Available on More Favorable Terms.*   The Debtors are unable to obtain financing on terms more favorable than those offered by the Lenders under the DIP Loan and are unable to obtain unsecured credit allowable under 11 U.S.C. § 503(b)(1) as an administrative expense.   The Debtors are also unable to obtain secured credit under 11 U.S.C. § 364(c) on equal or more favorable terms than those offered by the Lenders under the DIP Loan.

        d.     *Use of Proceeds of the DIP Loan*.   The Debtors have agreed that the proceeds of the DIP Loan and any Advance shall be used only in accordance with then current approved budget(s) approved by Lenders (the "Approved DIP Budgets") and each advance shall be used solely in a manner consistent with the terms of the DIP Loan, the DIP Loan Documents, this Interim Order, any Final DIP Financing Order and any order granting the Cash Collateral Motion (a "Cash Collateral Order").   Lenders' consent and approval of any budget for use of

proceeds of the DIP Loan and any Advance shall be in the sole and absolute discretion of Lenders.

        i.      *Interim Use(s)*: Per this Interim Order, the Debtors shall be authorized to use the proceeds of the DIP Loan for the designated Week One (1) expenditures and for the miscellaneous expense line item for Weeks One (1) through Two (2) in the Interim Approved DIP Budget.

        ii.      *Use(s) upon Final DIP Order:* Lenders' agreement to fund the DIP Loan beyond the Interim Approved DIP Budget is contingent upon the entry of an order approving bidding procedures in connection with the Sale Motion, and entry of the Final DIP Order, and entry of a final order approving the Cash Collateral Motion, in their entirety and without amendment, and pursuant to Approved DIP Budgets, as may be approved by Lenders in their sole discretion.

    H.    *Good Faith of the Lenders*.

        a.    *Willingness to Provide Financing*. The Lenders have indicated a willingness to provide financing to the Debtors subject to: (i) the entry of this Interim Order, including the grant to Lenders of the liens herein; (ii) the approval of the terms and conditions of the DIP Loan and the DIP Loan Documents; (iii) the entry of an interim order granting the Cash Collateral Motion; and (iv) entry of an order approving bidding procedures in connection with the Sale Motion.

        b.    *Good Faith Pursuant to 11 U.S.C. § 364(e)*. Lenders are extending credit to the Debtors in good faith and, therefore, the security interests, liens, DIP Superpriority Claims (defined below) and other protections granted pursuant to this Interim Order and the DIP Loan Documents to the Lenders will have the protections provided in 11 U.S.C. § 364(e) and will not

be affected by any subsequent reversal, modification, vacatur, amendment, re-argument or reconsideration of this Interim Order or any other order.

Based upon the foregoing findings and conclusions, the DIP Financing Motion, and the record before the Court with respect to the DIP Financing Motion, and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED that**:

1.      *Financing Approved*.   Subject to entry of the consent order for the interim use of cash collateral submitted by the Debtors and the Lenders contemporaneously herewith (the "Interim Cash Collateral Order"), the DIP Financing Motion is granted on an interim basis in accordance with the terms of this Interim Order.   Entry of a Final DIP Order authorizing DIP Financing shall be further conditioned upon the Court's entry of an order approving bidding procedures in connection with the Sale Motion, and entry of a final order granting the Cash Collateral Motion, each in their entirety and without amendment.

2.      *Objections Overruled*.   All objections to entry of this Interim Order, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled. For the sake of clarity, this Interim Order authorizes a very limited loan, the amount of which is miniscule in terms of dilution of any distribution that unsecured creditors might reasonably expect under the circumstances of these cases.   All objections to the approval of the balance of the DIP Loan are reserved.

3.      *Authorization of the DIP Loan*.   The Debtors are expressly and immediately authorized to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Loan Documents, which are expressly approved and incorporated herein by reference, the Interim Approved DIP Budget, and the Interim Cash Collateral Order.   Again, for the sake of clarity, the amount authorized to be drawn on the DIP

Loan is relatively small, and the dollar amount thereof as shown on the Interim DIP Budget and in the budget to the Interim Cash Collateral Order is exactly the same.

4.      *Authorization to Execute Documentation*.  The Debtors are hereby authorized to execute the DIP Loan Documents and any additional documents and instruments as may be reasonably required by the Lenders to implement the terms or effectuate the purposes of this Interim Order.

5.      *Authorization to Borrow*.  The Debtors are hereby authorized to request one or more Advances under the DIP Loan, subject to the terms, conditions, limitations on availability set forth in this Interim Order, the DIP Loan Documents, Interim Approved DIP Budget and the Interim Cash Collateral Order.

6.      *No Obligation to Extend Credit*. The Lenders shall have no obligation to make any loan or Advance under the DIP Loan Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents, the Interim Cash Collateral Order and this Interim Order have been satisfied in full or waived by the Lenders in their sole discretion.

7.      *Budget; Use of DIP Loan Proceeds*.  From and after the entry of this Interim Order, the Debtors shall use advances under the DIP Loan only for the purposes specifically set forth in this Interim Order, the DIP Loan Documents, and/or the  Interim Cash Collateral Order, and solely for expenses included in the Interim Approved DIP Budget.

8.      *Superpriority Claims*.  Pursuant to 11 U.S.C. § 364(c)(1), all of the DIP Obligations shall collectively constitute an allowed superpriority administrative expense claim against the Debtors (the "DIP Superpriority Claims") in each of these Cases with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtors or their estates, at any time existing or arising, of any kind or

nature whatsoever, including without limitation, administrative expenses of the kinds specified in or ordered pursuant to 11 U.S.C. §§ 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under 11 U.S.C. § 364(c)(1); and which shall at all times be senior to the rights of the Debtors and their estates and any creditor or other party in interest to the extent permitted by law.

9. *DIP Liens*.

a. As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution or recordation of filings by the Lenders of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Lenders over any collateral, the following security interests and liens are hereby granted by the Debtors to the Lenders (the "DIP Liens"):

i. a first priority, perfected security interest in, and lien, under 11 U.S.C. § 364(c)(2) upon: (A) all DIP Loan Collateral to the extent same is not subject to valid, perfected and non-avoidable liens which are entitled to priority over the DIP Liens; and (B) the Prepetition Collateral; and

ii. a junior lien, under 11 U.S.C. § 364(c)(3), upon all of the DIP Loan Collateral to the extent same is not subject to valid, perfected and non-avoidable liens (other than the Prepetition Liens) in favor of third parties which are entitled to priority over the DIP Liens.

b. The DIP Liens shall be senior priming liens on all Prepetition Collateral senior to all Prepetition Liens thereon and any Adequate Protection Liens (as defined below) thereon, but subject only to (i) the Carve-Out, and (ii) liens that are valid, binding, perfected and

unavoidable as of the Petition Date (other than the Prepetition Liens) and which are entitled to priority over the DIP Liens.

c.      The DIP Loan Collateral shall not include any claims or causes of action arising under 11 U.S.C. §§ 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a) (collectively, "Avoidance Actions"); and shall not apply to any proceeds of Avoidance Actions.

d.      For the avoidance of doubt and notwithstanding anything to the contrary contained herein, unless otherwise expressly permitted by the terms of the applicable lease and subject to the rights of all landlords and sublessors therein, any liens granted under this Order shall not include the Debtors' real property leases (including, for the avoidance of doubt, any ground leases), but shall include the proceeds from the disposition of all such leases.

e.      For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, the DIP Loan Collateral shall not include the franchise agreements and development agreements by and between any of the Debtors, as franchisee, and IHOP Franchising, LLC, a Delaware limited liability company, and its successors and assigns, as franchisor ("IHOP") (the "Franchise Agreements"), or the equipment, machinery, furniture, fixtures and other personal property leased by any of the Debtors from IHOP or any affiliate of IHOP (the "IHOP Leases"), but the DIP Loan Collateral shall include the proceeds from the disposition of any or all of the Franchise Agreements and IHOP Leases.[4]

10.      _Prepetition Secured Parties' Adequate Protection_.

a.      The Lenders are entitled, pursuant to 11 U.S.C.§§ 361, 363(e) and 364(d)(1), to adequate protection to the extent and priority of their liens in the Prepetition Collateral, including cash collateral, for any diminution in the value of their interests in the

---

[4]      However, for purposes of this Interim Order, such proceeds shall not include proceeds from the disposition of personal property under any of the IHOP Leases that are not true leases.

Prepetition Collateral, including, without limitation, any such diminution that may result from the sale, lease or use by the Debtors (or other actual consumption) of cash collateral and any other Prepetition Collateral, and the imposition of the automatic stay pursuant to 11 U.S.C. § 362 (each, a "Diminution Claim").  As adequate protection for such Diminution Claims, the Lenders are granted, *nunc pro tunc* to the Petition Date, the following adequate protection (collectively, the "Adequate Protection Provisions"):

      b.      *Adequate Protection Liens*. Subject to paragraph 9.e. n. 4, the Lenders are hereby granted valid and perfected replacement security interests in and liens on any of the DIP Loan Collateral in which the Lenders did not have valid, perfected liens and security interests as of the Petition Date (the "Adequate Protection Liens"); provided, that the Adequate Protection Liens shall not attach to the Avoidance Actions or the proceeds of the Avoidance Actions.

      11.      *Repayment of DIP Loan*.  All DIP Obligations shall be due and payable in full, as set forth in the DIP Loan Documents.  Unless otherwise agreed in writing by Lenders, the first proceeds from any sale, assignment, or disposition of DIP Loan Collateral shall be disbursed to Lenders up to the outstanding amounts due under the DIP Loan Documents at the time of each such sale, assignment, or disposition of DIP Loan Collateral.

      12.      *Reservation of Rights of Lenders*. Notwithstanding any other provision hereof, the grant of adequate protection to the Lenders in the form of the Adequate Protection Provisions is without prejudice to the right of any Lender to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, upon proper notice and without prejudice to the right of the Debtors or any other party to contest such modification.

      13.      *Perfection of DIP Liens and Adequate Protection Liens*. The DIP Liens and the Adequate Protection Liens shall be and hereby are fully perfected liens and security interests,

effective and perfected upon the date of this Interim Order.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens.

14.   <u>Payments of Debtors' Professionals - Carve Out</u>.

a.   The Interim Approved DIP Budget shall include payment of allowed fees and expenses of: (i) Debtors' counsel, Saul Ewing Arnstein & Lehr LLP ("<u>Debtors' Counsel</u>"); and (ii) any chief restructuring officer, and his/her firm, that may be retained in the Cases (collectively the "<u>CRO</u>," and collectively with the Debtors' Counsel, the "<u>Retained Professionals</u>"), accrued from and after the Petition Date in an amount of up to $95,000 to Debtors' Counsel, and in an amount of up to $75,000 to the CRO — inclusive of the $20,629.50 retainer held by Debtors' Counsel and the $47,000 retainer held by the CRO (collectively, the "<u>Initial Professional Fee Payments</u>").

b.   The Initial Professional Fee Payments have and shall be funded from Lenders' Cash Collateral (as defined in the Cash Collateral Motion) and/or the proceeds of the DIP Loan as, when, and to the extent set forth in the Interim Approved DIP Budget and subject to the terms and conditions of the DIP Loan Documents, this Interim Order and the Interim Cash Collateral Order.  The Debtors shall wire transfer funds to the Saul Ewing Arnstein & Lehr LLP Client Trust Account (to the extent of such funds actually deposited, the "<u>Carve-Out Reserve Account</u>") in the amounts equal to, but not to exceed, the amounts budgeted for Saul Ewing and the CRO set forth in the Interim Approved DIP Budget for each such week.  Saul Ewing shall

release to itself or the CRO, as the case may be, such amounts as are payable pursuant to an applicable Order of this Court, including, without limitation, an order approving the CRO Retention Motion (defined below), any order approving interim compensation procedures in the Cases and any order granting interim or final fee applications in the Cases. In making payments from the Carve-Out Reserve Account, Saul Ewing shall be entitled to rely on written certifications from the CRO as to the amount the CRO is due and owing from the Carve-Out Reserve Account and in no circumstance shall Saul Ewing be obligated to pay any party other than from the funds held, from time to time, in the Carve-Out Reserve Account.

c.      The entitlement of Debtors' Counsel to retain its portion of the Initial Professional Fee Payments is contingent upon (i) entry of an Order by the Bankruptcy Court approving the retention of Debtors' Counsel pursuant to 11 U.S.C. §§ 105, 327, 328, 1103, or 363, Bankruptcy Rule 2016(b), and Local Rule 2016-1; and (ii) entry of an Order by the Bankruptcy Court allowing and approving compensation and/or reimbursement to said professional pursuant to 11 U.S.C. §§ 330 and 331, and shall be further limited to the amount(s) allowed and approved pursuant to such Order(s) (an "Allowed Fee Order").

d.      The entitlement of the CRO and his/her firm to retain their portion of the Initial Professional Fee Payments is contingent upon: (i) entry of an Order by the Bankruptcy Court approving the Motion authorizing the Debtors (a) to retain Focus Management Group USA Inc. to provide a chief restructuring officer and additional personnel, as set forth in that certain engagement agreement between the Debtors and Focus and (b) to designate J. Tim Pruban as the Debtors' CRO, *nunc pro tunc* to the Petition Date (the "CRO Retention Motion") (ECF No. 20) -- provided that the order granting the CRO Retention Motion includes Lenders and their counsel as additional "Notice Parties" (as defined in the CRO Retention Motion); and (ii) payment to the

CRO in accordance with the terms and conditions in the CRO Retention Motion and the Order granting that motion.

       e.      Pursuant to 11 U.S.C. § 364(c)(1), the Initial Professional Fee Payments are and shall be included in the allowed DIP super priority claims awarded to Lenders under this Interim Order; provided that each of the liens and claims, including the DIP super priority claims granted to the Lenders in connection with the DIP Loan, shall be subject only to a "Carve-Out"[5] from the Lenders' Collateral for: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code and (ii) any unpaid portion of the Initial Professional Fee Payments, awarded by entry of an Allowed Fee Order or pursuant to the terms and conditions in the CRO Retention Motion and the Order granting that motion, which fees and charges have not been otherwise paid with unencumbered estate funds. Any Carve Out obligations shall be paid from any unencumbered funds of the Debtors' estates _before_ being paid from any collateral of Lenders. No part of the Carve Out shall be available to pay professional fees incurred by any other party in the Cases.

       f.      Nothing herein shall constitute a cap on the amount of professional fees and expenses that may be incurred or allowed in the Cases; _provided_ that no payments of such

---

[5]    The "Carve Out" shall mean (a) the unpaid fees and expenses incurred by Retained Professionals that were incurred (i) on and after the Petition Date and before the Termination Date (as defined in the DIP Loan Agreement) (both only if the Lenders terminate the Debtors' use of proceeds of the DIP Loan and Lenders' cash collateral as a result of the occurrence of a Termination Event (as defined in the DIP Loan Agreement) and the Agent delivers notice to counsel for the Debtors that the Agent has exercised its right to terminate the Debtors' use of cash collateral as a result of the occurrence of a Termination Event) but not in excess of the total aggregate amount set forth in the Interim Approved DIP Budgets, and (ii) provided that, in each case, such fees and expenses are ultimately allowed on a final basis by this Court and are not excluded from the Carve Out under the later provisions hereof; and (b) any unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code. All prepetition retainers and any other unencumbered property of the estates shall be used to pay any allowed fees and expenses of the Retained Professionals before any payment of such fees or expenses are made from the Carve Out.

fees and expenses shall be made from Lenders' Cash Collateral, Lenders Collateral and/or the DIP Loan proceeds except as, when, and to the extent set forth in Approved DIP Budgets, and subject to the terms and conditions of the DIP Loan Documents, this Interim Order and the Interim Cash Collateral Order. Moreover, nothing herein shall be construed as consent to the allowance of any fees or expenses of the Retained Professionals or shall affect the rights of Lenders to object to such amount.

g.      In exchange for the consideration afforded by Lenders under this Order, none of the Lenders' respective interests in property of the Debtors' estates shall be, with respect to any fees, expenses or charges incurred by the Retained Professionals or any other professional retained by any of the Debtors, subject to the surcharge provisions of section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including unjust enrichment).

h.      No portion of the Lenders' Cash Collateral, Lenders' Collateral, the DIP Loan proceeds or Carve Out may be used to pay any fees or expenses incurred by any entity in connection with any claim, actions or services adverse to Lenders, Agent or their affiliates (direct or indirect), or any of their respective directors, officers, members (direct or indirect), partner, equity owner, agent, servant, employees, counsel, consultants or other representative (collectively, the "Lender Parties"), including (i) preventing, hindering or delaying Agent's or Lenders' enforcement or realization upon any collateral upon the occurrence of the Termination Date, (ii) using or seeking to use Cash Collateral or selling other Collateral without Lenders' consent, (iii) incurring indebtedness with a priority equal or senior to Lenders' interest in property of the estate, (iv) objecting to or contesting in any manner, or raising any defense to, the validity, extent, amount, perfection, priority or enforceability of Lenders' claims or security interests, or (v) commencing and continuing any adversary proceeding against any of the Lender

Parties, provided, however, that up to $7,500 of the Carve-Out may be used by the Debtors'
professionals to investigate the validity, extent, amount, perfection, priority and/or enforceability
of Lenders' claims and security interests.

       i.     Upon the Termination Date, and with the exception of the accrued but
unfunded portion of the Carve Out incurred in accordance with any Interim Approved Budget
prior to the Termination Date, Lenders shall have no obligation to fund any Carve Out for
amounts incurred in excess of the aggregate of the weekly line items for the period prior to the
Termination Date.

       15.    Termination.  As and when set forth in the DIP Loan Agreement, Lenders may
terminate the Debtors' ability to draw upon the DIP Loan or receive Advances, including at any
time, for any reason or no reason, in the sole and absolute discretion of Lenders. As of the
Termination Date, Debtors shall no longer have any ability to access or draw upon the DIP Loan,
except that the Termination Event shall not impact draws and disbursements already made or in
process under the DIP Loan, nor shall it impact the Lenders' obligations with respect to the Carve-
Out and the Post-Termination Carve-Out (defined below), subject to the condition for payment
thereof as set forth herein. For purposes herein, "Post-Termination Carve-Out" shall mean
reasonably necessary fees and expenses incurred by Debtors' Counsel and the CRO following the
Termination Date in order to conclude the Cases, including with respect to seeking dismissal
and/or conversion of the Cases, up to a cap of $35,000. With the exception of the $35,000 limit on
the Post-Termination Carve Out, the Post-Termination Carve Out shall be subject to the same
terms and conditions as the Carve Out.   In addition, the Debtors may draw upon the DIP Loan
after the Termination Date for the sole express purpose of paying for essential Utility Services[6]

---

[6]     "Utility Services," as used herein, means the limited, post-petition utility services, including but not limited
to electricity, water, telephone and/or internet services actually provided at each of the Debtors' locations
required to preserve the value of the Debtors' assets, as set forth more fully in the *Debtors' Motion for Entry*

incurred after the Petition Date and through the Termination Date, which amounts shall be included on subsequent Approved DIP Budgets, subject to the approval of the Lenders.

16.    *Good Faith Under 11 U.S.C. § 364(e); No Modification or Stay of this Interim Order.*  Lenders are extending credit to the Debtors pursuant to the DIP Loan Documents and  in good faith and, therefore, the security interests, liens, DIP Superpriority Claims, and other protections granted pursuant to this Interim Order and the DIP Loan Documents to the Lenders will have the protections provided in 11 U.S.C. § 364(e) and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

17.    *Proofs of Claim.*  Lenders shall not be required to file proofs of claim in the Cases for any claim allowed herein in relation to the DIP Loan or the Prepetition Indebtedness.  The Lenders are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim in these cases for any claim allowed herein in relation to the DIP Loan or the Prepetition Indebtedness.

18.    *Limitations on the DIP Loan and the DIP Loan Collateral.*  The DIP Loan and the DIP Loan Collateral may not be used in connection with: (a) preventing, hindering, or delaying any of the Lenders' enforcement or realization upon any of the DIP Loan Collateral or Prepetition Collateral; (b) objecting to or challenging in any way any claims or, liens of the Lenders; (c) the pursuit of any affirmative claims of recovery against either of the Lenders; or (d) prosecuting an objection to, or contesting in any manner, or raising any defenses to (but not the investigation of), the validity, extent, amount, perfection, priority, or enforceability of any of the

---

*of Conditional Order: (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service on Account of Pre-Petition Invoices; and (B) Establishing Procedures for Additional Adequate Assurances* being filed contemporaneously herewith.

Prepetition Liens, the Prepetition Indebtedness, the DIP Obligations, the DIP Liens, or any other rights or interests of the Lenders.

19.   *Prohibition on Liens/Subordination*.   Except as otherwise provided in the DIP Loan Documents or this Interim Order, the Debtors shall not seek to have the DIP Liens be: (i) made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under 11 U.S.C. §§ 363 or 364(d) or otherwise; or (ii) made subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estates under 11 U.S.C. § 551.

20.   *Modification of the Automatic Stay*.   The automatic stay imposed under 11 U.S.C. § 362(a) is hereby modified to the extent necessary (i) to authorize the Debtors to pay, and Lenders to retain and apply, payments made in accordance with the terms of this Interim Order and consistent with the DIP Loan Documents including, without limitation, payments of accrued interest and payments of principal amounts outstanding under the DIP Loan; and (ii) upon the occurrence of a Termination Event as defined in the DIP Loan Documents, to authorize Lenders to pursue any and all rights under the DIP Liens and as to the DIP Collateral without further court order.  Notwithstanding anything to the contrary contained herein, upon the occurrence and continuance of an event of default, the Lenders may enter upon leased premises only as provided by (i) any separate agreement by and between the applicable landlord and the Lenders (the terms of which shall be reasonably acceptable to the parties thereto), (ii) applicable non-bankruptcy law, or (iii) an order from the Bankruptcy Court on no less than five (5) days' notice to the applicable landlord.

21.   *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the Initial Carve-Out, the Debtors hereby waive any rights they may have to charge against or to recover from the DIP Loan Collateral expenses of administration of these Cases or any future

proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, pursuant to 11 U.S.C. § 506(c), the enhancement of collateral provisions of 11 U.S.C. § 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Lenders.  In no event shall the Lenders be subject to the "equities of the case" exception contained in 11 U.S.C. § 552(b) or any other similar doctrine with respect to the DIP Loan Collateral.

22.     _No Waiver by Failure to Seek Relief_. The failure of the Lenders to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

23.     _Binding Effect of Interim Order_. Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Lenders, all other creditors of the Debtors, and all other parties in interest and their respective successors and assigns, including upon dismissal of the Cases.

24.     _Priority of Terms_.  To the extent of any specific conflict between or among (a) the DIP Financing Motion, the DIP Loan Documents, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, the terms and provisions of this Interim Order shall govern.

25.     _No Modification of Interim Order_. The Debtors irrevocably waive the right to seek and shall not, without the Lenders' prior written consent, seek or consent to, directly or indirectly: (a) any modification, stay, vacatur or amendment to this Interim Order; or (b) the granting of any lien on any of the DIP Loan Collateral with priority equal or superior to the DIP Liens, except as specifically provided herein or in the DIP Loan Documents.

26.     *Modifications of DIP Loan Documents, and Approved DIP Budget*.  The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the Lenders providing for any non-material modifications to the DIP Loan Documents or the Interim Approved DIP Budget necessary to conform the terms of this Interim Order.

27.     *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

28.     *Survival*.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the Lenders pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Cases, or following dismissal of the Cases, and shall maintain their priority as provided by this Interim Order until all the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Loan which survive such discharge by their terms), and all commitments to extend credit under the DIP Loan are terminated.

29.     Bankruptcy Rule 7052. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

30.     Further Hearing.  The Court shall hold a further hearing to consider the relief requested in the Motion on **May 29, 2020 at 2:30 p.m. (ET)**.

31.     Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Interim Order and DIP Loan Documents according to their terms.



AGREED AS TO FORM, ENTRY AND CONTENT AS ORIGINALLY SUBMITTED
WITHOUT CHANGES MADE BY THE COURT

**SAUL EWING ARNSTEIN & LEHR LLP**       **K&L GATES LLP**

By: */s/  Aaron S. Applebaum_____*       By: */s/  Daniel M. Eliades_____*
    Carmen Contreras-Martinez           Daniel M. Eliades, Esq.
    Florida Bar No. 093475           David S. Catuogno, Esq.
    701 Brickell Avenue, 17th Floor           One Newark Center, 10th Floor
    Miami, FL 33131           Newark, New Jersey 07102
    Telephone: (305) 428-4500           Tel: (973) 848-4000
    Facsimile: (305) 374-4744           Facsimile: (973) 848-4001
    Carmen.Contreras-Martinez@saul.com           Email: daniel.eliades@klgates.com
                                                          Email: david.catuogno@klgates.com
    -and-

                                                          *Counsel to Valley National Bank and*
    Stephen B. Ravin       *Raymond James Bank, N.A,*
    Florida Bar No. 293768 (*inactive status*)
    Aaron S. Applebaum
    1037 Raymond Boulevard
    Suite 1520
    Newark, NJ 07102
    Telephone: (973) 286-6700
    Facsimile:  (973) 286-6800
    Stephen.Ravin@saul.com
    Aaron.Applebaum@saul.com

 *Proposed Counsel for Debtors and   Debtors-
in-Possession*

# # #

(*Carmen Contreras-Martinez, Esq. is directed to serve a copy of this Order on interested parties
who are non-CM/ECF users and to file a proof of service within three days of entry of this
Order.*)

## EXHIBIT A
## DIP LOAN AGREEMENT

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AGREEMENT is made as of May ▢▢, 2020, by and between **CFRA HOLDINGS, LLC,** a Delaware limited liability company ("CFRA Holdings"), **CFRA, LLC,** a Delaware limited liability company (**"CFRA"**), and **CFRA Tri-Cities, LLC,** a Delaware limited liability company ("CFRA Tri-Cities," and collectively with CFRA Holdings and CFRA, the "Borrowers") on the one hand, and **VALLEY NATIONAL BANK** ("VNB" or "Agent") and **RAYMOND JAMES BANK, N.A.** ("RJB") on the other hand. VNB, in its capacity as a lender, and RJB are collectively referred to as the "Lenders".

## BACKGROUND

A.      On May 6, 2020 (the "Petition Date"), Borrowers each filed voluntary petitions for relief commencing cases (the "Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et* seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), which cases are jointly administered under Case No. 8:20-bk-03608 (CPM).

B.      This DIP Loan Agreement is being executed pursuant to a Motion for a Consent Order for Debtor-in-Possession Financing (the "DIP Financing Motion")[1] filed in the Cases requesting an Interim Order Approving Debtor-in-Possession Financing which Order was entered by the Bankruptcy Court on ▢▢▢▢▢▢▢▢▢, 2020 (the "Interim Order"). This DIP Loan Agreement is also made in conjunction with a Promissory Note and Security Agreement of even date herewith (the "Note and Security Agreement"), and other loan documents between Borrowers and Lenders of this date as approved by the Bankruptcy Court (collectively the "DIP Loan Documents"). The terms and conditions of the Interim Order, the DIP Loan Agreement, the Note and Security Agreement, and DIP Loan Documents are each incorporated herein by reference as if each document were fully set forth at length herein. Except as otherwise set forth herein, all terms shall have the definitions set forth herein.

C.      On or about September 9, 2016, CFRA and CFRA Tri-Cities[2] entered into loan transactions with Lenders and/or Lenders' predecessors[3] whereby the Operating Company Debtors were authorized to receive advances of funds from Lenders and thereby became obligated to repay said funds to Lenders under terms and conditions set forth in agreements memorializing each loan transaction (collectively the "Bank Credit Agreements").

D.      The initial loan involving the Operating Company Debtors was set forth in a Loan Agreement dated September 9, 2016 (the "Original Loan Agreement") pursuant to which

---

[1] The Debtors filed a combined Motion for (i) Authority to Obtain Post-petition Financing; and (ii) Authority to use Lenders' Cash Collateral. Although one motion, same is referred to herein as either the "DIP Financing Motion" or the "Cash Collateral Motion" as the context may require.

[2] CFRA Tri-Cities and CFRA are referred to collectively as the "Operating Company Debtors".

[3] The documents evidencing the original loan transaction(s) (the "Loan Documents") were executed between Borrowers, RJB and USAmeribank.   VNB acquired USAmeribank effective January 1, 2018 and succeeded to the rights and participation of USAmeribank in the Loan Documents as of that date

Lenders made available to the Operating Company Debtors a revolving line of credit in the principal amount of up to Twenty-Six Million Dollars ($26,000,000) (the "<u>Original Loan</u>").

E.      The terms of the Original Loan are reflected, *inter alia*, in the Original Loan Agreement, as well as: (a) a Revolving Line of Credit Promissory Note dated September 9, 2016 in the maximum amount of $15,000.000 between the Operating Company Debtors and RJB; and (b) a Revolving Line of Credit Promissory Note dated September 9, 2016 in the maximum amount of $11,000,000 between the Operating Company Debtors and USAmeribank.

F.      In connection with the Original Loan, Lenders received a contemporaneous Guaranty of Payment and Performance (the "<u>Guaranty</u>") from CFRA Holdings as to the Operating Company Debtors' obligations under the Original Loan.

G.       To secure repayment of the Original Loan, the Operating Company Debtors conveyed to Lenders a Security Agreement dated September 9, 2016 granting Lenders a continuing security interest in:

> [A]ll goods, fixtures, equipment, inventory, accounts, accounts receivable, contract rights, commissions, choses in action, money, general intangibles, documents, instruments and chattel paper of Borrowers,[4] whether now owned or hereafter acquired, and all proceeds, products, replacements, additions, substitutions and accessions of and to all of the foregoing, which together collectively constitute and are hereinafter designated as the "<u>Collateral</u>," and which Collateral includes, without limitation, the following:
>
> (a)      all of Borrowers' inventory of whatever type or description wherever located and whether now owned or hereafter acquired; and
>
> (b)      all of Borrowers' accounts and accounts receivable and all other forms of customer obligations, now existing or hereafter acquired; and
>
> (c)      all of Borrowers' vehicles, equipment, machinery, furniture, fixtures or other items of personal property, whether now owned or hereafter acquired; and
>
> (d)      all of Borrowers' permits, licenses and other governmental approvals (but only to the extent permissible under applicable law without the consent of the grantor or issuer of such permits, licenses and other governmental approvals); and
>
> (e)      all of Borrowers' cash, certificates of deposit, securities, investment property, instruments and general intangibles; and
>
> (f)      all proceeds, products, replacements, additional, substitutions and accessions of and to all of the foregoing.

---

[4] For purposes of this Paragraph G, the term "Borrowers" is limited to the Operating Company Debtors.

Notwithstanding the foregoing, specifically excluded from the Collateral are all franchise agreements and development agreements by and between Borrowers, as franchisee, and IHOP Franchising, LLC, a Delaware limited liability company, and its successors and assigns, as franchisor ("IHOP"), and all equipment, machinery, furniture, fixtures and other personal property leased by Borrowers from IHOP or any affiliate of IHOP and such leases.

H.      Lenders' security interest in the Collateral was duly perfected by the filing and recording of a UCC-1 financing statement on September 12, 2016 with the Delaware Secretary of State under Filing Number 20165542756.

I.      As of the Petition Date, Borrowers were jointly and severally indebted to Lenders as follows: (i) to VNB in the amount of at least $8,269,315.85, exclusive of legal fees and costs due under the Bank Credit Agreements; and (ii) to RJB in the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements.

J.      As noted  in footnote 1, *supra*, the Parties are likewise simultaneously seeking Bankruptcy Court approval of the Borrowers' use of the Lenders' cash collateral (the "Cash Collateral Motion") which request for relief is included in a single integrated motion along with the request for  DIP Financing.

K.      Borrowers have requested that Lenders make available to Borrowers a loan in the principal amount of up to One Million Dollars ($1,000,000) (the "DIP Loan").  Borrowers seek the DIP Loan so that they may preserve property of their bankruptcy estates and maximize the distribution to creditors of their estates. Specifically, Borrowers have requested the DIP Loan in order to pursue a sale of all or substantially all of the property of the estates and the Debtors do not have sufficient unencumbered cash or other assets to fund the necessary activities for that purpose.  Lenders have agreed, contingent upon approval of the Bankruptcy Court, to provide Borrowers a debtor-in-possession line of credit as set forth in more detail herein.

## AGREEMENTS

NOW, THEREFORE, in consideration of the mutual promises herein made and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Borrowers and Lenders agree as follows:

1.      Definitions. As used in this Agreement, the following terms shall have the meanings ascribed, unless the context otherwise requires:

 "**Advance Request**" has the meaning set forth in Section 2(d)(i).

"**Advances**" has the meaning set forth in Section 2(d)(i).

 "**Business Day**" means a weekday on which commercial banks are open for business in Tampa, Florida.

"**Default**" has the meaning set forth in Section 9.

 "**Franchisor**" means any Person with whom a Borrower now or hereafter has entered into a franchise or similar agreement.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America set forth from time to time by applicable agencies.

"**Hazardous Materials**" means any urea, solid wastes, polychlorinated biphenyls, toxic or hazardous substances, wastes, or contaminants, paint containing lead, formaldehyde foam insulation, and discharges of sewage or effluent, as those terms are defined from time to time in or for the purposes of any relevant Environmental Laws.

"**Indebtedness**" means as to any Person at any time, without duplication, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person including without limitation, (i) indebtedness for borrowed money, (ii) the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business that are not unpaid beyond sixty (60) days from the due date therefor), (iii) reimbursement obligations (contingent or otherwise) under (x) any letter of credit or (y) any swap agreement, (iv) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument, (v) all indebtedness secured by any Lien or security interest on any property or asset owned or held by the Borrowers regardless of whether the indebtedness secured thereby shall have been assumed by the Borrowers or is nonrecourse to the credit of the Borrowers and (vi) any guaranty of any of the foregoing. For purposes of this definition, capital or finance leases shall be treated as operating leases under GAAP as currently in effect on the date of this Agreement and not "Indebtedness."

"**Lease**" and "**Leases**" have the meanings set forth in Section 5(h).

"**Liens**" means mortgages, security interests, security deeds, pledges, liens, charges, and all other encumbrances.

"**DIP Loan Agreement**" means this DIP Loan Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance herewith.

"**DIP Loan Documents**" means this DIP Loan Agreement, the Note and Security Agreement and any other instruments, certificates or other documents executed in connection herewith.

"**Material Adverse Change**" means any material adverse change in the assets, liabilities, business, prospects, or condition (financial or other) of the Borrowers on a consolidated basis.

"**Maturity Date**" has the meaning set forth in the Note and Security Agreement.

"**Maximum Revolving Loan Amount**" has the meaning set forth in Section 2(d)(ii).

"**Note and Security Agreement**" means the Promissory Note and Security Agreement, the forms of which are attached at Exhibits **"A"** and **"B"** hereto.

"**Obligations**" means all obligations now or later owed to Lenders by the Borrowers, whether or not related to the DIP Loan, including amounts owed or to be owed under the terms of the DIP Loan Documents, or arising out of the transactions described in the DIP Loan Documents, including the DIP Loan, sums advanced to pay any overdrafts that occur on any account maintained by a Borrower with a Lender, reimbursement obligations and fees for outstanding letters of credit or banker's acceptances issued to or for the account of a Borrower, including Letter of Credit Obligations, amounts paid by Lender under letters of credit or drafts accepted by a Lender for the account of a Borrower, together with all interest accruing thereon, all fees, all costs of collection, attorneys' fees and expenses of or Advances which a Lender pays or incurs in discharge of obligations of the Borrowers, whether such amounts are now due or later become due, direct or indirect, and whether such amounts due are from time to time reduced or entirely extinguished and thereafter re-incurred.

"**Person**" means any individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, joint venture, governmental organization, or any other entity.

"**Petition Date**" means May 6, 2020.

2.    <u>DIP Loan.</u> Lenders agree to make the DIP Loan available to Borrowers upon the terms and subject to the conditions set forth in this DIP Loan Agreement:

(a)    <u>Generally</u>.  Lenders shall make available to Borrowers the DIP Loan, upon the execution by Borrowers of the Notes and the other DIP Loan Documents until the Maturity Date, as that term is defined in the Note and Security Agreement.  Payments under the DIP Loan shall be made in the manner provided in the Note and Security Agreement. Each Borrower consents to all renewals and extensions of the Note and Security Agreement (as a whole or in part), and all delays in time of payment or other performance under the Note and Security Agreement, that any Lender allows, without limitation and without notice to, or further consent of, any Borrower.

(b)    <u>Use of DIP Loan Proceeds</u>.  Borrowers shall use the proceeds of the DIP Loan and any Advance only in accordance with then current approved budget(s) approved by Lenders (the "<u>Approved DIP Budgets</u>") and each advance shall be used solely in a manner consistent with the terms of the DIP Loan, the DIP Financing Agreements, the Interim Order(s) and the Final DIP Financing Order, and Cash Collateral Order(s).  Lenders consent and approval of any budget for use of proceeds of the DIP Loan and any Advance shall be in the sole and absolute discretion of Lenders.

(c)    <u>Advances</u>.

(i)    Subject to the terms and conditions of this DIP Loan Agreement, the Interim Order and the Final DIP Financing Order, and provided that no Event of Default exists and is continuing, Lenders shall make advances under the DIP Loan ("<u>Advances</u>"), available to Borrowers upon written request of Borrowers pursuant to an Advance Request in the form attached hereto as **Exhibit "C"** (each an "<u>Advance Request</u>"). Borrowers shall deliver a written and signed Advance Request to Lenders not later than 10:00 A.M., Eastern Time, at least two (2) Business Days prior to the proposed date of the Advance. The Advance Request shall

specify (w) the amount of the requested Advance, (x) the date of the Advance (which must be a Business Day) and (y) a brief description of the purposes for which the funds will be utilized and (z) such other information as may reasonably be required by Lenders. Any such notice made pursuant to this Section 2(d)(i) will be irrevocable and binding on Borrowers on its receipt by Lenders. Subject to the terms and conditions of this DIP Loan Agreement, the Interim Order and the Final DIP Financing Order, and provided that no Event of Default exists and is continuing, each Advance shall be made by Lenders by crediting or wiring the funds to the Borrowers' depository account reflected in Lenders' records for such purposes in the amount of the Advance.

(ii)    The outstanding balance of the DIP Loan may increase or decrease from time to time, as Advances under the DIP Loan may be repaid and re-borrowed, but the total of Advances outstanding at any one time under the DIP Loan shall never exceed One Million Dollars ($1,000,000) (the "Maximum Revolving Loan Amount"). Borrowers shall promptly pay to Lenders any such excess, provided that Lenders may, in their discretion, make or permit to remain outstanding Advances in excess of the Maximum Revolving Loan Amount, which such amount will be part of the DIP Loan and the Obligations, bear interest as provided in the Note and Security Agreement, and be entitled to all rights and security provided for in this DIP Loan Agreement and in all other DIP Loan Documents.

(d)    Nature of Lenders' Obligations with Respect to Advances Each Lender shall be obligated to participate in each Advance in an amount equal to the proportion of each Lender's obligation to make such Advance per agreement between Lenders. Not later than 2:00 P.M., Eastern Time, on the proposed date of an Advance, each Lender shall make available to Borrowers its proportionate share of the Advance in immediately available funds.

(e)    The Loan Account.

(i)    An account ("Loan Account") shall be opened on the books of the Lenders in which Loan Account a record may be kept of all Advances made under or pursuant to this DIP Loan Agreement and of all payments thereon.

(ii)    Any statement rendered by the Lenders to the Borrowers concerning the Obligations shall be considered correct and accepted by the Borrowers and shall be conclusively binding upon the Borrowers unless the Borrowers provide the Lenders with written objection thereto within twenty (20) days from the mailing of such statement, which written objection shall indicate, with particularity, the reason for such objection. The Loan Account and the Lenders' books and records concerning the loan arrangement contemplated herein and the Obligations shall be prima facie evidence and proof of the items described therein.

(f)    Payment of Loan Account.

(i)    The Borrowers may repay all or any portion of the principal balance of the Loan Account from time to time until the Maturity Date.

(ii)    The Borrowers shall pay the then entire unpaid balance of the Loan Account and all other Obligations no later than the Maturity Date.

(iii)    Lenders may apply any net proceeds or other payments received hereunder to principal, interest, Lenders' expenses or any other sum due or secured hereunder, in such order and amounts, as Lenders shall elect in their sole and absolute discretion. The making of any partial prepayment shall not change the due date or maturity date under the DIP Loan.

(g)    <u>Interest</u>.

(i)    Borrowers agree to pay Lenders interest on the unpaid principal amounts advanced on this DIP Loan at a rate equal to the One Month LIBOR Rate (as defined in the Note) plus eight hundred basis points (8.00%) as set forth in the Note.  Interest will be charged and shall accrue on the DIP Loan from the date the monies are advanced under this DIP Loan Agreement until the principal amount of the DIP Loan, together with all outstanding interest, fees and other amounts and charges specified herein, have been paid in full. Interest shall be calculated on the basis of a 365/360 day year.

(ii)    Borrowers agree to pay Lenders a commitment fee of one and one half percent (1.5%) of the amount of the Advances made on this DIP Loan as set forth in the Note (the "<u>Commitment Fee</u>").  Each Commitment Fee shall be added to the balance due under the Note and shall be paid to Lenders in accordance with the terms of the Note.

(iii)    Following the occurrence of any Event of Default (and whether or not the Lenders exercise any of the Lenders' rights on account of such Event of Default), all Advances shall bear interest, through and until date when paid, at a rate which is the aggregate of that provided for in Section2(h), above, plus an additional five percent (5%) percent *per annum*.

3.    <u>Term.</u> The term of this DIP Loan Agreement shall be for a period beginning with the date hereof and terminating upon the soonest to occur of: (i) final payment in full of all Obligations and the corresponding termination of the Revolving Line of Credit established under the Note pursuant to a closing of a sale of all or substantially all of Debtors' asset pursuant to Court Order under 11 U.S.C. § 363; (ii) a Termination Event as defined herein at which time all outstanding sums due hereunder shall be immediately due and payable in full; or (iii) August 31, 2020 (the "Maturity Date").

(a)    To secure the Borrowers' prompt, punctual, and faithful performance of all and each of the Obligations, pursuant to the Security Agreement, the Borrowers shall grant to the Lenders an automatically perfected first-priority security interests in and Liens on all of the property, assets or interests in property of each Debtor and each Debtor's "estate" (as defined in the Bankruptcy Code and exclusive of Avoidance Actions), in each case of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, real property leases, personal property leases, intellectual property, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, all proceeds of leases of real property, all of the issued and outstanding capital stock of each subsidiary of such Debtor, money, investment property, deposit accounts, all commercial tort claims and other causes of action, all cash and cash equivalents of the Debtors and all cash and non-cash proceeds, rents,

products, substitutions, accessions and profits of any of the collateral described above (collectively, with respect to all such entities, the "DIP Loan Collateral") to secure all DIP Obligations;

(b)    This grant of a security interest shall continue in full force and effect applicable to all Obligations hereunder until all such Obligations have been paid and/or satisfied in full and the security interest granted herein is specifically terminated in writing by a duly authorized officer of the Lenders. As set forth in the Interim Order or any Final Order Approving DIP Financing ("Final DIP Financing Order") as the case may be, Lenders are not required to take any action in order to perfect their security interests in the DIP Loan Collateral, as entry of the Interim Order and any Final DIP Financing Order are each sufficient and conclusive evidence of the validity, perfection, and priority of the Liens on the DIP Loan Collateral granted herein, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect (in accordance with applicable non-bankruptcy law) or to entitle the Lenders to the Liens granted by this DIP Loan Agreement.

4.    Reaffirmation and Acknowledgment of Agreements and Obligations.

(a)    Unless specifically set forth herein, nothing contained herein shall be deemed to modify, nullify, discharge or extinguish: (a) the contractual relationship(s) between the Parties as it existed before the date hereof under the Original Loan Agreement and Loan Documents, including the Guaranty and other Bank Credit Agreements; or (b) the obligations of Borrowers under the Original Loan and agreements related thereto.

(b)    Except as may be specifically set forth herein, the terms, conditions and obligations of the Parties under the Loan Documents, including the Bank Credit Agreements and Guaranty (a) have not been modified by this DIP Loan Agreement; (b) remain unchanged; (c) are hereby ratified and affirmed in their entirety by the Borrowers; and (d) are legally valid, binding and enforceable against the Borrowers in accordance with their respective terms.

(c)    Borrowers acknowledges their absolute, joint and several liabilities to Lenders for the entire indebtedness under the Loan Documents, including the Bank Credit Agreements and Guaranty, which, as of the Petition Date, consisted of: (i) $8,269,315.85 due VNB, exclusive of legal fees and costs due under the Bank Credit Agreements; and (ii) $11,276,339.75 due to RJB, exclusive of legal fees and costs due under the Bank Credit Agreements.

5.    Representations and Warranties.  Each Borrower jointly and severally represents and warrants to Lenders that:

(a)    Payment and Performance of Obligations. The Borrowers shall pay each Obligation due to Lenders when due (or when demanded if payable on demand) and shall promptly, punctually, and faithfully perform each other Obligation due to Lenders.

(b)    Bankruptcy Court Authorization

(i)      The Borrowers are presently duly qualified debtors-in-possession under the Bankruptcy Code, 11 U.S.C. 101 et seq., with due authority to administer the Borrowers' chapter 11 estates and are further, under the Interim Order, vested with all legal power and authority to execute and deliver all the DIP Loan Documents to which the Borrowers are a party and have and will hereafter retain all requisite legal power and authority to perform any and all of the obligations hereunder.

(ii)     The execution and delivery by the Borrowers of each Loan Document to which they a party; the Borrowers' consummation of the transactions contemplated by such DIP Loan Documents (including, without limitation, the creation of security interests by the Borrowers as contemplated hereby); the Borrowers' performance under those of the DIP Loan Documents to which they are a party; the borrowings hereunder; and the use of the proceeds thereof:

(1)      Have been duly authorized by the Bankruptcy Court; and

(2)      Do not, and will not, contravene in any material respect any provision of any Order entered by the Bankruptcy Court in the Cases.

(iii)    The DIP Loan Documents duly executed and delivered by the Borrowers shall constitute the legal, valid and binding obligations of the Borrowers, enforceable against the Borrowers in accordance with their respective terms and the terms of any applicable Borrowing Order.

(c)     <u>Title to Assets</u>.  Borrowers are, and shall hereafter remain, the owners of the DIP Loan Collateral free and clear of Liens other than those in favor of Lenders.

(d)     <u>Capacity and Standing; Compliance with Laws</u>. The DIP Loan Documents to which each Borrower is a party, when executed, shall constitute valid and binding obligations of such Borrower. Each Borrower is duly organized and existing under the laws of the state of its incorporation or formation and is duly qualified and in good standing in every other state in which the nature of its business shall require such qualification, and each Borrower is duly authorized to make and perform its obligations under the DIP Loan Documents. Each Borrower (i) is in material compliance with all requirements of law applicable to it and (ii) possesses all governmental franchises, licenses, and permits that are necessary to own or lease its assets and to carry on its business. The copies of each Borrowers' organizational documents that have been furnished to Lenders reflect all amendments made thereto and are correct and complete.

(e)     <u>Violation of Other Agreements</u>. The execution of the DIP Loan Documents and the performance of each Borrower of the DIP Loan Documents will not violate any provision of law, or any agreement, indenture, note or other instrument binding upon any Borrower or give cause for the acceleration of any obligations of any Borrower and will not result in a breach or violation of, or require the creation or imposition of any Lien other than those created by the DIP Loan Documents on any Borrower's assets pursuant to any provision of law or contractual obligation of any Borrower.

(f)    <u>Authority; Due Execution and Delivery</u>. All authority from and approval by any governmental body, commission or agency, State or Federal, necessary to the making or validity of the DIP Loan Documents has been obtained. This DIP Loan Agreement has been, and each other Loan Document to which each Borrower is a party will be, duly executed and delivered to Lenders on behalf of such Borrower.

(g)    <u>Leases</u>. The real property leases and subleases and the equipment leases of each Borrower (each a "<u>Lease</u>" and collectively the "<u>Leases</u>") are valid, binding, enforceable (except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding of law or in equity)) and in full force and effect and have not been modified, and such Borrower holds a valid and existing leasehold interest under such Leases to which it is a party for the term set forth in each of the Leases, except that Lenders acknowledge that IHOP Franchising LLC and/or its affiliates assert that it terminated, pre-petition, the real property leases/subleases, and personal property/equipment leases, as to certain Leases prior to the Petition Date.

(h)    <u>No Litigation</u>. Except as disclosed by the financial statements provided to Lenders or otherwise submitted to Lenders in writing, no litigation, investigation, or proceeding is pending or, to the knowledge any Borrower, threatened by or against any Borrower, or against any of its assets, businesses, properties, or revenues.

(i)    <u>Regulation U</u>. None of the proceeds of the DIP Loan made pursuant to this DIP Loan Agreement shall be used directly or indirectly for the purposes of purchasing or carrying any stock in violation of any of the provisions of Regulation U of the Board of Governors of the Federal Reserve System.

(j)    <u>Investment Company Act</u>. No Borrower is an "investment company," as defined in the Investment Company Act of 1940, as amended.

(k)    <u>Subsidiaries</u>. Holdings does not have any subsidiaries other than CFRA and Tri-Cities. Neither CFRA nor Tri-Cities have any subsidiaries.

(l)    <u>Accuracy and Completeness of Information</u>. All material information, reports and other papers concerning any Borrower furnished to Lenders by the Borrowers, or on behalf of the Borrowers, when furnished, is complete and correct in all material respects, or has been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to make such information not misleading in any material respect. No fact is known to any Borrower that materially and adversely affects or in the future would be expected to materially and adversely affect the business, assets or liabilities, financial or other condition, results of operations or business prospects of any Borrower, which have not been set forth in the financial statements, or other information, reports, papers, and data previously disclosed in writing to Lender.

6.    <u>Affirmative Covenants</u>. Each Borrower covenants and agrees that until the earlier of: (a) payment in full of the Obligations and termination of Lenders' commitments to make Advances, and its satisfaction of all other obligations under this DIP Loan Agreement, unless

Lenders shall otherwise consent in writing; or (b) the sale of substantially all of the Borrowers' assets pursuant to 11 U.S.C. § 363 as approved by Final Order in the Cases, each Borrower will:

(a)    <u>Maintain Properties</u>. To the extent set forth in the Approved DIP Budgets: (i) maintain in good repair, condition and working order all assets and properties used in that business, except for isolated assets and properties that are replaced or are not in the aggregate material to their business; and (ii) make all appropriate repairs, renewals, and replacements of those assets and properties.

(b)    <u>Access to Books and Records</u>. Allow Lenders, or their agents: (i) during normal business hours, and in a manner that will not unreasonably interfere with normal business operations, at each Borrower's business premises to have access to the books, financial records and such other financial documents of such Borrower, as Lender shall reasonably require, and allow Lender to make copies thereof at the Borrowers' expense which copies will be kept confidential by Lenders; and (ii) make such audit and examination thereof and conduct such other investigation as they consider appropriate to determine and verify each Borrower's business properties and to protect Lenders' security interest in and Lien on the DIP Loan Collateral. The Borrowers shall bear the reasonable costs and expenses of such audits, examinations and inspections; provided that, so long as no Event of Default is continuing, Lenders' right to conduct any such audit, examination or inspection shall be limited to no more than once in any twelve (12) month period.

(c)    <u>Insurance</u>. Maintain adequate insurance coverage, including but not limited to, insurance against loss by fire, and other hazards included in the term "extended coverage," workmen's compensation insurance, and business interruption insurance in such amounts and with such companies as Lenders may from time to time reasonably require, and shall promptly pay all premiums therefor when due. Each Borrower shall not take any action or fail to take any action which such action or inaction would result in the invalidation of any insurance policy required hereunder. All such policies shall name Lenders as a named insured and provide that any losses payable thereunder shall (pursuant to lender loss payable clauses, in form and content reasonably acceptable to Lenders, to be attached to each policy) be payable to Lenders, and provide that the insurance provided thereby, as to the interest of Lenders, shall not be invalidated by any act or neglect of any Borrower, nor by any foreclosure, repossession, or other proceedings relating to the property insured, nor by any occupation of such property or the use of such property for purposes more hazardous than permitted in the policy. Each Borrower assigns to Lenders all right to receive proceeds, directs any insurer to pay all proceeds directly to Lenders, and authorizes Lenders to endorse any check or draft for such proceeds and apply the same toward satisfaction of the Obligations. The Borrowers shall furnish to Lenders insurance certificates, in form and substance reasonably satisfactory to Lenders, evidencing compliance by it with the terms of this Section 6(c) and, on the request of Lenders at any time, the Borrowers shall furnish Lenders with copies of the policies required by the terms of this Section 7(c). The Borrowers will cause each insurer under each of the policies to agree (either by endorsement upon such policy or by letter addressed to Lenders) to give Lenders at least thirty (30) days' prior written notice of the cancellation of such policies in whole or in part or the lapse of any coverage thereunder. No Borrower shall take any action or fail to take any action which action or inaction would result in the invalidation of any insurance policy required hereunder. The Borrowers shall

furnish all information required by this Section 7(c) to Lenders within five (5) Business Days of a Lender's request.

(d)    <u>Compliance with DIP Loan Documents</u>. Comply, in all material respects, with all covenants, terms and conditions contained in this DIP Loan Agreement and the other DIP Loan Documents (with the exception of covenants, terms and conditions already containing a materiality or Material Adverse Change qualification with respect to which the Borrowers shall comply in all respects).

(e)    <u>Compliance; Hazardous Materials</u>. Comply in all material respects with all requirements of law. No Borrower shall engage in the storage, manufacture, disposition, processing, handling, use, or transportation of any Hazardous Materials, except in compliance in all respects with applicable laws and regulations.

(f)    <u>Books and Records</u>. Maintain and keep proper, complete and accurate books of record and account.

(g)    <u>Further Assurances</u>. Take such further action, execute such further agreements, and provide to Lenders such further assurances as may be reasonably requested to ensure compliance with the intent of this Agreement and the other DIP Loan Documents.

7.    <u>Negative Covenants</u>. Each Borrower covenants and agrees that until payment in full of the Obligations and termination of the Lenders' commitments to make Advances, and its satisfaction of all other obligations under this Agreement, unless Lenders shall otherwise consent in writing, such Borrower will not:

(a)    <u>Limitation on Indebtedness</u>. Create or permit to exist any additional Indebtedness, except in favor of Lenders as set forth herein.

(b)    <u>Liens</u>. Create, assume, or permit to exist any Lien on any of the property given as security for the DIP Loan.

(c)    <u>Limitation on Fundamental Transactions</u>. Other than a potential sale all or a portion of the Borrowers' assets approved by Final Order of the Bankruptcy Court pursuant to 11 U.S.C. § 363, liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), and shall not merge or consolidate with any Person or acquire all or substantially all of the assets or equity interests of any Person, or sell, lease, assign, or otherwise dispose of any substantial portion of its assets (other than sales of obsolete or worn-out equipment and sales of inventory in the ordinary course of business).

(d)    <u>Agreements Not to Encumber</u>. Agree with any Person (other than Lenders) to not grant or allow to exist a Lien upon any of its assets, or covenant to any Person that such Borrower will in the future refrain from creating, incurring, assuming or allowing any Lien with respect to such Borrower's assets.

(e)    <u>Use of Proceeds</u>. Use any of the proceeds of the DIP Loan or any other credit extended under this Agreement for purposes other than as expressly contemplated by Section 2(c) the Interim Order and the Final DIP Financing Order.

8.    <u>Conditions Precedent to the DIP Loan</u>. The effectiveness of this DIP Loan Agreement, the establishment of the DIP Loan, and the making of Advances, are conditioned upon the delivery to Lenders of any documents described below, each in form and substance satisfactory to the Lenders, and the satisfaction of the conditions described below:

(a)    <u>Representations and Warranties</u>:  Each of the representations made by or on behalf of the Borrowers in this DIP Loan Agreement or in any of the other <u>DIP Loan Documents</u> or in any other report, statement, document, or paper provided by and or on behalf of the Borrowers shall be true and complete as of the date as of which such representation or warranty was made.

(b)    <u>No Event of Default</u>. No event shall have occurred, or failed to occur, which occurrence or which failure constitutes, or which, solely with the passage of time or the giving of notice (or both) would constitute, an Event of Default.

(c)    <u>No Adverse Change</u>. No Material Adverse Change has occurred since the Petition Date.

(d)    <u>Further Conditions</u>.

(i)    There shall not be the entry of an Order in the pending Cases which appoints a Trustee, an examiner or any other fiduciary for the Borrowers or any property of their estates.

(ii)    An Interim Order and Final DIP Financing Order, as the case may be, granting the DIP Motion shall have been entered by the Bankruptcy Court which Interim Order and Final DIP Financing Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified in any respect or be pending appeal (unless such order contains a provision for the Lenders' protection under 11 U.S.C. § 364(e) satisfactory to Lenders) and Borrowers shall have complied in full with the notice and other requirements of the Bankruptcy Code and any applicable Bankruptcy Rules with respect to any relevant Interim Order and Final DIP Financing Order  in a manner reasonably acceptable to Lenders and their counsel.

(iii)    If applicable, the Interim Order shall be entered on or before the date of the initial Advance and shall remain in effect for a period ending on the later of thirty (30) days or such other date expressly agreed to in writing by Lenders.

(iv)    An interim and final order, as the case may be, granting the Cash Collateral Motion shall have been entered by the Bankruptcy Court which interim and final order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified in any respect or be pending appeal and Borrowers shall have complied in full with the notice and other requirements of the Bankruptcy Code and any applicable Bankruptcy Rules with respect to any relevant interim and final order in a manner reasonably acceptable to Lenders and their counsel.

(v)    A final order shall have been entered by the Bankruptcy Court permitting the Borrowers to market and sell the assets of the Borrowers, including property and property interests utilized in connection with operation of the forty-nine (49) restaurants of

CFRA and CFRA Tri-Cities as specifically identified in the contemplated marketing motion, either through private sale or public auction which final order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified in any respect or be pending appeal and Borrowers shall have complied in full with the notice and other requirements of the Bankruptcy Code and any applicable Bankruptcy Rules with respect to such final order in a manner reasonably acceptable to Lenders and their counsel.

(vi)    Unless otherwise entered earlier, a Final DIP Financing Order shall have been entered on or before thirty (30) days after the date of the initial Advance, unless Lenders expressly agree in writing to extend such time period.

9.    <u>Events of Default</u>. The following shall be events of default hereunder by the Borrowers (each an "<u>Event of Default</u>"):

(a)    Any representation or warranty made by any Borrower or any other party to any Loan Document (other than Lenders) herein or therein shall prove to be false or misleading in any material respect when made;

(b)    Failure to make any payment under the Note and Security Agreement as and when due and payable or failure to pay any other amount due under any other DIP Loan Document (subject to applicable grace or cure periods);

(c)    Any Borrower shall otherwise default under the Note and Security Agreement or any other DIP Loan Document, with the exception of any monetary obligation of the Borrowers to Lenders when due or in the performance of any obligation incurred for money borrowed;

(d)    Breach of any covenant, condition, or agreement made by any Borrower pursuant to the DIP Loan Documents, or the occurrence of a default thereunder;

(e)    Borrowers shall fail to comply or shall default in the performance of any term of any Order entered by the Bankruptcy Court in the Cases;

(f)    Entry of an Order modifying, reversing, revoking, staying, rescinding, vacating, or amending any Order entered by the Bankruptcy Court in the Cases, or any of the other DIP Loan Documents, without Lenders' express prior written consent and no such consent shall be implied from any other action, inaction, or acquiescence of Lenders;

(g)    Entry of an Order in the Cases approving or allowing any claim, Lien or security interest ranking equal or senior in priority to the claims, Liens and security interests of Lenders under any Order entered by the Bankruptcy Court in the Cases, or the other DIP Loan Documents or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in either case, as expressly permitted under Order entered by the Bankruptcy Court in the Cases, or the other DIP Loan Documents;

(h)    Any of the DIP Loan Documents or any Lien or security interest of Lenders created thereunder shall cease for any reason to be in full force and effect or to have the priority provided in the Order entered by the Bankruptcy Court in the Cases, or entry of an Order

14

in the Cases or in any adversary proceeding commenced in the Cases granting a challenge to the validity, enforceability, perfection or priority of any of the DIP Loan Documents or any of such Liens and security interests;

(i)     Any Interim Order shall cease to be in full force and effect and the Final Order with regard to said matter shall not have been entered by the Bankruptcy Court prior to such cessation; or the Bankruptcy Court shall not have entered a Final Order on or before expiration of any Interim Order or the Final Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(j)     Entry of an Order in the Cases which appointing any trustee or other fiduciary for the Borrowers or for any property of the Borrowers' estates, or the appointment of any examiner having expanded powers to operate all or any part of the Borrowers businesses;

(k)     Entry of an Order in the Cases dismissing the Cases or converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; or

(l)     Entry of an Order in the Cases granting any motion or application which seeks approval for or allowance of the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to 11 U.S.C. § 362, which order permits any creditor, other than the Lenders, to realize upon, or to exercise any right or remedy with respect to the DIP Loan Collateral.

10.     Any of the following events shall also constitute an Event of Default hereunder: (a) the entry of and Order granting Lenders, or any party other than Lenders, relief from the automatic stay with respect to any property of the Borrowers in which Lenders hold or claim a lien or security interest, whether pursuant to this Agreement or otherwise; (b) the entry of an Order dismissing any of the Cases or converting any of the Cases; (c) the entry of an Order authorizing the appointment of a trustee in any of the Cases; (d) the entry of an Order confirming a Plan of Reorganization or liquidation for any Borrower, without the consent of Lenders; or (e) the entry of an Order which reverses, revokes, stays, rescinds, modifies or amends any Interim DIP Financing Order or Final DIP Financing Order, without the consent of Lenders thereto.

11.     Remedies Upon Default. In the event of the occurrence of any Event of Default, then Lender may at any time thereafter, at its option, take any or all of the following actions, at the same or different times:

(a)     Declare the balance of the DIP Loan to be forthwith due and payable, both as to principal and interest, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in the Note to the contrary notwithstanding;

(b)     Exercise such other rights and remedies as Lender may be provided in the Note and Security Agreement and any other DIP Loan Documents, or as provided by law or equity;

(c)     Terminate the Borrowers' ability to draw upon the DIP Loan and receive any Advances;

(d)    File a motion in the Bankruptcy Court for an order granting relief from the automatic stay of 11 U.S.C. § 362, which motion the Borrowers hereby agree not to contest, in order to take possession of the DIP Loan Collateral.

12.    <u>Termination</u>.  Lenders shall have the ability to terminate the Borrowers' ability to draw upon the DIP Loan and receive any further Advances (a) upon an Event of Default hereunder; (b) should Lenders, in their sole and absolute discretion, decline to consent or approve any budget for use of proceeds of the DIP Loan and any Advance; or (c) otherwise at any time in their sole and absolute discretion for any reason, or no reason -- any of which shall be a "<u>Termination Event</u>". Such termination shall be effective immediately upon Borrowers' receipt of written notice of termination from the Lenders (the "<u>Termination Date</u>") at which time the Borrowers shall no longer have any ability to access or draw upon the DIP Loan except that the Termination Event shall not impact draws and disbursements already made under the DIP Loan nor shall it impact the Lenders' obligations with respect to the Carve-Out and the Post-Termination Carve-Out as set forth in the Interim DIP Financing Order or any Final DIP Financing Order.  Upon the Termination Date, all Obligations shall be immediately due and payable in full from Borrowers, without deduction or setoff.  Upon the Termination Date, Lenders may also exercise such other rights and remedies as Lenders may be provided in the Note and Security Agreement and any other DIP Loan Documents, or as provided by law or equity or order of this Court.  Lender may pursue such remedies without necessity of further Order of the Court consistent with the provisions of the Interim Order which grants Lenders relief from the automatic stay provisions of 11 U.S.C. § 362 for purposes of pursuing their rights under the DIP Liens and as to the DIP Collateral.  To the extent necessary, Lenders may file a motion in the Bankruptcy Court for an order granting relief from the automatic stay of 11 U.S.C. § 362, which motion the Borrowers hereby agree not to contest, in order to take possession of the DIP Loan Collateral.

13.    <u>Miscellaneous Provisions</u>.

(a)    <u>Waiver and Modification; Remedies Cumulative</u>. A waiver, amendment, discharge, extension, termination, or modification of this Agreement will be valid and effective only if it is in writing, signed by Lenders and any or all of the Borrowers, and approved by order of the Bankruptcy Court. A written waiver by Lenders of a Default under any provision of this DIP Loan Agreement will not operate as a waiver of either any other Default or a succeeding Default under the same provision or as a waiver of the provision itself. No delay or course of dealing by Lenders will operate as a waiver of any right, power, or remedy of Lenders, except to the extent manifested in writing by Lenders and except when this DIP Loan Agreement expressly requires a right, power, or remedy to be exercised within a specified time. The remedies provided in this DIP Loan Agreement are cumulative and are in addition to any other remedies provided by law, any other Loan Document or otherwise.

(b)    <u>Survival of Representations</u>. All representations and warranties made in this DIP Loan Agreement shall survive the making of the DIP Loan hereunder and the delivery of the Note and Security Agreement, and shall continue in full force and effect so long as any Obligations are outstanding, there exists any commitment by Lenders to Borrowers, and until this Agreement is formally terminated in writing.

(c)     <u>Indirect Means</u>. Any act which the Borrowers are prohibited from doing shall not be done indirectly through a subsidiary or by any other indirect means.

(d)     <u>Assignment</u>. The DIP Loan Documents are not assignable by the Borrowers, and any purported assignment will be invalid and unenforceable. This Agreement is binding on the respective heirs, assignees, successors, and personal representatives of the parties to it and inures to the benefit of each Lender's assignees, successors, and legal representatives and any subsequent holder of the Notes.

(e)     <u>Non-Impairment</u>. If any one or more provisions contained in this Agreement or any other document executed pursuant to this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and the documentation executed pursuant hereto, shall not in any way be affected or impaired thereby and this Agreement shall otherwise remain in full force and effect.

(f)     <u>Stamps and Fees</u>. The Borrowers shall pay all federal or state stamps or taxes, or other fees and charges, if any, payable or determined to be payable by reason of the execution, delivery or issuance of this Agreement, the Notes or any security granted to Lenders, or the making of any Advance from time to time, whether they be payable upon execution or recurring from time to time, the Borrowers agree to indemnify and hold harmless Lenders and Lenders against any and all liability in respect therefor.

(g)     <u>Notices</u>. Any notice or other communication under this Agreement or any of the DIP Loan Documents to any party shall be by hand delivery, overnight delivery, facsimile, telegram, telex or registered or certified mail and unless otherwise provided in this Agreement, will be deemed to have been given or made when delivered, telegraphed, telexed, or faxed or three (3) days after having been deposited in the mails, postage prepaid, addressed to the party at its address specified below (or at any other address that the party may specify to the other parties in writing):

If to Lenders:                           Valley National Bank
                                           1455 Valley Road
                                           Wayne, New Jersey 07470

                                           Raymond James Bank, N.A.
                                           710 Carillon Parkway
                                           St. Petersburg, Florida 33716

With a copy to:                       Daniel M. Eliades
                                             David S. Catuogno
                                           K&L Gates LLP
                                           One Newark Center, 10th Floor
                                           Newark, New Jersey 0710s

If to Borrowers:                   CFRA Holdings, LLC
                                           1340 Hamlet Avenue,

Clearwater, Florida, 33756

CFRA LLC
1340 Hamlet Avenue,
Clearwater, Florida, 33756

CFRA Tri-Cities, LLC
1340 Hamlet Avenue,
Clearwater, Florida, 33756

With a copy to:                    Stephen B. Ravin
Aaron S. Applebaum
Saul Ewing Arnstein & Lehr LLP
One Riverfront Plaza
1037 Riverfront Boulevard, Suite 1520
Newark, New Jersey 07102

and

J. Tim Pruban, CRO
Focus Management Group
5001 W. Lemon St.
Tampa, FL 33609

        (h)    <u>Right of Setoff</u>. Each Borrower grants to Lenders a continuing Lien to secure all Obligations on its monies, securities, and other property and the proceeds of those properties, now or later held or received by or in transit to Lenders, and also on any deposits (general or special) and credits of any Borrower at any Lender, at any time existing. On the occurrence of a Default, Lenders may, without notifying the Borrowers, set off appropriate, and apply to the Obligations the foregoing property.

        (i)    <u>Approvals</u>. If this Agreement calls for the approval or consent of Lenders, that approval or consent may be given or withheld in Lenders' discretion, unless this DIP Loan Agreement otherwise specifies.

        (j)    <u>Counterpart Execution</u>. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, and such counterparts together constitute one and the same instrument. Signature and acknowledgment pages may be detached from the counterparts and attached to a single copy of this document to physically form one document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or e-mail transmission of a portable document file (also known as a PDF file) shall be as effective as delivery of an original executed counterpart of this Agreement.

        (k)    <u>Legal Proceedings; Venue.</u> The validity, enforcement, construction, and interpretation of this DIP Loan Agreement and all other DIP Loan Documents are governed by the laws of the state of Florida and the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflict with laws of other jurisdictions. The proper,

exclusive, and convenient venue for any arbitration or litigation arising under this Agreement is the Bankruptcy Court, and each party waives any defense, whether asserted by motion or pleading, that the Bankruptcy Court is an improper or inconvenient venue.

(l)     <u>Waiver of Jury Trial</u>. THE BORROWERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EACH BORROWER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED UPON THIS AGREEMENT OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT AND ANY OTHER AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

IN WITNESS WHEREOF, the Borrowers and Lenders have caused the DIP Loan Agreement to be duly executed all as of the day and year first above written.

**BORROWERS:**

**ATTEST:**                                    **CFRA HOLDINGS, LLC**
                                               **Debtor and Debtor-in-Possession**


                                               By: _____
                                                   Name: _____
_____                   Title: _____


**ATTEST:**                                    **CFRA, LLC**
                                               **Debtor and Debtor-in-Possession**


                                               By: _____
                                                   Name: _____
_____                   Title: _____


**ATTEST:**                                    **CFRA TRI-CITIES, LLC**
                                               **Debtor and Debtor-in-Possession**


                                               By: _____
                                                   Name: _____
_____                   Title: _____

**LENDERS:**

**ATTEST:**                                    **VALLEY NATIONAL BANK**


By: _____
     Name: _____
     Title: _____

_____


**ATTEST:**                                    **RAYMOND JAMES BANK, N.A.**


By: _____
     Name: _____
     Title: _____

_____


20

**<u>EXHIBIT B</u>**
**INTERIM APPROVED DIP BUDGET**

**CFRA, LLC; CFRA Holdings, LLC; CFRA Tri-Cities, LLC**
**2-Week Budget & Cash Flow**

| ($ thousands) Week Ending Date | 1 Projected 5/23/2020 | 2 Projected 5/30/2020 | Weeks 1 - 2 Total |
|---|---|---|---|
| **Cash Receipts** | | | |
| DIP Draws | $ 73 | $ 15 | $ 88 |
| A/R Collections (Gross) | $ - | $ - | $ - |
| Less Discount | $ - | $ - | $ - |
| A/R Collections (Net) | $ - | $ - | $ - |
| Equipment Sales | $ - | $ - | $ - |
| Franchise Sales | $ - | $ - | $ - |
| Total Cash Receipts | $ 73 | $ 15 | $ 88 |
| | | | |
| Cash Disbursements | | | |
| Rents | $ - | $ - | $ - |
| Utilities | $ - | $ - | $ - |
| Insurance | $ 32 | $ - | $ 32 |
| Debtors Counsel | $ 75 | $ - | $ 75 |
| Debtors CRO | $ 28 | $ - | $ 28 |
| Appraisal | $ - | $ - | $ - |
| Miscellaneous | $ 5 | $ 5 | $ 10 |
| US Trustee Fees | $ - | $ - | $ - |
| Contingency | $ 5 | $ 5 | $ 10 |
| Secured Lender Fees and Interest | $ - | $ - | $ - |
| Claims and/or Noticing Agent | $ - | $ 5 | $ 5 |
| Total Cash Disbursements | $ 145 | $ 15 | $ 160 |
| | | | |
| **Net Weekly Cash Flow** | $ (72) | $ - | $ (72) |
| | | | |
| Beginning Cash Balance | 72 | - | 72 |
| | | | |
| **Ending Cash Balance** | $ - | $ - | $ - |

**Notes:**

1. Assumes no payment of rent during the projection period.
2. Property and Liability insurance is maintained at current rates under current policies.
3. Bank fees and interest not included.
4. Assumes $5,000 payment to the claims/noticing agent in week 2.
5. No site landscaping or other maintenance included.

CFRA BK Filing Budget - 051820 - 053020 - v1