**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| CFRA HOLDINGS, LLC | Case No. 8:20-bk-03608-CPM |
| | *Jointly Administered with:* |
| CFRA, LLC | Case No. 8:20-bk-03609-CPM |
| CFRA TRI-CITIES, LLC | Case No. 8:20-bk-03610-CPM |
| Debtors. | |

_____ /

**DEBTORS' MEMORANDUM OF LAW
IN SUPPORT OF ENTRY OF ORDER
APPROVING BIDDING PROCEDURES,
ASSUMPTION AND ASSIGNMENT PROCEDURES,
<u>AND THE FORM AND MANNER OF NOTICE THEREOF</u>**

The above-captioned debtors and debtors-in-possession (the "**Debtors**") respectfully submit this memorandum of law in support of their request for entry of an Order Approving Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof (the "**Bidding Procedures Order**") in connection with the Debtors' Sale and Bidding Procedures Motion (defined below) [Docket No. 53]. In support hereof, the Debtors' respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

The Debtors, franchisees of forty-nine (49) IHOP-branded restaurants, shuttered all of their locations and ceased restaurant operations as a direct result of the ongoing Covid-19 pandemic and the related governmental "safer-at-home" orders. These closures resulted in an immediate liquidity crisis because, without operating revenue, the Debtors had no means to satisfy ongoing financial obligations such as rent, utilities and debt service.

To try to address these untenable circumstances, the Debtors contacted IHOP[1] and their Lenders[2] in an effort to develop a consensual path forward that would protect the interests of all key stakeholders.   When those efforts failed to produce a consensual resolution, the Debtors pursued an assignment for the benefit of creditors under Florida law, and then commenced these chapter 11 cases in order to effectuate a sale of their businesses that would preserve and maximize the value of their assets for the benefit of their creditors.   The Debtors, in their business judgment, believe that a sale constitutes the only practical means of preserving and maximizing the value of the Debtors' assets and maintaining the restaurants as going concerns – safeguarding the interests of the Debtors' creditors *and* the long-term business interests of IHOP in its capacity as franchisor.

IHOP, however, sought to capitalize on the Debtors' situation.   Just days before the bankruptcy filings, IHOP drew down on a letter of credit in excess of $1 million (and more than IHOP had claimed to be owed) and attempted to terminate the Debtors' franchise agreements (and related subleases and equipment leases).   IHOP's motivations are evident – it seeks to sell the Debtors' restaurants for its own benefit, which would deprive the Debtors' creditors from realizing any recovery from the value of the Debtors' assets.   IHOP continues these efforts during these bankruptcy cases, as it takes the position that it terminated all of the Debtors' franchise agreements prepetition such that the Debtors have nothing to sell.   IHOP's goal is obvious – to keep all the Debtors' enterprise value for itself, leaving nothing for the Debtors' actual creditors. Given IHOP's draw on the letter of credit, IHOP may not even have been a creditor of the Debtors as of the commencement of these cases.

---

[1]    For purposes herein, "IHOP" means, collectively, IHOP Restaurants LLC, IHOP Franchisor LLC and IHOP Leasing LLC.

[2]    For purposes herein, "Lenders" means, collectively, Valley National Bank and Raymond James Bank, N.A.

37018688.3 05/28/2020

For the reasons herein, this Court should find that IHOP has not effectively terminated any of the Debtors' franchise agreements, subleases or equipment leases.  IHOP's attempted terminations were ineffective for several reasons, including that (a) the purported basis for the termination, the closure of the Debtors' restaurants, did not constitute a breach of the franchise agreements pursuant to applicable force majeure clauses, (b) IHOP failed to comply with the notice and termination provisions of their own agreements, and (c) principles of equity would be violated by permitting IHOP to keep all of the Debtors' assets without regard for actual creditors. To the extent IHOP asserts that the Debtors' assignment for the benefit of creditors constitutes an independent basis to terminate the franchise agreements, such argument ignores the fact that such assignment took place after IHOP had already unilaterally declared a termination and that any such breach should be considered cured as a result of the subsequent commencement of these cases by both the Debtors and the assignee.

Because IHOP failed to properly and effectively terminate the franchise agreements, the franchise agreements, along with all related IHOP subleases and equipment leases, remain part of the Debtors' estates and may be assumed and assigned by the Debtors to the extent permitted by the Bankruptcy Code in connection with a sale of the Debtors' assets.  Any other result leaves the estates largely bereft of saleable assets, and will enable IHOP to enjoy a significant windfall on the backs of the Debtors' creditors.

## **BACKGROUND**

The Debtors commenced these cases (the "Chapter 11 Cases") on May 6, 2020 (the "**Petition Date**") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their financial affairs as debtors-in-possession.  No trustee or

examiner has been appointed in the Chapter 11 Cases.  On May 27, 2020, the United States Trustee appointed an official committee of unsecured creditors.

The Debtors are franchisees of IHOP restaurants, operating forty-nine (49) IHOP restaurants in South Carolina, North Carolina, Tennessee and Virginia.  All of the Debtors' restaurants were shuttered prior to the Petition Date as a result of the various "safer at home" restrictions in connection with the ongoing Covid-19 pandemic.  These closures resulted in an immediate liquidity crisis, leaving the Debtors unable to fund operations and debt service in the ordinary course of business.

A.      **Communications with IHOP During Covid-19 Pandemic**

Communications between the Debtors and IHOP in connection with the Covid-19 pandemic consisted entirely upon a series of letters and emails from March 23, 2020 through April 25, 2020.  Copies of such correspondence, in chronological order, are attached hereto as **Exhibit A**.  The following table provides a chronological summary of the communication between the parties during this time period:

| Date | Description | Summary |
|------|-------------|---------|
| 3/24/2020 | Letter from Nicholas Peters (CFRA) to Jay Johns (IHOP) | Indicates that 28 restaurants were forced to close and 21 remain open.   "Rather than simply walk away from the business, however, we intend to invest considerable efforts and non-cash resources to create best present outcome for [IHOP, lenders and remaining employees]." Expect lenders to provide additional working capital for this purpose.  Requests a call to discuss plan for 28 restaurants that were forced to close and that we have no current intention to reopen. |
| 3/24/2020 | Letter from Nicholas Peters (CFRA) to Jay Johns (IHOP) | Notice of closure of the 28 restaurants, forced by Covid-19.   21 stores will continue to operate. Notes governmental actions which have basically eliminated dine-in services, taking away 85-90% of revenue. Constitutes a "force majeure" event such that we are closing them permanently. |

37018688.3 05/28/2020

| 3/24/2020 | Letter from Nicholas Peters (CFRA) to Ronald Ciganek (Lenders) | Indicates plan to keep 21 restaurants open and close 28 restaurants "under some form of reorganization plan." Notes contemporaneous approach to IHOP regarding their cooperation in a reorganization plan. |
|---|---|---|
| 3/25/2020 | Letter from Jay Johns (IHOP) to Nicholas Peters (CFRA) | Acknowledges prior correspondence, advises that permanent closures are not being authorized. Agrees to 30-day temporary closures. |
| 4/10/2020 | Letter from Dan Eliades (Lenders' Counsel) to Jay Johns (IHOP) | Lenders understand that CFRA intends to cease operations at the 21 restaurants that had remained open. Lenders request a call with IHOP business and legal team. |
| 4/16/2020 | Letter from Charles Scaccia (IHOP) to Nicholas Peters (CFRA) | Notice of default and immediate termination of 28 franchise agreements for the 28 closed restaurants. Alleges that, since March 24, "CFRA has reiterated multiple times and unequivocally its intention not to reopen the Restaurants and to permanently close and abandon them." Alleges that CFRA owes $534,287.00 for the 28 closed restaurants, and that any deferral agreement is now void. |
| 4/16/2020 | Letter from Charles Scaccia (IHOP) to Nicholas Peters (CFRA) | Notice of default for the 21 other restaurants. Alleges that CFRA owes $370,410.00 for the 21 restaurants, and that any deferral agreement is void because of CFRA's permanent closure of the other 28 restaurants. Deadline of April 24, 2020 to cure monetary default. |
| 4/17/2020 | Letter from Charles Scaccia (IHOP) to Nicholas Peters (CFRA) | Notice of default *and termination* for the 21 restaurants. Alleges that "IHOP learned CFRA has closed and ceased operating the Restaurants" such that "CFRA has apparently followed through on its threats, demonstrated its intention not to reopen the Restaurants, and abandoned them." Immediately terminates the franchise agreements for the 21 restaurants. |
| 4/17/2020 | Email from Alexander Wong (Dine Brands) to Nicholas Peters (CFRA) | Notes previous approval for 30-day temporary closure granted on March 25, and provides that such approval are due to expire on April 23. |
| 4/18/2020 | Letter from Allison Hall (IHOP) to Valley National Bank | Sight Draft – drawing on a standby letter of credit in the full amount of $1,078,000.00, an amount in excess of the $534,287 and $370,410 amounts referenced in IHOP's default notices. Certifies that CFRA is delinquent in the payment of obligations to IHOP and did not cure within the time periods provided under the franchise agreements or any other agreements. |

| 4/20/2020 | Letter from Jeff Haff (counsel to CFRA) to Christine Son (IHOP) | Responds to termination notice. Denies that CFRA made any threats. Asserts that grounds for purported termination are invalid. Closing of stores was required as a result of Covid-19 and cannot serve as proper grounds for terminating franchise agreements. IHOP agreed to defer payments, so payment defaults are also improper grounds for terminating. CFRA wanted to work to keep restaurants open but IHOP terminated. |
|---|---|---|

These communications, when viewed as a whole, do not paint a picture of a franchisee simply walking away, shirking its responsibilities and abandoning restaurants, as IHOP seeks to characterize the Debtors' actions. Instead, they reflect a franchisee dealing with an unprecedented situation and doing its best to do right by its creditors and by IHOP.

Indeed, the only statements by CFRA indicating anything akin to "permanent closure" and/or "no current intention to reopen" are found in the first two letters written on March 24, 2020. Those letters, however, were immediately responded to *and rejected* by the letter of Jay Johns of March 25, 2020, *which instead approved a 30-day temporary closure*. IHOP's position and communications during this time period are internally inconsistent and make no sense. On the one hand, IHOP authorizes the Debtors to close for 30-days, and also defers payment obligations. However, a full week before those 30-days expire, a different person at IHOP issues a series of default and/or termination notices, alleging that the Debtors had made threats and had effectively abandoned their assets. IHOP's characterization of the Debtors' statements is further contradicted by the Debtors' contemporaneous letter to their lenders sent on March 24, 2020, which, rather than suggesting any abandonment, expressly contemplates addressing the 28 closed restaurants through a reorganization plan for which they were seeking IHOP's cooperation.

The Debtors, faced with these inconsistent responses (i.e., the more reasonable responses of Mr. Johns and the aggressive default letters from Mr. Scaccia), continued to seek a path

toward a consensual resolution. Indeed, both the letters sent by Mr. Peters on March 24 as well as the letter sent by Lenders' counsel requested that IHOP participate in a call to actually discuss the situation and try to find a consensual path forward.  IHOP refused to engage, however, and instead capitalized on the situation so that it could sell these restaurants on its own and keep all the proceeds.

**B.**    **The ABC and the Bankruptcy Filings**

Faced with IHOP's unwillingness to work cooperatively, coupled with its efforts on April 16 and April 17 to unilaterally terminate the franchise agreements, the Debtors determined that the interests of their creditors and other stakeholders could best be protected through an insolvency proceeding, and initially sought to obtain relief through an assignment for the benefit of creditors, or "ABC."

Accordingly, on April 22, 2020, each of the Debtors executed an *Assignment for the Benefit of Creditors* pursuant to Chapter 727, Florida Statutes, designating J. Tim Pruban ("**Mr. Pruban**") of Focus Management Group USA Inc. ("**Focus**") as assignee of the Debtors' assets and empowering him to liquidate such assets and take such other actions as may be warranted to maximize value for the Debtors' creditors and stakeholders.

Upon commencement of the ABC proceedings, however, the Debtors learned that IHOP had not only declared a termination of the Debtors' franchise agreements, but that it had also commenced active marketing of the Debtors' restaurants, at least for the 29 locations where IHOP is not only the franchisor, but also the sub-landlord and equipment lessor to the Debtors. In fact, the Debtors were advised that IHOP already had one or more buyers lined up and a sale was imminent.

37018688.3 05/28/2020

The Debtors, believing that IHOP had improperly and ineffectively terminated the franchise agreements, determined that valuable estate assets would be lost, to the detriment of creditors, if IHOP proceeded to sell the Debtors' assets for IHOP's own and exclusive benefit. Thus, Mr. Pruban and the Debtors determined that it was in the best interest of the Debtors and their estates to seek relief under chapter 11 of the Bankruptcy Code, in order to gain the "breathing spell" afforded by the automatic stay of section 362 of the Bankruptcy Code and to pursue a  sale of the Debtors' assets free and clear of liens, claims, encumbrances and other interests pursuant to section 363(b) of the Bankruptcy Code.   In order to effectively and efficiently transition into chapter 11, the Debtors and Mr. Pruban, in his capacity as Assignee of the Debtors, appointed Mr. Pruban as Chief Restructuring Officer of each of the Debtors, subject to the approval of the Bankruptcy Court.

On May 18, 2020, the *Debtors' Motion for Entry of (I) an Order Approving Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof; and (II) Order(s) (A) Approving the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Sales Free and Clear of All Encumbrances, and (C) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "**Sale and Bidding Procedures Motion**") [Docket No. 53] was filed with the Court.  For the reasons set forth herein, the Debtors ask the Court to overrule all objections by IHOP to entry of the Bidding Procedures Order, and find that the Debtors' franchise agreements remain property of the Debtors' estates such that the Debtors may market, sell and/or assume and assign them as proposed through the Sale and Bidding Procedures Motion.

## ARGUMENT

### A.    IHOP Improperly Sought to Terminate the Franchise Agreements

The primary dispute between the Debtors and IHOP is whether IHOP had grounds to terminate the Debtors' franchise agreements as a result of the communications between the parties commencing on March 24, 2020 in connection with the Covid-19 pandemic.[3]    The Debtors respectfully assert that IHOP wrongfully sought to terminate the franchise agreements and that as a result, any such "declared termination" should be deemed a nullity.

IHOP cannot credibly maintain that the mere act of closing restaurants under the unique circumstances of the Covid-19 pandemic gives IHOP the right to declare an incurable material breach of the franchise agreements to justify immediate termination by IHOP.    Indeed, the Debtors understand that of the approximately 1,800 IHOP locations throughout the United States, approximately 700 closed as a result of the pandemic.    Presumably, most of the locations that remained open were not allowed to offer dine-in services, and thus remained open solely for takeout and/or delivery service.    As IHOP did not terminate the franchise agreements of the other 700 locations that fully closed, the Debtors' decision to close cannot by itself constitute a termination event.

IHOP, instead, seeks to distinguish CFRA from all of its other franchisees based on IHOP's contention that the Debtors threatened "permanent" closure and that the Debtors effectively abandoned their restaurants.    IHOP's support for this contention, however, is limited to just the first two letters sent by the Debtors to IHOP at the outset of the pandemic, on March

---

[3]     IHOP's default notices also suggest the existence of monetary defaults, totaling $904,697 between the two notices.    The Debtors do not separately address the monetary defaults herein because IHOP successfully drew down on its letter of credit in the amount of $1,078,000, thus fully curing any monetary defaults.    The Debtors reserve all rights in connection with IHOP's actions with respect to the letter of credit, including (a) the fact that IHOP appears to have improperly drawn the full amount even though such amount exceeded the actual monetary default by approximately $173,000 and (b) IHOP had previously agreed to defer some or all of the amounts it claimed as due through the default notices.

37018688.3 05/28/2020

24, 2020, and completely ignores IHOP's immediate response on March 25, 2020 which, while acknowledging receipt of Debtors' March 24, 2020 letters, expressly permitted the Debtors to close temporarily for 30 days.  IHOP can point to no other correspondence from the Debtors to IHOP after March 24, 2020 which rejects IHOP's March 25, 2020 letter or the agreement to permit the Debtors to temporarily close for 30 days.

Instead, commencing on April 16, 2020, IHOP issued a flurry of default and termination notices, ignoring their own March 25, 2020 letter and apparently relying solely on the Debtors' prior letters of March 24, 2020.  In addition to obviously ignoring their own intervening correspondence, IHOP ignores the emphasis of the Debtors' March 24, 2020 letters, which displayed no intention of abandonment, but made clear the Debtors' willingness to expend efforts, and the Lenders' willingness to assist, in pursuing a mutually beneficial path forward that would allow for a transition of some or all of the Debtors' restaurants to a new franchisee.  When taken in the full context of the March 24, 2020 correspondence, the Debtors' language of permanent closure and "no current intention to reopen" can only mean that the *Debtors* would not reopen the locations, clearly suggesting that a transition to a new franchisee should be explored.   The Debtors' clear willingness to work cooperatively to this end nullifies any assertion by IHOP that the Debtors abandoned anything.

**B.**      **The Debtors' Closure Was Not a Breach Under the Force Majeure Clause**

In addition to the foregoing, the Debtors' decision to close their locations in the midst of the Covid-19 pandemic, with or without the consent of IHOP, did not constitute a breach of the franchise agreements. Attached hereto as **Exhibit B** is the franchise agreement for the Debtors location at store #470, which IHOP attached to their objection to the Debtors' motion for post-petition financing as an indicative sample of one of the Debtors' franchise agreements.   Section

12.01 of that franchise agreement, under the heading "Right of Termination After Notice of Default," gives IHOP, as franchisor, the right to terminate the franchise agreement with notice and with a 7-day cure period, upon the occurrence of certain enumerated events.  Specifically, section 12.01(d) provides that one such situation is:

> (d) Failure to keep the Franchised Restaurant open for business during ordinary business hours for a continuous period of more than 3 days, without the prior written consent of Franchisor (hereinafter "Voluntary Abandonment"), unless and for so long as the Franchised Restaurant was closed by reason of: (1) action by any Governmental Authority, not related to a breach by Franchisee of this Agreement, (2) the death or disability of Franchisee, or (3) *force majeure* not caused, directly or indirectly, by Franchisor's willful misconduct.

The Debtors' closure of their restaurants in March 2020 falls within two of the three exceptions to the default provision of section 12.01(d) of the franchise agreement.  <u>First</u>, the Debtors' decision not to keep the restaurants open was caused by actions of government authorities, as each state in which the Debtors operated, either at the state or county level, issued various "safer at home" orders that, among other things, prohibited the operation of a restaurant for dining-in services, and only permitting takeout and/or delivery.  As 85-90% of the Debtors' revenue is derived from dining-in services, the decision to close (i.e., and not stay open for the limited purposes of offering takeout and/or delivery) qualified as a closure by reason of action of government authorities.

<u>Second</u>, the closure was also required by reason of a *force majeure*, namely, the Covid-19 pandemic, which was obviously not caused by the Debtors in any way. A global pandemic, the likes of which has not been seen for over 100 years, clearly constitutes an unforeseeable circumstance justifying the Debtors' non-performance notwithstanding the provisions of the franchise agreement requiring them to remain open.

37018688.3 05/28/2020

To the extent IHOP interprets the Debtors' ancillary statements as to their "intent" to reopen or not somehow voids the exceptions to section 12.01(d), there is no basis in the contract for IHOP's position.  The franchise agreement provides that the failure to remain open is a breach **unless** closure results from governmental action or a *force majeure*.  So long as those circumstances remained in place, indications of the Debtors' *intent*, i.e., what might happen once the governmental action or *force majeure* no longer justified closure, is completely immaterial.

C.    **IHOP Failed to Comply with Applicable Notice**
      **and Termination Provisions of the Franchise Agreements**

In addition to not having proper grounds to terminate the franchise agreements due to the application of the *force majeure* clause, IHOP's purported termination thereof was procedurally defective and thus, ineffective.  First, as described above, section 12.01 of the franchise agreement includes the failure to keep the restaurants open as a basis for termination  "after notice of default."   Indeed, section 12.01 plainly provides that "Franchisor may terminate this Agreement prior to its expiration after providing written notice of Franchisee's Material Breach of this Agreement to Franchisee, *if such Material Breach is not cured within 7 days.* Further, if the material breach cannot be cured within such 7 day period, the agreement provides that Franchisor will allow Franchisee "such additional reasonable period of time as Franchisor deems necessary to cure such Material Breach."

IHOP's termination notices ignore the plain language of their own franchise agreements because IHOP did not provide the Debtors any period of time to cure the alleged default, let alone the minimum required 7 days (or more if reasonably needed).  Instead, IHOP inexplicably took the position that the Debtors' actions in closing the stores and merely expressing *the intention* to not reopen warranted disregard for the notice and cure provision of section 12.01. This position is even more confounding given the relative ease in which cure could be

accomplished – all that would be required would be a clarification by the Debtors that they had not abandoned anything and that they were working to find a suitable transferee for their franchise agreements who could reopen as soon as permissible in light of the Covid-19 situation. IHOP, however, ignored their own agreement and declared a unilateral termination, despite the lack of any basis to do so in the agreement.  If the alleged breach by the Debtors was sufficient to warrant immediate termination without notice and an opportunity to cure, then it would be listed in section 12.02 of the franchise agreement, which lists the types of breaches that justify immediate termination without notice.   In other words, closure in violation of section 12.01(d) coupled with a statement of intention to not re-open is not set forth in section 12.02 and renders the termination ineffective.

Finally, section 12.03 of the franchise agreement provides strict requirements for notices of default and/or intent to terminate franchise agreements.  Significantly, the default and termination notices issued by IHOP do not comply with these requirements, which serves as further basis to deem any purported termination to have been invalid.

First, section 12.03(a) requires that all monetary defaults "contain an accounting . . . of the amounts of each of the unpaid obligations, the items for which such obligations are unpaid, and the dates upon which such obligations became due, as well as an allocation of credits made for partial payments, if any." IHOP's default notices to the Debtors, which each included monetary defaults as described above, failed to specify the dates upon which *any* of the Debtors' obligations came due.

Further, section 12.03(b) requires, for non-monetary defaults, that each notice identify (i) the specific provision or provisions of the agreement that was violated, (ii) the date such violations were observed, and (iii) by whom such violation was observed and reported.  IHOP's

notices to the Debtors did not identify any specific provision of the franchise agreement in connection with the Debtors' alleged non-monetary default, nor did it provide the required detail, i.e., the dates or by whom they were reported, and as such fully fail to comply with section 12.03.

Separate from the technical contract provisions, IHOP's termination notices were also deficient because they only purported to terminate franchise agreements, without also terminating related subleases and equipment leases.  IHOP never referenced subleases and equipment leases in its termination notices until after the Debtors' commenced their ABC proceedings.  Interconnected and inextricably interwoven franchise and lease agreements, such as those at issue here, constitute a single contractual relationship for bankruptcy purposes, and the failure to terminate all is fatal to any purported prepetition termination.  See, In re Karfakis, 162 B.R. 719, 725 (Bankr. E.D. Pa. 1993).

Because IHOP failed, in multiple respects, to comply with its own notice and default provisions, its purported termination of the Debtors' franchise agreements is invalid.

D.      **The Debtors May Assume and Assign the Franchise Agreements**

To the extent IHOP suggests that the Debtors should not be permitted to proceed with their proposed sale process because IHOP has an unfettered right to block any assignment of the franchise agreements, IHOP's position is entirely undermined by, again, the plain language of its own franchise agreements.   IHOP's franchise agreements are not akin to trademark agreements that give licensors unlimited discretion to reject an assignee.   Indeed, the IHOP franchise agreements include a fully developed process through which a franchisee can seek to assign its franchise agreement.

Specifically, in no uncertain terms, section 11.02 of the franchise agreement provides that "During the Term, Franchisee *shall have the right* to assign, transfer or sell its interest in this Agreement, upon the terms and conditions provided herein, and subject to the provisions contained in section 11.03 and 11.04." Section 11.03 of the franchise agreement, in turn, sets forth the conditions to assignment by franchisee. Rather than affording the franchisor sole and absolute discretion, section 11.03(a)(ii) requires the franchisee to obtain IHOP's "written consent, not to be unreasonably withheld, of the proposed Assignment." Thus, the Debtors can assume and assign their franchise agreements, and IHOP's ability to reject any proposed assignment is subject to a reasonableness standard. Because the Debtors believe that a likely buyer for their restaurants will come from the pool of existing IHOP franchisees (i.e., businesses that have already been approved by IHOP) the Debtors respectfully suggest that they will be able to meet this burden.

**E.      The Court Should Consider the Equities of the Case and Avoid giving
         IHOP an Unfair Windfall to the Detriment of Actual Creditors**

The Debtors respectfully suggest that principles of equity strongly support the Court finding that IHOP did not effectively terminate the franchise agreements.

Ruling in IHOP's favor in this matter will have the result of permitting IHOP to capitalize on the Covid-19 pandemic to seize assets of the Debtors that could otherwise have been monetized for the benefit of all creditors in their proper order of priority under the Bankruptcy Code. Notably, the Debtors' owe nearly $20 million to the Lenders and nearly $4.5 million to unsecured creditors. The Debtors respectfully suggest that they do not owe IHOP anything, given that IHOP drew down on the letter of credit in the amount of $1,078,000, which exceeded the amounts IHOP even alleged it was due at that time.

37018688.3 05/28/2020

If IHOP is found to have properly and effectively terminated the franchise agreements, then IHOP will be permitted to sell the Debtors' assets and keep all the proceeds for itself, without regard for the Debtors' legitimate creditors.  This constitutes an unfair windfall for IHOP and should not be approved.  Moreover, IHOP will still clearly benefit if the Court permits the Debtors to move forward with their sale – in addition to establishing a process that will determine the highest and best bidder(s) for the assets, a successful sale will likely result in  in significant new franchise fees for IHOP, cure of rent and other lease arrearages (if any), and preservation of all of the Debtors' 49 locations as going concern restaurants.   Permitting IHOP to both obtain replacement franchisees *and* keep all the proceeds of the sale is simply unfair. Accordingly, to ensure that principles of equity and fairness are maintained, especially against the backdrop of a global pandemic, the Court should find that IHOP did not effectively terminate the franchise agreements and approve the Bidding Procedures Order so that the Debtors can market and sell their assets as requested.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

37018688.3 05/28/2020

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request entry of the Bidding Procedures Order granting the

relief requested herein and such other and further relief as is just and proper.


Dated: May 28, 2020                **SAUL EWING ARNSTEIN & LEHR LLP**
*Proposed Counsel for Debtors and Debtors-in-Possession*
701 Brickell Avenue, 17th Floor
Miami, FL 33131
Telephone: (305) 428-4500
Facsimile: (305) 374-4744

By:     <u>/s/ Aaron S. Applebaum</u>
        Carmen Contreras-Martinez
        Florida Bar No. 093475
        Carmen.Contreras-Martinez@saul.com

        -and-

        Stephen B. Ravin (*pro hac vice*)
        Florida Bar No. 293768 (*inactive status*)
        Aaron S. Applebaum (*pro hac vice*)
        1037 Raymond Boulevard
        Suite 1520
        Newark, NJ 07102
        Telephone: (973) 286-6700
        Facsimile:  (973) 286-6800
        Stephen.Ravin@saul.com
        Aaron.Applebaum@saul.com

37018688.3 05/28/2020