**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re:

CFRA HOLDINGS, LLC,

CFRA, LLC
CFRA TRI-CITIES, LLC

      Debtors.

Case No.
20-03608-CPM

*Jointly Administered with*

20-03609-CPM
20-03610-CPM

Chapter 11

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO**
**THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM ORDERS**
**(A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING**
**AND (B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL**

      The Official Committee of Unsecured Creditors (the "Committee") appointed in the cases

of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and

through its proposed undersigned counsel, hereby submits its objection (the "Objection") to the

Debtors' *Emergency Motion for Entry of Interim Order (A) Authorizing Debtors to Obtain Post-*

*Petition Financing and (B) Authorizing Debtors to Use Cash Collateral* [Docket No. 47] (the "DIP

Motion").[1]  In support of the Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

      1.      This Court has made it clear multiple times that the Lenders must "pay to play" and

that they cannot use the bankruptcy process for their own recovery without providing some benefit

---

[1] Capitalized terms used, but not otherwise defined, shall have the meanings ascribed to them below or in the DIP
Motion.

to unsecured creditors.  But that is *exactly* what the Lenders, with the assistance of the Debtors, are seeking to do now, and the Committee must therefore object to the DIP Motion.

2.       While the Debtors propose to sell substantially all of their assets through a lightning-quick sale process—with a closing required by June 27—the Debtors have formulated no exit strategy for their cases.  Even if there were any funds to distribute to unsecured creditors following the proposed sale of the Debtors' assets (which, both the Debtors and the Lenders have advised the Committee, **there will not be**), no thought has been given as to what happens next, including how anything that might be available for unsecured creditors (*e.g.*, proceeds of unencumbered assets, causes of action, avoidance actions, etc.) would be distributed, since, given their shoestring budget and lack of preparation for these cases, it is abundantly clear that the Debtors have no intent of seeking to confirm a plan of liquidation.  In fact, when the Committee raised this issue during yesterday's status conference, neither the Debtors nor the Lenders came forward with any post-sale exit plan.[2]  It is wholly inappropriate for the Lenders (and the Debtors, who are controlled not by equity and/or former management—who abandoned ship some time ago—but by a professional CRO) to use the bankruptcy process in this fashion: **a quick fire sale followed by…..“whatever.”**

3.       In sum, the DIP Motion creates the illusion of a legitimate bankruptcy process, but in reality simply permits the Lenders to liquidate their collateral—using the Bankruptcy Code as a federal foreclosure statute—with no expectation of any return to unsecured creditors or any funding in place which might permit the Committee to perform its fiduciary duties, including seeking to uncover any value for its constituency.  For these reasons, as well as other deficiencies

---

[2] The Committee and the Lenders have engaged in negotiations in an effort to resolve the Committee's objection to, among other things, the DIP Motion, but as of the time of this submission, the parties have reached no agreement.

set forth below, the Committee objects to the DIP Motion and respectfully requests that it be

denied.

## BACKGROUND

**A.    General Background**

4.      On May 6, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition

for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to

operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11

cases.

5.      A brief description of the Debtors' businesses and the events leading to the

commencement of these cases is set forth in the *Consolidated Chapter 11 Case Management*

*Summary* (the "Case Management Summary") [Docket No. 7].

6.      On May 21, 2020, IHOP Restaurants LLC, IHOP Franchisor LLC, and IHOP

Leasing LLC (collectively, "IHOP") filed the *Objection of IHOP Restaurants LLC, IHOP*

*Franchisor LLC, and IHOP Leasing LLC to Debtors' Emergency Motion for Entry of Interim*

*Orders (A) Authorizing Debtors to Obtain Post-Petition Financing and (B) Authorizing Debtors*

*to Use Cash Collateral* [Docket No. 62] (the "IHOP Objection").

7.      On May 27, 2020, the Court entered the *Consent Order (I) Authorizing Debtors to*

*Use Cash Collateral; (II) Acknowledging Extent, Validity and Priority of Lien; and (III)*

*Scheduling a Further Hearing* [Docket No. 72] (the "Cash Collateral Consent Order") and the

*Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing from Prepetition*

*Lenders Pursuant to 11 U.S.C. § 364; (II) Granting Liens and Superpriority Claims Pursuant to*

*11 U.S.C. § 364; (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361,362, and 363;*

*and (IV) Granting Such Other and Further Relief That This Court Finds Equitable* [Docket No. 81] (the "Interim DIP Order").  On June 4, 2020, the Debtors' counsel provided the Committee's counsel a copy of the proposed second interim DIP order (the "Proposed Second Interim DIP Order").

8.      On May 27, 2020, the United States Trustee for Region 21 (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  [Docket No. 74].  The Committee consists of the following three (3) members:  Performance Food Group, Inc. (Chair of the Committee); Interface Security Systems, LLC; and Putnam Mechanical.  On May 28, 2020, the Committee selected Squire Patton Boggs (US) LLP ("SPB") as its bankruptcy counsel.[3]

9.      The Committee represents a broad constituency that includes unsecured noteholders, vendors, trade claimants, landlords, employees, and contract counterparties. According to the Debtors' schedules and statement of financial affairs filed yesterday [Docket Nos. 108, 109, 110, 111, 112, and 113], **the Debtors have a total of $4,783,630.37 in unsecured claims** and $44,670.11 in priority claims.

**B.      The Debtors' Prepetition Secured Debt**

10.     According to the DIP Motion, as of the Petition Date, the Debtors had secured debt in the approximate amount of $19.5 million.  *See* DIP Motion, ¶¶ 9-15.  The secured debt consists of the following:

>     a.  Revolving Line of Credit Promissory Note (the "VNB Note") held by Valley National Bank ("VNB") in the principal amount of $8,269,315.85; and

---

[3] The Committee anticipates filing an application seeking this Court's approval of SPB's retention as its counsel next week.

b.  Revolving Line of Credit Promissory Note (the "RJB Note," and collectively with the VNB Note, the "Prepetition Notes") held by Raymond James Bank ("RJB," and together with VNB, the "Lenders") in the principal amount of $11,276,339.75.

11.    The Prepetition Notes are purportedly secured by perfected security interests and liens (the "Prepetition Liens") in substantially all of the Debtors' assets.  The Committee has not yet had an opportunity to investigate the Prepetition Liens, including the perfection and/or priority of the liens.

**C.    The Proposed DIP Loan**

12.    In the DIP Motion, the Debtors requested approval of a $1 million new money debtor-in-possession loan facility (the "DIP Loan") from the Lenders.[4]  In the DIP Motion, the Debtors also seek authority to use cash collateral and to provide adequate protection to the Lenders in the form of replacement liens and superpriority administrative expense claims to the extent of any diminution in value.

13.    Yesterday, on June 4, 2020, the Debtors circulated a proposed four (4) week DIP budget, *i.e.*, a budget which runs only through June 30, 2020 (the "DIP Budget").  The total amount to be advanced under the DIP Budget during this period is approximately $317,000 (in addition to the $72,000 advanced under the initial two (2) week budget).

**D.    The IHOP Objection**

14.    The IHOP Objection raises a critical issue in these chapter 11 cases.  Specifically, the IHOP Objection claims that the Debtors' 49 franchise agreements (the "Franchise Agreements") and lease agreements with IHOP (collectively, the "IHOP Agreements") were

---

[4] Inexplicably, the budgets submitted to date by the Debtors reflect that **less than $500,000 will be advanced under the $1 million DIP Loan**.

terminated prior to the Petition Date, and that the IHOP Agreements are therefore not property of

the Debtors' estates and cannot be assumed and assigned.  IHOP also argues that the Franchise

Agreements cannot be assumed and assigned pursuant to section 365(c)(1) of the Bankruptcy Code

because the agreements all contain non-exclusive trademark licenses.

15.     As discussed below, and as recognized by this Court at yesterday's status

conference, the pendency of the IHOP Objection and the uncertainty caused thereby has likely had

a negative impact on the value of the Debtors' assets and the Debtors' ability to market their assets

for sale.

**E.      Initial Actions Taken By the Committee**

16.     Following its appointment, the Committee engaged with the Debtors, the Lenders

and IHOP in numerous discussions concerning a proposed path forward in these cases.  From these

discussions it has become clear that these chapter 11 cases are nothing more than a two-party

dispute and that the proposed DIP Loan does nothing more than permit the Debtors to liquidate

their assets (*i.e.*, the Franchise Agreements, related leases and furniture, fixtures and equipment)

and pay IHOP and the Lenders, leaving nothing for unsecured creditors and leaving the Committee

unable to fulfill its fiduciary obligations.

**OBJECTION**

17.     It is well settled that, in order to obtain postpetition financing, the Debtors must

prove, among other things, that the terms of a proposed DIP facility are fair, reasonable and

adequate given the circumstances of the debtor and the proposed lender.  *See, e.g.*, *In re GB

Peninsula, Ltd.*, 2010 Bankr. LEXIS 5896 *19 (Bankr. M.D. Fla. March 10, 2010) (approving the

postpetition financing after finding that "[t]he terms and conditions of the DIP Loan and the DIP

Loan Documents, and the fees and costs to be paid thereunder, are fair, reasonable, and the best

available under the circumstances"); *In re Fiddler's Creek, LLC*, 2010 Bankr. LEXIS 5974 (Bankr. M.D. Fla. Sept. 28, 2010) (same); *In re GBFC Marina, Ltd.*, 2010 Bankr. LEXIS 5901 (Bankr. M.D. Fla. March 10, 2010) (same).  As described in greater detail below, the Debtors cannot satisfy this standard and, accordingly, the DIP Motion should be denied.

**A.      The Proposed DIP Budget Is Inadequate In Terms Of Amount And Time**

18.      The DIP Budget proposed by the Debtors is inadequate and will not support a process that will lead to the confirmation of a plan of liquidation, the reconciliation of and/or objections to claims, the potential prosecution of avoidance and other actions, **or any distribution to unsecured creditors**.  Based on the DIP Budget, **there is no funding beyond the proposed closing date of the asset sale on June 27**.[5]  As such, the estates will lack the necessary funding, and the Debtors, the Committee or an appointed or elected trustee (as the case may be) will be *unable* to perform any claims reconciliation, *unable* to pursue any avoidance or other causes of action that may be identified, *unable* to fund even the bare minimum costs necessary to administer these estates, and ultimately *unable* to make any distribution to unsecured creditors.  In other words, even assuming that the Debtors or the Lenders were to agree to a cash payment or other consideration available for unsecured creditors, there is no mechanism being proposed through which any such payments could actually be made.

19.      If they wish to use the bankruptcy courts to liquidate their collateral, the Lenders should be required to provide funding for a post-sale mechanism that will allow payment to unsecured creditors.  The Lenders have acknowledged to this Court that they must "pay to play,"

---

[5] The Proposed Second Interim DIP Order provides, in paragraph 15, for a $35,000 "Post-Termination Carve Out" for the Debtors' counsel and the Debtors' chief restructuring officer to "conclude the Cases."  However, that amount will come nowhere close to enabling the Debtors, or a Chapter 7 Trustee upon conversion, to perform their duties or to make a distribution to unsecured creditors.

but without any funding beyond a four (4) week budget, that promise remains unfulfilled and these Cases are of no benefit from the standpoint of unsecured creditors. Moreover, the Budget does not currently include any amounts for the Committee's professionals. Proposed counsel retained by the Committee must be included in the Budget in an amount of no less than $125,000 per month (pro-rated with respect to any partial month. Such amount is reasonable considering the fees and expenses which the Debtors have already committed to pay to numerous professionals for multiple other parties, the size of the unsecured creditor class and the anticipated proceeds of sale. The Budget should also allow for additional Committee professional fees in the event that the Committee retains its own financial, real estate or investment banking advisors.

20.     Furthermore, the sale process proposed by the Debtors and made a condition of the DIP Motion (*see* Proposed Second Interim DIP Order at ¶E(ii))) is far too compressed. The Committee believes that the value of the Debtors' assets would be maximized by a sale process which does not appear to be a "fire sale." In fact, as noted by the Court at yesterday's status conference, the value of the Debtors' assets is likely being negatively impacted by the pending IHOP Objections and the bid procedures should not be considered unless and until the IHOP Objections are resolved (either consensually or by the Court).[6] Accordingly, the Committee believes that moving the requirement for the closing of a sale at least until the end of July would be in the best interests of the Debtors' creditors and would be consistent with what has occurred in other recent restaurant and retailer bankruptcies (*e.g.*, Modell's; Craftworks).

**B.     The Challenge Period and Related Investigation Cap are Inadequate**

---

[6] Contemporaneously herewith, the Committee is filing its own objections to the *Debtors' Motion for Entry of (I) an Order Approving Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof; and (II) Order(s) (A) Approving the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Sales Free and Clear of All Encumbrances, and (C) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 53].

21.    The terms of the Proposed Second Interim DIP Order and the Cash Collateral Consent Order [Docket No. 72] completely hinder the Committee's ability to properly investigate the Lenders' liens and to raise any potential claims through a compressed "challenge period" and a woefully inadequate budget.  The Cash Collateral Consent Order provides the Committee with only thirty (30) days after its appointment to conduct an investigation into the stipulations, admissions, and releases contained in that order.  *See* Cash Collateral Consent Order at ¶13.  The Proposed Second Interim DIP Order **fails to provide a challenge period altogether**.  Further, the Debtors have proposed only **$7,500** for such investigation.  *See* Proposed Second Interim DIP Order at ¶14(h).

22.    The proposed timeframe is far too short.  A fulsome investigation simply cannot be completed within the twenty-two (22) days remaining in the investigation period.  The minimum time period in nearly all chapter 11 cases is sixty (60) days from the date of the Committee's formation.  Accordingly, the Committee should be afforded a challenge period of no less than sixty (60) days from May 27, 2020, the date of its formation, and the Committee's right to such challenge must be as to all relevant motions and orders, including but not limited to, the DIP Motion, the Cash Collateral Consent Order, the Interim DIP Order, the Proposed Second Interim Dip Order, and any and all related proposed interim and final orders.  Such rights should also inure to the benefit of any chapter 7 trustee appointed or elected in the Cases.

23.    The proposed investigation budget of $7,500 is also woefully inadequate.  That token amount should be increased to no less than $75,000, so as to allow the Committee to conduct an appropriate and fulsome investigation.  In fact, the proposed $7,500 budget appears to be intended only to make the Committee nothing more than window dressing—it certainly does not permit a real investigation of anything.

24.     Furthermore, if the Court ultimately approves the extremely short life span of these cases as proposed by the Debtors, the Committee should be granted automatic standing to pursue any claims and causes of action it identifies in the course of its investigation.  If automatic standing is not granted, and the challenge period is not extended, it will be procedurally impossible for the Committee to bring a proper "Challenge" before the period expires.[7]

## C. The Proposed Waivers of Bankruptcy Code Sections 506(b) and 552(b) Should Not be Permitted in these Cases

25.     The Committee also objects to: (a) the proposed waiver of the Debtors' rights to recover the reasonable, necessary costs and expenses of preserving or disposing of property securing any allowed secured claim of the Lenders and to any waiver of section 506(c) rights with respect to the collateral securing the DIP Loan, the prepetition collateral or the cash collateral; and (b) the proposed waiver of the "equities of the case" exception set forth in Bankruptcy Code section 552(b).

26.     By waiving their rights under Bankruptcy Code section 506(c), the Debtors are essentially agreeing to pay for any and all expenses associated with the preservation of the secured parties' collateral.  Such waivers have been found to be inappropriate in certain circumstances because they may provide a windfall to the secured creditor at the expense of unsecured claimants. *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F. 3d 321, 325 (3d Cir. 1995) (finding that section "506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant"); *see also Hartford Fire Ins. Co. v. Norwest Bank Minn, N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (Bankr. D. Md. 2000) (Bankruptcy Code section 506(c) Code exists

---

[7] If the Court is not inclined to grant automatic standing to the Committee, however, any order granting the DIP Motion must at least provide that the challenge period will be automatically tolled upon the timely filing of a standing motion until the Court rules on such motion, so that, if authorized, the Committee can appropriately commence a challenge.

so that unsecured creditors are not required to bear the cost of protecting collateral that is not theirs and to require the secured party to bear the costs of preserving or disposing of its own collateral); *In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs."); *Fulcrum Int'l, Ltd. v. Saybrook Mfg. Co.*, 124 B.R. 141 (Bankr. M.D. Ga. 1991) ("the purpose of section 506(c) is to shift the cost of preserving or disposing of a secured creditor's collateral from the estate to the secured party.").

27.     The proposed waiver of section 506(c) rights is inappropriate in these cases because the waiver has been designed solely for the benefit of the Lenders, who are using the chapter 11 process to protect their prepetition position, liquidate their collateral and obtain broad releases.  If the Lenders wish to maintain their position and their collateral through the chapter 11 process, they should pay for the costs of preserving such collateral.  Accordingly, the Committee objects to the 506(c) waiver and submits that this provision must be stricken from the Final Order.

28.     The Debtors are also seeking a waiver of the "equities of the case" exception contained in Bankruptcy Code section 552(b), which would otherwise allow the Debtors, the Committee, or other parties-in-interest to assert that equitable considerations justify the exclusion of postpetition proceeds from prepetition collateral.  As a result, the Committee submits that any finding or order of this Court that prospectively waives the "equities of the case" exception set forth in section 552(b) is inappropriate and should be stricken.  *See In re Metaldyne Corp.*, No. 09-13412 MG, 2009 Bankr. LEXIS 1533, at *20 (Bankr. S.D.N.Y. June 23, 2009) (holding that in the context of a proposed section 552(b) waiver, "the waiver of an equitable rule is not a finding of fact . . . and the Court, in its discretion, declines to waive prospectively an argument that other

parties in interest may make.  If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lenders' (sic) rights, the Court will consider it.").

## D.  Miscellaneous Objectionable Provisions of the DIP Motion

29.     In addition to the objections and necessary modifications discussed above, there are several additional provisions of the DIP Motion to which the Committee objects:

30.     **Marshaling Waiver**.  The Cash Collateral Consent Order provides that "The claims of Lenders shall not be subject to the equitable doctrine of marshalling with respect to the Lenders' Collateral or any other collateral securing amounts owed to Lenders by the Operating Company Debtors or CFRA Holdings, LLC."  *See* Cash Collateral Consent Order at ¶21.  The Committee objects to this provision as inequitable, as it would permit these parties to "cherry pick" the collateral they would liquidate, without regard for the overall value that the estates may realize. A debtor generally has standing to assert the equitable remedy of marshalling as it has the status of a hypothetical lien creditor.  Should the debtor waive this right, a committee could seek to do so on a derivative basis.  *See Official Comm. Of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("[S]tanding in the shoes of the debtor in possession, the Committee can assert [a marshalling] claim.").

31.     **Commercial Tort Claims**.  The DIP Lenders should not receive liens of the Debtors' commercial tort claims.  Any such claims should be preserved for the benefit of unsecured creditors, who otherwise stand to realize nothing from the Debtors' estates.

## RESERVATION OF RIGHTS

32.     The Committee has not yet had an opportunity to obtain information concerning the scant line items covered in the DIP Budget.  Once this information and all related documents

and other diligence information is provided, the Committee may have additional objections to the DIP Loan.  The Committee has also not been provided with a form of a final DIP order.  The Committee therefore specifically reserves all its rights to raise any additional objections in connection with approval of any final DIP order.

WHEREFORE, the Committee respectfully requests that the Court (a) deny the DIP Motion, and (b) grant such other and further relief to the Committee as the Court may deem just and proper.

Dated:  June 5, 2020

*/s/ Mark A. Salzberg*
**SQUIRE PATTON BOGGS (US) LLP**
Mark A. Salzberg, Esq. (Florida Bar No. 965741)
2550 M Street, N.W.
Washington, DC 20037
(202) 457-600 (Phone)
(202) 457-6315 (Fax)
mark.salzberg@squirepb.com

— and —

Norman N. Kinel (admitted *pro hac vice*)
1211 Avenue of the Americas, 26th Floor
New York, New York 10036
(212) 872—9800 (Phone)
(212) 872—9815 (Fax)
norman.kinel@squirepb.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 5, 2020, a true and correct copy of the foregoing was served through the Court's Case Management/Electronic Case Filing ("CM/ECF") system, which sent automatic email notices of electronic filing to all parties indicated on the electronic filing receipt.

*/s/ Mark A. Salzberg*
Mark A. Salzberg
Florida Bar No. 965741