ORDERED.

**Dated: June 09, 2020**

Catherine Peek McEwen
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

In re:

CFRA HOLDINGS, LLC

Case No. 8:20-bk-03608-CPM
Chapter 11

*Jointly Administered with:*

CFRA, LLC
CFRA TRI-CITIES, LLC

Case No. 8:20-bk-03609-CPM
Case No. 8:20-bk-03610-CPM

    Debtors.

_____/

### SECOND INTERIM CONSENT ORDER (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (II) ACKNOWLEDGING EXTENT, VALIDITY AND PRIORITY OF LIEN; AND (III) SCHEDULING A FURTHER HEARING



**THIS MATTER** came on for hearing on 6-8-20 on the Motion (the "Cash Collateral

Motion")[1] [Docket No. 47] of CFRA, LLC and CFRA Tri-Cities, LLC (the "Operating Company

Debtors"); and (ii) the *Notice of Perfection of Security Interest in Property Pursuant to 11*

*U.S.C. § 546(b) and Objection to Use of Cash Collateral* (the "Objections") (ECF Nos. 15 and

15) filed in the cases of each of the Operating Company Debtors by Valley National Bank

("VNB" or "Agent"), successor in interest to USAMERIBANK, and Raymond James Bank,

N.A. ("RJB," and collectively with VNB, the "Lenders"); and the Court having considered the

---

[1]     The Debtors filed a combined Motion for (i) Authority to Obtain Post-petition Financing; and (ii) Authority to use Lenders' Cash Collateral.  This Interim Order address the request for Authority to use Lender's Cash Collateral.  The request for Authority to use incur Post-petition Financing is addressed in a separate Interim Order.  For purposes of this Interim Order the motion is defined as the Cash Collateral Motion.

pleadings submitted and the arguments of counsel in support and opposition, if any; and the Operating Company Debtors and Lenders having stipulated to the findings below and having agreed to the form and entry of this Order (the "Second Interim Cash Collateral Order"); and the Court having entered a first interim order with respect to the Cash Collateral Motion on May 27, 2020 (the "First Interim Cash Collateral Order") [Docket No. 72] and for good cause having been shown:

**THE COURT HEREBY FINDS:**

A.      On May 6, 2020, (the "Petition Date") each of the Operating Company Debtors filed a separate petition for relief under chapter 11 of the United States Bankruptcy Code. 11 U.S.C. 101, et seq. (the "Bankruptcy Code").   On May 6, 2020, CFRA Holdings, LLC, an affiliate of the Operating Company Debtors, also filed a separate petition for relief under chapter 11 of the Bankruptcy Code.

B.      The Operating Company Debtors have remained in possession of their assets and are currently authorized to continue in the operation and management of their business as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

C.      Lenders possess a validly perfected first lien on the following property of the Operating Company Debtors, as set forth in that certain Security Agreement dated September 9, 2016 conveyed by the Operating Company Debtors to Lenders, (the "Collateral"):

*all goods, fixtures, equipment, inventory, accounts, accounts receivable, contract rights, commissions, choses in action, money, general intangibles, documents, instruments and chattel paper of Borrowers, whether now owned or hereafter acquired, and all proceeds, products, replacements, additions, substitutions and accessions of and to all of the foregoing, which together collectively constitute and are hereinafter designated as the "Collateral," and which Collateral includes, without limitation, the following:*

*(a) all of Borrowers' inventory of whatever type or description wherever located and whether now owned or hereafter acquired; and*

*(b) all of Borrowers' accounts and accounts receivable and all other forms of customer obligations, now existing or hereafter acquired; and*

*(c) all of Borrowers' vehicles, equipment, machinery, furniture, fixtures or other items of personal property, whether now owned or hereafter acquired; and*

*(d) all of Borrowers' permits, licenses and other governmental approvals (but only to the extent permissible under applicable law without the consent of the grantor or issuer of such permits, licenses and other governmental approvals); and*

*(e) all of Borrowers' cash, certificates of deposit, securities, investment property, instruments and general intangibles; and*

*(f) all proceeds, products, replacements, additional, substitutions and accessions of and to all of the foregoing.*

*Notwithstanding the foregoing, specifically excluded from Collateral are all franchise agreements and development agreements by and between Borrowers, as franchisee, and IHOP Franchising, LLC, a Delaware limited liability company, and its successors and assigns, as franchisor ("IHOP"), and all equipment, machinery, furniture, fixtures and other personal property leased by Borrowers from IHOP or any affiliate of IHOP and such leases.*

D.      Lenders' assert that their lien and security interest in the Collateral secures the obligations of the Operating Company Debtors pursuant to that certain Loan Agreement dated September 9, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") among the Operating Company Debtors, CFRA Holdings, LLC, Agent and the Lenders.  Pursuant to the Loan Agreement and other documents, Lenders contend to have made available to the Operating Company Debtors and CFRA Holdings, LLC a revolving line of credit in the principal amount of up to Twenty-Six Million Dollars ($26,000,000) (the "Loan").  The Loan is reflected in: (i) that certain Revolving Line of Credit Promissory Note dated September 8, 2016 made by Operating Company Debtors and held by VNB in the principal amount of $11,000,000; (ii) that certain Revolving Line of Credit Promissory Note dated September 8, 2016 made by Operating Company Debtors and held by RJB in the principal amount of $15,000,000; (iii) a contemporaneous Guaranty of Payment and Performance (the "Guaranty") from CFRA Holdings, LLC and (iv) other loan agreements which,

together with Security Agreement, Loan Agreement and aforementioned Promissory Notes, are collectively referred to as the "Bank Credit Agreements".

E.      Lenders claim that the security interests granted to Lenders pursuant to the Security Agreement and other Bank Credit Agreements were perfected by Lenders by, among other things, the filing of a UCC-1 Financing Statement filed on September 12, 2016 with the Delaware Secretary of State under Filing Number 20165542756.

F.      As of the Petition Date, Lenders assert that the Operating Company Debtors and CFRA Holdings, LLC (collectively, the "Debtors") were jointly and severally indebted: (i) to VNB in at least the amount of at least $8,269,315.85, exclusive of legal fees and costs due under the Bank Credit Agreements; and (ii) to RJB in at least the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements. Lenders allege that the foregoing claims are secured by a primary and perfected first lien on the Collateral. The Debtors stipulate and consent to the amount, extent, validity and priority of the Lenders' claims and security interests as set forth herein.

G.      The Debtors contend that they require immediate authority to use cash collateral of Lenders in order to pursue a sale of all or substantially all of the property of the estates and the Debtors do not have sufficient unencumbered cash or other assets to fund the necessary activities to be performed during the marketing period. As noted, *supra,* the Cash Collateral Motion also incorporates the Debtors' request for authority to use cash collateral of Lenders in these Cases (the "DIP Financing Motion") and the Debtors have also filed a separate motion to approve bidding procedures and the sale of property of the estate (the "Sale Motion"), including property and property interests utilized in connection with operation of the Debtors' forty-nine (49) restaurants (the "Restaurants") as specifically identified in the Sale Motion. The Debtors

4

contend that the Sale Motion, DIP Financing Motion and Cash Collateral Motion are inextricably intertwined.

H.    The Operating Company Debtors use of the Lenders' cash collateral, to the extent and on the terms and conditions set forth herein, is necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Good cause has been shown for the entry of this Second Interim Cash Collateral Order and its terms are fair and reasonable under the circumstances.

It is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1.    All objections to entry of this Second Interim Cash Collateral Order, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled. All objections to the approval of further use of cash collateral are reserved.  The objection to the Cash Collateral Motion [Docket No. 62] and further objection and reservation of rights [Docket No. 78] filed by IHOP Restaurants LLC, IHOP Franchisor LLC, and IHOP Leasing LLC (collectively, the "IHOP Entities") have been withdrawn pursuant to the settlement among the Debtors, Lenders and the IHOP Entities as documented in connection with the order approving bidding procedures in connection with the Sale Motion, the terms and conditions of which are incorporated herein by reference.  The objection to the Cash Collateral Motion filed by the Official Committee of Unsecured Creditors (the "Committee") [Docket No. 120] is overruled. For avoidance of doubt, entry of this Second Interim Cash Collateral Order is without prejudice to any and all rights of Smartvision Construction, LLC to assert, supplement and/or amend the objections raised in its Objection to the Cash Collateral Motion [Docket No. 91] in connection with any final hearing on the Cash Collateral Motion, as well as with respect to any proposed sale of any and/or all of the assets of the Debtors, and/or with respect to any plan(s) of reorganization in these Cases.

2.    All rents, income, issue, profits and proceeds arising from any of the Collateral, and all cash, negotiable instruments, proceeds, product or profits arising there from and any and all substitutions, replacements, additions and accessions thereto, constitute the "cash collateral" of Lenders in accordance with and as defined pursuant to 11 U.S.C. §§ 363(a) and 552(b).

3.    The Operating Company Debtors are authorized to use Lenders' cash collateral only in accordance with the terms set forth in this Second Interim Cash Collateral Order for the payment of expenses, as set forth at **Exhibit "A"** hereto, which are necessary for the conduct of the Operating Company Debtors' business and for protection of Lenders' Collateral. Such use of cash collateral is with the consent of Lenders and is only for the period from **June 1, 2020** through **June 12, 2020** (the "Second Interim Cash Collateral Period"), unless such period expires or is terminated earlier by the terms of this Second Interim Cash Collateral Order or further order of this Court.[2] This Court shall hold a hearing to consider further use of cash collateral on **June 19, 2020 at 2:00 p.m. (ET)** (the "Further Cash Collateral Hearing Date"). Objections to such further use of cash collateral, if any, shall be filed and served no later than three (3) days prior to the Further Cash Collateral Hearing Date.

4.    The Operating Company Debtors may use (and were permitted to use) the cash collateral of Lenders for the expenses and in the respective amounts listed in the budget annexed hereto and made part hereof as Exhibit "A" (the "Second Interim Approved Budgeted Expenses"), but only to the extent such expenses are actually incurred.

5.    Any cash collateral received or collected by the Operating Company Debtors on account of Lenders' Collateral shall be deposited in the appropriate Operating Company Debtors' debtor-in-possession operating account, and Lenders shall retain a security interest in

---

[2] For avoidance of doubt, nothing herein shall be construed as limiting the Debtors' authority to use the Lenders' cash collateral to the extent previously approved pursuant to the First Interim Cash Collateral Order.

the same to the same extent and with the same priority as it would have had had the cash collateral been acquired prior to the commencement of this case. The Operating Company Debtors shall deposit all cash collateral received on account of Lenders' Collateral into the appropriate Operating Company Debtors' debtor-in possession operating account within one (1) business day of receipt thereof in the form received and endorsed by the Operating Company Debtors.

6.      Prior to being required to consent to any extraordinary expenses, which are not set forth in the second interim budget attached at Exhibit "A" hereto (the "Second Interim Approved Budget"), the Operating Company Debtors shall provide Lenders with all documents relating to such extraordinary expenses, including but not limited to, estimates, invoices (if and when available), leases (in final form), work orders and other relevant documents. Upon receiving such documentation, Lenders will notify the Operating Company Debtors within five (5) business days as to whether Lenders consent or object to the proposed extraordinary expenses. If Lenders objects or do not indicate their approval to all or any part of such extraordinary expenses on five (5) days' notice to Lenders and other parties in interest, the Operating Company Debtors shall request a hearing with the Bankruptcy Court for approval of use of cash collateral for such extraordinary expenses.

7.      On the Tuesday of each week, the Operating Company Debtors shall provide Lenders with an accounting of all income received or collected and/or paid during the preceding week by the Operating Company Debtors. Together with such accounting, the Operating Company Debtors shall provide written notice to Lenders of all Second Interim Approved Budgeted Expenses (and any other expenditures) of the Operating Company Debtors during the preceding week.

8.      The Operating Company Debtors shall provide and maintain hazard, loss and fire insurance on all of the Lenders' Collateral in an amount equal to the insurable value of such assets, with Lenders designated as additional insureds and as loss payees, on such asset to the extent of their interest therein.

9.      Nothing contained herein shall obligate Lenders to make any loans or advances to the Operating Company Debtors.

10.     As partial adequate protection for the Operating Company Debtors' use of Lenders' cash collateral, Lenders are hereby granted, pursuant to 11 U.S.C. §§ 361(2) and 363 of the Bankruptcy Code, to the extent of diminution in the value of the Lenders' prepetition cash collateral and subject to the Carve-Out (defined below), valid and existing first and senior replacement liens and security interests in all post-petition leases, rents, issues, profits and proceeds, arising from the Collateral and in all the cash collateral arising from the Collateral on and after the Petition Date.  For the avoidance of doubt and notwithstanding anything to the contrary contained herein, unless otherwise expressly permitted by the terms of the applicable lease, any liens granted under this Second Interim Cash Collateral Order shall not include the Debtors' real property leases (including, for the avoidance of doubt, any ground leases), but shall include the proceeds from the disposition of all such leases.

11.     The Debtors stipulate and consent to the amount, extent, validity and priority of the claims and security interests of Lenders as set forth in this Paragraph and, subject to the provisions of paragraph 14 of this Second Interim Cash Collateral Order, this Court hereby: (i) allows VNB claims against the Debtors and their bankruptcy estates in the amount of at least $8,269,315.85 as of the Petition Date, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (ii) allows RJB claims against the Debtors and their

8

bankruptcy estates in the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; and (iii) determines that such claims against the Operating Company Debtors and their respective bankruptcy estates are secured by a primary and perfected security interest in the Collateral in favor of Lenders.

12.    Lenders shall have the right upon forty-eight (48) hours telephone notice to the Operating Company Debtors through their attorneys, to have Lenders' agents inspect, audit, examine, inventory and appraise the Collateral, and to audit, copy or extract records of the Operating Company Debtors, and the Operating Company Debtors shall make all of their records available to Lenders for such purposes.

13.    This Second Interim Cash Collateral Order shall be sufficient evidence of Lenders' perfected liens and security interests in and to the Collateral, in any other collateral described in the Bank Credit Agreements, and in and to the collateral granted by way of adequate protection pursuant to this Second Interim Cash Collateral Order, without the necessity of Lenders taking possession, filing financing statements, mortgages or other documents. The Operating Company Debtors are authorized to execute and deliver all instruments as may be necessary or appropriate to implement the terms and condition of this Second Interim Cash Collateral Order.

14.    The Official Committee of Unsecured Creditors (the "Committee") shall have thirty (30) days from the date of its formation/appointment to contest any provision of this Second Interim Cash Collateral Order by filing and serving an objection on counsel for the Debtors and Lenders, as well as all interested parties under Bankruptcy Rule 2002, within such thirty (30) day period. In the absence of such timely objection, all creditors and all successors to the Debtors shall be bound by the provisions of this Second Interim Cash Collateral Order as it

relates to all of them. The right of the Committee to object under this Order shall terminate thirty-one (31) days from formation/appointment. Any creditor, on its own accord, shall file and serve any objection to any provision of this Second Interim Cash Collateral Order no later than seven (7) days prior to the hearing date set by the Court to consider use of cash collateral on a final basis, and in the absence of such action all creditors shall be bound by the terms of this Second Interim Cash Collateral Order. After the applicable objection period set forth herein, all creditors, any committee formed or trustee appointed, successors in interest to the Debtors, and all other interested parties shall be bound by the provisions of this Second Interim Cash Collateral Order.

15.    The Operating Company Debtors' authorization to use cash collateral and Lenders' consent thereto, shall immediately terminate without further Order on the earlier of (i) the entry of an Order granting Lenders, or any party other than Lenders, relief from the automatic stay with respect to any property of the Operating Company Debtors in which Lenders claims a lien or security interest, whether pursuant to this Second Interim Cash Collateral Order or otherwise; (ii) the entry of an Order dismissing the Chapter 11 proceedings of  any of the Debtors or converting their proceeding to cases under Chapter 7 of the Bankruptcy Code; (iii) the entry of an Order authorizing the appointment of a trustee in the bankruptcy proceedings of any of the Debtors; (iv) the entry of an Order confirming a Plan of Reorganization or liquidation for either of the Operating Company Debtors; (v) the entry of an Order by which this Second Interim Cash Collateral Order is reversed, revoked, stayed, rescinded, modified or amended without the consent of Lenders thereto.

16.    Nothing contained in this Second Interim Cash Collateral Order shall be deemed or construed to (i) limit or waive or release any and all of Lenders' objections to the Operating Company Debtors' use of cash collateral in any manner of or for any period beyond that which is

expressly authorized by the terms of this Second Interim Cash Collateral Order; (ii) limit Lenders to the relief granted herby; (iii) limit or bar Lenders from seeking other and further relief (including, without limitation, relief from the terms of this Second Interim Cash Collateral Order) for cause on appropriate notice to the Operating Company Debtors and other parties-in-interest entitled to notice of same; (iv) limit or bar Lenders from seeking allowance of pre-petition claims against any of the Debtors or their estates in amounts greater than allowed herein; (v) limit or bar Lenders from seeking allowance and/or payment of an administrative expense claim (or any other claim arising after the Petition Date) against any of the Debtors or their estates; or (vi) limit or waive any of Lenders' rights and remedies with respect to its interests in the Lenders' Collateral or proceeds there from, or any of Lenders' other collateral for the subject indebtedness, all of said rights and objections Lenders hereby expressly reserve.

17.     Lenders shall have the right to terminate their consent for the use of cash collateral for "cause" as defined by a finding of the Court, after five (5) business days' written notice to the Operating Company Debtors, that at any time the Operating Company Debtors have violated the material duties imposed on it hereunder. Lenders reserve their rights to move at any time for relief from the automatic stay, conversion or for the appointment of a trustee on any and all appropriate grounds.  Notwithstanding anything to the contrary contained herein, upon the occurrence and continuance of an event of default, the Lenders may enter upon leased premises only as provided by (i) any separate agreement by and between the applicable landlord and the Lenders (the terms of which shall be reasonably acceptable to the parties thereto), (ii) applicable non-bankruptcy law, or (iii) an order from the Bankruptcy Court on no less than five (5) days' notice to the applicable landlord.

18.     Nothing in this Second Interim Cash Collateral Order shall constitute a waiver of any event of default which has occurred under the Bank Credit Agreements to date or which may occur in the future.

19.     If the adequate protection provided for hereby proves insufficient to protect Lenders' interest in and to the cash collateral, Lenders shall be entitled to the protections of Sections 361 and 507 of the Bankruptcy Code.  Lenders shall be entitled to an administrative expense claim pursuant to Sections 507(a)(2) and (b) and 503(b) of the Bankruptcy Code for the amount of diminution, if any, in the value of the Lenders' Collateral subsequent to the Petition Date, without waiver of any other rights or claims Lenders may possess.  Any such administrative expense claim to which Lenders are entitled pursuant to this Paragraph shall have a super priority administrative expense claim, pursuant to Section 507(b) of the Bankruptcy Code, senior to any and all claims against the Operating Company Debtors under Section 507(a) of the Bankruptcy Code, whether in this proceeding or in any superseding proceeding except that same shall be subordinated only to any outstanding fees allowed and payable to the United States Trustee and/or the Clerk of this Court.

20.     Lenders are granted, to the extent of any diminution in the value of the Lenders' prepetition cash collateral and subject to the Carve-Out (as defined below), a replacement lien on and in all property acquired or generated post-petition by the Operating Company Debtors to the same extent and priority and of the same kind and nature as Lenders would have had prior to the filing of these bankruptcy cases; but excluding all proceeds of property recovered or transfers avoided by or on behalf of the Operating Company Debtors, their estates or any subsequently appointed trustee under Sections 544 through 550, inclusive, of the Bankruptcy Code (the "Post-Petition Collateral").  This replacement lien and security interest in the Post-Petition Collateral granted to Lenders (the "Replacement Lien") is deemed to be valid and perfected without the

need of Lenders to take possession, file financing statements, file or record any further documents or instruments, or as otherwise required to be executed or filed under non-bankruptcy law. The Operating Company Debtors are, however, authorized to execute and deliver all instruments to Lenders as may be necessary or appropriate to implement the terms of this Paragraph.

21.    <u>Payments of Debtors' Professionals -- Carve Out</u>.

a.    The Debtors are authorized to use cash collateral pursuant to this Second Interim Cash Collateral Order, and any interim order approving the DIP Financing Motion, to pay allowed fees and expenses of: (i) Debtors' counsel, Saul Ewing Arnstein & Lehr LLP ("<u>Debtors' Counsel</u>"); (ii) any chief restructuring officer, and his/her firm, that may be retained in the Cases (collectively the "<u>CRO,</u>"); and (iii) proposed counsel for the Committee, Squire Patton Boggs (US) LLP ("<u>Committee's Counsel</u>" and, collectively with the Debtors' Counsel and the CRO, the "<u>Retained Professionals</u>") in the amounts set forth on the Second Interim Approved Budget (collectively, the "<u>Second Interim Professional Fee Payments</u>").

b.    The Second Interim Professional Fee Payments have and/or shall be funded from Lenders' Cash Collateral and/or the proceeds of the DIP Loan (as defined in the DIP Financing Motion) as, when, and to the extent set forth in the Interim Approved Budgets and subject to the terms and conditions of this Second Interim Cash Collateral Order. The Debtors shall wire transfer funds to the Saul Ewing Arnstein & Lehr LLP Client Trust Account (to the extent of such funds actually deposited, the "<u>Carve-Out Reserve Account</u>") in the amounts equal to, but not to exceed, the amounts budgeted for the Retained Professionals set forth in the Second Interim Approved Budget for each such week. Debtor's Counsel shall release to itself, the CRO or Committee's Counsel, as the case may be, such amounts as are payable pursuant to an applicable Order of this Court, including, without limitation, an order approving the CRO

Retention Motion (defined below), any order approving interim compensation procedures in the Cases and any order granting interim or final fee applications in the Cases.  In making payments from the Carve-Out Reserve Account, Debtor's Counsel shall be entitled to rely on written certifications from the CRO as to the amount the CRO is due and owing from the Carve-Out Reserve Account and in no circumstance shall Debtor's Counsel be obligated to pay any party other than from the funds held, from time to time, in the Carve-Out Reserve Account.

   c. The entitlement of Debtors' Counsel and Committee's Counsel to retain their portion of the Second Interim Professional Fee Payments is contingent upon (i) entry of Orders, respectively, by this Court approving the retention of Debtors' Counsel and Committee's Counsel pursuant to 11 U.S.C. §§ 105, 327, 328, 1103, or 363, Bankruptcy Rule 2016(b), and Local Rule 2016-1; and (ii) entry of an Order by this Court allowing and approving compensation and/or reimbursement to said professional pursuant to 11 U.S.C. §§ 330 and 331, and shall be further limited to the amount(s) allowed and approved pursuant to such Order(s) (an "Allowed Fee Order").

   d. The entitlement of the CRO and his/her firm to retain their portion of the Initial Professional Fee Payments is contingent upon compliance with the terms and conditions of the Order approving the CRO's retention in these Cases [Docket No. 71].

   e. Pursuant to 11 U.S.C. § 364(c)(1), the Second Interim Professional Fee Payments are and shall be included in the allowed DIP Superpriority Claims awarded to Lenders under any order approving the DIP Financing Motion; provided that each of the liens and claims, including the DIP Superpriority Claims granted to the Lenders in connection with the DIP Loan, shall be subject only to a "Carve-Out"[3] from the Lenders' collateral for: (i) all fees required to

---

[3] The "Carve Out" shall mean (a) the unpaid fees and expenses incurred by Retained Professionals that were incurred (i) on and after the Petition Date and before the Termination Date (as defined in the DIP Financing Motion) (both only if the Lenders terminate the Debtors' use of proceeds of the DIP Loan and Lenders'

be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee

pursuant to section 1930(a)(6) of title 28 of the United States Code and (ii) any unpaid portion

of the Professional Fee Payments, awarded by entry of an Allowed Fee Order or in accordance

with the terms and conditions set forth in the Order approving the CRO's retention, which fees

and charges have not been otherwise paid with unencumbered estate funds. Any Carve Out

obligations shall be paid from any unencumbered funds of the Debtors' estates <u>before</u> being paid

from any collateral of Lenders.  No part of the Carve Out shall be available to pay professional

fees incurred by any other party in the Cases.  A Termination Event shall not impact the Debtors'

obligations with respect to the Carve-Out and the Post-Termination Carve-Out (defined below),

subject to the condition for payment thereof as set forth herein.  For purposes herein, "<u>Post-

Termination Carve-Out</u>" shall mean reasonably necessary fees and expenses incurred by

Debtors' Counsel and the CRO following the Termination Date in order to conclude the Cases,

including with respect to seeking dismissal and/or conversion of the Cases, up to a cap of

$35,000.  With the exception of the $35,000 limit on the Post-Termination Carve-Out, the Post-

Termination Carve-Out shall be subject to the same terms and conditions as the Carve-Out.

   f.  Nothing herein shall constitute a cap on the amount of professional fees

and expenses that may be incurred or allowed in the Cases; <u>provided</u> that no payments of such

fees and expenses shall be made from Lenders' Cash Collateral, Lenders Collateral and/or the

---

cash collateral as a result of the occurrence of a Termination Event (as defined in the DIP Financing Motion) and the Agent delivers notice to counsel for the Debtors that the Agent has exercised its right to terminate the Debtors' use of cash collateral as a result of the occurrence of a Termination Event) but not in excess of the total aggregate amount set forth in the Interim Approved Budgets, and (ii) provided that, in each case, such fees and expenses are ultimately allowed on a final basis by this Court and are not excluded from the Carve Out under the later provisions hereof; and (b) any unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.  All prepetition retainers and any other unencumbered property of the estate shall be used to pay any allowed fees and expenses of the Retained Professionals before any payment of such fees or expenses are made from the Carve Out.

DIP Loan proceeds except as, when, and to the extent set forth in the Interim Approved Budgets, and subject to the terms and conditions of this Second Interim Cash Collateral Order.  Moreover, nothing herein shall be construed as consent to the allowance of any fees or expenses of the Retained Professionals or shall affect the rights of Lenders to object to such amount.

g.      In exchange for the consideration afforded by Lenders under this Second Interim Cash Collateral Order, none of the Lenders' respective interests in property of the Debtors' estates shall be, with respect to any fees, expenses or charges incurred by the Retained Professionals or any other professional retained by any of the Debtors, subject to the surcharge provisions of section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including unjust enrichment).

h.      No portion of the Lenders' Cash Collateral, Lenders' Collateral, the DIP Loan proceeds or Carve Out may be used to pay any fees or expenses incurred by any entity in connection with any claim, actions or services adverse to Lenders, Agent or their affiliates (direct or indirect), or any of their respective directors, officers, members (direct or indirect), partner, equity owner, agent, servant, employees, counsel, consultants or other representative (collectively, the "Lender Parties"), including (i) preventing, hindering or delaying Agent's or Lenders' enforcement or realization upon any collateral upon the occurrence of the Termination Date, (ii) using or seeking to use Cash Collateral or selling other Collateral without Lenders' consent, (iii) incurring indebtedness with a priority equal or senior to Lenders' interest in property of the estate, (iv) objecting to or contesting in any manner, or raising any defense to, the validity, extent, amount, perfection, priority or enforceability of Lenders' claims or security interests, or (v) commencing and continuing any adversary proceeding against any of the Lender Parties, provided, however, that up to $7,500 of the Carve-Out may be used by the professionals

retained by the Committee to investigate the validity, extent, amount, perfection, priority and/or enforceability of Lenders' claims and security interests.

21.     The claims of Lenders shall not be subject to the equitable doctrine of marshaling with respect to the Lenders' Collateral or any other collateral securing amounts owed to Lenders by the Operating Company Debtors or CFRA Holdings, LLC.

22.     Notwithstanding any subsequent modification of this Second Interim Cash Collateral Order by this Court, the protections accorded to Lenders pursuant to this Second Interim Cash Collateral Order shall apply with regard to all cash collateral utilized prior to any further order by this Court.

23.     The Debtors shall timely perform all obligations of debtors-in-possession required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and the orders of this Court.

24.     This Second Interim Cash Collateral Order is without prejudice to: (a) any subsequent request by a party in interest for modified adequate protection or restrictions on use of cash collateral; (b) any other right or remedy which may be available to the Lenders.

25.     The Court shall retain jurisdiction to enforce the terms of this Second Interim Cash Collateral Order.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

AGREED AS TO FORM, ENTRY AND CONTENT

**SAUL EWING ARNSTEIN & LEHR LLP**      **K&L GATES LLP**

By: */s/  Aaron S. Applebaum_____*          By: */s/ Daniel M. Eliades_____*
    Carmen Contreras-Martinez                  Daniel M. Eliades, Esq.
    Florida Bar No. 093475                     David S. Catuogno, Esq.
    701 Brickell Avenue, 17th Floor            One Newark Center, 10th Floor
    Miami, FL 33131                            Newark, New Jersey 07102
    Telephone: (305) 428-4500                  Tel: (973) 848-4000
    Facsimile: (305) 374-4744                  Facsimile: (973) 848-4001
    Carmen.Contreras-Martinez@saul.com         Email: daniel.eliades@klgates.com
                                               Email: david.catuogno@klgates.com
    -and-
                                               *Counsel to Valley National Bank and*
    Stephen B. Ravin                           *Raymond James Bank, N.A,*
    Florida Bar No. 293768 (*inactive status*)
    Aaron S. Applebaum
    1037 Raymond Boulevard
    Suite 1520
    Newark, NJ 07102
    Telephone: (973) 286-6700
    Facsimile:  (973) 286-6800
    Stephen.Ravin@saul.com
    Aaron.Applebaum@saul.com

 *Counsel for Debtors and   Debtors-in-Possession*


# # #


(*Carmen Contreras-Martinez, Esq. is directed to serve a copy of this Order on interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of this Order.*)

**<u>EXHIBIT A</u>**
**<u>BUDGET</u>**

**CFRA, LLC; CFRA Holdings, LLC; CFRA Tri-Cities, LLC**
**1-Week Budget & Cash Flow**

| ($ thousands)<br>Week Ending Date | | 1<br>Projected<br>6/6/2020 | | Week<br>1<br>Total |
|---|---|---|---|---|
| **Cash Receipts** | | | | |
| DIP Draws | $ | 117 | $ | 117 |
| A/R Collections (Gross) | | - | | - |
| Less Discount | | - | | - |
| A/R Collections (Net) | $ | - | $ | - |
| Equipment Sales | | - | | - |
| Franchise Sales | | - | | - |
| Total Cash Receipts | $ | 117 | $ | 117 |
| | | | | |
| Cash Disbursements | | | | |
| Rents (1) | $ | - | $ | - |
| Utilities (2)(3) | | 25 | | 25 |
| Insurance | | 32 | | 32 |
| Debtors Counsel | | 25 | | 25 |
| Debtors CRO | | 25 | | 25 |
| Appraisal | | - | | - |
| Miscellaneous | | 5 | | 5 |
| US Trustee Fees | | - | | - |
| Contingency | | 5 | | 5 |
| Creditors Committee Counsel | | - | | - |
| Secured Lender Fees and Interest | | - | | - |
| Total Cash Disbursements | $ | 117 | $ | 117 |
| | | | | |
| **Net Weekly Cash Flow** | $ | - | $ | - |
| | | | | |
| Beginning Cash Balance | | - | | - |
| | | | | |
| **Ending Cash Balance** | $ | - | $ | - |

**Notes:**

1. Monthly rent of $715,000, though IHOP subleases require weekly payments. Assumes June rent is paid out of sales proceeds.
2. Site utilities and security are maintained. Assumes $25,000 for security with utilities later in the month.
3. No site landscaping or other maintenance included.