UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

CFRA HOLDINGS, LLC, CFRA, LLC and          Case No. 8:20-bk-03608-CPM
CFRA TRI-CITIES, LLC                        Jointly Administered with
                                           Case No. 8:30-bk-03609-CPM and
        Debtors.                           Case No. 8:20-bk-03610-CPM

_____/                 Chapter 11 Cases

### MOTION FOR RELIEF FROM STAY BY CASUAL DINING SMYRNA, LLC OR IN THE ALTERNATIVE REQUEST FOR ADEQUATE PROTECTION

CASUAL DINING SMYRNA, LLC ("Movant"), by and through its undersigned counsel, hereby files this Motion for Relief from Stay, Or In the Alternative Request for Adequate Protection and requests approval to enforce all of its in rem rights with regard to a certain commercial non-residential lease, pursuant to 11 U.S.C. §362(d)(1) and (d)(2). In support of this Motion, Movant states the following:

1.      Debtor filed a petition pursuant to Chapter 11 of the Bankruptcy Code on May 6, 2020 ("Petition Date").

2.      This Court has jurisdiction of the parties and the subject matter pursuant to the Bankruptcy Code, 11 U.S.C. §101 et seq., 28 U.S.C. §1334, 28 U.S.C. §157(a) and the standing order of reference entered by the District Court.

### Casual Dining Smyrna, LLC Property

3.      Movant owns commercial non-residential real property located in Rutherford County, Tennessee, commonly known as 779 Team Boulevard, La Vergne, Tennessee 37167 (the "Property"). Debtor, CFRA, LLC, leases a commercial space in which it operated an IHOP

franchise, Store #3218.  The Debtor ceased operations at the Property prior to the Petition Date.

The legal description of the property is attached hereto as **Exhibit "A"** and incorporated herein.

4.      Restaurant Real Estate Holdings, LLC, as Landlord, and Debtor, as tenant, entered into a Lease Agreement on or about November 26, 2008 for the lease of the Property. A copy of the Lease Agreement is attached hereto as Exhibit "B" and made part hereof.

5.      The Lease Agreement was assigned by Restaurant Real Estate Holdings, LLC to Movant on or about April 30, 2009.  A copy of the Assignment and Assumption of Lease is attached hereto as Exhibit "C" and made part hereof.

6.      On April 30, 2009, Movant and Debtor entered into a Memorandum of Lease which is attached hereto as Exhibit "D" and made part hereof.

7.      The Lease Agreement, the Assignment and Assumption of Lease and the Memorandum of Lease shall collectively hereinafter be referenced as the "Lease".

8.      The term of the Lease terminates November 25, 2025.  Under the terms of the Lease, rent payable by Debtor is as follows:

|  | Term | Annually | Monthly |
|---|---|---|---|
|  | Years 1 - 5 | $250,000.00 | $20,833.33 |
|  | Years 6 - 10 | $268,750.00 | $22,395.83 |
| **Current Term** | **Years 11 - 15** | **$288,906.25** | **$24,075.52** |
|  | Years 16 − 20 | $310,574.22 | $25,881.18 |

9.      Debtor has defaulted under the Lease for, *inter alia,* failing to pay the monthly payment due on April 1, 2020 and continuing through the present.

10.      Pursuant to the bankruptcy code, from the petition date until the date the debtor assumes or rejects the lease, the debtor must pay rent and common area charges and perform other tenant obligations under the lease (11 U.S.C. § 365(d)(3) of the Bankruptcy Code.  Unpaid obligations incurred prepetition entitle Movant to a general unsecured claim unless the lease is

assumed requiring the defaults to be cured and payments to be made in full unless otherwise agreed to by the parties.

11.    Unpaid rent and other Lease charges incurred post-petition will entitle Movant to an administrative expense claim.

12.    As of the date of filing the Chapter 11 case, Debtor is indebted to Movant in the amount of $72,225.00 for past due rent, plus late fees, attorneys' fees and costs, and all unpaid operating expenses associated with the Property.

**Request for Relief**

13.    Absent timely payment of all Lease related obligations, Movant requests an order lifting the stay because the terms of the Lease require timely monthly lease payments. The stay should be lifted so that Movant can enforce its state court rights and remedies and re-let the premises to a new tenant.

14.    Movant also seeks stay relief in order to proceed with its rights to provide notice to IHOP Franchising, LLC pursuant to paragraph A of the Addendum to Lease, which is attached to the Lease Agreement, or Exhibit "B", at page 36. Specifically, paragraph A provides:

> "In the event Lessor shall declare a default under the Lease due to Lessee's failure to perform any obligation of Lessee under the terms of the Lease, and in the event Lessee shall fail to cure such default within the period provided in the Lease or at law for such cure, before Lessor shall take any action to terminate the Lease or Lessee's right to possession of the Demised Premises, Lessor shall give written notice to IHOP at 450 North Brand Boulevard, 7th Floor, Glendale, California 91203, of its intention to so terminate the Lease or Lessee's right to possession of the Demised Premises, whereupon IHOP shall have a period of ten (10) days after its receipt of said notice to notify Lessor in writing that IHOP has elected to cure such default and to succeed to Lessee's rights under the Lease. IHOP's right to so succeed to Lessee's interest under the Lease shall be conditioned upon IHOP tendering to Lessor an amount sufficient to cure any monetary defaults of Lessee then existing under the Lease, within ten (10) days after the date of

IHOP's giving of such notice, and curing any nonmonetary defaults within a reasonable period of time after IHOP shall obtain possession of the Demised Premises."

15.     In the alternative, Movant seeks adequate protection of its interest.

16.     Movant has employed the law firm Johnson Pope Bokor Ruppel & Burns, LLP to represent it in this action and has obligated itself to pay a reasonable fee for their services herein.

WHEREFORE, Movant respectfully requests that if adequate protection in the form of post-petition Lease and CAM payments are not timely paid, Movant seeks entry of an Order granting it relief from the automatic stay to allow Movant to evict the Debtor/Tenant, and to proceed in State Court in rem and obtain any other relief as the Court deems proper, including adequate protection.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing **Motion for Relief from Stay** has been furnished electronically by the Court's CM/ECF system to all parties who receive electronic notices via CM/ECF in this case and via U.S. Mail to Debtor, **CFRA, LLC,** 900 Branchview Drive, Suite 215, Concord, NC  28025 on June 10, 2020.

JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP

/s/ Alberto F. Gomez, Jr.
Alberto F. Gomez, Jr. (FBN:  784486)
401 E. Jackson Street, Suite 3100
Tampa, FL  33602
Telephone:     813-225-2500
Facsimile:      813-223-7118
Email: Al@jpfirm.com
Attorney for Movant

Record Book
916 Pg 1247

## EXHIBIT A TO MEMORANDUM OF LEASE
### Legal Description of the Premises

Land in Rutherford County, State of Tennessee, and being Lot 13 on the Final Plat of Lot 13 and the 2nd Resubdivision of Lot 4 of Team Chevrolet Subdivision, as shown by plat of record in Plat Book 32, Page 42, in the Register's Office of Rutherford County, Tennessee, to which reference is hereby made for a more complete description.

Being the same property conveyed to RREH SPE, LLC by Deed from Smyrna Theatres, LLC (also known as Smyrna Theaters, LLC), a Tennessee limited liability company, of record in Book RB797, page 3895, dated November 7, 2007, Register's Office for Rutherford County, Tennessee.

40626265v1

Being the same property conveyed to Restaurant Real Estate Holdings, LLC, a Delaware limited liability company, by deed from RREH SPE, LLC, a Delaware limited liability company, of record in Record Book 853, page 2133, Register's Office for Rutherford County, Tennessee, dated June 25, 2008.

Jennifer M Gerhart, Register
Rutherford County Tennessee
Rec #: 590041
Rec'd:      25.00     Instrument #: 1618728
State:      0.00
Clerk:      0.00          Recorded
EDP:        2.00      5/1/2009 at 3:00 PM
Total:     27.00          in
                     Record Book 916 Pgs 1243-1247

IHOP Store no. 3218, Rutherford County, Tennessee

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into as of November 26, 2008, by and between:

> (i) **RESTAURANT REAL ESTATE HOLDINGS, LLC**, a Delaware limited liability company, with principal office and place of business at Two Concourse Parkway, Suite 155, Atlanta, Georgia 30328-6192 ("Landlord"), and

> (ii) **CFRA, INC.**, a Delaware corporation, with a mailing address of Two Concourse Parkway, Suite 155, Atlanta, Georgia 30328-6192 ("Tenant").

## W I T N E S S E T H:

Landlord leases to Tenant, for the purpose of operating an IHOP Restaurant (and otherwise as may be permitted in this Lease) and subject to the terms and conditions of the Rent Addendum attached hereto, and Tenant rents from Landlord, the following described premises (hereinafter "Premises") located at 779 Team Boulevard, City of La Vergne, Rutherford County, Tennessee, and being more particularly described in Exhibit "A" attached hereto and made a part hereof, together with all rights and privileges appurtenant thereto as may be necessary or convenient to Tenant's business, inclusive of all easements benefiting the Premises, restrictions and reservations. Premises shall include all improvements and structures whether now existing or hereafter constructed thereon (hereinafter "Improvements") and the land on which the Improvements are located (hereinafter "Land").

The following additional stipulations are hereby declared to be covenants of this Lease and shall, unless otherwise expressly stated, be applicable at all times throughout the term of this Lease and any extension or renewal thereof:

## 1.  **DEFINITIONS**

For purposes of this Lease, the following terms shall have the definitions ascribed to them:

"Effective Date" shall mean the date set forth at the beginning of this Lease.

"Franchise Agreement" shall mean that certain franchise agreement between Franchisor and Tenant related to the Premises, and any amendments, renewals or replacements thereof.

"Franchisor" shall mean **IHOP FRANCHISING, LLC**, a Delaware limited liability company, its successors and assigns.

"Guarantor" shall mean **CFRA, INC.**, a Delaware corporation, its successors and assigns.

"Landlord" shall mean **RESTAURANT REAL ESTATE HOLDINGS, LLC**, a Delaware limited liability company, its successors and assigns.

"Lease" shall include this Lease Agreement and all amendments hereto, if any, entered into from time to time hereafter, together with the Rent Addendum and exhibits attached hereto.

"Lease Year" shall mean a fiscal period beginning on the Effective Date (and each anniversary thereof) and expiring on the last day of the twelfth (12th) month thereafter. In the event the Effective Date is not the first (1st) day of a calendar month, then the Lease Year shall commence on the first (1st) day of the calendar month following the Effective Date.

"Rent" shall mean the rent payable under this Lease as set forth in the Rent Addendum attached hereto and incorporated herein, and shall include Annual Rent (as defined in the Rent Addendum) and all other items described in this Lease as "additional rent".

"Tenant" shall include the named Tenant and any assignee or sublessee thereof pursuant to an assignment or sublease under Paragraph 17 of this Lease.

"Tenant's Leasehold Mortgagee" shall mean any leasehold mortgagee now or hereafter holding a leasehold mortgage secured by Tenant's interest in this Lease.

## 2.    **TERM AND RENT**

(a)    <u>Term</u>.  The term of this Lease shall begin on the Effective Date and shall expire on the date that is the twenty (20) years after the Effective Date (as identified in the Rent Addendum) (hereinafter the "Termination Date"), unless previously terminated or renewed or extended as provided herein.

(b)    <u>Rent</u>.  Rent shall be due and payable as provided in the Rent Addendum attached hereto and incorporated herein.

## 3.    **ALTERATIONS AND IMPROVEMENTS, INVESTMENT TAX CREDIT, MECHANIC'S LIENS, LANDLORD'S DISCLAIMER**

(a)    <u>Alterations and Improvements</u>.

(i)    <u>Tenant's Property</u>.  Tenant shall be permitted to install, use on and about, and remove from the Premises at any time and from time to time all trade fixtures and other personal property (exclusive of lighting, electrical, and heating and air conditioning improvements) which are not a component of the building located or to be located on the Premises (hereinafter referred to as the "Tenant's Property"), all of which at all times shall remain the property of Tenant with the right of removal (subject to Paragraph 3(d) below) at the expiration of this Lease. Tenant's Property shall include:  (1) removable decor items and office equipment; (2) building lettering, signs, sign posts and sign standards;  (3) unattached food and customer service equipment; and  (4) food and customer service equipment attached to the building by bolts and screws and/or by utility connections, including without limitation, walk-in refrigerators and freezers, remote refrigeration systems, exhaust systems and hoods, and water heaters.  Tenant agrees to return the Premises to good condition, normal wear and tear excepted, following removal of any of Tenant's Property from the Premises.

2

(ii)    Subsequent Improvements.  Tenant shall also have the right to make any additions, alterations, changes and improvements, structural and nonstructural, including but not limited to construction of additional buildings and additions to the then existing buildings, as Tenant shall desire (collectively, "Tenant Improvements"); provided, however, (A) Tenant shall submit plans of all changes to Landlord at least thirty (30) days in advance of the proposed construction date, which plans shall be subject to Landlord's approval, which approval shall not be unreasonably withheld, delayed or conditioned, (B) if the cost of changes exceeds FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00), Tenant shall deliver to Landlord unconditional payment and performance bonds for such work naming Landlord and Tenant as dual obligees, (C) all such construction shall be completed in a workmanlike manner and in material compliance with all laws, building codes and ordinances applicable thereto, at Tenant's sole expense, and (D) such additions, alterations, changes and improvements (whether structural or non-structural) shall not reduce the fair market value of the Premises. Notwithstanding the foregoing, Landlord and Tenant acknowledge and agree that Tenant is subject to a franchise agreement promulgated by Franchisor, setting forth Tenant's and Franchisor's expression of interest as to the types of asset actions to take place, including, but not limited to, modifications, alterations, remodels, upgrades, scrapes and rebuilds to and of the Premises.  Tenant shall be permitted without Landlord's prior consent and without adherence to items (A) and (D) above to undertake said modifications, alterations, remodels, upgrades, scrapes and rebuilds in such franchise agreement provided that prior to commencing any work Tenant delivers to Landlord (i) copies of franchise agreement and (ii) detailed information as to the changes that will be made to the Premises.  Tenant acknowledges and agrees that there will be no abatement of Rent or any other obligation set forth in the Lease during the time that the modifications, alterations, remodels, upgrades, scrapes and rebuilds are undertaken at the Premises and Tenant further agrees to indemnify landlord for any costs related to the Tenant Improvements, including, but not limited to, any costs associated with the filing of a mechanic's lien.

(iii)    Upon Termination, Subletting or Assignment.  Subject to the requirements of this Paragraph 3, Tenant shall have the right, at its option and expense, to redecorate or otherwise remodel the Premises upon any termination hereof or upon any permitted subletting or assignment in such manner as will, without reducing the fair market value thereof, avoid the appearance of the IHOP Restaurant operated under this Lease; provided, however, that in addition to the other requirements of this Paragraph 3, Tenant shall not impair the structural condition of the Premises, or reduce the size of the buildings on the Premises.

(iv)    Landlord's Property.    All subsequent improvements referred to in Paragraph 3(a)(ii) above, all improvements upon termination, subletting or assignment referred to in Paragraph 3(a)(iii) above, and any and all other additions, alterations, changes and improvements of any type (exclusive of Tenant's Property described in Paragraph 3(a)(i) above) shall be deemed to be a part of the Premises and the sole property of Landlord.

(b)    <u>Investment Tax Credit</u>. Landlord hereby grants Tenant the right and privilege of applying for and receiving all investment tax credits, if any, under the Internal Revenue Code which may be available with respect to the building and other improvements to be constructed. To this end, Landlord agrees to execute all such further documents and supply such additional information as may be required to make such election effective.

(c)    <u>Mechanic's and Other Liens</u>. Tenant shall not do or suffer anything to be done whereby the Premises, or any part thereof, may be encumbered by a mechanic's, materialman's, or other lien for work or labor done, services performed, materials, appliances, or power contributed, used, or furnished in or to the Premises or in connection with any operations or any other activity of Tenant. If, whenever and as often as any lien is filed against the Premises, or any part thereof, purporting to be for or on account of any labor done, materials or services furnished in connection with any work in or about the Premises, done by, for or under the authority of Tenant, or anyone claiming by, through or under Tenant, Tenant shall discharge the same of record within ten (10) days after service upon Tenant of notice of the filing thereof; provided, however, Tenant shall have, in lieu of the obligation of discharging such lien, (i) the right to remove the lien as an encumbrance upon the Premises by bonding same in accordance with applicable law should bonding be a permitted substitution for such lien under the applicable law and (ii) the right to contest any such lien; provided further that Tenant shall diligently prosecute any such contest, at all times effectively staying or preventing any official or judicial sale of the Premises under execution or otherwise, and, if unsuccessful, satisfy any final judgment against Tenant adjudging or enforcing such lien or, if successful, procuring record satisfaction or release thereof.

(d)    <u>Landlord's Disclaimer</u>. All of Tenant's Property placed in or upon the Premises by Tenant shall remain the property of Tenant with the right to remove the same at any time during the term of this Lease. Landlord, if requested by Tenant, agrees to execute, acknowledge and deliver an instrument by which Landlord subordinates its lien rights to the lien rights of Tenant's Leasehold Mortgagee, any equipment lender or lessor of Tenant's Property, and to all rights of levy for distraint for rent against same; provided any damage to the Premises caused by, or resulting from the removal of any of Tenant's Property or other personal property therefrom (including the leaving of holes or other openings in the roof or exterior of the building) shall be promptly repaired by Tenant or the party entitled to remove same. Landlord shall be entitled to charge a reasonable fee not to exceed Five Hundred Dollars ($500.00) in connection with execution of such documentation, and Tenant agrees to pay such fee as a condition precedent to Landlord's execution of such documents.

(e)    <u>Asbestos Survey</u>. In the event that Tenant restores, repairs, alters, renovates, or improves the Premises as provided under this Lease (including without limitation under Paragraphs 3, 4, 5 and 6 of this Lease) which includes the demolition, cutting into or other material disturbance of the improvements on the Premises that could reasonably result in the release of asbestos, then Tenant shall provide prior written notification thereof to Landlord, and upon the written request of Landlord, Tenant shall conduct, or cause to be conducted, a complete asbestos survey (including the collection and laboratory analysis of any and all suspect material) of the Premises prior to any such restoration, repair, alteration, renovation or improvement to the Premises. Any disturbance or removal of asbestos or repairs to the Premises resulting from the findings of said survey shall comply with all applicable laws and shall be at Tenant's sole cost

and expense.  Tenant shall provide to Landlord a copy of any reports obtained by Tenant in connection with such asbestos survey.[[**THIS PARAGRAPH APPLICABLE <u>ONLY</u> TO BUILDINGS BUILT BEFORE 1981**]]

## 4.    <u>DESTRUCTION OF PREMISES; INSURANCE</u>

(a)    If the Premises is damaged or destroyed by fire, flood, tornado or other element, or by any other casualty and such damage or destruction does not occur within the last twenty four (24) months of the original or of any extended or renewed term of this Lease, this Lease shall continue in full force and effect and Tenant shall, as promptly as possible, restore, repair or rebuild the Premises to substantially the same condition as it existed before the damage or destruction, including any improvements or alterations required to be made by any governmental body, county or city agency, due to any changes in code or building regulations.  Tenant shall for this purpose use all, or such part as may be necessary, of the insurance proceeds received from insurance policies required to be carried under the provision of Paragraph 4(b) of this Lease.  If such insurance proceeds are not sufficient to pay such costs, Tenant shall pay such deficit.  Should the Premises be damaged or destroyed by any of the foregoing described casualties within the last twenty-four (24) months of the original term or of any extended or renewed term of this Lease, then to the extent that the Premises is untenantable or unsuitable, in Tenant's reasonable opinion, for continued use in the normal conduct of Tenant's business, Tenant shall have the right, exercisable by written notice to Landlord given within sixty (60) days after the date of such damage or destruction, to terminate this Lease effective upon the date of such damage or destruction.  If Tenant terminates this Lease as thus provided Landlord shall be entitled to all of the insurance proceeds on the Premises and payment of Rent through the termination date, but not to the proceeds of insurance carried by Tenant on Tenant's Property and not to business interruption insurance; provided, however, Tenant shall not have the right to terminate this Lease unless (i) the damage or destruction of the Premises was caused by a peril which was insured against as required by the provisions of Paragraph 4(b) of this Lease; and (ii) at the time of such damage and destruction the said insurance policies required to be carried by Tenant were in the amount of the full replacement cost of such improvements (without deduction or co-insurance) and in full force and effect; and (iii) the insurer has confirmed coverage and its obligation to pay.  If Tenant defaults in its obligation to carry insurance in the amounts required under Paragraph 4(b) of this Lease, then, prior to Tenant's termination of this Lease and in addition to the requirements set forth in the preceding sentence, Tenant shall be obligated to pay toward said reconstruction or to Landlord the difference between the amount of insurance actually carried and the amount required to be carried under this Paragraph 4.

(b)    Tenant, at its expense and as additional rent hereunder, shall throughout the term of this Lease and any extension or renewal thereof, keep the Premises insured with (i) "Special Form Causes of Loss" coverage (as such term is used in the insurance industry), at least as broad as the most commonly available ISO Special Cause of Loss Form, including coverage for glass breakage, vandalism and malicious mischief, and builder's risk (if the Premises is to be constructed pursuant to the terms of this Lease) for one hundred percent (100%) insurable replacement value with no co-insurance penalty, with any deductible in excess of Ten Thousand Dollars ($10,000.00) to be approved by Landlord and, (ii) "Ordinance and Law Coverage" with limits of (i) not less than the building value for Coverage A (loss to the undamaged portion of the building), (ii) not less than fifteen percent (15%) of the building value for Coverage B

(Demolition Cost Coverage), and (iii) not less than fifteen percent (15%) of the building value for Coverage C (Increased Cost of Construction Coverage).

(c)    Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense and as additional rent, commercial general liability insurance including product liability and liquor liability (if alcohol is served) covering the Premises at least as broad as the most commonly available ISO Commercial General Liability policy form (occurrence basis) covering bodily injury, property damage and personal and advertising injury, for the joint benefit of and insuring Tenant and Landlord, with limits not less than One Million Dollars ($1,000,000.00) per occurrence, with a general aggregate of not less than Two Million Dollars ($2,000,000.00) and a "following form" umbrella liability policy or excess liability policy to include product liability and liquor liability (if alcohol is served), in an amount of not less than Ten Million Dollars ($10,000,000.00) per occurrence, with any deductible in excess of One Thousand Dollars ($1,000.00) to be approved by Landlord.

(d)    In the event the Premises is located in an area identified by the National Flood Insurance Program as an area having "special flood hazards" (zones beginning with "A" or "V"), Tenant shall maintain throughout the term of this Lease and any extension thereof, flood insurance for the full replacement value of the Premises, with any deductible in excess of Twenty-five Thousand Dollars ($25,000.00) to be approved by Landlord.

(e)    In the event the Premises is located in a major earthquake damage area and earthquake insurance is available, Tenant shall maintain throughout the term of this Lease, and any extension thereof, earthquake insurance for the full replacement value of the Premises, with any deductible in excess of Twenty-five Thousand Dollars ($25,000.00) to be approved by Landlord.

(f)    All insurance companies providing the coverage required under this Paragraph 4 shall be selected by Tenant and shall be rated A minus (A-) or better by Best's Insurance Rating Service (or equivalent rating service if not available), shall be licensed to write insurance policies in the state in which the Premises is located, and shall be acceptable to Landlord in Landlord's reasonable discretion. Tenant shall provide Landlord with copies of all policies or certificates of such coverage for the insurance coverages referenced in this Paragraph 4, and all commercial general liability and umbrella liability or excess liability policies shall name Landlord (and if Landlord is either a general or limited partnership, all general partners) and any mortgagee designated by Landlord, as an additional named insured. Any such coverage for additional insureds shall be primary and non-contributory with any insurance carried by Landlord or any other additional insured hereunder. All property insurance policies shall name Landlord (and if Landlord is either a general or limited partnership, all general partners) as an additional named insured and shall provide that all losses shall be payable as herein provided. Any mortgagee designated by Landlord must be named on the policy as a mortgagee with respect to real property and/or as a Lenders Loss Payee with respect to personal property and shall provide that all losses be payable as herein provided. All such policies of insurance shall provide that the amount thereof shall not be reduced and that none of the provisions, agreements or covenants contained therein shall be modified or canceled by the insuring company or companies without thirty (30) days prior written notice being given to Landlord; and that all insurance proceeds for claims in excess of Fifty Thousand Dollars ($50,000.00) shall be paid by check jointly payable to Landlord

Smyrna_ Lease Agreement _ Execution Copy

and any mortgagee designated by Landlord, and held in Trust for the benefit of Tenant and applied pursuant to the terms of this Lease. Such policy or policies of insurance may also cover loss or damage to Tenant's Property, and the insurance proceeds applicable to Tenant's Property shall not be paid to Landlord or any mortgagee but shall accrue and be payable solely to Tenant. In the event of a casualty, Tenant shall be responsible for any deficiency between the replacement cost of the Premises and the amount actually paid by the insurance company.

## 5.    **MAINTENANCE AND REPAIR**

(a)    Tenant shall, during the term of this Lease and any renewals thereof, (i) maintain the Premises and all buildings and improvements thereon (interior and exterior, structural, mechanical and otherwise) in good order and repair (normal wear and tear excepted); (ii) not commit waste or permit impairment or deterioration of the Premises (normal wear and tear excepted); (iii) not abandon the Premises; (iv) keep Tenant's Property, including trade fixtures, equipment, machinery and appliances thereon in good repair (normal wear and tear excepted) and replace trade fixtures, equipment, machinery and appliances on the Premises when necessary to keep such items in good repair; (v) comply in all material respects with all laws, ordinances, regulations and requirements of any governmental body applicable to the Premises; (vi) provide prompt notification to Landlord of any material adverse changes to the Premises, such as material changes in any environmental condition, including the presence of biocontaminants, such as, but not limited to mold, and shall promptly undertake reasonable remediation (and preventative) actions in connection therewith; and (vii) subject to the provisions of Paragraph 4(a) with respect to damage within the last twenty-four (24) months of this Lease, and Paragraph 6 herein, return the Premises and all buildings and improvements thereon at the expiration of the term of this Lease or any extension thereof in as reasonably as good condition as when received, ordinary wear and tear excepted.

(b)    Tenant agrees that Landlord shall have no obligation under this Lease to make any repairs or replacements (including the replacement of obsolete components) to the Premises or the buildings or improvements thereon, or any alteration, addition, change, substitution or improvement thereof or thereto, whether structural or otherwise. The terms "repair" and "replacement" include, without limitation, the replacement of any portions of the Premises which have outlived their useful life during the term of this Lease (or any extensions thereof). Landlord and Tenant intend that the Rent received by Landlord shall be free and clear of any expense to Landlord for the construction, care, maintenance (including common area maintenance charges and charges accruing under easements or other agreements relating to the Premises), operation, repair, replacement, alteration, addition, change, substitution and improvement of or to the Premises and any building and improvement thereon. Upon the expiration or earlier termination of this Lease, Tenant shall remain responsible for, and shall pay to Landlord, any cost, charge or expense for which Tenant is otherwise responsible for hereunder attributable to any period (prorated on a daily basis) prior to the expiration or earlier termination of this Lease.

(c)    Tenant acknowledges and agrees that the Premises is and shall be leased by Landlord to Tenant in its present "AS IS" condition, and that Landlord makes absolutely no representations or warranties whatsoever with respect to the Premises or the condition thereof. Tenant acknowledges that Landlord has not investigated and does not warrant or represent to Tenant that the Premises is fit for the purposes intended by Tenant or for any other purpose or

purposes whatsoever, and Tenant acknowledges that the Premises is to be leased to Tenant in its existing condition, i.e., "AS IS", on and as of the Effective Date.

## 6.    **CONDEMNATION**

(a)    In the event that the whole or any material part of the building on the Premises or a material portion of the land or a material portion of the parking area serving the Premises shall be taken during the term of this Lease or any extension or renewal thereof for any public or quasi public use under any governmental law, ordinance, regulation or by right of eminent domain, or shall be sold to the condemning authority under threat of condemnation, or if all reasonable access to the adjacent roadways from the existing or comparable curb cuts shall be taken (any of such events being hereinafter referred to as a "Taking"), then in such event, Tenant shall have the option of terminating this Lease as of a date no earlier than the date of such Taking, such termination date to be specified in a notice of termination which must be given by Tenant to Landlord not fewer than fourteen (14) days prior to the date of the Taking or the date on which possession of the Premises, or part thereof, must be surrendered to the condemning authority or its designee, whichever is earlier.

(b)    In the event of any taking which does not give rise to an option to terminate or in the event of a taking which does give rise to an option to terminate and Tenant does not elect to terminate, Landlord shall be entitled to the compensation awarded and shall make the award available to Tenant and Tenant shall, to the extent of the award from such taking (which term "award" shall mean the net proceeds awarded by a court or net purchase price under a sale in lieu of condemnation after deducting expenses incurred by Landlord in the settlement or trial of the eminent domain matter, but shall exclude the value of Landlord's reversionary interest), promptly restore or repair the Premises and all improvements thereon (except those items of Tenant's Property which Tenant is permitted to remove under the terms of this Lease) to the same condition as existed immediately prior to such taking insofar as is reasonably possible.  If the estimated cost of restoration or repair shall exceed the amount of Landlord's award, Tenant shall deposit with Landlord the amount of such excess.  The award and any excess shall be held in trust by Landlord and used, to the extent required, for the purpose of such restoration or repair.  A just and proportionate part of the Rent payable hereunder shall be abated from the date of such taking until ten (10) days after Tenant has restored same and thereafter the Rent shall be reduced in proportion to the reduction in the then rental value of the Premises after the taking in comparison with the rental value prior to the taking.  If the award shall exceed the amount spent or to be spent promptly to effect such restoration, repair or replacement, such excess shall unconditionally belong to Landlord and shall be paid to Landlord.

(c)    In the event of any partial taking where this Lease is not terminated, Tenant shall not be entitled (except for use in reconstruction) to any part of the compensation or award given Landlord for the taking of the fee of the Premises or any damages resulting therefrom, but Landlord shall be obligated to deliver to Tenant any portion of the compensation or award specifically designated for the loss of Tenant's business that may be delivered to Landlord, and Tenant shall have the right to recover from the condemning authority such compensation as is specifically awarded to Tenant (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises or for the loss of Tenant's Property in the taking and (ii) for loss of Tenant's business.

8

(d)     If this Lease is terminated by reason of a taking, then Landlord shall be entitled to receive the entire award in any such condemnation or eminent domain proceedings or purchase in lieu thereof for the taking of the fee of the Premises and Tenant hereby assigns to Landlord all of its right, title and interest in and to all and any part of such award, but Landlord shall be obligated to deliver to Tenant any portion of the compensation or award specifically designated for the loss of Tenant's business that may be delivered to Landlord.  Landlord shall further be entitled to direct and control any settlement negotiations or litigation relating to eminent domain proceedings or purchase in lieu thereof with respect to the fee of the Premises, and Tenant hereby assigns to Landlord all of its right or interest in such negotiations or litigation, Tenant reserving the right to participate in any negotiations or litigation related to the loss of Tenant's business.  Tenant shall be entitled to receive any award specifically awarded to Tenant (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises or for the loss of Tenant's Property in the taking and (ii) for loss of Tenant's business.

## 7.     TAXES AND ASSESSMENTS

(a)     Tenant shall pay, as additional rent hereunder, all "Real Property Taxes" (as hereinafter defined) and tangible personal property taxes applicable to the Premises during the term of this Lease and any extensions or renewals thereof, and together with all taxes and assessments levied upon or assessed against Tenant's Property.  Payment of taxes shall be made directly to the taxing authority prior to the due date for such taxes (provided Tenant receives a copy of the tax bill at least thirty (30) days prior to the due date), with a copy to Landlord of the remittance within five (5) days after payment by Tenant.  In the event such Real Property Taxes required to be paid by Tenant relate to any period of time after expiration of the term of this Lease, Tenant's share of such taxes shall be equitably prorated to cover only the period of time within the fiscal tax year during which this Lease is in effect.  Landlord shall forward copies of all tax bills which it receives within fifteen (15) days after Landlord's receipt thereof.

(b)     Within thirty (30) days after Tenant receives the paid receipted tax bills, Tenant shall furnish Landlord with copies thereof.  Tenant may, at its option, contest in good faith and by appropriate and timely legal proceedings any such tax and assessment; provided, however, that Tenant shall indemnify and hold harmless Landlord from any loss or damage resulting from any such contest, and all expenses of same (including, without limitation, all attorneys' and paralegal fees, court and other costs) shall be paid solely by Tenant.

(c)     As used in this section, the term "Real Property Taxes" shall mean and include any form of assessment, license fee, rent tax, tax on rental receipts, levy, or tax imposed by any authority having the direct or indirect power to tax, including any city, county, state, or federal government, or any school, agricultural, lighting, drainage, or other improvement district thereof, as against any legal or equitable interest of Landlord in the Premises or any part thereof, or as against Landlord's right to receive rent or other income therefrom.

## 8.     COMPLIANCE, UTILITIES, SURRENDER

(a)     Tenant, at its expense:  shall promptly, materially comply with all municipal, county, state, federal and other governmental requirements and regulations whether now in effect or enacted during the term of this Lease, whether or not compliance therewith shall require

structural or other changes in the Premises; will procure and maintain all permits, licenses, easements and other authorizations required for the use of the Premises or any part thereof then being made and for the lawful and proper installation, operation and maintenance of all equipment and appliances necessary or appropriate for the operation and maintenance of the Premises; and shall comply with all easements, restrictions, reservations and other instruments of record applicable to the Premises, including without limitation, any requirement in such instruments on behalf of the owner or occupant of the Premises to procure and maintain insurance, and whether now in effect or enacted during the term of this Lease. Tenant shall indemnify and save Landlord harmless from all expenses and damages by reason of any notices, orders, violations or penalties filed against or imposed upon the Premises, or against Landlord as owner thereof, because of Tenant's failure to comply with this paragraph.

(b)     Tenant shall pay all charges for heat, water, gas, sewage, electricity and all other utilities used or consumed on the Premises and shall contract for the same in its own name. Landlord shall not be liable for any interruption or failure in the supply of any such utility service to the Premises.

(c)     Tenant shall peacefully surrender possession of the Premises, the buildings and other improvements thereon to Landlord at the expiration, or earlier termination, of the original term or any extended or renewed term of this Lease.

## 9.    QUIET ENJOYMENT

Landlord covenants and warrants that Landlord has fee simple title to the Premises and full power and authority to enter into this Lease, and that Tenant shall have and enjoy full, quiet and peaceful possession of the Premises, its appurtenances and all rights and privileges incidental thereto during the term hereof and any renewals or extensions, subject to the provisions of this Lease and any easements, restrictions, reservations and other instruments of record applicable to the Premises and in existence at the time of the conveyance of the Premises to Landlord by Tenant or thereafter. Landlord agrees to cause the holder of any mortgage now or hereafter relating to the Premises to execute and deliver to Tenant a Subordination and Nondisturbance Agreement substantially in the form contemplated by Paragraph 18 of this Lease.

## 10.    OPTION TO RENEW

Tenant shall have four (4) successive five (5) year options to extend this Lease for up to an additional twenty (20) years upon the same terms, covenants, conditions and rental as set forth herein provided that Tenant is not in Default hereunder at the commencement of such option period. In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than six (6) months prior to the Termination Date or expiration of the then current option period, as applicable, provided however that Tenant's right to renew shall not expire even within such six (6) month period unless Landlord has provided Tenant written notice requesting a decision of renewal, and Tenant has failed to respond within fifteen (15) days after such notice. Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall expire at the Termination Date or end of the then current option period, as applicable.

11. **INTENTIONALLY OMITTED**

12. **INTENTIONALLY OMITTED**

13. **DEFAULT**

(a)     If any one or more of the following events occur, said event or events shall hereby be referred to as a "Default":

(i)     If Tenant fails to pay Rent or any other charges required under this Lease when same shall become due and payable, and such failure continues for ten (10) days or more after written notice from Landlord.

(ii)     If Tenant fails to pay Rent or any other charges required under any other lease or agreement with Landlord or an affiliate of Landlord (each an "Other Lease") when same shall become due and payable, and the aggregate of all amounts in default, or a series of payment defaults, under such Other Leases exceeds the sum of Fifty Thousand Dollars ($50,000.00). In the event of any such default, Landlord shall be entitled to the default interest rate specified in the Other Leases during the term of any such default, and any of Tenant's monies deposited with Landlord shall be immediately and irrevocably assigned to Landlord to apply to any obligations of Tenant owed to Landlord in any manner Landlord deems necessary.

(iii)     If Tenant shall fail to perform or observe any term, condition, covenant, agreement, or obligation required under this Lease; and either such failure continues for thirty (30) days after written notice from Landlord (except that such thirty (30) day period shall be automatically extended for such additional period of time as is reasonably necessary to cure such Default, if such Default cannot be cured within such period, provided Tenant is in the process of diligently curing the same).

Notwithstanding the foregoing, this Lease shall remain cross-defaulted with an Other Lease for a period commencing as of the Effective Date and expiring on the earlier of (i) one (1) year from the Effective Date or (ii) the date of the sale of the Premises by Landlord to a third party purchaser. For purposes of (ii) above, sale to a related entity or a joint venture that controls, is controlled by, or is under common control with the Landlord will not be considered a third party purchaser.

(iv)     If Franchisor gives notice of any default or event of default under the Franchise Agreement to Tenant and such default or event of default shall occur and remain uncured under the Franchise Agreement following any cure period applicable thereto and established in the Franchise Agreement, or if such Franchise Agreement is terminated for any reason, including without limitation, expiration without immediate renewal or replacement thereof. In the event the Franchise Agreement is terminated, Tenant shall notify Landlord of such termination within two (2) business days of its receipt of notice of termination, and upon termination of the Franchise Agreement, Franchisor, or any affiliate thereof, shall have the right, but not the obligation, to assume the rights and obligations of Tenant under this Lease, as provided in the Addendum to Lease attached hereto and incorporated herein. Notwithstanding the foregoing, Tenant

11

shall have the right to engage in good faith disputes with Franchisor under the Franchise Agreement without such dispute constituting a Default under this Lease, provided that such dispute shall not prevent or interrupt Tenant from performing its obligations under this Lease.

(v)     If Tenant shall make an assignment for the benefit of creditors or file a petition, in any federal or state court, in bankruptcy or reorganization, or make an application in any such proceedings for the appointment of a trustee or receiver for all or any portion of its property.

(vi)     If any petition shall be filed under federal or state law against Tenant in any bankruptcy, reorganization, or insolvency proceedings, and said proceedings shall not be dismissed or vacated within sixty (60) days after such petition is filed.

(vii)     If a receiver or trustee shall be appointed under federal or state law for Tenant, or any guarantor of Tenant's obligations hereunder, for all or any portion of the property of either of them, and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(b)     Upon the happening of any one or more of the aforementioned Defaults which are not cured within the cure period applicable thereto by Tenant or Tenant's Leasehold Mortgagee (if applicable), if any, Landlord shall have the right, in addition to any other rights and remedies, to terminate this Lease by giving written notice of same to Tenant. Upon such notice, this Lease shall cease and expire, and Tenant shall surrender the Premises to Landlord. Notwithstanding such termination, Tenant's liability and obligation under all provisions of this Lease, including the obligation to pay Rent and any and all other amounts due hereunder shall survive and continue. In addition, in the event of Tenant's Default under this Lease, Landlord may, by notice to Tenant, accelerate the monthly installments of Rent due hereunder for the remaining term of this Lease, in which event such amount, together with any sums then in arrears, shall immediately be due and payable to Landlord (provided, however, should Landlord re-let the Premises, Tenant shall only be responsible for (i) Landlord's cost of re-letting the Premises and (ii) the difference between the Rent due for the remaining term of this Lease and the rent payable by the replacement tenant in connection with such re-letting). Landlord shall reimburse Tenant for any amounts that Tenant may have paid by reason of Default and the foregoing amounts for which Tenant is responsible. Tenant hereby expressly agrees that its occupation of the Premises after Default constitutes forcible detainer (or equivalent) as is defined by the law in force in the jurisdiction in which the Premises is located. Tenant further agrees that in the event of a Default, any monies deposited by Tenant with Landlord shall be immediately and irrevocably assigned and released to Landlord (without further action by Landlord or Tenant) to be applied by Landlord against any and all of Tenant's obligations under this Lease, in any manner as Landlord may determine.

(c)     If this Lease shall terminate as provided hereinabove, Landlord may re-enter the Premises and remove Tenant, its agents and subtenants, together with all or any of Tenant's Property, by suitable action at law, or by force. Tenant waives any right to the service of any notice of Landlord's intention to re-enter and Landlord shall not be liable in any way in connection with any action it takes pursuant to this paragraph. Notwithstanding such re-entry or

removal, Tenant's liability under this Lease shall survive and continue. This provision shall be subject to the rights to Tenant's Leasehold Mortgagee to remove Tenant's Property in accordance with the provision set forth herein.

(d)   In case of re-entry, repossession or termination of this Lease, Tenant shall remain liable for Rent, any additional rent and all other charges provided for in this Lease for the otherwise remaining term of this Lease, and any and all expenses which Landlord may have incurred in re-entering the Premises including, but not limited to, allocable overhead, alterations to the building, leasing, construction, architectural, legal and accounting fees. Landlord shall have the right, to relet the whole or part of the Premises upon terms which Landlord, in its sole discretion, deems appropriate and Tenant shall be responsible for all expenses incurred by Landlord in reletting or attempting to relet and all rent collected for reletting shall be credited against all of Tenant's obligations hereunder.

(e)   In the event of a Default, Landlord may, at its sole option, enter upon the Premises, if deemed necessary by Landlord in its sole discretion, and/or do whatever may be deemed necessary by Landlord in its sole discretion to cure such failure by Tenant. Tenant shall pay to Landlord within ten (10) days of Landlord's written request, all reasonable costs actually incurred by Landlord in connection with Landlord's curing of such failure. In addition to the above costs, in the event Landlord does not receive payment from Tenant when due under this paragraph, then interest at the lesser of (i) eighteen percent (18%) per annum or (ii) the highest rate allowable by law shall be due and payable with respect to such payment from the due date thereof until Landlord receives such payment.

(f)   In the event Landlord engages legal counsel in connection with the enforcement of any of the terms and provisions of this Lease, then, in addition to all other sums due from Tenant to Landlord under this Lease, Tenant shall pay to Landlord any and all reasonable attorneys' fees, paralegal fees, and legal costs and expenses actually incurred by Landlord, whether or not judicial proceedings are filed, and including on appeal and in any bankruptcy proceedings.

(g)   Notwithstanding the foregoing, in the event Tenant fails (beyond any applicable cure periods set forth herein) to (1) maintain and keep in full force and effect any or all of the insurance policies required pursuant to Paragraph 4 of this Lease, or (2) pay when due any and all taxes and/or assessments levied or assessed against the Premises, or (3) maintain or repair the Premises pursuant to Paragraph 5 of this Lease, then in the event Landlord does not terminate this Lease, and at Landlord's request and in Landlord's sole discretion, Tenant shall escrow funds for payment of such insurance premiums, taxes and assessments, and utilities and maintenance costs and repair costs in the following manner:

(i)   Tenant shall immediately pay to Landlord all reasonable sums expended by Landlord, plus an additional ten percent (10%) thereof, for purposes of: (1) bringing current or reinstating or purchasing the insurance required under Paragraph 4 of this Lease; and/or (2) paying all taxes and assessments which are past due or currently due. Thereafter, Tenant shall pay to Landlord on the first (lst) day of each month along with the monthly payment of Rent a sum (the "Escrow Funds") equal to one-twelfth (1/12th) of: (A) the yearly premium(s) for the insurance required to be maintained pursuant to

Paragraph 4 of this Lease; and/or (B) the annual taxes and assessments levied or assessed against the Premises as reasonably estimated by Landlord, based on the prior year's taxes and assessments levied or assessed against the Premises.

(ii)    Landlord shall apply the Escrow Funds to pay said insurance and/or taxes and assessments.  No interest shall be payable by Landlord on the Escrow Funds unless required by applicable law, in which event all such interest shall be first applied by Landlord to pay such insurance and/or taxes and assessments. Landlord shall provide to Tenant an annual accounting of the Escrow Funds in Landlord's normal format showing credits and debits to the Escrow Funds and the purpose for which each debit to the Escrow Funds was made.

(iii)    If the amount of the Escrow Funds held by Landlord at the time of the annual accounting thereof shall exceed the amount deemed reasonably necessary by Landlord to provide for the payment of insurance and/or taxes and assessments as they become due, such excess shall be credited to Tenant against the next monthly installment or installments of Escrow Funds due.  If at any time the amount of the Escrow Funds held by Landlord shall be less than the amount deemed necessary by Landlord to pay the insurance and/or taxes and assessments as they become due, Tenant shall pay to Landlord any amount necessary to make up the deficiency within thirty (30) days after notice from Landlord to Tenant requesting payment thereof.

(iv)    The foregoing Escrow Funds arrangement shall terminate if Tenant fully and faithfully complies with the provisions of this Paragraph 13(g) for a period of twenty-four (24) consecutive months.  Upon the termination of this Lease, Landlord shall promptly refund (or credit to Tenant against amounts due to Landlord in the case of termination due to Tenant's Default) any Escrow Funds held by Landlord.

(h)    The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now or hereinafter provided by law, and all such rights and remedies shall be cumulative.  No action or inaction by Landlord shall constitute a waiver of any Default, and no waiver of any Default shall be effective unless it is in writing, signed by Landlord.

## 14.    HOLDING OVER

In the event Tenant remains in possession of the Premises after the expiration of this Lease without executing a new written lease acceptable to Landlord and Tenant, Tenant shall occupy the Premises as a tenant from month to month subject to all the terms hereof (except as modified by this paragraph), but such possession shall not limit Landlord's rights and remedies by reason thereof nor constitute a holding over.  In the event of such month to month tenancy, the monthly installment of Annual Rent due for each such month shall increase to be one hundred and fifty percent (150%) the monthly installment thereof which was payable during the last month of the term of this Lease.

## 15.    WAIVER OF SUBROGATION

Notwithstanding anything in this Lease to the contrary, other than Tenant's obligations to repair, restore or rebuild described in Paragraph 4 of this Lease, neither party shall be liable to

the other for any damage or destruction of the Premises resulting from fire or other casualty covered by insurance required of either party hereunder, whether or not such loss, damage or destruction of the Premises is caused by or results from the negligence of such party (which term includes such party's officers, employees, agents and invitees), and each party hereby expressly releases the other from all total liability for or on account of any said insured loss, damage or destruction, whether or not the party suffering the loss is insured against such loss, and if insured whether fully or partially.  Each party shall procure all endorsements of insurance policies carried by it necessary to protect the other from any right of subrogation and/or liability in the event of such loss.

## 16.    **LANDLORD'S LIEN FOR RENTS**

As security for Tenant's payment of Rent and all other payments required to be made by Tenant hereunder (including, by way of illustration only, taxes, damage to the Premises, court costs, and attorneys' fees), Tenant hereby grants to Landlord a lien upon all of Tenant's Property now or hereafter located upon the Premises.  The lien herein provided shall be subordinate to the lien of Tenant's Leasehold Mortgagee, any chattel mortgage, collateral assignment or security interest given by Tenant to any seller of Tenant's Property.  Subject to the rights of Leasehold Mortgagee in the event of a Default, Landlord may enter upon the Premises and take possession of Tenant's Property, or any part thereof, and may sell all or any part of Tenant's Property at public or private sale in one or successive sales, with or without notice, to the highest bidder for cash and on behalf of Tenant.  Landlord may sell and convey Tenant's Property, or any part thereof, to such bidder, delivering to such bidder all of Tenant's title and interest in such property sold to such bidder.  The proceeds of such sale shall be applied by Landlord first toward the costs of such sale and then toward the payment of all sums due from Tenant to Landlord under this Lease.  Notwithstanding anything above to the contrary, in connection with Tenant's financing of Tenant's Property, Landlord agrees to subordinate any lien provided in this paragraph to which it may be entitled, and agrees to execute customary documents requested by an entity providing such financing to evidence such subordination, provided the form and content of any such subordination are reasonably satisfactory to Landlord and its counsel.  As part of such subordination, Landlord agrees to permit such entity providing such financing to store equipment, fixtures or furnishings at the Premises for a period not to exceed thirty (30) days (or Landlord may remove such equipment, fixtures or furnishings at such financing entity's expense), or to remove such Tenant's Property from the Premises following reasonable notice to Landlord, provided such financing entity restores the Premises including without limitation, the covering and sealing of holes in the roof or outside walls and repairs all damage caused by such removal.

## 17.    **ASSIGNMENT AND SUBLETTING**

(a)    Except as hereinafter provided in this Paragraph, Tenant shall not have the right, without first obtaining Landlord's prior written consent which shall not be unreasonably withheld, conditioned or delayed, to assign or sublet any part or all of the Premises to any party for any purpose. Landlord, without being deemed unreasonable, may withhold its consent to any proposed assignment or subletting where (as determined by Landlord in Landlord's reasonable discretion):  (i) such assignment or subletting would violate the terms of any then existing agreement applicable to the Premises, or (ii) the financial capacity of such assignee or subtenant

15

is materially less than that of Tenant, or (iii) the proposed use violates any applicable governmental codes or regulations, or (iv) in the Landlord's reasonable determination, the proposed use is noxious or offensive, or relates to the sale or exhibition of sexually explicit material, or (v) the assignee or subtenant does not meet the then current underwriting requirements of Landlord, or (vi) such assignment would result in the downgrade of any bonds issued in connection with a net lease securitization of this Lease. Notwithstanding the foregoing, Tenant shall have the right without the consent of Landlord, written or otherwise, to sublet, assign, or otherwise transfer its interest in this Lease and the Premises to (i) a subsidiary, including an operating subsidiary, of Tenant (ii) a parent of Tenant, (iii) a corporation or other entity with which Tenant may merge or consolidate with, or (iv) a corporation or other entity to which Tenant may sell all or a substantial portion of its assets or stock; provided, however, that the Premises must continue to be used as an IHOP Restaurant or such other use approved by Landlord prior to such transferring event, and provided further that the party merging, consolidating or purchasing the assets or stock of Tenant shall execute and deliver to the Landlord a full unconditional guaranty of the obligations of Tenant in the same form as previously provided by Guarantor. No assignment or subletting or consent thereto by Landlord shall relieve Tenant of its liability for the continued performance of all terms, covenants and conditions of this Lease, including without limitation the payment of all Rent and other charges thereunder provided, however, in the event of a sale by Tenant to a single purchaser of one hundred percent (100%) of the assets of Tenant, Tenant shall be released from its obligations under this Lease. In the event of a subletting of the Premises or assignment of this Lease, any monetary consideration obtained from an assignee or transferee upon such subletting or assignment shall be shared equally between Landlord and Tenant. In the event of the subletting or assignment of this Lease, if Tenant derives funds or rental income greater than what it is paying to Landlord under this Lease, the Annual Rent provided for herein shall be increased to that amount received by Tenant from sublessee or assignee of this Lease.

(b)    Prior to any permitted assignment or subletting hereunder, Tenant shall deliver to Landlord written notice of such assignment or subletting, together with:  (i) a copy of the assignment or subletting documents (including copies of any recorded documents related thereto); (ii) the name, address and telephone number of such assignee or sublet tenant and a designated contact person therefor; (iii) a new insurance policy and binder complying with the terms of this Lease and naming such assignee as the tenant of the Premises; and (iv) an agreement executed by such assignee or sublet tenant, in recordable form, whereby such assignee assumes and agrees to discharge all obligations of Tenant under this Lease.

(c)    Landlord shall have the right without limitation to sell, convey, transfer or assign its interest in the Premises or its interest in this Lease, and upon such conveyance being completed and delivery by Landlord to Tenant of a copy of the fully-executed assignment instrument in which Landlord's assignee assumes all obligations of Landlord under this Lease, all covenants and obligations of Landlord under this Lease accruing thereafter shall cease, but such covenants and obligations shall run with the land and shall be binding upon the subsequent landlord or owners of the Premises or of this Lease.

18.    **SUBORDINATION, NON DISTURBANCE, ATTORNMENT, ESTOPPEL CERTIFICATE**

(a)    Upon written request of the holder of any mortgage (which term "mortgage" shall also include deeds to secure debt and deeds of trust) now or hereafter relating to the Premises, Tenant shall subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument in reasonable form customarily used by such encumbrance holder to effect such subordination; provided, however, as a condition of all such subordinations, the holder of such mortgage shall be first required to execute, acknowledge and deliver to Tenant an instrument in reasonable form customarily used by such encumbrance holder to provide that notwithstanding the foreclosure or other exercise of rights under any such first or other mortgage, Tenant's possession and occupancy of the Premises and the improvements and its leasehold estate shall not be disturbed or interfered with, nor shall Tenant's rights and obligations under this Lease be altered or adversely affected thereby so long as Tenant is not in Default.

(b)    Notwithstanding anything in Paragraph 18(a) above to the contrary, in the event the holder of any such mortgage elects to have this Lease be superior to its mortgage, then upon notification to Tenant to that effect by such encumbrance holder, this Lease shall be deemed prior to the lien of said mortgage, whether this Lease is dated prior or subsequent to the date of said mortgage, and Tenant shall execute, acknowledge and deliver an instrument, in the form customarily used by such encumbrance holder to effect such priority.

(c)    In the event proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under any mortgage made by Landlord encumbering the Premises, or in the event of delivery of a deed in lieu of foreclosure under such a mortgage, and provided that Tenant has previously received the subordination and nondisturbance agreement referenced in Subparagraph (a) above. Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as "Landlord" under this Lease, and upon the request of the purchaser, Tenant shall execute, acknowledge and deliver an instrument, in form and substance satisfactory to such purchaser, evidencing such attornment.

(d)    Each party agrees, within seven (7) days after written request by the other, to execute, acknowledge and deliver to and in favor of any proposed mortgagee, leasehold mortgagee, purchaser of the Premises, assignee, subtenant, transferee, or purchaser of all or substantially all assets of Tenant, an estoppel certificate, substantially in the form of Exhibit "C" attached hereto, stating, among other things (i) whether this Lease is in full force and effect, (ii) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment, (iii) the date to which Rent and other charges have been paid, and (iv) whether the party furnishing such certificate knows of any default on the part of the other party under this Lease, or has any claim against such party and, if so, specifying the nature of such default or claim.

(e)    Upon written demand by the holder of any mortgage encumbering the Premises, Tenant shall forthwith execute, acknowledge and deliver an agreement in favor of and in the form customarily used by such encumbrance holder, by the terms of which Tenant shall agree to give prompt written notice to such encumbrance holder in the event of any casualty damage to

17

the Premises or in the event of any default on the part of Landlord under this Lease, and shall agree to allow such encumbrance holder a reasonable length of time after notice to cure or cause the curing of such default before exercising Tenant's rights under this Lease, or terminating or declaring a default under this Lease.

(f)    In the event Landlord transfers, sells or assigns the Premises during the term of this Lease or any renewals thereof Tenant shall, within seven (7) days after written request by Landlord, provide Landlord with a franchisor certificate stating that Tenant is not in default under any franchise agreement with Franchisor.

## 19.    <u>USE OF PREMISES</u>

Landlord shall not be required to approve any use which Landlord deems to be "noxious or offensive", which shall be defined to mean an off-track betting business, massage parlor, blood bank, or adult or adult video rental store (which are defined as stores in which thirty percent (30%) or more of the inventory is not available for sale to children under eighteen (18) years old); or a business, the primary or exclusive operation of which consists of a dance hall, bar serving alcoholic beverages, billiard or pool hall, bingo parlor, video game arcade or night club. Tenant shall operate such restaurant on the Premises except for temporary closure due to repairs, Acts of God, renovation, other upgrades, remodeling, scrapes or rebuilds, or other actions that may be required under the Franchise Agreement, and similar matters, and as otherwise contemplated by Section 13(a)(v) of this Lease. Tenant shall at all times maintain the Premises in material compliance with all applicable regulations and requirements of all county, municipal, state, federal and other governmental authorities, and instruments of record affecting the Premises which are now in force or which are enacted during the term of this Lease.

## 20.    <u>NOTICES</u>

All notices and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by a nationally recognized overnight courier or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Landlord:    **RESTAURANT REAL ESTATE HOLDINGS, LLC**
Two Concourse Parkway, Suite 155
Atlanta, Georgia 30328-6192
Fax: (770) 395-9668

If to Tenant:    **CFRA, INC.**
Two Concourse Parkway, Suite 155
Atlanta, Georgia 30328-6192
Fax: (770) 395-9668

Any party may change its address for notices by written notice in like manner as provided in this paragraph and such change of address shall be effective seven (7) days after the date notice of such change of address is given. All notices given in accordance with the terms hereof shall be deemed given when it shall have been received, or upon refusal of delivery.

18

With respect to any such notice, Tenant shall, and Landlord shall use its best efforts to, simultaneously deliver a copy of such notice by facsimile at the appropriate facsimile number above to the other party; provided however, that certified mail or overnight courier delivery shall nevertheless be required to effect proper notice hereunder.

## 21.    **INDEMNIFICATION**

Tenant does hereby indemnify and exonerate and agrees to hold Landlord harmless against and from all liabilities, losses, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable architects' fees, attorneys' fees, paralegal fees, and legal costs and expenses incurred by Landlord during the term of this Lease or any extension or renewal hereof or while Tenant is occupying the Premises, whether or not judicial proceedings are filed, and including on appeal and in any bankruptcy proceedings, which are caused by, incurred, or result from Tenant's operations of or relate in any manner to Tenant's use of the Premises, or which may be imposed upon or asserted against or incurred by Landlord by reason of any of the following occurring (excluding from such indemnification any liabilities, losses, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable architects' fees, attorneys' fees, paralegal fees, and legal costs and expenses arising from the gross negligence or willful misconduct of Landlord or its agents, representatives, or employees):

(a)    any work or thing done by Tenant in respect of construction of, in or to the Premises or any part of the improvements now or hereafter constructed on the Premises;

(b)    any use, possession, occupation, operation, maintenance or management of the Premises or any part hereof by Tenant;

(c)    any failure to, or to properly, use, possess, occupy, operate, maintain or manage the Premises or any part thereof;

(d)    the condition, including environmental conditions, of the Premises or any part thereof;

(e)    any negligence on the part of Tenant or any of its agents, contractors, servants, employees, licensees or invitees;

(f)    any accident, injury or damage to any person or property occurring in, on or about the Premises or any part thereof including any sidewalk adjacent thereto; and

(g)    any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with.

## 22.    **COOPERATION**

(a)    Landlord shall fully cooperate with Tenant throughout the term of this Lease to secure or maintain proper zoning, building and other permits and compliance with all applicable laws. Landlord shall execute any petitions, requests, applications and the like as Tenant shall reasonably request in order to obtain any permit, license, variances and approvals which, in the

19

reasonable judgment of Tenant, are necessary for the lawful construction and/or operation of Tenant's business on the Premises, provided, however, that Tenant shall indemnify and save Landlord harmless from any and all expenses, costs, charges, liabilities, losses, obligations, damages and claims of any type which may be imposed upon, asserted against or incurred by Landlord by reason of same.

(b)      In the event of a substitution of the Premises pursuant to the terms and conditions of Paragraph 36 hereof, Landlord shall have the right, in Landlord's sole discretion, to enter into an exchange agreement with a qualified intermediary in order to effectuate a like-kind exchange of the Premises for one or more other properties. Landlord and Tenant agree that Tenant, at no cost to Tenant, shall cooperate with Landlord in effecting a like-kind exchange of the Premises by Landlord pursuant to and in accordance with the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder, and, if applicable, state law for the state in which the Premises is located.

## 23.    **EXCULPATION**

Landlord shall not be liable to Tenant, Tenant's employees, agents, invitees, licensees or any other person whomsoever for any injury to person or damage to property on or about the Premises caused by the negligence or misconduct of Tenant, its agents, servants or employees or of any other person entering the building under express or implied invitation by Tenant or due to any other cause whatsoever, unless caused by the negligence or neglect of Landlord, its employees or its authorized representatives.

Tenant shall not be liable to Landlord, Landlord's employees, agents, invitees, licensees or any other person whomsoever for any injury to person or damage to property on or about the Premises caused by the gross negligence or willful misconduct of Landlord, its agents, servants or employees.

## 24.    **LANDLORD'S LIABILITIES**

The term "Landlord" as used in this Lease means the owner from time to time of the Premises.  Neither Landlord nor any partner, shareholder or beneficiary thereof shall have any personal liability with respect to any of the provisions of this Lease, and if Landlord is in default with respect to its obligations hereunder, Tenant shall look solely to the equity of Landlord in the Premises.

## 25.    **SUCCESSORS**

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

## 26.    **ENTIRE AGREEMENT/MEMORANDUM OF LEASE**

This Lease contains the entire agreement between the parties hereto and may not be modified in any manner other than in writing signed by the parties hereto or their successors in

interest. A memorandum of this Lease shall be executed by the parties and shall be recorded in the official records of the county where the Premises is located.

## 27.    GENDER

Whenever the context hereof permits or requires, words in the singular may be regarded as in the plural and vice-versa, and personal pronouns may be read as masculine, feminine and neuter.

## 28.    BROKERAGE FEES

It is understood and agreed that neither party has incurred any real estate brokerage fees or commissions arising out of this Lease and each party agrees to hold the other harmless from and against all such fees and commissions incurred, and costs related thereto including legal fees, as a result of its own conduct or alleged conduct.

## 29.    CAPTIONS

The captions of this Lease are for convenience only, and do not in any way define, limit, disclose, or amplify terms or provisions of this Lease or the scope or intent thereof.

## 30.    NOT A SECURITY ARRANGEMENT

The parties hereto agree and acknowledge that this transaction is not intended as a security arrangement or financing secured by real property, but shall be construed for all purposes as a true lease.

## 31.    NET LEASE

It is the intention of the parties hereto that this Lease is and shall be treated as an absolute triple net lease, and that any and all costs expenses or charges (including, without limitation, all ground lease rental payments, if any, with respect to the Premises or the real property of which the Premises are a part) with respect to the Premises shall be the sole responsibility of Tenant. Any present or future law to the contrary notwithstanding, except as expressly set forth in this Lease, this Lease shall not terminate, nor shall Tenant be entitled to any abatement, suspension, deferment, reduction, setoff, counterclaim, or defense with respect to Rent, nor shall the obligations of Tenant hereunder be affected by reason of the following, except as may otherwise be provided in this Lease: any damage to or destruction of the Premises or any part thereof; any taking of any Premises or any part thereof or interest therein by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any other reason; any title defect or encumbrance or any matter affecting title to the Premises or any part thereof; any eviction by paramount title or otherwise; any default by Landlord hereunder; any proceeding relating to Landlord; the impossibility or illegality of performance by Landlord; any action of governmental authority; any breach of warranty or misrepresentation; any defect in the condition, quality or fitness for use of the Premises or any part thereof; or any other cause whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge of any of the foregoing.  The parties intend that the

21

obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated in accordance with an express provision of this Lease.

## 32.    WAIVER

No waiver by Landlord of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant of the same or any other provision. Landlord's consent to, or approval of, any act as required hereunder shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any such subsequent act by Tenant.   The acceptance of Rent hereunder by Landlord shall not be a waiver of any preceding Default by Tenant of any provision hereof, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent.

## 33.    TIME OF THE ESSENCE

Landlord and Tenant agree that time shall be of the essence of all terms and provisions of this Lease.

## 34.    GOVERNING LAW

This Lease shall be construed in accordance with the laws of the state in which the Premises are located.

## 35.    RESERVED

## 36.    ECONOMIC SUBSTITUTION

(a)    In the event Tenant determines in its reasonable business discretion, exercised in good faith, that the Premises is inadequate or unprofitable for the purposes for which the same are then used pursuant to this Lease, then Tenant may, at Tenant's option, during the term of this Lease or any extensions thereof, give written notice to Landlord of its intention to substitute another improved property having an IHOP Restaurant located thereon or to be developed with an IHOP Restaurant thereon, provided that the restaurant is operational at time of the closing of the substitution, which shall have a value no less than the greater of the following: (i) the then current value of the Premises as established by a qualified independent appraiser selected by Landlord (who is a member of the American Institute of Real Estate Appraisers); or (ii) the Total Cost; provided, however, the substitute property meets all of Landlord's underwriting requirements, including, but not limited to, confirmation that the rating of any bonds or trust certificates issued in connection with a securitization in which this Lease is included will not change as a result of the substitution.   Such other substitute property shall be subject to (iii) Landlord's reasonable approval (not to be unreasonably withheld, delayed or conditioned); and (iv) the approval of any then mortgagee having an interest in the Premises.   In addition to any other requirements of this paragraph with respect to the substitute property, it shall not be unreasonable for Landlord to reject a substitute property based on:   (v) an unacceptable site inspection performed by Landlord or its agents, (vi) location of the substitute property in the State of Tennessee, (vii) Tenant's failure to comply with any of Landlord's normal due diligence

and opinion letter requirements or (viii) failure of the substitute property to comply with any of Landlord's normal due diligence requirements. The terms of the related lease for such substitute property shall be identical to this Lease, except that the term shall be for the then remainder of the term of this Lease (considering renewal options). Tenant shall pay all reasonable costs associated with the closing to effect the substitution including but not limited to additional environmental work. If an acceptable site has been offered for substitution, Landlord shall convey the subject property to Tenant via Special Warranty Deed or Limited Warranty Deed, depending on the applicable jurisdiction. The Special Warranty Deed or Limited Warranty Deed, as the case may be will contain a right of first refusal to repurchase the Premises in favor of Landlord for the lesser of (i) five (5) years, or (ii) the remaining term of this Lease including all renewal options. Under said right of first refusal, Landlord shall have not less than thirty (30) days but not more than forty-five (45) days from receipt of notice from Tenant (together with all supporting information regarding the purchase and sale requested by Landlord) to exercise its right. If Landlord chooses to exercise its right, Landlord shall then have fifteen (15) days to close on the repurchase of the Premises. Landlord and Tenant shall share the costs of any repurchase in a manner consistent with local custom. Upon Landlord's and any mortgagee's approval of the substitution of the Premises, a closing of title shall take place as soon as reasonably practical thereafter, but in no event later than sixty (60) days after Tenant is notified that Landlord has approved the substitution. If Landlord and Landlord's mortgagee (if any) do not approve such substitute property, Tenant may submit other properties to Landlord for Landlord's (and Landlord's mortgagee, if any) approval. In no case shall Tenant exercise this right more than once during the term of this Lease, inclusive of any extension periods.

(b)    In the event Tenant chooses to exercise the right of economic substitution as set forth in this section, then Landlord may elect in writing, in its sole and absolute discretion and within forty-five (45) days of receipt of Tenant's notice of its intention to substitute the Premises, to terminate this Lease and retain the Premises, free and clear of the Lease and related documents, and effective as of a date chosen by Landlord and occurring not earlier than sixty (60) nor more than one hundred twenty (120) days following the date of Landlord's election notice (the "Termination by Substitution Date"). On or before the Termination by Substitution Date, Tenant shall: (i) pay to Landlord all sums which are or will be due and payable or will otherwise accrue under the Lease prior to or as of the Termination by Substitution Date, (ii) surrender the Premises to Landlord in properly secured and broom clean condition, and (iii) execute such documents as are reasonably required by Landlord to evidence termination of the Lease. Upon completion by Tenant of each of the aforesaid obligations, Tenant shall thereafter be relieved of all further obligations under this Lease.

## 37.    TENANT'S OBLIGATION TO MAINTAIN FRANCHISE AGREEMENT

Tenant agrees that if the Franchise Agreement is, by its terms, scheduled to expire prior to the Termination Date of the Lease, Tenant shall comply with all obligations set forth in the Franchise Agreement necessary to extend such Franchise Agreement or enter into a new franchise agreement for a period equal to the lesser of (i) the then-remaining Term of the Lease (not including any unexercised renewals or extensions of the Lease Term); or (ii) the term in Franchisor's then standard form franchise agreement, and in the event that this extension or new franchise agreement in (ii) results in a Franchise Agreement term that is less than the remaining term of this Lease, Tenant shall again use its best efforts to comply with all obligations set forth

in the Franchise Agreement necessary to extend such Franchise Agreement or enter into a new franchise agreement and to continue to extend such Franchise Agreement or enter into a new franchise agreement so that in no event shall the Franchise Agreement expire prior to the then-remaining Term of the Lease (not including any unexercised renewals or extensions of the Lease Term). Notwithstanding the foregoing, Tenant shall only be obligated to obtain an extension of the franchise agreement (rather than a new franchise agreement) if an extension is then currently available from Franchisor. Landlord and Tenant acknowledge that on the Effective Date hereof Franchisor may not offer any extensions of the franchise agreement thus Tenant would be required to obtain a new franchise agreement upon any expiration.

## 38.    SEVERABILITY

If any provision of this Lease becomes unenforceable for any reason, such unenforceability shall not limit or impair the operation or validity of any other provision of this Lease.

## 39.    JURISDICTION, VENUE, AND GOVERNING LAW

If any party to this Lease institutes any lawsuit or other action or proceeding against the other party and pertaining to this Lease, any right or obligation of any party hereunder, breach of this Lease or otherwise pertaining to the Premises, the sole and exclusive venue and jurisdiction for filing and maintaining any such lawsuit or other action or proceeding shall be in the jurisdiction where the Premises are located, and the parties to this Lease waive the right to institute or maintain any such suit, action or proceeding in any other courts or forums whatsoever. Each party by executing this Lease consents and submits itself to the personal jurisdiction of such court. This Lease shall be construed and governed in accordance with the laws of the state where the Premises are located without regard to conflict of law principles.

## 40.    COUNTERPARTS

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

## 41.    SPECIALLY    DESIGNATED    NATIONALS;    BLOCKED    PERSONS; EMBARGOED PERSONS

(a)    Tenant represents and warrants to Landlord that (1) Tenant and each person or entity directly or indirectly owning an interest in Tenant is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control of the Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"), and (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, (2) none of the funds or other assets of Tenant constitute property of, or are beneficially owned, directly or indirectly, by, any Embargoed Person, (3) no Embargoed Person has any interest of any nature whatsoever in Tenant (whether directly or indirectly), (4) none of the funds of Tenant have been derived from any unlawful activity with the result that the investment in

Tenant is prohibited by law or that this Lease is in violation of law, and (5) Tenant has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times.  The term "Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., the Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Tenant is prohibited by law or Tenant is in violation of law.

(b)    Tenant covenants and agrees (1) to comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect, (2) to immediately notify Landlord in writing if any of the representations, warranties or covenants set forth in this paragraph or the preceding paragraph are no longer true or have been breached or if Tenant has a reasonable basis to believe that they may no longer be true or have been breached, (3) not to use funds from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) to make any payment due to Landlord under this Lease and (4) at the request of Landlord, to provide such information as may be requested by Landlord to determine Tenant's compliance with the terms hereof.

(c)    Tenant hereby acknowledges and agrees that Tenant's inclusion on the List at any time during the term of this Lease shall be an event of Default.  Notwithstanding anything herein to the contrary, Tenant shall not knowingly permit the Premises or any portion thereof to be used or occupied by any person or entity on the List or by any Embargoed Person (on a permanent, temporary or transient basis), and any such use or occupancy of the Premises by any such person or entity shall be a material Default of this Lease.

## 42.    LEASEHOLD MORTGAGE; FINANCING.

(a)    Landlord and Tenant acknowledge and agree that Tenant may obtain a leasehold mortgage in and to Tenant's interest under this Lease and Tenant's Property (as hereinafter defined) in the Premises.  Landlord hereby consents to such leasehold mortgage and agrees that such leasehold mortgage shall not constitute a default hereunder.

(b)    Landlord, if requested by Tenant, agrees to execute, acknowledge, and deliver an instrument which Landlord subordinates its lien rights to the lien rights of Tenant's Leasehold Mortgagee, any equipment lender, or lessor, of **Tenant's Property**, and to all rights of levy for distraint for rent against same; provided any damage to the Premises caused by, or resulting from the removal of any of Tenant's Property or other personal property therefrom (including the leaving of holes or other openings in the roof or exterior of the building) shall be promptly repaired by Tenant or the party entitled to remove same.  As part of such subordination, Landlord agrees to permit such entity providing such financing to store equipment, fixtures or furnishings at the Premises for a period not to exceed thirty (30) days (or Landlord may remove such equipment, fixtures or furnishings at such financing entity's expense), or to remove such Tenant's Property from the Premises following reasonable notice to Landlord, provided such financing entity restores the Premises including without limitation, the covering and sealing of holes in the roof or outside walls and repairs all damage caused by such removal.

25

43.    **RIGHT OF FIRST REFUSAL**.

If Landlord elects during the term of this Lease, including any renewals, to sell or otherwise transfer all or any portion of the Land whether separately or as part of a larger parcel of which the Land is a part, Tenant shall have the right of first refusal to meet any bona fide offer of sale or transfer on the same terms and conditions of such offer, and to thereafter proceed to close pursuant to the terms of such offer.  If Tenant fails to meet such bona fide offer within fifteen (15) days after written notice thereof from Landlord, Landlord may sell or grant the interest in the Land or portion thereof to such third person in accordance with the terms and conditions of such third party offer.  Tenant's election not to exercise its right of first refusal shall not prejudice Tenant's rights hereunder as to any further bona fide offer.

**[Signatures on Next Page]**

26

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Lease Agreement to be effective as of the day and date first above written.

"LANDLORD"

**RESTAURANT REAL ESTATE HOLDINGS, LLC,** a Delaware limited liability company

By:  Prometheus V, LLC, a Delaware limited liability company, Manager

By:
Name: Nicholas Peters
Title: Manager

**"TENANT"**

**CFRA, INC.,** a Delaware corporation

By:_____

Name:  Nicholas Peters

Title:  President

<u>ATTACHED</u>
Exhibit "A" - Legal Description
Exhibit "B" – Reserved
Exhibit "C" - Estoppel Certificate
Rent Addendum
IHOP Addendum to Lease

**EXHIBIT "A"**

**Legal Description**

Land in Rutherford County, State of Tennessee, and being Lot 13 on the Final Plat of Lot 13 and the 2nd Resubdivision of Lot 4 of Team Chevrolet Subdivision, as shown by plat of record in Plat Book 31, Page 42, in the Register's Office of Rutherford County, Tennessee, to which reference is hereby made for a more complete description.

Being the same property conveyed to RREH SPE, LLC by Deed from Smyrna Theatres, LLC (also known as Smyrna Theaters, LLC), a Tennessee limited liability company, of record in Book RB797, page 3895, dated November 7, 2007, Register's Office for Rutherford County, Tennessee.

**EXHIBIT "B"**

**<u>Reserved</u>**

## EXHIBIT "C"

### <u>ESTOPPEL CERTIFICATE</u>

The undersigned with respect to the premises at _____ as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference (the "Premises"), certifies and affirms the following to _____ [["Tenant")]]  [["Landlord")]] and to _____ [["Mortgagee")]] [["Purchaser")]]:

1.    Tenant leases the Premises from Landlord under that certain Lease dated _____, attached hereto and made a part hereof by this reference (the "Lease").

2.    Rental under this Lease has been paid through _____, 20__.  No rent has been paid more than thirty (30) days in advance, except as described in the preceding sentence.  The monthly base rental amount is $_____.

3.    The term of the Lease is _____ through _____, a period of _____ years.  Tenant has _____ options to extend the Lease for _____ years each, for a total term including all options through _____ as set forth in the Lease.

4.    Tenant has paid Landlord the sum of $_____ as security deposit pursuant to the Lease and any amendments thereof.

5.    Tenant, to the best of the undersigned officer's knowledge and belief without any independent investigation, is not in default under any term of the Lease.

6.    Landlord, to the best of the undersigned officer's knowledge and belief without any independent investigation, is not in default under any terms of the Lease.

7.    The Lease is in full force and effect and Tenant has not entered into any modifications or amendments unless attached hereto.

This Certificate may be relied upon by [[Purchaser]] [[Mortgagee]], who intends to [[purchase the Premises] [and the Lease from Landlord], and by any mortgage lender of such person]] [[provide secured [lease] [loan] financing to [Landlord] [Tenant]].

Dated this _____ day of _____, 200____
[[Landlord]] [[Tenant]]: _____
By: _____
Title: _____

IHOP Store no. 3218, Rutherford County, Tennessee

## RENT ADDENDUM
### to
### LEASE AGREEMENT

THIS RENT ADDENDUM dated November 26, 2008, by and between **RESTAURANT REAL ESTATE HOLDINGS, LLC,** a Delaware limited liability company, as "Landlord", and **CFRA, INC.,** a Delaware corporation, as "Tenant", for IHOP Store no. 3218, City of La Vergne, Rutherford County, Tennessee, is attached to and made a part of that certain Lease Agreement by and between Landlord and Tenant of even date herewith (the "Lease"). Notwithstanding any other provision to the contrary which may be contained in said Lease, it is specifically agreed by and between Landlord and Tenant as follows:

1.   **Definitions.**   Capitalized terms used in this Rent Addendum shall, unless otherwise defined, have the meaning ascribed to them in the Lease.

2.   **Commencement of Rent.**   On the date hereof, Landlord has simultaneously entered into the Lease with Tenant pursuant to which Tenant has agreed to lease from Landlord the Premises.  Payment of Annual Rent shall commence as of the Effective Date.

3.   **Annual Rent.**

(a)   Beginning on the Effective Date through the expiration of the Term (including any renewal term), Tenant covenants and agrees to pay to Landlord annual rent ("Annual Rent") according to the following schedule:

| Lease Years | Annual Rent | Monthly Installment |
|---|---|---|
| 1 through 5 | $250,000.00 | $20,833.33 |
| 6 through 10 | $268,750.00 | $22,395.83 |
| 11 through 15 | $288,906.25 | $24,075.52 |
| 16 through 20 | $310,574.22 | $25,881.18 |

All payments of Annual Rent shall be paid in equal monthly installments paid monthly in advance, on the first (lst) business day of each month.

(b)   Increases in Annual Rent.  Commencing at the end of the fifth (5th) Lease Year after the Effective Date, and on each five (5) year anniversary of such date thereafter during the term of this Lease (and any extension thereof), Annual Rent shall be increased by an amount equal to seven and one-half percent (7.5%) of the Annual Rent payable during the immediately preceding Lease Year.

(c)   Partial Months.  If the date on which Annual Rent shall be first due and payable shall fall on a day other than the first day of a calendar month, then Rent for the partial

4.     **Sales/Use Tax**.  Tenant shall also pay to Landlord any sales and use tax imposed on any Rent payable hereunder from time to time by state law or any other governmental entity, which sums are due monthly as to monthly Rent payments on the due date of the Rent payment under this Lease.

5.     **Reporting.**  Tenant and Guarantor shall, during the term of this Lease and any extensions thereto:  (i) keep books and records reflecting its financial condition including, but not limited to, the operation of the Premises in accordance with generally accepted accounting principles consistently applied; and (ii) report to the Landlord on a semi annual basis, within thirty (30) days of the end of the Tenant's second quarter and end of each fiscal year, monthly store sales.  Tenant hereby authorizes Franchisor to release to Landlord any and all inspection reports issued by Franchisor to Tenant relating to the Premises.  Further, in the event Landlord seeks to securitize or otherwise transfer the Lease, then (upon Landlord's request), Tenant and Guarantor agree to cooperate with Landlord in providing such information as would be reasonably required for the transaction, including but not limited to income and expense statements for the Premises.  Tenant agrees that any default by Guarantor regarding compliance with such requirements shall, at Landlord's option, be and constitute a Default under this Lease.  Landlord shall maintain confidentiality and not disclose such information to third parties except (x) as may be required, in Landlord's reasonable judgment, for the exercise of Landlord's rights under this Lease, or as may be required by law; (y) for disclosure under signed Confidentiality Agreements to prospective lenders or purchasers; or (z) for purposes of a net lease securitization.  All other disclosures shall require the prior written consent of Tenant and, as applicable, the Guarantor.  Under no circumstance, including but not limited to a sale of the Premises or a securitization, unless required by law, shall Tenant be required to provide financial information with respect to the Premises, on a store-level basis or otherwise, other than monthly sales figures as set forth above.  Notwithstanding the foregoing, if an assumption or assignment of the Lease occurs wherein Franchisor becomes a successor tenant, the above stated reporting requirements shall not apply to Franchisor for so long as Franchisor is a publicly traded company whose annual report is publicly available.

6.     **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received on or before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent within ten (10) days after the date due hereunder, interest at the rate of the lesser of eighteen percent (18%) per annum or of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of such grace period until Landlord receives such Rent.

7.     **Payments of Rents.**  All Rent payments shall be made by electronic funds transfer to Landlord to the account and in accordance with the procedures designated by Landlord, or in such other manner as Landlord or its successors or assigns, respectively, may from time to time designate in writing.

8.    **No Abatement.**  Unless otherwise stated in the Lease, no abatement, offset, diminution or reduction of (a) Rent, charges or other compensation, or (b) Tenant's other obligations under this Lease shall be allowed to Tenant or any person claiming under Tenant, under any circumstances or for any reason whatsoever.

**[Initials on Next Page]**

Initialed for Identification:

_____
By Landlord

_____
By Tenant

IHOP Store no. 3218, Rutherford County, Tennessee

## ADDENDUM TO LEASE

THIS ADDENDUM TO LEASE (the "Addendum") forms a part of that certain Lease dated November 26, 2008, by and between RESTAURANT REAL ESTATE HOLDINGS, LLC, a Delaware limited liability company, as Lessor, and CFRA, INC, a Delaware corporation, as Lessee, demising those certain premises located at 779 Team Boulevard, City of La Vergne, Rutherford County, Tennessee.

### RECITALS:

WHEREAS, Lessor and Lessee acknowledge that the anticipated use of the Demised Premises is the conduct of an International House of Pancakes® Restaurant thereon, pursuant to the terms of a certain Franchise Agreement (the "Franchise Agreement") to be entered into between IHOP Franchising, LLC, a Delaware limited liability company ("IHOP"), as Franchisor, and Lessee, as Franchisee, and that by reason of such use certain benefits will inure to Lessor and Lessee; and

WHEREAS, Lessor and Lessee further acknowledge that in the event the Lease or Franchise Agreement, or both, are terminated by reason of the default of Lessee and the business of an International House of Pancakes® Restaurant upon the Demised Premises ceases or is otherwise interrupted, certain damages to IHOP and/or its servicemark will result; therefore, IHOP has required, as a condition to the Franchise Agreement, that Lessor and Lessee enter into this Addendum for the purpose of granting certain succession rights to IHOP in the event of a default by Lessee under the Lease or in the event of a termination of the Franchise Agreement, or both, so that the business of an International House of Pancakes® Restaurant, at IHOP's election, may continue to be conducted upon the Demised Premises, as hereinafter provided.

NOW, THEREFORE, in consideration of the above premises and as an inducement to IHOP to enter into the Franchise Agreement with Lessee, the parties hereto hereby agree as follows:

Notwithstanding anything contained in the Lease to the contrary:

A.    In the event Lessor shall declare a default under the Lease due to Lessee's failure to perform any obligation of Lessee under the terms of the Lease, and in the event Lessee shall fail to cure such default within the period provided in the Lease or at law for such cure, before Lessor shall take any action to terminate the Lease or Lessee's right to possession of the Demised Premises, Lessor shall give written notice to IHOP at 450 North Brand Boulevard, 7th Floor, Glendale, California 91203, of its intention to so terminate the Lease or Lessee's right to possession of the Demised Premises, whereupon IHOP shall have a period of ten (10) days after its receipt of said notice to notify Lessor in writing that IHOP has elected to cure such default

and to succeed to Lessee's rights under the Lease.  IHOP's right to so succeed to Lessee's interest under the Lease shall be conditioned upon IHOP tendering to Lessor an amount sufficient to cure any monetary defaults of Lessee then existing under the Lease, within ten (10) days after the date of IHOP's giving of such notice, and curing any nonmonetary defaults within a reasonable period of time after IHOP shall obtain possession of the Demised Premises.  Notwithstanding the foregoing, in the event Tenant has obtained a leasehold mortgage, so long as Tenant's Mortgagee has any cure rights with regards to the Lease, IHOP's notice and cure period described in this Addendum shall not commence until the expiration of the rights of Tenant's Mortgagee under the Lease.

B.    If for any reason the Lease is terminated before IHOP shall have the right to exercise its election to succeed to Lessee's interest under the Lease, as contemplated above, Lessor shall promptly notify IHOP in writing of such termination, and, provided IHOP notifies Lessor in writing of its desire to obtain possession of the Demised Premises within ten (10) days after the date that IHOP shall receive written notice from Lessor that said Lease has been terminated, then Lessor shall enter into a new lease with IHOP for the remainder of the term and any option terms that would have been available under the Lease, but for such termination, within ten (10) days after the date that IHOP shall give such notice, provided IHOP pays Lessor an amount sufficient to cure any monetary defaults of Lessee then existing under the Lease and within a reasonable period of time after IHOP obtains possession of the Demised Premises, cures any nonmonetary defaults under the Lease.

C.    In the event of the termination of the Franchise Agreement as a result of Lessee's breach thereof, IHOP shall also have the right to succeed to the interest of Lessee under the Lease by giving written notice to Lessor of its election to so succeed to Lessee's interest under the Lease, within ten (10) days after the date of the termination of the Franchise Agreement.

D.    In the event IHOP elects to succeed to Lessee's interest under the Lease pursuant to paragraphs A, B or C above, IHOP shall attorn to Lessor and shall assume all of the obligations thereafter to be performed by Lessee under the Lease, including all amendments, addenda and supplements thereto.

E.    In the event IHOP elects to succeed to Lessee's interest under the Lease pursuant to paragraphs A, B or C above, IHOP shall have the unqualified right to sublease the Demised Premises to a franchisee or prospective franchisee of IHOP meeting IHOP's minimum standard qualifications, without the written consent of Lessor, and in so doing IHOP shall have no obligation to pay to Lessor any consideration or portion thereof derived by Lessee in connection therewith.

INITIALS:    Lessor: _____    Lessee: _____

Please return to:

FOWLER WHITE BOGGS BANKER
2235 First Street
Fort Myers, FL 33901
Attention: Mr. Garey F. Butler

## MEMORANDUM OF LEASE

THIS MEMORANDUM is made as of the 26th day of November, 2008, by and between:

    **RESTAURANT REAL ESTATE HOLDINGS, LLC,** a Delaware limited liability company (hereinafter referred to as "Landlord"); and

    **CFRA INC.,** a Delaware corporation ("Tenant").

WHEREAS, by a certain Lease Agreement dated as of November 26, 2008 (hereinafter referred to as the "Lease"), Landlord leased to Tenant the premises (hereinafter referred to as the "Premises") described in the Lease and also set forth in item 4 below, subject to the terms, covenants, and conditions set forth in the Lease; and

WHEREAS, Landlord and Tenant have executed this Memorandum for the purpose of submitting it to be recorded in the public records of Rutherford County, Tennessee.

NOW, THEREFORE, WITNESSETH, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto state as follows with respect to the Lease:

1.   Names of the parties:

    Landlord:    Restaurant Real Estate Holdings, LLC

    Tenant:    CFRA, Inc.

2.   The addresses of the parties set forth in the Lease:

    Landlord's Address:   Two Concourse Parkway
                      Suite 155
                      Atlanta, Georgia 30328

    Tenant's Address:    Two Concourse Parkway
                      Suite 155
                      Atlanta, Georgia 30328

3.  Reference to the Lease:

The Lease was executed by and between Landlord and Tenant and was dated as of November 26, 2008.

4.  Description of the Premises as set forth in the Lease:  See Attached Exhibit A.

5.  Original Term of the Lease:

    Commencement Date:          November 26, 2008

    Termination Date:           Twenty years after the Effective Date (as identified in the Rent Addendum)

6.  Renewal Options:  Tenant shall have four (4) successive five (5) year options to extend this Lease for up to an additional twenty (20) years upon the same terms, covenants, conditions and rental as set forth in the Lease provided that Tenant is not in Default thereunder at the commencement of such option period.

    Notice Procedure:  In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than six (6) months prior to the Termination Date or expiration of the then current option period, as applicable, provided however that Tenant's right to renew shall not expire even within such six (6) month period unless Landlord has provided Tenant written notice requesting a decision of renewal, and Tenant has failed to respond within fifteen (15) days after such notice.  Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall expire at the Termination Date or end of the then current option period, as applicable.

7.  Rights of Franchisor:  Landlord and Tenant have granted IHOP Franchising, LLC, a Delaware limited liability company, and its affiliates certain conditional rights, including possession, in and to the Premises.

    IN WITNESS WHEREOF, the parties have executed this Memorandum as of the day and year first above written.

### [SIGNATURES CONTAINED ON FOLLOWING PAGES.]

| Signed, sealed, and delivered this 23rd day of December 200X, in the presence of: | LANDLORD: |
|---|---|
| _____ (Unofficial Witness) | RESTAURANT REAL ESTATE HOLDINGS, LLC, a Delaware limited liability company |
| Pamelyn N. Davison _____ (Notary Public) | By: Prometheus V, LLC<br><br>By: _____<br>Name: Nicholas Peters<br>Title: Manager |

**[SIGNATURES CONTINUED ON FOLLOWING PAGE.]**

PAMELYN N DAVISON
Notary Public
Cherokee County
State of Georgia
My Commission Expires May 17, 2009

Signed, sealed, and delivered this 23rd day of December, 200 8, in the presence of:

_____
(Unofficial Witness)

_____
(Notary Public)

TENANT:

CFRA, INC., a Delaware corporation

By: _____
Name: Nicholas Peters
Title: President

PAMELYN N DAVISON
Notary Public
Cherokee County
State of Georgia
My Commission Expires May 17, 2009

PAMELYN N DAVISON
Notary Public
Cherokee County
State of Georgia
My Commission Expires May 17, 2009

QUALITY PROTECTION SINCE 1882

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE ("**Assignment**") is made and entered into as of April 24, 2009, between RESTAURANT REAL ESTATE HOLDINGS, LLC, a Delaware limited liability company ("**Assignor**"), and CASUAL DINING SMYRNA, LLC, a Tennessee limited liability company ("**Assignee**" or "**Borrower**").

### RECITALS

**A.**    Assignee (as successor in interest to Rose Realty, a New Jersey corporation, and Mr. Richard Nasano) is or will be the owner of that certain real property more particularly described in the attached **Exhibit "A"** ("**Property**"), and Assignor has entered into that certain "**Lease**" (as defined in **Exhibit "B"**) with a party who occupies the Property pursuant to said Lease.

**B.**    COLUMBIAN MUTUAL LIFE INSURANCE COMPANY, a New York corporation ("**Lender**"), has agreed to make a loan ("**Loan**") to Assignee, to be secured by a Deed of Trust, Assignment of Leases and Rents and Security Agreement (Including Fixture Filing) (as the same may hereinafter be amended, modified, restated, reviewed or extended from time to time, "**Deed of Trust**") encumbering the Property. The Deed of Trust and all other documents related to the Loan collectively shall be referred to as the "**Loan Documents**."

**C.**    In order to induce Lender to make the Loan to Borrower, Borrower has agreed to execute this Assignment.

### AGREEMENT

NOW, THEREFORE, with reference to the foregoing Recitals, and in reliance thereon and for good and valuable consideration, the receipt of which is hereby acknowledged, Borrower agrees as follows:

**1.**    **Assignment of Lease**.  Assignor hereby assigns, sells, transfers, grants, delivers and conveys to Assignee, and Assignee hereby accepts such assignment, all of Assignor's right, title and interest in, to and under the Lease.  The Assignor's interest assigned, sold, transferred, granted, delivered and conveyed under this paragraph shall include any and all rights, privileges and benefits of the Assignor under the Lease and the rents, revenue income, profits, reimbursements and other benefits accruing from said Lease subsequent to the date hereof and the security deposits held under said Lease as set forth on Exhibit "B" attached hereto.

**2.**    **Assumption**.  Assignee hereby accepts said assignment, sale, transfer and conveyance of the Lease and assumes and agrees to keep, perform and be bound by all of the terms, covenants, conditions and obligations which are required to be performed by Assignor under the Lease.

**3.**    **Assignment of Warranties**.  Assignor hereby assigns, sells, transfers, grants, delivers and conveys to Assignee, and Assignee hereby accepts such assignment, all of Assignor's right, title and interest in, to and under all warranties and guaranties made by or received from any third party with respect to any building, building component, structure, fixture, machinery, equipment, or material situated on, contained in any building or other improvement situated on, or comprising a part of any building or other improvement situated on, any part of the Property.

1

400901

4.    **Further Assurances**.  Assignor and Assignee each agree that it will at any time and from time to time after the date hereof, on the written request of the other party, execute, acknowledge and deliver, or cause to be delivered, all such further documents and assurances and perform all such further acts as may be reasonably requested by such requesting party to implement and give effect to this Agreement.

5.    **Successors and Assigns**.  This Assignment shall be binding upon and inure to the benefit of the successors, assignees, personal representatives, heirs and legatees of all the respective parties hereto.

6.    **Governing Law**.  This Assignment shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of Tennessee.

7.    **Counterparts**.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Assignment.

8.    **No Third Party Beneficiaries**.  Assignor and Assignee shall not be deemed to be in privity of contract with any other third party nor shall any provision of this Agreement be construed or deemed to create any third party beneficiary status for any third party.

9.    **Miscellaneous**.  Headings in this Assignment are for convenience only and shall not define or limit the provisions hereof.  This Assignment shall be construed according to its ordinary meaning and shall not be strictly construed for or against any party hereto.  Any modification or waiver of any term of this Assignment, including a modification or waiver of this term, must be in writing signed by the party or parties against whom enforcement of the modification or waiver is sought. Except for the Agreement and the documents referenced therein, this Assignment constitutes the entire agreement among the parties pertaining to the subject matter hereof and all prior and contemporaneous agreements, representations and understandings, written or oral, express or implied, are hereby superseded and merged into this Assignment.  Should any term, provision, covenant or condition of this Assignment be void, invalid or inoperative, the same shall not affect any other term, provision, covenant or condition of this Assignment, but the remainder thereof shall be effective as though such void, invalid or inoperative term, provision, covenant or condition had not been contained herein.


[The balance of this page is intentionally left blank.]

400901

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute and enter into this Assignment as of the date set forth below.

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute and enter into this Assignment as of the date set forth below.

ASSIGNOR

RESTAURANT REAL ESTATE HOLDINGS, LLC, a Delaware limited liability company

By: Prometheus VLLC, its Managing Member

By: _Nicholas Peters_, its _Managing Member_

ASSIGNEE

CASUAL DINING SMYRNA, LLC, a Tennessee limited liability company

By: _____
      Richard Nasano, its member

By: _____
      Val Nasano, its member

## EXHIBIT "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN IS SITUATED IN RUTHERFORD COUNTY, TENNESSEE, AND IS DESCRIBED AS FOLLOWS:

Land in Rutherford County, Tennessee, being Lot No. 13 on the Final Plat, Lot 13 & the 2nd Resubdivision of Lot 4, Team Chevrolet subdivision, of record in Plat Book 32, page 42, in the Register's Office for Rutherford County, Tennessee, to which Plan reference is hereby made for a more complete description of the property.

400901

**EXHIBIT "B"**
**LEASE**

| LESSEE | PREMISES | DATE OF LEASE EXECUTION | SECURITY DEPOSIT |
|---|---|---|---|
| CFRA, Inc., a Delaware corporation, d/b/a IHOP Restaurant (Store no. 3218) | 4,972 s.f. | 11/26/08 – 11/25/28 [with four (4) successive five (5) year options to extend] | $0.00 |
| TOTAL: | 4,972 s.f. | | |

Record Book
916 Pg 1243

Prepared by:
Please return to:
Garey F. Butler
Fowler White Boggs, PA
2235 First Street
Fort Myers, FL 33901
(239) 334 7892

---

## MEMORANDUM OF LEASE

THIS MEMORANDUM is made as of the __30th__ day of April, 2009, by and between:

**CASUAL DINING SMYRNA, LLC**, a Tennessee limited liability company (hereinafter referred to collectively as "Landlord"); and

**CFRA INC.** a Delaware corporation ("Tenant").

WHEREAS, by a certain Lease Agreement dated as of November 26, 2008  and as assigned on April __30th__, 2009 (hereinafter referred to collectively as the "Lease"), Landlord leased to Tenant the premises (hereinafter referred to as the "Premises") described in the Lease and also set forth in item 4 below, subject to the terms, covenants, and conditions set forth in the Lease; and

WHEREAS, Landlord and Tenant have executed this Memorandum for the purpose of submitting it to be recorded in the public records of Rutherford County, Tennessee.

NOW, THEREFORE, WITNESSETH, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto state as follows with respect to the Lease:

1.    Names of the parties:

       Landlord:    CASUAL DINING SMYRNA, LLC, a Tennessee limited liability company

       Tenant:       CFRA INC., a Delaware corporation

2.    The addresses of the parties set forth in the Lease:

       Landlord's Address:  30 Second Street, Suite 109
                            Hackensack, NJ  07601

Tenant's Address:    Two Concourse Parkway
Suite 155
Atlanta, Georgia 30328

3.    Reference to the Lease:

The Lease was executed by and between Restaurant Real Estate Holdings, LLC and Tenant and was dated as of November 26, 2008 and assigned by Restaurant Real Estate Holdings, LLC to Landlord on April 30th, 2009.

4.    Description of the Premises as set forth in the Lease:  See Attached Exhibit A.

5.    Original Term of the Lease:

Commencement Date:    November 26, 2008

Termination Date:    Twenty years after the Effective Date (as identified in the Rent Addendum)

6.    Renewal Options:  Tenant shall have four (4) successive five (5) year options to extend this Lease for up to an additional twenty (20) years upon the same terms, covenants, conditions and rental as set forth in the Lease provided that Tenant is not in Default thereunder at the commencement of such option period.

Notice Procedure:  In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than six (6) months prior to the Termination Date or expiration of the then current option period, as applicable, provided however that Tenant's right to review shall not expire even within such six (6) month period unless Landlord has provided Tenant written notice requesting a decision of renewal, and Tenant has failed to respond within fifteen (15) days after such notice.  Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall expire at the Termination Date or end of the then current option period, as applicable.

7.    Rights of Franchisor:  Landlord and Tenant have granted IHOP Franchising, LLC, a Delaware limited liability company, and its affiliates certain conditional rights, including possession, in and to the Premises.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the day and year first above written.

### [SIGNATURES CONTAINED ON FOLLOWING PAGES.]

Record Book
916 Pg 1245

Signed, sealed, and delivered this _____
day of January, 2009, in the presence of:

_____
(Unofficial Witness)

_____
(Notary Public)

LANDLORD:

**Casual Dining Smyrna, LLC, a
Tennessee limited liability company**

By: _____

Print Name: RICHARD NAVARO

Title: MEMBER

Signed, sealed, and delivered this 28
day of April, 2009, in the presence of:

E. Craddock
_____
(Unofficial Witness)

_____
(Notary Public) FOR SC

Commission Exp. 2-20-19

**[SIGNATURES CONTINUED ON FOLLOWING PAGE.]**

| | |
|---|---|
| Signed, sealed, and delivered this _____ day of April, 2009, in the presence of:<br><br>_Pamelin M. Dawson_<br>(Unofficial Witness)<br><br>_[signature]_<br>(Notary Public)<br>Notary Public, Fulton County, Georgia<br>My Commission Expires September 8, 2010 | **TENANT:**<br><br>**CFRA INC**, a Delaware corporation<br><br>By: _____<br>Name: Nicholas Peters<br>Title: Manager |

## EXHIBIT A TO MEMORANDUM OF LEASE
### Legal Description of the Premises

Land in Rutherford County, State of Tennessee, and being Lot 13 on the Final Plat of Lot 13 and the 2nd Resubdivision of Lot 4 of Team Chevrolet Subdivision, as shown by plat of record in Plat Book 32, Page 42, in the Register's Office of Rutherford County, Tennessee, to which reference is hereby made for a more complete description.

Being the same property conveyed to RREH SPE, LLC by Deed from Smyrna Theatres, LLC (also known as Smyrna Theaters, LLC), a Tennessee limited liability company, of record in Book RB797, page 3895, dated November 7, 2007, Register's Office for Rutherford County, Tennessee.

40626265v1

Being the same property conveyed to Restaurant Real Estate Holdings, LLC, a Delaware limited liability company, by deed from RREH SPE, LLC, a Delaware limited liability company, of record in Record Book 853, page 2133, Register's Office for Rutherford County, Tennessee, dated June 25, 2008.

Jennifer M Gerhart, Register
Rutherford County Tennessee
Rec #: 590041
Rec'd:      25.00    Instrument #: 1618728
State:       0.00
Clerk:       0.00            Recorded
EDP:         2.00      5/1/2009 at 3:00 PM
Total:      27.00             in
             Record Book 916 Pgs 1243-1247