ORDERED.

**Dated:  June 19, 2020**

Catherine M. Ewen

Catherine Peek McEwen
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

In re:

CFRA HOLDINGS, LLC       Case No. 8:20-bk-03608-CPM
             Chapter 11

             *Jointly Administered with:*
CFRA, LLC          Case No. 8:20-bk-03609-CPM
CFRA TRI-CITIES, LLC      Case No. 8:20-bk-03610-CPM

   Debtors.
_____/

## FINAL CONSENT ORDER (I) AUTHORIZING DEBTORS TO
## USE CASH COLLATERAL; (II) ACKNOWLEDGING EXTENT, VALIDITY
## AND PRIORITY OF LIEN; AND (III) SCHEDULING A FURTHER HEARING

**THIS MATTER** came on for hearing on June 5, 2020, June 8, 2020 and June 19, 2020, upon (i) the Motion (the "Cash Collateral Motion") [Docket No. 47] of CFRA, LLC and CFRA Tri-Cities, LLC (the "Operating Company Debtors"); and (ii) the *Notice of Perfection of Security Interest in Property Pursuant to 11 U.S.C. § 546(b) and Objection to Use of Cash Collateral* (the "Objections") (Case No. 8:20-bk-03609-CPM at Docket No. 15 and Case No. 8:20-03610-CPM at Docket No. 15) filed in the cases of each of the Operating Company Debtors by Valley National Bank ("VNB" or "Agent"), successor in interest to USAMERIBANK, and Raymond James Bank, N.A. ("RJB," and collectively with VNB, the "Lenders"); and the Court having considered the Objection filed by the Official Committee of

Unsecured Creditors (the "Committee Objection") [Docket No. 120] and the Lenders' Response

to the Committee Objection (the "Lenders' Response") [Docket No. 126]; and the Court having

considered all other pleadings submitted and the arguments of counsel in support of and

opposition to the Cash Collateral Motion, if any; and the Court having entered a first interim

order with respect to the Cash Collateral Motion on May 27, 2020 (the "First Interim Cash

Collateral Order") [Docket No. 72], and the Court having entered a second interim order with

respect to the Cash Collateral Motion on June 10, 2020 (the "Second Interim Cash Collateral

Order") [Docket No. 135]; and the Operating Company Debtors and the Lenders having

stipulated to the findings below, and the Committee having withdrawn any objection to the form

and entry of this Order (the "Final Cash Collateral Order"); and for good cause having been

shown:

**THE COURT HEREBY FINDS:**

A.    On May 6, 2020, (the "Petition Date") each of the Operating Company Debtors

filed a separate petition for relief under chapter 11 of the United States Bankruptcy Code. 11

U.S.C. 101, et seq. (the "Bankruptcy Code").   On May 6, 2020, CFRA Holdings, LLC, an

affiliate of the Operating Company Debtors, also filed a separate petition for relief under chapter

11 of the Bankruptcy Code.

B.    The Operating Company Debtors and CFRA Holdings, LLC (collectively, the

"Debtors") have remained in possession of their assets and are currently authorized to continue

in the operation and management of their business as debtors-in-possession pursuant to 11

U.S.C. §§ 1107 and 1108.

C.    Lenders possess a validly perfected first lien on the following property of the

Operating Company Debtors, as set forth in that certain Security Agreement dated September 9,

2016 conveyed by the Operating Company Debtors to Lenders, (the "Collateral"):

*all goods, fixtures, equipment, inventory, accounts, accounts receivable, contract rights, commissions, choses in action, money, general intangibles, documents, instruments and chattel paper of Borrowers, whether now owned or hereafter acquired, and all proceeds, products, replacements, additions, substitutions and accessions of and to all of the foregoing, which together collectively constitute and are hereinafter designated as the "Collateral," and which Collateral includes, without limitation, the following:*

*(a) all of Borrowers' inventory of whatever type or description wherever located and whether now owned or hereafter acquired; and*

*(b) all of Borrowers' accounts and accounts receivable and all other forms of customer obligations, now existing or hereafter acquired; and*

*(c) all of Borrowers' vehicles, equipment, machinery, furniture, fixtures or other items of personal property, whether now owned or hereafter acquired; and*

*(d) all of Borrowers' permits, licenses and other governmental approvals (but only to the extent permissible under applicable law without the consent of the grantor or issuer of such permits, licenses and other governmental approvals); and*

*(e) all of Borrowers' cash, certificates of deposit, securities, investment property, instruments and general intangibles; and*

*(f) all proceeds, products, replacements, additional, substitutions and accessions of and to all of the foregoing.*

*Notwithstanding the foregoing, specifically excluded from Collateral are all franchise agreements and development agreements by and between Borrowers, as franchisee, and IHOP Franchising, LLC, a Delaware limited liability company, and its successors and assigns, as franchisor ("IHOP"), and all equipment, machinery, furniture, fixtures and other personal property leased by Borrowers from IHOP or any affiliate of IHOP and such leases.*

D.      Lenders' lien and security interest in the Collateral secures the obligations of the Operating Company Debtors pursuant to that certain Loan Agreement dated September 9, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") among the Operating Company Debtors, CFRA Holdings, LLC, Agent and the Lenders. Pursuant to the Loan Agreement and other documents, Lenders contend to have made available to the Operating Company Debtors and CFRA Holdings, LLC a revolving line of credit in the principal amount of up to Twenty-Six Million Dollars ($26,000,000) (the "Loan"). The Loan is reflected in: (i) that certain Revolving Line of Credit Promissory Note dated September

8, 2016 made by the Operating Company Debtors and held by VNB in the principal amount of $11,000,000; (ii) that certain Revolving Line of Credit Promissory Note dated September 8, 2016 made by the Operating Company Debtors and held by RJB in the principal amount of $15,000,000; (iii) a contemporaneous Guaranty of Payment and Performance (the "Guaranty") from CFRA Holdings, LLC and (iv) other loan agreements which, together with Security Agreement, Loan Agreement and aforementioned Promissory Notes, are collectively referred to as the "Bank Credit Agreements".

E.    The security interests granted to Lenders pursuant to the Security Agreement and other Bank Credit Agreements were perfected by Lenders by, among other things, the filing of a UCC-1 Financing Statement filed on September 12, 2016 with the Delaware Secretary of State under Filing Number 20165542756.

F.    On June 8, 2020, each of the Lenders filed proofs of claim in each of the Debtors' three (3) related cases. Specifically, RJB filed proofs of claim in the amount of $11,276,339.75 in the cases of CFRA LLC (Claim No. 6) CFRA Tri-Cities, LLC (Claim No. 4) and CFRA Holdings, LLC (Claim No. 16). VNB filed proofs of claim in the amount of $8,269.315.85 in the cases of CFRA LLC (Claim No. 7) CFRA Tri-Cities, LLC (Claim No. 5) and CFRA Holdings, LLC (Claim No. 17) (collectively the "Lender POCs"). Each of the Lender POCs attached the applicable Bank Credit Agreements and other documentation establishing the bona fides of the claim in terms of amount, as well as the nature, validity and extent of the perfected liens possessed by the Lenders with respect to said obligations. The Debtors and the Committee each acknowledge and consent to the allowance of the Lender POCs in full, and waive any and all claims for reduction, modification and set off of any kind. The Debtors further acknowledge the lack of any affirmative claim(s) against Lenders and the Debtors and the Committee waive all rights to assert any such claims.

G.      As of the Petition Date, the Debtors were jointly and severally indebted: (i) to VNB in at least the amount of at least $8,269,315.85, exclusive of legal fees and costs due under the Bank Credit Agreements; and (ii) to RJB in at least the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements.  The foregoing claims are secured by a primary and perfected first lien on the Collateral.  The Debtors stipulate and consent, and the Committee consents to, the amount, extent, validity and priority of the Lenders' claims and security interests as set forth herein and in the Lender POC's.

H.      The Debtors require final authority to use cash collateral of Lenders in order to pursue and consummate a sale of all or substantially all of the property of the estates and the Debtors do not have sufficient unencumbered cash or other assets to fund the necessary activities to be performed during the marketing period.  The Cash Collateral Motion also incorporates the Debtors' request for authority to incur additional post-petition financing from the Lenders in these Cases (the "DIP Financing Motion") and the Debtors have also filed a separate motion to approve bidding procedures and the sale of property of the estates (the "Sale Motion"), including property and property interests utilized in connection with operation of the Debtors' forty-nine (49) restaurants (the "Restaurants") as specifically identified in the Sale Motion.  The Sale Motion was granted, with respect to the approval of bidding procedures, by Order dated June 10, 2020 (the "Bidding Procedures Order") [Docket No. 134], and a final sale hearing is scheduled to commence on June 26, 2020. The Sale Motion, DIP Financing Motion and Cash Collateral Motion are inextricably intertwined.

I.      The Operating Company Debtors use of the Lenders' cash collateral, to the extent and on the terms and conditions set forth herein, is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Good cause has been shown for the entry of this Final Cash Collateral Order and its terms are fair and reasonable under the circumstances.

It is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1.      All objections to entry of this Final Cash Collateral Order, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled. The objection to the Cash Collateral Motion [Docket No. 62] and further objection and reservation of rights [Docket No. 78] filed by IHOP Restaurants LLC, IHOP Franchisor LLC, and IHOP Leasing LLC (collectively, the "IHOP Entities") have been withdrawn pursuant to the settlement among the Debtors, Lenders and the IHOP Entities as reflected in the Bidding Procedures Order, the terms and conditions of which are incorporated herein by reference. The Committee Objection has been withdrawn subject to entry of this Final Cash Collateral Order and the Final Order Approving DIP Financing (the "Final DIP Financing Order") - which reflect a settlement of the Committee Objection agreed to by and among the Debtors, Lenders and the Committee.

2.      All rents, income, issue, profits and proceeds arising from any of the Collateral, and all cash, negotiable instruments, proceeds, product or profits arising there from and any and all substitutions, replacements, additions and accessions thereto, constitute the "cash collateral" of Lenders in accordance with and as defined pursuant to 11 U.S.C. §§ 363(a) and 552(b).

3.      The Operating Company Debtors are authorized to use Lenders' cash collateral only in accordance with the terms set forth in this Final Cash Collateral Order for the payment of expenses, as set forth at **Exhibit "A"** hereto, which expenses are necessary for the conduct of the Operating Company Debtors' business and for protection of Lenders' Collateral. Such use of cash collateral is with the consent of Lenders and is only for the period from **June 12, 2020** through **June 30, 2020** (the "Final Cash Collateral Period"), unless such period: (i) expires or is terminated earlier by the terms of this Final Cash Collateral Order or further order of this Court; or (ii) is extended by further order of this Court or by written agreement of the Lenders.

4.      The Operating Company Debtors may use (and were permitted to use) the cash collateral of Lenders for the expenses and in the respective amounts listed in the budget annexed hereto and made part hereof as **Exhibit "A"** (the "Final Approved Budget"), but only to the extent such expenses are actually incurred. Subject to the provisions of the following sentence, the Operating Company Debtors and the Lenders may amend, supplement or modify the Final Approved Budget as they may deem appropriate and necessary in the event of any extension of the Final Cash Collateral Period or otherwise.  Notice of any proposed material modification, and/or any extension of the Final Cash Collateral Period, shall be filed on the docket and forwarded to the IHOP Entities, the Committee, and all other parties in interest, and shall further provide that the Court may enter an Order approving the proposed modification and/or extension unless an objection is filed by a party in interest within three (3) days of the filing of the Notice, provided, however, that no further order shall be required to extend the Final Cash Collateral Period, with the written consent of the Lenders, if no additional expenses are required beyond those set forth on the Final Approved Budget; provided further, however, that the Debtors' right to use cash collateral shall be subject to the provisions of paragraphs 14(i) and 15 of the Final DIP Financing Order, provided further, however, that the Final Approved Budget may not be amended or modified so as to reduce the Authorized Professional Fee Payments.

5.      Any cash collateral received or collected by the Operating Company Debtors on account of Lenders' Collateral shall be deposited in the appropriate Operating Company Debtors' debtor-in-possession operating account, and Lenders shall retain a security interest in the same to the same extent and with the same priority as it would have had had the cash collateral been acquired prior to the commencement of this case. The Operating Company Debtors shall deposit all cash collateral received on account of Lenders' Collateral into the appropriate Operating Company Debtors' debtor-in possession operating account within one (1)

business day of receipt thereof in the form received and endorsed by the Operating Company Debtors.

6.      Prior to being required to consent to any extraordinary expenses, which are not set forth in the Final Approved Budget, the Operating Company Debtors shall provide Lenders with all documents relating to such extraordinary expenses, including but not limited to, estimates, invoices (if and when available), leases (in final form), work orders and other relevant documents. Upon receiving such documentation, Lenders will notify the Operating Company Debtors within five (5) business days as to whether Lenders consent or object to the proposed extraordinary expenses. If Lenders object or do not indicate their approval to all or any part of such extraordinary expenses on five (5) days' notice to Lenders and other parties in interest, the Operating Company Debtors shall request a hearing with the Bankruptcy Court for approval of use of cash collateral for such extraordinary expenses.

7.      On the Tuesday of each week, the Operating Company Debtors shall provide Lenders with an accounting of all income received or collected and/or paid during the preceding week by the Operating Company Debtors. Together with such accounting, the Operating Company Debtors shall provide written notice to Lenders of all Approved Budget expenses (and any other expenditures) of the Operating Company Debtors during the preceding week.

8.      The Operating Company Debtors shall provide and maintain hazard, loss and fire insurance on all of the Lenders' Collateral in an amount equal to the insurable value of such assets, with Lenders designated as additional insureds and as loss payees, on such asset to the extent of their interest therein.

9.      [intentionally omitted]

10.      As partial adequate protection for the Operating Company Debtors' use of Lenders' cash collateral, Lenders are hereby granted, pursuant to 11 U.S.C. §§ 361(2) and 363 of

the Bankruptcy Code, to the extent of diminution in the value of the Lenders' prepetition cash collateral, and subject to the Professional Fee Carve-Out, the Termination Event Carve-Out and Unsecured Creditor Carve-Out (each defined below and collectively referred to as the "Carve-Outs"), valid and existing first and senior replacement liens and security interests in all post-petition leases, rents, issues, profits and proceeds, arising from the Collateral and in all the cash collateral arising from the Collateral on and after the Petition Date.  For the avoidance of doubt and notwithstanding anything to the contrary contained herein, unless otherwise expressly permitted by the terms of the applicable lease, any liens granted under this Final Cash Collateral Order shall not include the Debtors' real property leases (including, for the avoidance of doubt, any ground leases), but shall include the proceeds from the disposition of all such leases.

11.     The Debtors and the Committee consent to the amount, extent, validity and priority of the pre-petition claims and security interests of Lenders as set forth in this paragraph and in the Lender POCs, and the Debtors further acknowledge the lack of any affirmative claim(s) against Lenders on behalf of the Debtors' bankruptcy estates and the Debtors and the Committee waive any and all rights to assert any and all such claims on behalf of the Debtors' bankruptcy estates. This Court hereby: (i) allows VNB claims against the Debtors and their bankruptcy estates in the amount of at least $8,269,315.85 as of the Petition Date, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; (ii) allows RJB claims against the Debtors and their bankruptcy estates in the amount of at least $11,276,339.75, exclusive of legal fees and costs due under the Bank Credit Agreements prior to the Petition Date and exclusive of amounts which accrue under the Bank Credit Agreements after the Petition Date; and (iii) determines that such claims against the Operating Company Debtors and their respective bankruptcy estates are secured by a primary and perfected security interest in the Collateral in

favor of Lenders.  This paragraph acknowledges and allows the pre-petition claims and security interests of the Lenders and does not determine the nature, extent or validity of the amount(s) due or security interests in connection with any post-petition DIP financing, which items are addressed and established pursuant to the Final DIP Financing Order and the interim DIP Financing Orders entered by this Court.

12.     Lenders shall have the right upon forty-eight (48) hours telephone notice to the Operating Company Debtors through their attorneys, to have Lenders' agents inspect, audit, examine, inventory and appraise the Collateral, and to audit, copy or extract records of the Operating Company Debtors, and the Operating Company Debtors shall make all of their records available to Lenders for such purposes.

13.     This Final Cash Collateral Order shall be sufficient evidence of Lenders' perfected liens and security interests in and to the Collateral, in any other collateral described in the Bank Credit Agreements, and in and to the collateral granted by way of adequate protection pursuant to this Final Cash Collateral Order, without the necessity of Lenders taking possession, filing financing statements, mortgages or other documents. The Operating Company Debtors are authorized to execute and deliver all instruments as may be necessary or appropriate to implement the terms and condition of this Final Cash Collateral Order.

14.     All creditors and parties in interest with notice of the Cash Collateral Motion, the Committee, any subsequently appointed Trustee, the Debtors, and any successors in interest to the Debtors shall be bound by the provisions of this Final Cash Collateral Order.

15.     The Operating Company Debtors' authorization to use cash collateral and Lenders' consent thereto, shall immediately terminate without further Order on the earlier of (i) the entry of an Order granting Lenders, or any party other than Lenders, relief from the automatic stay with respect to any property of the Operating Company Debtors in which Lenders claims a

lien or security interest, whether pursuant to this Final Cash Collateral Order or otherwise; (ii) the entry of an Order dismissing the Chapter 11 proceedings of any of the Debtors or converting their proceeding to cases under Chapter 7 of the Bankruptcy Code; (iii) the entry of an Order authorizing the appointment of a trustee in the bankruptcy proceedings of any of the Debtors; (iv) the entry of an Order confirming a Plan of Reorganization or liquidation for either of the Operating Company Debtors; (v) the entry of an Order by which this Final Cash Collateral Order is reversed, revoked, stayed, rescinded, modified or amended without the consent of Lenders thereto; provided, however, that, subject to the provisions of paragraphs 14(i) and 15 of the Final DIP Financing Order, no such termination shall affect or reduce the respective obligations of any party in connection with the Carve-Outs.

16.    Nothing contained in this Final Cash Collateral Order shall be deemed or construed to (i) limit or waive or release any and all of Lenders' objections to the Operating Company Debtors' use of cash collateral in any manner of or for any period beyond that which is expressly authorized by the terms of this Final Cash Collateral Order; (ii) limit Lenders to the relief granted herby; (iii) limit or bar Lenders from seeking other and further relief (including, without limitation, relief from the terms of this Final Cash Collateral Order) for cause on appropriate notice to the Operating Company Debtors and other parties-in-interest entitled to notice of same; (iv) limit or bar Lenders from seeking allowance and/or payment of an administrative expense claim (or any other claim arising after the Petition Date) against any of the Debtors or their estates; or (v) limit or waive any of Lenders' rights and remedies with respect to its interests in the Lenders' Collateral or proceeds there from, or any of Lenders' other collateral for the subject indebtedness, all of said rights and objections Lenders hereby expressly reserve.

17.     Lenders shall have the right to terminate their consent for the use of cash collateral for "cause" as defined by a finding of the Court, after five (5) business days' written notice to the Operating Company Debtors, that at any time the Operating Company Debtors have violated the material duties imposed on them hereunder. Lenders reserve their rights to move at any time for relief from the automatic stay, conversion or for the appointment of a trustee on any and all appropriate grounds.  Notwithstanding anything to the contrary contained herein, upon the occurrence and continuance of an event of default, the Lenders may enter upon leased premises only as provided by (i) any separate agreement by and between the applicable landlord and the Lenders (the terms of which shall be reasonably acceptable to the parties thereto), (ii) applicable non-bankruptcy law, or (iii) an order from the Bankruptcy Court on no less than five (5) days' notice to the applicable landlord.

18.     Nothing in this Final Cash Collateral Order shall constitute a waiver of any event of default which has occurred under the Bank Credit Agreements to date or which may occur in the future.

19.     If the adequate protection provided for hereby proves insufficient to protect Lenders' interest in and to the cash collateral, Lenders shall be entitled to the protections of Sections 361 and 507 of the Bankruptcy Code.  Lenders shall be entitled to an administrative expense claim pursuant to Sections 507(a)(2) and (b) and 503(b) of the Bankruptcy Code for the amount of diminution, if any, in the value of the Lenders' Collateral subsequent to the Petition Date, without waiver of any other rights or claims Lenders may possess.  Any such administrative expense claim to which Lenders are entitled pursuant to this paragraph shall have a super priority administrative expense claim, pursuant to Section 507(b) of the Bankruptcy Code, senior to any and all claims against the Operating Company Debtors under Section 507(a) of the Bankruptcy Code, whether in this proceeding or in any superseding proceeding except that same shall be

subordinated only to any outstanding fees allowed and payable to the United States Trustee and/or the Clerk of this Court and the Carve-Outs.

20.     Lenders are granted, to the extent of any diminution in the value of the Lenders' prepetition cash collateral and subject to the Carve-Outs, a replacement lien on and in the DIP Loan Collateral as that term is defined in the Final DIP Financing Order.  This replacement lien and security interest in the DIP Loan Collateral granted to Lenders (the "Replacement Lien") is deemed to be valid and perfected without the need of Lenders to take possession, file financing statements, file or record any further documents or instruments, or as otherwise required to be executed or filed under non-bankruptcy law.  The Operating Company Debtors are, however, authorized to execute and deliver all instruments to Lenders as may be necessary or appropriate to implement the terms of this paragraph.

21.     Payment of Professionals -- Professional Fee Carve Out and Termination Event Carve-Out.

a.     Notwithstanding anything contained herein to the contrary, the Debtors are authorized to use cash collateral pursuant to this Final Cash Collateral Order, and any order(s) approving the DIP Financing Motion, to pay allowed fees and expenses of: (i) Debtors' counsel, Saul Ewing Arnstein & Lehr LLP ("Debtors' Counsel"); (ii) any chief restructuring officer, and his/her firm, that may be retained in the Cases (collectively the "CRO,"); and (iii) counsel for the Committee, Squire Patton Boggs (US) LLP ("Committee's Counsel" and, collectively with the Debtors' Counsel and the CRO, the "Retained Professionals") in the amounts set forth on the Final Approved Budget (collectively, the "Authorized Professional Fee Payments").

b.     The Authorized Professional Fee Payments have and/or shall be funded from Lenders' Cash Collateral and/or the proceeds of the DIP Loan (as defined in the DIP Financing Motion) as, when, and to the extent set forth in the Approved Budgets and subject to

the terms and conditions of this Final Cash Collateral Order and/or any prior interim Cash Collateral Order(s).  The Debtors shall wire transfer funds to the Saul Ewing Arnstein & Lehr LLP Client Trust Account (to the extent of such funds actually deposited, the "Professional Fee Carve-Out Reserve Account") in the amounts equal to, but not to exceed, the amounts budgeted for the Retained Professionals set forth in the Final Approved Budget for each such week (or for any prior week for which such funds have not already been disbursed). Debtor's Counsel shall release to itself, the CRO or the Committee's Counsel, as the case may be, such amounts as are payable pursuant to an applicable Order of this Court, including, without limitation, an order approving the CRO Retention Order [Docket No. 71], any order approving interim compensation procedures in the Cases and any order granting interim or final fee applications in the Cases.  In making payments from the Professional Fee Carve-Out Reserve Account, Debtor's Counsel shall be entitled to rely on written certifications from the CRO and/or the Committee's Counsel, as appropriate, to the amount due and owing to them from the Professional Fee Carve-Out Reserve Account and in no circumstance shall Debtor's Counsel be obligated to pay any party other than from the funds held, from time to time, in the Professional Fee Carve-Out Reserve Account.

c.    The entitlement of Debtors' Counsel and Committee's Counsel to retain their portion of the Authorized Professional Fee Payments is contingent upon entry of an Order by this Court allowing and approving compensation and/or reimbursement to said professional pursuant to 11 U.S.C. §§ 330 and 331, and shall be further limited to the amount(s) allowed and approved pursuant to such Order(s) (an "Allowed Fee Order").

d.    The entitlement of the CRO and his/her firm to retain their portion of the Authorized Professional Fee Payments is contingent upon compliance with the terms and conditions of the Order approving the CRO's retention in these Cases [Docket No. 71].

e.       Pursuant to 11 U.S.C. § 364(c)(1), the authorized Professional Fee Payments are and shall be included in the allowed DIP Superpriority Claims awarded to Lenders under the Final DIP Financing Order; provided that each of the liens and claims, including the DIP Superpriority Claims granted to the Lenders in connection with the DIP Loan, shall be subject only to (A) a "Professional Fee Carve-Out" from the Lenders' collateral for: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to Section 1930(a)(6) of title 28 of the United States Code and (ii) any unpaid portion of the authorized Professional Fee Payments, awarded by entry of an Allowed Fee Order, or in accordance with the terms and conditions set forth in the Order approving the CRO's retention, which fees and charges have not been otherwise paid with unencumbered estate funds; and (B) the Unsecured Creditor Carve-Out, as defined at paragraph 22, *infra*. To the extent that the Debtors' estates may, at some point, recover funds that are not Lenders' Collateral or proceeds of Lenders' Collateral (other than the proceeds of avoidance actions or commercial tort claims) and which funds are otherwise unencumbered, Lenders reserve any right they may have to seek reimbursement from such funds up to the amount actually paid by Lenders as Professional Fee Payments, subject to any rights and objections of parties in interest. For the avoidance of doubt, Lenders waive the right to seek reimbursement of the Professional Fee Carve-Out from the proceeds of avoidance actions or commercial tort claims. No part of the Professional Fee Carve Out shall be available to pay professional fees incurred by any other party in the Cases.  A Termination Event shall not impact the Lenders' obligations with respect to the Professional Fee Carve-Out and the Post-Termination Carve-Out (defined below), subject to the condition for payment thereof as set forth herein.  For purposes herein, "Post-Termination Carve-Out" shall mean reasonably necessary fees and expenses incurred by Debtors' Counsel, the CRO and Committee Counsel following the Termination Date in order to conclude the Cases,

including with respect to seeking dismissal and/or conversion of the Cases, up to a cap of $35,000. With the exception of the $35,000 limit on the Post-Termination Carve-Out, the Post-Termination Carve-Out shall be subject to the same terms and conditions as the Professional Fee Carve-Out.

      f.     Nothing herein shall constitute a cap on the amount of professional fees and expenses that may be incurred or allowed in the Cases; <u>provided</u> that no payments of such fees and expenses shall be made from Lenders' Cash Collateral, Lenders' Collateral and/or the DIP Loan proceeds except as, when, and to the extent set forth in the Approved Budgets, and subject to the terms and conditions of this Final Cash Collateral Order and prior interim Cash Collateral Orders. Moreover, nothing herein shall be construed as consent to the allowance of any fees or expenses of the Retained Professionals or shall affect the rights of Lenders to object to such amount; <u>provided</u>, <u>however</u>, that the Debtors and the Lenders agree that, any alleged potential conflict of Committee Counsel may not be the basis for any objection to the allowance of the fees and expenses of Committee Counsel as such issue has been fully resolved herein.

      g.     In exchange for the consideration afforded by Lenders under this Final Cash Collateral Order, none of the Lenders' respective interests in property of the Debtors' estates shall be, with respect to any fees, expenses or charges incurred by the Retained Professionals or any other professional retained by any of the Debtors or the Committee, subject to the surcharge provisions of Section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including unjust enrichment).

      h.     No portion of the Lenders' Cash Collateral, Lenders' Collateral, the DIP Loan proceeds or Professional Fee Carve Out may be used to pay any fees or expenses incurred by any entity in connection with any claim, actions or services adverse to Lenders, Agent or their

affiliates (direct or indirect), or any of their respective directors, officers, members (direct or indirect), partner, equity owner, agent, servant, employees, counsel, consultants or other representative (collectively, the "Lender Parties"), including: (i) preventing, hindering or delaying Agent's or Lenders' enforcement or realization upon any collateral upon the occurrence of the Termination Date as defined in the DIP Loan Documents; (ii) using or seeking to use Cash Collateral or selling other Collateral without Lenders' consent; (iii) incurring indebtedness with a priority equal or senior to Lenders' interest in property of the estates; (iv) objecting to or contesting in any manner, or raising any defense to, the validity, extent, amount, perfection, priority or enforceability of Lenders' claims or security interests; or (v) commencing and continuing any adversary proceeding against any of the Lender Parties.

22.    Resolution of Committee Objection -- Disposition of Cases.    The Debtors, Lenders and the Committee have reached agreement on withdrawal of the Committee Objection and related issues, which is memorialized in this paragraph and elsewhere in this Final Cash Collateral Order and which is incorporated by reference into the Final DIP Financing Order.

a.    Withdrawal of Committee Objection.    Upon entry of this Final Cash Collateral Order and the Final DIP Financing Order, the Committee Objection shall be deemed withdrawn.

b.    Retention of Committee Counsel.  Upon entry of this Final Cash Collateral Order and the Final DIP Financing Order, (i) the Lenders shall and hereby agree not to seek reconsideration of the Order Approving the Retention of Squire Patton Boggs (US) LLP as Counsel to the Official Committee of Unsecured Creditors (the "Committee Counsel Retention Order") [Docket No. 153] and (ii) VNB shall convey a waiver of any purported conflict of interest to Committee Counsel, in a form reasonably satisfactory to VNB and Squire Patton Boggs (US) LLP.

     c.    <u>Support for Sale Process and Proposed Distribution of Sale Proceeds</u>. Upon entry of this Final Cash Collateral Order and the Final DIP Financing Order, the Committee shall and hereby does (i) agree not to object to the sale process and proposed distribution of sale proceeds set forth in the Bidding Procedures Order, including the Addendum A thereto, (ii) agree not to take or permit to be taken any action to delay, hinder, prevent, or impede the sale process and proposed distribution of sale proceeds set forth in the Bidding Procedures Order, including the Addendum A thereto, and (iii) agree not to object to entry of an order approving the sale resulting from the sale process set forth in the Bidding Procedures Order and proposed distribution of sale proceeds set forth therein.

     d.    <u>Payment to Committee Professionals</u>.  Subject to the terms of this Final Cash Collateral Order and the Final DIP Financing Order, the Final Approved Budget shall contain an aggregate line item for Authorized Professional Fee Payments to Committee Counsel of $150,000 (the "<u>Committee Professional Budget Allowance</u>"), inclusive of up to $7,500 that Committee Counsel was authorized to incur in order to investigate the nature, extent, and validity of the liens of Lenders in these Cases.  Subject to paragraphs 14 (i) and 15 of the Final DIP Financing Order, and subject to the Approved Budgets, the Committee Professional Budget Allowance shall be available for payment of fees and reimbursement of expenses incurred by Committee Counsel and allowed by the Court, regardless of the date such fees and expenses were incurred or allowed.

     e.    <u>Lenders' Claim Approval</u>.  Upon entry of this Final Cash Collateral Order and the Final DIP Financing Order, the Committee shall and does hereby consent to the amount, extent, validity and priority of the claims and security interests of Lenders as set forth in this Final Cash Collateral Order.  Notwithstanding any provision in any prior order of this Court, the

period for the Committee to challenge the amount, extent, validity and priority of the claims and security interests of Lenders shall expire upon entry of this Final Cash Collateral Order and the Final DIP Financing Order.

     f. <u>Unsecured Creditors Carve-Out</u>. Subject to the terms of the Bidding Procedures Order, including the Addendum A thereto, Lenders shall carve out (the "<u>Unsecured Creditor Carve-Out</u>) $125,000 from the sale proceeds received by Lenders on account of Lenders' pre-petition claims allowed pursuant to this Final Cash Collateral Order for the benefit of holders of allowed general unsecured claims against the Debtors (the "<u>Unsecured Creditor Distribution Fund</u>"). In addition, any portion of the Authorized Professional Fee Payments to Committee Counsel of $150,000 which has not been incurred by the Committee Counsel, or approved for payment by the Court, shall be contributed to the Unsecured Creditor Distribution Fund.

    To the extent any other creditor or party-in-interest in these cases contributes to the Unsecured Creditor Distribution Fund or toward the costs of sale subject to the Bidding Procedures Order, by way of surcharge under 11 U.S.C. § 506 (c), voluntary agreement, court order, or otherwise, Lenders shall be entitled to reimbursement from any such funds, on a dollar for dollar basis, on account of their contribution to the Unsecured Creditor Distribution Fund (but shall in no event reduce the Lenders' obligation to fund the Unsecured Creditor Distribution Fund in full or reduce such fund).

    The Unsecured Creditor Distribution Fund shall be reserved for the benefit of holders of allowed general unsecured claims and shall be used exclusively to fund a distribution to such creditors, <u>provided</u>, <u>however</u>, that any unsecured deficiency claim(s) of the Lenders and any unsecured claims held by Insiders of the Debtors (including, but not limited to, Prometheus

Franchise Restaurant Holdings, LLC ("PFRH," which debtor CFRA, LLC has scheduled as holding a claim in the amount of $2,186,695.97) shall not be eligible to receive any distribution from the Unsecured Creditor Distribution Fund. Lenders shall, however, be entitled to receive a distribution, on account of any administrative or unsecured deficiency claim(s) of the Lenders, which distribution is funded by sources other than the Unsecured Creditor Distribution Fund and nothing contained herein shall be deemed to allow or disallow any claim(s) of Insiders or prejudice the ability of any Insiders to participate in any distribution from any source other than the Unsecured Creditor Distribution Fund. The Unsecured Creditor Distribution Fund shall be held in the debtor-in-possession operating account of CFRA, LLC, and remitted to the duly-appointed Chapter 7 trustee upon conversion of the Cases.

g.   <u>Conversion</u>.   No later than five (5) days after closing of the sale(s) contemplated in the Bidding Procedures Order, the Debtors shall file a motion seeking to convert the Cases to cases under Chapter 7 of the Bankruptcy Code (the "<u>Conversion Motion</u>").

Subject to the terms of this Final Cash Collateral Order and the Final DIP Financing Order, Lenders agree to and shall fund $25,000 through the DIP Loan to be used by any subsequently appointed Chapter 7 Trustee to fund the costs of administration of these Cases following their conversion to Chapter 7 (the "<u>Administrative Fund</u>").   The Administrative Fund shall be held in the debtor-in-possession operating account of CFRA, LLC and remitted to the duly-appointed Chapter 7 trustee upon conversion of the Cases. If a final order granting the Conversion Motion is not entered by July 31, 2020, the Debtors shall return the entire Administrative Fund to the Lenders on August 1, 2020.

The Lenders and the Committee (i) agree not to object to approval of the Conversion Motion by order entered prior to July 31, 2020, and (ii) agree not to take or permit to be taken

any action to delay, hinder, prevent, or impede the Conversion Motion. If the Cases are not converted prior to July 31, 2020, the Debtors, Lenders and the Committee agree to conduct good faith negotiations on a potential increase in the Professional Fee Carve-Out allocated to Debtors' Counsel and Committee Counsel in the Final Approved Budget if the fees incurred through that date exceed the budgeted amounts.

23.    The claims of Lenders shall not be subject to the equitable doctrine of marshaling with respect to the Lenders' Collateral or any other collateral securing amounts owed to Lenders by the Operating Company Debtors or CFRA Holdings, LLC.

24.    Notwithstanding any subsequent modification of this Final Cash Collateral Order by this Court, the protections accorded to Lenders pursuant to this Final Cash Collateral Order shall apply with regard to all cash collateral utilized prior to any order entered by this Court.

25.    The Debtors shall timely perform all obligations of debtors-in-possession required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and the orders of this Court.

26.    The agreement of the parties to the terms and conditions of this Final Cash Collateral Order, including any waivers of rights, as manifested by their execution hereof is conditioned, and shall become effective, only upon the Court's entry of this Order.

27.    The Court shall retain jurisdiction to enforce the terms of this Final Cash Collateral Order.


[REMAINDER OF PAGE INTENTIONALLY BLANK – SIGNATURES ON NEXT PAGE]

AGREED AS TO FORM, ENTRY AND CONTENT

**SAUL EWING ARNSTEIN & LEHR LLP**          **K&L GATES LLP**

By: */s/  Aaron S. Applebaum_____*          By: */s/ Daniel M. Eliades_____*
    Carmen Contreras-Martinez              Daniel M. Eliades, Esq.
    Florida Bar No. 093475              David S. Catuogno, Esq.
    701 Brickell Avenue, 17th Floor              One Newark Center, 10th Floor
    Miami, FL 33131              Newark, New Jersey 07102
    Telephone: (305) 428-4500              Tel: (973) 848-4000
    Facsimile: (305) 374-4744              Facsimile: (973) 848-4001
    Carmen.Contreras-Martinez@saul.com              Email: daniel.eliades@klgates.com
                                      Email: david.catuogno@klgates.com
    -and-

                                      *Counsel to Valley National Bank and*
                                      *Raymond James Bank, N.A,*

    Stephen B. Ravin
    Florida Bar No. 293768 (*inactive status*)          **SQUIRE PATTON BOGGS (US) LLP**
    Aaron S. Applebaum
    1037 Raymond Boulevard          By: */s/ Norman N. Kinel_____*
    Suite 1520              Norman N. Kinel, Esq.
    Newark, NJ 07102              Mark A. Salzberg, Esq.
    Telephone: (973) 286-6700              1211 Avenue of the Americas, 26th Floor
    Facsimile:  (973) 286-6800              New York, NY  10036
    Stephen.Ravin@saul.com              Telephone: (212) 407 0130
    Aaron.Applebaum@saul.com              norman.kinel@squirepb.com
                                        mark.salzberg@squirepb.com

*Counsel for Debtors and   Debtors-in-*          *Counsel for the Official Committee of*
*Possession*          *Unsecured Creditors*

# # #

*(Carmen Contreras-Martinez, Esq. is directed to serve a copy of this Order on interested parties*
*who are non-CM/ECF users and to file a proof of service within three days of entry of this*
*Order.)*

**<u>EXHIBIT A</u>**
**FINAL APPROVED  BUDGET**

**CFRA, LLC; CFRA Holdings, LLC; CFRA Tri-Cities, LLC**
**4-Week DIP Budget Commencing Week of 6/13/20**

| ($ thousands)<br>Week Ending Date | 1<br>Projected<br>6/13/2020 | | 2<br>Projected<br>6/20/2020 | | 3<br>Projected<br>6/27/2020 | | 4<br>Projected<br>7/4/2020 | | Weeks<br>1 - 4<br>Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | |
| DIP Draws | $ | 128 | $ | 153 | $ | 153 | $ | 205 | $ | 639 |
| A/R Collections (Gross) | | - | | - | | - | | - | | - |
| Less Discount | | - | | - | | - | | - | | - |
| A/R Collections (Net) | $ | - | $ | - | $ | - | $ | - | $ | - |
| Equipment Sales | | - | | - | | - | | - | | - |
| Franchise Sales | | - | | - | | - | | - | | - |
| Total Cash Receipts | $ | 128 | $ | 153 | $ | 153 | $ | 205 | $ | 639 |
| | | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | | |
| Rents (1) | $ | - | $ | - | $ | - | $ | - | $ | - |
| Utilities (2) | | - | | 25 | | 25 | | 25 | | 75 |
| Insurance (3) | | - | | - | | - | | - | | - |
| Debtors Counsel | | 48 | | 48 | | 48 | | 25 | | 169 |
| Debtors CRO | | 20 | | 20 | | 20 | | 20 | | 80 |
| Miscellaneous | | 5 | | 5 | | 5 | | 5 | | 20 |
| US Trustee Fees | | - | | - | | - | | 100 | | 100 |
| Chapter 7 Trustee | | | | | | | | 25 | | 25 |
| Contingency | | 5 | | 5 | | 5 | | 5 | | 20 |
| Creditors Committee Counsel | | 50 | | 50 | | 50 | | - | | 150 |
| Secured Lender Fees and Interest | | - | | - | | - | | - | | - |
| Total Cash Disbursements | $ | 128 | $ | 153 | $ | 153 | $ | 205 | $ | 639 |
| | | | | | | | | | | |
| **Net Weekly Cash Flow** | $ | - | $ | - | $ | - | $ | - | $ | - |

**Notes:**

1. Assumes rent paid out of sale proceeds.
2. May utilities payments paid in weeks 2 and 3.  June utilities paid in week 4.
3. Property and Liability insurance is maintained at current rates under current policies.  Assumes divesting of assets as of 6/30/20.