EXHIBIT "B"

## Tenant Estoppel

CFRA, LLC ("Tenant"), hereby certifies to **BALLANTYNE PROPERTY GROUP, LLC, a California limited liability company** ("Buyer"), and to **CAPSTONE COMMONS PROPERTIES, LLC a North Carolina limited liability company** and its successors and assigns (collectively, "Landlord"), as follows:

1.    Tenant and Landlord entered into that certain Retail Lease dated 12/20/2011 (the "Lease"), pursuant to which Tenant has leased the premises located at 16015 Lancaster Highway, Charlotte, North Carolina 28277 and referred to in the Lease as the "Premises." A complete and accurate copy of the Lease, including all amendments, supplements, side letters and modifications, if any, is attached hereto as Exhibit A. The Lease contains the entire agreement between the parties with respect to the Premises.

2.    The Lease is now in full force and effect, and has not been amended, modified or supplemented, except as stated above.

3.    All capitalized terms not otherwise defined herein shall have the meaning set forth in the Lease.

4.    The term of the Lease commenced on 9/12/2012.

5.    The term of the Lease is currently scheduled to expire on 9/30/2022  Except as provided below, Tenant has no early termination rights under the Lease.  N/A.

6.    Tenant has no option to renew or extend the term of the Lease, , except as follows: (3) 5 year terms.

7.    Tenant has no right to purchase the Premises or any portion of the property on which the Premises are located, whether pursuant to the Lease or otherwise.  Tenant has no right of first refusal to lease additional space, option to expand or other right to lease space within the Property other than the Premises, except as follows: N/A.

8.    Tenant has accepted and is now in possession of the Premises, and has not sublet, assigned or encumbered the Lease, the Premises or any portion thereof.

9.    The current Monthly Basic or Minimum Rent (as adjusted pursuant to the terms of the Lease) is $9,908.33.   The Lease provides for Tenant to pay its proportionate share of property operating expenses, including, but not limited to, insurance, real property taxes and common area maintenance; such proportionate or percentage share is 54.5%; and the (estimated) dollar amount of Tenant's proportionate or percentage share of property operating expenses is currently $1,879.17 per month.

10.   The amount of security deposit is $N/A, and, to Tenant's knowledge, no deductions have been made therefrom, except as follows: N/A.

11.     All rental payments payable by Tenant have been paid in full as of the date hereof. No Rent under the Lease has been paid for more than thirty (30) days in advance of its due date.

12.     All tenant improvements and other work required to be performed by Landlord under the Lease have been completed and have been accepted by Tenant, and all tenant improvement allowances and/or other incentives to be provided by Landlord have been paid, provided and utilized in full. As of the date hereof, there are no defaults on the part of Landlord or Tenant under the Lease, and Tenant knows of no events or conditions which, with the passage of time or notice, or both, would constitute a default by Landlord under the Lease.

13.     Tenant has no defenses, claims or set-offs with respect to Landlord's enforcement of the Lease, and all conditions of the Lease to be performed by Landlord and necessary to the enforceability of the Lease have been satisfied .

14.     All insurance required of Tenant under the Lease has been provided by Tenant, and all premiums have been paid.

15.     There has not been filed by or against Tenant a petition in bankruptcy, voluntary or otherwise, any assignment for the benefit of creditors, any petition seeking reorganization or arrangement under the bankruptcy laws of the United States or any state thereof, or any other action brought pursuant to such bankruptcy laws with respect to Tenant.

16.     Tenant pays Rent due Landlord under the Lease directly to Landlord, and Tenant has no knowledge of any other person who has any right to receive such rents, by collateral assignment or otherwise.

17.     The Lease is guaranteed by the following party or parties (if none, write "none" or "n/a"): N/A

The certifications contained in this Tenant Estoppel Certificate shall inure to the benefit of, and may be relied upon by, Landlord, Buyer, and their respective lenders, successors and assigns, and shall be binding upon Tenant and its successors and assigns.

                                        TENANT:

Dated: June 2      , 2015.

                                        By: _____

**THIS ESTOPPEL CERTIFICATE SHALL NOT BE DEEMED COMPLETE UNLESS A COMPLETE COPY OF THE LEASE, INCLUDING ALL AMENDMENTS, SUPPLEMENTS, SIDE LETTERS AND MODIFICATIONS, IF ANY, IS ATTACHED AS EXHIBIT A.**

# EXHIBIT A

### (Lease)

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease"), dated December ___, 2011, is entered into between **MECKLENBURG LAND DEVELOPMENT LLC**, a North Carolina limited liability company ("Landlord"), and **CFRA, LLC**, a Delaware limited liability company ("Tenant").

Landlord and Tenant agree for themselves, their successors and assigns, as follows:

1. **Basic Lease Provisions**.

The following terms whenever capitalized and used in this Lease shall have the meanings set forth in this Paragraph 1. In the event of any conflict between these basic lease provisions and the balance of this Lease, including any exhibits, riders or amendments, then the balance of this Lease shall control.

(a) _Premises_. The space crosshatched on Exhibit A, containing a total Floor Area of approximately four thousand one hundred (4,100) square feet.

(b) _Shopping Center_. The Shopping Center consists of a parcel of land owned by Landlord located in the city of Charlotte, County of Mecklenburg, North Carolina, together with the improvements to be constructed thereon, on which the Premises will be located. The Shopping Center is outlined in bold on Exhibit A and legally described on Exhibit B, and has a street address of 16061 Lancaster Highway at Old U. S. Highway 521, Charlotte, North Carolina.

(c) _Common Areas_. All facilities furnished in the Shopping Center and designated for the general use and benefit, in common, by tenants or occupants of the Shopping Center or by the public, including, but not limited to, surface parking areas, driveways and entrances, sidewalks, roofs, canopies, loading docks and platforms, landscaped areas, retaining walls, common utility facilities, storm water detention facilities, patio, exterior lighting and other similar facilities.

(d) _Lease Term_. Ten (10) full Lease Years, plus three (3) options to renew and extend the Lease Term for a period of five (5) full Lease Years (the "Renewal Periods"). In addition, the period from the Turnover Date, as defined in Paragraph 5(b), through the Rent Commencement Date shall be included within the Lease Term, and Tenant's occupancy of the Premises during such period shall be subject to all of the terms and conditions of this Lease, other than those relating to the payment of rent and other charges.

(e) _Lease Year_. The first Lease Year shall be the period from the Rent Commencement Date through the last day of the twelfth (12th) full calendar month following the Rent Commencement Date. Each subsequent Lease Year shall be a consecutive twelve (12) month period.

(f) _Base Rent_.

| Lease Years | Annual Amount | Monthly Amount |
|---|---|---|
| 1-5 | $118,900.00 | $9,908.33 |
| 6-10 | $130,790.00 | $10,899.17 |
| 11-15 | $143,869.00 | $11,989.08 |
| 16-20 | $158,255.90 | $13,187.99 |
| 21-25 | $174,081.49 | $14,506.79 |

(g)     Use Permitted. Tenant shall use the Premises for the operation of a restaurant, or for another lawful purpose that is not in violation of (i) the Prohibited Uses set forth on Exhibit C, or (ii) any exclusive use provision that Landlord may grant to another tenant in the Shopping Center (so long as that other tenant is not operating a restaurant or one of the Prohibited Uses set forth on Exhibit C), so long as Landlord notifies Tenant in writing of such exclusive use.

(h)     Property Taxes and Insurance. Tenant pays its pro rata share, as defined in Paragraph 4(b) below. The initial estimated costs for the first calendar year during the Term (calculated on an annualized basis) are $7,175.00 (seven thousand, one hundred and seventy-five dollars) per annum for property taxes and $2,460.00 (two thousand, four hundred and sixty dollars) for insurance premiums, and as provided in Paragraph 4(b), the actual amounts payable for first calendar year shall not exceed such estimates by more than ten percent (10%).

(i)     Common Area Maintenance . Tenant pays its pro rata share, as defined in Paragraph 9(b) below. The initial estimated costs for the first calendar year during the Term (calculated on an annualized basis) are $12,915.00 (twelve thousand, nine hundred and fifteen dollars) per annum, and as provided in Paragraph 9(b), the actual amount payable for such calendar year shall not exceed such estimate by more than ten percent (10%).

(j)     Additional Rent. A collective reference to all amounts payable by Tenant to Landlord under this Lease, other than Base Rent. Base Rent and Additional Rent are collectively referred to in this Lease as "Rent."

(k)     Landlord's Mailing Address.

        (i)     For Payments: 1401 Central Avenue, Charlotte, NC 28205

        (ii)    For Notices: Mr. John Rudolph, 1401 Central Avenue, Suite 200-D, Charlotte, NC 28205

(l)     Tenant's Mailing Address.

        (i)     For Invoices: Post Office Box 504, Concord, North Carolina 28026;

        (ii)    For Notices: Two Concourse Parkway NE, Suite 155, Atlanta, Georgia 30328, Attention: Chris Suh; with a copy to: Mr. John R. Mitchell, Mitchell & Associates, 5435 Dunwoody Mill Court, Atlanta, Georgia 30360; and a copy to: Mr. David Robinson, Ledbetter Wanamaker Glass LLP, 100 Colony Square, 1175 Peachtree Street NE, Atlanta, Georgia 30309.

(m)     Floor Area. The number of square feet of floor space within the Premises or other areas of the Shopping Center, as the case may be. All Floor Areas shall be calculated using dimensions from the centerlines of interior or party walls, and from the exterior faces of exterior walls.

(n)     Gross Leasable Area. The number of square feet of Floor Area of all enclosed areas of the Shopping Center available for lease to tenants.

(o)     Rent Commencement Date. The earlier of: (i) ninety (90) days after the Turnover Date, as provided in Paragraph 5(b), or (ii) the date Tenant opens for business in the Premises. Upon establishment of the Rent Commencement Date, Landlord and Tenant shall execute a Commencement Agreement confirming the same, in the form of Exhibit H.



(p)     Exhibits. The following Exhibits are attached to this Lease and are hereby incorporated in and made a part of this Lease:

| | | |
|---|---|---|
| (i) | Exhibit A | Site Plan |
| (ii) | Exhibit B | Legal Description of the Shopping Center |
| (iii) | Exhibit C | Prohibited Uses |
| (iv) | Exhibit D | Standard Gray Shell Specifications |
| (v) | Exhibit E | Standards for Performance of Tenant's Work |
| (vi) | Exhibit F | Approved Elevation Drawings |
| (vii) | Exhibit G | Monument Sign Drawing |
| (viii) | Exhibit H | Form of Commencement Agreement |
| (ix) | Exhibit I | Form of Turnover Notice |
| | Exhibit J | Form of Subordination, Non-Disturbance and Attornment Agreement |
| (x) | Exhibit K | Form of Memorandum of Lease |

(q)     Brokers. The Providence Group of the Carolinas, LLC, for Landlord; Melissa McDonald of CORE Properties for Tenant.

2.     **Premises**.

Landlord leases to Tenant, and Tenant rents from Landlord, at the rent, and upon the terms and conditions set forth in this Lease, the Premises as described in Paragraph 1(a). In addition to the Premises, Tenant shall have the nonexclusive right to use all non-reserved Common Areas (as defined in Paragraph 1(c)) located from time to time in the Shopping Center.

Landlord and Tenant agree that at any time after Tenant takes possession of the Premises, Landlord or Tenant may cause a licensed architect to measure the Floor Area of the Premises. If any such measurement determines there is a deviation between the Floor Area of the Premises and the number of square feet set forth in Paragraph 1(a), this Lease shall be amended to reflect the Floor Area and to adjust proportionately the Base Rent and Additional Rent payable by Tenant; provided, however, that in no event shall be Floor Area of the Premises be deemed to exceed four thousand six hundred (4,600) square feet. In the event the Premises is in excess of 4,100 square feet, Tenant shall have rights to use the entire Premises but the rent shall be charged only 4,100 square feet.

3.     **Term**.

The Lease Term shall begin upon delivery of the Premises by Landlord to Tenant, as provided in Paragraph 5, and shall end at midnight on the last day of the tenth (10th) Lease Year.

At the end of the initial Lease Term, provided that Tenant is not in default under this Lease beyond the expiration of any applicable cure period, Tenant shall have the options to extend the Lease

Term for the Renewal Periods specified in Paragraph 1(d), upon the same terms and conditions set forth in this Lease, including Base Rent as set forth in Paragraph 1(f). Tenant shall be deemed to have exercised each Renewal Period unless Tenant delivers written notice to Landlord, given at least six (6) months before the expiration of the original Lease Term or any previously exercised Renewal Period, as the case may be, that it does not elect to exercise the subsequent Renewal Period. All references to the "Lease Term" or the "Term of this Lease" shall, unless the context clearly indicates a different meaning, be deemed to include any properly exercised Renewal Periods.

4.    **Rent**.

Tenant shall pay to Landlord for the use and occupancy of the Premises and appurtenances thereto the following amounts:

(a)    Base Rent. Commencing on the Rent Commencement Date, and for the balance of the Lease Term, Tenant shall pay to Landlord Base Rent at the rate per annum specified in Paragraph 1(f), payable in equal monthly installments as specified in Paragraph 1(f), in advance on or before the first day of each and every calendar month, without notice, demand, setoff or deduction, except as expressly set forth in this Lease. Notwithstanding the foregoing, if the Rent Commencement Date is not the first day of a calendar month, the initial installment of Base Rent for the first partial calendar month shall be paid within three (3) business days after the Rent Commencement Date.

(b)    Taxes and Insurance Premiums. Commencing on the Rent Commencement Date, and for the balance of the Lease Term, Tenant shall pay to Landlord a pro rata share of each of the following expenses, which pro rata share shall be computed by multiplying such expenses by a fraction having as its numerator the Floor Area of the Premises and as its denominator the Gross Leasable Area of tax parcels owned and being developed by Landlord:

(i)    All taxes and assessments now or hereafter imposed or assessed upon the Premises or the Shopping Center, including any taxes or excises on Rent payable under this Lease and the reasonable cost to Landlord for professional tax consulting services, and the reasonable and documented costs and charges incurred by Landlord in any tax appeal, protest or review. Nothing in this subparagraph 4(b)(i) shall impose or be deemed to impose any obligation on Tenant to reimburse Landlord for any inheritance, estate, succession, gift, transfer, franchise, corporation, income or net profit tax or capital levy that is or may be imposed on Landlord.

(ii)    The cost to Landlord of insurance obtained by Landlord pursuant to Paragraph 13(b) and any other insurance obtained by Landlord for the Shopping Center. Landlord's cost of insurance set out in this subparagraph 4(b)(ii) and the amounts set out in subparagraph 4(b)(iii) below may, at Landlord's option, be included in Common Area Maintenance Costs as provided in Paragraph 9.

(iii)    Any amounts paid by Landlord with respect to property damage as a result of the deductible provisions of the insurance obtained by Landlord, not in excess of Ten Thousand and No/100 Dollars ($10,000.00) per occurrence.

At the beginning of each calendar year, Landlord shall estimate Tenant's pro rata share of the foregoing costs. The initial estimate for the first partial calendar year of the Lease Term is set forth in Paragraph 1(h). The annual estimated amount shall be paid to Landlord in twelve (12) equal monthly installments, in advance, on the first (1st) day of each calendar month, as Additional Rent, without notice, demand, setoff or deduction. Within sixty (60) days after the end of each calendar year, Landlord will furnish to Tenant a statement showing in reasonable detail the amount of Landlord's costs for such taxes

and insurance for the preceding calendar year. Any deficit will be paid by Tenant within thirty (30) days after demand by Landlord. In the absence of a default by Tenant under this Lease, any surplus will be refunded to Tenant within thirty (30) days after delivery of Landlord's statement. Notwithstanding any provision in this Paragraph 4(b) to the contrary, the amount payable by Tenant to Landlord as its share of property taxes under subparagraph 4(b)(i) for the first calendar year of the Lease Term (on an annualized basis) shall not exceed the estimate set forth in Paragraph 1(h) by more than ten percent (10%), and the amount payable by Tenant to Landlord as its share of insurance premiums under subparagraph 4(b)(ii) for the first calendar year of the Lease Term (on an annualized basis) shall not exceed the estimate set forth in Paragraph 1(h) by more than ten percent (10%).

(c)　　Additional Rent. In addition to all other Rent required to be paid pursuant to the terms of this Paragraph 4, Tenant shall pay, as Additional Rent, the sums required to be paid pursuant to other provisions of this Lease, whether or not designated "Additional Rent". If the due date of any such payment is not specified in this Lease, it shall be due within ten (10) days after demand by Landlord.

(d)　　Interest and Late Charges. If Tenant fails to pay within five (5) days after the date due and payable, any Rent payable under this Lease, such unpaid amounts shall bear interest at the rate of eight percent (8%) per annum from the date due to the date of payment. In addition, if Tenant fails to pay any monthly installment of Base Rent by the fifth (5th) day of the month in which the installment is due, a late charge equal to four percent (4%) of the installment shall be assessed; provided, however, that (i) no late charge shall be assessed for the first two late payments in any period of twelve (12) consecutive months, and (ii) in no event may any late charge and/or interest provided in this Paragraph 4(d) exceed the maximum permitted by law or be imposed prior to the date permitted by law.

(e)　　Payment of Rent. All Rent payments provided in this Lease shall be: (i) prorated on a daily basis for partial months or partial years; (ii) made payable to Landlord; (iii) paid in lawful U.S. currency; and (iv) delivered to the address set out in Paragraph 1(k)(i), until notice to the contrary is given by Landlord. Rent shall be deemed paid when received by Landlord. At Landlord's discretion, all payments made by Tenant shall be applied to amounts payable by Tenant in the following order: first to interest and late charges, second to Additional Rent and third to installments of Base Rent. Landlord reserves the right, at any time after any event of default hereunder as provided in Paragraph 16 or following the return of any check of Tenant for insufficient funds, to require any payments to be made by Tenant by virtue of this Lease to be made by cashier's check, bank wire or similar mode of payment.

5.　　**Construction of Shopping Center and Delivery of Premises**.

Upon full execution of this lease agreement, Tenant shall have a period of forty five (45) days to perform any due diligence efforts it wishes to include but not be limited to obtaining a title report of the shopping center property, feasibility studies, environmental studies, and tenant may terminate this lease agreement at any time during such due diligence period in its sole discretion.

(a)　　Approval of Plans. Landlord will cause to be developed upon that tract commercial buildings (including the Premises) with parking areas and other improvements in accordance with Exhibit A attached hereto. Within ten (10) business days after the complete execution of this Lease, Landlord shall cause to be prepared, and shall deliver to Tenant, a complete set of preliminary plans and specifications (the "Preliminary Plans") for the Premises and the remaining improvements within the Shopping Center. The Preliminary Plans shall be consistent with Exhibit A and the preliminary elevation drawings for the Premises attached to this Lease as Exhibit F, which have been approved by Tenant. In addition, the Preliminary Plans shall be consistent with Tenant's proposed interior layout for the Premises.



Within ten (10) business days after it receives the Preliminary Plans, Tenant shall notify Landlord in writing of the respects, if any, in which the Preliminary Plans are not consistent with the requirements of this Lease, or otherwise are reasonably objectionable to Tenant, and Landlord shall promptly make any corrections to the Preliminary Plans as shall be reasonably necessary to obtain Tenant's approval. If Tenant fails to respond to the Preliminary Plans within the ten (10) business day period, the Preliminary Plans shall be deemed approved by Tenant in the form submitted by Landlord.

Within thirty (30) days after Tenant's approval of the Preliminary Plans, Landlord shall cause to be prepared, and shall deliver to Tenant, a complete set of working drawings and specifications (the "Working Drawings") prepared in conformity with the approved version of the Preliminary Plans. Within ten (10) business days after it receives the Working Drawings, Tenant shall notify Landlord in writing of the respects, if any, in which the Working Drawings fail to conform to the Preliminary Plans, and Landlord shall promptly make any corrections to the Working Drawings as may be reasonably necessary to obtain the approval of Tenant. If Tenant fails to respond to the Working Drawings within the ten (10) business day period, the Working Drawings shall be deemed approved by Tenant in the form submitted by Landlord.

(b)    Delivery of Premises. Following approval of the Working Drawings, Landlord agrees to construct the portions of the Premises that are included within the description of the Standard Grey Shell Specifications set forth on Exhibit D attached to this Lease. In addition, Landlord will construct the various elements of site improvement work within or serving the Shopping Center, including a new monument sign, all in substantial accordance with Exhibit A and the requirements of Exhibit D. All of the foregoing work is collectively referred to in this Lease as the "Landlord's Work."

Landlord shall construct and perform the Landlord's Work in a good and workmanlike manner, in compliance with all applicable permits and approvals, laws and ordinances, and in compliance with the Working Drawings approved by Tenant as provided above. Landlord shall deliver the Premises to Tenant when Landlord's Work is substantially complete, except for minor finishing operations which do not materially interfere with the conduct of Tenant's Work ("Punch List Items") and except items necessarily awaiting performance of Tenant's Work. The date of such delivery shall be deemed the "Turnover Date" for purposes of this Lease, and Landlord shall deliver to Tenant a statement confirming the Turnover Date, in the form of Exhibit I attached to this Lease. At any time prior to the Turnover Date, Tenant shall have the right, at its own risk, to enter upon the Premises for the purpose of taking measurements therein and for any other purpose expressly permitted by Landlord, provided, however, that such entry shall not interfere with or obstruct the progress of the work being done by Landlord. By occupying the Premises after the delivery of possession, to install fixtures, facilities or equipment, or for any other purposes, Tenant shall be deemed to have accepted the same and to have acknowledged that the Premises are in the condition required by this Lease, except for latent defects not reasonably discoverable by an inspection, and except for the Punch List Items disclosed on a written punch list delivered to Landlord within ten (10) days after the Turnover Date. Landlord shall complete the Punch List items within ten (10) days after delivery of the Punch List or longer than ten (10) days if Landlord is diligently pursuing completion.

Landlord estimates that it will complete Landlord's Work on or before 120 days after Tenant receives all necessary permits or upon the waiver of these conditions as a right to terminate. The "Target Turnover Date" is currently estimated to be June 1, 2012. The Lease must be in full force and effect in order for Landlord to commence construction. If Landlord for any reason cannot deliver possession of the Premises to Tenant in accordance with the terms of this Lease on or before the Target Turnover Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting from the delay in delivery. Notwithstanding the foregoing, if Landlord is unable to deliver possession of the Premises in accordance with the terms of this Lease within one hundred eighty (180) days after the Target Turnover Date, except to the extent that any such delay has been caused by: (a) the

acts of Tenant, its agents, employees or contractors, or (b) an event of force majeure, as described in Paragraph 28, then either party may elect to terminate this Lease upon written notice to the other party prior to the occurrence of the Turnover Date. In addition, if Landlord is unable to deliver possession of the Premises in accordance with the terms of this Lease within two hundred seventy (270) days after the Target Turnover Date, regardless of force majeure delays, unless caused by Tenant, then either party may elect to terminate this Lease upon written notice to the other party prior to the occurrence of the Turnover Date. Upon such termination, Landlord shall reimburse Tenant, within thirty (30) days after written demand, for the reasonable and documented third-party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, costs associated with the review of the Working Drawings, the preparation of the Tenant Plans and the preparation and submittal of the Upfit Working Drawings, in an amount not to exceed $75,000.00, and upon payment of such reimbursement, neither party shall have any further rights or obligations under this Lease.

Following any termination of this Lease pursuant to this Paragraph 5(b) or Paragraph 38, if Landlord subsequently elects to proceed with the development of the Shopping Center within one (1) year after the effective date of such termination, then Landlord agrees, upon written demand and repayment of any expenses paid to Tenant by Landlord as outlined in this section, to enter into a new lease of the Premises with Tenant on the same economic terms set forth in this Lease, and in a form substantially similar in all material respects to this Lease at Tenant's option.

(c)    Permits and Approvals.  Landlord shall be solely responsible for obtaining all land disturbance permits, driveway and curb cut permits, building permits, and other approvals necessary to construct the Landlord's Work and the balance of the Shopping Center, except for the Approvals to be obtained by Tenant as provided below. Within forty-five (45) days after Tenant's approval of the Working Drawings, Tenant shall cause to be prepared, and shall deliver to Landlord plans and specifications covering the Tenant's Work, as provided in Paragraph 5(d). Within fifteen (15) days after the approval of such Tenant Plans by Landlord, Tenant shall make the necessary submittals to Mecklenburg County for issuance of a building permit, including a complete set of working drawings and specifications for the Tenant's Work, as defined below (the "Upfit Working Drawings"). The Upfit Working Drawings shall be prepared in conformity with the approved Working Drawings. If Tenant has not received, within ninety (90) days after the date that Tenant's plans and specifications for the Tenant's Work have been approved by Landlord (the "Approval Period"), any and all necessary and required local, state, federal and private permits, licenses, variances, consents and approvals (collectively "Approvals") which give Tenant the ability to construct Tenant's initial improvements to the Premises and do business as an "IHOP" restaurant, which Approvals must be acceptable to Tenant in its sole discretion and Tenant must diligently pursue all efforts to obtain all necessary governmental approvals and permits on conditions that would not adversely impact Tenant's ability to operate its proposed IHOP restaurant and work with permitting authorities to insure any conditions proposed that are in Tenant's sole judgment adversely impact Tenant's ability to operate its IHOP restaurant in a good faith effort to resolve any such conditions, then Tenant shall have the right, at its sole option, to terminate this Lease by notifying Landlord in writing of its election within fifteen (15) days after the expiration of the Approval Period. Upon such termination, both parties shall be released from any further obligations under this Lease. If Tenant fails to terminate this Lease in a timely manner, it shall be deemed to have waived the contingency set forth in this Paragraph 5(c). Landlord shall assist Tenant in obtaining all necessary Approvals. Tenant shall apply for the Approvals promptly after Landlord's approval of the Upfit Working Drawings, and shall use diligent and commercially reasonable good faith efforts to obtain the Approvals.

(d)    Tenant's Work.  Upon delivery of possession of the Premises by Landlord, Tenant shall complete all other work in the Premises necessary for its use and requirements (the "Tenant's Work") including without limitation the following:

(i)    Tenant shall be responsible for distribution of all electric, plumbing, and HVAC within the Premises.

(ii)    Tenant shall install all interior ceilings, light fixtures, fans, etc.

(iii)    Tenant shall be responsible for its own interior walls, where not provided as part of the Landlord's Work, as well as floor, wall and ceiling finish materials. Tenant will provide and install all fixtures, furnishings, and equipment within the Premises including, but not limited to, television sets, seating, bar area, tables, chairs, kitchen equipment, etc. Tenant also will provide all kitchen exhaust, makeup air equipment, and fire suppression system including all wiring, ducting, and connections.

(iv)    Tenant will be responsible for all building-mounted signage, and its identification panel on the pylon sign.

Tenant agrees to submit to Landlord plans and specifications covering the Tenant's Work including, without limitation, sign drawings, an interior layout plan, and a fixturing plan (collectively, the "Tenant Plans"). The Tenant Plans shall be prepared in such detail as Landlord may reasonably require, and Tenant agrees not to commence work upon any of Tenant's Work until Landlord has approved the Tenant Plans and in writing. Landlord agrees not to unreasonably withhold, delay or condition its approval of the Tenant Plans. If Landlord fails to respond to the Tenant Plans within ten (10) business days after they have been submitted, the Tenant Plans shall be deemed approved by Landlord in the form submitted by Tenant. Tenant shall cause all such work to be done in a good and workmanlike manner and in strict conformity with the approved Tenant Plans and in compliance with all applicable laws. In addition, performance of the Tenant's Work is subject to the criteria set forth in Exhibit E.

Tenant shall complete the Tenant's Work so that it may open for business in the Premises on the Rent Commencement Date. If Tenant does not open the Premises for the conduct of an IHOP restaurant within ninety (90) days after the Rent Commencement Date, except to the extent that any such delay has been caused by: (a) the acts of Landlord, its agents, employees or contractors, or (b) an event of force majeure, as described in Paragraph 28, then Landlord shall have the right at any time thereafter to terminate this Lease by giving Tenant written notice of such termination, and Landlord shall have the rights and remedies for default provided in Paragraph 18.

6.    **Use of the Premises**.

(a)    General. The Premises shall be used and occupied only for the Use Permitted, and for no other purpose without the written consent of Landlord. Additionally, Tenant shall comply with all reasonable rules and regulations promulgated by Landlord from time to time, which Landlord in its sole discretion shall deem necessary for the proper operation of the Shopping Center, provided that such rules and regulations are uniformly enforced against all tenants in the Shopping Center. In particular, Tenant shall take all measures reasonably necessary to prevent odors generated in connection with the preparation and cooking of food from permeating the premises occupied by other tenants of the Shopping Center or the common area of the shopping center. If Landlord, in its reasonable discretion, finds that Tenant is in breach of foregoing covenant, Landlord may require Tenant, at Tenant's sole expense, to take necessary measures to correct the problem, including, but not limited to, the installation of additional air handlers and/or venting systems within the Premises.

(b)    Go Dark. After Tenant has opened for business in the Premises, as provided in Paragraph 5(d), nothing in this Lease shall be construed to require Tenant to operate its business in the Premises (continuously or otherwise). Notwithstanding the foregoing, if Tenant ceases business operations in the

Premises for a period of ninety (90) consecutive days or longer during the Lease Term, except as a result of a Permitted Closure (as defined below), Landlord shall have the right (as its sole right and remedy due to such failure to operate) to terminate this Lease and recapture the Premises by providing Tenant with written notice thereof at least thirty (30) days prior to the recapture date. Notwithstanding the foregoing, if Tenant is engaged in good faith negotiations with a potential subtenant or assignee at the time the Landlord's notice of termination is delivered, Tenant shall notify Landlord in writing of that fact, and the Landlord's notice shall be nullified if the subtenant or assignee opens for business in the Leased Premises within thirty (30) days after the date of Landlord's notice. Upon the recapture date, both Landlord and Tenant shall be released from any and all duties, liabilities and obligations under this Lease accruing on or after the recapture date. As used in this Paragraph 6(b), the term "Permitted Closures" shall mean any of the following cessations of business in the Premises: (i) a total of two (2) days per calendar year for the purpose of taking inventory in the Premises, (ii) up to sixty (60) days in each instance for remodeling of the Premises, not more often than every three years, (iii) up to sixty (60) days in each instance for transition to a permitted assignee or subtenant; or (iv) as a result of casualty damage, condemnation or other causes beyond the reasonable control of Tenant.

(c)     Hazardous Materials.   Tenant shall not use, generate, manufacture, produce, store, release, discharge or dispose of on, in, under or about the Premises or the Shopping Center, or transport to or from the Premises or the Shopping Center, any Hazardous Materials (as defined below), or allow any other person or entity to do so. Tenant shall comply with all applicable Environmental Laws (as defined below) with respect to its use and occupancy of the Premises and Shopping Center. Tenant shall promptly notify Landlord should Tenant receive notice of, or otherwise become aware of, any presence, release or discharge, or threatened release or discharge, of any Hazardous Material in, on, under or about the Premises or the Shopping Center, or any violation of any Environmental Law with respect to the Premises or the Shopping Center. Tenant agrees to indemnify, defend and hold harmless Landlord, and its respective principals, owners, agents, managers, employees, successors and assigns from and against any and all liabilities, claims, demands, damages, liens, penalties, costs and expenses of every kind and nature directly or indirectly attributable to Tenant's failure to comply with this Paragraph 6(e), including without limitation reasonable attorneys' fees and expenses, court costs and costs incurred in the investigation, settlement and defense of claims. This indemnity obligation shall survive the expiration of the Lease Term or the earlier termination of this Lease.

As used in this Paragraph 6(c), "Hazardous Material" means any substance or material meeting any one or more of the following criteria: (i) it is or contains a substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any Environmental Law; (ii) it is toxic, reactive, corrosive, ignitable, infectious or otherwise hazardous; or (iii) it is or contains, without limiting the foregoing, petroleum hydrocarbons. As used in this Paragraph 6(b), "Environmental Law" shall mean any federal, state or local law, statute, ordinance, rule, regulation, permit, directive, license, approval, guidance, interpretation, order, or other legal requirement relating to the protection of safety, human health or the environment.

(d)     Exclusive Use and Prohibited Uses.   In order to induce Tenant to enter into this Lease and to protect Tenant's legitimate business interests and investment in the Premises, Landlord covenants that until the expiration or earlier termination of the Lease Term, Landlord shall not, without the prior written consent of Tenant: (i) lease or permit any other portion of the Shopping Center to be used for the operation of a restaurant larger than 2,400 square feet and only one such restaurant shall be leased and in no event shall any restaurant serve breakfast or open before 10:00 am each day of the week, or (ii) lease or permit any other portion of the Shopping Center to be used in violation of the Prohibited Uses set forth on Exhibit C. The foregoing restriction shall apply to all other tenants of the Shopping Center, and their respective assignees, subtenants and licensees, and Landlord shall incorporate a reference to the foregoing restrictive covenant in the memorandum or short form lease referenced in Paragraph 36, and in any lease

of a portion of the Shopping Center entered into after the date of this Lease, and prior to the expiration or earlier termination of the Lease Term. The foregoing restriction shall not prevent any tenant in the Shopping Center from selling packaged food or beverages for off-premises consumption as an incidental part of its business, defined to mean that no more than five percent (10%) of such tenant's gross sales are derived from the sale of packaged food or beverages. If Tenant ceases business operations in the Premises for a period of ninety (90) consecutive days or longer during the Lease Term, except as a result of a Permitted Closure, the restrictive covenant set forth in Paragraph 6(d)(i) shall terminate automatically.

Landlord and Tenant agree that in the event of a violation of the restrictions set forth in this Paragraph 6(d), which is not cured by Landlord within thirty (30) days which time can be extended if Landlord is diligently and in good faith pursuing the cure of a violation after written notice from Tenant, then Tenant may exercise all remedies available to it at law or in equity for such breach, including without limitation the right to terminate this Lease by delivery of written notice to Landlord at any time that such violation is continiung.

7.    **Landlord's Covenant to Maintain**.

Landlord will keep and maintain in good order and repair during the Lease Term the roof, the gutters and downspouts, the exterior supporting walls, the foundations and the principal structural portions of the buildings and other improvements constituting the Shopping Center, those portions of all mechanical and utility systems within the Shopping Center that serve the Premises, but not the mechanical systems that directly serve the HVAC for Tenant, and other improvements in the Shopping Center, the sprinkler systems (if any) that serve the Premises, and all Common Areas; provided, however, that Landlord will not be responsible for or required to make, and Tenant will make, any repairs which may have been occasioned or necessitated by the negligence or willful misconduct of Tenant, its agents, employees or invitees. Landlord shall not be liable for any damages resulting from its failure to make repairs unless Landlord has received notice of the need for such repairs in writing, and Landlord has failed to make the repairs within fifteen (15) days after written notice from Tenant; provided, however, that if any repairs required to be made by Landlord are commenced when necessary, but cannot be completed within fifteen (15) days, then Landlord shall have an additional reasonable period of time to complete the repairs, so long as it continues to prosecute the completion of the repairs with due diligence, and provided it keeps Tenant fully informed on the progress of its repairs. In addition, Landlord shall warrant that the heating and air conditioning system ("HVAC System") serving the Premises is in good operating condition for a period of one (1) year following the Turnover Date. If the HVAC System requires repair or replacement during the first year, excluding regular quarterly servicing, Landlord shall, at Landlord's cost, perform such repair or replacement.

If any repairs required to be made by Landlord under this Lease are not completed within fifteen (15) days after written notice from Tenant, as such cure period may be extended pursuant to the preceding paragraph, then Tenant, without limiting any other right or remedy it may have therefor, may at its option make such repairs on behalf of Landlord; and Landlord shall reimburse Tenant, within ten (10) days after written demand, for the reasonable and documented cost of such repairs incurred by Tenant; provided, however, that in the case of emergency repairs that affect Tenant's use and occupancy of the Premises, Tenant shall be obligated only to use reasonable efforts to notify Landlord of the need for the repairs, and shall have the right make such repairs immediately at Landlord's expense if Tenant is unable to reach Landlord, or if Tenant reaches Landlord but Landlord fails to make the repairs as soon as reasonably possible.



8.   **Tenant's Covenant to Maintain; Alterations**.

(a)   Tenant's Maintenance Obligations.  Tenant will, at its own expense, keep and maintain in good order and repair during the Lease Term all parts of the Premises, including without limitation, the entire interior thereof and all doors and door frames, window glass, plate glass, the HVAC System (after the expiration of the warranty period referenced above), and all plumbing, wiring, electrical systems and mechanical systems exclusively serving the Premises; provided, however, that Tenant will not be responsible for or required to make, and Landlord will make, any repairs which may have been occasioned or necessitated by the negligence or willful misconduct of Landlord, its agents, employees or invitees.  In connection with Tenant's duty to maintain the HVAC System, Tenant agrees to obtain and maintain in full force, at Tenant's expense, a preventive maintenance contract on the HVAC System from a reputable licensed and bonded HVAC maintenance company.  Such contract shall provide for the periodic replacement of filters; the proper monitoring of the system and repair and replacement of its components (including without limitation coils, motors, fans, valves, and thermostats); and the disposal of and/or recycling of any CFCs and HCFCs in the HVAC System in accordance with all applicable governmental requirements.  If Tenant is required to replace any equipment (including HVAC equipment) serving the Premises to comply with its obligations set forth above, the replacement equipment shall be substantially similar in quality (commercial grade such as Trane or Lennox) to the equipment being replaced.

In addition to its maintenance obligations under the preceding paragraph, Tenant shall be responsible, at its sole cost and expense, for the regular cleaning, maintenance and repair of all drains, grease interceptor units and grease trap lines, and vented hoods and air handlers located within or serving the Premises.  The maintenance of the grease traps, vented hoods and air handlers shall be performed pursuant to a service contract maintained by Tenant throughout the Term with one or more reputable, licensed contractors, a copy of which service contract shall be delivered to Landlord no less than annually.  Tenant shall refrain from disposing of grease into sanitary sewer system, shall remove and wash daily the filters in the food processing exhaust system hoods, shall scrape and clean the hoods and exhaust ducts at least once every three (3) months, and shall maintain a record of such cleaning to be furnished Landlord upon request.

If any repairs required to be made by Tenant under this Lease are not completed within fifteen (15) days after written notice from Landlord, or in case of emergency if those repairs are not made immediately, Landlord, without limiting any other right or remedy it may have therefor, may at its option make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs; and Tenant shall pay to Landlord, as additional rent within ten (10) days after written demand, the cost of such repairs.  If any repairs required to be made by Tenant are commenced when necessary, but cannot be completed within fifteen (15) days, then Tenant shall have an additional reasonable period of time to complete the repairs, so long as it continues to prosecute the completion of the repairs with due diligence, and provided it keeps Landlord fully informed on the progress of its repairs.

(b)   Alterations and Signs.  Following completion of the Tenant's Work, Tenant shall not decorate, paint or in any other manner alter the Premises and shall not install or affix any sign, device, fixture, awning, canopy, marquee, advertising matter, decoration, lettering, or other attachment on or to the exterior of the Premises, without first obtaining Landlord's written consent.  Landlord agrees not to unreasonably withhold, delay or condition its approval of such alterations.  Notwithstanding the foregoing, Tenant may make interior, non-structural alterations and improvements to the Premises in an amount not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) in each instance, provided Tenant strictly complies with the provisions of this Lease (except for any provision requiring the submission and approval of plans and specifications).

Tenant, at its expense, shall furnish and install, within ninety (90) days following the Turnover Date, at an appropriate location on the exterior of the Premises as shown on the Tenant Plans, an identification sign of such design, content, form and material as it may select for the purpose of designating its business in the Premises. In addition, Tenant shall have the right to install, at its expense, a sign panel on the free-standing monument sign for the Shopping Center to be constructed by Landlord at the location shown on the Site Plan. The location of Tenant's sign panel is shown on Exhibit G attached to this Lease. All signs must be approved by Landlord and be in conformance with applicable municipal or county sign ordinances. Drawings must be presented to Landlord for approval by Tenant's sign company prior to installation. Landlord agrees not to unreasonably withhold, delay or condition its approval of such sign drawings.

All work performed by Tenant in the Premises, including without limitation all signs installed by Tenant, shall be performed: (i) in a good and workmanlike manner, (ii) in compliance with all governmental requirements, (iii) at such times and in such manner as will cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center, and (iv) in compliance with in compliance with the standards attached hereto as Exhibit E. Furthermore, if Tenant makes any improvements or alterations to the Premises, the construction shall be undertaken and maintained in a neat and orderly condition at all times, with construction materials and equipment, if any, stored so as to be screened from view to the greatest extent possible, and Tenant shall cause all of Tenant's construction debris to be removed from the Premises and be disposed of outside the boundaries of the Shopping Center.

(c)    Communications Equipment. Landlord shall allow Tenant, at no additional charge, to install antennas, satellite dishes or similar communications equipment ("Communications Equipment") on the roof of the building containing the Premises, and will permit Tenant to install wiring between the roof and Premises in appropriate locations and through conduits, and to allow roof access at reasonable times to service and maintain the Communications Equipment. All Communications Equipment shall be screened from view in a manner reasonably satisfactory to Landlord, and removed at Tenant's expense upon the expiration of the Lease Term. Landlord will require that any roof penetrations necessary to install the Communications Equipment be made by Landlord's roofing contractor at Tenant's expense, and also that Landlord's roofing contractor be engaged to seal any conduits or other roof penetrations upon removal of the Communications Equipment. Tenant shall be solely responsible for any damage to the Premises or the roof of the building caused by the installation, maintenance or removal of the Communications Equipment. Tenant shall operate any Communications Equipment in compliance with all applicable governmental requirements, and in a manner to minimize interference with any other equipment (including other satellite dishes) in the Shopping Center. Tenant shall maintain all Communications Equipment in a good and safe condition and repair throughout the Lease Term, at its own expense.

9.    **Common Areas**.

(a)    Changes to Common Areas. The Common Areas within the Shopping Center shall at all times be subject to the exclusive control and management of Landlord; provided, however, that Landlord shall not, without the prior written consent of Tenant, (i) construct or allow any buildings, free-standing signs, kiosks or other structures within the Shopping Center except as shown on Exhibit A; (ii) reduce the parking ratio in the Shopping Center below five (5) spaces per one thousand (1,000) square feet of gross leasable area in the Shopping Center. Landlord may temporarily close any part of the parking facilities or other portions of the Common Areas for such period of time as may be necessary for (i) temporary use as a work area in connection with the construction, repairs or maintenance of buildings or other improvements within the Shopping Center or contiguous property, (ii) repairs or alterations in or to the Common Areas or to any sewers, utility facilities or distribution lines located within the Common Areas,

(iii) preventing the public from obtaining prescriptive rights in or to the Common Areas, (iv) security reasons, or (v) doing and performing such other acts (whether similar or dissimilar to the foregoing) in, to and with respect to, the Common Areas as in the use of good business judgment Landlord shall determine to be appropriate for the Shopping Center, provided however, that Landlord shall use reasonable efforts not to unduly interfere with or disrupt Tenant's business.

(b)      Tenant's Share of Common Area Maintenance Costs.    Commencing on the Rent Commencement Date, and for the balance of the Lease Term, Tenant shall pay to Landlord its pro rata share of Landlord's Common Area Maintenance Costs, as defined below.  The term "Common Area Maintenance Costs" shall mean: (i) all costs incurred by Landlord in operating, repairing, equipping, maintaining, replacing or improving the Shopping Center and the Common Areas, including, but not limited to, costs incurred for lighting, painting, cleaning, sanitizing, pest control, trash removal, illuminating, inspecting, landscaping, repairing, replacing, policing, guarding and protecting the Common Areas of the Shopping Center, (ii) all costs incurred by Landlord with respect to maintenance and repair of off-site improvements, (iii) the cost of personnel to implement the above-referenced services (including social security, unemployment and disability insurance), (iv) insurance and losses borne by Landlord as a result of deductibles carried by Landlord as provided under Paragraphs 4(b)(ii) and 4(b)(iii) (unless same are separately charged); and (v) an administrative fee equal to ten percent (10%) of such costs, to cover Landlord's management, administration and overhead expenses. The term "Common Area Maintenance Costs" shall not include the cost of capital improvements to the Shopping Center or other expenses properly classified as capital expenditures under generally accepted accounting principles.  Tenant's pro rata share shall be computed by multiplying Common Area Maintenance Costs by a fraction having as its numerator the Floor Area of the Premises and as its denominator the Gross Leasable Area of the Shopping Center. Tenant shall pay for dumpster service for pickups that exceed the normal use of a similarly sized center.  Landlord will provide to Tenant comparables of similarly sized and similarly occupied centers once the leasing has occurred and the type of business use is known.  Landlord will obtain data from dumpster operator for review.

At the beginning of each calendar year, Landlord shall estimate Tenant's pro rata share of the foregoing costs.  The initial estimate for the first partial calendar year of the Lease Term is set forth in Paragraph 1(i). The annual estimated amount shall be payable to Landlord in twelve (12) equal monthly installments, in advance, on the first (1st) day of each calendar month, as Additional Rent, without notice, demand, set-off or deduction.  Within sixty (60) days after the end of each calendar year, Landlord will furnish to Tenant a statement showing in reasonable detail the amount of Landlord's costs for such services for the preceding calendar year.  Any deficit will be paid by Tenant within thirty (30) days after demand by Landlord.  In the absence of a default by Tenant hereunder, any surplus will be refunded to Tenant within thirty (30) days after delivery of Landlord's statement.  Notwithstanding any provision in this Paragraph 9(b) to the contrary, the amount payable by Tenant to Landlord as its share of Common Areas Maintenance Costs for the first calendar year of the Lease Term (on an annualized basis) shall not exceed the estimate set forth in Paragraph 1(i) by more than ten percent (10%).

Landlord shall keep at its main office accurate books and records with respect to Common Areas Maintenance Costs for a period of at least the past three calendar years.  Provided that Tenant is not then in default under this Lease, Tenant shall have the right to audit those books and records at Landlord's main office during business hours, upon not less than ten (10) business days' prior notice to Landlord, which notice shall specify the year that Tenant intends to audit.  Tenant shall deliver to Landlord a copy of the audit within ten (10) days after it is completed. Landlord shall refund to Tenant any overcharge disclosed by the audit within ten (10) days after Tenant delivers a copy of the audit, and Tenant shall likewise pay Landlord any undercharge within that ten (10) day period.  Notwithstanding the foregoing, Tenant shall not have the right to audit any year outside of the Lease Term, or any year that Tenant has

previously audited or more than once a year. Landlord reserves the right to review and contest any audit performed by Tenant.

10. **Utilities**.

During the Lease Term, Tenant shall pay for all utilities or services required by it in the use of the Premises. If Landlord elects to furnish any such utilities or services to Tenant, Tenant agrees to purchase the same from Landlord, provided that Landlord does not charge more for those services than the consumer rate that would be charged by the public service corporation or municipal authority or other entity, as the case may be, supplying similar services to a similar sized commercial customer, in the area in which the Premises are situated. Tenant agrees to have all utility services transferred into its name on or before the Turnover Date. Landlord shall be responsible for any impact fees, connection fees, usage or capacity fees applicable to the provision of utility services to the Premises, and Tenant shall be responsible for posting any deposits required by a utility provider.

Landlord shall not be liable to Tenant for any damages should the furnishing of any utilities by Landlord be interrupted or required to be terminated because of necessary repairs or improvements or any cause beyond the reasonable control of Landlord. Nor shall any such interruption or cessation relieve Tenant from the performance of any of Tenant's covenants, conditions and agreements under this Lease. Notwithstanding the foregoing, if any interruption of utility service is caused by the negligence or willful misconduct of Landlord or its agents, employees or contractors, then Tenant shall have all remedies at law or in equity, and, in addition, if such interruption causes Tenant to be unable to operate its business at the Premises for a period longer than forty-eight (48) consecutive hours, then Base Rent, Additional Rent and all other amounts payable under this Lease shall abate until Tenant is once again able to operate in the Premises.

11. **Laws and Insurance Standards**.

During the Lease Term, Tenant shall not use the Premises in violation of, and Tenant shall promptly comply with, any and all laws, ordinances, rules, regulations, directives and standards of all federal, state, county and municipal governments and all departments and agencies thereof having jurisdiction over the Premises now or hereafter in effect. Tenant shall, at Tenant's sole cost and expense, make all changes to the Premises which are or hereafter may be required in order to comply with the foregoing. Tenant expressly covenants and agrees to indemnify and save Landlord harmless from any penalties, damages or charges imposed for any violation of any of the foregoing covenants, whether occasioned by Tenant or any person upon the Premises by license or invitation of Tenant or holding or occupying the Premises under or by right of Tenant. Tenant shall have no claim against Landlord for any damages should Tenant's use and occupancy of the Premises for the purposes set forth in this Lease be prohibited or substantially impaired by reason of any law, ordinance or regulation of federal, state, county or municipal governments or by reason of any part of any legal or governmental or other public authority.

12. **Indemnification**.

(a)    Tenant's Indemnification. Tenant shall indemnify, protect, defend and hold Landlord harmless from claims, actions, damages, liabilities and expenses (including reasonable attorneys' fees and court costs) in connection with loss of life, bodily or personal injury or property damage: (i) arising from or out of any occurrence in, upon, at or from the Premises, when not a result of the negligence or willful misconduct of Landlord, its agents, contractors or employees; (ii) arising from the occupancy or use by Tenant of the Premises; (iii) caused by any act or omission by Tenant, its agents, contractors, employees, licensees, invitees or concessionaires; or (iv) resulting from a breach of this Lease by Tenant. For purposes of this subparagraph 12(a), the term "Landlord" shall include its partners, members, managers,

shareholders, officers, directors and employees, as applicable, as well as any person or entity with which Landlord contracts to manage the Shopping Center.

(b)     Landlord's Indemnification.  Landlord shall indemnify, protect, defend, and hold Tenant harmless from claims, actions, damages, liabilities and expenses (including reasonable attorneys' fees and court costs) in connection with loss of life, bodily or personal injury or property damage: (i) arising from or out of any occurrence in, upon, or at or from the Common Areas within the Shopping Center that is caused by negligence or willful misconduct by Landlord or its agents,contractors or invitees, when not a result of the negligence or willful misconduct of Tenant, its agents, contractors, employees, licensees or concessionaires; (ii) caused by any act or omission by Landlord, its agents, contractors or employees; or (iii) resulting from a breach of this Lease by Landlord.

(c)     Survival.  The indemnification obligations of the parties under this Paragraph 12 shall survive the expiration or earlier termination of the Lease Term with respect to any occurrences before the effective date of such expiration or termination.

13.    **Insurance**.

(a)     Tenant's Insurance:  At all times during the Lease Term, Tenant shall pay all premiums for and maintain in full force and effect the following policies of insurance with insurance companies admitted to do business in the state in which the Shopping Center is located and carrying a current rating of at least A-VI in "Best's Insurance Guide":

(i)     Commercial general liability insurance (current ISO form or its equivalent) with a combined single limit at least Five Million and No/100 Dollars ($5,000,000.00) per occurrence, with a general aggregate limit per location of at least Five Million and No/100 Dollars ($5,000,000.00).  Tenant further agrees that such insurance shall contain fire and extended coverage legal liability insurance. Tenant may satisfy the liability insurance requirements with any combination of primary and excess ("umbrella") liability insurance policies.

(ii)     The equivalent of ISO Special Form property insurance covering Tenant's leasehold improvements, trade fixtures, furniture, inventory and equipment used in the Premises, providing protection to the extent of at least eighty percent (80%) of the replacement cost of such property.

(iii)     Statutory workers' compensation insurance and employer's liability insurance with minimum limits of at least $500,000/$500,000/$500,000.

Each policy of insurance required by subparagraphs 13(a) (i) and (ii) above shall name Landlord and any holder of a first deed of trust encumbering the Premises as additional insureds.  Each policy of insurance required by this Paragraph 13(a) shall contain an endorsement requiring thirty (30) days' written notice from the insurance company to all insureds prior to any cancellation, or material reduction in coverage of the policy.  Prior to the commencement of the Lease Term, and annually thereafter, Tenant shall deliver to Landlord certificates of insurance evidencing the policies of insurance required by this Paragraph 13(a), together with satisfactory evidence of proof of payment of premiums.

(b)     Landlord's Insurance.  At all times during the Lease Term, Landlord shall maintain in full force and effect the following policies of insurance, with insurance companies admitted to do business in the state in which the Shopping Center is located:



       (i)      Commercial general liability insurance (current ISO form or its equivalent) with a combined single limit of at least Five Million and No/100 Dollars ($5,000,000.00) per occurrence, with a general aggregate limit per location of at least Five Million and No/100 Dollars ($5,000,000.00). Landlord may satisfy the liability insurance requirements with any combination of primary and excess ("umbrella") liability insurance policies

       (ii)      The equivalent of ISO Special Form property insurance providing protection to the extent of not less than ninety percent (90%) of the replacement cost of the building in which the Premises are located (less the cost of foundations and footings), excluding Tenant's permanent leasehold improvements. Nothing herein shall be construed to require Landlord to insure those items that Tenant is obligated to insure pursuant to Paragraph 13(a)(ii) above.

     (c)     <u>Waiver of Claims; Waiver of Subrogation</u>. Each policy of property insurance required by this Lease shall contain an endorsement in which the insurance company waives and releases any right of subrogation that it may acquire against Landlord or Tenant by virtue of payment of any loss under such policy. In addition, Landlord and Tenant each waives and releases any claims it may have against the other arising out of any casualty that would be covered by the policy of property insurance required to be maintained by it under this Lease, or that actually is covered by any policy of property insurance maintained by such party, without giving effect to any deductible amounts or self-insured risks.

     (d)     <u>Blanket Policies</u>. Any policy of insurance required by this Lease may be maintained under a blanket policy of insurance, covering multiple locations, provided that: (i) in all other respects, each such policy shall comply with the requirements of this Lease, as applicable; (ii) prior to the commencement of the Lease Term, and annually thereafter, the insuring party shall furnish the other party with a written certificate from the insurer specifying, (A) the maximum amount of the total insurance afforded by the blanket policy to the Premises or the Shopping Center, as the case may be, and (B) any sublimits in the blanket policy applicable to the Premises or the Shopping Center, as the case may be, which amounts shall not be less than the amounts specified in this Lease and (iii) the protection afforded the insuring party under the blanket policy shall be no less than that which would have been afforded under a separate policy or policies relating only to the Premises or the Shopping Center, as the case may be.

     14.     **Ownership of Certain Property and Surrender of the Premises**.

     Upon the termination of this Lease or Tenant's right to possession thereunder, Tenant shall surrender to Landlord the Premises, including, without limitation, all buildings, alterations, improvements, additions, utility and mechanical systems, and fixtures then upon the Premises, in good condition and repair, ordinary wear and tear excepted. Such property shall be surrendered to Landlord by Tenant without injury, damage or disturbance thereto or payment therefor. Tenant shall remove its signs, unattached movable trade fixtures, inventory and furniture and other personal property upon the termination of this Lease. Tenant shall promptly repair any damage to the Premises resulting from the installation or removal of any of the foregoing items.

     15.     **Landlord's Entry and Easement for Pipes**.

     (a)     <u>Landlord's Entry</u>. Landlord shall have the right to enter upon the Premises at all reasonable times during the Lease Term for the purposes of inspection, maintenance, repair and alteration, to show the same to prospective purchasers and lenders, and during the last six (6) months of the Lease Term only, to show the same to prospective tenants; provided, however, that Landlord shall: (i) give at least forty-eight (48) hours prior notice to Tenant of such entry, except in the event of an emergency; (ii) enter only during Tenant's normal business hours, except in the event of an emergency; and (iii) use

commercially reasonable efforts to minimize any interference with Tenant's conduct of its business in the Premises.

(b)    Easement for Pipes.  Tenant shall permit Landlord to use, maintain and repair pipes, cables, conduits, plumbing, vents and wire in, to and through the Premises as often and to the extent that Landlord may now or hereafter deem to be necessary or appropriate for the proper operation and maintenance of the Shopping Center, provided that such work shall be performed with a minimum of disruption to Tenant and the business conducted at the Premises.

(c)    No Liability of Landlord.  Landlord shall not be liable to Tenant for any interruption of Tenant's business or inconvenience caused Tenant on account of Landlord's performance of any repair, maintenance or replacement in the Premises or any other work therein pursuant to Landlord's rights or obligations under this Lease, except to the extent caused by the negligence or willful misconduct of Landlord, its agents, contractors or employees.

16.    **Default**.

(a)    Events of Default.  Each of the following shall constitute an event of default by Tenant under this Lease:  (i) Tenant fails to pay any installment of Base Rent or Additional Rent payable under this Lease when due; (ii) Tenant fails to observe or perform any of the other covenants, conditions or provisions of this Lease to be observed or performed by Tenant; (iii) a petition is filed by or against Tenant to declare Tenant bankrupt or seeking a plan of reorganization or arrangement under any chapter of the Bankruptcy Code; (iv) Tenant's interest in this Lease is levied upon under execution or other legal process; (v) Tenant is declared insolvent by law or any assignment of Tenant's property is made for the benefit of creditors; or (vi) a receiver, liquidator or trustee is appointed for Tenant or Tenant's property or any guarantor of Tenant's obligations under this Lease.

(b)    Landlord's Remedies.  Upon the occurrence of an event of default by Tenant under this Lease, and if such default can be cured solely by the payment of money and is not cured within ten (10) days after written notice from Landlord (provided, however, that if Tenant fails to pay any installment of Base Rent when due two (2) or more times in any twelve (12) month period, Landlord shall not be obligated to give such a notice), or if such default cannot be cured solely by the payment of money and is not cured within fifteen (15) days after written notice from Landlord (provided, however, that if such default is not reasonably capable of being cured within thirty (30) days, then Tenant shall have an additional reasonable period of time to cure the default, so long as it continues to prosecute the cure with due diligence, and provided it keeps Landlord fully informed on the progress of its cure efforts), then Landlord, at its option, without further notice or demand to Tenant, may in addition to all other rights and remedies provided in this Lease, at law or in equity:

(i)    terminate this Lease and Tenant's right of possession of the Premises, and recover all damages to which Landlord is entitled as a result of Tenant's breach.  These damages include, without limitation: (a) any existing arrearage; (b) all costs and expenses (including reasonable attorneys' fees and court costs) incurred by Landlord in enforcing its rights under this Lease, (c) all expenses of reletting the Premises (including repairs, alterations, advertising, legal fees and brokerage commissions), (d) the unamortized value (amortized on a straight line basis over the first five (5) Lease Years of the Lease Term) of any construction/upfitting allowance or "free rent" granted to Tenant; and (e) an amount equal to the present value of the difference between the Rent that would be payable by Tenant under this Lease for the balance of the Lease Term and the reasonable rental value of the Premises for the balance of the Lease Term; or

(ii)    terminate Tenant's right of possession of the Premises without terminating this Lease, in which event Landlord may, but shall not be obligated to, relet all or part of the Premises for the account of Tenant, for such rent and term and upon such terms and conditions as are acceptable to Landlord. Landlord may, at its option, enter into the Premises, remove Tenant's signs and other evidences of tenancy, and take and hold possession of the Premises, as provided in Paragraph 14; provided, however, that such entry and possession shall not terminate this Lease or release Tenant, in whole or in part, from Tenant's obligation to pay all Rent for the full Lease Term, or from any other obligation of Tenant under this Lease. Upon such reentry, Landlord is authorized to redecorate, repair, alter and improve the Premises to the extent reasonably necessary to relet the Premises to a third party. Until Landlord relets the Premises, Tenant shall continue to pay Landlord all Rent for the full Lease Term. If and when the Premises are relet and a sufficient sum is not realized from such reletting, after payment of all Landlord's expenses of reletting (including additions, repairs, alterations, improvements, decorations, legal fees and brokerage commissions), to satisfy the payment of Rent under this Lease for any month, Tenant shall pay Landlord the deficiency monthly upon demand. Tenant agrees that Landlord may file suit to recover any sums due to Landlord under this Paragraph 16(b)(ii) from time to time and that the filing of a suit or the recovery of any amount due Landlord shall not be any defense to any subsequent action brought for any amount not previously reduced to judgment in favor of Landlord.

(c)    Remedies Non-Exclusive. No remedy provided in this Lease or otherwise available to either party under law shall be considered exclusive of any other remedy, and every remedy provided to Landlord or Tenant in this Lease may be exercised from time to time as often as occasion may arise. The failure or delay by either party to exercise any remedy following a default by the other party shall not impair any such remedy, or be construed to be a waiver of such default. In particular, the receipt by Landlord of Rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach, and no provision of this Lease shall be deemed to have been waived by either party unless such waiver is in writing and signed by such party, except as expressly provided otherwise in this Lease.

(d)    Cost of Enforcement. Upon the occurrence of any default by Tenant, whether resulting in termination or otherwise, Landlord may immediately recover from Tenant the cost of recovering the Premises and its costs and expenses (including reasonable attorney's fees) incurred in connection with enforcing its rights under this Lease.

17.    **Damage and Destruction**.

(a)    Repair and Restoration. Unless this Lease is terminated as provided in Paragraph 17(c) below after any damage or destruction to the Premises, Landlord shall repair and restore those parts of the Premises constructed by it to substantially the same condition as existed immediately prior to the damage. Tenant shall likewise repair and restore all other parts of the Premises (not required to be repaired or restored by Landlord) to substantially the condition as existed immediately prior to the damage, or otherwise consistent with new or recently implemented new standards adopted by IHOP restaurants, including all leasehold improvements, exterior signs, trade fixtures, equipment, display cases, furniture, furnishings and other installations of Tenant. If the Premises are damaged or destroyed, but this Lease is not terminated pursuant to Paragraph 17(c) below, then upon the expiration of the applicable ninety (90) day period provided for in Paragraph 17(c) below, or upon notice by Landlord to Tenant prior thereto (but after the expiration of the thirty (30) day period, if applicable) that Landlord has elected not to terminate this Lease, Landlord and Tenant shall commence their respective obligations under this Paragraph 17(a) as soon as is reasonably possible, and shall prosecute the same to completion with all due diligence.

(b)    Application of Insurance Proceeds.  All property insurance proceeds payable with respect to the Premises, excluding the proceeds payable to Tenant under the separate policy of property insurance maintained by it under Paragraph 13(a)(ii), shall belong to and shall be payable to Landlord.  If this Lease is not terminated as provided in Paragraph 17(c) below, Landlord shall disburse and apply such property insurance proceeds against the cost to Landlord of Landlord's restoration and rebuilding obligations.

(c)    Rebuilding.  If the Premises or any or all of the buildings of the Shopping Center are damaged or destroyed by any casualty not covered by the policy of insurance maintained by Landlord under Paragraph 13(b)(iii), or if the casualty is so covered, but (i) the insurance proceeds (including any applicable deductible amount) are insufficient or unavailable to cover Landlord's restoration obligations, or (ii) Landlord's architect certifies that the extent of such damage or destruction is fifty percent (50%) or more of the replacement value of the Premises immediately prior to the occurrence of such damage or destruction, then Landlord shall have the option to terminate this Lease by giving Tenant notice in writing any time within ninety (90) days after the occurrence of such casualty.  If the Premises are damaged or destroyed during the last two (2) Lease Years of the Lease Term, or during any Renewal Period, by any casualty and Landlord's architect certifies that the extent of such damage or destruction is fifty percent (50%) or more of the replacement value of the Premises immediately prior to the occurrence of such damage or destruction, then Tenant shall have the option to terminate the Lease by giving Landlord notice in writing any time within thirty (30) days after the occurrence of such casualty.  In the event of any termination under this Paragraph 17(c), this Lease shall terminate at the end of the calendar month in which the notice of termination is given, and Landlord shall refund to Tenant any rent or other charges previously paid by Tenant and pertaining to the period after the date of the casualty.  If Landlord terminates this Lease following a casualty but subsequently elects to commence the repair or restoration of the Premises within six (6) months after the date of the casualty, then Tenant may elect to negate Landlord's termination of this Lease by delivery of written notice to that effect within thirty (30) days after the date that Landlord commences the repair or restoration work.

(d)    Rent Abatement.  If the Premises are damaged, all Rent payable under this Lease shall be abated in proportion to the degree in which Tenant's use of the Premises is impaired during the period of any damage, repair or restoration provided for in this Paragraph 17.  Tenant shall continue to operate its business in the Premises during any such period, to the extent reasonably practicable from the standpoint of reasonable business management.  Except for the abatement of the Base Rent and other charges provided for above, and except for the indemnity obligations of Landlord under Paragraph 12(b) subject however to the waiver of subrogation provisions in paragraph 13 C, Tenant shall not be entitled to any compensation or damage from Landlord for loss of the use of the whole or any part of the Premises, or for inconvenience or annoyance occasioned by any damage, destruction, repair or restoration.

18.    **Eminent Domain**.

If any substantial part of the Premises or the Shopping Center is taken under the power of eminent domain (including any conveyance made in lieu thereof), and such taking makes the operation of Tenant's business on the Premises impractical, then Tenant shall have the right to terminate this Lease by giving Landlord written notice of such termination within thirty (30) days after such taking; and if Tenant does not so elect to terminate this Lease, Landlord, at its option, may either terminate this Lease or apply the proceeds of such condemnation to repair and restore the Premises to tenantable condition, in which case the rental to be paid by Tenant hereunder shall be proportionately and equitably reduced.  In no event shall Tenant have any interest for any award for the value of Tenant's leasehold interest.

All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) whether for the whole or a part of the Premises, shall be the property of Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Premises, and Tenant hereby assigns

all of its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for relocation expenses or for the taking of Tenant's leasehold improvements, trade fixtures and other property within the Premises (which Tenant is authorized to remove at termination pursuant to Paragraph 14) if a separate award of such items is made to Tenant, but any such award to Tenant shall be subject to the prior rights of the first mortgagee.

19.    **Financial Information**.

From time to time during the Lease Term, Tenant shall provide to Landlord, within fifteen (15) days after written request by Landlord, such financial information concerning Tenant and Tenant's business operations (and any guarantor of this Lease) as may be reasonably requested by any prospective mortgagee or purchaser of the Shopping Center; provided, however, that Landlord shall not have the right to request such information more frequently than once every twelve (12) months.

20.    **Assignment and Subleasing**.

(a)    Landlord's Consent Required.  Except as expressly permitted in Paragraph 20(b) and Paragraph 20(c), Tenant shall not, voluntarily or by operation of law, assign, transfer, mortgage or otherwise encumber all or any part of Tenant's interest in this Lease or in the Premises, or sublease all or any part of the Premises, without first obtaining the prior written consent of Landlord in each and every instance, which consent shall not be unreasonably withheld or delayed by Landlord.  Receipt by Landlord of amounts payable under this Lease from any party other than Tenant shall not be deemed to operate as consent to an assignment or sublease.

(b)    Permitted Affiliate Transfers.  Tenant may assign this Lease to (i) its parent entity, (ii) a subsidiary controlled by Tenant or Tenant's parent entity, (iii) any entity in which the existing shareholders of Tenant hold not less than fifty percent (50%) of the voting interests and fifty percent (50%) of the equity interests, (iv) any entity that purchases all or substantially all of the assets of Tenant, in a transaction involving at least ten (10) restaurant locations, in each case without the necessity of obtaining Landlord's consent.  The sale or other transfer (except as the result of death) of more than fifty percent (50%) of the voting interests or equity interests in Tenant shall constitute an assignment of this Lease for the purposes of this Paragraph 20 and is prohibited without the written consent of Landlord.

(c)    Permitted Franchise Transfers.  In addition to the assignments permitted under Paragraph 20(c), Tenant shall have the right, without Landlord's approval (but upon prior notice to Landlord), to assign this Lease or sublease the Premises to (i) IHOP Franchise Company, LLC, a Delaware Limited Liability Company or its successors ("Franchisor"), or (ii) an approved in good standing franchisee of Franchisor that is not a single purpose entity, that owns a minimum of ten (10) IHOP restaurants in its name and is not in default to IHOP under any franchise agreement or to any lender or landlord (a "Qualified Franchisee"); provided, however, as a condition of any such transfer, the assignee or subtenant shall assume, in writing reasonably acceptable to Landlord, all of the obligations of Tenant under this Lease.  If an assignment is made to the Franchisor or any such Qualified Franchisee pursuant to this Paragraph 20(c), Tenant shall be released from further liability under this Lease upon the later to occur of (x) the effective date of such assignment, and (y) Landlord's receipt of the written assumption prepared by Landlord and required by this Paragraph 20(c).  The Qualified Franchisee may be related or unrelated to Tenant and may include, among others, any entity affiliated with Tenant by conversion, merger or otherwise.

(d)    Approval Procedure.  If Tenant desires to assign this Lease or sublease all or any part of the Premises, except for an assignment or sublease not requiring the consent of Landlord under Paragraph 20(b) or Paragraph 20(c), Tenant shall submit to Landlord, at least thirty (30) days prior to the effective



date of the proposed assignment or sublease, a written notice of its intent, which notice shall: (i) state the name of the proposed assignee or subtenant, (ii) state the nature and character of the business of the proposed assignee or subtenant, (iii) state the term, use, rental rate and other particulars of the proposed assignment or sublease, including, without limitation, evidence reasonably satisfactory to Landlord that the proposed assignee or subtenant is financially responsible, and (iv) be accompanied by a copy of the proposed assignment or sublease documents.

(e)    Standards for Consent.  If Tenant desires to assign this Lease or sublease all or any part of the Premises, except for an assignment or sublease not requiring the consent of Landlord under Paragraph 20(b) or Paragraph 20(c), Landlord shall not be deemed to be unreasonable for requiring that the proposed assignee or subtenant (i) have a tangible net worth (according to its published financial statement or another financial statement certified by an independent certified public accounting firm) satisfactory to meet Tenant's financial obligations under this Lease, (ii) be financially responsible and (iii) be experienced in the operation of a restaurant of a size comparable to the Premises.  Additionally, Landlord shall not be deemed to be unreasonable for withholding consent on the grounds that such assignment or sublease will violate a restrictive covenant granted to any other tenant in the Shopping Center, or that the proposed use is in direct conflict with another then-existing use at the Shopping Center.

(f)    Effect of Assignment or Sublease.  If Landlord consents to any transfer of Tenant's interest in this Lease, or if Landlord's consent is not required, then the term "Tenant" shall thereafter be deemed to include, without further reference, the party to whom such interest is transferred, such as any subtenant, assignee, concessionaire or licensee.  Any consent by Landlord to an assignment, except for an assignment not requiring the consent of Landlord under Paragraph 20(b) or Paragraph 20(c), is expressly conditioned upon Tenant's delivery to Landlord of a copy of the assignment document, in which the assignee shall agree in writing to assume all outstanding obligations of Tenant at the effective date of such assignment and all obligations to be performed by Tenant under this Lease arising after the effective date of the assignment.  Notwithstanding any assignment or sublease permitted by this Lease or consented to by Landlord, Tenant shall remain fully liable for the performance of all of the terms of this Lease, even if this Lease is amended, except to the extent provided in Paragraph 20(c).  Notwithstanding the foregoing, in the case of any amendment without assignor-Tenant's written consent, after assignment, assignor-Tenant's obligations shall be limited to those existing at the time of assignment.

(g)    Administrative Fee.  In the event of an assignment or sublease that requires Landlord's consent, Tenant agrees to pay Landlord the sum of One Thousand and No/100 Dollars ($1,000.00), as Additional Rent, for costs incurred by Landlord in connection with the processing of the assignment or sublease.  Such amount shall be paid by Tenant to Landlord at the time it requests Landlord's consent.

(h)    Concessions and Licenses.  Any concession or license granted for any part of the sales area of the Premises shall be considered a sublease for the purposes of this Paragraph 20.

21.    **Notices**.

All notices provided for in this Lease shall be in writing and shall be deemed to be given when sent after having been sent by prepaid registered or certified mail, return receipt requested, or by an overnight courier service which requires the recipient to sign a receipt; addressed to Landlord at the address set out in Paragraph 1(k) (ii) and addressed to Tenant at the address set out in Paragraph 1(l)(ii). Either party may, from time to time, by giving ten (10) days prior written notice as provided above, designate a different address to which notices to it shall be sent.

22.    **Holding Over**.

If Tenant remains in possession of the Premises or any part thereof after the expiration of the Lease Term without any written agreement of the parties, Tenant shall be only a tenant at will, at a rent equal to one hundred fifty percent (150%) of the Base Rent in effect immediately prior to the expiration of the Lease Term, together with other charges set forth in this Lease and there shall be no renewal of this Lease or exercise of an option by operation of law. The foregoing shall not prejudice any rights of Landlord in the event Tenant remains in possession of the Premises after the expiration of the Lease Term without Landlord's acquiescence, including, without limitation, the right to dispossess Tenant or to seek any damages Landlord might have by virtue of Tenant's holding over.

23.    **Subordination and Non-Disturbance**.

This Lease shall be subordinate to any present or future first mortgage or first deed of trust covering the Premises; provided, however, that at the option of the first mortgagee this Lease can be made superior to the first mortgage or deed of trust. As a condition to such subordination, the holder of the mortgage or the trustee of the deed of trust shall agree that the rights of Tenant under this Lease shall not be divested or in any way affected by a foreclosure or other default proceeding under the mortgage, deed of trust or obligations secured thereby, so long as Tenant is not in default under the terms of this Lease, and Tenant agrees that this Lease shall remain in full force and effect notwithstanding any such foreclosure or default proceeding. Tenant further agrees that it will attorn to the mortgagee, trustee or beneficiary under such mortgage or deed of trust, to their successors or assigns and to any purchaser or its assignee at a foreclosure sale. Each party will, upon request by the other party, execute and deliver an instrument required to give effect to the provisions of this Paragraph 23, in substantially the form attached to this Lease as **Exhibit J**. Tenant agrees that upon the request of either Landlord or any mortgagee, Tenant shall send to such mortgagee copies of all notices sent to Landlord, such copies to be forwarded to such mortgagee as and when such notices are sent to Landlord and at the mailing address from time to time provided to Tenant by either Landlord or such mortgagee.

24.    **Transfer of Landlord's Interest**.

In the event of the sale, assignment or transfer by Landlord of its interest in the Shopping Center or in this Lease (other than a collateral assignment to secure a debt of Landlord) to a successor in interest who expressly assumes in writing the obligations of Landlord under this Lease, and upon delivery of such written assumption agreement to Tenant, Landlord shall be released or discharged from all of its covenants and obligations under this Lease, except any obligations that have accrued prior to any such sale, assignment or transfer, and Tenant agrees to look solely to such successor for the performance of those obligations. Landlord's assignment of the Lease shall not affect Tenant's obligations under this Lease, and Tenant shall attorn to such assignee as Landlord, provided Tenant has received written notice of the assignment.

25.    **Quiet Enjoyment and Warranty**.

Landlord warrants that it has full right and authority to lease the Premises to Tenant upon the terms and conditions set forth in this Lease; and that Tenant shall peacefully and quietly hold and enjoy the Premises for the full Lease Term so long as it does not default in the performance of any of its covenants under this Lease.

26.    **Estoppel Certificate**.

Within ten (10) days after written request by Landlord, Tenant shall deliver a written statement to any proposed mortgagee or purchaser of the Shopping Center, or to Landlord, certifying those facts contained therein that are then true with respect to this Lease, including without limitation (if such is the case) that this Lease is in full force and effect, that Tenant is in possession of the Premises, that Tenant has commenced the payment of Rent, and that there are no defaults, defenses or offsets to this Lease claimed by Tenant.

27.    **Mechanics' Liens**.

Tenant agrees that if any mechanics' or other lien is filed against Tenant's interest in this Lease or in the Premises by reason of labor, services or materials supplied or claimed to have been supplied to Tenant, or anyone holding the Premises through or under Tenant, or if any tax lien is filed against Tenant, Tenant shall cause the lien to be discharged of record within twenty (20) days after the date of filing, by bonding or otherwise. If Tenant fails to discharge the lien within the twenty (20) day period, then, in addition to any other right or remedy available to it, Landlord may, but shall not be obligated to, discharge the lien either by paying the amount claimed to be due or by giving security or in such other manner as may be prescribed by law. In that event, Tenant shall, within ten (10) days after written demand by Landlord, reimburse Landlord for all of its reasonable and documented costs and expenses arising in connection with such lien (including reasonable attorneys' fees). Nothing contained in this Paragraph 27 shall imply any consent or agreement on the part of Landlord to subject Landlord's estate to liability under any mechanics' or other lien law.

28.    **Force Majeure**.

If Landlord or Tenant is delayed, hindered or prevented from the performance of any act required under this Lease, by reason of governmental restrictions, scarcity of labor or materials, strikes, fire, or any other reasons beyond its control (it being agreed that the financial inability of either party shall not be deemed a reason beyond its control), then, provided the party claiming the permitted delay advises the other party of the circumstances supporting such claim within fifteen (15) days after the event, the performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for the period necessary to complete performance after the end of the period of such delay. Any failure to provide timely notice of a permitted delay circumstance will be deemed a waiver of the additional time claim.

29.    **Limitation of Liability**.

Notwithstanding anything contained in this Lease to the contrary, Tenant agrees that it shall look solely to the interest of Landlord in the land and buildings comprising the Shopping Center for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord for any default under this Lease, subject, however, to the prior rights of any ground landlord or the holder of any first mortgage or deed of trust. No other assets of Landlord, its officers, directors, partners, managers, members or employees, shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claim.

30.    **Real Estate Brokers**.

Landlord and Tenant represents to each other that they have not dealt with any real estate broker, salesperson or finder in connection with this Lease, other than the Brokers as identified in Paragraph 1(q). Tenant agrees to indemnify and hold harmless Landlord from and against any and all liabilities and claims

for commissions and fees arising out of a breach of the foregoing representation. Landlord agrees to pay any agreed upon commissions due the Brokers as identified in Paragraph 1(q), and to indemnify and hold harmless Tenant from and against any and all liabilities and claims for commissions and fees arising out of a breach of the foregoing representation.

31.    **Accord and Satisfaction**.

No payment by Tenant or receipt by Landlord of a lesser amount than any installment of Rent due under this Lease shall be deemed to be other than on account of the amount due, and no endorsement or statement on any check or any letter accompanying any check or payment of Rent or other charges shall be deemed an accord and satisfaction, and Landlord may accept such check for payment without prejudice to Landlord's right to recover the balance of such installment or pursue any other remedies available to Landlord. No receipt of money by Landlord from Tenant after the termination of this Lease or Tenant's right of possession of the Premises shall reinstate, continue or extend the Lease Term.

32.    **Nature and Extent of Agreement**.

This Lease contains the complete agreement of the parties regarding the terms and conditions of the Lease of the Premises, and there are no oral or written conditions, terms, understandings or other agreements pertaining thereto which have not been incorporated in this Lease. Landlord and Tenant agree that the fact either one of them may have drafted this Lease or any portion thereof shall not be used to construct such provisions against its author. This Lease creates only the relationship of landlord and tenant between the parties as to the Premises; and nothing in this Lease shall in any way be construed to impose upon either party any obligations or restrictions that are not expressly set forth in this Lease. The laws of the state in which the Shopping Center is located shall govern the validity, interpretation, performance and enforcement of this Lease. The captions and the table of contents used in this Lease are for convenience only and do not in any way limit or amplify the terms and provisions hereof. Whenever the singular number is used the same shall include the plural, and words of any gender shall include each other gender.

33.    **Waiver of Jury Trial**.

Landlord and Tenant each expressly waive any right to trial by jury of any claim, demand or cause of action arising under this Lease or in any way related to the dealings of the parties with respect to the Premises or the Shopping Center.

34.    **Interlineation**.

Whenever in this Lease any printed portion has been stricken out, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken out which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

35.    **Time of Essence**.

Time is of the essence with respect to the performance of each of Tenant's covenants and obligations under this Lease, and the strict performance of each shall be a condition precedent to Tenant's rights to remain in possession of the Premises or to have this Lease continue in effect.



36. **Short Form Lease**.

Upon request of Landlord or Tenant, the parties shall execute a memorandum or short form lease agreement, in recordable form and substantially in the form attached to this Lease as Exhibit K, specifying the Premises and the Lease Term, and including any other provisions of this Lease (exclusive of provisions dealing with monetary terms) as either party may desire to incorporate therein.

37. **Waivers**.

One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

38. **Addendum to Lease**.

An Addendum to Lease required by the Franchisor is attached to this Lease and made a part hereof by this reference.

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the day and year first above written.

**LANDLORD**

**MECKLENBURG LAND DEVELOPMENT LLC, A NORTH CAROLINA LIMITED LIABILITY COMPANY**

By: _John Rudolph_
Name: _John Rudolph_
Title: _Manager_

**TENANT**

**CFRA, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

## ADDENDUM TO LEASE

THIS ADDENDUM TO LEASE (the "Addendum") forms a part of that certain Lease Agreement (the "Lease") dated _____, 2011, by and between Mecklenburg Land Development LLC, a North Carolina limited liability company, as Lessor, and CFRA, LLC, a Delaware limited liability company, as Lessee, demising those certain premises located at 16061 Lancaster Highway, Charlotte, North Carolina (the "Premises").

R E C I T A L S:

WHEREAS, Lessor and Lessee acknowledge that the anticipated use of the Demised Premises is the conduct of an International House of Pancakes or IHOP Restaurant thereon, pursuant to the terms of a certain Franchise Agreement (the "Franchise Agreement") to be entered into between IHOP Franchise Company, LLC, a Delaware limited liability company ("IHOP"), as Franchisor, and Lessee, as Franchisee, and that by reason of such use certain benefits will inure to Lessor and Lessee; and

WHEREAS, Lessor and Lessee further acknowledge that in the event the Lease or Franchise Agreement, or both, are terminated by reason of the default of Lessee and the business of an International House of Pancakes or IHOP Restaurant upon the Demised Premises ceases or is otherwise interrupted, certain damages to IHOP (or its Affiliates) and/or its servicemarks will result; therefore, IHOP has required, as a condition to the Franchise Agreement, that Lessor and Lessee enter into this Addendum for the purpose of granting certain succession rights to IHOP in the event of a default by Lessee under the Lease or in the event of a termination of the Franchise Agreement, or both, so that the business of an International House of Pancakes or IHOP Restaurant, at IHOP's election, may continue to be conducted upon the Demised Premises, as hereinafter provided.

NOW, THEREFORE, in consideration of the above premises and as an inducement to IHOP to enter into the Franchise Agreement with Lessee, the parties hereto hereby agree as follows:

Notwithstanding anything contained in the Lease to the contrary:

A.      In the event Lessor shall declare a default under the Lease due to Lessee's failure to perform any obligation of Lessee under the terms of the Lease, and in the event Lessee shall fail to cure such default within the period provided in the Lease or at law for such cure, before Lessor shall take any action to terminate the Lease or Lessee's right to possession of the Demised Premises, Lessor shall give written notice to IHOP c/o International House of Pancakes, LLC at 450 North Brand Boulevard, Attn: Legal Dept., 7th Floor, Glendale, California 91203, of its intention to so terminate the Lease or Lessee's right to possession of the Demised Premises, whereupon IHOP shall have a period of ten (10) days after its receipt of said notice to notify Lessor in writing that IHOP has elected to cure such default and to succeed to Lessee's rights under the Lease. IHOP's right to so succeed to Lessee's interest under the Lease shall be conditioned upon IHOP tendering to Lessor an amount sufficient to cure any monetary defaults of Lessee then existing under the Lease, within ten (10) days after the date of IHOP's giving of such notice, and curing any nonmonetary defaults within a reasonable period of time after IHOP shall obtain possession of the Demised Premises. Notwithstanding the foregoing, in the event Lessee has obtained a leasehold mortgage, so long as Lessee's Mortgagee has any cure rights with regards to the Lease, IHOP's notice and cure period described in this Addendum shall not commence until the expiration of the rights of Lessee's Mortgagee under the Lease.

B.      If for any reason the Lease is terminated before IHOP shall have the right to exercise its election to succeed to Lessee's interest under the Lease, as contemplated above, Lessor shall promptly notify IHOP in writing of such termination, and, provided IHOP notifies Lessor in writing of its desire to obtain possession of the Demised Premises within ten (10) days after the date that IHOP shall receive

written notice from Lessor that said Lease has been terminated, then Lessor shall enter into a new lease with IHOP for the remainder of the term and any option terms that would have been available under the Lease, but for such termination, within ten (10) days after the date that IHOP shall give such notice, provided IHOP pays Lessor an amount sufficient to cure any monetary defaults of Lessee then existing under the Lease and within a reasonable period of time after IHOP obtains possession of the Demised Premises, cures any nonmonetary defaults under the Lease.

C.     In the event of the termination of the Franchise Agreement as a result of Lessee's breach thereof, IHOP shall also have the right to succeed to the interest of Lessee under the Lease by giving written notice to Lessor of its election to so succeed to Lessee's interest under the Lease, within ten (10) days after the date of the termination of the Franchise Agreement.

D.     In the event IHOP elects to succeed to Lessee's interest under the Lease pursuant to paragraphs A, B or C above, IHOP shall attorn to Lessor and shall assume all of the obligations thereafter to be performed by Lessee under the Lease, including all amendments, addenda and supplements thereto.

E.     In the event IHOP elects to succeed to Lessee's interest under the Lease pursuant to paragraphs A, B or C above, IHOP shall have the unqualified right to sublease the Demised Premises to a franchisee or prospective franchisee of IHOP meeting IHOP's minimum standard qualifications, without the written consent of Lessor, and in so doing IHOP shall have no obligation to pay to Lessor any consideration or portion thereof derived by IHOP in connection therewith.

F.     Upon default by Lessee of the terms of its Franchise Agreement with IHOP, and where such default extends beyond all applicable cure periods in the Franchise Agreement, Lessor hereby grants IHOP, or its assignee, the right to enter the Premises to make any modifications necessary to protect the proprietary trademarks, trade dress and other intellectual property owned by IHOP and relating to the operation of an IHOP or International House of Pancakes Restaurant, without being deemed guilty of trespass or any other tort, to make such modifications reasonably necessary at the reasonable expense of Lessee, which expense Lessee shall pay to IHOP pursuant to the Franchise Agreement.

G.     Upon the expiration or earlier termination of the Lease for any reason, Lessee shall, upon written demand of IHOP, remove all IHOP trademarks and elements of trade dress from all buildings, signs, fixtures and furnishings, and make reasonable alterations to and paint those portions of buildings and other improvements maintained pursuant to the Lease a neutral color to the extent necessary to protect the trade dress of the IHOP system.   In addition to and without limiting the generality of the foregoing, Lessee shall make any other changes which IHOP requests in order to protect the proprietary trademarks and trade dress of the IHOP system.

H.     If Lessee shall fail to make or cause to be made any such removal, alteration or repainting within thirty (30) days after written notice, Lessor shall use commercially reasonable efforts to give IHOP written notice of such failure. IHOP shall have the right to enter upon the Premises, upon at least 48 hours advance notice to Lessor, without being deemed guilty of trespass or any other tort, and make or cause to be made such removal, alterations and repainting at the reasonable expense of Lessee, for the purposes described in G. above, which expense Lessee shall pay to IHOP pursuant to the Franchise Agreement.

INITIALS:     Lessor: _____     Lessee: _____

# EXHIBIT "A"
## SITE PLAN



## EXHIBIT "B"

## LEGAL DESCRIPTION OF SHOPPING CENTER

DESCRIPTIONS OF PARCELS IN DECLARATION:

THE SHOPPING CENTER IS DEFINED AS:
Being all of Parcels A and B as shown on that certain plat entitled "Recombination and Subdivision Plat for Capstone Commons, Mecklenburg Land Development, LLC (Owner)" prepared by R. B. Pharr & Associates, P.A. which plat is recorded in Map Book 53 at Page 234 in the Mecklenburg Public Registry

THE MIXED USE CENTER known as CAPSTONE COMMONS IS
Being all of Parcels A, B and C as shown on that certain plat entitled "Recombination and Subdivision Plat for Capstone Commons, Mecklenburg Land Development, LLC (Owner)" prepared by R. B. Pharr & Associates, P.A. which plat is recorded in Map Book 53 at Page 234 in the Mecklenburg Public Registry.

# EXHIBIT "C"

## PROHIBITED USES

The Premises and the balance of the Shopping Center shall not be used for any of the following "Prohibited Uses":

1.    funeral establishment;

2.    facility for the sale, leasing, repair or display of motor vehicles, or used car lot, including body repair facilities;

3.    auction or bankruptcy sale;

4.    pawn shop;

5.    outdoor circus, carnival or amusement park, or other entertainment facility;

6.    outdoor meetings;

7.    bowling alley;

8.    billiard or pool hall (except as incidental to the operation of a restaurant);

9.    shooting gallery;

10.    off-track betting (provided that state sponsored lottery tickets shall not be prohibited);

11.    refinery;

12.    adult bookstore or facility selling or displaying pornographic books, literature, or videotapes (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), or a massage parlor;

13.    any residential use, including but not limited to living quarters, sleeping apartments or lodging rooms;

14.    theater;

15.    auditorium, meeting hall, ballroom,

16.    unemployment agency, service or commission;

17.    gymnasium, health club, exercise or dance studio; provided, however, that Landlord shall have the right to lease space to one (1) such establishment, not greater than 3,000 square feet in size;

18.    dance hall;

19.    cocktail lounge, bar, disco or night club;



20.    bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business;

21.    video game or amusement arcade, except as an incidental part of another primary business;

22.    skating or roller rink;

23.    car wash or car rental agency;

24.    auction house, or flea market;

25.    a facility for the sale of paraphernalia for use with illicit drugs;

26.    a beauty school, barber college, reading room, school or other facility catering primarily to trainees rather than customers).

# EXHIBIT "D"

## STANDARD GREY SHELL SPECIFICATIONS

1. **HEATING AND AIR CONSITIONING SYSTEM:**

   Landlord shall provide a rooftop unit with a minimum capacity of 1 ton of air conditioning capacity per 125 square feet of leasable (Carrier/Trane or equal – with gas heat). Landlord shall provide a one-year warranty for HVAC system, and shall forward all warranty paperwork to the Tenant. The distribution shall be by Tenant.

2. **ELECTRICAL:**

   Landlord will install (2) 4" conduits with secondary wiring capable of 1000 amp service for main gutter location to the interior of Premises. Transformer or permanent power to the building shall be in place at the time of Delivery. Landlord to provide gas line to building, sized for 2100 MBH demand based on 7" W.C., 0.5 psi (max.), 0.6 specific gravity, and 0.5" W.C. pressure drop.

3. **SIGNAGE:**

   Building signage shall be by Tenant. Landlord shall install appropriate blocking to support Tenant's signage. Tenant shall have the right (at their expense) to install a panel on the common monument sign which shall be constructed by Landlord. Building signage per IHOP corporate standards at size allowance a per local sign codes.

4. **INTERIOR FINISH AND INSULATION:**

   The structure shall have sufficient height for Tenant to have 12' ceiling throughout. The entire interior surface of the exterior wall and roof sheeting shall be insulated per governing ordinances. Landlord shall provide a 20 year roof guarantee. Tenant will use the Landlord's roof contractor to make Tenant's roof penetrations. The demising and perimeter walls shall be constructed per local code per Tenant's approved drawings including sheetrock, sound attenuation insulation, and fire taped. Demising wall shall be fire rated as required.

5. **EXTERIOR FINISH AND INSULATION:**

   A complete storefront glass system (Kaweer or equal to) to include One (1) 6'-0" X 6'-8" double acting door, aluminum or equal; position of doors shall be per Exhibit C –Building Elevations. Other glass doors shall be provided as required by code. Rear door is to be a single 4'-0" x 7'0" fire rated hollow metal door with piano hinge hardware. Security peep hole and panic device by Tenant.

6. **PARKING LOT:**

Parking lot and service drive to have adequate drainage away from building in order to prevent standing water or flooding in parking area of Premises. Parking and landscape to be completed by Delivery Date. Tenant shall have to non-exclusive right to use parking areas shown in Exhibit A – SITE PLAN. The Landlord shall provide a dedicated dumpster area with concrete block/concrete filled steel bollards to protect rear wall, double metal gates, concrete floor and loading apron capable or enclosing 2-8 yard refuse containers and grease recycle container. Location is identified on Exhibit C- Site Plan.

## 7. SANITARY SEWER:

Minimum 4" line run and separate 4" grease waste line to the interior of the Premises, complete with City inspections for same. Landlord to install (1) 2000 gallon (or as required by local code) grease trap to be installed at the exterior receiving area.

## 8. TELEPHONE:

Landlord shall provide Tenant with (1) 2" conduit and pull string for telephone service stubbed into the Premises. Telephone service must be brought to the site by the Landlord and available for the Tenant prior to Delivery. Landlord to provide a separate 2" conduit w/ pull string for cable TV.

## 9. FIRE SPRINKLER SYSTEM:

If required by code, LL to install adequately sized fire water line, vault, fire riser system, valves, and distributed fire sprinkler system-with chrome plated pendant sprinkler heads turned up-for a complete, fully functioning, Fire Marshall approved-automatic wet pipe fire sprinkler system . Tenant will be responsible for re-distribution-after improvements are installed, and dropping the sprinkler heads. Tenant will furnish and install a monitoring system-if required by code. This monitoring system will be connected to a central monitoring system, or if required by the Fire Marshall, to the LL's central monitoring panel.

## 10. WATER:

Landlord to install one 2" domestic water line stubbed overhead to the rear of the space.

## 11. FLOOR:

Floor to be compacted soil, graded to within 8" of final finish floor, except for concrete floor along the first three fee of the front, rear, and demising walls of the building.

## 12. FINAL SHELL BUILDING INSPECTIONS:

Prior to Tenant acceptance of Premises, the Landlord will have obtained a final shell Certificate of Occupancy or equivalent from local building authority.



## EXHIBIT "E"

## STANDARDS FOR PERFORMANCE FOR TENANT'S WORK

In performing the Tenant's Work, Tenant shall comply and cause its contractor and subcontractors to comply with the following general requirements.

(a)      The general contractor(s) (**"Tenant Contractor"**) engaged by Tenant to perform the Tenant's Work shall be licensed in the State of North Carolina, and Tenant shall supply to Landlord prior to the commencement of construction a list of all general contractor(s) and all subcontractors that will be engaged to perform the Tenant's Work.  Except as a result of the negligence or willful misconduct of Landlord, its agents, contractors or employees, Landlord shall not be liable in any way for injury, loss or damage which may occur to any Tenant's Work, or to any personal property placed in the Premises, the same being at Tenant's and its contractors' sole risk.

(b)      Entry into the Premises by Tenant and/or Tenant Contractor, their respective employees, agents, contractors and subcontractors, to perform the Tenant's Work shall be conditioned upon Tenant and Tenant Contractor providing the following types of insurance in the following minimum amounts, issued by financially responsible insurance companies that may legally provide insurance in North Carolina.

(1)      Worker's Compensation coverage, with limits equal to or greater than the statutory limits as required by the State of North Carolina, with Landlord and its mortgagee(s) named as additional insureds.

(2)      Builders Risk Completed Value fire and extended coverage, covering damage to the construction and improvements to be made by Tenant, in amounts at least equal to the estimated completed cost of said construction and improvements with 100% co-insurance protection, with Landlord and its mortgagee(s) named as loss payees as their respective interest may appear.

(3)      Commercial General Liability coverage, with limits of at least $2,000,000.00, with Landlord and its mortgagee(s) named as additional insureds.

Original or duplicate policies or original certificates thereof, in form and content satisfactory to Landlord, for all of the foregoing insurance coverages shall be delivered to Landlord before the Tenant's Work is started and before any contractor's equipment is moved into any part of the Shopping Center.

(c)      Tenant shall obtain from Tenant Contractor, and shall require Tenant Contractor to obtain from each subcontractor participating in the Tenant's Work, a guarantee that their work will be free from any and all defects in workmanship and materials for the period of time which customarily applies in good contracting practice, but in no event for less than one (1) year after the acceptance of the work by the Tenant and Landlord.  The guarantees of each such contractor and subcontractor shall include the obligation to repair or replace in a thoroughly first-class and workmanlike manner, and without any additional charge, all defects in workmanship and materials. All warranties or guarantees as to materials or workmanship on or with respect to the Tenant's Work shall be contained in the contracts and subcontracts for performance of the Tenant's Work and shall be written so that they will inure to the benefit of Landlord and Tenant as their respective interests may appear.  Such warranties and guarantees shall be so written that they can be directly enforced by either Landlord or Tenant, and Tenant shall give the Landlord any assignment or other assurance necessary to effectuate the same.

(d)    Tenant Contractor and each subcontractor participating in the Tenant's Work shall obtain prior written approval from Landlord for any space in the Shopping Center (other than space in the Premises) which such contractor or subcontractor desires to use for storage, handling and moving of its materials and equipment; provided that in no event shall this paragraph be considered as a commitment of Landlord to provide the Tenant, its contractors or subcontractors, any storage facilities outside the Premises.

(e)    Tenant Contractor and each subcontractor participating in the Tenant's Work shall make prior arrangements with Landlord for connections to the Shopping Center's utility systems and services, with such connections being made during the time of day or night and on such a day as Landlord may reasonably determine. Landlord shall make, or cause to be made, such systems and services available to Tenant's contractors at reasonable times, at Tenant's expense.

(f)    It shall be Tenant's responsibility to cause Tenant Contractor, and Tenant Contractor shall cause all subcontractors participating in the Tenant's Work, to adhere to the requirements of this Exhibit E. Tenant shall indemnify, hold harmless and defend Landlord from and against any loss, liability, damage or other costs incurred by Landlord (i) in connection with the Tenant's Work, and/or (ii) resulting from the failure of Tenant, Tenant Contractor or any other contractor or subcontractor performing the Tenant's Work to adhere to the requirements of this Lease with respect to the performance of the Tenant's Work; provided, however, that Tenant's indemnity obligation shall not extend to any matter caused by the negligence or willful misconduct of Landlord, its agents, contractors or employees. Tenant shall cause Tenant Contractor to remove and dispose of, all debris and rubbish caused by or resulting from the performance of the Tenant's Work and, upon completion of the Tenant's Work, to remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining in the Shopping Center, which has been brought in or created by the contractors and subcontractors in the performance of the Tenant's Work.

(g)    Tenant Contractor and all subcontractors shall park in areas designated by Landlord. All materials, supplies and equipment shall be brought into the Shopping Center at times reasonably approved by Landlord. Landlord shall be entitled to set such other reasonable rules and regulations as Landlord may promulgate.

(h)    It shall be Tenant's responsibility to cause Tenant Contractor, and Tenant Contractor shall cause all subcontractors, to maintain continuous protection of adjacent premises in the Shopping Center in such a manner as to prevent any damage to such adjacent property by reason of the performance of the Tenant's Work.

(i)    In connection with the Tenant's Work, Tenant or Tenant Contractor shall file all drawings, plans and specifications, pay all fees and obtain all permits and applications required by Iredell County, the City of Charlotte, the State of North Carolina, the United States Department of Labor and any other authorities which may have jurisdiction.



# EXHIBIT "F"
## APPROVED ELEVATION DRAWINGS





# EXHIBIT "G"

## SIGN DRAWING SHOWING LOCATION OF TENANT'S PANEL


Landlord and Tenant will agree on the signage during the 45 day due diligence period as defined in Paragraph 5 of the Lease Agreement.

# EXHIBIT "H"

## COMMENCEMENT AGREEMENT

**THIS AGREEMENT**, is made and entered into this _____ day of _____, by and between **Mecklenburg Land Development, LLC**, a South Carolina limited liability company ("Landlord"), and **CFRA, LLC**, a Delaware limited liability company ("Tenant").

W I T N E S S E T H:

**WHEREAS,** by a certain Lease Agreement dated _____, (the "Lease"), Landlord leased to Tenant a restaurant space containing approximately 4,520 square feet in the City of Charlotte, County of Mecklenburg, North Carolina, and more particularly described in the Lease (the "Premises")l and

**WHEREAS,** Tenant is now in possession of the Premises and has opened for business; and

**WHEREAS,** the Lease did not contain a specific Rent Commencement Date; and

**WHEREAS,** the Landlord and Tenant have agreed upon a Rent Commencement Date.

**NOW, THEREFORE,** the parties hereto agree as follows:

1.    The term of the Lease commenced on _____, and shall expire on _____ unless sooner terminated or extended as provided in said Lease.

2.    The Base Rent and estimated Additional Rent commenced on _____. The annual Base Rent shall be _____ which Tenant covenants and agrees to pay in lawful money of the U.S. in equal monthly installments of _____ in advance on the first day of each month. In addition to Base Rent, estimated Additional Rent shall be payable as follows:

    CAM:  $_____psf. $_____ payable monthly @ $_____

    TAX:   $_____psf. $_____ payable monthly @ $_____

    INS:    $_____psf. $_____ payable monthly @ $_____

All Rents shall be prorated for a fraction of a month, if any, by dividing the rent by the actual number of days in said month and multiplying by the total number of days billable in said month.

3.    All other terms and conditions of said Lease are hereby reaffirmed as being in full force and effect.

**IN WITNESS WHEREOF,** the parties hereto have executed this Commencement Agreement the day and year first above written.

**LANDLORD**                                          **TENANT**

_____              _____

Date: _____              Date: _____

3039762v6 17165.00022                          H-1

Witness: _____        Witness: _____

# EXHIBIT "I"

## TURNOVER DATE NOTICE

Project: _____

Tenant: _____

Space: _____

Square Feet: _____

Mailing Address: _____

Turnover Date: _____

Est. Tenant Const.
  Completion: _____

Est. Date of Opening: _____

Acceptance of Delivery:

By: _____

Print: _____

Title: _____

Date: _____

NOTES:

1. Please be sure to have the locks changed on your space upon taking possession.

2. Below are a list of utility companies and the building official. Please be sure to have all utilities changed into your name at turnover/delivery. Our contractor will terminate service on the day of Delivery.

3. Please provide Landlord with a copy of the HVAC service contract within five (5) days of opening for business.

4. Please provide Landlord with a copy of the insurance certificate with Landlord's lender _____ named as an additional insured within five (5) days prior to Landlord Delivery Date.

Date Utility services to be shut off by Landlord: ____N/A_____

**Property Manager:** _____

**Utility Companies**
**Power:** _____

**Water:** _____

**Gas:** _____

**Phone:** _____

# EXHIBIT "J"

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT dated _____, 20____ (the "Agreement"), by and among CFRA, LLC, a Delaware limited liability company ("**Tenant**"), _____ ("**Bank**"), and Mecklenburg Land Development, LLC, a North Carolina limited liability company ("**Landlord**").

### BACKGROUND

A.     Bank has provided a loan (the "**Loan**") to Landlord, secured by, among other things, a lien on the Property described on **Exhibit A** attached hereto (the "**Property**"), and secured by a Deed of Trust and certain other instruments, dated on or about the date hereof (the "**Security Instruments**") covering the Property.

B.     Tenant entered into a Lease Agreement dated _____, a complete copy of which has been provided to the Bank (the "**Lease**") covering all or a portion of the Property as described in the Lease (the "**Leased Premises**"); and.

C.     Bank has required that the Lease be subordinated to the Security Instruments and that Tenant agree to attorn to any purchaser of the Property in the event of a foreclosure of the Security Instruments, or to Bank (or its successor or assign) prior to foreclosure in the event Bank elects to collect the rents and other sums due and becoming due under the Lease, and Tenant is willing to attorn on the terms and conditions hereinafter provided.

**NOW, THEREFORE,** the parties hereto, in consideration of the mutual covenants herein contained, and intending to be legally bound hereby, agree as follows:

### AGREEMENT

1.     **SUBORDINATION OF LEASE**.

The Lease is and shall be subject and subordinate to lien of the Security Instruments, and all provisions thereof, including but not limited to the use of insurance proceeds and eminent domain awards, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal amount and other sums secured thereby and interest thereon, as if the Lease had been executed and delivered after the execution, delivery and recording of the Security Instruments.

2.     **ATTORNMENT**.

Tenant agrees that, if applicable, it will attorn to and recognize:  (a) Bank, whether as mortgagee in possession or otherwise; (b) any purchaser at a foreclosure sale under the Security Instruments; (c) any transferee who acquires possession of or title to the Property, whether by deed in lieu of foreclosure or other means; and (d) the successors and assigns of the Bank, such purchasers and/or transferees (each of the foregoing parties, a "**Successor**"), as its landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions as set forth in the Lease.  Such attornment shall be effective and self-

operative without the execution of any further instruments by any party hereto; provided, however that Tenant will, upon request by Bank or any Successor, execute a written agreement (i) attorning to Bank or such Successor, affirming Tenant's obligations under the Lease, and agreeing to pay all rent and other sums due or to become due under the Lease to Bank or such Successor (Bank and/or any Successor are referred to collectively as "**Holder**"); and (ii) an instrument or certificate regarding the status of the Lease, consisting of statements, if true (or if not true, explaining why), (1) that the Lease is in full force and effect, (2) the date through which rentals have been paid, (3) the date of the commencement of the term of the Lease, (4) the nature of any amendments or modifications to the Lease, and (5) that no default, or state of facts, which with the passage of time or notice would constitute a default, exists on the part of either party to the Lease.

3. **NON-DISTURBANCE**.

So long as Tenant complies with Tenant's obligations under this Agreement and is not in default under any of the terms, covenants or conditions of the Lease, Holder will not disturb Tenant's use, possession and enjoyment of the Leased Premises, in accordance with the terms of the Lease, nor will the leasehold estate of Tenant be affected or Tenant's rights under the Lease be impaired in any foreclosure action, sale under a power of sale, transfer in lieu of the foregoing, or the exercise of any other remedy pursuant to the Security Agreements.

4. **ASSIGNMENT OF LEASES**.

Tenant acknowledges notice of and consents to the assignment of leases and rents included as part of the Security Instruments, and agrees that if any Holder of the Security Instruments, and whether or not it becomes a mortgagee in possession, shall give written notice to Tenant that Holder has elected to require Tenant to pay to Holder the rent and other charges payable by Tenant under the Lease, Tenant shall, until Holder shall have cancelled such election, be similarly bound to Holder and shall similarly attorn to Holder and shall thereafter pay to Holder all rent and other sums payable under the Lease. Any such payment shall be made notwithstanding any right of setoff, defense or counterclaim which Tenant may have against Landlord, or any right to terminate the Lease. Landlord hereby consents to this provision and agrees that any payment by Tenant of rent and other charges payable by Tenant under the Lease to Holder pursuant to this provision shall be deemed to be in accordance with the provisions of the Lease. Tenant acknowledges that Lender has not assumed any liability for Landlord's performance under the Lease, and Tenant agrees that Lender's collection of rent or other exercise of Landlord's rights under the Lease shall not render Lender liable for any obligations of the Landlord under the Lease unless Lender takes title to the Premises as provided herein or specifically so agrees in writing. An undertaking by Lender to cure or cause the cure of a default or series of defaults shall not in itself be construed as evidencing an agreement on Lender's part to assume liability for Landlord's obligations under the Lease.

5. **LIMITATION OF LIABILITY**.

In the event that Holder succeeds to the interest of Landlord under the Lease, or title to the Property, then, if applicable, Holder and any Successor shall assume and be bound by the obligations of Landlord under the Lease which accrue from and after such party's succession to Landlord's interest in the Leased Premises, but Holder and such Successor shall not be: (a) liable for any act or omission of any prior landlord (including Landlord); (b) liable for the

return of any security deposit unless any such security deposit has actually been received by the Holder; (c) liable for any offsets, credits or other claims against rentals for any periods prior to the date Holder succeeds to the interests of the Landlord); (d) bound by any rent or additional rent which Tenant might have paid for more than the current month; (e) bound by any amendment, modification or termination of the Lease affecting the interests of the Holder, made after the date hereof without Holder's prior written consent; or (f) personally liable for any default under the Lease or any covenant on its part to be performed thereunder as landlord, it being acknowledged that Tenant's sole remedy in the event of such default shall be to proceed against Holder's interest as beneficiary in the Premises. Nothing in this section shall be deemed to waive any of Tenant's rights and remedies against any prior landlord.

6.    **RIGHT TO CURE DEFAULTS**.

Tenant agrees to give written notice to Holder of any default by Landlord under the Lease (which notice shall be delivered simultaneously with Tenant's notice to Landlord), specifying the nature of such default, and thereupon Holder shall have the right (but not the obligation) to cure such default, and Tenant shall not terminate the Lease or abate the rent payable thereunder by reason of such default unless and until it has afforded Holder thirty (30) days after Holder's receipt of such notice to cure such default and a reasonable period of time in addition thereto (a) if the circumstances are such that said default cannot reasonably be cured within said thirty (30) day period and Holder has commenced and is diligently pursuing such cure, or (b) during and after any litigation action including a foreclosure, bankruptcy, possessory action or a combination thereof. Notwithstanding the foregoing, in the event of any Landlord default resulting in a necessary emergency repair to the Premises, Tenant shall have the right, prior to the expiration of such thirty (30)-day period (as the same may be extended pursuant to the terms of this Paragraph 6), to perform any such repair to the extent permitted under the terms of the Lease. It is specifically agreed that Tenant shall not require Holder to cure any default which is not susceptible of cure by Holder.

7.    **TENANT'S COVENANTS AND REPRESENTATIONS**.

Tenant hereby covenants and agrees with Holder that so long as the Loan remains outstanding, Tenant shall: (a) not pay any rent due under the Lease more than one month in advance; (b) Tenant shall not amend or modify the Lease without Holder's prior written consent; and (c) Tenant shall deliver to Holder, from time to time and within twenty (20) days from the date of request, a written estoppel certificate in form and substance reasonably satisfactory to Holder certifying to certain factual matters relating to the Lease.

8.    **MISCELLANEOUS**.

8.1    **Binding Effect**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Nothing contained in this Agreement shall in any way affect or impair the lien created by the Security Instruments, except as specifically set forth herein.

8.2    **Modifications**. This Agreement may not be supplemented, amended or modified unless set forth in writing and signed by the parties hereto.

8.3    **Notices**.  All notices and communications under this Agreement shall be in writing and shall be given by either (a) hand delivery, (b) first class mail (postage prepaid), or (c) reliable overnight commercial courier (charges prepaid) to the addresses listed in this Agreement.  Notice shall be deemed to have been given and received:  (i) if by hand delivery, upon delivery; (ii) if by mail, three (3) calendar days after the date first deposited in the United States mail; and (iii) if by overnight courier, on the date scheduled for delivery.  A party may change its address by giving written notice to the other party as specified herein.

8.4    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the substantive laws of the State on North Carolina.

<div align="center">(Remainder of Page Intentionally Left Blank)</div>



**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound, have duly executed and delivered this Agreement as of the day and year first above written.

**TENANT:**

**CFRA, LLC**

By:_____

Name: _____

Title: _____

Address: _____

_____

_____

**BANK:**

_____

By:_____

Name_____

Title: _____

Address: _____

**LANDLORD:**

**MECKLENBURG    LAND    DEVELOPMENT, LLC**

By:_____

Name: _____

Title: _____

Address: _____

_____

_____

STATE OF _____  )
                       )
COUNTY OF _____    )

Before me, the undersigned, a Notary Public in and for the County and State aforesaid, personally appeared _____ with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be _____ of CFRA, LLC, the within named bargainor, a Delaware limited liability company, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the company by himself as _____.

Witness my hand and seal at office in _____, this _____ day of _____, 20___.


_____
Notary Public

My Commission Expires:_____

STATE OF _____   )
                            )
COUNTY OF _____  )

       Before me, the undersigned, a Notary Public in and for the County and State aforesaid, personally appeared _____ with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be _____ of _____, the within named bargainor, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the bank by himself as _____.

       Witness my hand and seal at office in _____, _____, this _____ day of _____, 20___.


_____
My Commission Expires:_____

_____
Notary Public

STATE OF _____ )
                         )
COUNTY OF _____ )

        Before me, the undersigned, a Notary Public in and for the County and State aforesaid, personally appeared _____ with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be _____ of _____, the within named bargainor, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the company by himself as _____.

        Witness my hand and seal at office in _____, _____, this _____ day of _____, 20___.


_____
Notary Public

My Commission Expires:_____

## EXHIBIT A

### DESCRIPTION OF PROPERTY

DESCRIPTIONS OF PARCELS IN DECLARATION:

THE SHOPPING CENTER IS DEFINED AS:
Being all of Parcels A and B as shown on that certain plat entitled "Recombination and Subdivision Plat for Capstone Commons, Mecklenburg Land Development, LLC (Owner)" prepared by R. B. Pharr & Associates, P.A. which plat is recorded in Map Book 53 at Page 234 in the Mecklenburg Public Registry

THE MIXED USE CENTER known as CAPSTONE COMMONS IS
Being all of Parcels A, B and C as shown on that certain plat entitled "Recombination and Subdivision Plat for Capstone Commons, Mecklenburg Land Development, LLC (Owner)" prepared by R. B. Pharr & Associates, P.A. which plat is recorded in Map Book 53 at Page 234 in the Mecklenburg Public Registry.



# EXHIBIT "K"

## MEMORANDUM OF LEASE

After recording, please return to:

_____

_____

_____

_____

### MEMORANDUM OF LEASE

THIS MEMORANDUM is made as of the ____ day of _____, 2010 by and between: MECKLENBURG LAND DEVELOPEMNT LLC, a North Carolina limited liability company ("Landlord"); and CFRA, LLC, a Delaware limited liability company ("Tenant").

WHEREAS, by a certain Lease Agreement dated as of _____ (hereinafter referred to as the "Lease"), Landlord leased to Tenant the premises (hereinafter referred to as the "Premises") described in the Lease and also set forth in item 4 below, subject to the terms, covenants, and conditions set forth in the Lease; and

WHEREAS, Landlord and Tenant have executed this Memorandum for the purpose of submitting it to be recorded in the public records of Mecklenburg County, North Carolina.

NOW, THEREFORE, WITNESSETH, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto state as follows with respect to the Lease:

1.   Names of the parties:

    Landlord:   _____

    Tenant:   CFRA, LLC

2.   The addresses of the parties set forth in the Lease:

    Landlord's Address:   _____

                                  _____

                                  _____

                                  _____

    Tenant's Address:   Two Concourse Parkway, Suite 155
                                    Atlanta, Georgia 30328

3. Reference to the Lease:

The Lease was executed by and between Landlord and Tenant and was dated as of
_____.

4. Description of the Premises and the Shopping Center as set forth in the Lease: See Attached Exhibit A.

5. Original Term of the Lease:

Commencement Date: _____

Termination Date: _____

6. Renewal Options: Tenant shall have _____ (_) successive _____ (_) year options to extend this Lease for up to an additional _____ (_) years upon the same terms, covenants, conditions and rental as set forth in the Lease provided that Tenant is not in Default thereunder at the commencement of such option period.

Notice Procedure: The term of the Lease shall be automatically extended for _____ (_) periods of _____ (_) years, unless at least _____ (_) days prior to the expiration of the then existing Term Tenant shall give written notice to Landlord that Tenant has elected to waive its right to any remaining option, as applicable.

7. Landlord Covenant: Landlord covenants that until the expiration or earlier termination of the Lease Term, Landlord shall not, without the prior written consent of Tenant:, lease or permit any other portion of the Shopping Center to be used for the operation of a restaurant greater than 2,400 square feet not including any outdoor seating. The foregoing restriction shall apply to all other tenants of the Shopping Center, and their respective assignees, subtenants and licensees, and Landlord shall incorporate a reference to the foregoing restrictive covenant in any lease of a portion of the Shopping Center entered into after the date of this Lease, and prior to the expiration or earlier termination of the Lease Term. The foregoing restriction shall not prevent any tenant in the Shopping Center from selling packaged food or beverages for off-premises consumption as an incidental part of its business, defined to mean that no more than five percent (10%) of such tenant's gross sales are derived from the sale of packaged food or beverages. If Tenant ceases business operations in the Premises for a period of ninety (90) consecutive days or longer during the Lease Term, except as a result of a Permitted Closure, the foregoing restrictive covenant shall terminate automatically.

8.    Rights of Franchisor:  Landlord and Tenant have granted IHOP Franchising, LLC, a Delaware limited liability company, and its affiliates certain conditional rights, including possession, in and to the Premises.

IN WITNESS WHEREOF, the parties have signed, sealed and delivered this Memorandum as of the day and year first above written.

Signed, sealed and delivered in
The presence of:

**MECKLENBURG LAND DEVELOPMENT, LLC**, a North Carolina limited liability company

_____
Unofficial Witness
Name: _____

By: _____

Name: _____

Title: _____

_____
Notary Public

My Commission Expires:

_____

**[SIGNATURES CONTINUED ON FOLLOWING PAGE]**

Signed, sealed and delivered in
The presence of:

**CFRA, LLC**, a Delaware limited liability
company;

By: **CFRA HOLDINGS, LLC**, its sole
member;

_____

Unofficial Witness
Name: _____

    By: **PROMETHEUS V, LLC**, Managing
    Member

_____

Notary Public

My Commission Expires:

    By: _____

    Name: Nicholas Peters

    Title: Manager

_____

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AMENDMENT (the "*First Amendment*") is made and entered into as of January *13*, 2012 by and between **MECKLENBURG LAND DEVELOPMENT LLC**, a North Carolina limited liability company ("*Landlord*"), and **CFRA, LLC**, a Delaware limited liability company ("*Tenant*").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement on December 14, 2011 (the "*Lease*") relating to the premises located in the City of Charlotte, North Carolina, and more particularly described in the Lease (the "*Property*"); and

WHEREAS, Landlord and Tenant desire to amend the Lease upon the terms and conditions contained herein;

NOW, FOR AND IN CONSIDERATION of the mutual covenants and promises contained herein and other good and valuable consideration, the parties hereto agree that the Lease is hereby amended as follows:

1.    DUE DILIGENCE CONTINGENCY.    The first paragraph of Section 5 to the Lease states that, "...Tenant shall have a period of forty five (45) days to perform any due diligence efforts it wishes to include but not be limited to obtaining a title report of the shopping center property, feasibility studies, environmental studies, and tenant may terminate this lease agreement at any time during such due diligence period in its sole discretion". Tenant hereby conveys to Landlord that as of the date of this First Amendment, the Tenant hereby waives the due diligence period of forty five (45) days.

3.    LEASE CONTINUED.    Except as expressly modified hereby, the Lease is hereby ratified and confirmed and all provisions shall remain in full force and effect.

4.    ENTIRE FIRST AMENDMENT.    This First Amendment sets forth the entire agreement of the parties with respect to its subject matter.

5.    COUNTERPARTS. This First Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

[Signatures continued on following page]

IN WITNESS WHEREOF, the parties have set their hands and seals as of the date set forth above.

**LANDLORD:**

**MECKLENBURG LAND DEVELOPMENT LLC**

By: _____

Name: John Rudolph

Title: Manager


**TENANT:**

**CFRA, LLC**, a Delaware limited liability company

By: _____

Name: Chris Suh

Title: Vice President

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT (the *"Second Amendment"*) is made and entered into as of February ___, 2012 by and between MECKLENBURG LAND DEVELOPMENT LLC, a North Carolina limited liability company (*"Landlord"*) and CFRA LLC, a Delaware limited liability company ("*Tenant*").

## WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement on December 14, 2011 relating to the premises located in the City of Charlotte, North Carolina, and more particularly described in the Lease (the "Property"); and entered into a First Amendment of the Lease on January 13, 2012 (collectively referenced herein as the *"Lease"*) and;

WHEREAS, Landlord and Tenant desire to amend the Lease upon the terms and conditions contained herein;

NOW, FOR AND IN CONSIDERATION of the mutual covenants and promises contained herein and other good and valuable consideration, the parties hereto agree that the Lease is hereby amended as follows:

1.    EXHIBIT A- SITE PLAN.    The existing Exhibit A Site Plan shall be deleted and the attached Exhibit A Site Plan shall govern in its stead.

2.    COMMON AREAS.    The Lease is amended by the addition of the following provision to Section 9:

(c)    Assigned Parking Spaces.    Except as provided herein, all parking spaces shown on Exhibit A shall be non-exclusive to be used by the tenants or occupants of the Shopping Center and the adjoining property as provided in the Declaration of Easements and Restrictions for Capstone Commons as recorded in Book 26525 at Page 475 in the Mecklenburg Public Registry. Tenant shall have two (2) dedicated parking spaces as designated on Exhibit A for the exclusive use of its invitees and or employees. Landlord shall have the right to designate eight (8) spaces for the exclusive use for itself for any tenant or occupant of a portion of the Shopping Center, and hereby designates the current location of said spaces as shown on Exhibit A. Landlord has the right to relocate its designated spaces, subject to Tenant's approval, which shall not be unreasonably conditioned, delayed, or denied.

3.    LEASE CONTINUED. Except as expressly modified hereby, the Lease is hereby ratified and confirmed and all provisions shall remain in full force and effect.

4.    **ENTIRE SECOND AMENDMENT.**    This Second Amendment sets forth the entire agreement of the parties with respect to its subject matter.

5.    **COUNTERPARTS.**    This Second Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(Signatures continued on the following page)

IN WITNESS WHEREOF, the parties have set their hands and seals as of the date set forth above.

LANDLORD:

MECKLENBURG LAND
DEVELOPMENT LLC

By:_____
Name: John Rudolph
Title: Manager


TENANT:

CFRA, LLC, a Delaware limited
liability company

By:_____
Name: Chris Suh
Title: Vice President

EXHIBIT A
SITE PLAN



AYER DESIGN GROUP
PROJECT:
CAPSTONE COMMONS
FOR:
CAPSTONE PROPERTIES
SITE PLAN
C.1A
VICINITY MAP
SITE
Mecklenburg Land Development, LLC will have the right to designate eight (8) parking spaces highlighted in yellow as exclusive parking for the occupant of Building A after 10:00 a.m. each day.
Building A
Building B
CFRA, Inc. will have the exclusive right to use the two (2) parking spaces highlighted in blue in front of Bldg. B for carry out parking. Mecklenburg Land Development, LLC will relocate the handicap parking spaces from where presently shown.
SITE ANALYSIS
GOODWILL
FUTURE RETAIL
SITE PLAN
LANCASTER HIGHWAY
OLD HIGHWAY U.S. 521
PAVING LEGEND
BEFORE YOU DIG.....

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AMENDMENT (the *"First Amendment"*) is made and entered into as of January *13*, 2012 by and between **MECKLENBURG LAND DEVELOPMENT LLC**, a North Carolina limited liability company (*"Landlord"*), and **CFRA, LLC**, a Delaware limited liability company (*"Tenant"*).

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement on December 14, 2011 (the *"Lease"*) relating to the premises located in the City of Charlotte, North Carolina, and more particularly described in the Lease (the *"Property"*); and

WHEREAS, Landlord and Tenant desire to amend the Lease upon the terms and conditions contained herein;

NOW, FOR AND IN CONSIDERATION of the mutual covenants and promises contained herein and other good and valuable consideration, the parties hereto agree that the Lease is hereby amended as follows:

1.    DUE DILIGENCE CONTINGENCY.    The first paragraph of Section 5 to the Lease states that, "...Tenant shall have a period of forty five (45) days to perform any due diligence efforts it wishes to include but not be limited to obtaining a title report of the shopping center property, feasibility studies, environmental studies, and tenant may terminate this lease agreement at any time during such due diligence period in its sole discretion". Tenant hereby conveys to Landlord that as of the date of this First Amendment, the Tenant hereby waives the due diligence period of forty five (45) days.

3.    LEASE CONTINUED.    Except as expressly modified hereby, the Lease is hereby ratified and confirmed and all provisions shall remain in full force and effect.

4.    ENTIRE FIRST AMENDMENT.    This First Amendment sets forth the entire agreement of the parties with respect to its subject matter.

5.    COUNTERPARTS. This First Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

[Signatures continued on following page]

IN WITNESS WHEREOF, the parties have set their hands and seals as of the date set forth above.

**LANDLORD:**

**MECKLENBURG LAND DEVELOPMENT LLC**

By: _____

Name: John Rudolph

Title: Manager

**TENANT:**

**CFRA, LLC,** a Delaware limited liability company

By: _____

Name: Chris Suh

Title: Vice President

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT (the *"Second Amendment"*) is made and entered into as of February ___, 2012 by and between MECKLENBURG LAND DEVELOPMENT LLC, a North Carolina limited liability company (*"Landlord"*) and CFRA LLC, a Delaware limited liability company ("*Tenant*").

## WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement on December 14, 2011 relating to the premises located in the City of Charlotte, North Carolina, and more particularly described in the Lease (the "Property"); and entered into a First Amendment of the Lease on January 13, 2012 (collectively referenced herein as the *"Lease"*) and;

WHEREAS, Landlord and Tenant desire to amend the Lease upon the terms and conditions contained herein;

NOW, FOR AND IN CONSIDERATION of the mutual covenants and promises contained herein and other good and valuable consideration, the parties hereto agree that the Lease is hereby amended as follows:

1.    EXHIBIT A- SITE PLAN.    The existing Exhibit A Site Plan shall be deleted and the attached Exhibit A Site Plan shall govern in its stead.

2.    COMMON AREAS.    The Lease is amended by the addition of the following provision to Section 9:

(c)    Assigned Parking Spaces.    Except as provided herein, all parking spaces shown on Exhibit A shall be non-exclusive to be used by the tenants or occupants of the Shopping Center and the adjoining property as provided in the Declaration of Easements and Restrictions for Capstone Commons as recorded in Book 26525 at Page 475 in the Mecklenburg Public Registry. Tenant shall have two (2) dedicated parking spaces as designated on Exhibit A for the exclusive use of its invitees and or employees. Landlord shall have the right to designate eight (8) spaces for the exclusive use for itself for any tenant or occupant of a portion of the Shopping Center, and hereby designates the current location of said spaces as shown on Exhibit A. Landlord has the right to relocate its designated spaces, subject to Tenant's approval, which shall not be unreasonably conditioned, delayed, or denied.

3.    LEASE CONTINUED. Except as expressly modified hereby, the Lease is hereby ratified and confirmed and all provisions shall remain in full force and effect.

4.    <u>ENTIRE SECOND AMENDMENT.</u>    This Second Amendment sets forth the entire agreement of the parties with respect to its subject matter.

5.    <u>COUNTERPARTS.</u>    This Second Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(Signatures continued on the following page)

IN WITNESS WHEREOF, the parties have set their hands and seals as of the date set forth above.

LANDLORD:

MECKLENBURG LAND
DEVELOPMENT LLC

By: _____
Name: John Rudolph
Title: Manager


TENANT:

CFRA, LLC, a Delaware limited
liability company

By: _____
Name: Chris Suh
Title: Vice President

EXHIBIT A
SITE PLAN

Mecklenburg Land Development, LLC will have the right to designate eight (8) parking spaces highlighted in yellow as exclusive parking for the occupant of Building A after 10:00 a.m. each day.
CFRA, Inc. will have the exclusive right to use the two (2) parking spaces highlighted in blue in front of Bldg. B for carry out parking. Mecklenburg Land Development, LLC will relocate the handicap parking spaces from where presently shown.
Building A
Building B
FUTURE DEVELOPMENT TO PERMITTED SEPARATELY
VICINITY MAP
SCALE: NTS
SITE
PAVING LEGEND
CONCRETE PAVEMENT
LIGHT DUTY PAVEMENT
HEAVY DUTY PAVEMENT
NCDOT R/W PAVEMENT
NCDOT 1.5" OVERLAY
LANCASTER HIGHWAY
OLD HIGHWAY U.S. 521
SITE PLAN
SCALE: 1" = 30'
24 HR EMERGENCY CONTACT
MR. JOHN RUDOLPH
(704) 372-8000
BEFORE YOU DIG.....
North Carolina One-Call Center, Inc.
Call 48 Hours Before You Dig! It's The Law!
1-800-632-4949
SITE ANALYSIS
PROPOSED BUILDING AREA (TOTAL) 33,815 S.F.
ZONING NS
PARKING REQUIRED @ 1/800 S.F. (NS ZONING) 84 SPACES
PARKING PROVIDED 168 SPACES
TOTAL PROJECT AREA (INCLUDING FUTURE DEVELOPMENT & MINUS R/W) 7.31 ACRES
CURRENT PROJECT AREA 3.91 ACRES
GOODWILL
PROPOSED BUILDING AREA 12,000 S.F.
PARKING PROVIDED 59 SPACES
PARCEL/SITE AREA 1.80 ACRES
FUTURE RETAIL
PROPOSED BUILDING AREA (TOTAL) 21,815 S.F.
PARKING PROVIDED 109 SPACES
PARCEL/SITE AREA 2.11 ACRES
AYER DESIGN GROUP
PROJECT:
CAPSTONE COMMONS
16051 LANCASTER HWY
U.S. HIGHWAY 521 &
OLD U.S. HIGHWAY 521
CHARLOTTE, N.C.
MECKLENBURG COUNTY
FOR:
CAPSTONE PROPERTIES
1928 RANDOLPH ROAD
SUITE 217
CHARLOTTE, NC 28207
REVISIONS
1 1.12.11 CITY COMMENTS
2 2.14.11 CITY COMMENTS
3 2.22.11 NCDOT COMMENTS
4 6.2.11 ARCH. COMMENTS
5 7.19.11 BLDG. REVIEW COMMENTS
DWG. NAME : 2007165C
DRAWN BY : ASW
DATE. : 08.06.07
SCALE: 1" = 30'
SITE PLAN
C.1A

