**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| CFRA HOLDINGS, LLC, | Case No.: 8:20-bk-03608-CPM |
| | *Jointly Administered with:* |
| CFRA, LLC | Case No.: 8:20-bk-03609-CPM |
| CFRA TRI-CITIES, LLC | Case No.: 8:20-bk-03610-CPM |
|     Debtor. | |
| _____/ | |

**LIMITED OBJECTION BY ELLISTON PLACE LIMITED PARTNERSHIP TO**
**NOTICE OF ASSUMPTION, ASSIGNMENT AND CURE AMOUNT WITH RESPECT**
**TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS**

COMES NOW, Elliston Place Limited Partnership (the "Elliston" or "Landlord"), by and through its undersigned counsel, and hereby files this, its Limited Objection to Notice of Assumption, Assignment and Cure Amount with Respect to Executory Contracts and Unexpired Leases of the Debtors, and as grounds therefore states as follows:

**Background**

1.    On May 6, 2020 CFRA Holdings, LLC; CFRA, LLC; and CFRA Tri-Cities, LLC (collectively, the "Debtors") filed their respective voluntary petitions under Chapter 11 of the Bankruptcy Code. The Debtors cases are being jointly administered under Case No. 8:20-bk-03608-CPM.

2.    Pre-petition, CFRA, LLC entered into the Lease Agreement dated November 1, 2012, with Elliston Place Limited Partnership to lease certain real property located in Davidson County, Tennessee at 2214 Elliston Place, Nashville, Tennessee 37203. True and correct copies of the Lease Agreement is hereto as **Exhibit "A"** and incorporated herein by reference.

3.    CFRA, LLC defaulted under the Lease Agreement by, *inter alia*, failing to pay the April 2020, May 2020, and June 2020 lease payments as they came due.  As of the filing of the instant objection, CFRA, LLC is still in default under the Lease Agreement and has not cured any of the monetary defaults.

4.    On June 6, 2020, the Court entered its Order Approving Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof (Doc. No. 134) (the "Bidding Procedures Order").  Amongst other things, the Bidding Procedures Order set out certain procedures for the assumption and assignment of the various executory contracts and leases to which the Debtors were parties.

5.    Pursuant to the Bidding Procedures Order, the Debtors filed their Notice of Assumption, Assignment and Cure with Respect to Executory Contracts and Unexpired Leases of the Debtors (Doc. No. 145) (the "Assumption Notice").  Exhibit A to the Assumption Notice states that CFRA, LLC intends to assume and assign its lease with Elliston and proposes a cure amount of $43,172.00.

## Relief Requested

6.    Elliston does not object to the assumption and assignment of its lease provided all cure amounts required under the lease are paid in full.  As just one example supporting Landlord's limited Objection, Ellison objects to the proposed cure amount as it does not include attorney's fees and costs and other fees and charges as required by the lease such as accrued late fees and taxes.  For instance, to date, just the attorney's fees and costs are approximately $2,163.00. The Cure amount proposed by the Debtor is for the most part accurate but Landlord files this limited objection to preserve Landlord's rights.

7.    As a condition to any assumption and assignment of the Lease, all defaults must be cured upon assumption. 11 U.S.C. §365(b)(1)(A).

8.      The Assumption Notice correctly states the amount of base rent, but other amounts required by the lease such as reasonable attorney fees, taxes and other charges must also be paid as part of the cure as required by the lease.

9.      The Debtors are obligated to cure all defaults under the Lease and compensate Landlord for its actual pecuniary loss as a result of defaults under the Lease. *See* 11 U.S.C. § 365(b)(1)(A) and (B). "To assume an executory contract that is in default, a debtor must prove that it can promptly cure the default and provide adequate assurance of future performance." *In re Bayou Shores SNF, LLC*, 525 B.R. 160, 169 (Bankr. M.D. Fla. 2014).

10.     Landlord will cooperate with the Debtor and prospective purchaser or assignee and provide an up to date cure amount if a sale of assets which includes an assumption and assignment of Landlord's lease ever materializes.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that the foregoing **Limited Objection** has been furnished electronically by the Court's CM/ECF system to all parties who receive electronic notices via CM/ECF in this case and via U.S. Mail to Debtor, **CFRA, LLC,** 900 Branchview Drive, Suite 215, Concord, NC  28025 on June 23, 2020.

<div style="margin-left:40%;">

JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP

/s/ Alberto "Al" F. Gomez, Jr.
Alberto "Al" F. Gomez, Jr. (FBN:  784486)
401 E. Jackson Street, Suite 3100
Tampa, FL  33602
Telephone:    813-225-2500
Facsimile:    813-223-7118
Email: Al@jpfirm.com
Attorney for Elliston Place Limited Partnership

</div>

6341928_1

ELLISTON PLACE DEVELOPMENT

LEASE AGREEMENT

BETWEEN

ELLISTON PLACE LIMITED PARTNERSHIP, LANDLORD

AND

CFRA, LLC, TENANT

DATED:  MAY _29_, 2012

Exhibit "A"

## INDEX

1. PREMISES — 1
2. TERM — 1
3. MINIMUM RENT AND ADDITIONAL RENT — 2
4. TAXES AND INSURANCE — 2
5. COMMON AREA COSTS — 3
6. UTILITIES — 4
7. USE/CONDUCT OF BUSINESS — 5
8. USE OF COMMON AREAS — 6
9. CONDITION OF PREMISES/ CONSTRUCTION — 6
10. ALTERATIONS AND ADDITIONS — 7
11. REPAIRS BY LANDLORD — 7
12. REPAIRS BY TENANT — 7
13. NO LIENS — 8
14. INDEMNITY AND INSURANCE — 8
15. CASUALTY — 10
16. CONDEMNATION — 11
17. ASSIGNMENT AND SUBLETTING — 11
18. DEFAULT — 12
19. REMEDIES FOR DEFAULT — 13
20. LIABILITY OF LANDLORD — 16
21. SURRENDER OF PREMISES — 16
22. EXTERIOR SIGNS — 17
23. RIGHT OF ENTRY — 17
24. SUBORDINATION/ ATTORNMENT/ESTOPPEL — 18
25. NO ESTATE IN LAND — 19
26. PARKING — 19
27. HOLDING OVER — 19
28. HAZARDOUS MATERIALS — 19
29. NOTICES — 19
30. QUIET ENJOYMENT — 20
31. MERCHANTS' ASSOCIATION/ ADVERTISING — 20
32. RULES AND REGULATIONS — 20
33. FINANCIAL STATEMENTS — 20
34. MISCELLANEOUS — 20
35. SECURITY DEPOSIT — 22
36. RELOCATION — 22
37. AUTHORITY OF PARTIES — 23

126812/ACARGILE
999999-009/ 5/25/12

EXHIBIT A - SITE PLAN FOR PROJECT

EXHIBIT-A1-DESCRIPTION OF PREMISES

EXHIBIT B - DESCRIPTION OF REAL PROPERTY

EXHIBIT C - LEASE COMMENCEMENT AGREEMENT

EXHIBIT D - DESCRIPTION OF LANDLORD'S WORK AND TENANT'S WORK

EXHIBIT D-1 - SCOPE OF LANDLORD'S WORK

EXHIBIT E - SIGN CRITERIA

EXHIBIT F - RULES AND REGULATIONS

EXHIBIT G – PROHIBITED USES

## LEASE SUMMARY SHEET

LANDLORD:     Name: ELLISTON PLACE LIMITED PARTNERSHIP

               Notice Address:    c/o Morrison Wanger Properties
                               903 North 47th Street, Ste. 103
                               Rogers, AR 72756
                               Attn: Pat Morrison

With a copy to:                  c/o Brookside Properties
                               2002 Richard Jones Road, Suite 200-C
                               Nashville, Tennessee 37215
                               Attn: David P. Crabtree

TENANT:        Name:              CFRA, LLC

               Notice Address:    900 Branchview Drive, Suite 215
                               Concord, NC 28025
                               Attn: Tom Gough, Chief Financial Officer

With a copy to:                  Ledbetter Wanamaker Glass, LLP
                               1201 Peachtree Street NE
                               400 Colony Square, Suite 1501
                               Atlanta, Georgia 30309
                               Attn: David Robinson

                               and

                               Mitchell & Associates
                               5435 Dunwoody Mill Ct.
                               Atlanta, GA 30360
                               c/o Mr. John Mitchell

PROJECT: An office and retail building known as Elliston Place Development, located on a certain tract or parcel of land located at 2214 Elliston Place, Nashville, Davidson County, Tennessee, being more particularly described on Exhibit B, attached hereto and made a part hereof.

PREMISES AND APPROXIMATE SQUARE FOOTAGE: The Premises, containing approximately 4,114± SF and located on the first floor of the Project, are as shown on the site plan attached hereto as Exhibit A and Exhibit A-1 and made a part hereof.

DUE DILIGENCE RIGHT OF TERMINATION: Tenant shall have thirty (30) days from the Effective Date to perform its due diligence (the "Due Diligence Period"). Tenant shall have the right to terminate this Lease, in its sole discretion, during the Due Diligence Period by providing written notice to Landlord prior to the end of the Due Diligence Period. Tenant shall have sixty (60) days following the Effective Date (the "Permit Period") to obtain all necessary approvals and permits from the appropriate governmental authorities so that Tenant may construct the Premises. Tenant shall pursue all necessary permits and approvals diligently and in good faith. In the event Tenant is not able to receive permit approvals suitable for the operation and construction of the Premises as a standard IHOP restaurant during the Permit Period, Tenant shall have the right to terminate this Lease by written notice to Landlord prior to the end of the Permit Period. Tenant agrees it shall submit its plans to the appropriate governmental authorities on or before thirty (30) days following the Effective Date. In the event Tenant does not submit plans to the governmental authorities within thirty (30) days following the Effective Date, then Landlord shall have the right to terminate this Lease. Tenant will provide Landlord a set of its plans concurrently with Tenant's submittal to the governmental authorities.

TERM: One hundred, eighty (180) calendar months, commencing on the earlier of (a) the date that is sixty (60) days after the Permit Period; or (b) the date on which Tenant shall open the Premises for business to the public (the "Commencement Date"). The Commencement Date shall be subject to extension as provided in Section 34(m). If the Commencement Date occurs on a date other than the first day of a calendar month, then the period from the Commencement Date to the first day of the next calendar month shall be added to the term of this Lease.

MINIMUM RENT: Tenant shall pay to Landlord Minimum Rent as follows:

| Term | Annually | Monthly | Per SF |
|------|----------|---------|--------|
| Months 1 -60 | $127,534.08 | $10,627.84 | $31.00/SF |
| Months 61 – 120 | $140,287.44 | $11,690.62 | $34.10/SF |
| Months 121 – 180 | $154,316.16 | $12,859.68 | $37.51/SF |

OTHER SUMS PAYABLE: Tenant's Proportionate Share of Taxes, Insurance, Common Area Costs, and Utilities (payable to the applicable utility or to Landlord, if provided by Landlord, all as provided in Section 6). Tenant shall pay its Proportionate Share of Taxes, Insurance and Common Area Costs, which are estimated to be $8.64/SF for 2012 (after deduction of $0.24 for water, which will be submetered), in monthly installments.

Tenant's Proportionate Share of Taxes, Insurance and Common Area Costs for the first twelve (12) months of the Term shall not exceed the foregoing estimates by more than ten percent (10%) (the "Cap"). It is understood that if the Taxes, Insurance and Common Area Costs for the first twelve (12) months of the Term exceed the Cap, the amount of the excess (the "Excess Charges") shall not be included in the Common Area Costs for subsequent years. For example, the Cap is $9.50/SF ($8.64/SF plus 10%). If the actual Taxes, Insurance and Common Area Costs for the first twelve (12) months of the Term (after deduction of $0.24 for water), are $10.00, the Excess Charges would be $.50/SF, and each year that amount would be deducted from Tenant's Proportionate Share after the actual amount of Taxes, Insurance and Common Area Costs for the applicable year has been determined.

TENANT TRADENAME: IHOP Restaurant #3427

PERMITTED USE: Operation of an IHOP Restaurant and for no other use

SECURITY DEPOSIT: $0.00

GUARANTOR: _____

126812/ACARGILE
999999-009/ 5/25/12

- 2 -

**SUPPLEMENTAL TENANT INFORMATION**

1.   HOME PHONE: _____

2.   BUSINESS PHONE: _____

3.   EMERGENCY CONTACT: _____

4.   EMERGENCY PHONE, PAGER OR MOBILE: _____

5.   OFFICE OR STORE MANAGER: _____

6.   ACCOUNTS PAYABLE NAME, PHONE AND FAX: _____

## LEASE AGREEMENT

THIS LEASE is made this _27th_ day of May, 2012 (the "Effective Date") by and between ELLISTON PLACE LIMITED PARTNERSHIP, an Arkansas limited partnership ("Landlord"), and CFRA, LLC, a Delaware limited liability company ("Tenant").

### WITNESSETH:

1. **PREMISES.**

    (a)    The "Premises," as used herein, shall mean the Premises described on the Lease Summary Sheet. Landlord, for and in consideration of the rents, covenants, agreements, and conditions hereinafter set forth, reserved and contained to be paid, kept, observed and performed by Tenant, does hereby demise and lease the Premises unto Tenant, and Tenant hereby takes and rents the Premises from Landlord upon the terms and conditions hereinafter set forth. The floor area of the Premises as used throughout the Lease shall mean and include the square footage of the Premises measured from the exterior surface of building walls (and extensions thereof, in the case of openings), from the exterior surface of walls separating the Premises from the Common Area, and from the center line of walls separating the Premises from adjacent space occupied or intended to be occupied by another tenant, all of which form the perimeter of the Premises. No deduction or exclusion shall be made in determining the floor area of the Premises by reason of stairs, elevators, escalators, interior partitions or other interior construction elements or equipment.

    (b)    The "Project," as used herein, shall mean the development described on the Lease Summary Sheet. Exhibit A sets forth the layout of the Project, but Landlord reserves the right to enlarge or to decrease the size of the Project, to subdivide the Project, and to construct other buildings or improvements or to relocate or add any buildings, improvements, parking areas and other common areas in the Project, provided that the size and relative location of the Premises shall not be materially altered, and access to, visibility of and parking available for the Premises are not materially impaired.

    (c)    Landlord reserves the use of the roof, exterior walls (excluding store fronts) and the area above and below the Premises, together with the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural elements running through the Premises that serve other parts of the Project; provided that the entrance to the Premises shall not be blocked thereby and Tenant's business shall not be interfered with unreasonably.

2. **TERM.**

    (a)    Tenant shall have and hold the Premises for the term set forth on the Lease Summary Sheet. Once the Commencement Date has been determined, Landlord shall deliver to Tenant a Lease Commencement Notification which shall be an addendum to the Lease setting forth the Commencement Date, in the form attached as Exhibit C.

    (b)    The term "Lease Year," as used in this Lease, shall, in the case of the first Lease Year, mean the period from the Commencement Date through the last day of the twelfth (12th) full calendar month following the Commencement Date. Each subsequent "Lease Year" shall mean the twelve (12) full calendar month period commencing on the first day of the calendar month next following the end of the first Lease Year, and commencing with each subsequent annual anniversary date thereof. The last "Lease Year" shall mean the period commencing with the then current Lease Year and terminating on the date of the termination or cancellation of the term of this Lease. The parties acknowledge and agree that the first Lease Year will include twelve (12) full calendar months, plus the partial month, if any, at the commencement of the term of this Lease if the Commencement Date occurs on a date other than the first day of a calendar month, and that the last Lease Year may be less than twelve (12) full calendar months depending upon the date of the termination or cancellation of the term of this Lease.

3.      MINIMUM RENT AND ADDITIONAL RENT.

(a)      "Minimum Rent," as used herein, shall mean the Minimum Rent described on the Lease Summary Sheet.  During the term of this Lease, Tenant shall pay the Minimum Rent to Landlord in advance, in monthly installments, with the first such monthly installment being due and payable on or before the Commencement Date, and subsequent installments being due and payable on or before the first (1st) day of each succeeding calendar month thereafter.  However, if the Commencement Date occurs on a day other than the first day of a calendar month, then there shall be due and payable on or before the Commencement Date, as Minimum Rent for the balance of such calendar month a sum equal to one-thirtieth (1/30th) of the Minimum Rent for such calendar month times the number of days commencing on the Commencement Date and continuing through the end of such calendar month.

(b)      Taxes, Insurance, Common Area Costs, utilities and other expenses or sums that Tenant is required to pay hereunder, together with all interest and penalties that may accrue thereon in the event of Tenant's failure to pay such amounts, and all damages, costs and expenses which Landlord may incur by reason of any default of Tenant or failure on Tenant's part to comply with the terms of this Lease, shall be deemed to be additional rent ("Additional Rent") and, in the event of nonpayment by Tenant, Landlord shall have all the rights and remedies with respect thereto as Landlord has for nonpayment of the Minimum Rent.  As used herein, the term "Rent" shall mean the Minimum Rent and Additional Rent.

(c)      All payments of Rent shall be made by Tenant without notice or demand at the office of Landlord or at such other place as Landlord may from time to time designate in writing, and without set-off, deduction or abatement except as otherwise expressly provided herein.  Any payments of Rent not received by Landlord on or before the date when due shall be deemed delinquent and Tenant shall pay to Landlord on demand a late charge equal to five percent (5%) of the amount of such Rent.  Tenant acknowledges that such late charge is not a penalty, but is to compensate Landlord for the additional administrative expenses and other expenses incurred by Landlord in handling delinquent payments (which expenses are not readily ascertainable), and is in addition to, not in lieu of, interest on late payments as provided herein and any other remedies that Landlord may have by virtue of Tenant's failure to make payments when due.  Interest on any payment of Rent not received by Landlord on or before the date when due shall accrue from the date when due to and including the date such payment is received by Landlord at the base or index rate established from time to time by SunTrust Bank in Nashville, Tennessee, or its successor, plus four percent (4%), but in no event in excess of the maximum interest rate permitted under applicable law from time to time (the "Default Rate").

4.      TAXES AND INSURANCE.

(a)      Tenant shall pay to Landlord Tenant's Proportionate Share, as set forth below, of Taxes and Insurance.

(b)      "Taxes" shall mean all taxes and assessments (special or otherwise), sewage charges and other governmental impositions of every kind and nature whatsoever (whether in lieu of the same or not), extraordinary as well as ordinary, foreseen and unforeseen levied or assessed against the use and/or occupancy of the Project, including any personalty used in connection therewith, together with any use or other tax be levied, assessed or imposed upon the Minimum Rent or any other Rent reserved hereunder, imposed by any federal, state or local authority or any other authority having jurisdiction over the Project, and shall also include all costs and expenses, including reasonable attorney's fees, incurred by Landlord during negotiations for or contests of the amount of Taxes.  Taxes shall not include Landlord's income, capital gain, franchise or excise taxes, or any penalties or interest because of late payment.  In the event the methods of taxation prevailing at the commencement of this Lease shall thereafter be modified so that in lieu of or as a substitute for the whole or any part of the Taxes now levied, assessed or imposed, there shall be levied, assessed or imposed an income or other tax, then the same shall be included in the computation of Taxes.  Tenant's Proportionate Share shall be determined by multiplying the Taxes by a fraction, the numerator of which is the gross rentable square footage of the Premises, as defined in Section 1 of this Lease, and the denominator of which is the gross rentable square footage of all space in the Project.

(c)     "Insurance" shall mean all premiums and other costs paid by Landlord for insurance on the Project from time to time, including, but not limited to, property coverage, rental income insurance, malicious mischief and public liability insurance carried by Landlord on the Project.  For the purpose of allocating Insurance, Tenant's Proportionate Share shall be determined by multiplying the expense in question by a fraction, the numerator of which is the gross rentable square footage of the Premises, as defined in Section 1 of this Lease, and the denominator of which is the gross rentable square footage in the Project.

(d)     Taxes and Insurance shall be paid in equal monthly installments at the same place and on the same date on which the Minimum Rent is payable hereunder.  Landlord shall notify Tenant from time to time of the amount which Landlord estimates will be the amount of Tenant's Proportionate Share of Taxes and Insurance for each calendar year (subject to adjustment by Landlord not more than one (1) time during such calendar year); such estimated amount will then be used to compute the monthly installments of Taxes and Insurance payable by Tenant hereunder.  After the actual Taxes and Insurance for the current calendar year has been ascertained, Landlord shall send Tenant a statement setting forth the actual amount of Tenant's Proportionate Share of Taxes and Insurance for such calendar year and the amount of the resulting deficiency or overpayment, as the case may be.  Tenant shall pay any deficiency within thirty (30) days after mailing of such notice.  Landlord will refund any surplus payments of Taxes and Insurance to Tenant within thirty (30) days of determination.

5.     COMMON AREA COSTS.

(a)     "Common Areas," shall mean the portions of the Project, whether now or hereafter owned by Landlord or now or hereafter made available by Landlord for use by tenants within or adjacent to the Project, that are or have been designated and approved by Landlord for common use by or for the benefit of more than one tenant of the Project and their respective employees, agents, subtenants, concessionaires, licensees, customers and invitees, including but not limited to parking lots, access and perimeter roads, truck passageways, loading platforms, fire corridors, service corridors, landscaped areas, exterior walks, arcades, stairways, ramps, interior corridors, elevators, stairs, underground storm and sanitary sewers, utility lines, wash rooms, drinking fountains, toilets, equipment, signs and other public facilities, bus stations, taxi stands, and the like; but excluding all portions of the Project that are used or intended for the exclusive use by one tenant under the terms of its lease.  Any portion of the Project that may be included within the Common Areas may thereafter be excluded therefrom when designated by Landlord for a non-common use.

(b)     Tenant shall pay to Landlord Tenant's Proportionate Share of Common Area Costs.  For the purpose of allocating Common Area Costs, Tenant's Proportionate Share shall be determined by multiplying the expense in question by a fraction, the numerator of which is the gross rentable square footage of the Premises, as defined in Section 1 of this Lease, and the denominator of which is the gross rentable square footage in the Project.  "Common Area Costs," shall mean all costs and expenses of every kind and nature incurred by Landlord in the operation, management, maintenance, replacement and repair of all the Common Areas.  Common Areas Costs shall include, without limitation: the cost of police and fire protection equipment and services, if provided; gardening and landscaping; repairs and painting; decorating and redecorating the Common Areas; striping, sweeping and lighting (including the cost of electricity and maintenance and replacement of fixtures and bulbs); regulating traffic; rubbish, garbage and other refuse removal; ice and snow removal; machinery, equipment and supplies used in the operation, maintenance and repair of the Common Areas and facilities; depreciation of machinery and equipment used in the operation and maintenance of the Common Areas that is not expensed; replacement of paving, curbs and walkways; utility, drainage and water systems, and the cost to Landlord of personnel to implement and perform the operation, maintenance and repairs of the Common Areas as provided above (including worker's compensation insurance, salaries and other benefits covering such personnel); management fees for the management of the Project not to exceed five percent (5%) of the gross revenues from the Project; and administrative cost not to exceed ten percent (10%) of the total costs of operating, managing, maintaining, replacing and repairing the Project or the Common Areas.  Any capital expenses included in Common Area Costs shall be amortized over the useful life of the item in question

and only the annual amortization shall be included in Common Area Costs each year. Landlord, in its sole discretion, may elect to employ security for the Common Areas and the cost of the same shall be included in Common Area Costs; provided however, Landlord shall be under no obligation to do so, and Landlord's election to employ security shall not be deemed an undertaking by Landlord to ensure the safety of the tenants or any of their agents, employees, contractors, customers or invitees or the property of any such parties.

(c)     Common Area Costs shall be paid in equal monthly installments at the same place and on the same date on which the Minimum Rent is payable hereunder. Landlord shall notify Tenant from time to time of the amount which Landlord estimates will be the amount of Tenant's Proportionate Share of Common Area Costs for each calendar year (subject to adjustment by Landlord not more than one (1) time during such calendar year); such estimated amount will then be used to compute the monthly installments of Common Area Costs payable by Tenant hereunder. After the actual Common Area Costs for a calendar year has been ascertained, Landlord shall send Tenant a statement setting forth the actual amount of Tenant's Proportionate Share of Common Area Costs for such calendar year and the amount of the resulting deficiency or overpayment, as the case may be. Tenant shall pay any deficiency within thirty (30) days after mailing of such notice. Landlord will refund any surplus payments of Common Area Costs to Tenant within thirty (30) days of determination.

(d)     Landlord reserves the right to create pools of similarly situated tenants for the purpose of allocating certain Common Area Costs that benefit only the tenants in such pool ("Specialized Operating Costs"). For the purpose of allocating Specialized Operating Costs for any pool of which Tenant is a member, Tenant's Proportionate Share shall be a fraction, the numerator of which shall be the rentable area of the Premises, and the denominator of which shall be the rentable area of the premises of all tenants in such pool, minus any anchor tenants.

(e)     Upon request of Tenant, and not more than once in any twelve (12) month period, Landlord shall make its records relating to Common Area Costs for the immediately preceding calendar year available to Tenant for review. The right to such review shall be conditional upon the following:

(i)     No Default by Tenant, or event that with the giving of notice of the passage of time would become a Default by Tenant, has occurred.

(ii)     Tenant shall be current in the payment of all Common Area Costs.

(iii)     Tenant must provide Landlord at least thirty (30) days advance notice of its desire to review such information, and Landlord shall make the same available to Tenant at Landlord's offices during regular business hours.

(iv)     Such review shall be at Tenant's sole cost and expense, unless the audit discloses an overcharge by Landlord of five percent (5%) or more of Tenant's share of Common Area Costs for a given year, in which case, Landlord shall reimburse the reasonable, out-of-pocket costs incurred by Tenant in connection with such audit, not to exceed $1,000.

(v)     Landlord shall not be obligated to provide any documentation other than that maintained by Landlord in the ordinary course of its business.

(vi)     Such review may not be conducted on a contingency basis and must be conducted by a certified public accountant.

(vii)     Tenant shall provide a copy of the results of such review to Landlord, and Landlord may conduct an independent review of the same.

(viii)     Tenant shall hold all of the results of such review confidential and shall not disclose the same to any other party.

(ix)    The party performing the review on behalf of Tenant may not have performed such review for any other tenant of the Project, and may not solicit audit business for any other tenant in the Project concurrently with or following such review for Tenant.

(x)    No assignee or transferee of Tenant shall have the right to conduct an audit for any period prior to the effective date of such assignment or transfer.

(xi)    No subtenant shall have any right to conduct an audit.

6.    UTILITIES.    Tenant shall pay all bills, costs and charges for water, gas, electricity, telephone, garbage and trash collection (for trash generated within the Premises), fuel, light, heat and power furnished to or used by Tenant on or about the Premises, and all sewage disposal or sewerage service charges for the Premises and any utility fees as required by the Metropolitan Government of Nashville and/or any utility company. It is understood that all utilities, other than water, shall be separately metered. If Tenant does not pay such bills and charges, Landlord may, but shall not be obligated to, pay the same, and such payment shall be Additional Rent payable upon demand by Landlord. Landlord shall furnish and submeter water service to Tenant. Tenant shall purchase such water service from Landlord and shall pay, as Additional Rent, the charges for such services provided by Landlord, based upon the fees charged by the utility company to Landlord and Tenant's usage, as established by such submeter. Landlord may at any time discontinue furnishing any service without obligation, other than to connect the Premises to the appropriate public utility. In no event shall Landlord be liable for any interruption or cessation in the supply of any such services or utility services not furnished by Landlord to the Premises nor for any interruption or cessation in the supply of any such services or utility services that are due to fire, accident, strike, acts of God or other causes beyond the control of Landlord, or in order to make alterations, maintenance, repairs or improvements. No disruption or cessation of utility service to the Premises shall be construed as an eviction of Tenant, work an abatement of rent, or relieve Tenant from fulfillment of any covenant or agreement of this Lease.

7.    USE/CONDUCT OF BUSINESS.

(a)    Tenant shall use and occupy the Premises exclusively for the Permitted Use and under the Tradename, as set forth on the Lease Summary Sheet, and shall not use or permit the use of the Premises for any other purpose whatsoever. Tenant shall not commit waste on the Premises, and shall not use or permit to be used the Premises for any illegal purposes, nor in any manner to create any nuisance or trespass, or to disturb other tenants or occupants of the Project, or to injure the reputation of the Project (as reasonably determined by Landlord), or to vitiate the insurance or increase the rate of insurance for the Premises or the Project. No second-hand, auction, fire, distress or bankruptcy sales may be conducted on the Premises. Tenant shall not permit any business to be operated in or from the Premises by any concessionaire or licensee without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed. Tenant shall comply with all state and local laws in effect from time to time prohibiting discrimination or segregation by reason of race, color, creed, age, religion, sex or national origin. Tenant shall not offer any goods or services that Landlord determines, in its reasonable discretion, to be inconsistent with the image of a first-class, family-oriented shopping center, nor shall Tenant display or sell any goods containing portrayals that Landlord determines, in its reasonable discretion, to be lewd, graphically violent or pornographic. Notwithstanding the foregoing, in no event shall Landlord have approval rights over items that are required as part of Franchisor's regional or national standards. Tenant shall not sell or display any paraphernalia used in the preparation or consumption of controlled substances. If Tenant remains open for business after normal Project hours, then Tenant shall pay for all additional costs reasonably incurred by Landlord as a result thereof. Except as expressly permitted herein, Tenant shall not install any radio or television or other similar device exterior to the Premises and shall not erect any aerial on the roof or exterior walls of any building within the Project. Tenant shall not use, or permit the use of, any portion of the Premises as sleeping quarters, lodging rooms or for any unlawful purposes. Landlord shall have the option to provide pest extermination services throughout the Project, in which event Tenant shall pay to Landlord Tenant's Proportionate Share of the reasonable cost of such service as a Common Area Cost. In the event that Tenant is

permitted pursuant to this Lease to engage in the sale of food and beverages from the Premises then Tenant shall: (i) be solely responsible for prompt disposal within the Premises of all trash, garbage and debris; and (ii) inspect and maintain all grease traps, pans and hood ventilators in good order, condition and repair.

(b)     Tenant shall not use or permit to be used the Premises which will in any way conflict with any law, statute, ordinance or governmental rule or regulation now or hereafter in force or any restrictions or prohibited uses contained in any other tenant lease or document of record affecting the Project of which Tenant has prior notice, or which will violate the exclusive of any other tenant existing in the Project as of the date of this Lease of which Tenant has prior notice, including but not limited to the exclusive uses and restrictions set forth in Exhibit G, attached.  Tenant shall, at its cost and expense, promptly comply with all laws, statutes, ordinances and governmental rules, regulations or requirements now or hereafter in force, and with the requirements of any board of fire underwriters or other similar bodies relating to or affecting the condition, use or occupancy of the Premises whether now or hereafter in effect. Tenant shall pay for any increase in insurance premiums on insurance carried by Landlord resulting from Tenant's use or occupancy of the Premises or the Project within ten (10) days after notice from Landlord.

(c)     Subject to Section 34(m), in the event Tenant fails to open the Premises for business fully fixtured, stocked and staffed on the Commencement Date, Landlord shall have in addition to any and all remedies herein provided the right at its option to collect not only the Minimum Rent provided herein, but also Additional Rent at the rate of One Hundred and No/100 Dollars ($100.00) per day for each and every day that Tenant shall fail to commence to do business as herein provided.

(d)     Subject to Section 34(m), failure by Tenant to be open for business as required herein, or if Tenant opens for business but thereafter does not operate for business for longer than one hundred, twenty (120) days with the exception of the Premises being under repair and/or remodel, Landlord may terminate this Lease.

(e)     Landlord hereby grants Tenant a non-exclusive license to locate a satellite dish (the "Equipment") on the roof of the Project, subject to the following:

(i)     Tenant shall have access to the roof for the sole purpose of installing and maintaining the Equipment.  Such access shall be subject to such reasonable restrictions as Landlord may impose.

(ii)     There shall be no penetration of the roof without the consent of Landlord.  Landlord shall have the right to approve the location and method of attachment, in its sole discretion and in advance.  Installation of the Equipment and the making of any approved roof penetrations shall be performed by Landlord's contractor at Tenant's expense in a manner that will not violate any applicable warranty on the roof.

(iii)     The Equipment shall be located on the roof at Tenant's sole risk, and Tenant shall make use of the roof on an "as is, where is" basis, without any representation or warranty by Landlord as to the fitness of the roof for Tenant's use, or any other matter.

(iv)     The Equipment shall not be visible to the public and shall not interfere with the operation of any other electrical devices in the Project or on the roof.

(v)     Tenant shall maintain the Equipment in good condition and shall remove the same at the expiration of this Lease.  All of the provisions regarding repair, indemnity, insurance, remedies and limitations of Landlord's liability under this Lease shall apply to Tenant's use of the roof.

8.     USE OF COMMON AREAS.  Tenant shall have the non-exclusive right during the term of this Lease to use the Common Areas for itself, its employees, agents, customers, invitees and licensees for their intended purpose, subject, however, to all the provisions of this Lease and to reasonable and non-discriminatory rules and regulations as set forth in Exhibit F

("Rules") attached hereto and incorporated herein by reference. Landlord shall have the right to modify, add or change such Rules as Landlord deems necessary or appropriate in its sole discretion and the same are reasonable and non-discriminatory. Landlord shall have the right, at any time and from time to time, to change the size, location, elevation or nature of the Common Areas, or any part thereof, including, without limitation, the right to locate thereon structures and buildings of any type, as long as access to, visibility of and parking available for the Premises are not materially impaired. All Common Areas shall be subject to the exclusive control and management of Landlord. Landlord shall have the right (a) to close, if necessary, all or any portion of the Common Areas to such extent as may, in the opinion of Landlord's counsel, be reasonably necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (b) to close temporarily all or any portion of the Common Areas to discourage non-customer use; (c) to use portions of the Common Areas while constructing additional phases of the Project or while engaged in making additional improvements or repairs or alterations to the Project; and (d) to do and perform such other acts whether similar or dissimilar to the foregoing) in, to and with respect to the Common Areas, as in the use of good business judgment, Landlord shall determine to be appropriate for the Project. In the exercise of the foregoing rights, Landlord shall use reasonable efforts not to disrupt the operation of Tenant's business.

9.      CONDITION OF PREMISES/CONSTRUCTION. Landlord shall expeditiously commence and diligently perform such of its obligations contained in Exhibit D as are to be performed by it ("Landlord's Work") prior to delivery of the Premises to Tenant. Except as may expressly set forth in Exhibit D, Tenant accepts the Premises in "as is, where is" condition, and agrees the same are suited for the use intended by Tenant, without any warranties whatsoever by Landlord. Tenant shall expeditiously commence and diligently perform such of its obligations contained in Exhibit D as are to be performed by it ("Tenant's Work") prior to the commencement of the term of this Lease, and subject to Section 34(m), shall complete its work prior to the expiration of the time allowed to Tenant for completion of Tenant's Work, as provided in Exhibit D. Tenant shall perform or cause to be performed Tenant's Work in a good and workmanlike manner, in accordance with all applicable governmental requirements and the plans and specifications therefor, and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Project. Tenant shall also observe and perform all of its obligations under this Lease (except its obligation to pay Minimum Rent and Additional Rent) from the date upon which the Premises are made available to Tenant's Work until the Commencement Date in the same manner as though the term of this Lease began when the Premises were so made available to Tenant for Tenant's Work.

10.     ALTERATIONS AND ADDITIONS. Tenant shall not make or allow to be made any alterations, additions, or improvements to the Premises or any part thereof without the prior written consent of Landlord which may be withheld in Landlord's sole discretion if such alterations would affect the structure or exterior of the Project, and which shall not be unreasonably withheld, conditioned or delayed for any other alterations. Tenant shall have the right to make interior, cosmetic alterations that cost less than $75,000 in any one instance without Landlord's consent. Any alterations, additions or improvements to the Premises, excepting movable furniture and trade fixtures, shall, on the expiration of this Lease, at Landlord's option become a part of the realty and belong to Landlord or shall be removed by Tenant. Tenant shall make all such alterations and additions at Tenant's sole cost and expense, and Landlord must first approve in writing any contractor or person selected by Tenant to make the same, which consent shall not be unreasonably withheld, conditioned or delayed. If Landlord fails to notify Tenant of any objection to Tenant's contractor within ten (10) business days of written notice, Landlord shall be deemed to have approved Tenant's contractor, as long as such notice conspicuously states that failure to object within such ten (10) day period will be deemed approval. Landlord's roofing contractor must perform any roof penetrations, so as not to impair the roof warranty. If Tenant violates the provisions of this Section relating to roof penetrations or performs any other work that impairs the roof warranty, in addition to any other damages to which Landlord may be entitled, Tenant shall indemnify Landlord for all repairs to the roof that would have been covered by Landlord's roof warranty, and this indemnity shall survive the expiration or earlier termination of this Lease.

11.    REPAIRS BY LANDLORD.

(a)    Landlord shall keep and maintain the structural portions of the Project, including the foundation, exterior walls and roof, in which the Premises are located (exclusive of all glass, exterior doors and store fronts that are part of the Premises) in good repair, except that repairs rendered necessary by the acts or omissions of Tenant, Tenant's agents, employees or invitees shall be the responsibility of Tenant.    Except as expressly provided in this Lease, Landlord shall not be required to make any alteration, repairs or additions to the Premises. Landlord shall not be liable for any failure to make any such repairs or to perform any maintenance required of Landlord hereunder unless such failure shall persist for any unreasonable time after Tenant gives Landlord written notice of the need for such repairs or maintenance.

(b)    If at any time during the Term, the Premises are in need of repairs that are the Landlord's obligation under this Lease (the "Landlord Repair") (other than by reason of fire or other casualty for which repairs are covered under other sections of this Lease, Tenant shall give Landlord prompt written notice thereof (the "First Notice").  If Landlord fails to commence the Landlord Repair within thirty (30) days following receipt of Tenant's notice and diligently pursue the same to completion or as soon as reasonably possible in the event of an emergency, Tenant shall give Landlord a second written notice thereof (the "Final Notice"). If Landlord does not commence the Landlord Repair within five (5) business days after Landlord's receipt of the Final Notice, and (i) the item in need of repair is materially interfering with the operation of Tenant's business on the Premises; (ii) is located solely within the Premises; and (iii) does not impact any building systems, the roof or structural portions of the Project, the exterior of the Project or any interior areas of the Project outside of the Premises, then Tenant may perform such Landlord Repair, subject to the following terms and conditions:

(i)    Before commencing the Landlord Repair, Tenant shall give Landlord written notice of Tenant's intention to perform the Landlord Repair, together with:

(i)    Copies of at least three (3) separate bids for the Landlord Repair that Tenant has solicited and obtained from reputable, independent and licensed, if applicable, contractors, provided, however, that if the item is then under any existing guaranty or warranty from a contractor or supplier, Tenant shall not be obligated to obtain such bids and shall instead use the contractor authorized to service the warranty; and

(ii)    The name of the contractor that Tenant intends to engage to perform the Landlord Repair, which must be the contractor authorized to service any applicable guaranty or warranty, or otherwise shall be the contractor submitting the lowest bid price to Tenant.

(ii)    The Landlord Repair shall be performed in a good and workmanlike manner, in accordance with all applicable laws, and in accordance with all the provisions of this Lease.

(iii)    Tenant shall not be entitled to perform the Landlord Repair if the need for the repair is caused by the negligence or willful acts of Tenant, or Tenant's agents or contractors, in which event Landlord may perform the Landlord Repair at Tenant's sole cost and expense.

(iv)    If Tenant performs the Landlord Repair, Tenant shall promptly give Landlord a final statement (the "Statement") of the actual out-of-pocket costs paid by Tenant to its contractor to perform the Landlord Repair ("Tenant's Cost").  Within thirty (30) days after Landlord's receipt of the Statement, Landlord, at its sole election, shall either:

(i)    Reimburse Tenant for the amount of Tenant's Cost;

(ii)     Give Tenant a written notice (the "Dispute Notice") that Landlord disputes (the "Dispute") either or both:

  1. Tenant's right to perform the Landlord Repair; or

  2. The amount of Tenant's Cost.

(v)     In the event any Dispute is resolved in Tenant's favor by the final judgment of a court of competent jurisdiction, and Landlord does not pay such amount to Tenant within thirty (30) days following the date such judgment becomes final, Tenant shall have the right to offset the amount of such judgment against the Minimum Rent payable hereunder.

12. REPAIRS BY TENANT.

(a)     Tenant shall, during the term of this Lease, at Tenant's sole cost and expense, maintain the Premises and every part thereof in good condition and repair, excluding only such repairs as Landlord is expressly obligated to make under this Lease.  Tenant's obligation to repair shall include the obligation to maintain, service and replace, regardless of whether the need for the same is foreseen or unforeseen.  Without limiting the generality of the foregoing, Tenant agrees that its obligation to repair, maintain, service and replace shall extend to all electrical, air conditioning, heating and sprinkler systems, plumbing and plumbing fixtures and sewerage pipes serving the Premises (including the free flow to the main sewer line), all fixtures, walls, floors, ceilings, the exterior and interior portion of all doors, windows, plate glass and store front that form a part of the Premises, and any tenant finish work or other alterations or improvements performed by Tenant.  Tenant shall be responsible for damage, from whatever causes, to all glass or plate glass in the Premises, for all damages to water or steam pipes in the Premises caused by freezing or neglect by Tenant and for damages to the property of other tenants caused by the overflow or breakage of any such pipes.

(b)     Except as specifically set forth herein, Landlord shall have no obligation whatsoever to alter, remodel, improve, repair, decorate or paint the Premises or any part thereof and the parties hereto affirm that Landlord has made no representations to Tenant respecting the condition of the Premises except as specifically provided herein.  Landlord may, but shall not be obligated to, make any repairs to be made by Tenant hereunder, if not made by Tenant within thirty (30) days of notice of the need therefor, or such sooner period as may be necessary in an emergency or to prevent further damage,, and all such payments made and incurred by Landlord shall be treated as Additional Rent payable upon demand by Landlord, plus an administrative fee of ten percent (1o%).

(c)     Notwithstanding the provisions of subsection (a) above, Landlord shall repair and maintain the roof, foundation and structural portions of the Premises, unless such maintenance or repairs are caused in part or in whole by the act, neglect, fault or omission of any duty by Tenant, its agents, servants, employees or invitees, in which case Tenant shall pay to Landlord the costs of such maintenance and repairs. Landlord shall not be liable for any failure to make any such repairs or to perform any maintenance required of Landlord hereunder unless such failure shall persist for any unreasonable time after written notice of the need of such repairs or maintenance is given to Landlord by Tenant.

13. NO LIENS.  Landlord's interest in the Premises shall not be subject to liens for improvements, repairs or alterations made by Tenant, and Tenant shall have no power or authority to create any lien or permit any lien to attach to the Premises or the present estate, reversion or other interest of Landlord in the Premises, the Project, or other improvements thereon as a result of improvements made by Tenant or by reason of any other work done on Tenant's behalf or any other act or omission of Tenant.  All materialmen, contractors, artists, mechanics and laborers and other persons contracting with Tenant with respect to the Premises or any part thereof, are hereby charged with notice that such liens are expressly prohibited and that they must look solely to Tenant to secure payment for any work done or material furnished for improvements made at the request of Tenant.  Tenant agrees to provide notice to such effect to any such persons doing work or supplying materials to the Premises.  Tenant shall indemnify Landlord against any loss or expenses incurred as a result of the assertion of any such lien, and

Tenant covenants and agrees to remove such lien or transfer such lien to a bond or such other security, as may be permitted by applicable law, within twenty (20) days of its assertion. In the event Tenant fails to have such lien removed as required hereunder, Landlord shall have the right to pay such lien and Tenant shall reimburse Landlord for such sum as Additional Rent, plus an administrative fee of ten percent (10%) upon demand.

14.    INDEMNITY AND INSURANCE.

(a)    Tenant agrees to, and hereby does, indemnify and save Landlord harmless from and against any and all claims, actions, damages, liability, costs and expenses (including reasonable attorney's fees, expenses, liability incurred and court costs incurred by Landlord) for any injury (including death) to any persons or damage to any property arising from, caused by or in connection with (i) any occurrence in, upon or at the Premises; or in any way related to or arising out of Tenant's use or occupancy of the Premises, the Common Areas, in or about the Project, or any part thereof; or (ii) the negligence or willful misconduct of Tenant, its agents, employees, contractors, subcontractors, subtenants, licensees or concessionaires. If any case, action or proceeding be brought against Landlord by reason of any such claim(s), Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in upon or about the Premises from any cause other than Landlord's negligence or willful misconduct and Tenant hereby waives all claims in respect thereof against Landlord.

(b)    Landlord agrees to, and hereby does, indemnify and save Tenant harmless from and against any and all claims, actions, damages, liability, costs and expenses (including reasonable attorney's fees, expenses, liability incurred and court costs incurred by Tenant) for any injury (including death) to any persons or damage to any property arising from, caused by or in connection with the negligence or willful misconduct by Landlord, its agents, or employees. If any case, action or proceeding be brought against Tenant by reason of any such claim(s), Landlord, upon notice from Tenant, shall defend the same at Landlord's expense by counsel reasonably satisfactory to Tenant.

(c)    Landlord shall not be liable for any loss or damage to any property by theft or otherwise, nor for any injury to or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain, unless caused by or due to the negligence or willful misconduct of Landlord, its agents, servants or employees. Landlord shall not be liable for any failure or interruption of utility services to the Premises and the same shall not be considered a constructive eviction of Tenant, nor shall the same entitle Tenant to an abatement of rent. Provided, however, in the event that utility service to the Premises is disrupted for a period in excess of three (3) months such that Tenant is unable to operate for business, and if the same is not due to the negligence or willful misconduct of Tenant, then the Minimum Rent payable by Tenant under this Lease shall be abated and waived beginning in the fourth (4th) month of the failure and continuing thereafter until such time as the disruption ends. Landlord shall not be liable for loss of business by Tenant. Except as expressly set forth in this Lease, Landlord shall not be liable for any defects in the Premises. Tenant shall give prompt notice to Landlord in case of fire or accident in the Premises or in the Project.

(d)    Tenant shall, at its sole cost, maintain the following insurance at all times during this Lease and at all times when Tenant is in possession of the Premises:

(i)    Commercial general liability insurance with a combined single limit for personal injury, loss of life and property damage of not less than Three Million and No/100 Dollars ($3,000,000.00) per occurrence.

(ii)    Property insurance insuring Tenant's leasehold improvements, furnishings, personal property, inventory, fixtures and equipment on an "all risk" basis written on a "special form" policy, or the equivalent, against loss by reason of fire, hazard or other casualty,

with extended coverage, to the extent of at least eighty percent (80%) of the value thereof.

(iii)  Plate glass insurance on all plate glass for the Premises insuring both Landlord and Tenant against loss or liability arising as a result thereof.

(iv)  Workman's compensation insurance as may be required by applicable law.

(v)  In the event Tenant is permitted to make any improvements or alterations on the Premises, builders risk insurance written on a completed value (non-reporting) basis.

(vi)  If the Permitted Use of the Premises includes the sale of alcoholic beverages, the policy of commercial general liability insurance required herein shall include coverage for employer's liability, host liquor liability, liquor liability and so called "Dram Shop" liability coverage with a combined single limit of not less than Three Million and No/100 Dollars ($3,000,000.00), per occurrence.

(e)  All insurance required of Tenant hereunder shall be carried with insurance companies and in form reasonably satisfactory to Landlord. Tenant shall deliver to Landlord prior to the Commencement Date original policies or certificates of all of such insurance, which shall provide that Landlord will be given not less than ten (10) days written notice prior to cancellation or expiration of the insurance evidenced thereby. Renewals of all of such insurance shall be delivered to Landlord at least thirty (30) days prior to the expiration date of such insurance.

(f)  All insurance required of Tenant hereunder shall be on a non-contributory basis and shall name Landlord, and at Landlord's option, any mortgage lender on the Project, as an additional insured or insured mortgagee as the case may be. The limits of said insurance shall not, however, limit the liability of Tenant hereunder. Tenant may carry such insurance under a blanket policy; provided, however, such insurance by Tenant shall have a Landlord's protective liability endorsement attached thereto. If Tenant shall fail to procure and maintain such insurance, Landlord may, but shall not be required to, procure and maintain the same, and Tenant shall reimburse Landlord for the cost thereof as Additional Rent, plus an administrative fee of fifteen percent (15%) upon demand. Landlord may require reasonable periodic increases in the amounts of Tenant's insurance coverage in accordance with sound and prudent business practice.

(g)  Landlord will carry liability and property insurance on the Project in customary amounts for similar projects in Nashville, Tennessee. Tenant acknowledges and agrees that Landlord will not obtain or carry insurance on Tenant's personal property, fixtures, equipment, inventory or Tenant's leasehold improvements, and Tenant agrees that Tenant shall be responsible for obtaining and carrying insurance on the foregoing, at its sole cost and expense.

(h)  Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each hereby waives any and all rights of recovery, claim, action or cause of action against the other for any loss or damage that may occur to the Premises or any improvements thereto, the Project or any personal property of Landlord or Tenant, arising from any cause that (i) would be insured against under the terms of any property insurance required to be carried hereunder; or (ii) is insured against under the terms of any property insurance actually carried, regardless of whether the same is required hereunder. The foregoing waiver shall apply regardless of the cause or origin of such claim, including but not limited to the negligence of a party, or such party's agents, officers, employees or contractors. The foregoing waiver shall not apply if it would have the effect, but only to the extent of such effect, of invalidating any insurance coverage of Landlord or Tenant. The foregoing waiver shall also apply to any deductible, as if the same were a part of the insurance recovery.

15.     CASUALTY.

(a)     Subject to the other provisions of this Section, in the event the Premises or the Project are damaged by fire or other casualty, this Lease shall remain in full force and effect, and Landlord shall forthwith repair the Premises to a state ready for restoration by Tenant of Tenant's improvements.

(b)     Notwithstanding the foregoing, Landlord shall not have any obligation whatsoever to repair, reconstruct or restore the Premises or the Project when (i) the cost of restoration of the Premises (whether or not compensated for by insurance) shall exceed the annual Minimum Rent then payable for the balance of the term of the Lease; (ii) the Premises are damaged to the extent of fifty percent (50%) or more thereof; (iii) the Premises are damaged during the last two (2) years of the term of this Lease; (iv) twenty-five percent (25%) or more of the Project is damaged; (v) the insurance available to Landlord is not sufficient to cover the cost of such repair, reconstruction or restoration; or (vi) the holder of a deed of trust or mortgage encumbering the Project elects not to permit use of insurance proceeds for reconstruction. Landlord shall notify Tenant in writing within ninety (90) days after the occurrence of such casualty if Landlord intends to so terminate this Lease. Any such termination shall be effective as of the date specified in such notice, which date shall be no more than thirty (30) days after giving such notice, and all Rent shall be accounted for as between Landlord and Tenant as of the date of the termination of the Lease.

(c)     The provisions of this Section with respect to repair by Landlord shall be limited to such repair as is necessary to place the Premises in the condition prior to the casualty and when placed in such condition the Premises shall be deemed restored and rendered tenantable, as reasonably determined by the parties. Promptly following Landlord's restoration work Tenant, at Tenant's expense, shall repair or replace its stock in trade, fixtures, personal property, furniture, furnishings, floor coverings and equipment, and if Tenant has closed, Tenant shall promptly reopen for business.

(d)     Tenant shall be entitled to an abatement in Minimum Rent in proportion to the portion of the Premises that is rendered unusable for the operation of Tenant's business; provided, however, if the damage is due to the acts or omissions of Tenant or its employees, there shall be no such abatement. Such abatement shall commence as of the date of such damage and shall terminate on the date Landlord delivers the Premises with Landlord's restoration work completed.

16.     CONDEMNATION.

(a)     As used in this Section "Taking" shall mean the taking of, or damage to, the Premises or the Project or any portion thereof, as the case may be, as the result of the exercise of any power of eminent domain, condemnation, or sale or purchase under threat or in lieu thereof by any public or quasi-public authority. The term "Award" means the award for, or proceeds of, any Taking, less all expenses in connection therewith including reasonable attorney's fees.

(b)     If the whole of the Premises, or such portion thereof as will make the Premises untenantable for the purposes for which it was leased, as reasonably determined by the parties, be taken, Landlord or Tenant shall have the right, at its option, to terminate this Lease from the date of such Taking upon written notice within thirty (30) days following the date of such Taking and all Rent shall be accounted for as between Landlord and Tenant through such date. If less than the whole of the Premises are taken, and the remaining portion of the Premises and the Project are tenantable for the purposes for which it was leased, as reasonably determined by the parties, then this Lease shall not cease and Minimum Rent shall abate in such proportion as the Premises have been so taken. Landlord shall, as diligently as practicable following the receipt of the Award, restore the Premises as nearly as is reasonably possible to the condition existing prior to such taking. Tenant, at Tenant's expense, shall make the remaining repairs and restorations to the Premises to place the same in the condition specified for Tenant's Work in Exhibit D, and shall also repair or replace its stock in trade, personal property, equipment and fixtures, and if Tenant has closed shall promptly reopen for business.

(c)     Notwithstanding the foregoing, Landlord shall have no obligation to undertake any repairs or restoration in the event of a Taking if the cost thereof exceeds that portion of the Award for such purpose, and if Landlord does not elect to make such repair or restoration, Landlord or Tenant shall have the right to terminate this Lease in such event. Further, if more than twenty-five percent (25%) of the parking areas or of the Common Areas from time to time designated by Landlord for the Project, or more than twenty-five percent (25%) of the gross rentable square footage of the Project, is taken, or if any mortgagee of Landlord requires that the Award be applied to the payment of the mortgage debt and Landlord does not elect to fund the same, Landlord or Tenant shall also have the option to terminate this Lease regardless of whether or not such Taking damages the Premises.  Each Party shall notify the other party within ninety (90) days after such Taking if it intends to so terminate this Lease.  Any such termination shall be effective as of the date specified in such notice, which date shall be no more than thirty (30) days after giving such notice, and all Rent shall be accounted for as between Landlord and Tenant as of the date of the termination of this Lease.

(d)     The entire Award, whether for the whole or a part of the Premises or of the Project, shall be the property of Landlord, and Tenant shall have no claim against Landlord for the value of the unexpired term of this Lease or any part of the fee of the Premises or of the Project, or otherwise; however, Landlord shall not be entitled to any award payable to Tenant for Tenant's individual and separate damages, including but not limited to moving or relocation expenses, damage to or obsolescence of trade fixtures, or unamortized leasehold improvements; provided such award to Tenant does not reduce the Award otherwise payable to Landlord.

17.     ASSIGNMENT AND SUBLETTING.

(a)     Tenant shall not, without the prior written consent of Landlord, which may be withheld in Landlord's reasonable discretion, either voluntarily or by operating of law, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest hereunder, or sublet the Premises or any part thereof nor assign this Lease or any part thereof or any right or privilege appurtenant thereto, or suffer any other person to occupy or use the Premises, or any portion thereof, or permit the use of the Premises by any party other than Tenant.  Except as set forth in subsection (b), a transfer of a majority of the ownership interest in Tenant whether by a single transfer or in the aggregate by several transfers shall be considered an assignment subject to this Section.  Landlord's consent to any assignment, transfer, mortgage or encumbrance or sublease shall not constitute a waiver of the rights of Landlord under this Section, and all subsequent assignments, transfers, mortgages, encumbrances or subleases shall be made only with the prior written consent of Landlord.  Any assignee or transferee of Tenant, at the option of Landlord, shall become directly liable to Landlord for all obligations of Tenant hereunder, but no sublease, assignment or transfer by Tenant shall relieve Tenant of any liability hereunder. Landlord may consent to subsequent assignments of this Lease or sublettings or amendments or modifications to the Lease with assignees of Tenant without notifying Tenant, or any successor tenant, and without obtaining its or their consent thereto, and any such actions shall not relieve Tenant of liability under this Lease.  .  Except as set forth in subsection (b), any assignment, transfer, mortgage, encumbrance or subletting by Tenant without the prior written consent of Landlord shall be void and shall be deemed a Default.  If Landlord consents to a proposed sublease or assignment, Tenant shall submit to Landlord a copy of the executed sublease or assignment, which must provide for the assumption of all of Tenant's obligations under this Lease.  At any time, Landlord may require that any rent or other sums paid by a sublessee or assignee be paid directly to Landlord,

(b)     If Landlord does not consent to a proposed assignment or sublease within thirty (30) days of request, the same shall be deemed disapproved.

(c)     Notwithstanding anything to the contrary in this Lease, Tenant shall have the right, without Landlord's approval, but upon written notice to Landlord, to assign or sublease the Premises to (i) International House of Pancakes, LLC (the "Franchisor") or Franchisor's affiliate, or (ii) an approved, in good standing, franchisee of Franchisor that is not a single purpose entity, owns a minimum of five (5) IHOP restaurants in its name and is not in default to the Franchisor under any franchise agreement or to any lender, provided, however, as a condition

of any such transfer, the assignee or subtenant shall assume, in writing reasonably acceptable to Landlord, all of the obligations of Tenant under this Lease. If an assignment is made to the Franchisor or any such permitted franchisee pursuant to this section, Tenant shall be released of liability first arising under this Lease after the date of such assignment, provided such release shall only be effective upon the later to occur of (i) the effective date of such assignment; and (ii) Tenant's receipt of the written assumption prepared by Landlord and required pursuant to this paragraph. The franchisee in this clause may be related or unrelated to Tenant and may include, among others, any entity affiliated with Tenant by conversion, merger, or otherwise. In such case, Tenant and any Guarantor will be fully released from any obligation first arising under this Lease subsequent to the actual assignment date

(d)     This Lease shall be contingent upon Landlord and Tenant's lender, Wells Fargo, reaching a mutually acceptable agreement regarding a waiver of Landlord's lien rights on Tenant's personal property and the rights of Tenant's lender with respect to this Lease following a Default by Tenant hereunder or a default by Tenant under its loan (collectively, a "Default Event"). Landlord agrees that, at minimum, Wells Fargo may direct that the Lease be assigned to Franchisor or a new franchisee of Franchisor without Landlord's consent following a Default Event. If the foregoing contingency is not satisfied or waived within thirty (30) days of execution of this Lease, either party may terminate this Lease at any time prior to the contingency being satisfied or waived.

18.     DEFAULT. This Lease is made upon the condition that Tenant shall punctually and faithfully perform all of the covenants, conditions and agreements by it to be performed as in this Lease set forth. The following shall each be deemed to be an event of default (each of which is sometimes referred to as a "Default" in this Lease):

(a)     Tenant shall fail to pay when due any Rent or other sums due any other party under the terms and provisions of this Lease and does not cure such failure within five (5) days of notice that the same is past due.

(b)     Tenant fails to open its business to the public in the Premises as required in this Lease.

(c)     Tenant or any other party liable for the obligations of Tenant under this Lease shall have a permanent receiver appointed for such party's property and such receiver is not removed within thirty (30) days after appointment of such receiver.

(d)     Tenant or any other party liable for the obligations of Tenant under this Lease shall have filed against it any proceedings under any present or future state or federal insolvency or bankruptcy laws or other laws of similar purpose, and such proceeding is not dismissed within thirty (30) days.

(e)     Tenant or any other party liable for the obligations of Tenant under this Lease shall voluntarily commence any debtor relief proceedings, or shall be adjudicated as bankrupt or insolvent, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state, or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Tenant or any such guarantor, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay or shall fail to pay its debts generally as they become due, under any present or future state or federal insolvency or bankruptcy laws or other laws of similar purpose.

(f)     Tenant or any other party liable for the obligations of Tenant under this Lease shall make an assignment for the benefit of creditors.

(g)     Tenant or any other party liable for the obligations of Tenant under this Lease shall have its property levied upon or attached under process that is not satisfied or dissolved within thirty (30) days after inception of such levy or attachment.

(h)     A court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Tenant or any such guarantor seeking any reorganization, dissolution or similar relief under any present or future federal, state, or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors or Tenant or any such guarantor shall be the subject of an order for relief entered by such a court, and such order, judgment or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or any trustee, receiver, custodian or liquidator of Tenant or any such guarantor shall be appointed without the consent or acquiescence of Tenant or any such guarantor and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).

(i)     Tenant shall fail to perform any other covenant, agreement, provision or condition of this Lease, which failure is not cured within thirty (30) days after notice from Landlord; provided, however, if such failure by its nature cannot reasonably be cured within such thirty (30) day period then no Default shall be deemed to exist as long as Tenant commences curing the failure within such thirty (30) day period and thereafter continuously and diligently prosecutes cure to completion.

(j)     The repetition or continuation of any failure to timely pay any Rent or any other sums due hereunder, where such failure shall continue or be repeated two (2) times in any period of twelve (12) consecutive months, notwithstanding the cure of such failures within any applicable notice or cure period.

(k)     The repetition of any failure to observe or perform any of the other material covenants, terms or conditions hereof more than six (6) times, in the aggregate, in any period of twelve (12) consecutive months, notwithstanding the cure of such failures within any applicable notice or cure period.

19.     REMEDIES FOR DEFAULT.  In event of a Default, Landlord at its option may, without further demand or notice, at once, or any time thereafter during continuance of such Default, do one or more of the following:

(a)     Landlord may terminate this Lease by written notice to Tenant in which event Tenant shall immediately surrender possession of the Premises to Landlord.  If the Lease is so terminated, Tenant shall be obligated to and shall pay Landlord all Rent that would have been payable by Tenant from the date of termination to the date when this Lease would have expired if it had not so terminated, less the fair rental value of the Premises for the same period, both discounted to present value at the discount rate of the Federal Reserve Bank of Atlanta, Georgia, in effect at the time of termination, plus all reasonable costs and expenses incurred by Landlord by reason of such Default, including reasonable attorney's fees.  The Additional Rent after termination shall be an estimate computed by Landlord, taking into consideration the current estimates of such amounts and the average yearly percentage increase of such amounts over the completed portion of the Lease term.  The fair rental value of the Premises shall be based upon the then prevailing rent obtainable for the Premises or for comparable space in the Project.  Tenant agrees to accept the estimates prepared by Landlord for the purpose of computing the amounts owed Landlord following termination of the Lease.  No termination of this Lease prior to the scheduled expiration thereof shall affect Landlord's right to collect Rent or Landlord's reasonable costs and expenses incurred by reason of such Default, including reasonable attorney's fees, for the period prior to the termination thereof.

(b)     Landlord, as Tenant's agent, without terminating this Lease, may enter upon, retake and relet the Premises at the best price obtainable by reasonable effort, without advertisement and by private negotiations, for any term Landlord deems appropriate, and Tenant shall be liable immediately to Landlord for all reasonable costs Landlord incurs in reletting the Premises, including without limitation, reasonable attorneys fees, brokers' commissions, expenses of remodeling the Premises and like costs and Tenant's right to possession of the Premises shall immediately be terminated.  In addition, Landlord shall have the right to have a receiver appointed to collect Rent and conduct Tenant's business.  Tenant shall be liable to Landlord for the deficiency, if any, between all Rent due hereunder and the rent received by Landlord as a result of such reletting or receivership (after first deducting from the rents received

from such reletting or receivership the reasonable costs incurred by Landlord in connection with such entry, retaking, reletting or receivership). Tenant shall have no right to any rent received by Landlord from any such reletting in excess of the Rent due hereunder. No act by Landlord with respect to the Premises shall terminate this Lease, including but not limited to acceptance of the keys, institution of an action for detainer or other dispossessory proceedings; it being understood that this Lease may only be terminated by express written notice from Landlord to Tenant, and any reletting of the Premises shall be presumed to be for and on behalf of Tenant, and not Landlord, unless Landlord expressly provides otherwise in writing to Tenant.

(c)     In addition to all other remedies available to Landlord under this Lease and to Landlord's rights of self-help set forth elsewhere in this Lease, Landlord may, at Landlord's option, but is not obligated to, upon Default, pay any sum of money on behalf of Tenant that Tenant has failed to pay in accordance with the terms hereof, or perform on behalf of Tenant any covenant or obligation of Tenant that Tenant has failed duly to keep, observe and perform, and all sums so paid by Landlord and all reasonable costs incurred by Landlord in connection with such performance shall become Additional Rent payable hereunder, and shall be repaid by Tenant to Landlord upon demand, together with interest thereon at the Default Rate.

(d)     Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Landlord obtaining possession of the Premises by reason of the violation by Tenant of any of the terms, covenants or obligations of this Lease, or otherwise.

(e)     No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered exclusive of any other remedy but the same shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute, and every power and remedy given by this Lease to Landlord may be exercised from time to time and as often as occasion may arise or as may be deemed expedient. No delay or omission of Landlord to exercise any right or power arising from any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. No waiver of any breach of any of the covenants of this Lease shall be construed or held to be a waiver of any other breach nor waiver, acquiescence in or consent to any further or succeeding breach of the same covenant. Neither the rights herein given to receive, collect, sue for, or distrain for any Rent or to enforce the terms, provisions and conditions of this Lease or to prevent the breach of any other right or remedy hereunder or otherwise granted or arising shall in any way affect, impair, or toll the right or power of Landlord to declare the term herein granted ended and to terminate this Lease as otherwise herein provided. No failure of Landlord to insist upon strict compliance by Tenant with the terms and provisions of this Lease, and no custom or practice of the parties at variance with the terms and provisions hereunder, shall constitute a waiver of Landlord's rights to demand strict compliance by Tenant with the terms and provisions hereof. No receipt of money by the Landlord from or on behalf of the Tenant after a default, nor the application by Landlord of any security for the obligations of Tenant after default shall (i) reinstate, continue, or extend the term of this Lease, if the same has been terminated; (ii) affect any notice given to the Tenant; (iii) operate as a waiver of the right of the Landlord to enforce the payment of Rent then due or falling due thereafter; or (iv) operate as a waiver of the right of the Landlord to recover possession of the Premises by proper suit, action, proceeding, or a waiver of any other remedy to which Landlord may be entitled on account of such default. The acceptance of Rent hereunder by Tenant shall not be deemed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease.

(f)     If any Rent is collected by or through an attorney at law or upon advise therefrom, or if Landlord retains an attorney at law in connection with enforcement by Landlord of any covenant or obligation of Tenant or of any right or remedy of Landlord hereunder, Tenant agrees to pay the reasonable attorney's fees incurred by Landlord and all court costs and all reasonable costs of collection, including but not limited to costs of depositions and expert witnesses.

(g)     A termination of this Lease by Landlord or the recovery of possession of the Premises by Landlord or any voluntary or other surrender of this Lease by Tenant or a mutual

cancellation thereof, shall not work a merger and subject to the rights of IHOP in Addendum II, shall at the option of Landlord, terminate all or any existing franchises or concessions, licenses, permits, subleases, subtenancies or the like between Tenant and any third party with respect to the Premises, or may, at the option of Landlord, operate as an assignment to Landlord of Tenant's interest in same.

(h)     The rights given to Landlord in this Section are cumulative and shall be in addition and supplemental to all other rights or remedies that Landlord may have under this Lease, under laws then in force or in equity.

(i)     All demands for Rent and all other demands, notices and entries, whether provided for under common law or otherwise, that are not expressly required by the terms hereof, are hereby waived by Tenant.

(j)     If Landlord elects to terminate this Lease under the provisions of the preceding Section, Landlord may recover from Tenant damages computed in accordance with the following formula in addition to Landlord's other remedies:

(i)     the worth at the time of judgment of any unpaid Rent which has been earned at the time of such termination; plus

(ii)     the worth at the time of judgment of the amount by which the unpaid Rent which would have been earned after termination until the time of judgment exceeds the amount of such rental loss Tenant proves could have been reasonably avoided; plus

(iii)     the worth at the time of judgment of the amount by which the unpaid Rent for the balance of the Term after the time of judgment exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(iv)     any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would likely to result therefrom including but not limited to, the reasonable cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and the unamortized portion of (A) real estate commissions paid by Landlord in connection with this Lease, (B) all reasonable costs incurred by Landlord to improve the Premises, and (C) any additional amount furnished in the nature of an allowance (all of such amortization to be based on the assumption that such costs and expenses are amortized on a straight line basis over the initial lease term); plus

(v)     at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable state law.  Damages shall be due and payable from the date of termination.

As used herein, the phrase "worth at the time of judgment" shall be computed by adding interest on all such sums from the date when originally due at the lesser of twelve percent (12%) per annum or the maximum interest rate permissible by law.  The phrase "worth at the time of judgment" as used herein is computed by discounting the sum in question at the federal reserve rate promulgated by the federal reserve office for the district in which the Project is located.  For the purposes of this Section, "Rent" for each year of the unexpired Term shall be the Minimum Rent payable under this Lease, together with any other continuously accruing expenses payable hereunder.

20.     LIABILITY OF LANDLORD.

(a)     Notwithstanding anything elsewhere in this Lease to the contrary, the term "Landlord" as used in this Lease means, with regard to the obligations and liabilities of Landlord hereunder, only the owner from time to time of the real property of which the Project and the Premises are a part, and upon the sale of said real property, Landlord and each successive owner shall be relieved of all liability hereunder except for liability which arose or accrued while such

owner was Landlord. Landlord and, in case Landlord shall be a joint venture, partnership, tenancy-in-common, association or other form of joint ownership, the members of any such joint venture, partnership, tenancy-in-common, association or other form of joint ownership, shall have absolutely no personal liability with respect to any provision of this Lease or any obligation or liability arising from this Lease or in connection with this Lease in the event of a breach or default by Landlord of any of its obligations. In no event shall Landlord be in default hereunder unless it has failed to cure such default within thirty (30) days after receipt of written notice (or if more than thirty (30) days shall be required because of the nature of the default, if Landlord shall fail to proceed diligently to cure such default after receipt of written notice). Tenant shall look solely to the equity of the owner in the Project at the time of the breach or default (or if the interest of Landlord is a leasehold interest at that time, Tenant shall look solely to such leasehold interest) for the satisfaction of any claims of Tenant. Such exculpation of liability shall be absolute and without any exception whatsoever. Notwithstanding the foregoing, in the event of failure by Landlord to give any consent, as provided in this Lease, Tenant's sole remedy shall be an action for specific performance at law, but in no event shall Landlord be responsible in monetary damages for failure to give such consent.

(b)     Anything in this Lease to the contrary notwithstanding, providing such cause is not due to the willful act or gross neglect of a party, neither party shall be deemed in default with respect to the performance of any of the terms, covenants and conditions of this Lease if same shall be due to any strike, lockout, civil commotion, war-like operation, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain any material, service or financing, through Act of God or other cause beyond the control of such party. Neither party shall be responsible or liable for any such delays and the doing or performing of any such act or thing shall be excused for the period of the delay and the period for the performance of any such act shall be extended for the period equal to the period of such delay.

21.     SURRENDER OF PREMISES.

(a)     Tenant may (if not in Default) immediately prior to the expiration or earlier termination of this Lease or any extension thereof, remove all personal property, furnishings, trade fixtures, merchandise and equipment which Tenant has placed in the Premises and all debris and rubbish, provided Tenant simultaneously repairs all damage to the Premises caused by such removal. Notwithstanding the foregoing, Tenant shall not be permitted to remove any other alterations, additions or improvements to the Premises without Landlord's consent, including but not limited to wall coverings, floor coverings and fixtures. Upon the expiration or earlier termination of this Lease, Tenant shall, at Landlord's option, restore the Premises to its condition upon delivery of the Premises by Landlord to Tenant. It is understood that Tenant will have use, possession and ownership of all furnishings, fixtures and equipment remaining in the Premises from the prior Tenant and Landlord hereby conveys to Tenant all right, title and interest of Landlord in and to the same.

(b)     Upon the expiration or earlier termination of this Lease or the reentry by Landlord of the Premises following Default, Tenant shall at once surrender possession of the Premises to Landlord in the same condition as upon delivery of possession to Tenant hereunder, reasonable wear and tear excepted, shall surrender all keys for the Premises to Landlord, and shall remove all Tenant's effects therefrom subject to and as provided in subsection (a). Should any property of Tenant remain in or about the Premises following such expiration or termination (or upon reentry by Landlord following Default), then such property shall be conclusively deemed to have been abandoned by Tenant, and Landlord shall have the right, at the expense of Tenant, to dispose of said property without liability for damages or otherwise. Any proceeds from such disposition may be applied by Landlord to the expense of removal, storage or sale and to any amounts due under this Lease, with the balance to be retained by Landlord.

22.     EXTERIOR SIGNS. Tenant shall place no signs, awnings, canopies, advertising manner or other thing of any kind on any exterior door, wall or window, or upon the roof of the Premises except with the prior written consent of Landlord, and in accordance with the sign criteria attached hereto as Exhibit E, and made a part hereof. Any and all signs placed on the

Premises by Tenant shall be maintained in compliance with all governmental ordinances, rules and regulations governing such signs, and Tenant shall be responsible to Landlord for any damage caused by the installation, use, removal or maintenance of the same or violation of any ordinance, rule or regulation with regard thereto. All such signs, awnings, canopies, advertising matter or other thing of any kind shall be removed by Tenant prior to the expiration or termination of this Lease, and upon such removal Tenant shall simultaneously repair all damage incidental to such removal, including complete restoration of the brick storefront, if any. All pylon and monument signs serving the Premises shall be deemed to be part of the land, shall not be removed by Tenant and shall be surrendered to Landlord as part of the Premises at the expiration of this Lease. Tenant's proposed signage, as set forth on Exhibit E-1, is hereby approved.

  23.  RIGHT OF ENTRY. Upon reasonable notice, except in an emergency, Landlord or Landlord's agents shall have the right to enter the Premises at any and all times to examine and inspect the same, to show them to prospective purchasers of the Project or the Premises, to post notices of non-responsibility and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable or which result from Default. Landlord shall be allowed to take all material into and upon the Premises that may be required for repairs, alterations, improvements or additions without the same constituting an eviction of Tenant in whole or in part, including but not limited to, erecting scaffolding and any other necessary structures where required by the character of the work to be performed, and the Rent shall in no event abate while said repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of business of Tenant, or otherwise. During the six (6) months prior to the expiration of the Lease term, Landlord may exhibit the Premises to prospective tenants or purchasers, and place upon the Premises the usual notices "To Let" or "For Sale," which notices Tenant shall permit to remain thereon without molestation. As long as Landlord complies with the next to last sentence of this Section, Tenant hereby waives any claim for damages or for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby. For each of aforesaid purposes, Landlord shall at all times have and retain a key to all doors in, upon and about the Premises, excluding Tenant's vaults, safes and files, and Landlord shall have the right to use any and all means that Landlord may deem proper to gain access to the Premises in an emergency, without liability to Tenant except for any failure to exercise due care for Tenant's property. In the exercise of the rights granted in this Section, Landlord shall always provide that the entrance to the Premises shall not be blocked thereby and Tenant's business shall not be interfered with unreasonably. Landlord's entry on the Premises in accordance with this paragraph shall not be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or a constructive eviction of Tenant from the Premises or any portion thereof.

  24.  SUBORDINATION/ATTORNMENT/ESTOPPEL.

    (a)  At Landlord's election, this Lease shall be subordinate or superior to any ground lease or to the lien of any present or future mortgage, deed of trust or other security instrument (collectively an "encumbrance") placed by Landlord upon the Premises or the Project, irrespective of the time of execution or the time of recording of the encumbrance. From time to time, Landlord may elect that this Lease be subordinate to the lien of any encumbrance, or that this Lease be paramount to the lien of any encumbrance, by giving notice to Tenant. Landlord initially elects and gives notice to Tenant that this Lease shall be subordinate to the lien of any present or future encumbrance placed by Landlord upon the Premises or the Project. The exercise of any of the elections provided in this Section shall not affect Landlord's right to elect differently thereafter from time to time; provided, however, Landlord may not change its initial election without the consent of the holder or beneficiary of such encumbrance. The foregoing provisions shall be self-operative and no further instrument shall be required. Tenant shall, within ten (10) days after request therefor by Landlord, execute an instrument confirming that this Lease is subordinate or paramount (as Landlord may elect) to the encumbrance, in a form as may be required by the holder or beneficiary thereof. Notwithstanding the foregoing, Tenant shall not be required to subordinate this Lease to any future encumbrance unless the holder or beneficiary thereof agrees not to disturb Tenant's use and enjoyment of the Premises pursuant to the terms of this Lease. Once all contingencies to Tenant's obligations under this Lease have

been satisfied or waived and Tenant has accepted possession of the Premises, Landlord will use reasonable efforts to obtain a subordination, non-disturbance and attornment agreement (an "SNDA") from Landlord's current lender, provided that Tenant shall bear all fees charged by the lender or its counsel in connection with such agreement. It is understood that a failure to obtain an SNDA from the current lender shall not be a default by Landlord under this Lease.

(b)     If the Premises or the Project is encumbered, and the encumbrance, if a ground lease, is terminated or, if a lien, is foreclosed, or if the Premises or Project is sold pursuant to foreclosure or by reason of a default under any encumbrance, the following shall apply notwithstanding the foreclosure, the sale, or the default:  (i) Tenant shall not disaffirm this Lease or any of its obligations under this Lease absent a Landlord default; (ii) at the request of the applicable ground lessor, mortgagee or purchaser at the foreclosure or sale, Tenant shall attorn to the ground lessor, mortgagee or purchaser.

(c)     Within twenty (20) days after request therefor by Landlord, or in the event of any sale, assignment or hypothecation of the Premises, the Project and/or the land thereunder by Landlord, Tenant agrees to deliver in recordable form, an estoppel certificate to any proposed ground lessor, mortgagee or purchaser, or to Landlord, certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), that there are no defenses or offsets thereto (or stating those claims by Tenant), the dates to which Minimum Rent and other Rent has been paid, and such other matters as may be requested.  If Tenant fails to deliver such certificate as required herein, Tenant shall be deemed to have conclusively agreed to and be bound by all matters set forth in the certificate as submitted by the requesting party.

(d)     Any document to be delivered under this Section may be relied upon by a prospective purchaser or encumbrancer of all or any portion of the Project.  In addition to all other remedies to which Landlord may be entitled on account of Tenant's failure to deliver a document as required herein, Landlord shall be entitled to collect and amount equal to $25.00 per day for each day after the initial ten (10) day period that Tenant's failure to deliver the document continues.

(e)     If in connection with obtaining financing for the Project, Landlord's lender shall request reasonable modifications in this Lease as a condition to such financing, Tenant will not unreasonably withhold, delay, or defer its consent thereto, provided that such modifications do not increase the monetary obligations of Tenant hereunder or materially impair the leasehold interest hereby created.

(f)     Tenant agrees to give any ground lessors or mortgage and/or deed of trust holders, as to all or a portion of the Project, by certified mail, return receipt requested, a copy of any notice of default served upon Landlord, provided that prior to such notice Tenant has been notified in writing (by way of notice or assignment of rents and leases, or otherwise) of the addresses of such parties.  Tenant agrees not to exercise any remedies available by virtue of a Landlord's failure to cure a default within thirty (30) days after receipt of notice of default (or such additional time as may be reasonably necessary to cure such default) unless Tenant has also given such parties a reasonable opportunity to cure such default (including but not limited to foreclosure proceedings if necessary to effect such cure).

25.     NO ESTATE IN LAND.  This Lease shall only create the relationship of Landlord and Tenant between the parties hereto and the parties state that they have not created and do not intend to create any relationship between them other than as landlord and tenant.

26.     PARKING.  Tenant shall have the non-exclusive right to use the existing parking garage in common with other tenants.  Tenant agrees that it will have its employees park in the third and fourth floors of the garage.  Landlord will exercise diligent and continuous efforts, including without limitation, towing if necessary to ensure that the employees of other tenants also park in the third and fourth floors of the garage in order to ensure that parking on the first and second level of the garage is available for customers of the Project.  Landlord at all times shall have the right to designate the particular parking area to be used by any or all of Tenant's employees and any such designation may be changed from time to time.  Tenant shall supply

Landlord with lists of the license plate numbers of the vehicles of Tenant's employees within five (5) days' of Landlord's request, and will notify Landlord of any changes within five (5) days after such changes occur. If Tenant or its employees fail to park their vehicles in the designated parking areas, Landlord shall have the right to either have such vehicles towed from the Project at Tenant's expense or to charge Tenant an amount not to exceed $25.00 per car parked in any parking area other than those so designated.

27.     <u>HOLDING OVER</u>. If Tenant remains in possession of the Premises after the expiration or termination of the term hereof, without the execution of a new lease, Tenant shall be a tenant at will. Commencing on the date following the date of such expiration or termination, the Minimum Rent shall, for each month or fraction thereof that Tenant so remains in possession, be one hundred fifty percent (150%) of the Minimum Rent in effect at the expiration or termination of this Lease, subject to all the other terms and provisions of this Lease.

28.     <u>HAZARDOUS MATERIALS</u>. Tenant shall not cause or permit the use, generation, storage or disposal in or about the Premises of any substances, materials or wastes subject to regulation under any federal, state or local law from time to time in effect concerning hazardous, toxic or radioactive materials (hereinafter "Hazardous Materials"), other than nominal amounts used in the ordinary course of operation of a restaurant and in compliance with all applicable laws, unless Tenant shall have received Landlord's prior written consent, which consent Landlord may withhold or at any time revoke at its sole discretion. If Tenant uses, generates, stores or disposes of any Hazardous Materials in or about the Premises, Tenant shall obtain all necessary permits and comply with all statutes, regulations and rules applicable to such activity. Furthermore, in the event that Tenant uses Hazardous Materials on the Premises other than nominal amounts used in the ordinary course of a restaurant operation, Landlord shall have the right to require that Tenant deliver periodic environmental audits of the Premises evidencing that no violations have occurred. Tenant shall indemnify and hold Landlord harmless from and against all liability, cost, claim, penalty, expense and fees (including court costs and attorney's fees) arising from Tenant's use, generation, storage, or disposal of Hazardous Materials in or about the Premises. This section shall survive the expiration or earlier termination of this Lease.

29.     <u>NOTICES</u>. Any notice required or permitted to be given hereunder shall be deemed sufficient if in writing and sent by United States registered or certified mail, postage prepaid, nationally recognized overnight courier, hand-delivery or telecopy followed by another copy sent in one of the preceding fashions to the party being given notice, at the addresses set forth on the Lease Summary Sheet. Either party hereto may change its address for notices or may designate other or additional persons to receive such notices by giving the other party notice of such change. Notice given as herein above provided shall be deemed received by the party to whom it is addressed on the day on which said notice, properly addressed and bearing sufficient postage, is deposited in the United States mail, the day after deposit with an overnight courier, or when hand-delivered or telecopied to such party at the address set forth herein. The refusal to accept delivery shall constitute acceptance.

30.     <u>QUIET ENJOYMENT</u>. Upon payment by Tenant of the Rent herein provided, and upon the observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed under this Lease, Tenant shall peaceably and quietly hold and enjoy the Premises for the term of this Lease without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease and subject to all the provisions of any mortgage, deed of trust, ground lease or other encumbrance affecting. all or any portion of the Project.

31.     <u>INTENTIONALLY DELETED</u>.

32.     <u>RULES AND REGULATIONS</u>. Tenant agrees to comply with and observe the rules and regulations attached hereto as <u>Exhibit F</u> and incorporated herein. Tenant's failure to keep and observe said rules and regulations shall constitute a default of the terms of this Lease in the same manner as if the same were contained herein as covenants. Landlord reserves the right from time to time to amend or supplement said rules and regulations and to adopt and promulgate additional reasonable, non-discriminatory rules and regulations applicable to the

Premises and the Project. The additions and modifications to those rules shall be binding upon Tenant upon delivery of a copy to Tenant. Landlord will use reasonable efforts to uniformly enforce all rules and regulations in a nondiscriminatory manner.

33.    FINANCIAL STATEMENTS.

(a)    At any time following the execution of this Lease and thereafter during the term of this Lease, but not more than once per calendar year, Tenant shall, upon fifteen (15) days prior written notice from Landlord, provide to Landlord Tenant's most recent yearend balance sheet and income statement. Such current statement shall be prepared in accordance with generally accepted accounting principles. Landlord agrees to keep such information confidential and that it will not share the information with any party except Landlord's lenders, Landlord's financial advisors and prospective investors/owners who have the Project under contract, and as otherwise necessary to enforce this Lease or as may be required by law.

(b)    Tenant shall accurately report its Gross Sales from the Premises to Landlord annually for Landlord's review and information, and in addition, within ten (10) days of request by Landlord in connection with a sale or financing of the Project or following a Tenant Default.

34.    MISCELLANEOUS.

(a)    The term "Landlord" as used in this Lease shall include the party signing this Lease as Landlord and its assigns and successors in title to the Premises. The term "Tenant" shall include the party signing this Lease as Tenant and his or its heirs, executors, administrators, legal representatives, successors, and, if this Lease shall be validly assigned or if the Premises should be sublet, shall also include Tenant's assignees or sublessees, as to the Premises covered by such assignment or sublease. "Landlord" and "Tenant" shall include male and female, singular and plural, corporation, partnership or individual, as may fit the particular parties.

(b)    The marginal captions in this Lease are for convenience of reference only, and are not to be considered a part hereof and shall not limit or otherwise affect any of the terms of this Lease.

(c)    This Lease shall not be recorded without the prior written consent of Landlord, but a short form memorandum hereof may be recorded at the expense of the requesting party setting forth the parties to the Lease, the description of the Premises, the Commencement Date and termination date of the Lease and such other information as may be necessary for the recording of a short form lease. Neither party shall set forth in such short form lease the amount of rental to be paid by Tenant to Landlord. At such time as this Lease terminates or expires for any reason, Tenant agrees to execute such instruments as necessary to release any short form lease of record. If Tenant refuses to do so after request from Landlord, Tenant hereby appoints Landlord as Tenant's attorney-in-fact for such purpose, such power being irrevocable and coupled with an interest.

(d)    Time is of the essence of this Lease.

(e)    If any provision of this Lease or the application of any provision of this Lease to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Lease, or the application of such provision to persons or circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby; and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(f)    This Lease and the exhibits attached hereto set forth all the terms, conditions, provisions and agreements between Landlord and Tenant concerning the Premises, and there are no promises, agreements or undertakings, either oral or written, between the parties concerning the Premises other than as set forth herein. No amendment, modification or addition to this Lease shall be binding upon the parties unless in writing and executed by the parties.

(g)     This Lease shall be governed by and construed in accordance with the laws of the State of Tennessee.

(h)     Each party warrants that it has had no dealings with any broker or agent in connection with the negotiation or execution of this Lease other than with Landlord's broker, Brookside Properties, Inc, and Tenant's broker, Centennial Retail Services, and each party covenants to pay, hold harmless and indemnify the other from and against any and all cost, expense or liability for any compensation, commissions or charges claimed by any other broker or agent with respect to the negotiation or execution of this Lease.

(i)     Each individual executing this Lease on behalf of Tenant represents and warrants that such individual has been duly authorized by Tenant to do so. Tenant agrees to provide Landlord with all documentation requested by Landlord in order to satisfy Landlord that Tenant is a duly organized entity, with the power and authority to enter into this Lease.

(j)     This Lease may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Lease shall not be deemed fully executed until a fully executed document has been delivered to Tenant.

(k)     The waiver by Landlord of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition on any subsequent breach of the same or any other term, covenant or condition herein contained. The acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease.

(l)     The covenants and conditions herein contained, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of the parties hereto.

(m)     Whenever a day is appointed herein on which, or a period of time is appointed within which, either party hereto is required to do or complete any act, matter or thing, the time for the doing or completion thereof shall be extended by a period of time equal to the number of days on or during which such party is prevented from, or is interfered with, the doing or completion of such act, matter or thing because of strikes, lock outs, embargoes, unavailability of labor or materials, wars, insurrections, rebellions, civil disorder, declaration of national emergencies, acts of God, or other causes beyond such party's reasonable control (financial inability excepted); provided however, nothing contained in this section shall excuse Tenant from the prompt payment of any Rent except as may be expressly provided elsewhere in this Lease.

(n)     In the event of any sale of the Project or any part thereof, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission occurring on or after the consummation of such sale, and the purchaser at such sale or any subsequent sale shall be deemed, without any further agreement between the parties or their successors in interest or between the parties and any such purchaser, to have assumed and agreed to carry out any and all of the covenants and obligations of the Landlord under this Lease.

35.     INTENTIONALLY DELETED.

36.     INTENTIONALLY DELETED.

37.     AUTHORITY OF PARTIES. If Tenant is a trust, corporation, partnership or limited liability company, each individual executing this Lease on behalf of said entity represents and warrants that said entity is in good standing under the laws of the state of its formation and is qualified to do business in the state in which the Project is located, and that such individual is authorized to execute and deliver this Lease on behalf of said entity, in accordance with the terms of the trust, a duly adopted resolution of the board of directors, the bylaws, or the partnership or operating agreement, as appropriate, and that this Lease is binding upon said entity

in accordance with its terms.  Tenant agrees to supply, upon request of Landlord, such evidence of authority as Landlord may reasonably request.

IN WITNESS WHEREOF, the parties have hereunto set their hands or caused this instrument to be executed, by and through their duly authorized officers, officials or representatives, as of the day and year first above written.

LANDLORD:

ELLISTON PLACE LIMITED PARTNERSHIP

By:   MORRISON HOLDINGS, LLC

Pat Morrison

Title:  Managing Member, EP, General; General Partner

TENANT:

CFRA, LLC

By:

Title: President

IN WITNESS WHEREOF, the parties have hereunto set their hands or caused this instrument to be executed, by and through their duly authorized officers, officials or representatives, as of the day and year first above written.

LANDLORD:

ELLISTON PLACE LIMITED PARTNERSHIP

By: MORRISON HOLDINGS, LLC

Pat Morrison

Title: Managing Member, EP, General; General Partner

TENANT:

CFRA, LLC

By:

Title: President

# EXHIBIT A

## SITE PLAN FOR PROJECT





PROPOSED ENTRY PLAN

PROPOSED FACADE ELEVATION

MATERIALS SCHEDULE

NOT FOR CONSTRUCTION

IHOP CUSTOM UPFIT
ICON 2.0 PROTOTYPE

Project location:
2214 ELLISTON PLACE #102
NASHVILLE, TN 37203

PROPOSED
FACADE

ELEV



**EXHIBIT F**

**RULES AND REGULATIONS**

1.   The Premises and all portions thereof, including vestibules, entrances, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition at all times. Tenant shall keep the outside areas immediately adjoining the Premises clean and free from snow, ice, dirt and rubbish.

2.   All trash, refuse and waste materials shall be stored within the Premises or in such locations as Landlord may designate and regularly removed at Tenant's expense and until removal shall be stored:  (a) in adequate containers therefor, which containers shall be located as Landlord may from time to time designate so as to not be visible to the general public shopping on the Project site; and (b) so as to not constitute any health or fire hazard or nuisance.  In the event that Tenant has not performed such trash, refuse or waste removal, Landlord may remove it and Tenant shall pay to Landlord the cost plus 25% overhead for such removal.  No burning of trash, refuse and waste materials shall be allowed.  In no event shall Tenant place or store trash or refuse or waste materials within Common Areas, except as specifically designated by Landlord.

3.   Neither the Premises nor any portion or portions thereof shall be used for lodging purposes.

4.   Tenant agrees to store or stock in the Premises only such goods, wares, merchandise or other property as are reasonably required in connection with Tenant's business operations in the Premises, and not to use any portion of the Premises for storage or warehouse purposes beyond such needs.

5.   Tenant agrees to use for office, clerical or other non-selling purposes only such space in the Premises as is from time to time reasonably required for Tenant's business therein.

6.   Tenant agrees not to overload any floor in the Premises or use or operate any machinery, equipment, or other device that in Landlords' opinion is harmful to the Premises or disturbs other tenants in the Project.

7.   Tenant agrees not to distribute any handbills or other advertising matter or to solicit business on or about any part of the Project, including the Common Areas.

8.   Tenant agrees not to use the plumbing facilities for any purpose other than that for which they were constructed and not to dispose of any noxious, damaging or injurious substances therein.

9.   Tenant agrees not to use any sidewalks, walkways or other Common Areas of the Project or any vestibules, entrances or returns located within the Premises for the keeping, displaying, advertising or sale of any merchandise or other object, without the prior written consent of Landlord.

10.   Tenant agrees not to install on or about the Premises any exterior lighting, amplifiers or similar devices and not to use in, on or about the Premises any advertising medium which may be heard or experienced outside the Premises, such as flashing lights, searchlights, loudspeakers, phonographs, television or radio broadcasts or to permit live entertainment on or about the Premises.

11.   Tenant agrees not to install a television or other antenna upon or within the Premises or any building or improvement in the Project without the prior written consent of Landlord. If Tenant connects with any master antenna provided by Landlord, then Tenant shall furnish and install any and all writing and booster systems related to such connection and the operation within the Premises of television receivers, and Tenant shall pay to Landlord such reasonable connection and subscription charges as Landlord may establish.

12.    Tenant agrees not to operate for use by the general public, without the prior written consent of Landlord, any coin or token operated vending machine or similar device for the sale of any goods, wares, merchandise, food, beverages or services, including, but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices and machines for the sale of beverages, foods, candy, cigarettes or other commodities. Tenant may install said vending machines or devices for use only by Tenant, its agents and employees, provided said installation is in a non-sales area not visible to the general public.

13.    Tenant agrees not to permit the extermination of vermin to be performed in, on or about the Premises except by a company designated by Landlord and at times reasonably designated by Landlord.

14.    Tenant agrees that it shall use its best efforts to cause all trucks servicing its store to load and unload prior to the earliest hours of operating for business to the general public of any store or retail facility on the Project site.  Delivery service during business hours shall be permissible, provided such delivery service does not, in the reasonable opinion of Landlord, constitute a nuisance to the operation of the Project.  All deliveries or shipments of any kind to and from the Premises shall be made only by way of the rear of the Premises or at any other location designated by Landlord.

15.    Tenant agrees that it will not violate or perform any act that would in any way conflict with or violate any reciprocal easement agreement or other restrictions affecting the Project.

## EXHIBIT G

## PROHIBITED USES

The following uses shall be prohibited uses for the Premises:

1.  flea market

2.  swap shop, outlet store, secondhand store or any other business that buys used, damaged, overstocked or discontinued merchandise from a retailer in bulk and sells such merchandise on a "close out," "odd lot," "cancellation," "second," "factory reject," "sample," "floor model," "over-stock," "distressed," "bankruptcy," "fire sale," "damaged" or other basis that is not a first class retail format of the type found in shopping centers of similar quality to the Project (provided the same shall not be deemed to prohibit the sale of antiques, used pianos or other high quality used goods or the operation of a catalog store)

3.  bowling alley

4.  arcade

5.  game room

6.  skating rink

7.  billiard room

8.  massage parlor (other than as part of an upscale spa that also offers other types of beauty or physical therapy treatments)

9.  adult book store

10. bar, tavern or pub

11. ballroom, dance hall, discotheque

12. barber college

13. theater

14. health club

15. place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers, except for on-site instruction for employees of tenants

16. funeral parlors

17. facility for the sale of paraphernalia for use with illicit drugs

18. off-track betting parlor

19. carnival, amusement park or circus

20. new or used car dealership

21. gas station

22. auto repair shop

126812/ACARGILE
999999-009/ 5/25/12

- 1 -

ADDENDUM I

TO LEASE AGREEMENT

DATED: MAY _27_, 2012

BETWEEN

ELLISTON PLACE LIMITED PARTNERSHIP, LANDLORD

AND

CFRA, LLC, TENANT

THE PARTIES FURTHER AGREE TO THE FOLLOWING MODIFICATIONS, ADDITIONS AND AMENDMENTS TO THE TERMS AND PROVISION SET FORTH IN THE PRECEDING PRINTED PAGES, AND THE FOLLOWING SHALL BECOME PART OF THIS LEASE, SUCH THAT ALL REFERENCES TO THE "LEASE" SHALL INCLUDE THIS ADDENDUM.

1.    OPTION TO RENEW: Provided that Tenant is not then in Default, Landlord hereby grants to Tenant the option to renew this Lease for three (3) additional sixty (60) month periods upon the same terms and conditions set forth herein, except that the Minimum Rent shall be as follows:

OPTION 1

| Term | Annually | Monthly | Per SF |
|---|---|---|---|
| Months 181 – 240 | $169,702.56 | $14,141.88 | $41.25/SF |

OPTION 2

| Term | Annually | Monthly | Per SF |
|---|---|---|---|
| Months 241 – 300 | $186,693.36 | $15,557.78 | $45.38/SF |

OPTION 3

| Term | Annually | Monthly | Per SF |
|---|---|---|---|
| Months 301 – 361 | $205,370.88 | $17,114.24 | $49.92/SF |

2.    NOTICE: Tenant shall notify Landlord in writing no later than one hundred eighty (180) days prior to the expiration date of the term preceding the renewal period in question. If Tenant fails to give such notice prior to such one hundred eighty (180) day period, this renewal option shall be deemed null and void.

3.    EXCLUSIVE USE: During the term of this Lease, Landlord shall not permit any portion of the Project, other than the Premises, to be used by a Competing Business.

a.  "Exclusive Use" shall mean the operation of a restaurant selling breakfast and/or breakfast items.

b.  "Competing Business" shall mean a business which uses its premises primarily for the Exclusive Use, excluding any business occupying premises directly or (as an assignee, sublessee or concessionaire) indirectly under a Permitted Lease;

c.  A "Permitted Lease" shall mean either a lease that was executed prior to the execution of this Lease but that is in effect as of the date of execution of this Lease (a

"Prior Lease"), a renewal or extension of a Prior Lease, or a new lease that is executed by a business which leased or occupied premises in the Project directly or indirectly under a Prior Lease (provided that in the case of a new lease, such new lease does not grant greater rights to use the leased premises for the Exclusive Use than did the Prior Lease).

d. A business (other than the business conducted at the Premises) shall not be deemed to use its premises in the Project primarily for the Exclusive Use, if on an annual basis, less than ten (10%) of the gross sales from such premises are generated by the Exclusive Use.

e. This Paragraph shall automatically become null and void if:

   i. A Default occurs under this Lease;

   ii. Tenant assigns its rights under this Lease in whole or in part or sublets all or any portion of the Premises, except for Permitted Transfers or assignments or subleases permitted by the terms of the Lease to which Landlord consents; or

   iii. the Premises cease to be used primarily for the Exclusive Use.

f. In addition to any other remedies to which Tenant may be entitled on account of a breach of this provision by Landlord, Tenant shall be entitled to pursue injunctive relief or an action for damages

g. Landlord warrants that there are currently no exclusive uses in effect for other tenants of the Project.

IN WITNESS WHEREOF, the parties have hereunto set their hands or caused this instrument to be executed, by and through their duly authorized officers, officials or representatives, as of the day and year first above written.

LANDLORD:

ELLISON PLACE LIMITED PARTNERSHIP

By:  MORRISON HOLDINGS, LLC

Pat Morrison

Title:   Managing Member, EP, General; General Partner

TENANT:

CFRA, LLC

By:_____

Title:_____

IN WITNESS WHEREOF, the parties have hereunto set their hands or caused this instrument to be executed, by and through their duly authorized officers, officials or representatives, as of the day and year first above written.

LANDLORD:

ELLISON PLACE LIMITED PARTNERSHIP

By: MORRISON HOLDINGS, LLC

Pat Morrison

Title: Managing Member, EP, General; General Partner

TENANT:

CFRA, LLC

By:_____

Title: President

ADDENDUM ii TO LEASE

THIS ADDENDUM TO LEASE (the "Addendum") forms a part of that certain Lease dated May 22, 2012, by and between ELLISTON PLACE LIMITED PARTNERSHIP, an Arkansas limited partnership, as Landlord, and CFRA, LLC, a Delaware limited liability company, as Tenant, demising those certain premises consisting of 4,114 square feet located at 2214 Elliston Place, Nashville, Davidson County, Tennessee (the "Premises") pursuant to a Lease Agreement of even date herewith (the "Lease").

R E C I T A L S:

WHEREAS, Landlord and Tenant acknowledge that the anticipated use of the Premises is the conduct of an International House of Pancakes or IHOP Restaurant thereon, pursuant to the terms of a certain Franchise Agreement (the "Franchise Agreement") to be entered into between International House of Pancakes, LLC, a Delaware limited liability company ("IHOP"), as Franchisor, and Tenant, as Franchisee, and that by reason of such use certain benefits will inure to Landlord and Tenant; and

WHEREAS, Landlord and Tenant further acknowledge that in the event the Lease or Franchise Agreement, or both, are terminated by reason of the default of Tenant and the business of an International House of Pancakes or IHOP Restaurant upon the Demised Premises ceases or is otherwise interrupted, certain damages to IHOP (or its Affiliates) and/or its servicemarks will result; therefore, IHOP has required, as a condition to the Franchise Agreement, that Landlord and Tenant enter into this Addendum for the purpose of granting certain succession rights to IHOP in the event of a default by Tenant under the Lease or in the event of a termination of the Franchise Agreement, or both, so that the business of an International House of Pancakes or IHOP Restaurant, at IHOP's election, may continue to be conducted upon the Premises, as hereinafter provided.

NOW, THEREFORE, in consideration of the above premises and as an inducement to IHOP to enter into the Franchise Agreement with Tenant, the parties hereto hereby agree as follows:

Notwithstanding anything contained in the Lease to the contrary:

A.     In the event Landlord shall declare a default under the Lease due to Tenant's failure to perform any obligation of Tenant under the terms of the Lease, and in the event Tenant shall fail to cure such default within the period provided in the Lease for such cure, before Landlord shall take any action to terminate the Lease or Tenant's right to possession of the Premises, Landlord shall give written notice to IHOP c/o International House of Pancakes, LLC at 450 North Brand Boulevard, Attn: Legal Dept., 7th Floor, Glendale, California 91203, of its intention to so terminate the Lease or Tenant's right to possession of the Premises, whereupon IHOP shall have a period of ten (10) days after its receipt of said notice to notify Landlord in writing that IHOP has elected to cure such default and to succeed to Tenant's rights under the Lease. IHOP's right to so succeed to Tenant's interest under the Lease shall be conditioned upon IHOP tendering to Landlord an amount sufficient to cure any monetary defaults of Tenant then existing under the Lease, within ten (10) days

after the date of IHOP's giving of such notice, and curing any nonmonetary defaults within the time allocated therefor under the Lease.

B.    If for any reason the Lease is terminated before IHOP shall have the right to exercise its election to succeed to Tenant's interest under the Lease, as contemplated above, Landlord shall promptly notify IHOP in writing of such termination, and, provided IHOP notifies Landlord in writing of its desire to obtain possession of the Premises within ten (10) days after the date that IHOP shall receive written notice from Landlord that said Lease has been terminated, then Landlord shall enter into a new lease, upon the same terms and conditions as set forth in the Lease, with IHOP for the remainder of the term and any option terms that would have been available under the Lease, but for such termination, within ten (10) days after the date that IHOP shall give such notice, provided IHOP pays Landlord an amount sufficient to cure any monetary defaults of Tenant then existing under the Lease and within thirty (30) days after IHOP obtains possession of the Premises, cures any nonmonetary defaults under the Lease.

C.    In the event of the termination of the Franchise Agreement as a result of Tenant's breach thereof, IHOP shall also have the right to succeed to the interest of Tenant under the Lease by giving written notice to Landlord of its election to so succeed to Tenant's interest under the Lease, within ten (10) days after the date of the termination of the Franchise Agreement.

D.    In the event IHOP elects to succeed to Tenant's interest under the Lease pursuant to paragraphs A, B or C above, IHOP shall attorn to Landlord and shall assume all of the obligations thereafter to be performed by Tenant under the Lease, including all amendments, addenda and supplements thereto.

E.    In the event IHOP elects to succeed to Tenant's interest under the Lease pursuant to paragraphs A, B or C above, IHOP shall have the unqualified right to sublease the Premises to a franchisee or prospective franchisee of IHOP meeting IHOP's minimum standard qualifications, without the written consent of Landlord, and in so doing IHOP shall have no obligation to pay to Landlord any consideration or portion thereof derived by IHOP in connection therewith.

F.    Upon default by Tenant of the terms of its Franchise Agreement with IHOP, and where such default extends beyond all applicable cure periods in the Franchise Agreement, Landlord hereby grants IHOP, or its assignee, the right to enter the Premises to make any interior, nonstructural modifications necessary to protect the proprietary trademarks, trade dress and other intellectual property owned by IHOP and relating to the operation of an IHOP or International House of Pancakes Restaurant, without being deemed guilty of trespass or any other tort.  IHOP shall repair any damage to the Premises occasioned by such entry and removal.

G.    Upon the expiration or earlier termination of the Lease for any reason, Tenant shall, upon written demand of IHOP, with a copy to Landlord (the "Removal Notice") remove all IHOP trademarks and elements of trade dress from all buildings, signs, fixtures and furnishings, and make reasonable alterations to and paint those portions of buildings and other improvements maintained pursuant to the Lease a neutral color to the extent

necessary to protect the trade dress of the IHOP system.  In addition to and without limiting the generality of the foregoing, Tenant shall make any other changes which IHOP requests in order to protect the proprietary trademarks and trade dress of the IHOP system.

     H.     If Tenant shall fail to make or cause to be made any such removal, alteration or repainting within thirty (30) days after the Removal Notice, IHOP shall have the right to enter upon the Premises, within ten (10) days thereafter and upon at least 48 hours advance notice to Landlord, without being deemed guilty of trespass or any other tort, and make or cause to be made such removal, alterations and repainting, for the purposes described in G. above.  If IHOP fails to sent the Removal Notice within ten (10) days after notice that the Lease has terminated, or fails to exercise its rights under this Section H within the period set forth herein, IHOPs right to enter the Premises for such purpose shall terminate, and Landlord shall be free to dispose of all IHOP trade dress and signage items, without liability to any party.

INITIALS:     Landlord:_____    Tenant:_____

necessary to protect the trade dress of the IHOP system.   In addition to and without limiting the generality of the foregoing, Tenant shall make any other changes which IHOP requests in order to protect the proprietary trademarks and trade dress of the IHOP system.

H.      If Tenant shall fail to make or cause to be made any such removal, alteration or repainting within thirty (30) days after the Removal Notice, IHOP shall have the right to enter upon the Premises, within ten (10) days thereafter and upon at least 48 hours advance notice to Landlord, without being deemed guilty of trespass or any other tort, and make or cause to be made such removal, alterations and repainting, for the purposes described in G. above.  If IHOP fails to sent the Removal Notice within ten (10) days after notice that the Lease has terminated, or fails to exercise its rights under this Section H within the period set forth herein, IHOPs right to enter the Premises for such purpose shall terminate, and Landlord shall be free to dispose of all IHOP trade dress and signage items, without liability to any party.

INITIALS:      Landlord:_____ Tenant:_____