ORDERED.

**Dated:  July 10, 2020**

Catherine M. Ewen

Catherine Peek McEwen
United States Bankruptcy Judge

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| CFRA HOLDINGS, LLC | Case No. 8:20-bk-03608-CPM |
| | |
| | *Jointly Administered with:* |
| | |
| CFRA, LLC | Case No. 8:20-bk-03609-CPM |
| CFRA TRI-CITIES, LLC | Case No. 8:20-bk-03610-CPM |

Debtors.

_____/

### ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL
### OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE SALE FREE AND
### CLEAR OF ALL ENCUMBRANCES, AND (C) AUTHORIZING ASSUMPTION
### AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion (the "Sale Motion")[1] [Docket No. 53] of the above-captioned debtors

and debtors-in-possession (the "Debtors"), for, *inter alia*, entry of an order, pursuant to sections

105, 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"):  (i)

approving the sale of substantially all of the Debtors' assets (the "Purchased Assets"), (ii)

authorizing the sale free and clear of all encumbrances, and (iii) authorizing assumption and

assignment of executory contracts and unexpired leases; and the Court having held a hearing on

June 29, 2020 (the "Sale Hearing") to approve the Sale Motion; and the Court having previously

---

[1]     Capitalized terms not otherwise used herein have the meanings set forth in the Sale Motion.

entered the *Order Approving Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof* (the "Bidding Procedures Order") [Docket. No. 134], and the Court having reviewed and considered (a) the Sale Motion, (b) the objections to the Sale Motion, if any, and (c) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing and after due deliberation thereon; and good cause appearing therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O), and the Court may enter a final order consistent with Article III of the United States Constitution.  The statutory predicates for the relief granted herein are sections 105, 106, 363, 365, 503, 507, and 525 of the Bankruptcy Code.

B.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

C.    Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing and the Debtors' potential assumption and assignment of the contracts and leases listed on **Exhibit A** hereto (the "IHOP Contracts") and **Exhibit B** hereto (the "Designated Contracts" and, collectively with the IHOP Contracts, the "Assigned Contracts") to Suncakes, LLC (the "Purchaser") has been provided in accordance with sections 102(1), 363, 365, 503, and 507 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

2002, 6004, 6006, 9008 and 9014 and the Bidding Procedures Order, and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this Order is required.

D.      A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (1) the Office of the United States Trustee; (2) counsel to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"); (3) counsel to the Lenders; (4) all parties known by the Debtors to assert a lien on any of the Assets; (5) all known creditors of the Debtors; (6) all non-Debtor parties to any of the Assigned Contracts; (7) the Office of the Attorney General in each state in which the Debtors operate; (8) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; and (9) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the date of service.

E.      The Debtors have full corporate power and authority to execute the Asset Purchase Agreement (the "Agreement") attached hereto as **Exhibit C** and incorporated and adopted by reference herein, and all other documents contemplated thereby and consummate the transactions contemplated therein and the sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) to the Purchaser of any Assigned Contracts as provided in the Agreement (collectively, the "Sale") has been duly and validly authorized by all necessary corporate action of the Debtors and no consents or approvals, other than the approval of this Court, are required for the Debtors to consummate such transactions.

F.      The Purchaser is not a successor to or mere continuation of the Debtors or their estates.

G.      The bidding procedures established pursuant to the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets and Assigned Contracts and no higher or better offer has been made.

H.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts and sell the Purchased Assets to the Purchaser, and that approval of the Sale is in the best interests of the Debtors, their estates and creditors.

I.      The Sale must be completed immediately in order to preserve the value of the Purchased Assets and, as a result, good and sufficient business justification exists for the immediate sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser outside of a plan of reorganization.

J.      The Purchaser is not an insider, as that term is defined in the Bankruptcy Code, of the Debtors.  Furthermore, no insiders of the Debtors are receiving or retaining any benefit, property or payments in connection with the Sale except to the extent such insiders may have allowed claims against or equity interests in the Debtors and, as a result, may participate in a distribution in these cases.

K.      The terms of the Sale were negotiated, proposed and entered into by the Debtors and Purchaser without collusion, in good faith, and as a result of arm's-length bargaining.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby with respect to the transactions authorized by this Order (including specifically, but without limitation, any assumption and assignment of executory contracts under section 365 of the Bankruptcy Code).  Neither the Debtors nor the

4

Purchaser has engaged in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

L.       In the absence of a stay pending appeal, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by this Order at any time after the entry of this Order.

M.       The consideration provided by the Purchaser for the Purchased Assets being purchased, including the Assigned Contracts, constitutes the best and highest offer for the Purchased Assets and the Assigned Contracts, and reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, and the District of Columbia.

N.       The Debtors may sell the Purchased Assets and the Assigned Contracts free and clear of all Interests (including, without limitation, those (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtors' or the Purchaser's interest in the Purchased Assets and/or the Assigned Contracts, and (ii) in respect of Taxes, because each entity with an Interest in any of the Purchased Assets and/or Assigned Contracts, has consented to the Sale, is deemed to have consented to the Sale, has a claim which is subject to a *bona fide* dispute, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such Interest.

O.       The Debtors have good and transferable title to the Purchased Assets and the Assigned Contracts  and, accordingly, the transfer of the Purchased Assets and assignment of the Assigned Contracts to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and assignment of the Assigned Contracts.

P.    Neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts will subject the Purchaser to any liability (except those expressly assumed by the Purchaser (the "Assumed Liabilities")) for claims against the Debtors or the Debtors' predecessors or affiliates of any kind or character, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor, vicarious or transferee liability.

Q.    Subject to compliance with the notice provisions for Designated Contracts in Paragraph 6 below, the Purchaser has provided adequate assurance of future performance under the Assigned Contracts, to the extent required by section 365(b)(1)(C) of the Bankruptcy Code.

R.    Upon the assumption and assignment of the Assigned Contracts, as provided herein, the Purchaser shall succeed to all of the right, title and interest of the Debtors under the Assigned Contracts including, without limitation, the right to exercise renewal options which, pursuant to any provision of the applicable Assigned Contract or applicable nonbankruptcy law, are not exercisable by assignees of the Debtors, the Court having found that such provisions, as they relate to the assumption and assignment (or assignment, as applicable) to the Purchaser of the Assigned Contracts, are unenforceable pursuant to sections 363(*l*), 365(e)(1), or 365(f)(3) of the Bankruptcy Code, as applicable.

**NOW, THEREFORE, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED THAT:**

1.    Subject to the terms and conditions of the Bidding Procedures Order, including without limitation Exhibit 4 thereto, which are incorporated herein by reference as if set forth in

full, the Sale Motion, and the relief sought therein (including approval of the Sale) is GRANTED, in all respects as set forth herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.      The Sale, and all of the terms and conditions thereof, is hereby approved.

4.      Pursuant to sections 105(a), 363(b) and 365 of the Bankruptcy Code, the Debtors are authorized and directed to take all actions necessary to consummate the Sale pursuant to and in accordance with the terms and conditions of the Sale and this Order.

5.      As of the date of closing (the "Closing Date"), which date is set forth in the Agreement and in no event shall be later than three (3) business days after entry of this Order by the Court, the IHOP Contracts that are executory contracts or unexpired leases shall be deemed to have been assumed by the Debtors and assigned to the Purchaser pursuant to section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and the Debtors' estates shall be relieved from any liability for any breach of such an Assigned Contract occurring after the Closing Date.  As of the Closing Date, any IHOP Contracts that are not executory contracts or unexpired leases shall be deemed to have been assigned to the Purchaser pursuant to section 363(b) of the Bankruptcy Code.   The closing of the Sale shall be subject to IHOP's consent, and the terms and conditions of that separate Consent Agreement, in a form acceptable to IHOP, between IHOP and the Purchaser.

6.      The Designated Contracts shall not be assumed and assigned, and shall not be deemed to be Assigned Contracts pursuant to this Order unless and until, within fourteen (14) days after entry of this Order, (i) the Purchaser files a notice (a "Designated Contract Notice")

7

stating that one or more Designated Contracts are being assumed and assigned to the Purchaser (which notice shall be served on the affected parties by email, fax or overnight mail) and (ii) the counterparty(s) identified in the Designated Contract Notice do(es) not file an objection within three (3) business days of filing of the Designated Contract Notice.   Purchaser shall designate to be assumed and assigned hereunder such real property leases listed in Exhibit B and as agreed in that separate Consent Agreement between Purchaser and IHOP.   Each Designated Contract Notice shall state the cure amount, if any, the Purchaser proposes to pay to cure defaults with respect to such Designated Contracts, including as may have been agreed to between Purchaser and the applicable counterparty.   Any objection to a Designated Contract Notice shall either (a) supplement a timely objection filed in accordance with the deadlines set forth in the Bidding Procedures or (b) set forth facts and circumstances arising after the date of the Sale Hearing as the basis for the objection.   Upon expiration of the notice period set forth herein or resolution of a timely filed objection, the applicable Designated Contract(s) shall be deemed assumed and assigned to the Purchaser under this Order.   Neither the number of Designated Contracts assumed by the Debtors, nor the cure amounts paid by Purchaser in connection therewith, shall reduce, modify or impact the Purchase Price or the amounts due and payable set forth in paragraphs 4(a) through 4(f) of Addendum A to the Bidding Procedures Order, as modified by paragraphs 12 and 13 of this Order with respect to resolution of mechanic's lien claims, to be paid by the Purchaser at Closing.   For the avoidance of doubt and notwithstanding anything to the contrary herein, and except as otherwise agreed to between the Purchaser and each applicable landlord, after the effective date of each lease assignment, the Purchaser shall remain liable for: (i) amounts owed under the applicable lease that are unbilled or not yet due as of the effective date of the lease assignment, regardless of when such amounts accrued, such as base rent,

common area maintenance, insurance, taxes, and similar charges; (ii) any regular or periodic adjustment or reconciliation of charges under the applicable lease which are not due or have not been determined as of the effective date of the lease assignment; (iii) any percentage rent that may come due under the applicable lease, as the same may be modified hereby; and (iv) indemnification obligations, if any, under the applicable lease.

7.      Notwithstanding the actual date of closing or the date of expiration of any notice period in a Designated Contract Notice, all Assigned Contracts shall be deemed to have been assigned to Purchaser as of June 30, 2020, and Purchaser shall be solely responsible for all obligations arising on and after July 1, 2020 with respect to all Assigned Contracts and all Purchased Assets, including obligations for base rent, common area maintenance, insurance, taxes and similar charges, use and occupancy, storage and/or transport that may be due in connection with any equipment and/or tangible assets included in the Purchased Assets. Additionally, as of July 1, 2020, the Debtors ability to draw under the DIP Loan as provided in the Final Order Authorizing Debtor in Possession Financing dated June 22, 2020 (the "Final DIP Financing Order")[Docket No. 164] shall terminate and Lenders shall have no further obligation to honor draw requests of the Debtors or fund expenses of the bankruptcy estates other than (i) draw requests that may be pending and unfunded as of June 30, 2020;  (ii) any Carve-Out obligations, as set forth under the Final DIP Financing Order and/or Final Order Authorizing Use of Cash Collateral dated June 22, 2020 (the "Final Cash Collateral Order") [Docket No. 163] to the extent same have been included in an Approved Budget and not already funded (including the Professional Fee Carve-Out and the Committee Professional Budget Allowance, as such terms are defined in the Final Cash Collateral Order); and the Post-Termination Carve-Out

37098594.8 07/10/2020

obligations as set forth under the Final DIP Financing Order and/or Final Cash Collateral Order to the extent not already funded.

8.      The Purchase Price (as defined in the Agreement) shall be $4,050,000.  On the Closing Date, from the Purchase Price, the Purchaser shall pay to IHOP the sum of $1,394,000 to cure all defaults required to be cured pursuant to section 365(b)(1)(A) of the Bankruptcy Code with respect to the IHOP Contracts.  In addition to the Purchase Price, Purchaser shall also pay IHOP at Closing the sum of $2,450,000 in accordance with the Bidding Procedures Order. Within two (2) business days after expiration of the applicable notice period set pursuant to a Designated Contract Notice, or within two (2) business days following entry of an order resolving a dispute related thereto, Purchaser shall pay to each affected counterparty the cure amounts listed thereon, which amounts shall be deemed "Cure Amounts" for all purposes hereunder.    On the Closing Date the Purchaser shall likewise pay the full balance of the Purchase Price to the Debtors.

9.      Upon the Closing, subject to paragraph 6, (i) all defaults under the Assigned Contracts required to be cured pursuant to section 365(b)(1)(A) of the Bankruptcy Code shall be deemed cured and all amounts due to the non-debtor parties to such Assigned Contracts pursuant to section 365(b)(1)(B) on account of any pecuniary loss resulting from such defaults shall be deemed paid in full, and (ii) each non-debtor party to such Assigned Contracts that is an executory contract shall be forever bound by such Cure Amounts and enjoined from seeking to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtors, including defaults as to which, pursuant to section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

10.     Any provision in any Assigned Contract that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtors as it relates to the assumption of any Assigned Contract by the Debtors and assignment of such Assigned Contract to the Purchaser is unenforceable, and all such Assigned Contracts shall remain in full force and effect, notwithstanding any such provision.  Unless otherwise agreed to by a landlord of a Designated Contract and the Purchaser, no sections or provisions of any Assigned Contract that purport to provide for additional payments, rent accelerations, assignment fees, increases, payments, deposits, security, charges or any other fees charged to the Purchaser or the Debtors as a result of the assumption and the assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser shall have any force and effect with respect to the transactions contemplated by the Agreement and assignments authorized by this Order, and such provisions are unenforceable under sections 363(l), 365(e)(1), 365(f), or 541(c)(1) of the Bankruptcy Code, as applicable.

11.     Except for any Assumed Liabilities, pursuant to (and to the maximum extent permitted by) sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing under the Agreement, the Purchased Assets and the Assigned Contracts shall be free and clear of all interests of any entity (collectively, "Interests"), including, without limitation, any (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code); (ii) successor, vicarious, or transferee liability against the Purchaser, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent based, in whole or in part, directly or indirectly, on any theory of law, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party

relating to the operation of the Debtors' businesses prior to Closing; (iii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Debtors' or Purchaser's interest in the Assigned Contracts and/or Purchased Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iv) claims in respect of Taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue); and (v) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, with all such Interests to attach to the net proceeds of the Sale (the "Net Proceeds") in the order of their respective priorities, with the same validity, force and effect (if any) which they now have against the Purchased Assets and Assigned Contracts, subject to any claims and defenses the Debtors may possess with respect thereto. For avoidance of doubt, Net Proceeds shall constitute all sale proceeds allocable to the Debtors' estates after payment of those amounts set forth in paragraphs 4(a) through 4(f) of Addendum A (Exhibit 4) to the Bidding Procedures Order, as modified by paragraphs 12 and 13 of this Order with respect to resolution of mechanic's lien claims, and, solely with respect to paragraph 4(f) thereof, as modified by the Final DIP Financing Order and/or Final Cash Collateral Order, all of which disbursements shall be made at Closing and the Debtors are authorized to and shall make the disbursements as set forth on **Exhibit D** hereto at Closing.

12.      The mechanic's lien claims appearing at Docket No. 142 and Proof of Claim No. 8 against CFRA, LLC filed by Etheridge Roofing, Inc. ("Etheridge") with respect to Store Nos. 585 and 2027 are hereby approved and allowed in their entirety in the asserted amounts of $45,078 and $42,789, respectively. Upon the later of: (i) the Closing Date or (ii) the date on

which each lease or sublease, as applicable, for Store Nos. 585 and 2027 is assumed and assigned hereunder, Etheridge shall be paid from the sale proceeds the amounts of $22,539 with respect to its mechanic's lien for Store No. 585 and $21,394.50 with respect to its mechanic's lien for Store No. 2027.   The remaining balance of each of Etheridge's allowed mechanic's lien claims, shall be treated as allowed general unsecured claims in the Debtors' bankruptcy cases. Upon receipt of funds set forth above for each of Store Nos. 585 and 2027, respectively, Etheridge shall provide a release of such liens, in form and substance reasonably satisfactory to the Purchaser.

13.    The mechanic's lien claims appearing at Docket Nos. 87, 88 and 89 filed by Smartvision Construction, LLC ("Smartvision") with respect to Store Nos. 585, 2027 and 4440 are hereby approved and allowed in their entirety in the amounts of $80,950, $72,025 and $92,350, respectively. Upon the later of: (i) the Closing Date or (ii) the date on which each lease or sublease, as applicable, for Store Nos. 585, 2027 and 4440 is assumed and assigned hereunder, Smartvision shall be paid from the sale proceeds the amounts of $40,475 with respect to its mechanic's lien for Store No. 585,  $36,012.50 with respect to its mechanic's lien for Store No. 2027, and $92,350 with respect to its mechanic's lien for Store No. 4440.   The balance of each of Smartvision's asserted mechanic's liens shall be treated as allowed general unsecured claims in the Debtors' bankruptcy cases. Upon receipt of funds set forth above for each of Store Nos. 585, 2027 and 4440, respectively, Smartvision shall provide a release of such liens, in form and substance reasonably satisfactory to the Purchaser.   In consideration of the foregoing, the Debtors, on behalf of their bankruptcy estates, agree to waive and release any and all claims against Smartvision, including but not limited to, any and all claims against Smartvision with respect to potential causes of action under sections 547 or 548 of the Bankruptcy Code.

14.     All persons (including, for the avoidance of doubt, governmental agencies and departments) are hereby enjoined from asserting, prosecuting or otherwise pursuing any claim against the Purchaser to recover on any claims (regardless of when accrued and regardless whether meeting the definition of "claim" under the Bankruptcy Code) such person had, has or may have (other than an Assumed Liability) against (x) the Debtors, their estates, officers, directors, members, the Purchased Assets or the Assigned Contracts, or (y) the Purchaser in connection with the negotiation of, and any agreements contained in, related to or conditioned upon, the Sale.

15.     As of the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in or claims against the Purchased Assets and Assigned Contracts, if any, as such Interests or claims may have been recorded or may otherwise exist.

16.     Each and every federal, state and local governmental agency or department, together with its agents, contractors, and designees, shall be, and hereby is, (i) authorized and directed to accept (A) this Sale Order as sufficient evidence of the transfers of all right, title, and interest in, to, and under the Purchased Assets and the Assigned Contracts, and (B) any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement; and (ii) authorized to rely on this Sale Order in consummating, or facilitating the consummation of, the transactions contemplated by the Agreement.

17.     Upon the occurrence of the Closing, all Interests in, against, or upon the Purchased Assets or the Assigned Contracts shall be unconditionally released, terminated, and discharged without the need for any further action.    Notwithstanding the foregoing, at the Closing, or as soon as practicable thereafter, (x) the Debtors and the Purchaser are hereby

authorized to execute and file such termination statements, instruments of satisfaction, releases, or other documents to reflect the unconditional release, termination, and discharge of such Interests on behalf of such person or entity with respect to the Purchased Assets and the Assigned Contracts, and (y) the Purchaser is hereby authorized on behalf of each holder of a purported Interest to file, register, or otherwise record a copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the unconditional release, termination, and discharge of all Interests in, against, or upon the Purchased Assets or the Assigned Contracts.  The provisions of this Order authorizing the sale of the Purchased Assets free and clear of all Interests are self-executing and, notwithstanding the failure of the Debtors, the Purchaser or any other party to execute, file or obtain termination statements, instruments of satisfaction, releases, or other documents to reflect the release, termination, and discharge of any such Interests, all such Interests shall be deemed divested immediately upon Closing.

18.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date; provided, however, that landlords are not obligated to incur any expense of such surrender and, if such Purchased Assets are in a location of a lease that is not assigned to the Purchaser, the Purchaser shall have two weeks from the date of Closing to remove the Purchased Assets and the applicable landlord will be compensated by Purchaser for the pro rata contractual rent for the period for which the landlord makes its premises available for the Purchaser to remove such Purchased Assets.

37098594.8 07/10/2020

19.     As of the Closing Date, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the transactions contemplated by the Agreement.

20.     Pursuant to, and to the fullest extent permitted by, sections 105(a) and 525 of the Bankruptcy Code, all governmental units are hereby prohibited from denying, revoking, suspending, or refusing to renew any permit, license, or similar grant relating to the operation of the Purchased Assets or the Assigned Contracts on account of the filing or pendency of the Bankruptcy Cases, the consummation of the Sale, or the Debtors' or the Purchaser's failure to pay a debt that is dischargeable in the Bankruptcy Cases or was discharged under the Bankruptcy Code.

21.     To the fullest extent permitted by applicable law, the Purchaser shall be authorized, as of the Closing Date and upon the occurrence of Closing, to operate under any transferred governmental license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

22.     No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the Sale, the Sale Motion and this Order.

23.     For the avoidance of doubt, any privileges, protections or immunities of the Debtors for communications, documents, materials or matters arising at any time, whether before or after the Petition Date, including but not limited to any attorney-client privilege, work product doctrine, common interest or joint defense privilege, relating to any matter whatsoever, including without limitation any matter relating to the negotiation and implementation of the Agreement

16

and any of the transactions contemplated thereby or entered into in connection therewith (collectively, "Privilege") shall not be Purchased Assets under the Sale, and any such Privilege is owned and will continue to be owned by the Debtors, and notwithstanding anything to the contrary herein, the Purchaser shall have no interest in or rights with respect to the Privilege, whether pursuant to this Order, the Agreement or otherwise.  The Privilege shall remain within the sole control of the Debtors and may not be waived by any other person or entity.

24.     Any agreements related to the Sale, may be modified, amended, or supplemented by the Debtors and the Purchaser without further order of the Court, provided that any such modification, amendment, or supplement either is (a) not material or (b) not less favorable to the Debtors than the existing applicable provisions.

25.     This Court shall retain jurisdiction (a) to enforce and implement the terms and provisions of the Sale, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith, (b) to compel delivery of the Purchased Assets and Assigned Contracts to the Purchaser, (c) to resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, and (d) to interpret, implement and enforce the provisions of this Order.

26.     Nothing contained in any plan confirmed in these Bankruptcy Cases or the order confirming any such plan shall conflict with or derogate from the terms and provisions of the Sale or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan, converting the Debtors' bankruptcy cases from chapter 11 to cases under chapter 7 of the Bankruptcy Code, or providing for dismissal of the Debtors' bankruptcy cases.

37098594.8 07/10/2020

27.     The terms and provisions of the Sale, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, creditors, the Purchaser and its affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting a claim against or Interest in the Debtors' estates or any of the Assigned Contracts and the Purchased Assets and any trustee appointed for the Debtors under any chapter of the Bankruptcy Code.

28.     The Purchaser is a party in interest and shall have standing to appear and be heard on all issues related to or otherwise connected with this Order or the Sale.

29.     Notwithstanding anything to the contrary in this Order, nothing set forth herein shall be deemed to limit, impair or affect in any way Debtors' right, title and interest in Debtors' cash and accounts receivable, (collectively, "Accounts Receivable") for services rendered or goods sold prior to the Closing Date, which cash and Accounts Receivable remain the property of the Debtors and shall be reimbursed to the Debtors if received by Purchaser.

30.     Notwithstanding anything to the contrary herein or in any documents relating to the Sale, the Purchased Assets shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action.

31.     The IHOP franchise agreements for the eight (8) locations set forth on **Exhibit E** hereto (the "Terminated Agreements") shall be deemed terminated effective as of the Closing Date. Notwithstanding this paragraph, the Purchaser shall cooperate with IHOP and provide

IHOP access to the properties associated with the Terminated Agreements, not less than fourteen days prior to the date on which the leases with respect to such properties are rejected, to allow IHOP, to the extent not addressed by separate agreements between IHOP and the Purchaser, to effectuate the de-identification of the properties, including but not limited to the repainting of roofs and the removal of signage.

32.    The franchise agreements with respect to the forty-one (41) locations shown on **Exhibit F** shall be deemed terminated as of the Closing Date. The Purchaser, upon the entry of the Order, agrees to and shall enter into new franchise agreements, based upon the form franchise agreements disclosed to the Purchaser in connection with the franchise disclosure document, with respect to the forty-one (41) locations shown on Exhibit F, subject to the Purchaser's designation rights with respect to the Designated Contracts, which shall be entered into after the Closing Date and in accordance with Paragraph 6 of the Sale Order and the Consent Agreement.

33.    Effective upon the waiver by IHOP as set forth in paragraph 5 of Addendum A (Exhibit 4) to the Bidding Procedures Order, the Debtors on behalf of themselves and their estates and any party authorized to assert claims on behalf of the estate waive, release, and agree that they shall neither assert nor possess any further or additional claims against IHOP, arising prior to the date of the Closing.

34.    Notwithstanding the provisions of Fed. R. Bankr. P. 6004(h), 6006(d), and 7062, this Order shall be effective and enforceable immediately upon its entry.

# # #

*(Carmen Contreras-Martinez, Esq. is directed to serve a copy of this Order on interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of this Order.)*

# **EXHIBIT A**

# **IHOP CONTRACTS**

| Contract Counterparty | Contract/Lease | Debtor Party |
|---|---|---|
| IHOP Properties, Inc. | Sublease – Store #470 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #476 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #477 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #491 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #492 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #498 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #574 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #585 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #587 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #595 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4403 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4405 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4407 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4408 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4414 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4416 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4417 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4423 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4424 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4431 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4442 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4448 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4451 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4458 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease –Store #4505 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #4506 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #470 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #476 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #477 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #491 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #492 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #498 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #574 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #585 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #587 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #595 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4403 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4405 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4407 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4408 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4414 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4416 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4417 | CFRA, LLC |

| Contract Counterparty | Contract/Lease | Debtor Party |
|---|---|---|
| IHOP Properties, Inc. | Equipment Lease – Store #4423 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4424 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4431 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4442 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4448 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4451 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4458 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4505 | CFRA, LLC |
| IHOP Properties, Inc. | Equipment Lease – Store #4506 | CFRA, LLC |
| IHOP Properties, Inc. | Sublease – Store #589 | CFRA Tri-Cities, Inc. |
| IHOP Properties, Inc. | Sublease – Store #4435 | CFRA Tri-Cities, Inc. |
| IHOP Properties, Inc. | Sublease – Store #4440 | CFRA Tri-Cities, Inc. |
| IHOP Restaurants, Inc. | Equipment Lease – Store #589 | CFRA Tri-Cities, Inc. |
| International House of Pancakes, Inc. | Equipment Lease – Store #4435 | CFRA Tri-Cities, Inc. |
| IHOP Restaurants, Inc. | Equipment Lease – Store #4440 | CFRA Tri-Cities, Inc. |

## **EXHIBIT B**

## **DESIGNATED CONTRACTS**

| Contract Counterparty | Contract/Lease | Debtor Party |
|---|---|---|
| Assembly Restaurant, LLC | Lease – Store #419 | CFRA, LLC |
| C&J Associates | Lease – Store #494 | CFRA, LLC |
| 6851 Lennox, LLC | Lease – Store #597 | CFRA, LLC |
| Alcimedes, Inc. | Lease – Store #2027 | CFRA, LLC |
| NorthCross Land & Development, LLC | Lease – Store #3139 | CFRA, LLC |
| Casual Dining Smyrna, LLC | Lease – Store #3218 | CFRA, LLC |
| Nashville West Shopping Center, LLC | Lease – Store #3326 | CFRA, LLC |
| DDR Cotswold, LLC | Lease – Store #3327 | CFRA, LLC |
| Cooke Properties | Lease – Store #3383 | CFRA, LLC |
| Ballantyne Property Group, LLC | Lease – Store #3423 | CFRA, LLC |
| Promenade Shopping Center, LLC | Lease – Store #3453 | CFRA, LLC |
| Mitchell Montgomery I, LLC | Lease – Store #3502 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #419 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #491 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #492 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #494 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #574 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #587 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #597 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #2027 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #3218 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #4405 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #4408 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #4414 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – | CFRA, LLC |

| Contract Counterparty | Contract/Lease | Debtor Party |
|---|---|---|
| | Store #4417 | |
| Ecolab, Inc. | Dishwasher Lease – Store #4423 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #4448 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #4505 | CFRA, LLC |
| Ecolab, Inc. | Dishwasher Lease – Store #4403 | CFRA, LLC |
| Arc3 Gases South | $CO_2$ Gas & Fixtures Contract | CFRA, LLC |
| Aramark Uniform Services | Uniforms Contract | CFRA, LLC |
| Pye Barker Fire and Safety | Fire Safety Services Agreement | CFRA, LLC |
| ROS Technology Services Inc. | Labor Management Software | CFRA, LLC |
| ROS Technology Services Inc. | POS sales tracking | CFRA, LLC |
| ROS Technology Services Inc. | Website, email and technology | CFRA, LLC |
| ROS Technology Services Inc. | Software | CFRA, LLC |
| ROS Technology Services Inc. | Uniform services agreement | CFRA, LLC |
| Dr Pepper/Seven Up, Inc. | Fountain Support Agreement | CFRA, LLC |

# **EXHIBIT C**

# **SALE AGREEMENT**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the " *Transaction Agreement*") is made as of the 30th day of June, 2020 (the "*Effective Date*"), by and among **CFRA Holdings, LLC; CFRA, LLC; and CFRA Tri-Cities, LLC** (individually and/or collectively as the case may be, "*DEBTORS*" or "Debtors")), and **Suncakes, LLC** ("*BIDDER*" or **"Bidder"**).

## R E C I T A L S

A.      DEBTORS currently own and operate forty-nine (49) IHOP Restaurants.

B.      DEBTORS wish to sell, transfer and convey to BIDDER and BIDDER wishes to purchase from DEBTORS, the property interests relating to  forty-one (41) of the Debtors' Restaurants and equipment relating to all forty-nine (49) of the Debtors' Restaurants on the terms and conditions set forth herein.

C.      On May 6, 2020, DEBTORS filed for protection under Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "*Bankruptcy Court*") in the matter styled *In re CFRA Holdings, LLC, et al.,* jointly administered under Case No. 8:20-bk-03608-CPM (the "*Bankruptcy Case*").

D.      On June 10, 2020, the Bankruptcy Court entered that certain Order Approving Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof [D.E. # 134] ("*Bidding Order*") pursuant to which the DEBTORS have been authorized to market their Assets (as defined in the Bidding Order) in accordance with the bid procedures ("*Bid Procedures*") set forth and approved therein.

E.      On June 11, 2020, the DEBTORS filed that certain Notice of Assumption, Assignment and Cure Amount with Respect to Executory Contracts and Unexpired Leases of the Debtors [D.E.# 145] (the "*Assumption Notice*") as required by the Bid Procedures which set forth, *inter alia,* a list of Assumed Contracts (as defined in the Assumption Notice") pertaining to, amongst others, the Restaurants ( as defined herein).  For avoidance of doubt the Assumption Notice does not list the Debtors' executory contracts and unexpired leases between the Debtors and IHOP (as defined in the Bidding Order), including subleases, equipment leases and franchise agreements.

## REPRESENTATIONS AND DISCLOSURES OF BIDDER
## PURSUANT TO THE BIDDING PROCEDURES

i. Bidder seeks to purchase and/or take assignment of the Debtors' real property interests related to forty-one (41) of the Debtors' restaurants ("*Restaurants*") as set forth in more detail on Exhibit A hereto, including the related IHOP leases associated therewith, including both subleases and equipment leases, as applicable within the Restaurants.  Bidder further seeks to purchase all equipment owned by the Debtors in all forty-nine of the Debtors' Restaurants.  For avoidance of doubt, nothing herein shall be deemed to constitute a sale of equipment or other assets owned by IHOP, including equipment leased by IHOP to the Debtors.

ii. Bidder is Suncakes, LLC, a Texas Limited Liability Company.  Bidder is not an insider (as defined in section 101 of the Bankruptcy Code) of any Debtor.  The contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors wish to discuss the bid submitted by the BIDDER (or BIDDER Qualifying Bidder is:

**Mr. Peter Lewis, Esq.**
Scheef and Stone, LLP
500 N. Akard, Suite 2700
Dallas, Texas 75201
Direct (214) 706-4241
Fax (214) 472-4242
peter.lewis@solidcounsel.com

iii. The purchase price to be paid by Bidder, is Four Million, Fifty Thousand and 00/100 Dollars, (U.S. $4,050,000.00), one hundred percent of which will be paid in cash at closing. In addition, Bidder shall separately pay IHOP the sum of $2,450,000 in cash at closing.  Bidder will separately cure defaults as necessary to assume executory contracts and unexpired leases for the Restaurants purchased hereunder – other than with respect to cure amounts to IHOP with respect to real property leases and equipment leases between the Debtors and IHOP, which cure payment, in the amount of $1,394,000, shall be paid from purchase price;

iv. (a) Bidder shall be responsible for any transfer or similar taxes that arise from the Sale; (b) Bidder shall be responsible for any cure costs required to be paid to assume and assign non-IHOP executory contracts and unexpired leases that are included in the bid - which cure costs shall include all outstanding amounts due under said executory contracts and unexpired leases (before and after the filing of the Debtors' bankruptcy cases) through the closing of the applicable Sale and be payable at closing directly to the non-debtor parties to said executory contracts and unexpired leases unless otherwise agreed to by the non-debtor parties to said executory contracts and unexpired leases.  Notwithstanding the foregoing, the assumption and assignment of all non-IHOP executory contracts and unexpired leases shall be subject to a 2-week designation period (the "*Designation Period*") as set forth in the Sale Order (as defined below) during which time the Bidder may negotiate with the counterparties with respect to the terms of any proposed assumption and assignment of such contracts and leases, and may otherwise exercise the designation rights as set forth in the Sale Order with respect thereto.  Nothing in the Bidder's exercise or non-exercise of rights during the Designation Period shall reduce, modify, delay or otherwise impact the Bidder's obligation to timely pay the Purchase Price and separate payment to IHOP at Closing as provided herein;

v. Bidder commits to close the transactions contemplated by the Transaction Agreement within three (3) business days after entry of the order approving the Sale.  Notwithstanding the foregoing, and regardless of the date on which closing actually occurs, from and after July 1, 2020: (i) Bidder shall be responsible for all carrying costs with respect to the Debtors' assets, including without limitation use and occupancy expenses related to the storage and maintenance of the equipment being purchased by Bidder, (ii) Bidder shall be responsible for providing adequate insurance with respect to all of the Debtors' locations and the equipment being sold to Bidder hereunder; and (iii) all other costs and charges reasonably imposed with respect to the assets being purchased by the Bidder hereunder;

vi. Bidder acknowledges and represents that it (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale, and (iv) has not entered into any agreement with any other potential bidder concerning the Auction or the Sale or discloses any agreement with any other potential bidder concerning the Auction or Sale.  Notwithstanding anything to the contrary in the foregoing, this representation shall not inure to the benefit of any person not a party to this Transaction Agreement, nor shall any such stranger to this Transaction Agreement be considered a

third party beneficiary of this Transaction Agreement.

vii. The Transaction Agreement is not subject to contingencies of any kind, including, including without limitation, contingencies related to financing, due diligence or third party, regulatory or internal approval;

viii. Bidder has obtained any required internal corporate, legal or other authorizations to close a sale transaction and possesses sufficient financial resources to assure future performance as required under section 365 of the Bankruptcy Code.

**TO THE EXTENT THAT THESE DISCLOSURES AND REPRESENTATIONS CONFLICT WITH ANY OTHER PROVISION IN THIS TRANSACTION AGREEMENT, THESE DISCLOSURES AND REPRESENTATIONS SHALL CONTROL**.

**W I T N E S S E T H**

NOW, THEREFORE, in consideration of the following mutual covenants and representations, the parties hereby agree as follows:

1. **DEFINITIONS**

As used in this Agreement, the terms below have the following meanings.  Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the context.

1.1    "*Affiliate*" means a Person which directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with a specified Person.

1.2    "*Agreement*" means this Asset Purchase Agreement.

1.3    "*Ancillary Agreements*" means the following: (a) the Lease Assignments, (b) the Owned Master Property Lease, (c) the Bill of Sale, (d) the Assignment and Assumption of Executory Contracts, and (e) any other written agreement or document entered into in connection with or for Closing.

1.4    "*Authority*" means any federal, state, municipal, local or other governmental department, commission, board, bureau, agency or instrumentality, or any administrative, judicial or arbitration court or panel, with jurisdiction over the applicable matter.

1.6    "*Claim*" means any known claim, demand, dispute, lawsuit, litigation, arbitration or mediation, or any other proceeding before a judicial, administrative or arbitration court or panel, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable.

1.7    "*Closing*" means the simultaneous payment of funds by wire transfer from BIDDER to DEBTORS and, subject to the Designation Period set forth in the Sale Order with respect to non-IHOP contracts and leases, the assumption, transfer and conveyance of the Purchased Assets, the Restaurants, and a leasehold interest in the Properties, from DEBTORS to BIDDER, and assumption of Executory Contracts by BIDDER as required under this Agreement and the Sale Order.

1.8    "*Closing Date*" means the date on which the Closing occurs, which shall be not later than three (3) business days after entry of the Sale Order.  The Closing may be extended as necessary to obtain the Franchisor Approval, or satisfy any other condition herein, providing each party is acting in good faith

and continues to use its commercially reasonable efforts to obtain the same.

1.9     "***Damages***" means any and all losses, shortages, damages, liabilities (contingent or otherwise), diminution of value, payments, obligations, expenses (including reasonable and documented attorneys' and accountants' fees), assessments or taxes sustained, suffered or incurred by DEBTORS or BIDDER arising from or in connection with any such matter that is the subject of indemnification under Section 16 of this Agreement.

1.10     "***Deposit***" means the earnest money deposit paid by BIDDER to Escrow Agent by wire transfer of funds in the amount of <u>Five Hundred Thousand</u> and NO/100 Dollars ($500,000.00).  The Deposit becomes non-refundable to BIDDER upon consummation of this Transaction Agreement.

1.13     "***Excluded Assets***" is defined in Section 2.8 of this Agreement.

1.14     "***Executory Contracts***" means the agreements and contracts related to the Restaurants, as set forth on Exhibits A and B to the Sale Order.

1.15     "***Existing POS***" means the "back of the office" server and Software for the Purchased POS Assets.

1.16     "***Existing Lease***" and collectively, "***Existing Leases***" mean the leases that will be assigned from DEBTORS to BIDDER at Closing for the Leased Properties, subject to the Designation Period set forth in the Sale Order.

1.17     "***Franchise Agreements***" means those certain Franchise Agreements between BIDDER and Franchisor for the Restaurants.

1.18     "***Franchise Assignments***" means that certain assignment of Franchise Agreement for each Restaurant to be delivered at Closing to BIDDER in a form mutually agreed upon by Franchisor, DEBTORS and BIDDER.

1.19     "***Franchisor***" means IHOP.

1.20     "***Franchisor Approval***" means DEBTORS and BIDDER shall have obtained (i) a waiver from Franchisor whereby Franchisor waives any and all rights of first refusal to acquire any or all of the Restaurants existing in favor of Franchisor by virtue of and pursuant to the Franchise Agreements (the "***Franchisor ROFR***"); and (ii) Franchisor's approval of the sale of the Restaurants to BIDDER.

1.21     "***Franchisor Marks***" means the trademarks, service marks, trade dress, logos, slogans, designs and other commercial symbols and source-identifying indicia (and the goodwill associated therewith) used in the operation of quick service restaurants operated under Franchisor's trade name throughout the United States, whether registered, applied for or unregistered.

1.22     "***Franchisor Restaurants***" means a quick service or fast food restaurant operated by Franchisor or by legitimate franchisees of Franchisor under the Franchisor System and utilizing the Franchisor Marks.

1.23     "***Franchisor System***" means the unique restaurant format and operating system developed by Franchisor and/or its Affiliates for the development and operation of quick service or fast food restaurants.

1.24    "***Fundamental Representations***" is defined in Section 16.6 of this Agreement.

1.25    "***Indemnified Person***" is defined in Section 16.3 of this Agreement.

1.26    "***Indemnifying Person***" is defined in Section 16.3 of this Agreement.

1.27    Omitted

1.28    "***Knowledge***" means, with respect to DEBTORS, the actual knowledge of the officers of DEBTORS.

1.29    "***Law***" and collectively, "***Laws***" means any laws, rules, statutes, decrees, regulations, ordinances or orders, including all applicable public, environmental, and competition laws and regulations; and any administrative decisions, judgments and other pronouncements enacted, issued, promulgated enforced or entered by any Authority.

1.30    "***Lease Assignments***" means that certain Assignment and Assumption of Lease for each Leased Property to be delivered by DEBTORS at Closing to BIDDER, or upon completion of the Designated Contract Notice provisions set forth in paragraph 6 of the Sale Order, in form and substance reasonably acceptable to Bidder.

1.31    "***Liens***" means any mortgage, pledge, security interest, encumbrance or other lien of any kind.

1.32    "***Notice of Claim***" is defined in Section 16.3 of this Agreement.

1.33    "***Office Equipment***" means all of the personal property and equipment used by DEBTORS in the administration of the Restaurants as such personal property is located at the Restaurants.

1.35    "***Permitted Exceptions***" means: (i) statutory liens for current Taxes or other governmental charges with respect to the Properties not yet due and payable; (ii) zoning, entitlement, building and other land use regulations imposed by Governmental Authorities having jurisdiction over the Properties which are not violated by the improvements located on the Properties or the current use and operation of the Properties; (iii) any standard utility easements which do not or will not materially interfere with the use of the Properties; (iv) matters caused by the actions of BIDDER; and (v) such other covenants, conditions, restrictions and easements of record affecting title to the Properties as shall be acceptable by BIDDER pursuant to Section 18.5 of this Agreement.

1.36    "***Person***" means any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, organization or other entity.

1.37    "***Properties***" individually and collectively, means the real property upon which the Restaurants are located, together with the Restaurant building and any other improvements thereon, and all rights under any easement agreement, declaration of covenants or other real property agreement burdening or benefitting each such Restaurant excluding, however, the Excluded Assets.  The addresses of the Properties are listed on Exhibit A attached to this Agreement.

1.38    "***Property Taxes***" means any and all real estate (other than real property transfer or gains) and personal property taxes, assessments, and charges (either certified and/or pending)  which may be levied upon the Properties, Restaurants or any of the Purchased Assets.

1.39    *"Purchased Assets"* means all of Debtors' interest in (i) the Purchased Equipment, (ii) maintenance tools, equipment and parts used in the operation and/or repair of the Restaurants, (iii) Executory Contracts to the extent assumed and assigned to Bidder pursuant to the Sale Order, including but not limited to as described in Paragraph 5 of the Sale Order and Exhibits A and B thereto, and (iv) subject to the provisions of Section 2.7 of this Agreement, the Purchased POS Assets.

1.40    *"Purchased Equipment"* means all Debtors' interest in the furniture, trade fixtures, telephone numbers, assignable permits and restaurant equipment used in connection with and located at each Restaurant and at each of the Debtors' other 8 locations at Takeover and all existing warranties relating thereto, including the Office Equipment, but excluding (i) any equipment or personal property which is leased to DEBTORS pursuant to an Executory Contract and (ii) any vendor provided equipment. Bidder shall be responsible for removal of all Purchased Equipment from each of the Debtors' other 8 locations.

1.41    Omitted.

1.42    Omitted.

1.43    *"Purchased POS Assets"* means the point of sale equipment and computers (excluding any Software and the Existing BOS) used in connection with and located at the Restaurants at Takeover, to the extent owned by the Debtors.

1.44    *"Purchase Price"* means FOUR MILLION, FIFTY THOUSAND AND 00/100 DOLLARS, (U.S. $4,050,000.00), which amount shall not include the sum of $2,450,000 that Bidder shall pay to IHOP in cash at closing.  For avoidance of doubt, the Purchase Price shall not be affected in any way by the number of contracts or leases ultimately assumed and assigned to the Bidder at the completion of the Designation Period and the procedures related thereto in the Sale Order.

1.45    Omitted.

1.46    *"Restaurant"* and collectively, *"Restaurants"* means the restaurants whose Purchased Assets and Executory Contracts are being sold, transferred, conveyed and/or assigned to BIDDER pursuant to this Agreement and the Sale Order.  All of the Restaurants are identified by restaurant number and are set forth on Exhibit A to this Agreement.

1.47    *"Restaurant Bank Amount"* is defined in Section 2.4 of this Agreement.

1.48    *"Software"* means the computer software programs used by, with and at the Restaurants, to the extent owned by the Debtors.

1.49    *"Standards"* means the standards, specifications and procedures for Franchisor's Restaurants issued, directed and amended by Franchisor and/or its Affiliates from time to time, in their sole discretion.

1.50    *"Takeover"* means the transfer of possession of the operation of the Restaurants, which shall occur at 12:01 a.m. on the Takeover Date, provided that, notwithstanding anything to the contrary herein, from and after July 1, 2020: (i) Bidder shall be responsible for all carrying costs with respect to the Debtors' assets, including without limitation use and occupancy expenses related to the storage and maintenance of the equipment being purchased by Bidder, (ii) Bidder shall be responsible for providing adequate insurance with respect to all of the Debtors' locations and the equipment being sold to Bidder hereunder; and (iii) Bidder shall be responsible for all other costs and charges reasonably imposed with

respect to the assets being purchased by the Bidder hereunder.

1.51    *"Takeover Date"* means the date on which Takeover occurs, which shall be the Closing Date.

1.52    *"Third Party ADA Claim"* means the assertion of liability or Damages by any Person other than BIDDER, DEBTORS, or any Affiliate of any of the foregoing based on a violation of the Americans with Disabilities Acts Title III at any of the Restaurants.

1.53    *Omitted.*

2.    **SUBJECT MATTER**

2.1.    Transfer of Purchased Assets.

Upon the terms and subject to the conditions contained in this Agreement, at Closing, DEBTORS shall sell, convey, transfer, assign and deliver, free and clear of all Claims, liabilities, liens and obligations other than those specifically set forth in this Agreement or any of the Ancillary Agreements, Debtors' interest in the Purchased Assets, and BIDDER shall purchase the Purchased Assets.

2.2.    Purchased Equipment.

At the Closing, BIDDER agrees to purchase from DEBTORS, and DEBTORS agrees to sell and deliver to BIDDER, the Purchased Equipment located at each of the Restaurants and at each of the Debtors' eight (8) other restaurant locations.

2.3.    Omitted.

2.4.    Omitted.

2.5    Properties.

At the Closing, or upon completion of the Designated Contract Notice process as set forth in the Sale Order, as applicable, BIDDER agrees to purchase and assume from DEBTORS, and DEBTORS agrees to sell, assign and deliver to BIDDER, all of Debtors' rights, as of the Closing Date, in and to the Leased Properties, all of Debtors' rights and obligations, arising on after the Takeover Date, under the Existing Leases.  DEBTORS shall provide BIDDER with copies of the Existing Leases for the Leased Properties.

2.6.    Liabilities Assumed.

Subject to conclusion of the Designation Period and the process related thereto as set forth in the Sale Order, BIDDER agrees to cure those defaults as necessary to assume executory contracts and unexpired leases pertaining to the Restaurants, which contracts are assumed and assigned to Bidder pursuant to the Sale Order.  Except as set forth in the immediately preceding sentence, and for obligations arising on and after July 1, 2020 under executory contracts and unexpired leases, Bidder shall not assume liabilities of Debtors.

2.7.    POS Equipment and Software**.**

Effective at Takeover, DEBTORS shall assign to BIDDER the POS hardware and Software for the Purchased POS Assets.  Except as aforesaid, the existing Software and licenses shall not be assigned or transferred to BIDDER at Closing.  Except for the software described in the first sentence of this paragraph, on or before the Closing, BIDDER, at its sole cost and expense, shall be required to purchase and enter into new software and license agreement(s) with a Franchisor approved vendor that licenses the software programs for the Purchased POS Assets.  BIDDER acknowledges that the Purchased POS Assets are connected to telephone/data lines that transmit product mix information that is important to the planning process within the Franchisor System to Franchisor.

2.8     <u>Omitted</u>.

**3.**     *Omitted.*

**4.**     **<u>PURCHASE PRICE AND PAYMENT</u>**

On the Closing Date, BIDDER shall pay to DEBTORS the Purchase Price and shall pay to IHOP the sum of $2,450,000 in cash.

**5.**     **<u>REPRESENTATIONS AND WARRANTIES OF DEBTORS</u>**

5.1     <u>Corporate Existence</u>.  Each of the Debtors is a limited liability company duly organized, validly existing, and in good standing.  Debtors have full power and authority and all licenses necessary to own and operate their properties and to carry on the business as now conducted.  Debtors are not in default under or in violation of any provision of their organizational documents.

5.2     <u>Authorization of Transactions</u>.  Subject to entry of the Sale Order, Debtors have all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which they are a party and to consummate the transactions contemplated hereby and thereby.  Subject to entry of the Sale Order, Debtors have duly approved this Agreement and the Ancillary Agreements to which they are a party and have duly authorized the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby.  Other than entry of the Sale Order and approval of the Bankruptcy Court, no other proceeding, corporate or otherwise, on the part of Debtors are necessary to approve and authorize the execution and delivery of this Agreement and the Ancillary Agreements to which they are a party and the consummation of the transactions contemplated hereby and thereby.  Subject to entry of the Sale Order, this Agreement has been duly executed and delivered by DEBTORS and constitutes the valid and binding agreement of DEBTORS, enforceable against it in accordance with its terms.

5.3     <u>Absence of Conflicts</u>.  Subject to entry of the Sale Order, the execution, delivery and performance by DEBTORS of this Agreement and each of the other Ancillary Agreements to which they are a party, the consummation of the transactions contemplated hereby and thereby, and the fulfillment of and compliance with the terms and conditions hereof and thereof do not and will not, with or without the passing of time or the giving of notice, or both:

(a)     violate or conflict with any provision of the organizational documents of DEBTORS;

(b)     violate any statute, ordinance, law, rule, regulation, judgment, order or decree of any court or other governmental authority to which Debtors are subject;

(c)     require any consent, approval, order or authorization of, notice to, or filing,

37157267.4 07/10/2020

recording, registration or qualification with any, Authority, other than approval of the Bankruptcy Court; or

        (d)       result in the creation of any lien upon any of the Purchased Assets.

.

      5.4    <u>Title</u>.  Debtors have good and marketable title to all of the Purchased Assets, which as of Closing will be subject to no liens, mortgages, pledges, encumbrances or charges of any kind except the Permitted Exceptions.

      5.5    <u>Pending Claims</u>.  Debtors have no knowledge and have not received written notice, of any pending or threatened Claims (including condemnation, taking or eminent domain proceedings) with respect to the Restaurants which would be binding on BIDDER, and the Sale Order shall provide that the conveyance of the Purchased Assets to Bidder shall be free and clear of all liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code.

      5.6    <u>Defaults</u>.  Upon assumption and assignment pursuant to section 365 of the Bankruptcy Code as set forth in the Sale Order, Debtors shall not be in default with respect to any of the Existing Leases or Executory Contracts in relation to the Restaurants.

      5.7    <u>Compliance with Laws</u>.  Debtors have not received written notice that it is/they are currently not in compliance with any Laws with respect to the Restaurants.  Debtors have complied, in all material respects, with all Laws related to the payment of sales tax, unemployment insurance or related tax.

      5.8    <u>Properties</u>.  Each of the DEBTORS hereby represents and warrants the following in addition to those representations and warranties of DEBTORS set forth above:

        (a)       To Debtors' knowledge, upon entry of the Sale Order and the remittance of the payments required thereunder, there are no known Claims against or affecting the Properties;

        (b)       To DEBTORS' knowledge, Debtors have not received any written notice that it/thesis/are in violation of any federal, state or local law, code or ordinance in effect as of the Closing Date, and all rules and regulations promulgated there under, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act ("***CERCLA***"), 42 U.S.C. §§ 9601 et seq., the Resource Conservation and Recovery Act ("***RCRA***"), 42 U.S.C. §§ 6901 et seq., or The Toxic Substance Control Act ("***TSCA***"), 15 U.S.C. §§ 2601 et seq.;

        (c)       The Existing Leases are in effect, and all amounts due and owing by DEBTORS pursuant to the Existing Leases prior to Closing will be paid by BIDDER as provided herein and in the Sale Order;

        (d)       To Debtors' knowledge, Debtors have a primary leasehold interest or subleasehold interest in the Leased Properties, with no other tenant or occupant having a right of occupancy in the Properties, and, upon entry of the Sale Order and the remittance of the payments required thereunder, otherwise free and clear of all liens except the Permitted Exceptions.

        (e)       Except as disclosed to BIDDER, there are no leases, service contracts, management agreements, or other agreements or instruments in force and effect, oral or written, to which Debtors are a party or of which Debtors have knowledge that grant to any Person any right, title, interest,

or benefit in or to all or any part of the Properties or any rights relating to the use, operation, management, maintenance, or repair of all or any part of the Properties;

(f)    There are no delinquent real estate Taxes for the Properties, and no delinquent installments for assessments for public improvements which will remain unpaid after Closing;

(g)    Debtors have not received any written notice of pending or threatened condemnation, taking or eminent domain proceedings related to the Properties, other than with respect to the Restaurant at 1161E Broad Streeet, Statesville, North Carolina, of which Bidder has been made aware, or affecting Debtors' right to convey their interest in the Properties.  Other than with respect to the Debtors' pending Bankruptcy Cases, neither DEBTORS nor any portion of the Properties are subject to the terms of any decree, judgment or any action or any court, administrative agency or arbitrator;

(h)    Debtors have not received any written notice from any municipal, state, federal or other governmental authority and has no knowledge of any zoning, land use, environmental, building, fire, water, use, health or other statute, ordinance, code or regulatory violations issued with respect to the Properties.  Debtors have not received any notice of any pending public improvements in or about any portion of the Properties which could result in a special assessment or any reassessments against or affecting the Properties;

(i)    To Debtors' knowledge, other than with respect to a water leak at store #3327, there are no material structural defects with regards to any of the improvements at any of the Properties.  The plumbing, electrical, HVAC, telephone and other applicable systems at the Properties are in substantially the same condition at Closing as the condition of the plumbing, electrical, HVAC, telephone and other applicable systems at the Properties at the time of the Debtors' filing of their petitions in bankruptcy, normal wear and tear excepted;

(j)    To Debtors' knowledge, the Properties have available all utility services that are required for the operation of the Restaurants as currently conducted on the Properties;

(k)    To Debtors' knowledge, they have complied and through the Closing will continue to comply in all material respects with all Laws with respect to the Properties and otherwise; and

(l)    DEBTORS shall maintain the Properties through July 1, 2020 in substantially the same manner as they have been maintained prior to the Effective Date.

5.9    Closing.  As of Closing, all of Debtors' representations, warranties and covenants in this Agreement shall be true and correct in all material respects.

5.10    Omitted.

5.11    Disclosure/Transaction Due Diligence.  To Debtors' knowledge, the Transaction Due Diligence provided to BIDDER by DEBTORS are complete and accurate and copies of all such documents which are known by DEBTORS to relate to the Restaurants, the Properties and the Properties and which are in the possession or control of DEBTORS have been provided to BIDDER.

5.12    Omitted.

5.13    Brokers.  Other than DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Debtors have engaged no broker, finder, intermediary, or other Person acting in a similar capacity who may have been involved in this transaction that would be entitled to a fee or commission upon its

consummation. DEBTORS shall be solely liable for any and all amounts owed to the above named broker at Closing, and shall provide written confirmation that such broker has been or is currently being fully paid any and all fees related to the Restaurants and this Agreement and the transaction hereunder, subject to any requisite approvals by the Bankruptcy Court. DEBTORS shall indemnify, defend and hold harmless BIDDER from any Claims inconsistent with the foregoing representation.

5.14    Omitted.

5.15    Omitted.

5.16    Omitted

5.17    Asset Preservation. DEBTORS shall maintain the Purchased Assets through July 1, 2020 in the condition existing as of the Effective Date. The Purchased Equipment shall be the equipment used to operate the Restaurants as of the Effective Date, subject to replacements of equal or greater value occurring in the ordinary course of business.

5.18    Purchased Assets. DEBTORS shall convey the Purchased Assets to Bidder in "as is" and "where is" condition as of the Closing Date.

5.19    No Additional Representations.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER DEBTORS NOR ANY OF THEIR AGENTS OR PERSONS ACTING ON THEIR BEHALF MAKE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO THE PURCHASED ASSETS, EXECUTORY CONTRACTS, PROPERTIES, RESTAURANTS OR OTHER PROPERTY THAT IS THE SUBJECT OF THIS AGREEMENT, AND DEBTORS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY NOT EXPRESSLY SET FORTH IN THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BIDDER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE RESTAURANTS, THE PURCHASED ASSETS, EXECUTORY CONTRACTS, PROPERTIES, RESTAURANTS OR OTHER PROPERTY THAT IS THE SUBJECT OF THIS AGREEMENT BIDDER IS RELYING SOLELY ON ITS OWN INVESTIGATION AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ANY DEBTORS. DEBTORS WILL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO SUCH ASSETS, OR THE OPERATION THEREOF, FURNISHED BY ANY AGENT, EMPLOYEE OR OTHER PERSON, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT.

## 6.    REPRESENTATIONS AND WARRANTIES OF BIDDER

6.1    Existence. BIDDER is a limited liability company duly organized, validly existing and in good standing, has the limited liability power to own its properties and to carry on its business as it is now being conducted.

6.2.    Authorization. BIDDER has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. BIDDER has duly approved this Agreement and the Ancillary Agreements to which it is a party and has duly authorized the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the transactions contemplated hereby and

thereby.  No other proceeding, corporate or otherwise, on the part of BIDDER is necessary to approve and authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by BIDDER and constitutes the valid and binding agreement of BIDDER, enforceable against it in accordance with its terms.

6.3    Absence of Conflicts.  The execution, delivery and performance by BIDDER of this Agreement and each of the other Ancillary Agreements to which it is a party, the consummation of the transactions contemplated hereby and thereby, and the fulfillment of and compliance with the terms and conditions hereof and thereof do not and will not, with or without the passing of time or the giving of notice, or both:

(a)    violate or conflict with any provision of the organizational documents of BIDDER;

(b)    violate any statute, ordinance, law, rule, regulation, judgment, order or decree of any court or other governmental authority to which BIDDER is subject; or

(c)    require any consent, approval, order or authorization of, notice to, or filing, recording, registration or qualification with any, Authority.

6.4    Consents.  The consent or approval of a third party is not required in order that BIDDER may enter into this Agreement or into any Ancillary Agreement.

6.5    Brokers.  Other than Jim Avallone of DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, whose commissions and fees are the sole responsibility of DEBTORS, BIDDER has dealt with no broker, finder, intermediary, or other Person acting in a similar capacity who may have been involved in this transaction that would be entitled to a fee or commission upon its consummation. BIDDER shall indemnify, defend and hold harmless DEBTORS from any Claims inconsistent with the foregoing representation.

6.6    Certain Acknowledgements.  BIDDER acknowledges and agrees that Debtors have not made any representations or warranties regarding DEBTORS, the Franchisor System, the Purchased Assets, Executory Contracts, Existing Leases, Properties, Restaurants or operations of the business or otherwise in connection with the transactions contemplated hereby or under the Ancillary Agreements, other than the representations and warranties expressly made by DEBTORS in Section 5 of this Agreement.  BIDDER acknowledges and agrees that, while it has made its own inquiry and investigation into DEBTORS, the Franchisor System, the Purchased Assets, Executory Contracts, Properties, Restaurants and operations of the business, it is relying on (and only on) the express representations and warranties of DEBTORS set forth in Section 5 of this Agreement with respect to DEBTORS, the Franchisor System, the Purchased Assets, Executory Contracts, Properties, Restaurants and operations of the business.

## 7.    DEBTORS' AND BIDDER'S OBLIGATIONS CONDITIONAL

7.1    DEBTORS Obligations Conditional.

The obligations of DEBTORS herein are, at the option of DEBTORS, subject to the following conditions:

      (a)    <u>Representations and Warranties</u>.  All representations and warranties of BIDDER contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date.

      (b)    <u>Full Performance</u>.  BIDDER shall have performed and complied with the terms and conditions of this Agreement in all material respects prior to or at the Closing.

      (c)    <u>Omitted</u>.

      (d)    <u>Franchisor Approval</u>.

      (i)    Franchisor Approval shall have been obtained prior to the Closing Date.  Within five (5) business days following the Bid Acceptance Date, DEBTORS shall prepare and submit to Franchisor all materials required for the Franchisor Approval, and thereafter DEBTORS and BIDDER shall cooperate in submitting any additional documentation and satisfying any requests of Franchisor in connection with obtaining Franchisor Approval.  In the event Franchisor Approval is not obtained, frustrating the objectives of this Transaction Agreement, all Deposits shall be returned to BIDDER.

      (ii)    To the extent Franchisor requires repairs to the Restaurants for deferred maintenance, including capital expenditures, as a condition of its approval, such repairs together with all currently required past due remodels, deferred maintenance or current capital expenditures required by Franchisor to complete the transaction contemplated under this Agreement will be done at BIDDER's expense.  From and after July 1, 2020, BIDDER is responsible for funding all future capital expenditures with respect to the Restaurants, including, without limitation, any capital expenditures required under the Ancillary Agreements, any other DEBTORS agreement or any Franchisor System mandated capital expenditures.

    7.2    <u>Omitted</u>.

## 8.    <u>DEBTORS AND BIDDER COVENANTS PRIOR TO CLOSING</u>

    8.1    <u>Purchase and Sale Agreements</u>.  DEBTORS will not enter into any arrangement or agreements with any other person or entity for the purpose of sale or disposition of the Restaurants other than BIDDER during the pendency of this Agreement.

    8.2    <u>Debtors' Business Activity</u>.    During the pendency of this Agreement, DEBTORS agree that DEBTORS:

      (a)    will engage in no transaction out of the ordinary course of business;

      (b)    will enter into no agreement or transaction extending beyond the Closing Date which would have an adverse impact on a Restaurant;

      (c)    will use commercially reasonable efforts to preserve the Purchased Assets;

      (d)    <u>omitted</u>;

      (e)    will not dispose of any of the assets associated with the Restaurant, including that DEBTORS will not remove, replace or exchange any equipment existing in the Restaurant as of the Effective Date, except such as are retired and replaced in the

ordinary course of business with a replacement of equal or greater value;

(f)     will conduct its business in compliance with all applicable Laws;

(g)     will not make any non-cash distribution to shareholders; and will not pay any bonuses or make any salary or wage increases out of the ordinary course of business.

8.3     Omitted.

8.4     Omitted.

## 9.     **Omitted**

## 10.     **ADVERTISING FUNDS**

BIDDER hereby acknowledges and agrees that no advertising funds earned or accrued as the result of the operation of the Restaurants by DEBTORS prior to the date of Takeover shall accrue or inure to BIDDER's benefit.  BIDDER shall have the option of retaining or returning any non-current point-of-purchase restaurant promotional materials ordered prior to Takeover.

## 11.     **PUBLIC UTILITY SERVICES**

BIDDER shall make all necessary arrangements for the institution or continuation of service by public utilities at the Properties, for BIDDER's account only, not later than thirty (30) days following the Closing Date, and DEBTORS shall reasonably cooperate with such effort, including providing such consent, approval or other documentation as reasonably required for such transfer.  Notwithstanding the foregoing, Bidder shall be responsible for all utility payments incurred at all of the Restaurants from and after July 1, 2020, and from and after July 1, 2020 for all of the Debtors' other locations until Bidder completes removal of all Purchased Equipment therefrom, and shall indemnify the Debtors for any costs incurred related thereto.  If possible or reasonably practicable, BIDDER shall also obtain a final reading of any and all public utility service meters located at the Properties as soon as practicable after July 1, 2020.  Any deposits for public utility services made at any time by DEBTORS shall be returned or refunded to DEBTORS upon receipt by BIDDER. If BIDDER assumes any deposit or it is transferred to BIDDER, BIDDER shall immediately refund an amount equal to the deposit to DEBTORS within ten (10) days after any such assumption or transfer.

## 12.     **TRANSFER TAXES/SALES AND USE TAXES**

All sales, use, or transfer taxes and/or other similar fees which may be imposed or assessed by any taxing Authority pursuant to any Law resulting from the operations of the Restaurants or a result of the transactions effected by the Agreement (the "***Transaction Tax***") shall be the financial responsibility of BIDDER, and shall be paid by BIDDER when due.  The funds for the Transaction Tax shall be remitted on the closing statement to the appropriate taxing Authority.

## 13.     **ADJUSTMENTS**

13.1     General.  If necessary and pertinent to the transaction contemplated by this Agreement, BIDDER and DEBTORS agree to adjust and pay their respective pro-rata share of, as of July 1, 2020, any or all sewer charges, water charges, public utility service charges, fuel charges and other pro-ratable charges attributable to the Restaurants.  DEBTORS will be liable to the extent any items to be pro-rated under this Section 13.1 relate to any time period prior to July 1, 2020 and BIDDER will be liable to the

extent any items to be pro-rated under this Section 13.1 relate to any time period from and after July 1, 2020. The parties recognize that it may be impractical to determine on the Closing Date the amounts owing under this Section 13.1 and that the prorations for such items shall be settled between the parties as soon as the applicable information becomes known. DEBTORS shall be solely responsible for such prorated items prior to July 1, 2020 and BIDDER shall be solely responsible for such prorated items on and after July 1, 2020.

      13.2    <u>Property Taxes</u>.  The parties acknowledge and agree that the Existing Lease for each Leased Property shall govern and control BIDDER's obligation with respect to the payment of Property Taxes for the Properties.  The parties further acknowledge and agree that all obligations under each Existing Lease shall be the sole responsibility of Bidder, subject to completion of the Designation Period and the procedures related thereto as set forth in the Sale Order.

## 14.    <u>Omitted</u>

## 15.    <u>CONDITION OF PURCHASED ASSETS</u>

      BIDDER accepts the Purchased Assets, the Properties and the Restaurants, in "as is" and "where is" condition as of the Closing Date.

## 16.    <u>Omitted</u>

## 17.    <u>CLOSING DOCUMENTS</u>

      17.1    <u>BIDDER's Closing Deliveries</u>.  At the Closing, or upon conclusion of the Designation Period and related procedures set forth in the Sale Order, as applicable, BIDDER shall execute, deliver or cause to be delivered to DEBTORS the following:

        (i)    the payments referred to in Section 4 of this Agreement, which, for avoidance of doubt, shall be paid at the Closing;

        (ii)    Franchise Assignment for each Restaurant with consents to such assignments from Franchisor or new Franchise Agreements for each Restaurant, as agreed between Bidder and Franchisor;

        (iii)    Lease Assignments for each Restaurant related to a Leased Property;

        (iv)    Assignment and Assumption of Executory Contracts, evidencing that all Executory Contracts (other than Existing Leases and Franchise Agreements) to be assumed by BIDDER have been assumed by BIDDER.

      17.2    <u>Debtors' Closing Deliveries</u>.  At Closing, subject to the terms of the Consent Agreement between IHOP and BIDDER, or upon conclusion of the Designation Period and the procedures related thereto set forth in the Sale Order, as applicable, DEBTORS shall execute, deliver or caused to be delivered to BIDDER the following:

        (i)    Order entered by the Bankruptcy Court, in form and content satisfactory to BIDDER authorizing the consummation of this Transaction Agreement (the "Sale Order");

        (ii)    Bill of Sale attached hereto as <u>Exhibit E</u> to this Agreement;

(iii)    Franchise Assignment for each Restaurant with consents to such assignments from Franchisor;

(iv)    Lease Assignments for each Restaurant related to a Leased Property;

(v)    estoppel certificates satisfactory to BIDDER from each other party to the Existing Leases;

(vi)    copies of all written Executory Contracts which relate to any liability or obligation of DEBTORS which is to be assumed by BIDDER and in accordance with Section 2.6 of this Agreement;

(vii)    copies of all existing operating manuals and maintenance records pertaining to the operation of the Purchased Assets in Debtors' possession or control and not previously delivered to BIDDER, it being acknowledged that DEBTORS shall be entitled to keep copies of such manuals and records; and

(viii)    copies of certificates of occupancy for the Restaurants to the extent in Debtors' possession and not previously delivered to BIDDER.

Bidder is responsible for securing satisfactory approvals and franchise transfers/assignments and/or new Franchise Agreements from Franchisor. BIDDER shall be solely responsible for the payment of all Franchisor imposed fees in connection with such transfers/assignments to BIDDER, including payment of $2,450,000 as set forth in the Sale Order. Notwithstanding anything set forth herein to the contrary, Closing is conditioned upon the consent of Franchisor and entry of any agreements between Franchisor and Bidder related thereto.

**18.    <u>LEASES</u>**

18.1    <u>Closing Deliveries</u>.

(a)    DEBTORS shall convey all of its right, title and interest in and to the Existing Leases, subject to conclusion of the Designation Period and the related procedures set forth in the Sale Order;

(b)    Subject to Section 18.6 of this Agreement, delivery of any insurance proceeds and deductible relating to any casualty to the Properties and an assignment of all right, title and interest of BIDDER in any insurance proceeds due to any DEBTORS as a result of such damage or destruction;

(c)    Subject to Section 18.6 of this Agreement, DEBTORS shall deliver an assignment of all of the right, title, and interest of DEBTORS in and to any awards applicable to Properties that have been or that may thereafter be made for a condemnation, eminent domain, taking or similar proceeding;

(d)    DEBTORS shall deliver to BIDDER such other documents and instruments as BIDDER or their lenders may reasonably request to effect the transactions contemplated hereby; and

(a)    DEBTORS shall deliver actual physical possession of the Properties.

18.2    <u>Omitted</u>.

18.3.    <u>Omitted</u>

18.4.   <u>Omitted</u>

18.5.   <u>Omitted</u>

18.6   <u>Risk of Loss</u>.

(a)      The Properties shall be conveyed to BIDDER in the same condition as on July 1, 2020, ordinary wear and tear excepted (other than as hereinafter provided with respect to events of casualty or eminent domain), free of all tenancies or occupancies.

(b)      Upon receipt of an offer or any notice or communication from any governmental or quasi-governmental body seeking to take under its power of eminent domain all or any portion of the Properties, DEBTORS shall promptly notify BIDDER of the receipt of same and shall send such communication, or a copy of it, to BIDDER.  Upon receipt of such notice, BIDDER shall have the right to terminate this Agreement as to the affected Property by delivery of notice to DEBTORS within ten (10) days of BIDDER's receipt of the communication from DEBTORS.  In the event BIDDER elects to so terminate with respect to a Property or Properties, then the Purchase Price shall be adjusted accordingly. In the event BIDDER elects not to terminate, then BIDDER shall receive all condemnation awards and settlements and close "as is".

(c)      In the event that the Properties are damaged or destroyed by casualty prior to July 1, 2020, DEBTORS may repair and restore the Properties to the same condition as before the casualty, and the Closing shall be deferred for up to one hundred twenty (120) days to permit such repair and restoration.  If Debtors are unable or elects not to repair and restore within such one hundred twenty (120) day period, then BIDDER shall have the option of (i) terminating this Agreement as to the affected Property with adjustment to the Purchase Price as provide above, or (ii) close "as is". If the repair is covered by Debtors' insurance and Debtors are unable or elects not to repair and restore within such one hundred twenty (120) day period, then BIDDER shall have the option of (i) terminating this Agreement as to the affected Property with adjustment to the Purchase Price as provide above, or (ii) close "as is", and receive all insurance proceeds (excluding any proceeds for lost profits for profits lost prior to the Takeover Date) and the Purchase Price shall be reduced by the amount of any deductibles arising with respect to the applicable insurance policies.

18.7   <u>Time of the Essence</u>.  Time is of the essence as to all terms of this Section 18.

## 19.   **GENERAL**

19.1   <u>Notices</u>.  All notices or other communications required or permitted under this Agreement must be given in writing, as follows: (i) by actual delivery of the notice into the hands of the party entitled to receive it, in which case such notice will be deemed given on the date of delivery or the date delivery is rejected by the recipient; or (ii) by Federal Express, UPS, DHL, or any similar overnight carrier, in which case such notice will be deemed given on the date of delivery or the date delivery is rejected by the recipient.  All notices concerning this Agreement must be addressed as follows:

**BIDDER:**                Sun Cakes, LLC
                           4515 Lyndon B. Johnson Fwy.
                           Dallas, TX 75244
                           Attn: Legal Department

with a copy to:            <u>legal@sunholdings.net</u>

| | |
|---|---|
| **DEBTORS:** | CFRA Holdings, LLC et al. |
| | c/o Focus Management Group USA, Inc. |
| | 6585 N. Avondale Avenue |
| | Chicago, IL 60631 |
| | Attn:   J. Tim Pruban, CRO |
| | Alan Weiner |
| | T.Pruban@focusmg.com |
| | A.Weiner@focusmg.com |
| | |
| With a copy to: | Saul Ewing Arnstein & Lehr LLP |
| | 1037 Raymond Boulevard, Suite 1520 |
| | Newark, NJ 07102 |
| | Attn:   Stephen B. Ravin |
| | Aaron S. Applebaum |
| | Stephen.Ravin@saul.com |
| | Aaron.Applebaum@saul.com |

Either party hereto may change the address or addresses to which such communications should be directed by giving written notice to the other party of such change in accordance with this Section 19.1.

19.2    Omitted.

19.3    Caption Headings and Construction of Agreement.  The caption headings are used in this Agreement only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement nor the intent of any provision.  Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not construe this Agreement against one party more strictly by reason of any rule of interpretation which relates to preparation of a document, it being agreed that the agents of all parties have participated in the preparation of this Agreement and that legal counsel was consulted by each party prior to its execution hereof.

19.4    Entire Agreement; Modification.  All Exhibits and Schedules attached hereto or to be attached hereafter shall be deemed part of this Agreement and incorporated herein, as if fully set forth herein.  This Agreement sets forth the entire agreement and understanding of the parties in respect to the transactions contemplated by it and supersedes any and all prior agreements and understandings relating to the subject matter of this Agreement and the Ancillary Agreements.  No representations, promises, inducement or statement of intention have been made by DEBTORS to BIDDER which are not embodied in this Agreement or the Ancillary Agreements.  This Agreement may be amended, modified, superseded or cancelled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties or, in the case of a waiver, by the party waiving compliance.

19.5    Non-Waiver; Survival.  No waiver or waivers by any party of any provision of this Agreement, whether by conduct or otherwise, shall be deemed to be a further or continuing waiver of that or any other provision of this Agreement.    The terms and conditions of this Agreement and all representations, covenants and warranties made by DEBTORS and BIDDER shall survive the Closing Date pursuant to the terms and conditions set forth herein; provided, however, the representations and

warranties shall expire on the first anniversary of the date of this Agreement.

19.6    <u>Assignment and Transfer</u>.    All the terms, covenants, representations, warranties and conditions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the successors and permitted assigns of DEBTORS and BIDDER.    BIDDER may not assign this Agreement, in whole or part, to any Person other than to an entity controlling, controlled by or under common control with BIDDER, without Debtors' written consent, which consent shall not be unreasonably withheld.    Any assignment by BIDDER shall not relieve BIDDER of its liabilities hereunder.

19.7    <u>Severability</u>.    In the event that any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect of any reason, the validity, legality and enforceability of any provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

19.8    <u>Omitted</u>.

19.9    <u>Cooperation</u>.    BIDDER agrees to cooperate with DEBTORS in defending or settling any Claim arising out of Debtors' ownership or operation of the Purchased Assets or other property that is the subject of this Agreement.

19.10    <u>Counterparts</u>.    The parties may sign this Agreement in multiple counterparts.    Each signed counterpart is considered an original document, but all signed counterparts – when taken together – constitute one original document.    A party may effectively deliver that party's signed counterpart of this Agreement by facsimile or by e-mail of a PDF copy.    This Agreement takes effect when each party has delivered at least one of its signed counterparts to the other party.

19.11    <u>Governing Law</u>. This Agreement shall become valid when executed by both parties.    The parties agree that it shall be governed and construed under and in accordance with the laws of the State of Florida and exclusive jurisdiction and venue  shall be in the Bankruptcy Court.    The parties each consent to the jurisdiction of the Bankruptcy Court to hear and resolve any and all matters arising under this Agreement and/or the Sale Order.    To the extent of any consistencies between this Agreement and the Sale Order, the terms of the Sale Order shall govern.

19.12    <u>Omitted</u>.

19.13    <u>Time is of the Essence</u>.    Time is of the essence of each provision hereof.

19.14    <u>Omitted.</u>

19.15    <u>Calculation of Time Periods.</u>    The phrase "***Business Day***" or "***business day***" as used herein shall mean Mondays through Fridays, Legal Holidays excepted.    The phrase "***Legal Holidays***" shall mean and refer to any day which would otherwise constitute a Business Day but which is observed as a holiday by employees of the United States Government, the government of the State of Georgia, or the government for the state in which the Properties are located.    In the event the final date on which or by which a party is required to take action or perform hereunder falls on a Saturday, Sunday or Legal Holiday, then such date shall be extended through the end of the next Business Day following said date.

**20.    OMITTED**

*[SIGNATURE PAGE TO FOLLOW]*

This Agreement is hereby executed by the parties effective on the date indicated on the first page of this Agreement.

**DEBTORS:**                                    CFRA Holdings, LLC, CFRA, LLC and CFRA Tri-Cities, LLC**.,**
Delaware Limited Liability Companies


By:_____
Name: <u>J. Tim Pruban</u>
Title: <u>Chief Restructuring Officer</u>


**BIDDER:**                                     Sun Cakes, LLC


By:_____
Name:<u>Guillermo Perales</u>
Title:<u>Authorized Agent</u>

20

This Agreement is hereby executed by the parties effective on the date indicated on the first page of this Agreement.

**DEBTORS:**

CFRA Holdings, LLC, CFRA, LLC and CFRA Tri-Cities, LLC.,
Delaware Limited Liability Companies

By:_____
Name: J. Tim Pruban
Title: Chief Restructuring Officer

**BIDDER:**

Sun Cakes, LLC

By:_____
Name: Guillermo Perales
Title: Authorized Agent

37157267.4 07/10/2020

EXHIBITS

Exhibit A --    Property Addresses
Exhibit B --    Executory Contracts and Franchise Agreements
Exhibit C --    Assignment and Assumption of Executory Contracts
Exhibit D --    Omitted
Exhibit E --    Form of Bill of Sale
Exhibit F --    Form of Assignment and Assumption of Lease
Exhibit G --    Allocation

37157267.4 07/10/2020

## EXHIBIT A--PROPERTY ADDRESSES

| # | Store | Address | City | ST |
|---|---|---|---|---|
| 1 | 419 | 1031 Assembly St | Columbia | SC |
| 2 | 470 | 4098 Nolensville Pike | Nashville | TN |
| 3 | 476 | 2219 Gallatin Pike N | Madison | TN |
| 4 | 477 | 9940 Pineville Matthews | Pineville | NC |
| 5 | 491 | 1101Lanada Rd. | Greensboro | NC |
| 6 | 492 | 9253 E Independence | Matthews | NC |
| 7 | 494 | 1661E Broad St | Statesville | NC |
| 8 | 498 | 900 Longpine Rd | Burlington | NC |
| 9 | 574 | 65 Peppers Ferry Rd I | Christiansburg | VA |
| 10 | 587 | 109 University Blvd | Harrisonburg | VA |
| 11 | 589 | 3179 Linden Dr | Bristol | VA |
| 12 | 595 | 1740 Rio Hill Center | Charlottesville | VA |
| 13 | 597 | 107 Front Royal Pike | Winchester | VA |
| 14 | 2027 | 747 E Rochambeau D | Williamsburg | VA |
| 15 | 3139 | 16815 Caldwell Creek | Huntersville | NC |
| 16 | 3218 | 779 Team Blvd | Smyrna | TN |
| 17 | 3326 | 6800 Charlotte Pike | Nashville | TN |
| 18 | 3327 | 336 S. Sharon Amity I | Charlotte | NC |
| 19 | 3383 | 1203 Mufreesboro Re | Franklin | TN |
| 20 | 3423 | 16015-A Lancaster | Charlotte | NC |
| 21 | 3453 | 5335 Ballantyne Rd C | Charlotte | NC |
| 22 | 3502 | 1602 Haynes St | Clarksville | TN |
| 23 | 4403 | 1295 Silas Creek Park | Winston-Salem | NC |
| 24 | 4405 | 504 Cox Rd | Gastonia | NC |
| 25 | 4407 | 110 E Parris Ave | High Point | NC |
| 26 | 4408 | 3009 Capital Blvd | Raleigh | NC |
| 27 | 4414 | 2415 US HWY 70 SE | Hickory | NC |
| 28 | 4416 | 3191 N. Main St | Anderson | SC |
| 29 | 4417 | 800 Cloverleaf Plaza | Kannapolis | NC |
| 30 | 4423 | 105 Faith Rd | Salisbury | NC |
| 31 | 4424 | 817 Frist Colonial Rd | Virginia Beach | VA |
| 32 | 4431 | 134 W Woodlawn Rd | Charlotte | NC |
| 33 | 4435 | 1201 East Stone Dr | Kingsport | TN |
| 34 | 4440 | 3214 Peoples St | Johnson City | TN |
| 35 | 4442 | 5016 Old Hickory Bvlc | Hermitage | TN |
| 36 | 4448 | 8135 Warren H. Aber | Spartanburg | SC |
| 37 | 4451 | 5420 Target Dr | Antioch | TN |
| 38 | 4458 | 1106 East Dixie Dr | Asheboro | NC |
| 39 | 4505 | 1821North Pointe Dr | Durham | NC |
| 40 | 4506 | 8146 S. Tryon St | Charlotte | NC |
| 41 | 585 | 1540 General Booth | Virginia Beach | VA |

**EXHIBIT B**
**EXECUTORY CONTRACTS AND FRANCHISE AGREEMENTS**

**I.**     **Franchise Agreements**

**II.**    **Leases of Purchased Stores**

**III.**   **Executory Contracts – By Store Number**

**EXHIBIT C**
**FORM OF ASSIGNMENT AND ASSUMPTION OF EXECUTORY CONTRACTS**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT OF EXECUTORY CONTRACTS ("Assignment"), dated effective _____, 2020 (the "Effective Date"), is made by and between _____, a _____ ("Assignor") and _____, a _____ ("Assignee").

Assignor, for the consideration and upon the terms and conditions set forth in that certain Asset Purchase Agreement executed by and between Assignor and Assignee, dated _____ ___, 2020, (the "Agreement"), does by these presents hereby grant, convey, bargain, sell, assign, set over, transfer and deliver unto Assignee and its successors and assigns all of Assignor's right, title and interest in and to the Executory Contracts (other than the Franchise Agreements, which are being assigned under separate agreements between Assignor and Assignee). All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

TO HAVE AND TO HOLD all and singular the Executory Contracts hereby conveyed, transferred and assigned unto Assignee and its successors and assigns forever.

Assignee hereby purchases, acquires and accepts from Assignor the Executory Contracts.

In consideration of the assignment of the Executory Contracts contained herein and upon the terms and conditions set forth in the Agreement, Assignee, for the benefit of Assignor and the obligees thereunder, hereby expressly assumes and agrees to perform, pay and discharge all of the liabilities and obligations under the Executory Contracts arising on and after July 1, 2020. Assignor shall remain liable for all liabilities and obligations under the Executory Contracts arising prior to the Effective Date.

This Assignment is intended to evidence the consummation of the transactions contemplated by the Agreement and is subject to the terms and conditions set forth in the Agreement. Except the foregoing or as expressly stated in the Agreement, this Assignment is made without representation or warranty. Nothing contained in this Assignment shall be construed to supersede, limit or qualify any provision of the Agreement. To the extent there is a conflict between the terms and provisions of this Assignment and the terms and provisions of the Agreement, the terms and provisions of the Agreement shall govern.

Assignee hereby agrees to indemnify and hold Assignor harmless from any damage, cost or expense accruing, occurring or arising under the Executory Contracts from and after July 1, 2020.

Each of Assignor and Assignee agrees to use its commercially reasonable efforts to take or cause to be taken such further action, to execute, deliver and file or cause to be executed, delivered and filed such further documents and instruments, and to obtain such consents, as may be necessary or as may be reasonably requested in order to effectuate fully the purposes, terms and conditions of the Agreement.

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto, their respective successors in interest, and their respective permitted assigns.

The construction and performance of this Assignment shall be governed by the laws of the State of Florida.

This Assignment may be executed in any number of counterparts, each of which for all purposes shall be deemed to be an original and all of such counterparts shall together constitute but one and the same instrument. Delivery of executed counterpart signature pages of this Assignment by facsimile or

other electronic transmission shall be effective as delivery of original counterpart signature pages to this Assignment.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the date first above written.

ASSIGNOR:

**CFRA, LLC and CFRA Tri-Cities, LLC**

By:_____
Name: J. Tim Pruban
Title: Chief Restructuring Officer

ASSIGNEE:

_____

By:_____
Name:_____
Title:_____

37157267.4 07/10/2020

**EXHIBIT E**
**FORM OF BILL OF SALE**

This **BILL OF SALE**, dated effective_____, 2020, is made by and between **CFRA, LLC and CFRA Tri-Cities, LLC**, Delaware limited liability companies ("Grantors") in favor of _____, a _____ ("Grantee").

Grantors, for the consideration and upon the terms and conditions set forth in that certain Asset Purchase Agreement executed by and between Grantors and Grantee, dated _____ ___, 2020, as amended (the "Agreement"), does by these presents hereby grant, convey, bargain, sell, assign, set over, transfer and deliver unto Grantee and its successors and assigns all of Grantors' right, title and interest in and to Purchased Assets (all capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement) for the following Restaurants: (i) _____, (ii) _____, (iii) _____, and (iv) _____ (collectively, the " Assets").

TO HAVE AND TO HOLD all and singular the Assets hereby conveyed, transferred and assigned unto Grantee and its successors and assigns forever. Grantee hereby purchases, acquires and accepts from Grantors the Assets.

Grantors agree to use commercially reasonable efforts to take or cause to be taken such further action, to execute, deliver and file or cause to be executed, delivered and filed such further documents and instruments, and to obtain such consents, as may be necessary or as may be reasonably requested in order to effectuate fully the purposes, terms and conditions of this Bill of Sale.

This Bill of Sale shall be binding upon, and inure to the benefit of, the parties hereto, their respective successors in interest, and their respective permitted assigns.

This Bill of Sale may be executed in any number of counterparts, each of which for all purposes shall be deemed to be an original and all of such counterparts shall together constitute but one and the same instrument. Delivery of executed counterpart signature pages of this Bill of Sale by facsimile or other electronic transmission shall be effective as delivery of original counterpart signature pages to this Bill of Sale.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the date first above written.

GRANTORS:

**CFRA, LLC and CFRA Tri-Cities, LLC**

By:_____
Name: J. Tim Pruban
Title: Chief Restructuring Officer

**EXHIBIT F**
**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE**

(to be attached prior to execution)

1

**EXHIBIT D**

**APPROVED DISBURSEMENTS**

**Approved Disbursements:**

1. $202,500 to Gordon Brothers (commission);

2. $1,394,000 to IHOP (cure payments for IHOP Contracts);

3. $844,000 to Lenders (repayment of Debtor-in-Possession Financing);

4. $22,500 to Etheridge (Mechanic's Lien on Store No. 585);

5. $21,000 to Etheridge (Mechanic's Lien on Store No. 2027);

6. $40,475 to Smartvision (Mechanic's Lien on Store No. 585);

7. $36,012.50 to Smartvision (Mechanic's Lien on Store No. 2027);

8. $92,350 to Smartvision (Mechanic's Lien on Store No. 4440);

9. $756,000 to IHOP (Paragraph 4(e) of Addendum A to Bidding Procedures Order);

10. $125,000 to Debtors' estates  (GUC Carve-Out); and

11. Balance of Sale Proceeds to Lenders (prepetition secured claims).

# **EXHIBIT E**

## **TERMINATED AGREEMENTS**

| Store #3487 | 3001 Hillsborough Street, Raleigh, NC 27607 |
|---|---|
| Store #530 | 1412 Richmond Road, Williamsburg, WV 23185 |
| Store #3105 | 700 E. Dixon Blvd., Shelby, NC 28152 |
| Store #3367 | 478 River Highway, Mooresville, NC 28117 |
| Store #3427 | 2214 Elliston Place, Nashville, TN 37203 |
| Store #3450 | 825 Nashville Highway, Suite D, Gallatin, TN 37060 |
| Store #3472 | 702 Blowing Rock Road, Boone, NC 28607 |
| Store #3488 | 5815 Highland Shoppes Dr., Charlotte, NC 28269 |

## **EXHIBIT F**

## **TERMINATED AGREEMENTS**

| Store #470 | 4098 Nolensville Pike, Nashville, TN 37211 |
|---|---|
| Store #476 | 2219 Gallatin Pike N., Madison, TN 37115 |
| Store #477 | 9940 Pineville-Matthews Road, Pineville, NC 28134 |
| Store #491 | 1101 Linda Drive, Greensboro, NC 27407 |
| Store #492 | 9253 E. Independence Blvd., Matthews, NC 28105 |
| Store #498 | 900 Longpine Road, Burlington, NC 27215 |
| Store #574 | 65 Peppers Ferry Road NW, Christiansburg, VA 24073 |
| Store #585 | 1540 General Booth Blvd., Virginia Beach, VA 23454 |
| Store #587 | 109 University Blvd., Harrisonburg, VA 22801 |
| Store #595 | 1740 Rio Hill Center, Charlottesville, VA 22901 |
| Store #4403 | 1295 Silas Creek Parkway, Winston-Salem, NC 27127 |
| Store #4405 | 504 Cox Road, Gastonia, NC 28054 |
| Store #4407 | 110 E. Parris Avenue, High Point, NC 27262 |
| Store #4408 | 3009 Capital Blvd., Raleigh, NC 27604 |
| Store #4414 | 2415 US 70 SE, Hickory, NC 28602 |
| Store #4416 | 3191 N. Main Street, Anderson, SC 29621 |
| Store #4417 | 800 Cloverleaf Plaza, Kannapolis, NC 28083 |
| Store #4423 | 105 Faith Road, Salisbury, NC 28146 |
| Store #4424 | 817 First Colonial Road, Virginia Beach, VA 23451 |
| Store #4431 | 134 W. Woodlawn Road, Charlotte, NC 28217 |
| Store #4442 | 5016 Old Hickory Blvd., Hermitage, TN 37076 |
| Store #4448 | 8135 Warren H. Abernathy Hwy., Spartansburg, SC 29301 |
| Store #4451 | 5420 Target Drive, Antioch, TN 37013 |
| Store #4458 | 1106 East Dixie Drive, Asheboro, NC 27203 |
| Store #4505 | 1821 N. Pointe Drive, Durham, NC 27705 |
| Store #4506 | 8146 S. Tryon Street, Charlotte, NC 28273 |
| Store #419 | 1031 Assembly Street, Columbia, SC 29201 |
| Store #494 | 1661 E. Broad Street, Statesville, NC 28625 |
| Store #597 | 170 Front Royale Pike, Winchester, VA 22602 |
| Store #2027 | 747 East Rouchambeau Drive, Williamsburg, VA 23188 |
| Store #3139 | 16815 Caldwell Creek Drive, Huntersville, NC 28078 |
| Store #3218 | 779 Team Blvd., Smyrna, TN 37167 |
| Store #3326 | 6800 Charlotte Pike, Suite 117, Nashville, TN 37209 |
| Store #3327 | 336 S. Sharon Amity Road, Charlotte, NC 28211 |
| Store #3383 | 1203 Murfreesboro Road, Suite 190, Franklin, TN 37064 |
| Store #3423 | 16015-A Lancaster Highway, Charlotte, NC 28277 |
| Store #3453 | 5335 Ballantyne Commons Pkwy, #200, Charlotte, NC 28277 |
| Store #3502 | 1602 Haynes Street, Clarksville, TN 37043 |